```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE WESTERN DISTRICT OF LOUISIANA

 3                     MONROE DIVISION

 4     - - - - - - - - - - - - - x

 5     THE STATE OF MISSOURI      :

 6     et al.,                    :

 7              Plaintiffs,       :   No.

 8     v.                         :   3:22-cv-01213-TAD-KDM

 9     JOSEPH R. BIDEN, JR.,      :

10     et al.,                    :

11              Defendants.       :

12     - - - - - - - - - - - - - x

13

14        Videotaped Deposition of BRIAN J. SCULLY

15               Thursday, January 12, 2023

16                     9:06 a.m.

17

18

19

20

21     Job No.: 138046

22     Pages 1 through 376

23     Reported by:  Cassandra E. Ellis, RPR

24

25
```

**EXHIBIT 5**

```
 1              Deposition of BRIAN J. SCULLY, held
 2    pursuant to agreement, before Cassandra E. Ellis,
 3    Certified Shorthand Reporter -- Hawaii #475,
 4    Certified Court Reporter - Washington #3484,
 5    Certified Shorthand Reporter - California -
 6    #14448, Registered Professional Reporter #823848,
 7    Certified Realtime Reporter, Realtime Systems
 8    Administrator, and Notary Public of the District
 9    of Columbia.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              A P P E A R A N C E S

 2        ON BEHALF OF PLAINTIFF:

 3              D. JOHN SAUER, ESQUIRE

 4              TODD SCOTT, ESQUIRE

 5              KENT CAPPS, ESQUIRE

 6              JOSH DIVINE, ESQUIRE

 7              MISSOURI ATTORNEY GENERAL'S OFFICE

 8              Supreme Court Building

 9              221 W. High Street

10              P.O. Box 899

11              Jefferson City, Missouri  65101

12              (573) 751-8870

13              John.sauer@ago.mo.gov

14              Todd.scott@ago.mo.gov

15

16        ON BEHALF OF DEFENDANT:

17              JOSHUA E. GARDNER, ESQUIRE

18              INDRANEEL SUR, ESQUIRE

19              DEPARTMENT OF JUSTICE

20              1100 L Street, Northwest

21              Washington, D.C.  20530

22              (202) 514-3259

23              Joshua.e.gardner@usdoj.gov

24              Indraneel.sur@usdoj.gov

25
```

```
 1     A P P E A R A N C E S   C O N T I N U E D
 2       ON BEHALF OF DEFENDANTS:
 3              JESSICA SCHAU NELSON, ESQUIRE
 4              Senior Counsel, Special
 5              Litigation and Matters
 6              Cybersecurity and Infrastructure
 7              Security Agency
 8              (202) 870-3578
 9              Jessica.SchauNelson@cisa.dhs.gov
10
11              MATTHEW FLEISCHMAN, ESQUIRE
12              OFFICE OF THE GENERAL COUNSEL
13              U.S. DEPARTMENT OF HOMELAND SECURITY
14              (202) 746-8414
15              matthew.fleischman@hq.dhs.gov
16
17
18
19   ALSO PRESENT:
20   Joseph E. Ellis, Certified Legal Video Specialist
21
22
23
24
25
```

```
 1                    C O N T E N T S
 2   EXAMINATION OF BRIAN J. SCULLY              PAGE
 3        By Mr. Sauer                           11
 4
 5
 6                    E X H I B I T S
 7              (Attached to the Transcript)
 8   BRIAN J. SCULLY   Deposition Exhibit        PAGE
 9   Exhibit 1   EIP The Long Fuse:              69
10         Misinformation and the 2020 Election
11   Exhibit 2   The Virality Project Memes      138
12         Magnets and Microchips Narrative
13         Dynamics around COVID-19 VACCINES
14   Exhibit 6   Audio Transcription Event:      368
15         Atlantic council: Lightning talk:
16         Election Integrity Partnership
17         JUNE 24, 2021
18   Exhibit 7   Audio Transcription Event: CISA  369
19         Cyber Security Summit 2021: Responding
20         to Mis, Dis, and mal-information
21         OCTOBER 27, 2021
22
23
24
25
```

```
 1         E X H I B I T S    C O N T I N U E D

 2              (Attached to the Transcript)

 3   BRIAN J. SCULLY   Deposition Exhibit        PAGE

 4   Exhibit 9   Assortment of Documents Bates     156

 5        Stamped MOLA_DEFSPROD_00008353-355,

 6        9676-680,8356-358, 10679-682,

 7        10603-605, 13661-663,13511-517,

 8        7633-634, 8349-352, 13729-734,

 9        9603-605, 7583-587, 7574-576,

10        10538-541, 7564-566, 8768-769,

11        10512-516, 10523-526, 8496-498,

12        8756-758, 8778-780, 10492-494

13   Exhibit 10  Assortment of Documents          212

14        Bates Stamped MOLA_DEFSPROD_00008722-725,

15        10449-453, 13603-609, 8739-741, 8696-700,

16        10420-422, 8521-522, 8693-694, 8710-711,

17        8695, 8663-667, 8660-662, 8689, 8679,

18        8668-669, 8649-650, 8634, 8636-639,

19        8631-632, 8628-630, 8640-643

20   Exhibit 11  12/01/2020 E-mail(s) Bates        227

21        Stamped MOLA_DEFSPROD_00008600-604

22   Exhibit 12  Defendants' Amended Combined      190

23        Objections and Responses to Plaintiffs'

24        First Set of Expedited Preliminary-

25        Injunction Related Interrogatories
```

**BRIAN J. SCULLY  1/12/2023**

```
 1          E X H I B I T S    C O N T I N U E D

 2              (Attached to the Transcript)

 3   BRIAN J. SCULLY   Deposition Exhibit        PAGE

 4   Exhibit 13  Declaration of Yoel Roth dated   243

 5        12/17/2020

 6   Exhibit 14  Excerpts of 11/29/2022 Elvis     249

 7        Chan Deposition

 8   Exhibit 15  04/14/2022 E-mail string Bates    252

 9        Stamped MOLA_DEFSPROD_00014552-553

10   Exhibit 16  09/16/2020 E-mail Bates Stamped   252

11        MOLA_DEFSPROD_00013671

12   Exhibit 17  Assortment of Documents Bates     252

13        Stamped MOLA_DEFSPROD_00014551, 14545,

14        14552-553, 15741-743, 14526-529,

15        14545-547, 7598-600, 7654-659, 12076-079,

16        13599, 13696-701

17   Exhibit 18  Assortment of Documents Bates     277

18        Stamped MOLA_DEFSPROD_00007669-670,

19        10298-300, 8188-189, 10718, 9703,

20        7484-487, 7552-554, 10564-565, 8519,

21        10392-394, 10389-391, 8625-627,

22        8623-627, 10410-412, 8595, 8586-587,

23        8554-557, 12223-224,12053-059

24

25
```

```
 1        E X H I B I T S    C O N T I N U E D
 2              (Attached to the Transcript)
 3   BRIAN J. SCULLY   Deposition Exhibit         PAGE
 4   Exhibit 19  Elections Misinformation         363
 5       Reporting Portal Bates Stamped
 6       MOLA_DEFSPROD_00012672
 7   Exhibit 21  CNN Politics Web Article CNN      364
 8       Exclusive DHS rejects plan to protect
 9       Election officials from harassment as
10       Midterms loom
11   Exhibit 23  The Hill Web article Cyber        335
12       Agency beefing up disinformation,
13       Misinformation team
14   Exhibit 24  10/18/2022 CISA Mis, Dis,         365
15       Mal-information Team Announcement
16   Exhibit 27  Cyberscoop Article CISA           301
17       Expands efforts to fight election
18       Disinformation ahead of `challenging'
19       2024 vote, dated 08/12/2022
20   Exhibit 28  01/28/2022 E-mail Bates           306
21       Stamped MOLA_DEFSPROD_00011450-451
22   Exhibit 29  Text Messages Bates Stamped       309
23       MOLA_DEFSPROD_00015749-751
24
25
```

```
 1        E X H I B I T S    C O N T I N U E D

 2              (Attached to the Transcript)

 3  BRIAN J. SCULLY   Deposition Exhibit          PAGE

 4  Exhibit 30  The Intercept_ Truth Cops         319

 5        Article Leaked Documents Outline

 6        DHS's Plan to Police Disinformation,

 7        Dated 10/31/2022

 8  Exhibit 31  OIG Report DHS Needs a            328

 9        Unified Strategy to Counter

10        Disinformation Campaigns, dated

11        08/10/2022

12  Exhibit 46  CISA Draft Report to the CISA     352

13        Director, dated 06/22/2022 Bates

14        Stamped MOLA_DEFSPROD_00015459-463

15  Exhibit 49  The Breakdown Article Brian       345

16        Scully on government response to

17        Disinformation, dated 06/18/2020

18  Exhibit 52  02/17/2022 E-mail string Bates    349

19        Stamped MOLA_DEFSPROD_00015736-737

20  Exhibit 59  02/11/2022 E-mail Bates Stamped   359

21        MOLA_DEFSPROD_00011414-415

22  Exhibit 61  NRMC Election Security Initiative 13

23        Organizational Chart - August 2022

24  Exhibit 62  LinkedIn Profile of Jack Cable    194

25        Public Interest Technologist
```

**BRIAN J. SCULLY  1/12/2023**

```
 1               P R O C E E D I N G S
 2               THE VIDEOGRAPHER:  We are on the
 3    record.  Today's date is January 12th, 2023, and
 4    the time is now 9:06 a.m.  This is the video
 5    recorded deposition of Brian Scully in the
 6    matter of the State of Missouri, et al.,
 7    plaintiff, versus Joseph R. Biden, Junior, et
 8    al., defendants, Case Number
 9    3:22-CV-01213-TAD-KDM in the United States
10    District Court for the Western District of
11    Louisiana, Monroe Division.
12               This deposition is being held via
13    Zoom.
14               The reporter's name is Cassandra
15    Ellis.  My name is Robyn Ellis.  I'm the legal
16    videographer.  We are with Lexitas Legal.
17               Would the attorneys present please
18    introduce themselves and parties they represent.
19               MR. SAUER:  John Sauer, from the
20    Missouri Attorney General's Office, on behalf of
21    the plaintiffs.  And I'm joined by my colleague,
22    Todd Scott, who's in the room with the witness,
23    also of the Missouri Attorney General's Office.
24               MR. GARDNER:  And this is Josh
25    Gardner, with the United States Department of
```

**BRIAN J. SCULLY 1/12/2023**

```
 1     Justice, on behalf of the defendants, and
 2     witness does reserve the right to read and sign.
 3                 With me today is Jessica Nelson,
 4     with CISA.  Matt Fleischman, with the Department
 5     of Homeland Security and Indraneel Sur, with my
 6     office, the Department of Justice.  We all
 7     represent the defendants.
 8                 THE VIDEOGRAPHER:  Would the court
 9     reporter please swear in the witness.
10                 (Witness sworn)
11                 THE VIDEOGRAPHER:  You may proceed.
12                     BRIAN J. SCULLY
13      having been duly sworn, testified as follows:
14                       EXAMINATION
15   BY MR. SAUER:
16         Q.   Mr. Scully, could you please state
17     your full name for the record?
18         A.   Sure.  Brian Joseph Scully.
19         Q.   How long -- or what is your current
20     job title?
21         A.   Brand P for the MDM branch, at the
22     National Risk Management Center, which is part
23     of the Department of Homeland Security.
24         Q.   How long have you had that
25     particular job?
```

Case 3:22-cv-00513-FAB-KDM Document 1-309 Filed 03/24/23 Page 12 of 456 PageID# 424
13125

```
 1              A.    Almost -- almost four years, I
 2      started in January 2019.
 3              Q.    What did you do before that?
 4              A.    I was a deputy for the countering
 5      and foreign influence task force, starting in
 6      April-ish, April/May 2018.
 7              Q.    And what was your -- what was your
 8      job before that one?
 9              A.    I was a director for policy and
10      strategy in the Office of Infrastructure
11      Protection.
12              Q.    Have you ever given a deposition
13      before?
14              A.    I have not.
15              Q.    So this is your first one?
16              A.    This is my first deposition.
17              Q.    Can I just go over some common
18      ground rules with you?
19                    First of all, obviously what you
20      and I say is being transcribed by the court
21      reporter, so can we make an effort not to talk
22      too fast?
23              A.    Yep.
24              Q.    And could you give -- I saw you nod
25      your head there, and then you said yes.  Could
```

Case 3:22-cv-00513-FWD-KDM Document 209 Filed 05/03/23 Page 13 of 456 PageID #: 13126

```
 1     you try and give a verbal answer to my
 2     questions, you know, don't rely on uh-huh or
 3     uhn-uhn or head shaking as we go forward today.
 4             A.    Yes, I can do that.
 5             Q.    Can we make an effort not to
 6     interrupt each other, because that results in a
 7     kind of confused transcript.
 8             A.    Of course.
 9             Q.    Okay.  And then can you make an
10     effort to listen carefully to the question that
11     I'm asking you, and respond to the question that
12     I ask, instead of discussing some other
13     tangential topic as the day goes forward?
14             A.    Of course.
15             Q.    And you understand --
16             A.    Yes.
17             Q.    You understand that at the end of
18     the day, if your attorney wants to ask you some
19     follow-up questions he may have the opportunity
20     to do that.
21                   But when -- as I ask questions, I
22     would ask you to focus on the questions I'm
23     asking you, and respond to those; is that fair?
24             A.    That's fair.
25                   (Exhibit No. 61 was marked for
```

**BRIAN J. SCULLY 1/12/2023**

```
 1     identification.)

 2   BY MR. SAUER:

 3          Q.   Let me start by showing you an

 4   exhibit, and I apologize, this exhibit is out of

 5   numerical order already, so I'm e-mailing it to

 6   your counsel right now.  It's pre-marked Exhibit

 7   61, but it will be the first exhibit we look at

 8   today.

 9               And I'm going to pull it up on the

10   screen share.  Can you see that screen share?

11   I'm going to zoom in a little bit.

12               MR. GARDNER:  Hey, John, it hasn't

13   come through yet, the e-mail, so it's just --

14   unfortunately, that's kind of far away, it's a

15   little challenging to see, but as soon as we get

16   your e-mail we'll pull it up.

17               MR. SAUER:  You said you can't see

18   what's on the screen share if I zoom in?

19               MR. GARDNER:  As you make it larger

20   it's easier, but I don't want to speak for what

21   the witness can and can't see.

22               THE WITNESS:  Yeah, I can see it.

23   BY MR. SAUER:

24          Q.   Okay.  I'm happy to wait until it

25   arrives on the e-mail.  I just want to make
```

**BRIAN J. SCULLY 1/12/2023**

```
1      sure, because I think the day's going to go more

2      smoothly, if I can direct your attention to

3      stuff on the screen share.

4                  So you can see the screen share,

5      sir?

6            A.    Yes, I can.

7            Q.    Okay.  Just looking at the top of

8      this document, do you recognize it as an org

9      chart for August 2022, of a subdivision of CISA?

10           A.    Yes.

11           Q.    And what -- what -- are you

12     familiar with this org chart?

13           A.    Somewhat familiar with it, yes.

14           Q.    I just want to direct your

15     attention over here on the right side of the

16     page, you see here where it lists you as the

17     chief of the mis, dis and mal-information team?

18           A.    Okay.

19           Q.    Is that your job title?

20           A.    Yes.

21           Q.    Yeah, what, exactly -- generally

22     speaking, what do you do as the chief of the

23     mis, dis and mal-information team for CISA, the

24     Cyber Security and Infrastructure Security

25     Agency?
```

**BRIAN J. SCULLY  1/12/2023**

```
 1              A.   So I -- obviously I manage the
 2       team, as a team lead.  So I manage the staff,
 3       set priority, things like that.
 4                   The purpose of the team is to build
 5       national resilience to MDM, targeting critical
 6       infrastructure.
 7              Q.   Generally speaking, what kind of
 8       activities are involved in building resilience
 9       to critical infrastructure -- or sorry --
10              A.   We felt -- sure.
11                   So principally what we do is
12       develop products for public awareness and
13       education or products for key stakeholders to
14       help them understand how MDM works and steps
15       they can take to mitigate the risks.
16              Q.   Do you do anything else, besides
17       developing products?
18              A.   We engage with different
19       stakeholders, civil society groups, obviously
20       other federal partners, private sector
21       organizations, and then we -- we do some
22       analysis of open source reporting, and we do --
23       obviously, you know, in 2020 we did some
24       switchboard work on behalf of election
25       officials.
```

```
 1              Q.    Switchboard work, what does that
 2      mean?
 3              A.    It was essentially an audit
 4      official to identify something on social media
 5      they deemed to be disinformation aimed at their
 6      jurisdiction.  They could forward that to CISA
 7      and CISA would share that with the appropriate
 8      social media companies.
 9              Q.    And what was the purpose of sharing
10      it with social media companies?
11              A.    Mostly for informational awareness
12      purposes, just to make sure that the social
13      media companies were aware of potential
14      disinformation.
15              Q.    Was there an understanding that if
16      the social media platforms were aware of
17      disinformation that they might apply their
18      content moderation policies to it?
19              A.    Yes.  So the idea was that they
20      would make decision on the content that was
21      forwarded to them based on their policies.
22              Q.    Whereas, if it hadn't been brought
23      to their attention then they obviously wouldn't
24      have moderated it as content; correct?
25              A.    Yeah, I suppose that's true, as far
```

1    as I'm aware of it.

2            Q.    Directing your attention to the org

3    chart again, can you -- I would sort of walk

4    through the people here on your team and ask

5    you, kind of who they are and what they do, so

6    starting on the right column, I see Lauren

7    Protentis on as the engagements lead; who is she

8    and what does she do for your team?

9            A.    So she was -- she's a -- she's the

10   engagements lead.  So her job was engaging with

11   key stakeholders, interagency partners, private

12   sector partners, essentially a majority of

13   our outreach and engagement efforts, she managed

14   those.

15           Q.    Outreach and engagement to key

16   stakeholders, does that include social media

17   platforms?

18           A.    It did, yeah.

19           Q.    When you say:  "It did," does she

20   still do this or does she no longer communicate

21   with social media platforms?

22           A.    Well, she's on the -- she's been on

23   maternity leave since September, so she's --

24   she's not currently doing it, when she returns

25   to CISA that would be her role.

```
 1              Q.   Who's doing it while she's gone?
 2              A.   And she -- I'm sorry, could you
 3    repeat that?
 4              Q.   Who's -- who's playing that role in
 5    her absence?
 6              A.   I am.
 7              Q.   Okay.  And so for the past, I
 8    guess, three or four months you've served as
 9    essentially the active engagements lead for the
10    MDM team?
11              A.   Correct.
12              Q.   And that goes back, I think you
13    said, to September of 2022; is that right?
14              A.   Correct.
15              Q.   When do you expect Ms. Protentis to
16    return?
17              A.   Her maternity leave ends in a
18    couple of weeks, I believe the 23rd, potentially
19    being gone on a detail assignment, so probably
20    January 2024.
21              Q.   Oh, so you don't expect her back
22    for another year, because of the detail?
23              A.   Correct.
24              Q.   Is the detail in -- relate to
25    anything having to do with mis, dis or
```

```
 1      mal-information?
 2              A.    I believe that will be part of her
 3      portfolio on the detail, yeah.
 4              Q.    Where is she going, if I may ask?
 5              A.    The National Security Council.
 6              Q.    And in her absence, you're serving
 7      as the kind of person who directly communicates
 8      with social media platforms, among other
 9      stakeholders?
10              A.    Correct.
11              Q.    I should mention, you used the
12      shorthand earlier, MDM, and I assume it will
13      come up again today.  When you use that, you're
14      referring to mis, dis and mal-information;
15      right?
16              A.    Correct.
17              Q.    I think sometimes CISA refers to MD
18      to refer to mis and disinformation; is that
19      right?
20              A.    I'm not sure I've ever seen us use
21      MD, but that would be proactive in the context,
22      yeah.
23              Q.    Turning your attention back to the
24      period from September of 2022 to the present,
25      what sorts of communications have you had with
```

```
 1        social media platforms in Ms. Protentis's stead?
 2             A.   Two -- I would say two general
 3        types of communications, one, we did regular
 4        sync meetings between government and industry,
 5        so federal partners and different social media
 6        platforms.  So it's just a coordinated meeting.
 7                  Facebook was the industry lead, so
 8        I would have coordination calls with them prior
 9        to the meetings, just to set the agenda for the
10        meetings, so that was one.
11                  And then two, if a platform was
12        putting out a public statement -- or not public
13        statement -- public report on policies or
14        activities, we would often get a briefing on
15        that or at least get an awareness that it was
16        going out.
17                  Those are the two main types of
18        communications.
19             Q.   Did you -- were you involved in the
20        last -- in the period since September 2022, and
21        have you been involved in flagging any
22        misinformation or disinformation issues for
23        social media platforms?
24             A.   No, not that we recall.  We didn't
25        do switchboarding in 2022.
```

**BRIAN J. SCULLY 1/12/2023**

```
 1              Q.   So when was that decision made not
 2      to do switchboarding in 2022?
 3              A.   I believe it was back in April that
 4      that decision was made?
 5              Q.   Who made that decision?
 6              A.   April 2022.
 7              Q.   Was that early or late April, do
 8      you know?
 9              A.   I don't.  I don't recall.
10              Q.   Who made that decision?
11              A.   I -- I heard about it through Geoff
12      Hale, who is -- is a senior org chart would be
13      my supervisor.  I believe he received that
14      guidance from the director, Director Easterly.
15              Q.   So in -- some time around -- was
16      this late April?
17              A.   Honestly, I don't recall.  It's
18      even possible it was in May by the time -- my
19      memory's a little foggy on it -- but the
20      earliest it was is probably mid April.
21              Q.   Do you know --
22              A.   And it could have gone any time
23      into early May.
24              Q.   So the earliest would have been
25      late April, but possibly early May is when that
```

**BRIAN J. SCULLY  1/12/2023**

```
 1      decision was made; correct?
 2                  MR. GARDNER:  Objection.
 3   BY MR. SAUER:
 4           Q.   Correct?
 5                  MR. GARDNER:  Sorry.  Objection,
 6      mischaracterizes the witness's previous
 7      testimony.
 8           A.   Yeah, the earliest would have been
 9      mid April --
10           Q.   The earliest would have been mid
11      April?
12           A.   -- probably.
13           Q.   Okay.  And then possibly beginning
14      of May?
15           A.   Yeah.
16           Q.   And you said -- you called this
17      switchboarding.
18           A.   Mm-hmm.
19           Q.   Switchboarding refers to routing
20      particular disinformation concerns to social
21      media platforms so they can evaluate them under
22      the content modulation -- modulation policies;
23      correct?
24           A.   So switchboarding is CISA's role in
25      forwarding reporting received from election
```

```
 1    officials, state/local election officials, to
 2    social media platforms.
 3            Q.    CISA forwarded disinformation
 4    concerns from many other sources, besides state
 5    and local election officials, to social media
 6    platforms?
 7            A.    I don't believe so, not that I
 8    recall.
 9            Q.    Turning back to the two kinds of
10    interactions you had with social media
11    platforms, the last months since September of
12    2022, the first one you mentioned was, I
13    believe, a sync meeting between social media
14    platforms and the US government; correct?
15            A.    Correct.
16            Q.    How often did those occur?
17            A.    They started as monthly, until, I
18    think, October.  And then we did a couple of
19    biweekly, I believe two biweekly meetings --
20            Q.    What was the purpose of the --
21            A.    -- prior to the election.
22            Q.    What was the purpose of these
23    meetings?
24            A.    Generally speaking, from a CISA
25    perspective, we would -- we would provide kind
```

```
1     of -- we would try to educate the platforms on
2     how elections actually function, how they're
3     administered, potential threats to the election
4     administration, things like that.
5               So CISA's -- you know, has some
6     expertise in the election security space.  So
7     our role in the meetings was generally to
8     provide kind of expertise on how elections
9     actually work to the platforms.
10         Q.    And you said that was your role.
11               Were there other federal agencies
12    involved in these meetings?
13         A.    There were, and -- and that role
14    was generally Geoff Hale.  My role in the
15    meetings was generally to just oversee them,
16    facilitate the meetings.
17               Other agencies would provide
18    high-level reviews or strategic intelligence
19    briefs, if they had any -- anything to share
20    that was unclassified.
21         Q.    What sorts of -- first of all, what
22    agencies participated?
23         A.    DOJ, FBI, ODNI, and then DHS.
24         Q.    When you say DHS, was that just
25    CISA, you and Geoff Hale, or were there other
```

```
 1    components of DHS involved?
 2            A.   The Office of Intelligence and
 3    Analysis of DHS also participated.
 4            Q.   And that's called IA; is that
 5    correct?
 6            A.   Correct.
 7            Q.   And what was -- what did they say
 8    at these meetings, I&A?
 9            A.   If they put out unclassified
10    reporting, under their normal mandate, they
11    would just talk about the reporting that they --
12    that they published, that was related to
13    election security.
14            Q.   What kind of reporting did they do,
15    is it about foreign influence or is it about
16    domestic threats, what kind of reporting do they
17    do?
18            A.   I'm not a hundred percent certain
19    of their -- their mission of authority.  I
20    believe and recall what they talked about, they
21    certainly talked about foreign threats.  I'm not
22    sure -- they may have also talked a little bit
23    about domestic terrorism threats, but I think
24    that -- but I'm not 100 percent certain.
25            Q.   Like what sorts of things are they
```

1    saying to social media platforms, are they

2    saying, hey, you're going to see this kind of

3    content popping up on Facebook and Twitter and

4    so forth, and, you know, therefore, we want you

5    to be alert to it, what kind of -- what's the

6    purpose of giving them these briefings?

7              A.   So generally speaking, it's hard

8    for me to speak directly to the I&A reporting

9    because, you know, I don't recall all the

10   details of it, but generally speaking, it was

11   more strategic-level.  So high-level things that

12   they might be seeing, actors that might be

13   interested in undermining confidence in the

14   elections.

15             If they were seeing potential

16   domestic terrorism type threats, those sorts of

17   things, generally speaking, at least as long as

18   I recall, there was never any discussion of

19   specific content.

20             Q.   Did they identify specific domestic

21   actors who they believed might try to undermine

22   confidence in election outcomes through social

23   media?

24             A.   Not that I recall.

25             Q.   Let me ask this:  Who, on the

1    government side of these meetings, who

2    participates on behalf of -- who participated on

3    behalf of CISA?

4            A.   Geoff Hale and myself were the

5    primaries, and then you might have others who

6    were in listen-only mode.  So Kim Wyman, for

7    example, would sometimes be in listen-only mode.

8    Allison Snell would sometimes be essentially the

9    deputy or, slash, chief of staff of the --

10   underneath Geoff, she would sometimes be in

11   listen-only mode.  And then obviously when

12   Lauren was pre-maternity leave she would also be

13   on.

14           Q.   And then for I&A, who was on these

15   meetings?

16           A.   In 2022, I believe Luke Beckman was

17   the lead.  And then they would, depending on,

18   you know, what product they were briefing, they

19   would bring an analyst on, so those would

20   change.

21           Q.   Do you remember any other human

22   beings, besides Luke Beckman, from I&A, who

23   participated in these meetings in the period of

24   time we're talking about, from September 2022 to

25   the present?

```
 1                 A.   I don't know.  Like I -- Luke was
 2      the kind of principal lead, and who I coordinate
 3      with, I don't recall the analysts' names that
 4      they might have on there now.
 5                 Q.   What's his title?
 6                 A.   Honestly, I don't know.  I believe
 7      he's in the cyber mission center, but they are
 8      odd up there, so I'm not entirely sure what his
 9      title was, sorry.
10                 Q.   You mentioned FBI had
11      representatives at these meetings; is that
12      right?
13                 A.   Correct.
14                 Q.   Who from FBI participated in these
15      meetings?
16                 A.   I recall Laura Dehmlow, at least
17      one, and I forget who -- who the other folks
18      were.
19                 Q.   How many FBI people?
20                 A.   Generally, there would be one,
21      maybe two.
22                 Q.   How about Elvis Chan, was he on
23      these meetings?
24                 A.   Oh, good reminder.  Thank you.
25                      Yes, he would be on some of them,
```

```
 1    as well.  I forgot about Elvis.
 2            Q.   Do you remember anyone else,
 3    besides him?
 4            A.   There would be, again, periodically
 5    other people would be on from different parts of
 6    FBI, but again, Laura was usually who we
 7    coordinated through, and I don't really
 8    remember -- I don't really remember the other
 9    names, sorry.
10            Q.   When you say Laura, that's Laura
11    Dehmlow is who you coordinated through?
12            A.   Correct.
13            Q.   When you say:  You coordinated
14    through them, what kind of coordination did CISA
15    do with FBI as it pertained to these meetings?
16            A.   Yeah, so basically coordinating
17    time and the logistics of the meeting, and then
18    two, if they had any particular agenda items
19    they wanted to raise, you know, when we were
20    putting together the agenda, I would just check
21    with them to see if they had any -- any
22    particular agenda items they wanted to raise.
23            Q.   What sort of agenda items did they
24    raise?
25            A.   I don't believe in the time I was
```

```
 1    working, you know, in the timeframe we're
 2    talking about, I don't believe that they raised
 3    any.
 4            Q.   Do you have -- how about before
 5    that, when Ms. Protentis was still handling the
 6    meetings?
 7            A.   Not -- not that I recall.  Yeah, I
 8    don't -- I don't -- I don't recall, in
 9    particular, yeah, sorry.
10            Q.   And I take it these meetings, we've
11    been talking about them in the period from last
12    September until now, but they're actually going
13    on intermittently, at least, for years; right?
14            A.   Yeah, so the first meeting we had
15    with -- between federal and -- and industry was
16    in 2018.
17            Q.   Yeah, we're talking -- we're now
18    kind of four years in, and then in terms of
19    their frequency I take it they -- they --
20    they're less frequent when you're further away
21    from election, and they become monthly as the
22    election gets closer, and then they become
23    weekly or biweekly, you know, within the last
24    month or so before an election; is that right?
25            A.   I would say 2018, 2019 they were
```

```
 1    very infrequent, so we maybe did them quarterly
 2    or less.  And then sometime in 2020 we started
 3    monthly.  And then, like you said, as we got
 4    closer to the election they would pick up.  And
 5    then after the election they would -- we would
 6    spread them back out again.
 7               But 2018 and 2019 was different
 8    than 2020 and beyond.
 9          Q.   And is there a plan to have these
10    meetings continue in 2023?
11          A.   Not currently.
12          Q.   So you don't know -- you don't know
13    whether there's going to be quarterly meetings
14    or anything like that in 2023?
15          A.   Correct.
16          Q.   Who from DOJ was at these meetings?
17          A.   Rodney Patton -- Patton.
18          Q.   Anyone else?
19          A.   No, not that I recall.
20          Q.   How do you spell his last name?
21          A.   I believe it's P-a-t-t-o-n.
22          Q.   Like the general?
23          A.   Yes.
24          Q.   What -- what is his title at DOJ?
25          A.   I don't know what his title is, but
```

```
 1      I believe he's in the national security
 2      division.
 3              Q.    Was national security division of
 4      DOJ participating in these meetings leading up
 5      to the 2020 election?
 6              A.    Yes.
 7              Q.    Who from NSD participated in those
 8      meetings?
 9              A.    I believe it was Rodney, back then,
10      as well.
11              Q.    Do you remember anyone else?
12              A.    Adam Hickey may have jumped on a
13      couple.
14              Q.    Is he also from the national
15      security division of DOJ?
16              A.    I believe so, yeah.
17              Q.    Is that H-i-c-k-e-y?
18              A.    Yes.
19              Q.    What, if anything, did DOJ say in
20      these meetings?
21              A.    Generally speaking, they didn't say
22      anything.  Yeah, I don't recall in 2022 or even
23      back in 2020 that they were -- were particularly
24      active in the meetings.
25              Q.    Do you remember anyone from DOJ
```

```
 1        saying anything at any point?
 2              A.   I mean, I'm -- I'm sure they did,
 3        but I don't recall.
 4              Q.   Do you remember anyone from DOJ
 5        ever, you know, putting an agenda items on the
 6        calendar for these meetings?
 7              A.   I don't, no.
 8              Q.   How about ODNI, the Office of the
 9        Director of National Intelligence, what human
10        being from there participated in these meetings
11        in 2022?
12              A.   Is it okay if I ask my attorneys a
13        quick question?
14              Q.   The question --
15              MR. GARDNER:  Is it about a
16        privilege?
17              THE WITNESS:  Yeah.
18              MR. GARDNER:  Yeah, John, if you
19        want him to answer that question we'll need to
20        recess quickly so he can consult with counsel
21        about these issues of privilege.
22              MR. SAUER:  Let's go off the
23        record.
24              THE VIDEOGRAPHER:  The time is now
25        9:32.  We're off the record.
```

```
 1                    (Recess.)
 2                    THE VIDEOGRAPHER:  The time is now
 3         9:34.  We're back on the record.
 4                    MR. GARDNER:  And counsel, I will
 5         instruct the witness not to answer that question
 6         on the basis of the National Security Act, that
 7         information is extraordinarily protected.
 8                    MR. SAUER:  Before we proceed, I --
 9         I'm announcing, for the record, that Mr. Kent
10         Capps, from the Missouri Attorney General's
11         Office joined the call on behalf of plaintiffs
12         in the last break.
13    BY MR. SAUER:
14              Q.    Was there anyone -- how many
15         individuals from ODNI participated in these
16         meetings in 2022?
17              A.    I believe there were two to three.
18              Q.    Without telling me who they are, do
19         you remember who they are?
20              A.    I remember one's name and one's
21         position, the second one's position.
22              Q.    How about 2020, how many --
23              A.    Again, it was -- it was three or
24         four.
25              Q.    Do you remember who they were?
```

```
 1              A.    I remember the lead person's name.
 2              Q.    Did people from ODNI speak in these
 3    meetings during 2022?
 4              A.    Yes.
 5              Q.    What did they say?
 6              A.    Again, generally speaking, if they
 7    had some strategic intelligence, unclassified,
 8    strategic intelligence reporting, they might
 9    share a quick summary of that.  It was fairly
10    limited in the timeframe from September
11    through -- through the election, though.
12              Q.    Were you in the meetings prior to
13    September of 2022, when Ms. Protentis was still
14    at your team?
15              A.    I joined several of them over the
16    summer, a couple -- couple of them over the
17    summer, prior to her departure.  And that was
18    just the meetings, themselves, not necessarily
19    the coordination meetings prior to the actual
20    sync meetings.
21              Q.    So the coordination meeting, is
22    that a bilateral meeting that happens between
23    CISA and Facebook?
24              A.    Yes, CISA and Facebook, and then we
25    would do CISA with the interagency.  We would
```

```
 1    do -- federal interagency partners would do a
 2    coordination meeting.
 3              Q.    That would be separate from the
 4    meeting with Facebook?
 5              A.    Correct.
 6              Q.    Would there be two preparatory
 7    meetings, one between CISA --
 8              A.    Generally, yes.
 9              Q.    One between --
10              A.    Sorry.
11              Q.    -- CISA and Facebook, and one
12    between CISA and other federal agencies?
13              A.    Yes, that is correct.
14              Q.    Turning back to what ODNI said at
15    these meetings in 2022, what do you remember,
16    more specifically, that they said?  Did they
17    ever raise a specific threat advisory?
18              A.    Not that I recall.  I -- again,
19    generally speaking, it was -- it was -- I don't
20    recall specifics, so I'll just say that upfront.
21              And generally speaking, it was --
22    it was higher level, kind of strategic of what a
23    threat actor may be considering or thinking
24    about.
25              Q.    And do they identify specific
```

```
 1        threat actors?

 2              A.    Potential state actors, yeah, so

 3        other countries.

 4              Q.    How about domestic actors?

 5              A.    No, not that I recall.

 6              Q.    Did anyone on the US government

 7        side, in these meetings, identify domestic

 8        actors in the lead-up to the 2022 election?

 9              A.    They -- they may identify domestic

10        actors, generally, but not -- to my

11        recollection, there's no mention of specific

12        actors, individuals, or groups that I recall.

13              Q.    What social media platforms

14        participated in these meetings?

15              A.    So obviously Facebook, Twitter,

16        Microsoft, Google, Reddit generally

17        participated, I believe sometimes LinkedIn would

18        join.  They're a subsidiary of Microsoft, so

19        generally we worked through Microsoft.  Those

20        are the ones that I recall.

21                    I believe there are others, as

22        well, at different times, that maybe

23        participated in a meeting or two.

24                    But from September 2022 to the

25        election, I think it was principally the five I
```

Case 3:22-cv-01213-TAD-KDM Document 209 Filed 03/04/23 Page 39 of 456 PageID #: 13152

```
 1    mentioned.
 2              Q.    How about Wiki Media Foundation?
 3              A.    I know they participated in some, I
 4    don't know how frequently, and if it -- I don't
 5    recall them participating from September on, but
 6    it's possible.
 7              Q.    Were concerns about misinformation
 8    and disinformation on social media platforms
 9    discussed in these meetings in the 2022
10    timeframe?
11              A.    Yes.
12              Q.    What -- what was -- what was said
13    about those concerns and by whom?
14              A.    Again, it was a more general
15    approach.  So from a CISA MDM team perspective,
16    if we were developing any products we would
17    discuss those.  We didn't -- we released, I
18    believe, two sets of products in that timeframe.
19                    And in others, if there was the
20    intelligence community, if they're reporting
21    included foreign actors who were potentially
22    going to use information operations, they might
23    mention that in their briefings.  But I don't
24    remember specific, you know, what the specifics
25    of every kind of mention were.
```

```
 1              Q.    But you --
 2              A.    And then the platforms -- sorry, to
 3      give you both sides, that was just the
 4      government side -- the platforms, they might
 5      share some high-level trend information from
 6      public reporting that they put out.  So a lot of
 7      the platforms do their own regular reports on
 8      what they're seeing on their platforms and what
 9      they're -- what actions they're taking.  And so
10      the platforms, themselves, would share that type
11      of information.
12              Q.    So they would report to the
13      government on what sorts of mis and
14      disinformation they were seeing on their
15      platforms and what content moderation actions
16      they were taking with respect to it?
17              A.    So they would share essentially
18      what they were getting ready to make public or
19      what they had already made public.  So they
20      would share kind of what they're seeing in their
21      public reports, and then potentially provide
22      some additional context around that.
23                    So as I mentioned, most of the
24      platforms would put out regular public reporting
25      on what they were doing and what actions they
```

**BRIAN J. SCULLY  1/12/2023**

1    were taking.  And so they would share that, and

2    if the government had questions or was looking

3    for additional context they would often talk

4    about that, they would generally talk about any

5    new tactics that they were seeing.

6              Most of what they -- my

7    recollections for the time period we're talking

8    about here, from September 2022 to the election

9    in 2022, I recall most of it was foreign based.

10              But, you know, when we -- often

11   what you see overseas essentially makes its way

12   to the United States.  So they would share kind

13   of trends and tactics that they were seeing, but

14   again, it was all based on public reporting that

15   they put out.

16        **Q.   And you say that this -- all these**

17   **things that they're doing all relate to**

18   **misinformation and disinformation on the**

19   **platforms; correct?**

20              A.   They don't call it misinformation

21   or disinformation, generally, on the platforms.

22   They generally define it as coordinated

23   inauthentic behavior.

24              So they -- so -- so that's how they

25   would describe it.  They wouldn't normally kind

Case 3:22-cv-01213-TAD-KDM Document 269 Filed 03/24/23 Page 42 of 456 PageID #: 13155

```
 1     of say misinformation or disinformation.  And
 2     they would each kind of define coordinated and
 3     inauthentic behavior differently.
 4               I don't -- so I don't know that
 5     they would agree.  I don't want to speak for the
 6     platforms, obviously.  I don't know if they
 7     would agree that they were framing it as
 8     misinformation or disinformation.
 9          Q.   From the CISA MDM teams
10     perspective, is coordinated inauthentic behavior
11     typically a kind of mis and disinformation?
12          A.   It could lead to mis or
13     disinformation, for sure, yeah.  But it's not
14     always mis or disinformation.
15          Q.   So the coordinated and inauthentic
16     behavior may be a source of mis or
17     disinformation of particular concern?
18          A.   It could be, yeah.  It could be an
19     indicator.
20          Q.   Let me ask this:  Turning back to
21     the org chart, that should be on the screen,
22     below Ms. Protentis, is Chad Josiah, who's
23     described as the resilience lead.  What is his
24     role on your team?
25          A.   So he manages the production of our
```

Case 3:22-cv-00513-FDW-KDM Document 209 Filed 03/24/23 Page 43 of 456 PageID #: 13156

```
 1    products.  So, you know, for putting out a fact
 2    sheet or, for example, we have several graphic
 3    novels that we've developed, he would work and
 4    manage that process to get the products out, so
 5    the review process, the drafting process, things
 6    like that.
 7         Q.    These products you're referring to,
 8    I take it those are written, publicly available
 9    bulletins or other written work products
10    discussing disinformation and misinformation; is
11    that right?
12         A.    Correct.  All of our product are
13    available on our website.
14         Q.    Below him is Alex Zaheer, analyst;
15    what does he do?
16         A.    He's a more junior analyst.  He
17    supports essentially across our three lines of
18    work.  So he helps Chad on some, he helps Warren
19    on some of the engagement work, and then he
20    supports Rob Schaul, who leads our analysis work
21    in doing analysis activities, but he kind of
22    cuts across all three.
23         Q.    And Rob Schaul is listed over there
24    on the left side as analysis and response lead;
25    correct?
```

```
 1              A.    Yes.
 2              Q.    What does he do?
 3              A.    So he does a couple things, so one,
 4        he leads our engagement with international
 5        partners; two, he builds relationships with the
 6        research community, both in academia, across the
 7        federal government, as well as in the private
 8        sector; and then, three, he pulls that together
 9        to identify new reporting or research about MDM
10        that might be of interest to the team; and then
11        the fourth bucket of it is he helps develop kind
12        of analytic type products.
13                    So right now, for example, we're
14        working on a risk framework to help our
15        stakeholders understand how to determine if an
16        MDM campaign is a risk to them or not.
17                    So he would help kind of on that
18        side of things.
19              Q.    Okay.  There was -- so he talks to
20        international partners; who are they?
21              A.    It varies.  Generally, all of our
22        engagements with international partners come
23        through the State Department or the CISA
24        international office.
25                    We have engaged with NATO, G7 at
```

```
 1    the kind of multilateral level, with the CFI,
 2    counter foreign interference forum, that
 3    includes several countries.  And then we have
 4    different bilateral engagements.  A lot of
 5    countries want to come and talk to us, and so
 6    we'll do basically MDM 101 for different
 7    countries at their request.
 8         Q.   So this is both -- these are both
 9    foreign governments and foreign nongovernmental
10    organizations?
11         A.   Yeah.  I suppose if you consider
12    the multilateral organizations, like NATO and G7
13    as nongovernmental, but essentially we're only
14    talking to government -- foreign government
15    officials.
16         Q.   So the purpose of those discussions
17    is to, what, track misinformation that is
18    circulating in foreign countries that might come
19    to the United States?
20         A.   No, that's not the purpose of the
21    meetings.
22         Q.   Then what's the purpose?
23         A.   The purpose of the meetings is to
24    share information about -- from a CISA
25    perspective, share information about resilience
```

Case 3:22-cv-01213-TAD-KDM Document 209 Filed 05/03/23 Page 46 of 456 PageID #: 458
13159

```
 1    building.  So there's some countries that are
 2    much more mature and have been doing it for a
 3    long time.  So we try to learn from them kind of
 4    what they're doing, what works, what doesn't
 5    work.
 6               So that's, again, from a CISA
 7    perspective, that's primarily our engagement
 8    with these groups.
 9          Q.   And then you mentioned that
10    Mr. Schaul coordinates with academic and
11    research partners; is that correct?
12          A.   He doesn't coordinate, he builds
13    relationships with, so that we can -- you know,
14    if you have questions about reporting they put
15    out or public reports that they have, public
16    research, things like that, then we can have
17    conversations with them about that research.
18          Q.   Who -- who -- who -- who do you
19    have relationships like that with?
20          A.   We have relationships with a range
21    of different entities.  So from an academic
22    standpoint, we've talked to folks at Harvard, at
23    Clemson, University of Washington, Stanford, I
24    believe we talked to people at Georgetown and
25    American University, Michigan University,
```

```
 1    University of Michigan.

 2              Essentially, if there's an academic

 3    research that puts out a report that we think is

 4    of interest, and kind of reflects our work, we

 5    try to have conversations with them to try to

 6    understand what their research findings are, and

 7    in a non-profit stage, you know, the Alliance

 8    For Securing Democracy, the Digital Frameworks

 9    Research Lab -- sorry, for the court reporter, I

10    know I'm talking quickly.  So, you know, groups

11    like that.

12              And then from a private sector

13    perspective we talk to groups like Graphika,

14    Alethia Group (phonetic), and organizations like

15    those, who, again, kind of do that sort of work,

16    mandates, you know, different organizations.

17              So again, the idea is to have a

18    relationship with them so if they put out some

19    reporting or some research publicly, that we can

20    set up a meeting and kind of learn more about

21    what they're seeing and what they're doing.

22         Q.   And has that kind of coordination

23    gone on not from the last year but before the

24    2020 election cycle?

25         A.   Yeah.
```

Case 3:23-cv-00571-TAD-KDM Document 209 Filed 05/03/24 Page 49 of 456 PageID #: 13161

```
 1              Q.   And I think you mentioned a few
 2     entities there that includes Stanford and the
 3     University of Washington, Graphika; correct?
 4              A.   Correct.
 5              Q.   And all those organizations were --
 6     were involved in something called Election
 7     Integrity Partnership; right?
 8              A.   Yep.
 9              Q.   Yeah, what is the Election
10     Integrity Partnership?
11              A.   I mean, it's a collaboration
12     amongst -- I believe in 2020 it's amongst those
13     four -- amongst four organizations, to -- to
14     better understand what was going on in the
15     information environment around elections.
16              Q.   And you say were those four -- you
17     say those four organizations, I think I
18     mentioned three, Stanford, University of
19     Washington and Graphika, and was the Atlanta
20     Council involved in that?
21              A.   Yeah, I believe the Digital
22     Forensic Research Lab was involved.
23              Q.   And then were there other
24     collaborators, besides those four, on the
25     Election Integrity Partnership?
```

```
 1            A.   I think those were the official
 2    members of the partnership.  I -- I don't know
 3    if you mean something different about
 4    collaborators.
 5            Q.   Well, let me ask this:  Was CISA --
 6    did CISA have any involvement in the Election
 7    Integrity Partnership?
 8            A.   Involvement in the sense that a
 9    couple of our interns came up with the idea and
10    that we had some communications with them, yes.
11            Q.   What kinds of communications did
12    you have with them?
13            A.   So we received some briefings on
14    the work that they were doing.  And then, like I
15    said, we had some interns that ended up working
16    on it.  Those are principally -- principally the
17    communications.
18                 We had some communications early on
19    in the process, when they were making decisions,
20    when Stanford was trying to figure out what the
21    gap was.
22                 So yeah, so it was just general,
23    like you would have with any other research
24    organization.
25            Q.   So it was no different than the
```

```
 1      communications you had with other research
 2      organizations?
 3             A.   I think the one difference, I would
 4      say, is that we -- we probably connected them
 5      with other -- so we connected them with the
 6      Center For Internet Security, and we connected
 7      them with some of the election official groups,
 8      so the National Association of Secretaries of
 9      State and the National Association of State
10      Election Directors, and then we facilitated some
11      meetings between those three.
12             Q.   Let me ask you this:  You said you
13      had -- I take it you said some CISA interns came
14      up with the idea; is that right?
15             A.   Correct.
16             Q.   And who are those interns?
17             A.   I'm not going to give their names.
18             Q.   Who were those interns?
19             A.   Yeah, I'm not going to give those
20      names.
21             Q.   Who were -- you have no --
22             A.   The Stanford students -- Stanford
23      students have seen substantial amount of
24      harassment from public reporting.  I'm not going
25      to include my interns in that.
```

```
 1            Q.   Are you -- you're declining to
 2     answer the question without an instruction?
 3            A.   Correct.
 4            Q.   And you said those interns were
 5     also involved in the Election Integrity
 6     Partnership; correct?
 7            A.   I believe they worked for the
 8     Stanford Internet Observatory, as well, so yes.
 9            Q.   And they were working for CISA and
10     Stanford Internet Observatory on the project?
11            A.   When they came up with the idea,
12     they -- obviously they were just interns.  After
13     their internships a couple of interns remained
14     as interns.  Several others went back to
15     Stanford, as students, and did not remain as
16     interns.  Two of the interns ended up working on
17     both in the fall; correct.
18            Q.   You said two of the interns who
19     were CISA interns, in the fall of 2020, worked
20     on the Election Integrity Partnership; is that
21     right?
22            A.   They worked at the Stanford
23     Internet Observatory, which was part of the
24     Partnership.
25            Q.   Were there any other interactions
```

```
 1      between CISA and the Election Integrity

 2      Partnership, that you're aware of?

 3              A.   So just to say so we had some

 4      initial conversation with the interns.  We had a

 5      conversation with the Stanford Internet

 6      Observatory folks about the gap.

 7                   I believe we received a briefing

 8      from them, or two, on kind of what they were

 9      putting together.

10                   We facilitated some meetings

11      between Stanford folks, the Center For Internet

12      Security, and election officials, where they had

13      discussions about how they would work together.

14                   And then I -- I'm sure we had some

15      conversations, kind of throughout, when they

16      were -- particularly when they were putting out

17      public reporting about what they were seeing.

18                   I wouldn't be surprised if there

19      were some other kind of brief conversations in

20      there, but I'm not recalling.

21                   But those are generally the

22      categories of the conversations we had.

23              Q.   Did the Election Integrity

24      Partnership, or a similar collaboration of any

25      kind, operate during the 2022 election cycle?
```

Case 3:22-cv-01213-TAD-KDM Document 309 Filed 05/03/23 Page 53 of 456 PageID #: 13166

```
 1                    MR. GARDNER:  Objection, vague.
 2     BY MR. SAUER:
 3             Q.    You may answer.
 4             A.    So I believe the EIP did operate,
 5      but I'm not -- I'm not certain what they did.
 6             Q.    How do you know they operated in
 7      2022?
 8             A.    I believe they put out a public --
 9      some public reporting.
10             Q.    Did you have --
11             A.    But I --
12             Q.    Go ahead.
13             A.    We did not have communications with
14      them.  They gave us a briefing, early on, about
15      what they were thinking about, and that was the
16      extent of our communications with them on that
17      stuff.
18             Q.    When did that briefing occur?
19             A.    I believe it was May/June of 2022.
20             Q.    Who was at that briefing on your
21      end, CISA?
22             A.    On my end, it was me, I believe
23      Geoff Hale.  Who else was in that?  I think one
24      of our -- I think that may have been it, but
25      there might have been one other staff person
```

Case 3:22-cv-01213-TAD-KDM Document 209 Filed 03/04/23 Page 54 of 456 PageID #:
13167

**BRIAN J. SCULLY  1/12/2023**

Page 54

```
 1   there, as well.  But it was primarily Geoff Hale
 2   and myself, that I recall.
 3           Q.   Who was in the briefing on the EIP
 4   side?
 5           A.   Renée DiResta was the lead, and
 6   then one of their staff, I believe his name was
 7   John, but honestly I forget what his name is.
 8           Q.   So just two people?
 9           A.   That I recall, yeah.
10           Q.   What did they say in the briefing?
11           A.   Essentially, they just walked
12   through what their plans were for 2022, some of
13   the lessons learned from 2020, that was
14   essentially the gist of the conversation.
15           Q.   What were their plans for 2022?
16           A.   It sounded like they were going to
17   do something similar to what they did in 2020 in
18   terms of trying to support election officials.
19           Q.   Did they indicate that they were
20   coordinating with state and local election
21   officials?
22           A.   I think that was their goal with
23   the -- with the work with state and local
24   election officials.  I'm not sure how they would
25   describe it.
```

Case 3:22-cv-01213-TAD-KDM Document 209 Filed 03/04/23 Page 55 of 456 PageID #: 467
13168

```
 1              Q.    Sorry, I think you said this
 2     earlier, and I can't remember.
 3                    When did this briefing occur, would
 4     you say it was in May or June of 2022?
 5              A.    I believe it was around that
 6     timeframe.  My timeline recollections are awful,
 7     so I apologize for that, but I think it was
 8     around that timeline.
 9              Q.    Did you --
10              A.    Things all blur together.
11              Q.    Did they -- in fact, let me ask
12     you:  Did they invite CISA to participate again?
13              A.    No.  CISA didn't -- I mean, I
14     wouldn't say CISA participated in 2020, so it
15     wouldn't have been again, so it would have been
16     participate for -- kind of for the first time.
17              Q.    Did they invite CISA to have any
18     role, at all, in what they were doing?
19              A.    Not that I recall.
20              Q.    Why were they giving you a
21     briefing, then?
22              A.    I think they should know our role
23     in the federal government for election security.
24     And we have, you know, an established
25     relationship with them.  So I think they were
```

```
 1      just going around and making sure -- again, I

 2      don't -- I don't want to speak for them, but my

 3      sense was that they were just kind of briefing

 4      people who -- who were involved in election

 5      security at the federal level.

 6              Q.   Do you -- do you know -- do you

 7      have any knowledge of what they actually did,

 8      after that briefing, during the 2022 election

 9      cycle?

10              A.   No.  I know -- like I said, the

11      reason I -- I think they were operating was

12      there was a couple of public reports, one -- at

13      least one public report, that I recall, that I

14      thought was pretty good, but was it about

15      specific disinformation, it was basically how to

16      think about whether or not a narrative poses

17      risks.

18                   As I mentioned earlier, we were

19      particularly interested in understanding how to

20      determine if MDM creates risk.  And we thought

21      their products was pretty good on that.

22              Q.   You used a phrase earlier, that I

23      did -- I passed over, and I didn't understand, a

24      specific gap that we were talking about putting

25      together the I&P in the first place.  What's the
```

```
 1      gap that you're referring to?

 2              A.   Sure.  So we had a conversation

 3      with the interns, and they were asking questions

 4      about kind of needs that the election officials

 5      have, generally.

 6                   One of the gaps that we identified

 7      from 2018 is, as you know, most election

 8      officials their offices are fairly low staff,

 9      low resourced, and so there was no -- they

10      didn't have capabilities to try to identify

11      disinformation targeting their jurisdictions,

12      and so was essentially the gap is that most

13      election offices throughout the country just

14      didn't have that capacity or capability to be

15      monitoring so that they could identify anything

16      that would be potentially target their

17      jurisdictions, so that was the gap.

18              Q.   So the gap is that state and local

19      election officials don't -- just don't have the

20      bandwidth or capacity to monitor mis and

21      disinformation on social media that may affect

22      their jurisdictions; right?

23              A.   Correct.

24              Q.   And then I take it was it the

25      interns' idea that the Election Integrity
```

1     Partnership could be set up to kind of fill in

2     that gap, was that the idea?

3             A.   Again, I don't want to speak for

4     the interns.  But at that point I don't think

5     they were necessarily thinking about more of a

6     partnership.

7             I think the conversation was more

8     along the lines of this may be something that

9     the Stanford Internet Observatory could look

10    into, and then I think they went back and talked

11    to their folks at the Stanford Internet

12    Observatory and the idea was formed from there.

13            So I don't think that was the

14    interns' initial thought was to have the EIP.

15            Q.   Was there discussions of having

16    CISA fill that gap, for example, by doing

17    routing disinformation concerns to social media

18    platforms?

19            A.   With the -- there's no conversation

20    with the interns about CISA filling the gap, no.

21            Q.   How about internally to CISA, did

22    CISA view itself as kind of helping fill that

23    gap by, you know, helping state and local

24    election officials addressing this mis and

25    disinformation concern?

```
 1                    A.   Our focus generally was not to play
 2       that role, no.  We -- we weren't looking to
 3       identify -- monitor social media to share with
 4       platforms.
 5                    Q.   You mentioned that you -- I think
 6       you mentioned you put EIP in touch with CIS, the
 7       Center For Internet Security; is that right?
 8                    A.   Correct.
 9                    Q.   What is the Center For Internet
10       Security.
11                    A.   I don't -- I don't know how to
12       describe them.  They're essentially, as I
13       understand it, they're non-profit that oversees
14       the multi-state ISAC and the election
15       infrastructure subsector information sharing and
16       analysis center, that's what ISAC stands for, so
17       that's my understanding of what they do.  I
18       don't know what else they do.  I know them in
19       those two contexts.
20                    Q.   And those two contexts are
21       overseeing an ISAC, I-S-A-C, that involves
22       multiple states; is that right?
23                    A.   Correct.
24                    Q.   Now, and that's a -- basically a
25       sharing collaborative that they facilitate
```

```
 1       amongst state and local election officials; is
 2       that right?
 3               A.   Yeah, it's a general woven artifact
 4       is information sharing with the sector.  So each
 5       sector -- not each -- most sectors have their
 6       own information sharing and analysis center.
 7       They're independently stood up to serve those
 8       sectors.
 9               And so CIS was the one who was
10       responsible for kind of running the two that I
11       mentioned.
12               Q.   I'm sorry, what were those two, can
13       you identify them again?
14               A.   Sure.  The multistate ISAC and the
15       election infrastructure subsector ISAC.  And
16       just as a reminder of what ISAC is Information
17       Sharing and Analysis Center.
18               Q.   And those are, I think, referred to
19       as the EI-ISAC and the MS-ISAC; is that right?
20               A.   That's correct.
21               Q.   And both of those, I take it,
22       involve basically information sharing amongst
23       state and local election officials; is that
24       right?
25               A.   I believe only the election
```

**BRIAN J. SCULLY 1/12/2023**

```
1     infrastructure one is focussed on -- on election
2     officials.  I believe the multistate one is
3     broader across state and local government, but
4     includes a broader set.  I'm not sure if
5     election officials are involved in the
6     multistate.
7              Q.   Is the Center For Internet Security
8     funded, in part, by CISA?
9              A.   To the best of my knowledge, CISA
10    provides funding for the EI-ISAC.
11             Q.   Okay.  And do you know how -- how
12    is that funding provided, is it grants or how is
13    it provided?
14             A.   I don't believe it's a grant, but
15    I'm not 100 percent certain what the -- what the
16    actual mechanism is, vehicle for the money to go
17    there.
18             Q.   But they're --
19             A.   My understanding is that it's
20    statutory, as well, but I could be wrong, also,
21    so I don't want to speak too much.
22             Q.   But you're aware that CISA does
23    provide funding for CIS to operate the EI-ISAC;
24    is that right?
25             A.   My understanding is that they
```

```
 1    provide funding to the EI-ISAC.  I don't know if

 2    the goes -- if the EI-ISAC is an organization,

 3    and the money goes to them or if the money goes

 4    to CIS, and then they filter it down to the

 5    EI-ISAC.  I'm not sure how it works, in

 6    practice.

 7              Q.    Does CIS operate the EI-ISAC, I

 8    mean, does it kind of run it?

 9              A.    Yeah, that's essentially how I see

10    it, yeah.

11              Q.    And then you say you put them in

12    touch, or CISA put the EIP in touch with CIS in

13    2020, do you remember that?

14              A.    Yes.

15              Q.    How did that happen?

16              A.    So CISA's general position on -- on

17    the switchboarding role was that it wasn't a

18    role we necessarily wanted to play, because it's

19    very resource intensive.  And so we had been

20    working with election officials to try to find

21    an alternate way for them to have that role,

22    somebody play that role.

23              They seemed to settle on the Center

24    For Internet Security.  And so since the EIP was

25    working on the same mission, we wanted to make
```

```
 1    sure that they were all connected.
 2             Q.    And so the same mission, I take it,
 3    is the switchboarding role that you've talked
 4    about before?
 5             A.    Correct.
 6             Q.    Yeah, so I take it CISA was playing
 7    a switchboarding role in 2020, but you mentioned
 8    that that's resource intensive and it wasn't
 9    something that you guys wanted to be principally
10    responsible for; right?
11             A.    Something we didn't want to be
12    responsible for, at all.  But election officials
13    asked if we could continue serving in that role
14    until they kind of got something else set up.
15             Q.    And you did do that, right, in 2020
16    you mentioned earlier that CISA performed a
17    switchboarding function; right?
18             A.    Correct, in 2020.
19             Q.    And then Center For Internet
20    Security performs a switchboarding function,
21    too; is that right?
22             A.    Yeah.  So yes, yes and no.  So yes
23    in the sense they were receiving reporting
24    directly from election officials.  In the early
25    part of 2020, they would forward what they were
```

```
 1   receiving election officials to us at CISA, and

 2   then we would push that to the social media

 3   platform; as 2021 moved along, CIS more

 4   frequently provided that directly to the

 5   platforms, themselves.

 6              And so I would say early on in the

 7   process, the switchboarding generally came

 8   through CISA.  Later on in the process, it was

 9   more of a mixed bag of how the switchboarding

10   worked.

11        Q.   And then did EIP play a

12   switchboarding role, too?

13        A.   I believe EIP did report stuff to

14   the platforms, themselves, yes.

15        Q.   And was there coordination between

16   the switchboarders, so to speak, CISA and EIP

17   and CIS?

18        A.   Most of the coordination was

19   between CISA and the Centers For Internet

20   Security.

21              There was a point where one of the

22   platforms was concerned about too much kind of

23   duplicate reporting coming in, and so we did

24   have some conversations with EIP and CIS on how

25   to kind of better manage that activity to make
```

```
 1    sure we weren't overwhelming the platforms.
 2          Q.   In other words, like Twitter or
 3    Facebook would be hearing from CIS and CISA and
 4    EIP about a disinformation concern; correct?
 5          A.   Yeah.  Generally speaking, yes,
 6    I'll just leave it there, yes, that's correct.
 7          Q.   And then --
 8          A.   Twitter, in particular, reached out
 9    to us and had some concerns about that.
10          Q.   And I take you talked to EIP and
11    talked to CIS about creating a more streamlined
12    process through the platforms?
13          A.   I don't think it was necessarily a
14    streamlined process.  We just wanted to make
15    sure that there was -- that there was awareness
16    for the platform.
17               So I think, to be honest with you,
18    I don't recall how we ended up following this,
19    in practice.  But I think it was just we would
20    let everybody know when we were setting
21    something up through CIS.  We would let CIS
22    know, and I think CIS, through that
23    relationship, would like EIP know.
24               But I don't recall, specifically,
25    how we ended up kind of solving that problem.
```

```
 1              Q.   But at least there was, I guess,
 2    kind of communication among CISA, the EIP, and
 3    CIS about who was reporting various concerns in
 4    an attempt to kind of de-duplicate what's being
 5    sent to the social media platforms?
 6              A.   Yeah, I don't recall being directly
 7    from CISA to EIP.  Like I said, I think we
 8    mostly worked it through CIS.
 9              Q.   Was there -- for example, was there
10    direct e-mail communication between EIP and
11    CISA?
12              A.   I'm sure there was.
13              Q.   I mean, was it your practice to
14    copy the CISA's -- or sorry -- the EIP's tips,
15    e-mail address when you were -- you or CIS was
16    reporting a disinformation concern to a social
17    media platform?
18              A.   No, that was not standard practice.
19              Q.   Did CIS do that?
20              A.   I don't know.  That's a good
21    question.  I don't know.
22              Q.   Why don't we --
23              A.   Just to be clear, you're -- sorry,
24    just to be clear, you were asking if they were
25    sending EIP when they sent e-mail to social
```

```
 1    media platforms; correct.
 2            Q.    Yeah.
 3            A.    Yeah, I'm not sure.  Sorry.
 4            Q.    When -- when was EIP copied by CIS
 5    or you on disinformation e-mails, if ever?
 6            A.    I don't believe we ever -- CISA
 7    ever copied EIS on e-mails we sent to platforms.
 8    I don't -- but where we were forwarding -- if we
 9    were forwarding something we received from an
10    election official to the platform, I don't
11    believe CISA ever copied EIP, certainly not to
12    my recollection.  It wasn't kind of our process.
13                  I can't speak for the Center For
14    Internet Security.  I don't -- I don't recall
15    who they were including on theirs.
16            Q.    Did you notify EIP if you were
17    flagging a disinformation concern for a social
18    media platform in any way?
19            A.    Not that I -- not directly, that I
20    recall.  We would -- we would generally copy the
21    Center For Internet Security.
22            Q.    Was it your understanding that they
23    were communicating with EIP?
24            A.    CIS?  Yeah, that was essentially
25    the -- their relationship was between those two,
```

Case 3:22-cv-01213-TAD-KDM Document 209 Filed 05/03/23 Page 68 of 456 PageID #: 13181

```
 1    yeah.
 2              Q.    So in other words, you had the
 3    understanding that CIS had a relationship of
 4    communication and coordination with the Election
 5    Integrity Partnership; right?
 6              A.    Yes.  Correct.
 7              Q.    And then you would notify CIS if
 8    you were reporting something to a social media
 9    platform on the understanding that they were
10    coordinating with EIP on what was being
11    reported; correct?
12              A.    No.  The reason we -- we would
13    coordinate with CIS was generally most of the
14    reporting we received from an election official
15    came through CIS.  And so we just wanted to let
16    them know that we were -- we had set it up so
17    that they had awareness of kind of where the
18    report had gone.  And so that was the rationale
19    for us coordinating with CIS.
20              Q.    And did you have the understanding
21    that CIS was coordinating with EIP on what was
22    being reported?
23              A.    I -- that would be speculating on
24    exactly what they were doing there.  I'm not
25    sure.
```

**BRIAN J. SCULLY  1/12/2023**

```
 1              Q.   You didn't know what they were
 2    doing?
 3              A.   I mean, I know they coordinated on
 4    things.  I don't know the full nature of what
 5    they were coordinating on, I don't want to put
 6    words in their mouth.
 7              (Exhibit No. 1 was marked for
 8    identification.)
 9              MR. SAUER:  Let's look at Exhibit
10    1.  I've sent that to your counsel.
11              MR. GARDNER:  Yeah, we've got it up
12    here.
13    BY MR. SAUER:
14              Q.   Can you also see it on the screen
15    share?
16              A.   Yes.
17              Q.   Are you familiar with this
18    document?
19              A.   Yes.
20              Q.   In other words, is this the report
21    that the Election Integrity Partnership did in
22    2021, about its activities in the 2020 election?
23              A.   Correct.
24              Q.   Had you read it before or how did
25    it get on your attention?
```

Case 3:22-cv-01213-TAD-KDM Document 209 Filed 05/03/23 Page 70 of 456 PageID #: 13183

```
 1                 A.   Yeah, I've read portions of it
 2      before, and some of the folks briefed us on it.
 3                 Q.   Who are the folks that briefed you
 4      on it?
 5                 A.   Alex Stamos and Renée DiResta.
 6                 Q.   When did that briefing occur?
 7                 A.   I'm sorry, when or where?
 8                 Q.   When did that briefing occur?
 9                 A.   It was late spring, early summer
10      2021.
11                 Q.   This would have been around the
12      time that the report was released?
13                 A.   Yeah, sometime after that.
14                 Q.   And Alex Stamos is at Stanford
15      Internet Observatory; right?
16                 A.   Yes.
17                 Q.   Does he also serve on some CISA
18      committees or subcommittees?
19                 A.   I don't know.
20                 Q.   Renée DiResta, is she also at
21      Stanford -- Stanford Internet Observatory; is
22      that right?
23                 A.   Yes.  Yes, last I checked.
24                 Q.   Do you remember what they said in
25      the briefing?
```

```
 1                    A.    I think they just walked through
 2        kind of what they did and how they did it,
 3        explained what they kind of learned, how they
 4        viewed some of the issues, things like that.
 5                    Q.    Who participated in the briefing,
 6        other than you, for CISA?
 7                    A.    So I received a briefing when I was
 8        at the National Security Council.  So it was a
 9        National Security Council colleague of mine,
10        Marybeth Foley (phonetic).
11                    Q.    Did CISA receive a briefing?
12                    A.    I don't know for certain.
13                    Q.    Did you do -- I can't remember if
14        you said this -- did you do a detail on the
15        National Security Council in that timeframe?
16                    A.    From January 2021 to March 2022 I
17        was on detail to the National Security Council.
18                    Q.    Why did they report to the National
19        Security Council?
20                    MR. GARDNER:  Objection, calls for
21        speculation.
22        BY MR. SAUER:
23                    Q.    You may answer.
24                    A.    Yeah, I don't know why.
25                    Q.    I mean, were they reporting back to
```

```
 1      you because you had communicated with them back
 2      in 2020 or was it a report to your agency?
 3                MR. GARDNER:  Objection, compound,
 4      calls for speculation.
 5           A.    Yeah, again, I don't -- I don't
 6      know why they -- why they wanted to brief us.
 7           Q.    Can you see the document on the
 8      screen share?
 9           A.    Yep.
10           Q.    Scrolling down here on the third
11      page of the document, they list the participants
12      here.  Are these the same participants that you
13      talked about earlier?
14           A.    Yeah.
15           Q.    Yeah?  And I think you mentioned
16      Stanford Internet Observatory includes Alex
17      Stamos and Renée DiResta; correct?
18           A.    Yes.
19           Q.    And then the University of
20      Washington, Center For an Informed Public, is
21      that where Dr. Kate Starbird works?
22           A.    I believe so, yes.
23           Q.    And is she also on a CISA
24      subcommittee?  Actually, isn't she on the MDM
25      subcommittee for the CSAC?
```

**BRIAN J. SCULLY 1/12/2023**

```
 1                 A.    I believe that's correct, yeah.

 2                 Q.    And is she also involved in the

 3       Election Integrity Partnership?

 4                 A.    Yeah, that's my understanding.

 5                 Q.    Jumping ahead just a tiny bit, past

 6       the table of contents, here in the executive

 7       summary, on page six, little Roman six, you see

 8       here it says:  Election Integrity Partnership

 9       was formed to enable realtime information

10       exchange between election officials, government

11       agencies, civil society organizations, social

12       media platforms, the media, and the research

13       community; correct?

14                 A.    Yeah, I see that sentence.

15                 Q.    There's a reference to both

16       election officials and government agencies

17       engaging in realtime information exchange with

18       social media platforms; correct?

19                 A.    Yes.

20                 Q.    What -- do you know what government

21       agencies engaged in realtime information

22       exchange under the aegis of the EIP?

23                 A.    I don't know who they're referring

24       to.

25                 Q.    Did CISA do that, at all?  Did CISA
```

1    share information with EIP?

2         A.   Generally speaking, no.

3         **Q.   How about more specifically, did**

4    **anyone at CISA share information with the EIP?**

5         A.   I mean, that's very broad.  Did we

6    share information?  Can you be more specific

7    about what type of information you're asking

8    that we shared?  We had conversations with them,

9    so in that sense we shared information.  Is

10   there something in particular that you're asking

11   about?

12        **Q.   Sure.  What conversations did you**

13   **have with them?  I know you summarized them**

14   **earlier, can you be more specific?**

15        A.   Yeah, I mean, I think that summary

16   actually is -- is probably as specific as I can

17   get.  Like I said, we -- we had conversations

18   with Stanford about the gap.  They gave us some

19   briefings on what they were doing, how they were

20   doing it.

21             Prior to the election, we had some

22   conversations with them to facilitate and

23   coordinate meetings, as I mentioned.  And then

24   when they put public reporting out, if we had

25   questions about it, we would probably have

```
 1    conversations with them around that, as well.
 2             Q.   Was there any communication from
 3    government officials to EIP about specific
 4    disinformation concerns?
 5             A.   Not that I'm aware of, no.
 6             Q.   Who at CISA was involved in any
 7    interactions with the Election Integrity
 8    Partnership?
 9             A.   In addition to the two interns, the
10    primary interaction was myself and Matt
11    Masterson.
12             Q.   Are you aware of anyone else at
13    CISA communicating with them?
14             A.   It's possible, but I don't recall,
15    and it certainty wouldn't have been -- you know,
16    they would have just been part of a meeting with
17    either Matt or myself.
18             Q.   How about Lauren Protentis, did she
19    communicate?
20             A.   She wasn't part of the MDM team in
21    2020.
22             Q.   How about --
23             A.   So she would not have been
24    communicating them.
25             Q.   How about Geoff Hale?
```

```
 1              A.   I -- I wouldn't be surprised if
 2     Geoff was on some of the conversations, but I
 3     don't recall -- I don't recall him
 4     participating.
 5              Q.   How about Director Easterly?  I
 6     guess she wasn't director back then.  How about
 7     Director Krebs?
 8              A.   I believe Director Krebs had a
 9     relationship with Alex Stamos.  So he may have
10     had conversations in that context.  I don't -- I
11     don't believe he had -- necessarily had
12     conversations in relation to EIP.
13              Q.   And then, in fact, when he left
14     CISA he joined Alex Stamos at the Stanford
15     Internet Observatory or he joined Alex Stamos in
16     some capacity, didn't he?
17              A.   I believe they started a business
18     together, yes.
19              Q.   Do you know what that business was?
20              A.   I'm sorry?
21              Q.   Do you know what that business was?
22              A.   I believe the name of it is
23     Krebs -- Krebs/Stamos Group.
24              Q.   Do you know what it does?
25              A.   I believe cyber security theft.
```

**BRIAN J. SCULLY 1/12/2023**

1    I'm not entirely sure.

2          Q.   Does it do anything related to

3    misinformation and disinformation?

4          A.   I don't know, if they do it hasn't

5    been something they've been promoting, that I'm

6    aware of.

7          Q.   Are you aware of any communications

8    between Director Krebs -- Krebs and Alex Stamos

9    while he -- while Krebs was still director?

10              MR. GARDNER:  Objection, vague.

11         A.   Yeah, it's really vague.

12    Again what --

13         Q.   Any communications is broad and not

14    vague.

15              I want to know if you have any

16    communications of any kind between Director

17    Krebs and Alex Stamos when Krebs was still

18    director of CISA?

19              MR. GARDNER:  Same objection.

20         A.   I believe they -- Director Krebs

21    may have participated in a couple of meetings

22    that I'm aware of, that Stamos was also in, but

23    beyond that I'm -- I'm not familiar with --

24    obviously not going to be familiar with Krebs's

25    direct communications with Stamos.

**BRIAN J. SCULLY 1/12/2023**

```
 1              Q.    What meetings were they both
 2      involved in, if you recall?
 3              A.    So I can recall an event that
 4      occurred out in Stanford, that Krebs spoke at
 5      for the Stanford Internet Observatory, for
 6      example.  I believe the first government
 7      industry sync Stamos was the Facebook lead, at
 8      the time.  This was before he went to Stanford
 9      Internet Observatory, and Director Krebs
10      participated in that meeting, so meetings like
11      that.
12              Beyond that, I don't have a real
13      understanding of how they communicated with each
14      other.
15              Q.    Was there any discussion of the
16      Election Integrity Partnership at the meetings
17      you're aware of?
18              A.    Not that I'm aware of, no.
19              Q.    Turning back to the screen share,
20      it talks about election officials, engaging in
21      realtime information sharing with social media
22      platforms, among others; do you see that?
23              A.    Yeah, as part of that same
24      sentence, right; is that what you're referring
25      to?
```

**BRIAN J. SCULLY 1/12/2023**

```
1              Q.    Yeah.

2              A.    Yeah.

3              Q.    Are you aware of state and local

4       election officials engaging in realtime

5       information sharing with the election

6       integrity -- you know, with social media

7       platforms through the Election Integrity

8       Partnership?

9              A.    I -- I don't know the relationship

10      between EIP and election officials.  I'm not

11      sure if they're referring to direct reporting to

12      them from election officials or if they're

13      referring to reporting through the Center for

14      Internet Security, I'm just not sure what

15      they're referring to there.

16             Q.    How about through the Center For

17      Internet Security, was there election reporting

18      through them?

19             A.    Yeah, so generally speaking, the

20      reporting that CISA received came through the

21      Center For Internet Security.

22             Q.    Gotcha.

23                   And how about -- did -- did --

24      as -- to the extent you understand, did EIP

25      receive reporting through the Center of Internet
```

Case 3:22-cv-01213-TAD-KDM Document 209 Filed 03/04/23 Page 80 of 456 PageID #: 13193

```
 1        Security, you know, kind of from election
 2        officials through the internet security to the
 3        Election Integrity Partnership?
 4                   MR. GARDNER:  Objection, lack of
 5        foundation.
 6   BY MR. SAUER:
 7             Q.   You may answer.  Do you know if --
 8             A.   Yeah, I -- I'm not -- I'm not sure
 9        what their full relationship was and how they
10        were sharing, what the specifics were.  It
11        wouldn't surprise me if CIS had shared some with
12        EIP, but I just don't know.
13             Q.   You mentioned Matt Masterson, and I
14        think you said that he was involved in briefing
15        with the EIP; is that correct?
16             A.   No.  He was involved -- involved
17        in -- in conversations with Stanford Internet
18        Observatory.  He probably -- generally, all of
19        our -- so just to take a step back, generally
20        our communications, when VIPs stood up, were
21        still at the Stanford Internet Observatory.
22                   So the conversations I'm aware of
23        with Masterson were generally at the Stanford
24        Internet Observatory.  He was also briefed -- I
25        seem to recall he was probably in some of the
```

```
 1    briefings I was in or conversations when we had

 2    questions about reporting that they did, public

 3    reporting.

 4              So I don't know how to kind of

 5    thread the needle between, you know, when they

 6    were just conversations with Stanford Internet

 7    Observatory and when they would be considered

 8    conversations with the EIP.

 9         Q.   And that, I take it, you said

10    thread the needle, I take it that's kind of a

11    fuzzy distinction, because the EIP is a

12    collaboration that involves the Stanford

13    Internet Observatory; correct?

14         A.   Right.

15         Q.   Do you know -- do you know -- let

16    me ask you this:  What discussions do you know

17    of between Matt Masterson and Stanford Internet

18    Observatory that related in any way to the EIP?

19         A.   I think it would have just been if

20    we had questions about public reporting.

21         Q.   What is --

22         A.   Kind of once they were up and

23    running.

24              So he was involved in some of the

25    conversations before, you know, the first couple
```

```
 1    that I talked to about, kind of in our
 2    engagement with Stanford Internet Observatory,
 3    he was involved, I know, in at least one of the
 4    conversations about that.
 5              And then, after that, I don't think
 6    he was particularly involved, but he may have
 7    been involved, and we had some briefings for --
 8    or not briefings, I don't think is the right
 9    word, where we had conversations with them about
10    public reporting we put out.
11         Q.   When you say public reporting, what
12    do you mean?
13         A.   So the EIP put out regular kind of
14    blog posts, excuse me, regular blog posts on
15    what they were seeing, so -- so it was publicly
16    available information.
17         Q.   And -- and did you -- did they
18    discuss, you know, those blog posts with Matt
19    Masterson or you before they were posted?
20         A.   Not that I recall.
21         Q.   And what discussions did you have
22    with the public reporting?
23              MR. SCOTT:  John, just one second,
24    it looks like the video is frozen on our end.
25    Does it appear frozen on your end, as well.
```

Case 3:22-cv-01213-TAD-KDM Document 209 Filed 03/04/23 Page 83 of 456 PageID #: 13196

```
 1                    MR. SAUER:  I see a little
 2      interference.  Shall we go off the record?
 3                    THE WITNESS:  There's interference
 4      with the top and the bottom.  I'm not seeing
 5      that.  Still, we can go off -- we can go off the
 6      record and try to fix that.
 7                    MR. SAUER:  Let's go off the
 8      record.
 9                    THE VIDEOGRAPHER:  The time is now
10      10:27.  We are off the record.
11                    (Recess.)
12                    THE VIDEOGRAPHER:  The time is now
13      10:40.  We are back on the record.
14      BY MR. SAUER:
15              Q.   Mr. Scully, I think we were talking
16      about Matt Masterson before we had the
17      technical -- technical difficulty.
18                    Generally speaking, do you know
19      what role he had, if any, in originating the
20      concept for the Election Integrity Partnership?
21              A.   So his primary role was the same as
22      mine, in terms of just clarifying the gap that
23      election officials faced for the folks at the
24      Stanford Internet Observatory early on in the
25      process.
```

```
 1              Q.   And is that something that you
 2     discussed with the interns when they came up
 3     with the idea?  Did the interns come to you or
 4     Mr. Masterson and talk about the gap?
 5              A.   I'm sorry, so are you referring
 6     specifically to the gap?
 7              Q.   Yeah.
 8              A.   Yeah, so the gap came from our --
 9     the gap came from myself.
10              Q.   That was your idea, that there is a
11     gap, and you shared that with the interns?
12              A.   I'm not sure I would say that was
13     my idea.  That was -- that was just kind of from
14     lessons learned from 2018, I think across the
15     election community.
16                   I don't know that I would say that
17     that was -- that was something that we came up
18     with on our own.
19              Q.   Is that something you shared with
20     the interns?
21              A.   It is something I shared with the
22     interns, correct.
23              Q.   And then the interns came up with
24     the idea of putting together the Election
25     Integrity Partnership as a way of assisting
```

```
 1        state and local election authorities of filling
 2        that gap; right?
 3               A.   I don't -- I don't know what the
 4        exact process was, essentially they identified
 5        the gap.  They went back and talked to the folks
 6        at the Stanford Internet Observatory.  And
 7        somewhere in that sausage making process, along
 8        the way, they decided that this partnership
 9        would be the best approach to take.
10               Q.   In that timeframe, did they also
11        have discussions with you about putting together
12        something like this?
13               A.   I'm sure they mentioned it to us
14        somewhere along the line, that this was
15        something they were thinking about, but I
16        don't -- I don't know that it went beyond that.
17               Q.   How about Mr. Masterson, did they
18        discuss it with him?
19               A.   Again, I'm not familiar with all of
20        Matt's communications with these folks, but he
21        was in the meeting where we talked about the gap
22        with Stamos, in particular.  And I believe
23        Stamos mentioned that as an option during that
24        call.  I don't know if he had any other
25        conversations with them.  I don't know about
```

**BRIAN J. SCULLY  1/12/2023**

```
 1    that.
 2            Q.    When did that meeting with Alex
 3    Stamos occur?
 4            A.    Sometime in the summer of 2020, it
 5    would have -- yeah, I don't know.  The exact
 6    date would be hard for me to figure out, sorry.
 7    Yeah, the interns -- sorry -- the interns
 8    probably arrived in the May timeframe, so we
 9    probably would have had had that conversation --
10    the initial conversation sometime in June.  And
11    then probably Stamos, you know, a week or two
12    after that, so probably June/July, I would say.
13            Q.    Was Mr. Masterson in the meeting
14    where you discussed the gap with the interns?
15            A.    Not that I recall, no.
16            Q.    What did Mr. Stamos say in this
17    meeting you recall from the June to July
18    timeframe of 2020?
19            A.    Essentially, he just wanted to
20    confirm that we agreed with the interns that
21    this was a gap.
22            Q.    What -- what was said about the gap
23    in that meeting, that you remember?
24            A.    Yeah, it was basically along the
25    lines he just said, hey, the interns told me
```

```
 1    that there's a gap for election officials where
 2    most of them don't have the resources to do --
 3    to identify disinformation that may be targeting
 4    their jurisdictions, is that -- did the interns
 5    give me that information correctly.  He was
 6    thinking about potentially doing something, and
 7    he obviously didn't want to spend time and
 8    resources doing something if there wasn't, in
 9    fact, a gap.
10         Q.  How long did this meeting occur or
11    last, do you think?
12         A.  That's all of maybe 10 or 15
13    minutes.
14         Q.  Was there any other communications
15    with Mr. Stamos during this timeframe?
16              MR. GARDNER:  Objection, vague,
17    also calls for speculation.
18    BY MR. SAUER:
19         Q.  Do you remember any?
20         A.  So I don't recall any conversations
21    I had with him in that timeframe.  I obviously
22    can't speak for Masterson.
23         Q.  Okay.  Scroll ahead to page XII.
24    There's a thank you there for contributors, and
25    you see Kate Starbird is on that list; do you
```

```
 1      see that?  You can look at the screen share.
 2              A.    Yes.
 3              Q.    You're there?  Yeah, do you know --
 4              A.    Yeah, I got it.
 5              Q.    Do you know how she contributed to
 6      the Election Integrity Partnership?
 7              A.    I don't.
 8              Q.    And I see Alex Stamos up here,
 9      obviously kind of set the thing off; right?  Do
10      you know how else he was involved?
11              A.    I don't.
12              Q.    Okay.  Down here it says the
13      Election Integrity Partnership would like to
14      thank Matt Masterson for additional feedback; do
15      you see that?
16              A.    I do.
17              Q.    Do you know what feedback
18      Mr. Masterson provided to the Election Integrity
19      Partnership?
20              A.    I don't.
21              Q.    When did Mr. Masterson leave CISA
22      and go to Microsoft?
23              A.    So Matt left CISA, I believe, in
24      January 2021.  I don't think he started at
25      Microsoft until early 2022.
```

Case 3:22-cv-01213-TAD-KDM Document 209 Filed 03/24/23 Page 89 of 456 PageID #: 13202

```
 1              Q.   Oh, do you know what he did in the
 2     intervening year?
 3              A.   I believe he -- he worked -- he was
 4     a fellow at the Stanford Internet Observatory.
 5              Q.   Oh, so he went from CISA to work
 6     with Alex Stamos's group at the Stanford
 7     Internet Observatory?
 8              A.   That's my understanding, yes.
 9              Q.   And Mr. Masterson is thanked here,
10     in this spring of 2021, I take it he was at the
11     Stanford Internet Observatory by then?
12              A.   I don't know when he officially
13     started.
14              Q.   I'm going to jump ahead to page 2
15     of the executive summary.  So if you're
16     following on the PDF it would be the 20th page
17     of the PDF.
18                   There's a discussion here where it
19     says:  The initial idea for the partnership came
20     from four students that the Stanford Internet
21     Observatory funded to complete volunteer
22     internships at CISA; right?
23              A.   Correct.
24              Q.   Okay.  You've declined to identify
25     them, early in your testimony.  Do you know who
```

**BRIAN J. SCULLY 1/12/2023**

1      **they are?  Who are those four students?  Do you**

2      **know who they are?**

3           A.   I know for certain who two are, I

4      believe I know who the third is, I'm unsure who

5      the fourth is.

6           **Q.   What -- what were they doing in**

7      **their internships for CISA at the time they**

8      **originated this idea?**

9           A.   They had different activities, so

10     they supported across the election security

11     initiative, broadly.  So tying to think if I can

12     recall specific tasks that they had.

13          **Q.   And then, if you look to the next**

14     **two sentences, it talks about responsibilities**

15     **for election information security is divided**

16     **across government offices, and it goes on to say**

17     **that, yet, no government agency in the United**

18     **States has the explicit mandate to monitor and**

19     **correct election mis and disinformation;**

20     **correct?**

21          A.   I'm sorry, is that the next page?

22          **Q.   If you look at the screen share,**

23     **can you read that?  I can zoom in, if that**

24     **helps.**

25          MR. GARDNER:  A few sentences below

Case 3:22-cv-01213-TAD-KDM Document 209 Filed 03/04/23 Page 91 of 456 PageID #: 13204

```
 1     where he was reading.
 2                 THE WITNESS:  Okay.  Got you.
 3     BY MR. SAUER:
 4           Q.   So it says:  Yet, no government
 5     agency in the United States has the explicit
 6     mandate to monitor and correct misinformation
 7     and disinformation; correct?
 8           A.   Sorry, I'm just trying to read and
 9     catch up.
10           Q.   I'm just asking if you see where it
11     says that.
12           A.   Yeah, I see where it says that.
13           Q.   And it seems to me that they're
14     talking about a slightly different gap than the
15     one you talked about earlier; right?  They're
16     saying there's a gap in federal government
17     authority to monitor and correct election mis
18     and disinformation, right, as opposed to a gap
19     among the capacity for state and local election
20     authorities to do it; right?
21           A.   To be honest, I don't know what
22     they're referencing, so I don't -- I don't want
23     to speculate on what they're trying to say
24     there.
25           Q.   Let me ask you this:  Do you think
```

**BRIAN J. SCULLY  1/12/2023**

```
 1      there's a gap in the authority of federal

 2      government agencies to monitor and correct

 3      election mis and disinformation?

 4              MR. GARDNER:  Objection to the

 5      extent it calls for a legal conclusion.

 6   BY MR. SAUER:

 7              Q.   Do you think that?

 8              A.   Yeah, I'm not a -- I'm not a

 9      lawyer, I don't want to comment on the legal

10      authorities of the departmental agencies.

11              Q.   I'm just asking whether you

12      think --  I'm not asking for your legal

13      conclusion, I'm asking whether you think there's

14      a gap in the authority of federal agencies that

15      makes them unable to monitor and correct mis and

16      disinformation?

17              MR. GARDNER:  Same objection, calls

18      for a legal conclusion.

19              A.   Yeah, by definition, an authority

20      is a legal determination I'm not comfortable

21      making.

22              Q.   Let me ask you this:  As a

23      practical matter, do you believe there's a gap

24      in the ability, as opposed to the authority, the

25      ability of federal government agencies to
```

```
 1        monitor and correct mis and disinformation?

 2                    MR. GARDNER:  Objection, vague.

 3     BY MR. SAUER:

 4              Q.    You may answer.

 5              A.    Yeah, can you clarify exactly what

 6        you're asking?  I just want to make sure I

 7        understand what you're trying to get at.

 8              Q.    I'm using your word, a gap; right?

 9              A.    Yes.

10              Q.    You just called it a gap, earlier,

11        and that's a practical word, it's not a legal

12        conclusion?

13              A.    Correct.

14              Q.    So I'm asking you, you talked about

15        a gap with respect to the capacities of state

16        and local election authorities; correct?

17              A.    That's correct, yeah.

18              Q.    Do you think there's a similar gap

19        with respect to the ability of federal

20        government agencies to respond to mis and

21        disinformation on social media?

22                    MR. GARDNER:  Same objection,

23        vague.

24              A.    I -- I think the federal government

25        certainly would have the capability, if it chose
```

```
 1    to use it, and had the authority to do it.
 2              Q.   Do you think it hasn't chosen to
 3    use that capability?
 4              A.   So generally speaking, I'm trying
 5    to understand your question.  So is there a gap
 6    in the federal government's ability to, what, to
 7    provide information on social media about what's
 8    online on their platforms, is that what you're
 9    asking?
10              Q.   I'm asking if there was a gap in
11    the federal government's ability to, you know,
12    take any kind of action to correct mis and
13    disinformation on social media?
14              MR. GARDNER:  Same objection, to
15    the extent it calls for a legal conclusion.
16              A.   Yeah, I don't know that there's a
17    gap in the federal government's ability to do
18    it.
19              Q.   Well, let me ask this:  It goes on
20    to say -- let me ask you this:  This notion that
21    the report says that no government agency in the
22    United States has the explicit mandate to
23    monitor and correct election mis and
24    disinformation, is that something that was
25    discussed with the CISA interns who originated
```

```
 1      the EIP?

 2              A.   Not that I recall, no.

 3              Q.   Do you remember any discussions of

 4      that with anyone else, suggesting that, you

 5      know, there's no government agency in United

 6      States with an explicit mandate to monitor and

 7      correct election mis and disinformation?

 8              A.   No, not that I -- not that I

 9      recall.  It's possible, though.

10              Q.   It goes on to say:  This is

11      especially true for election disinformation that

12      originates from within the United States, which

13      would likely be excluded from law enforcement

14      action under the first amendment, is not

15      appropriate for study by intelligence agencies

16      restricted from operating in the United States;

17      connect?

18              A.   That's what the sentence says, yes.

19              Q.   Do you agree with that sentence?

20              MR. GARDNER:  Objection, calls for

21      a legal conclusion.

22      BY MR. SAUER:

23              Q.   Do you?

24              MR. GARDNER:  Same objection.

25              A.   I'm sorry, I'm reading the
```

**BRIAN J. SCULLY  1/12/2023**

Page 96

```
1    sentence.
2              Yeah, this definitely gets into
3    legal authority stuff that I would not want to
4    comment on.
5         Q.   And the next sentence says:  As a
6    result, during the 2020 election local and state
7    election officials, who had a strong partner on
8    election system and overall cyber security
9    efforts in CISA, were without a clearinghouse
10   for assessing mis and disinformation targeting
11   their voting operations; correct?
12             A.   Yeah, that's what this sentence
13   says.
14        Q.   That, to me, sounds like it's
15   talking about the same gap you talked about
16   earlier, and that's state and local election
17   officials were without a clearinghouse for
18   assessing mis and disinformation targeting their
19   voting operations; right?
20             A.   That's how I read that sentence,
21   yeah.
22        Q.   Yeah, and I take it that this
23   report links that gap to gaps that they perceive
24   in federal authority; right?
25             MR. GARDNER:  Objection, calls for
```

```
 1    speculation.
 2              A.   Yeah, I don't want to speculate on
 3    what they're trying to do there.
 4              Q.   Okay.  Next sentence says:
 5    Students approach SIO leadership in the early
 6    summer, and in consultation with CISA and other
 7    stakeholders a coalition was assembled with
 8    like-minded partner institutions; do you see
 9    that?
10              A.   I do.
11              Q.   What -- let me ask you this:  It
12    says, in consultation with CISA, what
13    consultation with CISA do you recall relating to
14    the assembling of this coalition?
15              A.   I don't recall any consultation
16    with relation to the assembly of the coalition.
17              Q.   Well, you don't recall anyone
18    consulting with CISA about putting together the
19    Election Integrity Partnership?
20              MR. GARDNER:  Objection,
21    mischaracterizes the witness's previous
22    testimony.
23              A.   Yeah, so I don't recall any
24    consultation with us about who would be involved
25    in the -- in the EIP, who their members would be
```

```
1    or anything like that.
2            Q.   Do you remember any consultation of
3    any kind about starting up the EIP in any
4    connection?
5            A.   Just what I referred to earlier,
6    the conversations with the interns and the
7    conversation with Stamos about verifying the gap
8    existed.
9            Q.   How about Mr. Masterson, is it
10   possible they consulted with him?
11           MR. GARDNER:  Objection, calls for
12   speculation.
13           A.   Yeah, I don't know what
14   conversations Matt had with them.
15           Q.   Do you know whether he had any
16   conversations with them relating to the
17   commencement of the EIP?
18           A.   I don't.
19           Q.   And the next page of the document,
20   they provide an operational timeline; do you see
21   that?
22           A.   I do.
23           Q.   And here, the second entry in their
24   operational timeline, is -- I'm having trouble
25   highlighting -- it says:  July 9th of 2020,
```

```
 1        meeting with CISA to present EIP concept; do you

 2        see that?

 3                A.   Yep, I see that.

 4                Q.   Do you know what meeting that is

 5        referring to?

 6                A.   I don't know specifically what

 7        meeting that's referring to, no.

 8                Q.   Would that -- to your mind, would

 9        that describe the 10 to 15 minute phone call you

10        had with Alex Stamos about the gap that you

11        talked about earlier?  Would you have described

12        that phone call as a meeting with the EIP for

13        EIP to present -- for -- to present the EIP

14        concept to CISA?

15                A.   That 10 to 15 minute phone call

16        only included Stamos, that I recall.  So I don't

17        know that I would frame it as a meeting to

18        present the EIP concept.

19                     As I mentioned earlier, he did kind

20        of raise the possibility of setting up some sort

21        of a partnership, during that call, so that

22        could be what his -- what his thinking was, but

23        I don't know what he's referring to there.

24                Q.   What kind of a partnership did he

25        talk about in that call?
```

**BRIAN J. SCULLY  1/12/2023**

```
 1              A.   He just said he thought he -- he
 2    was thinking about potentially just getting
 3    other -- other similar institutions involved.
 4              I don't recall it -- I don't even
 5    recall if he mentioned any names or not.  I
 6    think it was more of a generic, where he didn't
 7    think Stanford could necessarily do it on its
 8    own, and would consider kind of forming some
 9    sort of partnership.
10         Q.   Did he talk about forming any kind
11    of partnership with CISA?
12         A.   No.
13         Q.   So he didn't ask CISA to play any
14    role in the concept he was putting together?
15         A.   No.  Again, beyond -- sorry, just
16    to -- beyond what I've talked about earlier, you
17    know, I think he knew he would need us helping
18    him connect with election officials.
19         Q.   So he -- to the extent he -- okay.
20              So he was asking for your help in
21    connecting with election officials in that
22    meeting?
23         A.   I believe that was one of the asks,
24    but I don't -- it could have been then, it could
25    have been at another time, if that happened.
```

**BRIAN J. SCULLY  1/12/2023**

```
 1            Q.   Is there a later conversation with
 2    Mr. Stamos?
 3            A.   I don't recall, but that's what I
 4    think there was a fifth call.  But again, I
 5    don't -- you know, this was several years ago,
 6    and my memory's a little foggy on timelines and
 7    everything that happened.
 8            Q.   But to the best of your
 9    recollection, at some point he asked for CISA's
10    assistance in connecting with state and local
11    election officials; right?
12            A.   Yeah.
13            Q.   Is that when you put him in touch
14    with the Center For Internet Security?
15            A.   I think they way initially put him
16    in touch with the National Association, so the
17    two I mentioned earlier, the National
18    Association of Secretary's of State, and the
19    National Association of State Election
20    Directors.  I'm not entirely -- I don't recall
21    when, exactly, Center For Internet Security got
22    involved.
23            Q.   At some point, did you put him --
24    put him in touch with CIS?
25            A.   So we put the Stanford Internet
```

```
 1    Observatory in touch with them.  I forget if it
 2    was Alex, himself, or if it was somebody from
 3    the team there.
 4         Q.   So at some point you put them in
 5    touch with CIS.  And were you involved in
 6    further communications with CIS and anyone at
 7    EIP?
 8         A.   Yeah, so as I mentioned earlier, I
 9    facilitated some meetings between them, involved
10    between them and election officials.
11         Q.   What sort of -- can you unpack that
12    a little bit, you facilitated some meetings
13    between -- was that both EIP and CIS?
14         A.   Right.  So I facilitated meetings,
15    some meetings between EIP and CIS to make sure
16    that they were -- they didn't have relationship
17    before the -- they didn't know each other.
18              So we just facilitated getting them
19    together to talk and figure out how they were
20    going to work together.
21         Q.   Got you.  And who was at those
22    meetings from EIP?
23         A.   I don't recall.
24         Q.   How about CIS, who did you put them
25    in touch with at CIS?
```

**BRIAN J. SCULLY  1/12/2023**

```
 1              A.   I only recall the CIS person's
 2    first name was Aaron.  I'm blanking on his last
 3    name, at this point.  I suspect there were other
 4    people from CIS on the call, as well, but he
 5    was -- Aaron was my principal contact at CIS.
 6    And that's Aaron, A-a-r-o-n.
 7              Q.   And I take it the purpose of that
 8    meeting was to set up a direct line of
 9    communication between CIS and EIP?
10              A.   Correct.
11              Q.   And then did you mention that you
12    facilitated other meetings, for example, between
13    EIP and NASED or National Association of
14    Secretaries of State?
15              A.   Yeah, my recollection is that we
16    did facilitate.  We put them in contact.  I
17    don't -- I don't know if we were on the calls or
18    not, I don't recall, but -- but I seem to recall
19    we did put them in contact.
20              Q.   Okay.  And specifically you mean
21    you put EIP --
22              A.   EIP in.
23              Q.   -- in contact with NASED and NASOS;
24    is that what it's called?
25              A.   Just NASS, but yes.
```

**BRIAN J. SCULLY 1/12/2023**

```
 1              Q.   Okay.  And so, yeah, sorry, for
 2      clarity, you put EIP in contact with both NASED
 3      and NASS; correct?
 4              A.   And just to be clear, we put SIO
 5      folks in contact with them.
 6              Q.   Okay.
 7              A.   But they were part of EIP, so
 8      that's kind of the -- I don't know when EIP was
 9      stood up in relation to the conversations,
10      because I don't really know when the
11      conversations occurred, either.  So just so
12      you're clear, we worked through the SIO when we
13      made those connections.
14              Q.   Got you.  Do you remember who at
15      the SIO was involved in those connections?
16              A.   I don't.
17              Q.   And again, SIO is short for
18      Stanford Internet Observatory; correct?
19              A.   Correct.
20              Q.   Do you know, what was the timeframe
21      of those, you know, connections that you
22      facilitated with, you know, Stanford Internet
23      Observatory folks and CIS, NASED and NASS?
24              A.   I don't know for certain, but I
25      would guess they were late July or August.
```

```
 1              Q.   So this would have been around the
 2      time that the EIP is kind of ramping up its
 3      activities?
 4              A.   Yeah, I don't -- I mean, I don't
 5      know when they were ramping up their activities,
 6      but I would assume it was around that time.
 7              Q.   Let me scroll down, so you can see
 8      this on the screen share, it's page 8.  Is that
 9      size on the screen share visible to you?
10              A.   Somewhat.
11              Q.   Do you see here on page 8 there's a
12      kind of graphic where the EIP report lists four
13      major stakeholders, government, civil society,
14      platforms and media; right?
15              A.   Yep, I see that.
16              Q.   You got an arrow from government, a
17      black arrow that flows from government to intake
18      queue; correct?
19              A.   Yep.
20              Q.   Do you know what that's referring
21      to, did the government -- do you know what
22      governments as stakeholders submitting
23      information for the intake queue for the EIP?
24              A.   I don't know if, specifically, what
25      that's in reference to, no.  I mean, I would
```

```
 1    think it was election officials, but I don't --
 2    I don't know.
 3              Q.   How about CISA, would CISA ever
 4    receive a report from election officials and
 5    pass it along to EIP?
 6              A.   I don't recall us doing that.  It
 7    wasn't part of our process, and -- and we would
 8    just send it to the platforms, ourselves, so I
 9    don't know that we would send it to EIP.
10              Q.   How about CIS, do you know if they
11    did that on behalf of state and local officials?
12              A.   Did CIS forward messages that
13    election officials sent to them to EIP?
14              Q.   Yeah, about disinformation.
15              A.   I would think so, but I don't know
16    for certain.
17              Q.   And you see there's a red arrow
18    down here at the bottom, from tier 3:
19    Mitigation, and then that flows back to
20    government.
21              Were you aware of EIP reporting
22    back to CISA about what happened with
23    disinformation or misinformation reports?
24              A.   I don't recall that there was
25    communication when -- so just let me take a step
```

```
 1      back.  So you're asking if we were familiar with
 2      when EIP would send reports to the platforms,
 3      were we aware of that?
 4             Q.   Correct.
 5             A.   Generally speaking, we were not --
 6      as far as I know we were not aware.  I wouldn't
 7      say generally.
 8                  As far as I'm aware, we were not in
 9      the loop when they were communicating with
10      platforms.
11             Q.   And I apologize, I split the screen
12      on screen share.  Actually, stay with that
13      graphic for a minute.  Up here in the corner, it
14      says, tier one:  Detection intake.  On-call data
15      gathering, triage, and response; do you see
16      that?
17             A.   I do.
18             Q.   Do you know how the Election
19      Integrity Partnership gathered data about what
20      was being said on social media in 2020?
21             A.   I don't know the specifics of how
22      they did that, no.
23             Q.   Did you have any understanding at
24      all, other than obviously receiving reports from
25      CIS, NASED and NASS?
```

**BRIAN J. SCULLY  1/12/2023**

```
 1              A.   My understanding was that they
 2      monitored social media in some way.
 3              Q.   Yeah, do you have any idea how they
 4      did it?  I mean, there's different ways of doing
 5      that, do you know how they did it?
 6              A.   I don't know what tools or
 7      capabilities they used, no.
 8              Q.   Down here below the graphic, it
 9      talks about tickets being submitted to the EIP,
10      it says tickets were submitted both by trusted
11      expert stakeholders detailed in section 1.4 on
12      page 11, an internal EIP analysts; correct?
13              A.   Yes.
14              Q.   Do you know who the trusted
15      external stakeholders were?
16              A.   I don't.
17              Q.   Do you know whether CISA, at least
18      EIP considered CISA a trusted external
19      stakeholder?
20              MR. GARDNER:  Objection, calls for
21      separation.
22      BY MR. SAUER:
23              Q.   Do you know.
24              A.   I suspect if we scroll down to page
25      11 we'll find out who the stakeholders were.
```

1          Q.   Good idea.  So here at the bottom

2     of page 11, section 1.4, discussing external

3     stakeholders; do you see where we are?

4          A.   Getting there.  And 11, external

5     stakeholders.  Yep.

6          Q.   It says:  The EIP serve as a

7     connector for many stakeholders, who both

8     provided inputs and received outputs; correct?

9          A.   Yep.

10         Q.   Okay.  And then flipping to the

11    next page, 12, first sentence:  External

12    stakeholders include government, civil society,

13    social media companies, and news media entities;

14    correct?

15         A.   Correct.

16         Q.   It says:  Government and civil

17    society partners could create tickets or send

18    notes to EIP analysts; right?

19         A.   That's what it says, yes.

20         Q.   It goes on to say:  They use these

21    procedures to flag incidents to be emerging

22    narratives to be assessed by EIP analysts;

23    correct?

24         A.   That's what it says, correct.

25         Q.   And do you know what government's

```
 1      partners were creating tickets to flag incidents
 2      or merging narratives to the EIP?
 3              A.   I don't.
 4              Q.   Immediately below that paragraph,
 5      they mention some government officials; right?
 6              A.   Yep.
 7              Q.   Right there, it says:  Four major
 8      stakeholder groups in that graphic in the middle
 9      of page 12; right?
10              A.   Yep.
11              Q.   And there's three that are listed
12      there; right?
13              A.   Mm-hmm.
14              Q.   There's Election Infrastructure
15      ISAC; right?
16              A.   Correct.
17              Q.   And that's the EI-ISAC that CISA
18      funds the Center For Internet Security to
19      operate; is that right?
20              A.   Again, I don't know if the money
21      goes directly to the EI-ISAC.  I don't know how
22      the money flows, but EI-ISAC is part of CIS and
23      we do fund the EI-ISAC.
24              Q.   Yeah, and then the next one listed
25      is CISA?
```

**BRIAN J. SCULLY 1/12/2023**

```
 1              A.    Mm-mmm.

 2              Q.    And the next one is listed as the

 3     GEC; right?

 4              A.    Correct.

 5              Q.    So do you know why CISA is listed

 6     there, why the EIP listed CISA as a major

 7     stakeholder group in the EIP?

 8              MR. GARDNER:  Objection, calls for

 9     speculation.

10              A.    Yeah, I don't know why.

11              Q.    Down at the bottom, it says:  Four

12     major stakeholder groups that collaborated with

13     the EIP.  Do you believe that CISA collaborated

14     with the EIP?

15              A.    Did we have conversations with

16     representatives of the EIP?  Yes.  If that's

17     considered collaboration then I guess we

18     collaborated with the EIP.

19              Q.    Tell me about those conversations.

20     I know you mentioned a couple of them or a few

21     of them, already.  I take it those included a

22     call with Alex Stamos to talk about the gap;

23     right?

24              A.    Yep.

25              Q.    And it included facilitating
```

1    meetings between the EIP and NASED and NASS;

2    correct?

3              A.   Yes.

4              Q.   And it included in some -- I take

5    it, it included in some connection putting EIP

6    in touch with Center For Internet Security;

7    correct?

8              A.   That's correct.

9              Q.   And I take it were you kind of

10   putting them in touch with the EI-ISAC people

11   for the Centers For Internet Security?

12             A.   I don't recall that we put them in

13   touch with the EI-ISAC people.  We put them in

14   contact with CIS-specific people.

15             Q.   And, in particular, I think you

16   mentioned someone called Aaron; is that right?

17             A.   Yes, Aaron, Aaron, as far as I'm

18   aware, did not work for the EI-ISAC.  He worked

19   just for CIS.

20             Q.   What other conversations with

21   representatives of EIP do you recall, other than

22   those four we just listed?

23             A.   As I mentioned earlier, I believe

24   we had some conversations when they put out

25   public reports.  If we had any questions about

```
 1    those public reports I believe we have had a
 2    couple conversations about that.
 3           Q.   Sorry, go ahead and finish.
 4           A.   No, I think that's -- I think
 5    that's it, that I recall.
 6           Q.   Who was involved in those
 7    conversations about the public reports?
 8           A.   Again, it would likely be
 9    Masterson, and then there probably would have
10    been some staff.  So I don't know specifically,
11    but there would have been other election
12    security staff, and probably other MDM-specific
13    team staff.  But I don't recall who,
14    specifically, it would have been.  It could have
15    shifted, you know, based on who was available,
16    and things like that, so -- so I don't recall.
17           Q.   About how many conversations of
18    that nature, relating to public reports, do you
19    recall?
20           A.   To be honest, I don't recall any,
21    specifically.  I just know that we had a few.
22    And so I -- I don't want to make up a number for
23    you, but it was -- it was probably somewhere
24    between two and four.
25           Q.   And were you on the two and four
```

1     conversations or did other people have them?

2          A.   I mean, those are the ones that I

3     recall, so those are the ones I would have been

4     on, I don't know if there are others that other

5     people from CISA would have been on, that I was

6     not.

7          Q.   Okay.  What was discussed in the --

8     about their public reporting in the

9     conversations you were involved in?

10         A.   We would just ask questions about

11    tactics and things like that, what they were

12    seeing.

13         Q.   What kind of contacts would they

14    have?

15         A.   They were just fairly brief

16    conversations -- sorry -- they were just fairly

17    brief conversations, based on blog posts.  So if

18    we had a question about jurisdiction being

19    targeted or a new tactic or things like that, we

20    would just ask them kind of questions about that

21    sort of thing.

22         Q.   And what -- when you said tactics,

23    those are kind of online tactics for spreading

24    social media misinformation and disinformation?

25         A.   Correct.  Like we were talking

```
 1    about earlier, the coordinated inauthentic
 2    behavior.  So were they using things like bots
 3    or stuff like that, kind of what was their --
 4    the technique that they were using to
 5    distribute.
 6            Q.   Were people at CISA following their
 7    blog posts to sort of, you know, get information
 8    from them?
 9            MR. GARDNER:  Objection, calls for
10    speculation.
11          A.   Yeah, can you specify what you mean
12    by people?
13            Q.   Was anyone at CISA following the
14    EIP's public reports?
15            MR. GARDNER:  Same objection.
16          A.   I can only speak for myself.  I was
17    following the public reports.
18            Q.   Okay.  How about anyone -- how
19    about anyone on your team?
20            MR. GARDNER:  Same objection.
21          A.   Yeah, I mean, I -- they likely
22    were, but, you know, I couldn't say for certain.
23            Q.   And so --
24          A.   The only job requirement -- there's
25    nobody responsible on my team, as part of their
```

1    job, to regularly file to the EIP reporting.

2         Q.   I take it you did it, and saw some

3    stuff you thought was interesting; is that

4    right?

5         A.   Yeah.

6         Q.   And then are you the one who

7    decided to reach out to them and ask questions

8    about follow-up questions about stuff that they

9    posted?

10         A.   Yeah.

11         Q.   And then do you remember anything

12    specific about the tactics they flagged in their

13    blog posts?

14         A.   I don't.

15         Q.   Who did you talk to at the EIP when

16    you reached out?

17         MR. GARDNER:  Objection to the form

18    of the question.

19         A.   I don't recall.

20         Q.   Was it Mr. Stamos?

21         A.   It could have been Alex, it could

22    have been Renée.  I forget, kind of, how they --

23    I forget how we connected with them.

24         Q.   Did you already know Alex Stamos

25    and Renée DiResta when these conversations

```
 1        started happening in the summer of '20?

 2              A.   I knew Alex Stamos from previous --

 3        from when he was at Facebook.  And then, as I

 4        mentioned, Masterson and I went out to an event

 5        that Stamos hosted when he got to the Stanford

 6        Internet Observatory.  So I knew him.  Renée, I

 7        think I may have had a conversation or two with,

 8        prior, but I didn't know her as well as Alex.

 9              Q.   You say you knew him when he was at

10        Facebook.  What was your interactions with him

11        then?

12              A.   He headed the team at Facebook that

13        we did the coordination for some of the initial

14        government industry meetings.  So if you recall

15        back then, essentially the first meeting was

16        back in 2018, Alex was the Facebook lead for

17        that meeting.

18              Q.   So he was the contact person at

19        Facebook that would be in those meetings that

20        involved CISA and ODNI and DOJ and the FBI?

21              A.   Correct.

22              Q.   I just want to flip one page in the

23        report.  Up here on the screen share, do you see

24        up here they have a comment that says:

25        Additionally, the Countering Foreign Influence
```

Case 3:23-cv-00531-TAD-KDM Document 1061 Filed 06/30/23 Page 118 of 456 PageID #:
13301
Case 3:23-cv-00531-TAD-KDM Document 1061 Filed 06/30/23 Page 118 of 456 PageID #:
13301

BRIAN J. SCULLY 1/12/2023

```
 1        Task Force, a subcomponent of CISA, aided in the

 2        reporting process and in implementing resilience

 3        efforts to counter misinformation; do you see

 4        that sentence?

 5              A.    I do.

 6              Q.    I take it the counter -- countering

 7        and foreign influence task force is now called

 8        the MDM team that you lead; right?

 9              A.    Yeah, that's correct.

10              Q.    Were you the leader of that team

11        then called the CFITF in 2020?

12              A.    I was.

13              Q.    Do you know what the report means

14        when at it says that the CFITF, which was your

15        team, aided in the reporting process?

16              MR. GARDNER:  Objection, calls for

17        speculation.

18              A.    Yeah, I -- I don't know,

19        specifically, what they're referencing.  My

20        assumption would be they're referencing a

21        switchboarding we discussed earlier.

22              Q.    Tell me about that switchboarding.

23        I take it your testimony earlier was that you --

24        you were switchboarding or routing

25        disinformation concerns to social media
```

1    platforms and that there was coordination with

2    CIS and EIP on how they should be reported;

3    correct?

4             A.   No, that's not correct.

5             Q.   Okay.

6             A.   So I believe what my testimony said

7    earlier is that you would receive -- generally

8    receive reporting through one of three ways, one

9    of those was through the Center For Internet

10   Security, two-fifths of that we would then

11   forwarded to the platforms.

12            I don't recall any reporting

13   directly coming from EIP.  So generally

14   speaking, that's, you know, adding EIP into your

15   question I think is incorrect.

16            Q.   What were the other two ways, you

17   said there were three ways, one is you get

18   them --

19            A.   Yep.

20            Q.   -- through Center for Internet

21   Security, what are the other two?

22            A.   So the other two ways, sometimes

23   election officials would send them in to CISA

24   central, which is CISA's kind of ops center

25   block room type setup.  And then the third way

```
 1    was they would just send direct to a CISA
 2    employee, often -- often Matt Masterson, who had
 3    relationships with many of the election
 4    officials.  So those were the principal ways we
 5    received reporting from election officials.
 6            Q.   So through the CIS, kind of
 7    directly to -- was there a kind of e-mail
 8    address for reporting misinformation that CISA
 9    maintained?
10            A.   Not specific to misinformation.  It
11    was -- CISA central had their own e-mail
12    address, and obviously Matt had his.  We had an
13    internal CFITF e-mail address, but I don't
14    believe we -- we put that out for election
15    officials to send messages to, I don't recall us
16    doing that.
17            Q.   And then sometimes they would go to
18    straight to Mr. Masterson?
19            A.   Right.
20            Q.   And then I take it you -- did you
21    coordinate with CIS on what you were reporting
22    to social media platforms?
23            A.   Only in the sense that we would let
24    them know when we reported something to a
25    platform, again, to avoid duplication or, you
```

BRIAN J. SCULLY 1/12/2023

1    know, most of the reporting that I recall in

2    2020 came through CIS.  And so we just wanted to

3    let them know that we were acting on what they

4    sent us.

5              For reporting that didn't come

6    through CIS, we would often let them know after

7    we had shared it with the platforms that we had

8    shared something with the platforms for their

9    arrangement.

10             Q.   And then I take it you said

11   earlier, your understanding is that CIS was

12   coordinating with EIP?

13             A.   Again, they had a relationship.  I

14   don't know how I would characterize what they

15   were -- what they were doing with the EIP.

16             Q.   Do you know what interactions they

17   had, at all, other than the ones we talked about

18   between CIS and EIP?

19             A.   I mean, I can't specifically say

20   what they were doing.  They had a relationship.

21   They shared information.  I don't know kind of

22   the extent of that or kind of what their

23   policies and procedures were for what they were

24   doing.  So I know they were sharing stuff.  I

25   don't know what, how or when, towards the

1    questions.

2            Q.   I'm going to jump ahead to page 35

3    of this report.

4            A.   35?  All right.

5            Q.   That's going to be on page 53 of

6    the PDF?

7            A.   Almost there, sorry.  All right.

8    I'm on 35.

9            Q.   If you look here on the last

10   sentence before that heading on the page, it

11   says, according to the EIP, interestingly, just

12   one percent of tickets related to COVID-19, and

13   less than one percent related to foreign

14   interference; do you see that?

15           A.   I do.

16           Q.   Is that consistent with your

17   understanding of the reports that you were

18   making to social media platforms in that

19   timeframe that only a small minority related to

20   before and afters?

21           MR. GARDNER:  Objection, lack of

22   foundation, calls for speculation.

23   BY MR. SAUER:

24           Q.   If you know.

25           A.   So CISA does not do attribution.

1    We didn't do analysis of what we received from

2    election officials.  So we would not know what

3    percentage were foreign derived.

4         **Q.   So you would receive reports and**

5    **you would forward them onto social media**

6    **platforms, you know, for consideration under**

7    **their content moderation policies, without**

8    **assessing whether they were originated from**

9    **foreign or domestics sources?**

10        A.   That's correct.

11        **Q.   In other words, a report would come**

12   **in, and you, like, didn't take steps to see**

13   **whether this came from a foreign or domestic**

14   **source?**

15        A.   Correct.

16        **Q.   You would just pass it along to the**

17   **social media platforms?**

18        A.   Right.

19        **Q.   Are you familiar with the gateway**

20   **pundit?**

21        A.   Am I familiar with it?  Yeah.

22        **Q.   How do you know about it, what is**

23   **the gateway pundit, on your understanding?**

24        A.   It's some sort of a website.

25        **Q.   How do you know about it?**

**BRIAN J. SCULLY 1/12/2023**

Page 124

```
 1                    A.    I believe they've written some
 2      articles about CISA.
 3                    Q.    How did that get on your radar
 4      screen?
 5                    A.    Articles probably in our clips.
 6                    Q.    Do you remember hearing --
 7                    A.    I don't -- I don't --
 8                    Q.    Go ahead.
 9                    A.    I don't recall specifically how
10      they got on my radar.
11                    Q.    Do you remember hearing of them in
12      any other connection, other than writing
13      articles about CISA?
14                    A.    I do think of the general kind of
15      recall.  Yeah, I think probably just as a
16      general fact that it had news on it I think is
17      probably the extent of what I know.
18                    I'm sure I've just seen them, you
19      know, in reading other stories and things like
20      that, I don't -- I don't -- honestly, I don't
21      know how I came to know them.
22                    Q.    Are you aware of anyone at CISA
23      raising concerns that the gateway pundit might
24      be spreading misinformation or disinformation?
25                    A.    No.
```

**BRIAN J. SCULLY  1/12/2023**

```
 1              Q.   I'm going to jump far down in this
 2      document to page 196.
 3              A.   Let me see if there's a quick way
 4      for me to get down there.
 5              Q.   Yeah, it's page 213 of the PDF.
 6              MR. GARDNER:  I think you can go
 7      here.  That's a lot.
 8              THE WITNESS:  Sorry.
 9              MR. GARDNER:  Yeah, you have to
10      scroll.  All right, John, we're getting there.
11              THE WITNESS:  It's two what in the
12      PDF?  I'm sorry.
13   BY MR. SAUER:
14              Q.   It's page 214 of the PDF.
15              A.   Okay.  196.  Almost there.  Sorry.
16              Okay.  Yep.
17              Q.   Okay.  Do you see here, there's a
18      whole section that begins:  The gateway pundit
19      interval?
20              A.   I see that.
21              Q.   In the first sentence of that says:
22      The gateway pundit was among the most active
23      spreaders of election-related misinformation in
24      our analyses; correct?
25              A.   That's what it says.
```

```
 1              Q.   Does that ring a bell, at all?  Do
 2     you recall anyone at CISA ever raising the
 3     concern that the gateway pundit was a spreader
 4     of so-called election-related misinformation?
 5              MR. GARDNER:  Objection.  Asked and
 6     answered.
 7  BY MR. SAUER:
 8              Q.   Do you recall that?
 9              A.   Yep.  As I said earlier, I don't
10     recall any examples of that, no.
11              Q.   Jump ahead to page 211.  This is
12     page 229 of the PDF.
13              A.   Almost there.  Okay.  211, policy.
14              Q.   Yeah, chapter six.
15              A.   Gotcha.
16              Q.   There at the introduction, at the
17     very beginning, it says:  Platform policies
18     establish the rules of participation in social
19     media communities; correct?
20              A.   Yes.
21              Q.   It says:  Recognizing the
22     heightened rhetoric and the use of mis and
23     disinformation during the 2020 election, all the
24     major platforms made significant changes to
25     election integrity policies, both as the
```

```
 1    campaigns kicked off and through the weeks after
 2    election day; correct?
 3            A.   Yes.
 4            Q.   And let me ask you this:  Are you
 5    aware of social media platforms like Twitter and
 6    Facebook and YouTube and so forth changing their
 7    election integrity policies to limit
 8    election-related misinformation and
 9    disinformation during 2020?
10            A.   I'm aware that they changed
11    policies.  I don't know -- again, I don't know
12    that they needed mis and disinformation as their
13    terminology, so I don't want to go there.  But I
14    do recall that they changed policies in 2020
15    related to election security.
16            Q.   How did you know that, at the time,
17    did they report it to you?
18            A.   They -- they did talk about some of
19    it in our regular sync meetings.  And then I
20    believe there's some media coverage and public
21    statements that they made about their changes.
22            Q.   In the sync meetings, were there
23    any questions on the government side?  Did the
24    government ask:  What are you doing to change
25    your policies?
```

```
 1              A.   I don't recall that.  I think,
 2     generally speaking, the platforms would just
 3     talk, you know, on a regular course of the
 4     conversation they would -- that would be one of
 5     their briefing points, that they were making
 6     significant changes.  But it wasn't an essential
 7     part of the conversations, generally speaking.
 8              Q.   Were you aware of anyone in the
 9     federal government kind of asking or encouraging
10     them to change their content moderation policies
11     to address election integrity?
12              A.   Not that I'm aware of, no.
13              Q.   Do you recall, was it placed on the
14     agenda for the sync meetings?
15              A.   Was what placed on the agenda?
16              Q.   Changes in content moderation
17     policies.
18              A.   Not that I recall.
19              Q.   Do you know how it came up in those
20     meetings?
21              A.   Again, I think, you know, part of
22     the meetings were generally different
23     participants providing updates on what they were
24     doing relating to election security.  And my
25     recollection is, is that platforms might raise
```

```
1    those sorts of things during that portion of the
2    agenda.
3              Q.    Did they ever separately e-mail you
4    to notify you of a content policy update?
5              A.    Not that I recall, though it's
6    certainly possible.  You know, I would get press
7    releases that they would put out sometimes, they
8    would forward to me.  But I don't recall
9    specific e-mail on that.
10             Q.    Do you know whether anyone at the
11   Center For Internet Security discussed content
12   policy changes with the social media platforms?
13             A.    I don't.
14             Q.    Do you know whether anybody at CISA
15   did so during the 2020 election cycle?
16             A.    Not that I'm aware of, no.
17             Q.    How about Mr. Masterson?
18             A.    Not that I'm aware of.
19             Q.    What was Mr. Masterson's title or
20   what was his role at CISA during this timeframe
21   in 2020?
22             A.    He was the senior -- I don't know
23   what his exact title was, but he was a senior
24   election security person at CISA.
25             Q.    So did you report to him when you
```

**BRIAN J. SCULLY 1/12/2023**

1    were the head the countering foreign influence

2    task force?

3           A.   No.  Matt was what I call a

4    political appointee, so for organizational

5    reasons I reported up to Geoff and Geoff

6    reported to a normal chain of command.  So there

7    was something weird about Matt being a political

8    appointee and where he could sit in the org

9    chart, so none of us technically reported up to

10   him.

11          Q.   So he was -- but he was -- as a

12   political appointee is higher than you in the

13   org chart?

14          A.   Yeah.

15          Q.   Okay.  And did you coordinate with

16   him on the sort of -- sort of disinformation and

17   misinformation related activities that CISA was

18   engaged in, in 2020?

19               MR. GARDNER:  Objection, vague.

20          A.   Yeah, could you be a little more

21   clear in what you're asking, please?

22          Q.   Well, did you work with Matt

23   Masterson on election disinformation and

24   misinformation related issues in 2020?

25          A.   Yes.

 1             Q.    Okay.  What sort of work did you do
 2      with him?
 3             A.    Again, a majority of our work, as I
 4      mentioned earlier, was resilience building, so
 5      trying to develop products, public education,
 6      public awareness, product to help election
 7      officials, those sort of things.  And then I
 8      would have discussed with him -- he would have
 9      been familiar with the switchboarding work that
10      we were doing.
11             Q.    Did he participate in the
12      switchboarding work?
13             A.    Not beyond when he would receive
14      e-mails, he forwarded them to us.
15             Q.    Well, he would send them to you to
16      be switchboarded, so to speak?
17             A.    Yeah, I mean, he would send them to
18      me or the team e-mail address.
19             Q.    Oh, and you mentioned earlier that
20      he had close relationships with social media
21      platforms?
22             A.    No, I don't think I ever said that.
23      He had close relationships with election
24      officials.
25             Q.    Oh, okay.  Did you also mention

1    that he was in -- he had contacts with social

2    media platforms?

3            A.   Again, he would have participated

4    in the sync meetings that I talked about, the

5    government industry syncs.  If we had a briefing

6    or something at other meetings he would likely

7    participate.  Those are the only communications

8    I'm aware of, but he may have had others.  I'm

9    not sure.

10           Q.   Are you aware of anyone at the

11   Election Integrity Partnership communicating

12   with the social media platforms about changing

13   their policies to, you know, kind of restrict

14   election-related misinformation?

15           A.   I am not, no.

16           Q.   Is that something, that idea of

17   advocating to the social media platforms to

18   adopt more restrictive policies on

19   election-related misinformation, is that

20   something that's -- that you recall coming up in

21   any meetings or discussions you had in 2020?

22           A.   So did we ever have -- so one, if

23   you can clarify who the meetings were with, that

24   you're asking about.

25           Q.   I'm asking --

```
 1          A.   Or the general -- did anyone at
 2    CISA meet to discuss changes in platform policy?
 3    To the best of my recollection, the answer is
 4    no, we never meant to discuss asking the
 5    platforms to make any changes to their policies.
 6          Q.   Do you recall -- I take it that was
 7    a response as to internal meetings, are you
 8    aware of any meetings with anyone external to
 9    CISA to discuss, you know, changes in platform
10    policies?
11          A.   I'm not aware of any external
12    meetings along those lines.
13          Q.   Do you recall any communications of
14    any kind that related to that in 2020?
15          A.   Any communications that related to
16    what?  To -- to platforms changing their
17    policies?  Any communications -- with -- I mean,
18    that's a very broad -- I mean, it's possible
19    that somebody at CISA, along the way, had a
20    conversation about that, but I don't recall any
21    specific conversations where we sat down to talk
22    specifically about that.  I don't -- I don't
23    recall any of that.  It's a very broad answer,
24    so I don't want to say definitively that nobody
25    at CISA ever had any conversations in 2020 about
```

```
1    policy changes.
2            Q.   How about you, do you recall
3    communicating with anyone outside of CISA about
4    social media platform policy changes in 2020?
5            A.   I don't.  I don't.
6            Q.   Have you ever heard of the Virality
7    Project?
8            A.   I have.
9            Q.   What is the Virality Project?
10           A.   My understanding, it was Stanford's
11   attempt to mimic the EIP for COVID.
12           Q.   How do you know about that?
13           A.   Good question.  I believe they sent
14   me some of their public reports.
15           Q.   The Virality Project did?
16           A.   Yes.
17           Q.   Who -- who would have sent those to
18   you?  Was it the same people involved in -- same
19   people involved in the Election Integrity
20   Partnership?
21           A.   I think Alex was involved, and I
22   believe Renée was involved.  I don't know if the
23   rest were similar or not.  I don't recall who
24   was sending it, the exact individual who was
25   forwarding me their reports.
```

**BRIAN J. SCULLY  1/12/2023**

```
 1              Q.    Was that --
 2              A.    And to be honest, I'm not sure if
 3     they sent them directly to me or if they went to
 4     somebody else in government who forwarded it to
 5     me.
 6              Q.    Okay.  Was there -- did you have an
 7     oral conversation with anyone associated with
 8     the Virality Project about what they do?
 9              A.    Not specifically about what they
10     do, but I did have some conversations where they
11     were asking us for -- asking me, not us -- for
12     any connections I had with HHS or CDC.
13              Q.    And did you provide them with
14     connections?
15              A.    I did not.
16              Q.    What did you -- what did you say in
17     that conversation?
18              A.    I don't recall that I had any --
19     any relevant points of contacts to provide them.
20              Q.    Did you have any other
21     conversations with them relating to the Virality
22     Project?
23              A.    Not -- not substantial.  I'm trying
24     to think.  I mean, I -- most of that work took
25     place when I was over at the National Security
```

```
 1    Council, so I had substantially less
 2    communication.
 3              But I believe there were some
 4    informal kind of not work conversations that I
 5    may have had with Alex, in particular, and maybe
 6    Renée, as well.
 7         Q.   You believe when you were detailed
 8    to the National Security Council you had
 9    conversations with Alex Stamos and Renée DiResta
10    about the Virality Project?
11         A.   Just in the sense that it was
12    something that they were doing, and that was
13    when I think Alex asked if I had any contacts is
14    when I was at the National Security Council.
15         Q.   Did you and Alex discuss anything
16    else about it?  And let me ask you this:  Did he
17    give you any kind of overview what they planned
18    to do in the Virality Project?
19         A.   Not beyond that it was similar to
20    what they did with the -- with the EIP, that was
21    the extent.  We didn't get into any details or
22    anything like that.
23         Q.   And he asked you for contacts at --
24    at kind of federal kind of health agencies?
25         A.   Yeah, that's my recollection of
```

1    what he was asking for.

2            Q.   And did you have any other

3    discussions with him that related to Virality

4    Project?

5            A.   Not that I recall.  I don't know

6    that we ever got briefed on their work, so I

7    don't think there was anything like that.  So I

8    think to the extent was, you know, that

9    conversation about that, and then, like I said,

10   I believe I received some of their reports, the

11   public reports.

12           Q.   And you say either they or someone

13   within government forwarded you with their

14   public reports?

15           A.   Right, yeah, I don't recall exactly

16   how I got them.  I think it was from -- from the

17   Virality Project, itself, but I'm not a hundred

18   percent certain of that.

19           Q.   And let me ask you this:  Was CISA

20   active in -- in -- or take any activities to

21   follow or address information -- misinformation

22   relating to COVID-19?

23           A.   I believe we did at least one

24   product for our critical infrastructure

25   stakeholders related to COVID-19.

**BRIAN J. SCULLY 1/12/2023**

```
 1              Q.    How about --
 2              A.    It should be on our -- sorry.
 3                    It should be on our public website.
 4              Q.    How about switchboarding, did CISA
 5      do any switchboarding related to COVID-19
 6      misinformation concerns?
 7              A.    No.
 8              Q.    And again, the switchboarding
 9      that -- when I use that term I'm using your term
10      for kind of routing disinformation concerns and
11      misinformation concerns to the social media
12      platforms; correct?
13              A.    Correct, yeah, as far as I'm aware
14      there was no -- there was none of that occurred
15      related to COVID.
16              MR. SAUER:  I'm going to pull up
17      Exhibit 2 on the screen share, which has also
18      been e-mailed to you, which is the Virality
19      Project's public reporter.
20              (Exhibit No. 2 was marked for
21      identification.)
22              MR. GARDNER:  Hold on one second,
23      John.
24              MR. SAUER:  Which is the Virality
25      Project's public report, Virality,
```

**BRIAN J. SCULLY  1/12/2023**

```
 1    V-i-r-a-l-i-t-y.

 2                MR. GARDNER:  Yeah, hold on, John.

 3    Hold on, John.  Hold on.  Got it.

 4    BY MR. SAUER:

 5          Q.   You mentioned -- before we turn to

 6    the document, you mentioned that you had

 7    conversations with Alex Stamos and Renée DiResta

 8    about the Virality Project.  What were the

 9    nature of the conversations with Renée DiResta?

10          A.   They were at the same time as the

11    conversations with Alex.  I believe it was

12    similar content.  And I don't -- it wasn't a

13    lengthy conversation, it was just, hey, we're

14    doing something, I believe.

15          Q.   Mm-hmm.  Did she ask you for any

16    context or anything like that?

17          A.   I'm sorry, could you repeat that?

18          Q.   Did she ask you for any context or

19    anything like that?

20          A.   Not that I recall, but I think she

21    was with Alex when we had that conversation.

22          Q.   So you believe it was the same

23    conversation with Alex and Renée happened at the

24    same time?

25          A.   Yeah, I believe we were having a
```

1    meeting, they were briefing us about -- so I
2    think this was connected to when I got the brief
3    on the report, the election report, when I was
4    at the White House.  I think that's when they
5    mentioned that they were going to potentially do
6    something similar around COVID, and asked if we
7    had any contacts.
8            **Q.   And did you -- and I take it you**
9    **said earlier you didn't have any contacts;**
10   **right?**
11           A.   Yeah, I didn't have any good
12   contacts at CDC or HHS.
13           **Q.   Did you ask anyone else in**
14   **government if they had contacts that would be**
15   **useful to them?**
16           A.   I don't recall doing that, so I
17   don't think so.
18           **Q.   Did you notify people at the White**
19   **House about, you know, the briefing you got from**
20   **them or the information you got from them?**
21           A.   So I'm sure I talked to my
22   supervisor about the election briefing.  I may
23   have mentioned, although I don't recall if I did
24   or not, that they were going to do something
25   similar for -- for COVID.

**BRIAN J. SCULLY  1/12/2023**

```
 1              Q.   What did you report back about the
 2    election briefing?  I take it that's the long
 3    fuse report from the Election Integrity Project
 4    right, or partnership; right?
 5              A.   Yeah, just to the extent we -- just
 6    in general, we met with them kind of shared kind
 7    of their lessons learned, kind of what some of
 8    their big takeaways were.  I don't recall what
 9    the specifics were.  It was a brief kind of
10    conversation in passing.
11              Q.   Who was your supervisor at that
12    time?
13              A.   Kaitlin Gegovich (phonetic).
14              Q.   Looking at the Virality Project
15    report, skipping ahead to page 4 of the report?
16              A.   4, 4, or Roman numeral four?
17              Q.   Regular four.
18              A.   Gotcha.
19              Q.   Is there's recommendations --
20              A.   Okay.  Okay.
21              Q.   Is there a recommendation here to
22    implement misinformation and disinformation
23    center of excellence housed within the cyber
24    security infrastructure security agency; do you
25    see that?
```

**BRIAN J. SCULLY 1/12/2023**

```
 1                 A.   I do.
 2                 Q.   So Stanford recommends that the
 3     government create a misinformation and
 4     disinformation center of excellence housed
 5     within CISA; correct?
 6                      MR. GARDNER:  Objection.  He said
 7     it calls for speculation.
 8                 A.   That's what the sentence says.
 9                 Q.   Did they ever discuss --
10                 A.   What they meant by that, I don't
11     know what they meant.
12                 Q.   Did they ever -- did Alex Stamos or
13     Renée DiResta ever discuss that with you, you
14     know, having CISA take on a new and more
15     formalized roll with respect to misinformation
16     and disinformation?
17                 A.   Not that I recall.  I don't think I
18     was ever briefed on this report, so I don't
19     recall having that conversation.
20                 Q.   Do you know of anyone -- they
21     talked to anyone else at CISA about that?
22                 A.   I don't know.  I don't know.
23                 Q.   By the time of this report, in
24     2021, Matt Masterson was actually working for
25     the Stanford Internet Observatory; correct?
```

```
 1              A.   I believe so, yeah.
 2              Q.   Have you ever read this report
 3    before?
 4              A.   I think I read a little bit of it,
 5    but I don't think I read the whole -- I don't
 6    recall.  I haven't read the whole thing.  I
 7    shouldn't say I don't recall.  I haven't read
 8    the whole thing.
 9              Q.   Do you know when you read it?
10              A.   I don't.
11              Q.   Do you know why you read it?
12              A.   I mean, I would read it, generally
13    speaking, I'm interested in understanding what
14    researchers find related to mis, dis and
15    mal-information.
16              Q.   I'm sorry, relating to what?
17              A.   What researchers find, understand,
18    what they're learning relating to mis, dis and
19    mal-information.
20              Q.   And did you have any takeaways from
21    this report, that informed your work at the MDM
22    team?
23              A.   I don't think there's anything
24    specific that we took from this, from a product
25    standpoint or anything like that.
```

```
1          Q.   Do you know how -- do you know how
2    the Virality Project tracked, you know,
3    misinformation narratives about COVID vaccines
4    on social media?
5          A.   I don't.
6          Q.   I'm going to jump ahead to page 30
7    of the report, very usefully that's also page 30
8    of the PDF.
9          A.   Making things easier.
10         Q.   I think they learned a lesson after
11   the first report.
12         A.   Yeah.
13         Q.   Reference here to your --
14         A.   Okay.  Got you.
15         Q.   There's a reference here to tiered
16   ticket analysis, it says:  Their analysis
17   consisted of lateral -- lateral research that
18   used Crowd Tangle and Google searches to assess
19   the spread of the incident or content and so
20   forth; do you see that?
21         A.   I do.
22         Q.   What Crowd Tangle is?
23         A.   I believe Crowd Tangle was a
24   Facebook-owned social media monitoring service.
25         Q.   And is that something that's
```

```
 1      available to the public?  Can the public kind of
 2      subscribe to Crowd Tangle?
 3                  MR. GARDNER:  Objection.
 4   BY MR. SAUER:
 5            Q.   Or is it kind of a --
 6                  MR. GARDNER:  Objection.  Sorry.
 7      Sorry, thought you were done, John, please, are
 8      you done?
 9                  MR. SAUER:  Yeah.
10                  MR. GARDNER:  Sorry, objection,
11      lack of foundation.
12            A.   So I don't know -- I don't know the
13      nature of Crowd Tangle, if it's publicly
14      available or not.
15            Q.   Have you ever heard of it before?
16            A.   I have.
17            Q.   In what connection have you heard
18      of it?
19            A.   Just talking, you know, in the
20      general, mis, dis, mal-information research
21      community, I know it's a tool that some
22      researchers use.
23            Q.   Okay.  Next page of the report,
24      there's a reference to collecting video --
25      there's a reference to -- it says:  The
```

```
1      engagement data or video view data for links
2      associated with each ticket is collected
3      differently depending on the social media
4      platform in question, colon; do you see that?
5              A.   I do.
6              Q.   It talks about how Facebook and
7      Instagram, they used Crowd Tangle API; right?
8              A.   I see that, yeah.
9              Q.   What is -- do you know what API
10     stands for?
11             A.   I don't.
12             Q.   Okay.  Same question, then, as to
13     Twitter, it says Twitter API, YouTube, API, do
14     you know what API refers to?
15             A.   I --
16             MR. GARDNER:  Objection, asked and
17     answered.
18             A.   Yeah, I don't know, that's a little
19     above my technical knowledge.
20             Q.   Let's jump ahead to page 143.
21             A.   Okay.
22             Q.   Okay.  Here under:  Maintain clear
23     channels of communication across all levels of
24     government; do you see that?
25             A.   I do.
```

```
 1              Q.   And then there in this sentence it
 2      says -- or sorry, in this paragraph -- it says:
 3      For example, as voting-related mis and
 4      disinformation arose in the 2020 presidential
 5      election, the Election Infrastructure
 6      Information Sharing and Analysis Center, EI-ISAC
 7      served a critical role in sharing information in
 8      the Election Integrity Partnership in pushing
 9      its rapid response analysis back out to election
10      stakeholders across the states; right?
11              A.   That's what the sentence says,
12      yeah.
13              Q.   And I take it, we asked you this
14      before, but are you aware of the EI-ISAC
15      sharing -- serving a critical role in sharing
16      information with the EIP during 2020?
17              A.   I -- I'm not.  My understanding and
18      recollection it was Center For Internet
19      Security, it's of course possible that the
20      Stanford folks are conflating the EI-ISAC with
21      the Center For Internet Security, kind of we
22      talked about earlier, they're kind of part of
23      the same organization, but I'm not aware of
24      those sorts of direct communications with
25      EI-ISAC.
```

**BRIAN J. SCULLY  1/12/2023**

```
 1              Q.   What is the difference between the

 2    EI-ISAC and the CIS?  My understanding was that

 3    the CIS was a non-profit, and EI-ISAC is kind of

 4    like a program that it runs, that allows for

 5    information sharing among state and local

 6    election officials, is that the distinction of

 7    what's the difference?

 8              MR. GARDNER:  Objection, form.

 9    BY MR. SAUER:

10              Q.   You may answer.

11              A.   What's the difference between what,

12    CIS and EI-ISAC.

13              Q.   Yeah, what's the distinction

14    between them.

15              A.   I mean, I don't -- to be honest, I

16    don't fully know what the distinction is, my

17    understanding is it's roughly, as you kind of

18    stated it, right, is CIS is an umbrella

19    organization that has organizations underneath

20    it.  I don't know what the operating

21    relationship is between the EI-ISAC and CIS.  If

22    it's a direct line, I just don't know how they

23    operate that way.

24              But my understanding is that the

25    CIS has its own staff, and that those staff and
```

```
1     their own funding, and that that staff and
2     funding is what supported the 2020 election
3     switchboarding work.
4           Q.   So, in other words, you think the
5     CIS was -- was switchboarding to EIP during
6     2020?
7           A.   I'm not sure that's what I said.  I
8     mean, the relationship that I understood was
9     between CIS and EIP, what specifically they were
10    doing as part of that relationship I'm not --
11    again, I don't necessarily want to speak to,
12    because I'm not 100 percent sure how it worked.
13          Q.   Well, is the EI-ISAC kind of a
14    vehicle in which CIS receives reports of
15    misinformation and disinformation from state and
16    local election officials?
17          MR. GARDNER:  Objection, lack of
18    foundation, calls for speculation.
19          A.   Yeah, I don't know how -- how the
20    EI-ISAC played in this switchboarding role.
21          Q.   Down here at the bottom of the same
22    page there's another reference to the
23    recommendations to implement a misinformation
24    and disinformation center of excellence housed
25    within the federal government; correct?
```

```
 1              A.    Yeah.
 2              Q.    And that there in that paragraph it
 3      specifically recommends that it be housed within
 4      the federal government at CISA; correct?  See
 5      where I've highlighted?
 6              A.    Yeah, I'm just reading that now.
 7                    Yeah, that's what the sentence
 8      says, yeah.
 9              Q.    Do you have any recollection -- let
10      me ask you this:  I think you testified earlier
11      you don't remember discussing that
12      recommendation with anyone; correct?
13              A.    Correct.
14              Q.    Okay.  How about any discussions of
15      changing or increasing CISA's role in -- in kind
16      of tracking or monitoring online dis and
17      misinformation?
18                    MR. GARDNER:  Objection to the
19      extent that answers calls for the disclosure of
20      information, subject to the local process
21      privilege.  I would instruct the witness not to
22      answer.  To the extent that you can answer that
23      without disclosing information related to the
24      privilege you can do so.
25                    THE WITNESS:  I'm sorry, can you
```

```
 1     repeat the question, just to make sure I
 2     understand it.
 3               MR. SAUER:  Let's break it down.
 4   BY MR. SAUER:
 5          Q.   Do you recall any discussions with
 6     anyone outside of CISA about expanding CISA's
 7     role in addressing misinformation and
 8     disinformation concerns on social media?
 9          A.   CISA's role, expanding CISA's role,
10     yeah.  Yes.
11          Q.   Okay.  What conversations do you
12     remember about that?
13          A.   So we were piloting a capability
14     that would allow us to monitor narratives
15     online.
16          Q.   Now, when was this piloted?
17          A.   I believe it was -- we did one
18     short pilot, I believe, in summer 2020, so I
19     believe it was all 2020.
20          Q.   What -- what -- what sort of
21     pilighting -- can you explain what you mean by
22     pilighting -- I'm sorry -- piloting something to
23     track mis and disinformation online?
24          A.   So it wasn't necessarily to track,
25     it was to understand the information
```

```
 1    environment, what narratives were -- were kind

 2    of perking up.  The piloting was, as I'm sure

 3    you're aware, there was extensive -- extensive

 4    privacy rules around that sort of work, and so

 5    it was just kind of piloting it to see if it

 6    would work, if it did what we wanted it to do.

 7              In particular, we were trying to

 8    predict the likely impact of narratives on

 9    stakeholders.  And so we weren't sure if the

10    predictive activity that we were doing actually

11    worked, so we wanted to test that, and then we

12    wanted to just get a sense of the privacy and

13    other kind of rules that might be in play and if

14    it's something that we could -- we could do.

15         Q.   What exactly was the pilot?  I

16    mean, what -- what -- did you have a computer

17    program that would, you know, go out and track

18    what people were saying on social media?  What

19    exactly was the pilot?  I don't understand.

20              MR. GARDNER:  I'll object on the

21    grounds that that calls for disclosure of

22    information subject to deliberative process

23    privilege.  I instruct the witness not to

24    answer.

25              MR. SAUER:  Yeah, the deliberative
```

1    process privilege only applies when there is no

2    indication of any government wrongdoing.  Our

3    court has already found that there's at least a

4    substantial concern that there were significant

5    first amendment violations, here, so I ask you

6    to withdraw the objection.

7              MR. GARDNER:  I understand your

8    position and I decline your invitation.

9  BY MR. SAUER:

10             Q.   **Are you declining to answer the**

11   **question, sir?**

12             A.   Yes.

13             Q.   **So in that case, can you kind of**

14   **explain more generally what this pilot project**

15   **involved in 2020, to track social media on the**

16   **internet?**

17             MR. GARDNER:  To the extent that

18   that calls for the disclosure of information

19   subject to the deliberative process privilege I

20   instruct the witness not to answer.

21             To the extent that you can answer

22   that question at a high level of generality, you

23   may do so.

24             A.   Yeah, so as I mentioned, our

25   mission is to build the variance to MDM

```
 1    targeting critical infrastructure.
 2              So essentially what we were trying
 3    to understand is if we could predict the likely
 4    impact of MDM narrative in terms of increasing
 5    risks to critical infrastructure by a better
 6    understanding the information environment, so
 7    the pilot was essentially trying to test that
 8    theory out.
 9         Q.   Yeah, kind of, again, at a high
10    level of generality, how do you test that theory
11    out?
12         A.   So the predictive model essentially
13    was to say -- say you had an image, it would
14    pull particular components of an image out and
15    based on -- I don't want to get too -- I don't
16    know that I understand the black box that they
17    used all that well, if I were trying to test it,
18    but there was a methodology that they used to do
19    that, and so we were just trying to see if that
20    methodology, in fact, worked from a
21    disinformation standpoint.
22         Q.   When you say:  They, who's they?
23    Is this people at CISA or is there a contractor
24    that created a product?
25         A.   It was a contractor.
```

```
 1              Q.    What contractor?
 2              A.    I believe the company was Limbik.
 3              Q.    Sorry, can you spell that?
 4              A.    L-i-m-b-i-k.
 5                    And then there was a separate
 6       pilot, that's more generically around
 7       situational awareness of potential narratives
 8       online, that didn't feed into the -- into the
 9       predictive modeling.
10              Q.    Was that a Limbik product, too,
11       that second pilot?
12              A.    No, that was a -- that was a
13       different contractor, and I forget who it was.
14              Q.    Did either of these pilots ever get
15       any actual programming, something that you used?
16              A.    No.  The rules we operated the
17       pilot on was that none of it could be used for
18       operational purposes, because there's privacy
19       requirements around that.  And so essentially we
20       were just using it for internal deliberations in
21       terms of if the -- if the tools were helpful or
22       not.
23              Q.    Did you conclude that they were
24       helpful?
25                    MR. GARDNER:  Object on the grounds
```

**BRIAN J. SCULLY 1/12/2023**

```
 1    of deliberative process privilege.  I instruct

 2    the witness not to answer.

 3                MR. SAUER:  To be clear, I'm asking

 4    for the conclusion, not the deliberation.

 5    BY MR. SAUER:

 6           Q.   Did you conclude that they would be

 7    useful?

 8                MR. GARDNER:  Same objections, same

 9    instructions.

10                THE WITNESS:  Yeah, I'm not going

11    to answer.

12                MR. SAUER:  I've e-mailed around

13    Exhibit 9.

14                (Exhibit No. 9 was marked for

15    identification.)

16    BY MR. SAUER:

17           Q.   And if you have a minute to look at

18    it, I'm also putting on the screen share, it's a

19    collection of e-mails from October of 2020,

20    produced by the government, involving CISA.  And

21    I think they relate to the switchboarding you

22    testified there about earlier.

23                Do you see the -- the document?

24           A.   I do.

25           Q.   Just look here on the first page,
```

```
 1        there's an e-mail, if you look here, kind of on
 2        Thursday, October 1st, at 4:23 p.m., it shows
 3        misinformation reports sending an e-mail to you,
 4        to CISA central, which I think you mentioned
 5        earlier, to CFITF e-mail address, and -- and
 6        misinformation reports; do you see that?
 7             A.   I do.
 8             Q.   And this is a -- I take it, some
 9        report that relates to misinformation in social
10        media from CIS; correct?
11             A.   Let me just scroll to the beginning
12        of the e-mail chain.
13                  Yeah, this is a report I received
14        from CIS.
15             Q.   And when CIS e-mailed you this
16        report, if you look here, towards the top or
17        right in the middle of the first page, CIS --
18        first of all, it's signed by Walter Oberes and
19        Aaron Wilson; correct?
20             A.   Yeah.
21             Q.   And that Aaron, is that the Aaron
22        you talked about earlier, as your CIS contact?
23             A.   It is, correct.
24             Q.   And how about -- who's Walter
25        Oberes?
```

```
 1              A.   I don't know.
 2              Q.   Okay.  And he -- they say:
 3    Brian -- referring to you -- we know many are
 4    already aware of this case, but the impact seems
 5    to be escalating.  Our hope is the platforms can
 6    do more to take down the misinformation;
 7    correct?
 8              A.   That's what this says, correct.
 9              Q.   And then it goes on to say:  The
10    EIP has been tracking this spread under ticket
11    EIP-243, and has more examples; correct?
12              A.   Correct.
13              Q.   Did they commonly tell you when the
14    EIP was tracking online misinformation, as well
15    as CIS?
16              A.   I don't think that was common, no.
17              Q.   Okay.  Were you aware, at the time,
18    of what an EIP ticket was?
19              A.   I understood that EIP was using a
20    ticketing system.  That's the extent of it, so
21    that's what I assumed it was.
22              Q.   And how did you know that?
23              A.   That they were using a ticketing
24    system?
25              Q.   Yeah.
```

**BRIAN J. SCULLY 1/12/2023**

```
 1              A.   So as I mentioned earlier, we did
 2     get some briefs from them when they were setting
 3     things up, to let us know how they would work,
 4     and there was mention of a ticketing system
 5     during that, those conversations.
 6              Q.   When you received this report you
 7     forwarded it onto Facebook, correct, directly
 8     above?
 9              A.   I did.
10              Q.   And you said --
11              A.   Correct.
12              Q.   And you said:  This is not
13     Facebook-related reporting, but thought it would
14     be of interest to your team; right?
15              A.   Right.
16              Q.   Why did you forward it onto
17     Facebook if it appears to relate to tweets or
18     Twitter, as opposed to Facebook?
19              A.   Well, it related to Twitter and I
20     believe YouTube, if I'm reading this correctly.
21              Q.   Yeah, why did you forward it onto
22     Facebook?
23              A.   There's a lot of ways that people
24     generate traffic to YouTube, in particular, but
25     Twitter, as well, is by posting it across
```

**BRIAN J. SCULLY  1/12/2023**

```
 1   platforms.
 2            So something like this, it would
 3   sometimes share across other platforms that we
 4   thought there might be -- it might be relevant
 5   content showing up on their platforms.
 6            Q.   In other words, if the
 7   disinformation or misinformation might be
 8   spreading to other platforms you would notify
 9   not just the platform reported, but other
10   platforms, as well, so that they could be aware
11   of this content; is that what you did?
12            A.   Yeah.  So if I'm reading this
13   correctly, it sounds like it literally jumped
14   platforms.  So maybe I'm misreading.  And so,
15   yeah, sometimes we would just -- we would share.
16            Q.   When you say:  We would share, you
17   mean you would share it with other platforms
18   than the one that was currently hosting the
19   reported content?
20            A.   Correct.
21            Q.   Okay.  Just scrolling down a few
22   pages, there a page with a Bates number 9676 at
23   the bottom.
24            A.   9676.
25            Q.   It's page 7 of the PDF.
```

Caase 3:223-cw-00531TFAKKIDM DDocumeht20961 FFrled 0650/04/233 PRagge 1661 off4566 PBageeDO## : 13234

```
 1              A.   Let me just make sure I got the
 2       right one.  Got it.
 3              Q.   And again, on this one, here's
 4       another e-mail, and you said:  Hi Richard, this
 5       is not Google-specific reporting, but thought it
 6       might be of interest to your team; correct?
 7              A.   Correct.
 8              Q.   And there's this other situation
 9       where a misinformation report had come in that
10       related to a content of other platforms, and you
11       shared it with a different platform; right?
12              A.   This looks like the same example we
13       talked about above.
14              Q.   Oh, yeah, because this is the one
15       being tracked under ticket EIP243?
16              A.   I believe it's the same.  Reading
17       the e-mail it looks the same.
18              Q.   Is this something that was kind of
19       a common practice when you were performing this
20       switchboarding function that you described in
21       2020, that you would report misinformation
22       concerns, not just platform directly affected,
23       but other platforms, as well, to get ahead of
24       it, so to speak?
25                   MR. GARDNER:  Objection, asked and
```

**BRIAN J. SCULLY 1/12/2023**

```
 1    answered.  You can answer.
 2            A.   I wouldn't say it was a common
 3    practice, but we did do it period -- do it
 4    periodically.
 5            Q.   Let me jump ahead to Bates number
 6    8356.
 7            A.   Which PDF page is that?
 8            Q.   That looks like it's going to be
 9    page 12 of the PDF.
10            A.   Okay.  All right.  Just so you
11    know, for the e-mail, the PDF page numbers are
12    going to be a lot more helpful.
13            Q.   Sure.
14            A.   So 8357, is that what I'm looking
15    at?
16            Q.   56, I think it's the page before.
17            A.   Oh, the one above?  I got you.
18            Q.   So, yeah, and I think this still
19    relates to the same ticket; right?  If you look
20    at the middle of the page, you're still dealing
21    with the same report from CIS that has that same
22    EIP ticket number; correct?
23            A.   Yeah, it appears correct.
24            Q.   And this one you passed this onto
25    Twitter; right?
```

**BRIAN J. SCULLY  1/12/2023**

Page 163

```
 1                    A.    Mm-hmm.
 2                    Q.    And that was the platform that was
 3        directly affected; right?
 4                    A.    Correct.
 5                    Q.    And then talking to Twitter, at the
 6        very top, there, you said, you know, good
 7        afternoon, suspect you are -- you all are
 8        already aware of these issues, we wanted to pass
 9        along this reporting from Sonoma County,
10        California, to see if there's anything you can
11        share on how you're approaching; right?
12                    A.    Mm-hmm.
13                    Q.    Is that -- sorry, can you answer it
14        with a yes or no?
15                    A.    Oh, I'm sorry.
16                          Yes.
17                    Q.    Is that something you did when you
18        were serving the switchboarding function was ask
19        the social media platforms to report back how
20        they had addressed the contents reported?
21                    A.    Generally we would do that if the
22        election official asked.
23                    Q.    Why did you do that?
24                    A.    Well, the -- the election official
25        reported something, they just wanted to know if
```

```
 1      a decision was made often, not often, sometimes.
 2                   And so if the platform was open to
 3      sharing if they had made a decision or not, we
 4      would just push that back to the election
 5      officials so they were aware --
 6           Q.    So --
 7           A.    -- of where the platform landed.
 8           Q.    So CISA would, if the state or
 9      local official wanted to know, you know, whether
10      the reported misinformation had been actioned in
11      some way, CISA would ask the social media
12      platform to report that back, and then CISA
13      would relay that to the social media -- sorry --
14      to the state or local official; is that right?
15           A.    Yeah, we did that periodically,
16      where we would ask if the decision was made and
17      if we can share back.
18           Q.    Did you do --
19           A.    The platforms got better, along the
20      way, of communicating directly with the election
21      officials, themselves.
22           Q.    Sometimes they would report back
23      directly, later in the process, especially?
24           A.    Yeah, I believe it got better kind
25      of as time went on.
```

1          Q.    Did you do anything else with that

2     information, about whether and how the reported

3     misinformation had been actioned by the social

4     media platform?

5          A.    Did we do anything else with it?

6               No.  No.  I mean, if it came to CIS

7     we would push the response from the platform

8     back up to CIS.  If the information we received

9     from the election official came direct to us we

10    would push that back, just back to the election

11    official.

12         Q.    How about anyone else, would anyone

13    else be notified how they acted?

14         A.    I think we may have put a notation

15    in the tracking spreadsheet we kept, if a

16    platform said something returned.  But that was

17    an internal set of documents that would go to --

18    normally our attorneys, the privacy folks, would

19    let you see the tracking list review,

20    periodically.

21         Q.    So there was an internal

22    spreadsheet created by CISA to track these

23    reports?

24         A.    Yes.

25         Q.    And did you enter, you know, all of

```
 1      your switchboarding activity reports into that
 2      spreadsheet?
 3              A.   Yeah, we did the best we could to
 4      make sure everything was captured in there.
 5              Q.   Does that spreadsheet still exist?
 6              A.   I believe -- I would assume so.
 7              Q.   Who else -- or who would enter the
 8      information in this spreadsheet?
 9              A.   So the MDM team took shifts, in
10      terms of receiving and doing -- like I said, it
11      was very resource intensive for us, and so other
12      members of the MDM team would have asserted
13      stuff in there, as well, if it was their shifts.
14              Q.   Who would have -- who took shifts,
15      other than you?
16              A.   So back then it would have been
17      myself, Chad, Rob, from that org chart, sorry,
18      Rob Schaul, Chad Josiah, who else was doing it
19      back then, myself, Alex Zaheer, an intern, which
20      I'm not going to name, and I think that was it.
21              Q.   Let me see if I caught all --
22              A.   I think that was it.
23              Q.   Let me see if I caught all those
24      e-mails, Chad Josiah did that?
25              A.   Mm-hmm.
```

```
1              Q.    And then I think you said Rob
2    Schaul did that, S-c-h-a-u-l; corrects?
3              A.    Correct, and then Alex Zaheer, who
4    also should be on the org chart.
5              Q.    How do you spell letter name?
6              A.    His name, Alex, A-l-e-x,
7    Z-a-h-e-e-r.
8              Q.    Okay.  Anyone else?
9              A.    There's an intern.
10             Q.    Can you name the intern, please?
11             A.    No, I'm not going to name the
12   intern.
13             Q.    Are you refusing to answer that
14   question without an instruction, again?
15             A.    Yes.
16             Q.    Okay.  Anyone else?
17             A.    I feel like there was, but I'm
18   forgetting names, right now.  But those would
19   have been the principal -- oh, John Stafford,
20   sorry.
21             Q.    What's his role at CISA?
22             A.    He is not at CISA any longer.  He
23   left sometime in 2021.
24             Q.    Okay.  What was his role?
25             A.    He was an analyst by -- like the
```

```
 1    others.

 2            Q.    And would all those people be

 3    involved in e-mails like the ones we're looking

 4    at here in October 9 -- sorry -- in Exhibit 9,

 5    where word would come in from, you know, CIS or

 6    somebody like that, they would forward it onto a

 7    social media platform?

 8            A.    Yeah, so they would -- if -- if

 9    they received something, they would play that

10    switchboard role and they would forward it to

11    the platforms.

12            Q.    And then would they, like you,

13    report back sometimes to CIS or whatever

14    reporter on how things had been actioned?

15            A.    I don't recall if they did that or

16    not.  If the -- if the platform sent something

17    back on their own, which sometimes happened, as

18    well, they would report that.  I don't know that

19    they did anything beyond that.

20            Q.    Did any of them communicate with

21    anyone at the Election Integrity Partnership?

22            A.    Well, the intern, I believe, worked

23    both, although, when he was on duty, he was only

24    working for us.  Beyond that, I don't -- I don't

25    know.  I don't know that we would have
```

**BRIAN J. SCULLY 1/12/2023**

```
 1    conversations, not about the switchboarding, I
 2    wouldn't think.
 3          Q.   You say the intern worked both, you
 4    mean the intern part of the time was working for
 5    CISA and part of the time was working for EIP?
 6          A.   So my understanding -- so the
 7    intern was a Stanford student, so he worked part
 8    time for us.  On election day, when he would
 9    have been on the agenda, he was just working for
10    us.
11          And my understanding is he also did
12    some work for the Stanford Internet Observatory.
13    I don't know what that work entailed, if it was
14    EIP-specific or not.  But yeah, he was -- he did
15    do some stuff with the Stanford Internet
16    Observatory, I'm just not a hundred percent
17    certain of the nature of it.
18          Q.   Do you know whether he was involved
19    in tracking misinformation and disinformation
20    for the Stanford Internet Observatory?
21          A.   I don't know if that intern was
22    responsible for that or doing that work.
23          Q.   Was that the only intern during
24    2020 who was simultaneously working part time
25    for CISA, and also working with Stanford
```

```
 1        Internet Observatory?
 2              A.    No.   There was one other, as I
 3        mentioned earlier, there were two.
 4              Q.    And so, I see, in other words, it
 5        wasn't sequential.   Those two interns, did they
 6        maintain their part-time internship at CISA
 7        through the election -- the end of the election
 8        cycle in 2020?
 9              A.    Correct.  They were summer interns,
10        full-time summer interns, and then they went
11        back, they continued their studies at Stanford
12        and part-time interns of us.
13              Q.    Okay.  So they also, I take it,
14        when they went back to Stanford for the fall
15        semester they also worked for the Stanford
16        Internet Observatory?
17              A.    That's my understanding, correct.
18              Q.    And at least one of those interns
19        was involved in doing these switchboarding
20        e-mails like we're looking at in Exhibit 9;
21        right?
22              A.    Correct.
23              Q.    Okay.  What -- what did the other
24        intern do during this timeframe for CISA?
25              A.    He also did some of the
```

Case 3:23-cv-00153-TAD-KDM Document 2061 Filed 06/30/23 Page 171 of 456 PageID #: 13884

```
 1    switchboarding.
 2            Q.    Okay.  So should we add intern
 3    number two is also a -- a person who engages in
 4    switchboarding e-mails?
 5            A.    Correct.
 6            Q.    Are you declining to disclose the
 7    name of intern number two, as well?
 8            A.    Intern number two is on our staff
 9    now.
10            Q.    What's his name?
11            A.    Alex.
12            Q.    Alex what?
13            A.    Zaheer.
14            Q.    So Alex Zaheer was -- was he one of
15    the interns who originated the idea of the EIP?
16            A.    Correct.
17            Q.    What's his role in CISA now?
18            A.    He is an analyst on the MDM team.
19            Q.    What does he do for CISA?
20            A.    He works on the MDM team.  He
21    does -- we talked about him earlier in the org
22    chart discussion.
23            Q.    I'm sorry, I don't remember, what
24    does he do?
25            A.    So he steps across the range of
```

**BRIAN J. SCULLY  1/12/2023**

```
 1    work, he does some analysis, he does some
 2    engagement, he does some product development
 3    work.
 4           Q.   What's engagement?  Does he talk to
 5    social media platforms for CISA?
 6           A.   He does not, no.
 7           Q.   Does he still do any work for
 8    Stanford Internet Observatory?
 9           A.   No, not that I'm aware of.
10           Q.   When was he involved in working for
11    Stanford Internet -- Stanford Internet
12    Observatory, to your knowledge?
13           A.   I don't know.  It would have been
14    before he graduated, as far as I'm aware.
15           Q.   I'm asking you again, what's the
16    name of intern number one, the one who was
17    involved in routing disinformation concerns to
18    social media platforms, during the 2020
19    election, whose name you haven't disclosed yet?
20           A.   I'm still not going to disclose his
21    name.
22           MR. SAUER:  Counsel, on the break
23    let's talk about that.
24    BY MR. SAUER:
25           Q.   Moving on a little bit, if I could
```

```
 1        direct your attention back to -- or actually,
 2        let's jump ahead in the Exhibit 9.  Actually,
 3        let me -- let's stay on this page.
 4               A.   Which page?
 5               Q.   I think we're on page 11 of the
 6        PDF.
 7               A.   Okay.
 8               Q.   Or actually, I'm sorry, let's jump
 9        ahead to page 10603 Bates, and then that's going
10        to be page 18 of the PDF.
11               A.   All right.  Okay.  I'm on page 18.
12               Q.   Okay.  If you look here, this is a
13        reporting chain of a misinformation concern from
14        you to Twitter, on October 10th; correct?
15               A.   Yes, that's what it appears to be.
16               Q.   And you're making this report at --
17        on the Saturday afternoon; right?  Or is that an
18        early Saturday morning?  It looks like it's a
19        Saturday afternoon, at 12:52 p.m., there at the
20        bottom of the page; do you see that?
21               A.   I do.
22               Q.   So you talked about this being
23        resource intensive.  Were you guys staffing, you
24        know, the misinformation reports and doing the
25        switchboarding on nights and weekends?
```

**BRIAN J. SCULLY  1/12/2023**

```
 1              A.   So we ramped up as we got closer to
 2      the election.  At this stage I think it was
 3      primarily me that would receive them over the
 4      weekends.  I forget when we started -- when I
 5      started handing some of that off to my team to
 6      also pick it up over the weekends.
 7              But at some point, we did have
 8      people on the schedule.  It didn't mean that
 9      they were 24/7 waiting for things, they just
10      needed to monitor their phones in case something
11      came in.
12              Q.   How -- so somebody was kind of
13      tasked with -- I think you called them shifts,
14      earlier -- someone was tasked with covering a
15      shift at all times, not at all times, but at
16      times over the weekend?
17              A.   Yeah, particularly as we got closer
18      to the election.  I wouldn't say it was the
19      entire election cycle, it was -- I don't know
20      when it started, but probably sometime in
21      mid-October when -- when we started just shifts
22      so that people could review, before that it was
23      mostly me that would receive them from CIS.
24              Q.   And -- and then how about did you
25      ever have it where you were doing shifts in the
```

```
 1    meddling of the night.
 2            A.   No.  I mean, technically, you would
 3    be on for a day, if you're on your shift.  But
 4    there wasn't an expectation, if something came
 5    in at 3:00 in the morning, that you were
 6    forwarding it on.
 7            Q.   How because between 11:00 and 12:00
 8    at night?
 9            A.   Yeah, I mean if you were awake at
10    11:00 or 12:00 at night, I think that we would
11    push it on, and then obviously on election --
12    election night we were -- we were up until at
13    least midnight.  So if we received anything we
14    would push it forward.
15            But again, it was more when we got
16    into kind of off hours you just ask people to
17    monitor their phones, if they could, and if
18    something came in just to push it forward.  But
19    the expectation that, as per this e-mail, that
20    they would be responsible for forwarding
21    something.
22            Q.   Let me ask you this:  If you look
23    at this e-mail chain we're looking at, where it
24    says you would forward on a concern at 12:52
25    p.m., and looks like about 20 minutes later, on
```

**BRIAN J. SCULLY  1/12/2023**

Page 176

```
 1        a Saturday afternoon, maybe Saturday morning,

 2        for them, Twitter responds and says:  Thanks,

 3        Brian, we will escalate; do you see that?

 4             A.   Yes.

 5             Q.   So it looks like the people at

 6        Twitter are monitoring their phones to respond

 7        promptly to your reports; is that right?

 8             A.   I mean, that would -- I don't know

 9        what their monitoring behavior was, in this case

10        she certainty responded relatively quickly on a

11        Saturday.

12             Q.   And that's not the only case, it

13        happens again and again and again, where you get

14        almost immediate responses from not just

15        Twitter, but Facebook and others; correct?

16             A.   I mean, don't know.  I'd have to --

17        I'm sure you could show me documents that would

18        who that, but I honestly don't know the

19        timelines of sends and returns.

20             Q.   Well, you remember them pinging you

21        back promptly and being very responsive when you

22        would make reports like this?

23             A.   They were generally responsive in

24        making sure that we knew that they received it,

25        yeah.
```

**BRIAN J. SCULLY 1/12/2023**

```
 1              Q.   And not just received it, for
 2    example, in this case, not long after that, at
 3    6:30 p.m. the same day, she notifies you:  These
 4    tweets have actioned for violations of our
 5    policies; right?
 6              A.   That's what the e-mail says, yep.
 7              Q.   And was that timeframe typical,
 8    were they turning around, you know, content that
 9    was flagged and taking action on it within hours
10    of your reports?
11              A.   It's hard to say, because they
12    didn't always get back to us if they hadn't
13    taken any action.  So I don't know if I would
14    say that's typical.
15              You know, sometimes they would let
16    us know, sometimes they wouldn't.  Generally
17    speaking, I think they made their decisions
18    relatively quickly.  So I would assume if they
19    did get back to me it would be relatively
20    quickly.  But I can't speak to their timing or
21    their processes or any of that stuff.  A lot of
22    times they just didn't let us know --
23              Q.   But the more response --
24              A.   -- to be honest, if they received
25    it.
```

```
 1            Q.    Sorry to interrupt.
 2            A.    Yeah, I just wanted to say,
 3    normally we would get a note that they received
 4    the messages I forwarded to them.  We often
 5    didn't receive any kind of notification that
 6    they had taken action, no action, or what their
 7    decision was, so it's hard to say kind of what
 8    their typical timeline was for making decisions.
 9            Q.    Let me ask you this:  Were they
10    more responsive to you, as a representative of a
11    federal national security agency, than they were
12    to ordinary people who made such reports, if you
13    know?
14            MR. GARDNER:  Objection.
15    Objection, lack of foundation, calls for
16    speculation.
17            A.    Yeah, I have no clue.  I don't know
18    what the timeline was, generally.
19            Q.    Were there ever discussions between
20    you or anyone at CISA and any one of the
21    platforms about making sure the platforms are
22    monitoring their e-mails for the -- the
23    government's reports of misinformation?
24            A.    No.
25            Q.    How about in the synch meetings
```

1    that you talked about, between the USG and the

2    industry, was it ever brought up that, hey, you

3    know, we're going to have people standing by and

4    watching for misinformation reports so we can

5    move quickly on them?

6          A.   Not that I recall.  I believe on

7    election night several of the platforms set up

8    their own operations center.  But I don't know

9    that there's ever a conversation about -- from

10   the government expecting platforms to have any

11   particular timeline.

12         Q.   Again, these sort of e-mail --

13   e-mails that we're looking at here in Exhibit 9,

14   from you to the platform and the platforms

15   responding back about misinformation that you

16   guys have switchboarded to them, I take it

17   there's a set of e-mails like this, for not just

18   you, but also for Chad Josiah, Rob Schaul, Alex

19   Zaheer, John Stafford, and an intern that you

20   haven't named yet; right?

21         MR. GARDNER:  Objection, compound.

22         A.   So if I'm understanding your

23   question, would you find e-mails from those

24   individuals to platforms notifying them or

25   forwarding information from an election

1     official, so yes.

2              Would there likely be -- it's hard

3     for me to know if -- if they always responded

4     back, beyond the received, which I think was

5     pretty standard.

6              So I would assume that you would

7     find change with other members of the team,

8     where they sent something over to a platform and

9     the platform said received, so yeah, if that's

10    your question.

11         **Q.   So in other words, at least those**

12    **five individuals I just listed were involved,**

13    **separate from the e-mails that we're looking at**

14    **that involved you, they were sending their own**

15    **e-mails, when it was their shift, to social**

16    **media platforms, flagging disinformation**

17    **concerns?**

18             A.   Yeah, that's correct.  But keep in

19    mind, over the entire course of the election I

20    think we forwarded about 200 e-mails, total.  So

21    I would imagine the vast majority of them are

22    mine, because for a period of time I was the

23    principal one relaying it.

24             But then to answer your question,

25    yes, there's probably other e-mail chains with

**BRIAN J. SCULLY  1/12/2023**

```
 1     those five representatives on it.

 2               MR. GARDNER:  So we've now been

 3     going almost two hours.  I think now would

 4     probably be a good time for a break.

 5               MR. SAUER:  Let me ask one more

 6     question, that's right on this topic, and how

 7     about that or one little set of questions.

 8               MR. GARDNER:  Sure.

 9  BY MR. SAUER:

10          Q.   Did you ever discuss with Alex

11     Zaheer what he did for the Election Integrity

12     Partnership?

13          A.   I'm sure I had conversations with

14     Alex about his work with SIO, which was part of

15     the larger integrity partnership.

16          Q.   What did you discuss with him about

17     his work for SIO?

18          A.   I think he just talked about that

19     he was participating in it, I don't know the

20     specifics of the conversation, but that he was

21     participating in it, and he was one of the

22     people that were working with the ticketing

23     system.

24          Q.   When you say:  Working with the

25     ticketing system, what did he say he was doing
```

```
 1    with the ticketing system?
 2           A.   I don't recall.  I mean, I was -- I
 3    don't know how the ticketing system works, so I
 4    don't know, kind of, how his role would have
 5    played in there, what it was.
 6           Q.   When you refer to the ticketing
 7    system, is that the system that Stanford had for
 8    receiving reports of disinformation that they
 9    would analyze?
10           A.   Correct.
11           Q.   How about the other intern, the one
12    you haven't named yet, did you ever discuss with
13    that intern the work he did for the Stanford
14    Internet Observatory?
15           A.   I don't -- I don't recall.  I don't
16    think -- certainly not in the level of detail
17    with Alex.  Obviously Alex came to work for us,
18    so I have a little more familiarity with what he
19    did with SIO.  So I don't -- I didn't have a
20    clear understanding of the other intern's role.
21           Q.   What did the other intern go on to
22    do?
23           A.   I don't know.  As far as I know,
24    he's still at Stanford.  But I don't know if he
25    graduated.
```

```
 1                    MR. SAUER:  Why don't we take a
 2     break there.
 3                    MR. GARDNER:  Okay.  I mean, it is
 4     now -- oh, let's go off the record.
 5                    THE VIDEOGRAPHER:  The time is now
 6     12:34.  We're off the record.
 7                    (Recess.)
 8                    THE VIDEOGRAPHER:  The time is now
 9     1:41 p.m.  We are back on the record.
10                    MR. GARDNER:  Thank you.  And as I
11     had mentioned before we got back on the record,
12     the witness wanted to say something before we
13     began.
14                    THE WITNESS:  So the intern that
15     did both SIO and CISA push forwarding was Pierce
16     Lowary.
17     BY MR. SAUER:
18          Q.   And is that L-o-w-a-r-y?
19          A.   I believe so, yeah.
20          Q.   And that intern worked
21     simultaneously with CISA and the EIP?
22          A.   And SIO was a member of the EIP.
23          Q.   Right.  What did he do for SIO
24     while this was going on, do you know?
25          A.   I don't.
```

```
 1              Q.   What did he do for CISA while this
 2    was going on?
 3              A.   Again, he was part-time in the
 4    fall, so he would support the analytic stuff,
 5    and then, as I mentioned, he did some work in
 6    terms of the switchboarding.  I'm not --
 7    obviously not sure the extent of the e-mails or
 8    anything like that, that he would have forwarded
 9    over to the platforms.
10              Q.   Now, Pierce Lowary was involved in
11    forwarding e-mails over to the platforms?
12              A.   Correct.
13              Q.   And that's in addition to Chad
14    Josiah, Rob Schaul, Alex Zaheer, John Stafford,
15    and yourself; correct?
16              A.   Correct.
17              Q.   Anyone else, in 2020, who would
18    engage in those switchboarding e-mails?
19              A.   I believe that was all.
20              Q.   Was Pierce --
21              A.   From my recollection.
22              Q.   Was Pierce Lowary one of the four
23    interns who originated the idea of the EIP?
24              A.   Yes.
25              Q.   Okay.  Who were the other two?
```

**BRIAN J. SCULLY 1/12/2023**

```
 1                A.   I don't --
 2                Q.   Well, let me -- what about Alex
 3      Zaheer, was he one of the ones?
 4                A.   Alex was one.
 5                Q.   The idea --
 6                A.   It got --
 7                MR. GARDNER:  Hold on, guys, you
 8      keep talking over each other.  So let Mr. Sauer
 9      ask the question and then please answer.
10                John, can you re-ask it?
11   BY MR. SAUER:
12                Q.   Was Alex Zaheer one of the four
13      interns who originated the idea of the EIP?
14                A.   He was.
15                Q.   And he went on, like Mr. Lowary, to
16      simultaneously work for CISA and for Stanford
17      Internet Observatory during the 2020 election
18      cycle?
19                A.   Correct.
20                Q.   Who were the other two interns who
21      originated the idea?
22                A.   The fourth intern I do not know who
23      they're referring to, so I'm not sure who that
24      is.
25                The first intern is Isabella
```

**BRIAN J. SCULLY 1/12/2023**

```
 1     Camargo, I forget the rest of her last name, I'm
 2     sorry.  I'd have to look.
 3              Q.    Is it Isabella Garcia-Camargo?
 4              A.    Yes.
 5              Q.    Okay.  When did she intern for
 6     CISA?
 7              A.    Over the summer of 2020.
 8              Q.    Did she do that into the fall?
 9              A.    She did not.
10              Q.    Did she go on in the fall to work
11     for Stanford -- Stanford Internet Observatory?
12              A.    Yes.
13              Q.    And did she work for Stanford
14     Internet Observatory during the summer, when she
15     was also working for CISA?
16              A.    Yes.
17              Q.    Who is Ayelet Drazen, D-r-a --
18              A.    Hold on a second, I'm sorry, can
19     you repeat that last question?
20              Q.    Which question, who is Ayelet
21     Drazen?
22              A.    No, the one before.
23              Q.    Did she work for Stanford Internet
24     Observatory during the time she was also working
25     for CISA?
```

```
 1                     A.   I don't believe so, but I'm not
 2        sure kind of their arrangement in the SIO front.
 3        I think SIO was -- I think SIO may have been --
 4        I'm not sure how that worked with SIO when
 5        they're interns, but she did not work for us in
 6        the fall, when she was working for SIO, that I'm
 7        certain of, so I don't know what the
 8        relationship was over the summer internship.
 9                     Q.   What -- what did she do for CISA?
10                     A.   Again, like the other analysts,
11        typical intern stuff, supporting product
12        development, helping with, you know, any
13        research projects, standard kind of intern work
14        across the three panels I mentioned before,
15        engagement, product development, and analysis
16        research.
17                     Q.   Who is Ayelet Drazen, D-r-a-z-e-n,
18        first name A-y-e-l-e-t?
19                     A.   I don't know.
20                     Q.   Who is Ashwin Ramaswami?
21                     A.   I believe he was one of the
22        election security interns.
23                     Q.   During 2020 at CISA?
24                     A.   At least the summer of 2020.  I
25        don't -- I don't know, kind of, how long he
```

1    stuck around.  I didn't really work with him.

2            Q.   Is he another Stanford intern?

3            A.   Yeah, I believe so.

4            Q.   Did he go on to work for the

5    Stanford Internet Observatory?

6            A.   I don't know.  I don't know.

7            Q.   How about Jack Cable, C-a-b-l-e?

8            A.   He was a Stanford intern.  I

9    don't -- I don't know what he did, after, just

10   for the summer, that I'm aware of, but I'm not

11   entirely sure.  He didn't work on the MDM stuff

12   with me.

13           Q.   What did he do at CISA, do you

14   know?

15           A.   He was more cyber-focused, so I'm

16   not entirely sure, really, what his projects

17   are.

18           Q.   Just a second, I'm e-mailing you

19   two new exhibits.

20               Let me ask this:  Were you involved

21   in -- Mr. Scully, were you involved in preparing

22   CISA's discovery responses to written discovery

23   in this case?

24           A.   I believe I provided names of the

25   team.  And the IT folks searched my records for

```
1    me.
2              Q.    You provided names?
3              A.    Don't ask --
4              Q.    Names of the team, what does that
5    mean?
6              A.    So I believe I provided names of
7    the people who are part of the MDM team or the
8    CFITF.
9              Q.    So you provided names of key
10   custodians, for example, who might have relevant
11   e-mails in their inboxes, stuff like that?
12             A.    Right.
13             Q.    Okay.  Were you involved in
14   drafting interrogatory responses?
15             A.    If I recall correctly, I reviewed
16   some of them.
17             Q.    Did you review the ones that were
18   submitted on behalf of CISA?
19             A.    Yeah, those would have been the
20   only ones I reviewed.
21             Q.    Before the break, you mentioned
22   that there were about 200 e-mails that CISA
23   forwarded to serve this switchboarding function
24   of routing disinformation concerns to the social
25   media platforms in 2020; right?
```

```
 1              A.   Yeah, give or take a few.  I don't
 2      know the exact number, but it's about 200.
 3              Q.   How do you know how many there
 4      were.
 5              A.   Well, as I mentioned previously, we
 6      kept a tracking spreadsheet.  Everything we sent
 7      over we logged.
 8              Q.   Would you consult that tracking
 9      spreadsheet when you were preparing or working
10      on responding to written discovery in this case?
11              A.   I don't recall that I did, it's
12      possible, but I don't recall doing it.
13              (Exhibit No. 12 was marked for
14      identification.)
15  BY MR. SAUER:
16              Q.   Let me show you Exhibit 12.
17              A.   Okay.  That's a complaint.
18              Q.   It should be amended interrogatory
19      responses that have also been filed publicly
20      with the Court as document 86-3?
21              MR. GARDNER:  I'd like to take a
22      look.  Hold on.
23              THE WITNESS:  I don't know.
24              MR. GARDNER:  Hold on one sec.
25      Yeah, that's right.  That's right.
```

**BRIAN J. SCULLY  1/12/2023**

```
 1                THE WITNESS:  Okay.
 2   BY MR. SAUER:
 3           Q.   Can you go to page 19 of that
 4   document?  I've also got it up on the screen
 5   share.
 6           A.   All right.  Page 19?  Okay.  I'm at
 7   19.
 8           Q.   In here, at the bottom of page 19,
 9   you see where it says:  CISA, colon?
10           A.   Yes.
11           Q.   It's identifying people with
12   relevant communications response to our
13   discovery requests.
14                CISA has identified the following
15   custodians as having relevant communications as
16   produced in the response to requests two and
17   three; correct?  Do you see that?
18           A.   I do.
19           Q.   CISA custodians listed are Jen
20   Easterly, Christopher Krebs, Matt Masterson,
21   Geoff Hale, Brian Scully, and Lauren Protentis;
22   right?
23           A.   Yep.
24           Q.   So these other people, Chad Josiah,
25   Rob Schaul, Alex Zaheer, John Stafford, Pierce
```

```
 1        Lowary, who were involved in forwarding e-mails
 2        to social media platforms to flag them, were not
 3        disclosed in this part of the interrogatories;
 4        correct?
 5              A.   I think if you scroll down another
 6        paragraph, you would see most of those names.
 7              Q.   Yeah, that's extremely interesting,
 8        isn't it?  Very next paragraph it says, oh,
 9        we've also identified some other people as
10        appearing in the communications you produced,
11        and it lists four of those five people, Chad
12        Josiah, Robert Schaul, Alex Zaheer, John
13        Stafford; right?
14              A.   Yes, that's who is listed there.
15              Q.   It appears --
16              A.   I don't know that that's
17        interesting.
18              Q.   It's interesting that CISA knew
19        about the involvement of these people and
20        relevant communications, but didn't search their
21        inboxes in response to our discovery requests;
22        isn't that what this indicates?
23              A.   I have no idea what this indicates.
24              Q.   Well, let me ask you this:  You
25        testified before the break that those four
```

```
1    people there, plus Pierce Lowary, who you just
2    disclosed, all forwarded disinformation reports
3    to social media platforms as part of the
4    switchboarding function; isn't that right?
5         A.   They were all part of the
6    switchboarding function.  I don't know who sent
7    e-mails or how many e-mails or any of that.
8         Q.   But you testified that they took
9    shifts and sent e-mails to social media
10   platforms reporting this information; correct?
11        A.   They took shifts, and if they
12   received something they would have sent an
13   e-mail.  But without going through the
14   spreadsheet that I mentioned I wouldn't know if
15   an actual individual was on a shift, sent one,
16   but that would be my expectation that they did.
17        Q.   What was the last --
18        A.   There were generally two people
19   per -- there were generally two people per
20   shift, so it's possible that just one of those
21   two people were sending e-mails.
22        Q.   Pierce Lowary is not identified
23   anywhere in these discovery responses, is he?
24        A.   I mean, he's not identified in
25   these.  This is a small section.  I don't know
```

```
 1      if he is elsewhere.
 2              Q.    Well, you said you reviewed them
 3      when they were being prepared.  Do you remember
 4      seeing his name anywhere -- anywhere in the
 5      government's discovery responses?
 6              A.    I don't recall, but I wouldn't
 7      have -- I don't think I would have reviewed the
 8      entire document, so I don't know.
 9              Q.    Who would have --
10              A.    Obviously, I didn't see the final
11      document.
12              Q.    Who would have reviewed the final
13      document?
14              MR. GARDNER:  Objection, calls for
15      speculation.
16      BY MR. SAUER:
17              Q.    If you know.
18              A.    Yeah, I don't know.
19              MR. SAUER:  Exhibit 62, which I've
20      also e-mailed you.
21              MR. GARDNER:  John, did you say 62?
22              MR. SAUER:  62, should be the most
23      recent one in your inbox.
24              THE WITNESS:  Okay.  Okay.
25              (Exhibit No. 62 was marked for
```

**BRIAN J. SCULLY 1/12/2023**

Page 195

```
1      identification.)

2    BY MR. SAUER:

3            Q.    Here's Jack --

4            A.    Is it the -- sorry, go ahead.

5            Q.    This is Jack Cable's publicly

6      available online LinkedIn profile; do you see

7      that?

8            A.    I do.

9            Q.    If you scroll down, a fifth page of

10     this document, it looks like he was a research

11     assistant at Stanford Internet Observatory from

12     2019 to 2021; correct?

13           A.    That's what it says, yep.

14           Q.    And that he ended in June of 2021,

15     correct, at SIO?

16           A.    That's what it says, yeah.

17           Q.    And immediately below that, it

18     looks like he was an election security technical

19     advisor at CISA from June 2020 to January 2021;

20     correct?

21           A.    That's what he says.

22           Q.    So he also overlapped, for an

23     entire year, in working simultaneously for CISA

24     and for the SIO; correct?

25                 MR. GARDNER:  Objection, lack of
```

```
 1     foundation.
 2   BY MR. SAUER:
 3            Q.    According to his LinkedIn profile?
 4            MR. GARDNER:  Same objection.
 5            A.    LinkedIn profile says he worked at
 6   CISA for eight months.
 7            (Reporter admonition.)
 8            THE WITNESS:  Sorry.
 9            A.    The LinkedIn profile said he worked
10   at CISA for eight months.
11            Q.    Right.  Does the LinkedIn profile
12   also indicate that during those same eight
13   months, from June of 2020 to January of 2021, he
14   also was an intern -- a research assistant at
15   Stanford?
16            A.    It appears that way, yep.
17            Q.    Were you aware that Jack Cable was
18   working for Stanford Internet Observatory while
19   he was also interning for CISA?
20            A.    No.  Jack didn't work for me, so I
21   didn't really pay attention to what he was
22   doing.
23            Q.    He shares this simultaneous
24   employment with SIO and CISA, along with Alex
25   Zaheer and Pierce Lowary; correct?
```

```
 1                    MR. GARDNER:  Objection, lack of
 2      foundation.
 3      BY MR. SAUER:
 4             Q.    Correct?
 5             A.    I'm sorry, could you repeat the
 6      question?
 7             Q.    Pierce Lowary and Alex Zaheer also
 8      simultaneously worked for CISA and SIO; correct?
 9             A.    They did.
10             Q.    And then, if you scroll up a little
11      bit, to the page before, it looks like he went
12      on to work for the Krebs-Stamos Group; were you
13      aware of that?
14             A.    No, I don't think so.
15             Q.    And then he went on to work for the
16      senate; correct?  Does that ring a bell?
17             A.    I mean, it's what it says here.
18             Q.    So you didn't know what Jack Cable
19      went on to do after he left CISA?
20             A.    No, I didn't really pay attention
21      to what -- like I said, he didn't work for me,
22      so I didn't really follow him.  In fact, I'm --
23      a couple of my interns I'm not sure what they're
24      doing, either.
25             Q.    Let's go back to Exhibit 9.
```

```
 1                    Is it possible that Jack Cable was
 2     another one of the interns who originated the
 3     EIP?  You mentioned there's one, and you're not
 4     sure if it was them?
 5                    MR. GARDNER:  Objection, calls for
 6     speculation.
 7            A.    Yeah, I wouldn't know.  I wouldn't
 8     know.
 9            Q.    Let's go to page 8769 in this
10     document, Exhibit 9.
11            A.    Do you know what the PDF page is,
12     John?
13            Q.    I'm scrolling down to it, so I'll
14     tell you as soon as I know the answer.
15            A.    Okay.
16            Q.    I think it's PDF page 62.
17            A.    All right.
18            Q.    All right.  If you see here, it
19     looks like Alex Zaheer, on October 30th, sends a
20     report about misinformation to CFITF, which is
21     the CISA reporting e-mail address; correct?
22                    MR. GARDNER:  John, I'm sorry, are
23     you going to post this on the -- on the live
24     screen for us?
25                    MR. SAUER:  I'm sorry, I didn't
```

**BRIAN J. SCULLY 1/12/2023**

```
 1    realize it wasn't up.  Can you see it on the
 2    screen share?
 3                  MR. GARDNER:  Yeah, we got it now.
 4    Thank you.
 5  BY MR. SAUER:
 6            Q.    Alex Zaheer, on October 30th, sends
 7    an e-mail to CFITF; correct?
 8            A.    Yep.
 9            Q.    And he's actually --
10            A.    Yes.
11            Q.    He says:  FYSA, EIP has reported
12    the following to EI-ISAC and Twitter from EIP,
13    and then he reports on an EIP ticket; correct?
14            A.    Correct.
15            Q.    And then this -- you responded to
16    him, Thanks Alex; do you see that on the page
17    before?
18            A.    Yes.
19            Q.    And then you sent an e-mail, it's
20    not clear to whom, saying:  FYI, the EIP,
21    submitted the below to Twitter, no need to
22    respond.  But it looks like you were saying that
23    to Twitter; right?
24            A.    Yeah, there's no header there, so
25    I'm not certain, but that's what it appears.
```

```
 1              Q.   It appears that from your intern,
 2    who was simultaneously working for EIP, you
 3    received a report of alleged misinformation and
 4    submitted it onto Twitter; right?
 5              A.   Yeah.
 6              Q.   And then -- and that was an
 7    EIP-specific report; correct?
 8              A.   Yep.
 9              Q.   And then Twitter responded and
10    said, thanks Brian, we received that report from
11    the EIP and escalated it; correct?
12              A.   Yes.
13              Q.   And then she goes on to specify to
14    you the action they took against that; correct?
15              A.   Yeah, on a contextual label
16    pursuant to their policy on civic integrity,
17    yeah.
18              Q.   Were there other instances where
19    this occurred, where an EIP report was forwarded
20    to you, and you forwarded it onto -- to a social
21    media platform?
22              A.   As I said earlier, it's possible,
23    but I don't recall.
24              Q.   How about --
25              A.   It was our standard practice.
```

**BRIAN J. SCULLY  1/12/2023**

```
 1              Q.    How about the other five people who
 2      were monitoring these misinformation reporting
 3      e-mails, did they ever review that, do you know?
 4              MR. GARDNER:  Objection, calls for
 5      speculation.
 6              A.    Yeah, I don't know.  Again, it
 7      wasn't part of our normal process, so I'm not
 8      sure.
 9              Q.    Would that be reflected in this
10      spreadsheet you referred to multiple times?
11              A.    Yeah, it should be.
12              Q.    So if there was -- if the EIP is
13      referenced or is the originator of the report
14      you would note that in the spreadsheet?
15              A.    I believe so.  I believe we would
16      have the case number.
17              Q.    Can you scroll back up to page 33
18      of the PDF?
19              A.    Yep.
20              Q.    It's Bates 8349.
21              A.    8349, yep.
22              Q.    You see at the top of this page
23      there's a misinformation report from Oregon,
24      that's being sent on by the CIS, Center For
25      Internet Security, reporting e-mail; do you see
```

**BRIAN J. SCULLY  1/12/2023**

1    that?

2           A.   Yes.

3           Q.   And it's sent to you and a couple

4    other CISA e-mails or -- CISA e-mails, there in

5    the first line; right?

6           A.   Yep.

7           Q.   In the second line it's sent to

8    tips@2020partnership.atlassian.net; do you see

9    that?

10          A.   I do.

11          Q.   What is that?

12          A.   I don't know.

13          Q.   Is that the reporting e-mail for

14   tips to the 2020 Election Integrity Partnership?

15          MR. GARDNER:   Objection, calls for

16   speculation, also, asked and answered.

17          A.   Yeah, I don't know what it is.

18          Q.   Is it your testimony that you're

19   not aware whether or not that's the reporting

20   e-mail for the EIP?

21          A.   Yeah, I'm not aware -- the answer

22   is, I'm not aware of what e-mail that is.

23          Q.   Were you aware that -- did you

24   notice that CIS was commonly forwarding these

25   reports to both you and that

```
 1        tips@2020partnership e-mail?

 2             A.   I'm not sure that I paid that much

 3        attention to it, no.

 4             Q.   You didn't notice --

 5             A.   Again, yeah, I wasn't -- I guess

 6        that I wasn't aware of what processes they were

 7        following.

 8             Q.   So you didn't know they were

 9        looping in the EIP on their reports; is that

10        what you're saying?

11             A.   I don't recall it, but again, as we

12        discussed earlier, it could have been part of

13        the effort to deconflate for the platforms.

14             Q.   Up here on page 51 of the PDF,

15        scrolling to the bottom of that page down to 52,

16        here's another CIS report.  Once again, it's

17        sent to you at -- to CISA e-mails and

18        tips@2020partnership@atlassian.net; correct?

19             A.   Yeah, I see the e-mail address in

20        there.

21             Q.   And you don't recall that being --

22        you getting copied -- that being copied on

23        e-mails of this nature?

24             A.   I don't.

25             Q.   Really briefly, jumping ahead to
```

**BRIAN J. SCULLY 1/12/2023**

```
 1     page 10539, page 55, once again, CIS is copying

 2     you and tips@2020partnership.atlassian.net;

 3     correct?

 4             A.    That's the e-mail, yes.

 5             Q.    Jumping ahead to page 7565, here's

 6     a report from the Colorado secretary of state's

 7     office.  Do you see, we're on page 59 of the

 8     PDF, where they're reporting it to EI-ISAC,

 9     CISA, and Stanford Partners; correct?

10             A.    That's what the e-mail says, yep.

11             Q.    It says Stanford is presumably --

12             MR. GARDNER:  Objection, calls for

13     speculation.

14             A.    Yeah, I don't know what they mean

15     by Stanford.

16             Q.    Do you think Stanford might be some

17     other Stanford entity to which state and local

18     election officials are reporting disinformation

19     concerns --

20             MR. GARDNER:  Objection.

21  BY MR. SAUER:

22             Q.    -- during the 2020 cycle?

23             MR. GARDNER:  Objection, calls for

24     speculation, lacks foundation.

25  ///
```

```
 1    BY MR. SAUER:

 2              Q.    Do you know?

 3              A.    I don't know.

 4              Q.    Scrolling above this, again, CIS

 5    forwards this to you and tips22020partnership,

 6    that reporting e-mail or that e-mail address;

 7    correct?

 8              A.    Are you up on -- what page are you

 9    on now?

10              Q.    Page 58 of the PDF, immediately

11    above, shows CIS forwarding that report from

12    Colorado secretary of state's office to both you

13    and tips@2020partnership.atlassian.net?

14              A.    So Colorado sends to CIS, CIS sends

15    to me, CISA, and atlassian.net, okay.

16              Q.    And you forward this onto -- to

17    Twitter; correct, immediately above that?

18              A.    So again, there's no header, but

19    the response is from Twitter, so that's what I

20    assume.

21              Q.    And you -- they say -- you say:

22    Please see below reporting from Colorado.  These

23    do not appear to be connected to the imposter

24    parody accounts previously shared; correct?

25              A.    Correct.
```

**BRIAN J. SCULLY  1/12/2023**

 1          Q.   And Twitter responds within 15

 2     minutes:  We will escalate.  Thank you; correct?

 3          A.   Correct.

 4          Q.   Okay.  And if you scroll down a

 5     couple pages, you see that Colorado secretary of

 6     state's office has flagged some parody or

 7     imposter accounts, including one with 14

 8     followers; correct?

 9          A.   What page are you on?

10          Q.   59 of the PDF.

11          A.   59 of the PDF?  I don't see what

12     you're talking about there.  This is the same

13     e-mail chain we were just talking about.

14          Q.   Maybe look up at the screen share,

15     can you see where secretary of state's office

16     has forwarded a screen shot of a Twitter

17     account, it's got 14 followers?

18          A.   I do.

19          Q.   And secretary of state's office in

20     Colorado says:  These are concerning to us here

21     in Colorado because of their recent FBI/CISA

22     warnings about impersonation accounts; correct?

23          A.   That's what it says, yep.

24          Q.   So they say that we're reporting

25     this because it -- because it's the sort of

```
 1      things that the FBI and CISA warned us may

 2      warrant reporting; right?

 3              A.   I mean, I don't want to speak for

 4      the secretary of state, but that's kind of how

 5      the account sentence reads.

 6              Q.   Did you -- in fact, were you

 7      involved in warning state and local election

 8      officials about impersonation accounts spreading

 9      false information about the election?

10              A.   I'm sure I would have reviewed a

11      document that went out along those lines.  I'm

12      not aware of the document, but I'm sure if it

13      went out I would have reviewed it.

14              Q.   Do you remember reviewing it?

15              A.   They put out -- in 2020 we put out

16      a couple of joint FBI and CISA products.  I

17      don't remember specifically which one this is,

18      but it certainly sounds like something we would

19      do.

20              Q.   Okay.  Scrolling down, there's

21      another one they're flagging here, that if you

22      didn't know, it has two followers; correct?

23              A.   So it appears.

24              Q.   And you forwarded that onto

25      Twitter, and Twitter said:  We'll escalate;
```

**BRIAN J. SCULLY  1/12/2023**

1     right?

2            A.    Yes.  They said they will escalate.

3            Q.    Moving onto page 10512, just a few

4     pages down, that's going to be page 63 of the

5     PDF.

6            A.    Okay.

7            Q.    Do you see here in the middle,

8     here, it's an inquiry from Twitter, and she

9     says:  Hey Brian, can we talk about CIS

10    misinformation reporting duplicate reports to

11    EIP, possible to have just you escalate;

12    correct?

13           A.    Yeah, that's what the e-mail says.

14           Q.    What is she talking about, is this

15    the duplicate reporting issue that you talked

16    about earlier, where they were getting reports

17    from you and EIP and CIS?

18           A.    That's what I would imagine it is,

19    yeah.

20           Q.    Okay.  Do you remember anything

21    about this?  We're talking about October 27th,

22    so, you know, maybe a week before the 2020

23    election, do you remember the social media

24    platform is having this concern about duplicate

25    reports from CIS and EIP?

```
 1                A.   I remember Twitter, in particular,
 2      having that concern.
 3                     Our screen is screwy again.
 4                     THE REPORTER:  Can we go off the
 5      record?
 6                     MR. SAUER:  Yeah, we can go off the
 7      record.
 8                     THE VIDEOGRAPHER:  The time is now
 9      2:11 p.m.  We're off the record.
10                     (Recess.)
11                     THE VIDEOGRAPHER:  The time is now
12      2:13 p.m.  We are back on the record.
13      BY MR. SAUER:
14                Q.   Okay.  So -- and then, Mr. Scully,
15      you responded to this:  So here's the deal, EIP
16      will only report something to Twitter if they
17      have additional context to provided based on
18      their research; correct?
19                A.   That's what I wrote, yes.
20                Q.   How did you know that was going to
21      be their policy or their practice, did you talk
22      to EIP?
23                A.   I would imagine I did.
24                Q.   Who did you talk to?
25                A.   I don't recall.
```

1           Q.   And that he goes on -- or you go on
2      to say, they will not send Twitter reporting
3      unless it has that additional context that would
4      help you make a decision; correct?
5           A.   Yep.
6           Q.   And then it says:  EIP will also
7      let CISA know when they are reporting something
8      to you so I can give you a heads up; correct?
9           A.   Yep.
10          Q.   Is that what happened after this
11     e-mail, did EIP report to you when they were
12     reporting something to the social media
13     platforms?
14          A.   I don't recall that, in practice.
15     Although, obviously, we just went through each
16     one e-mail that did that.  I don't remember it
17     being a common thing but, again, I don't -- I
18     don't know.  It's possible.
19          Q.   Okay.  And then it says:  EIP will
20     continue to use the CIA -- CIS case number to
21     facilitate identifying duplicative reports;
22     correct?
23          A.   Yep.
24          Q.   So EIP was talking to CIS enough to
25     know what CIS's misinformation reporting case

```
 1    numbers were; right?

 2             A.   I don't know.  I don't know if

 3    that's true.

 4             Q.   Were you aware that EIP was using

 5    CIS's case numbers, because you said it in this

 6    e-mail?

 7             A.   Yep, I mean, if that's what I

 8    wrote, that's probably what they were doing.

 9             Q.   Okay.  Do you remember discussing

10    that with CIS or EIP that they were going to,

11    you know, kind of share case numbers?

12             A.   I don't recall any such

13    specificity.  I know we had a conversation.  I

14    recall that we had conversations about how to

15    de-duplicate, make sure we weren't overtaxing

16    Twitter, in particular.

17             Q.   And that de-duplication process

18    involved some kind of coordination between you,

19    EIP and CIS; correct?

20             A.   Again, reading this, it appears we

21    are just making sure we are sending something

22    over and everybody is aware of it.

23             Q.   Right.  So everybody would tell

24    everybody else that they were sending something

25    over, and there was an attempt to avoid sending
```

```
1        duplicative reports to Twitter?
2                    MR. GARDNER:  Objection, compound.
3     BY MR. SAUER:
4            Q.   Correct?
5            A.   Yeah, can you -- can you break
6     that -- can you start that over again?
7            Q.   Was there an agreement for EIP and
8     CIS and CISA to coordinate and let each other
9     know what they were reporting to platforms like
10    Twitter?
11           A.   I think that's generally right,
12    yeah.
13                   MR. SAUER:  Let me send you a
14    couple more exhibits, 10 and 11.  I'm going to
15    pull up 10 on the screen share while you're
16    waiting.
17                   MR. GARDNER:  John, do you -- John,
18    did you send them over?
19                   MR. SAUER:  Yeah.  They should be
20    in your inbox.
21                   MR. GARDNER:  Yeah, I'm looking.
22                   MR. SAUER:  They're in my sent box.
23                   MR. GARDNER:  Okay.  I believe you.
24    Hold on.
25                   (Exhibit No. 10 was marked for
```

Case 3:23-cv-00153-TAD-KDM Document 20-61 Filed 06/30/23 Page 233 of 456 PageID #: 18236

```
 1      identification.)

 2   BY MR. SAUER:

 3           Q.   Let me ask this:  Can you see it on

 4      the screen share?

 5           A.   I can.

 6                MR. GARDNER:  You haven't shared it

 7      yet, John.

 8                THE WITNESS:  Trick question.

 9   BY MR. SAUER:

10           Q.   Now can you see it on the screen

11      share?

12           A.   Yes.

13           Q.   Just looking here at the first

14      page, you know, this exhibit is a collection of

15      your switchboarding e-mails from November of

16      2020, do you see you, are copied here on

17      misinformation report from CIS on November 2nd

18      of 2020?

19           A.   Yes.

20           Q.   Once again, CIS continues to copy

21      tips@2020partnership.atlassian.net; do you see

22      that?

23           A.   I do.

24           Q.   Does that ring a bell for you about

25      what that e-mail is, after we talked about that
```

1    last e-mail, where you were arranging to

2    coordinate with EIP about de-duplicating reports

3    to social media platforms?

4              A.    I forget.  I don't recall the

5    e-mail.  If you tell me that that was the tips

6    for the 2020 EIP I would believe you.

7              Q.    Okay.  Let me scroll down a page to

8    Bates 13603.

9              A.    What page was that?  I'm sorry.

10             Q.    Bates 13603, 10 of the PDF.

11             A.    Okay.

12             Q.    You see here there's a report from

13   the Iowa secretary of state's office on November

14   2nd, that's sent to CIS; do you see that?

15             A.    Just scrolling through it, sorry.

16   Give me a second.  Yes.

17             Q.    And then it looks like the Iowa

18   secretary of state's office also sent this to

19   three FBI e-mail addresses; right, with the

20   recipients redacted, FBI number two, FBI number

21   three, and FBI number four; correct?

22             MR. GARDNER:  Lack of -- objection,

23   lack of foundation.

24             A.    I don't see the e-mail addresses

25   you're referring to.

**BRIAN J. SCULLY 1/12/2023**

Page 215

```
 1            Q.   Do you see @FBI, if you look on the
 2      screen share, @FBI.gov?
 3                 MR. GARDNER:  Same objections.
 4      BY MR. SAUER:
 5            Q.   With the handle omitted, three
 6      e-mails?
 7            A.   Okay.
 8            Q.   Were you aware of the FBI being
 9      involved in receiving misinformation reports
10      from state and local elections officials?
11            A.   Generally speaking, we tell
12      election officials to report what they saw to
13      either DHS or the FBI, and it would end up where
14      it needed to be.
15            Q.   So you told them to report it to
16      either DHS or the FBI?
17            A.   Correct.
18            Q.   Who at the FBI was receiving those
19      kinds of reports?
20            A.   I don't know.  I think it --
21            Q.   Go ahead.
22            A.   Generally speaking, the FBI has
23      field offices, and so the idea was if they
24      were -- election officials had established
25      relationships with the FBI field office and the
```

```
 1     elections coordinator in that office, and that's
 2     where they wanted to report it, that they could
 3     do so.
 4            Q.   So there was -- these FBI officials
 5     tended to be FBI field officers -- officers?
 6            A.   I don't want to speculate, but --
 7     but again, that was, you know, us trying to --
 8     to help the election officials, just if they had
 9     something they needed to report, if they had as
10     many different options to do that as possible.
11            Q.   Okay.  Do you know what FBI did
12     with its misinformation reports, was it
13     switchboarding them like you guys were doing?
14            A.   I don't know, to be honest.
15            Q.   Is that notion that you could
16     forward things to the FBI, is that something
17     that was discussed in those USG
18     industry-specific meetings you talked about?
19            A.   I -- not that I recall, but it's
20     possible we -- we talked to them about the
21     guidance we gave to election officials, that
22     election officials could it either way, but I
23     don't recall specific conversations along those
24     lines.
25            Q.   Can you scroll down to the page 27
```

```
 1      of the PDF.
 2              A.    Let's go.  Okay.
 3              Q.    If you look here, kind of at the
 4      bottom of this text chain, Aaron Wilson, he's
 5      your contact at CIS; right?
 6              A.    Correct.
 7              Q.    And he's forwarding something to --
 8      November 3rd, with a report about alleged
 9      election misinformation; right?
10              A.    Well, poll worker Erie PA says
11      announces on Instagram they will throw away
12      Pro-Trump votes, that's what you're talking
13      about?
14              Q.    Yeah.
15              A.    That's the subject of the e-mail.
16              Q.    He uses the EIP case number for
17      this report; correct?
18              A.    He does.
19              Q.    And he sent it to CISA at the CFITF
20      e-mail; correct?
21              A.    He does, correct.
22              Q.    And the CFITF e-mail forwards it to
23      you, and you forward it to Matt Masterson at
24      Facebook; correct?
25              A.    No, that's not correct.  I -- Matt
```

```
 1     was still at CISA at the time.  I forwarded it
 2     to Saleela Salahuddin at Facebook.
 3              Q.    Copying Matt Masterson?
 4              A.    I'm sorry?
 5              Q.    Copying Matt Masterson?
 6              A.    Yeah, who was at CISA.  You said he
 7     was at Facebook.  I just wanted to make sure
 8     that that was clear that he was still --
 9              Q.    I'm sorry, I meant to say and
10     Facebook, not at Facebook?
11              A.    Gotcha.
12              Q.    And then Facebook came back to you
13     for clarification; right?  Do you recall that?
14              A.    So we -- sorry, go ahead.
15              Q.    Go ahead, what were you going to
16     say?
17              A.    I said, just to be clear, we
18     forwarded the statement from Pennsylvania about
19     that incident to Facebook and Matt Masterson.
20              Q.    And so --
21              A.    That's what is here.
22              Q.    And they -- and it looks like
23     Facebook asked you, could you please confirm
24     that, A, the worker in question who was
25     supposedly destroying Pro-Trump ballots is not a
```

Case 3:23-cv-00153-TAD-KDM Document 2061 Filed 06/30/23 Page 219 of 456 PageID #: 16332

```
 1      poll worker, or B, that he did not, in fact,

 2      destroy ballots or at least there's no evidence

 3      he did.

 4              So Facebook asked you, Brian Scully

 5      and Matt Masterson, for that clarification;

 6      right?

 7          A.   They did.

 8          Q.   Yeah, and then you responded:  Not

 9      sure I understand the distinction you're trying

10      to make, but both components of the narrative

11      are false.  The person is not a poll worker and

12      no ballots were destroyed.  I suppose that makes

13      the entire thing a hoax; correct?

14          A.   Yeah, that was my response.

15          Q.   What was your basis for concluding

16      that both components of the narrative were

17      false?

18          A.   I believe the statements from

19      Pennsylvania.  I assume if you have that

20      document we can take a look and confirm.

21          Q.   You read the statement from

22      Pennsylvania and reported its content back to

23      Facebook?

24          A.   Correct.

25          Q.   Okay.  Did you -- did that happen
```

 1    **from time to time, where you wouldn't just**

 2    **forward the disinformation concern, but then you**

 3    **would provide, you know, information that would**

 4    **help debunk it through the social media network?**

 5          A.    I think I frame it a little

 6    differently, if social media platforms needed

 7    additional information from an election official

 8    we would try to support that.  There was also

 9    one time when I believe it was Facebook had a

10    question about DHS immigration and customs

11    enforcement having agents going places where we

12    also provided a response back on a specific

13    piece.

14          But generally speaking, we would do

15    what we did here, which is if the -- if the

16    jurisdiction made a public statement or if there

17    was additional information the jurisdiction

18    could provide, and the platforms asked for it,

19    that we would try to facilitate getting the

20    information they asked for.

21          Q.    **Did you merely relay that**

22    **information, the sort of debunking information**

23    **from the election official, would you sometimes**

24    **find it on your own and helpfully supply it to**

25    **the social media platform?**

```
 1              A.   If it was a public statement, I'm
 2      sure we pulled it ourselves.  If there was not a
 3      public statement, I would imagine we would go
 4      back to the election official.
 5              Q.   But you might --
 6              A.   I don't know --
 7              Q.   Go ahead.
 8              A.   Sorry, I don't want to say that
 9      every case was exactly like that, but again, if
10      there was a public statement that was put out by
11      the jurisdiction, we would -- we would defer to
12      that.
13              Q.   Did you take any steps to find
14      out -- for example, suppose there's a public
15      statement that disputes what a private citizen
16      has said on Facebook or Twitter, would you do
17      further research to figure out who was telling
18      the truth or would you just relay the official
19      government explanation of the incident to the
20      social media platforms?
21              A.   We would relay the -- the official
22      statement from the jurisdiction.
23              Q.   I take it sometimes you would go
24      find that official statement on your own, and
25      sometimes you would reach out to the state or
```

**BRIAN J. SCULLY 1/12/2023**

Page 222

```
 1      local jurisdiction to see if they issued a
 2      statement?
 3              A.   Yeah, we would find, I think it
 4      implies that we were doing a rigorous search.
 5      Generally, we would be aware if a jurisdiction
 6      put out a statement and we would just pull it
 7      ourselves.
 8              Q.   Look ahead to --
 9              A.   And sometimes --
10              Q.   Go ahead.
11              A.   Sorry.
12                   Sometimes we would reach out to the
13      jurisdiction and they would just provide the
14      statements that they had already made public, as
15      well.
16              Q.   Would you relay that to the social
17      media platform?
18              A.   Yeah, if they were asking for
19      additional information we would.
20              Q.   Here's another one, page 35 of the
21      PDF, Bates 8663.  Do you see that on the screen
22      share?
23              A.   I'm scrolling down to it.  8663?
24              Q.   Yeah.
25              A.   Yep.
```

**BRIAN J. SCULLY  1/12/2023**

1          Q.    And here in this e-mail chain it

2     looks like it's another situation where Twitter

3     asked for some clarification, for example, she

4     says, on November 6th, have Pennsylvania state

5     officials provided initial information to you on

6     the authenticity of the video or the

7     circumstances under -- underpinning it; do you

8     see that?

9          A.    I do.

10         Q.    And then you respond, scrolling

11    back up, you say:  There are two reports in the

12    e-mail chain, and you explain what you

13    understand what Pennsylvania is saying about the

14    disputed information; right?

15         A.    Sorry, I'm just scrolling down to

16    make sure I understand the context of the chain.

17              Okay.  Sorry.  Could you repeat the

18    question?

19         Q.    Sure.  My question is:  You

20    provided clarification to the social media

21    platform about what you believe the Pennsylvania

22    reporter meant; correct?

23         A.    I don't believe that is correct.

24         Q.    Well, did you say, for example, on

25    the authenticity Pennsylvania states in the very

```
1      first e-mail that they believe the videos are
2      false and we're reaching out to our partners to
3      validate; correct?
4             A.   Correct.
5             Q.   Okay.  And then, later that day, if
6      you scroll up, you say:  Hey, to Twitter, just
7      came across this debunk of the video on Twitter;
8      correct?
9             A.   Yes.
10            Q.   And then -- so you are looking
11     around to find information that would debunk it;
12     correct?
13            A.   I don't know if that's correct.
14     It's possible somebody just let us know that
15     there was something there.
16            Q.   And then 17 minutes later Twitter
17     responds, thank you so much, we applied a label
18     to the tweet; correct?
19            A.   Yes, that's what they said back,
20     correct.
21            Q.   Scroll down to page 8669.
22            A.   What page of the PDF?
23            Q.   46.
24            A.   46?
25            Q.   Yes.  And here you've got a
```

**BRIAN J. SCULLY 1/12/2023**

1    misinformation report from the secretary of

2    state of Arizona's office; do you see that?

3          A.   Yes.

4          Q.   It says:  This post is on a private

5    Facebook page, above.  I've included a screen

6    shot; correct?

7          A.   That's what the Arizona e-mail

8    says, yep.

9          Q.   How did they -- was that unusual

10   for them to report statements on a private

11   Facebook page?

12         A.   I don't -- I don't know.  We didn't

13   do any analysis of that kind.

14         Q.   Okay.  So you don't know whether

15   someone was monitoring how posts appeared on a

16   private Facebook page containing alleged

17   misinformation?

18         A.   I don't know how Arizona secretary

19   of state came across that information, no.

20         Q.   Dropping ahead to page 864, now.

21   Here at 954 --

22         A.   I'm sorry.

23         Q.   Sorry.

24         A.   54?

25         Q.   Oh, sorry, page 54 of the PDF, yes,

```
 1      sorry.  Actually, no, I'm sorry, that's not the
 2      right page.
 3               A.   Okay.
 4               Q.   No, sorry, page 59 of the PDF?
 5               A.   59?  Okay.
 6               Q.   Here's a chain on Tuesday, November
 7      10th, at 7:23 in the evening, you forwarded a
 8      report of information -- misinformation to
 9      Twitter; correct, at 7:23?
10               A.   Yeah, that's what appears, there's
11      no he header on the e-mail, but considering the
12      responses is from Twitter, I assume that's who I
13      sent it to.
14               Q.   And Twitter responds in two
15      minutes, we will escalate; right?
16               A.   Yep.
17               Q.   And then Twitter responds here a
18      few minutes later, after midnight, at 12:11
19      a.m., hey, we labeled all the tweets except two;
20      right?
21               A.   Yes.
22               Q.   So Twitter was working on this well
23      into the evening, along with -- were you guys
24      doing that well into the evening?
25                    MR. GARDNER:  Objection, compound.
```

**BRIAN J. SCULLY  1/12/2023**

```
 1   BY MR. SAUER:
 2           Q.   Timeframe?
 3           A.   So was Twitter working on it well
 4    into the evening?  I mean, I guess.  Were we?
 5    Again, if somebody was checking the phone, most
 6    of the post-election stuff would have been me.
 7    We would have done something with it, but it
 8    wasn't a requirement.
 9                (Exhibit No. 11 was marked for
10    identification.)
11   BY MR. SAUER:
12           Q.   And showing you Exhibit 11, which
13    should be in your inbox.
14                MR. GARDNER:  Yeah, I think that's
15    right.
16           A.   Okay.
17           Q.   On the last page of this PDF,
18    there's an e-mail from Aaron Wilson?
19                MR. GARDNER:  I'm sorry, John, do
20    you want to post it on the screen?
21                MR. SAUER:  Oh, thank you.
22                MR. GARDNER:  You don't need to, if
23    you don't want to, I mean, we have the --
24                MR. SAUER:  I got it, I mean, I
25    thought it was up.
```

BRIAN J. SCULLY 1/12/2023

```
 1    BY MR. SAUER:

 2           Q.   Last -- see it, last page of the

 3    PDF, there's a report from CIS.

 4           A.   Yeah.

 5           Q.   Actually, this is, interstingly, a

 6    report from CIS to Gwinnet County; right?  Where

 7    they say:  Hi Kristi, the EI-ISAC and our

 8    partners at the Election Integrity Partnership

 9    are tracking a social media post that's getting

10    traction very quickly; right?

11           A.   Yes, that's what the e-mail reads,

12    yeah.

13           Q.   So this is a situation where the

14    reporting was actually originated by CIS or EIP

15    or actually, according to this e-mail, both of

16    them.  They're the ones who noticed the

17    misinformation, online, first; right?

18                MR. GARDNER:  Objection to form.

19    BY MR. SAUER:

20           Q.   Correct?

21           A.   That's what -- that's what the

22    e-mail appears to say, yeah.

23           Q.   And they reached out, you know,

24    proactively to Gwinnett County asking them to

25    debunk it; right?
```

**BRIAN J. SCULLY  1/12/2023**

```
 1              A.    Yeah, they're just trying to get
 2      what was actually going on, yeah.
 3              Q.    Yeah, they say:  We're tracking a
 4      social media post that's gaining traction very
 5      quickly.  It's likely a misunderstanding, but
 6      being portrayed as a nefarious act.  If you can
 7      clarify for us what is being shown, if it even
 8      happened, we can work with the social media
 9      platforms to try to have the post removed as
10      misinformation; correct?
11              A.    Yeah, that's what he wrote.
12              Q.    And then Gwinnett County comes back
13      with a -- a -- an explanation of the post;
14      correct?
15              A.    Yes.
16              Q.    And that's forwarded to Twitter by
17      CIS, along with their explanation; correct?
18                    Well, actually, before they report
19      it to Twitter they report it to you; right?
20      Here's there's an e-mail that says --
21              A.    Yeah.
22              Q.    -- Brian and EIP --
23              A.    Yes.
24              Q.    Right?  So Brian --
25              A.    Yep.
```

```
 1                Q.   And EIP is Election Integrity
 2      Partnership; right?
 3                A.   Yep.
 4                Q.   And that's what CIS says, and they
 5      sent this to --
 6                A.   Yes.
 7                Q.   -- your e-mail, two CISA e-mails,
 8      their own e-mail and
 9      tips@2020partnership.atlassian.net; right?
10                A.   Yep.
11                Q.   So they sent this e-mail, where
12      they say:  Brian and EIP, to you, two CISA
13      accounts, their own account, and
14      tips@2020partnership.atlassian.net; right?
15                A.   Yep.
16                Q.   So it appears that that
17      tips@2020partnership e-mail is an EIP e-mail;
18      right?
19                MR. GARDNER:  Objection, asked and
20      answered, multiple times.
21   BY MR. SAUER:
22                Q.   Does that refresh your memory?
23                A.   I wouldn't say refreshes my memory,
24      but it's going on CISA or CIS e-mail there, so
25      it's probably a reasonable assumption to make.
```

```
 1              Q.   Then you forward this on, having
 2      received the report from CIS; right?
 3              A.   Yep.
 4              Q.   And then @Twitter reports back to
 5      you, and says, they labeled the tweet and are
 6      taking steps to limit trending; right?
 7              A.   Yes.
 8              Q.   What does that mean to take steps
 9      to limit trending; do you know?
10              MR. GARDNER:  Objection, calls for
11      speculation.
12              A.   Yeah, I don't know.  Twitter has a
13      range of tools that they use.  I couldn't
14      possibly speculate on what they were doing here.
15              Q.   Let's put Exhibit 12 back up.
16              These are the interrogatory
17      responses.
18              MR. GARDNER:  Yeah, hold on one
19      second, John.  You said 12?
20              MR. SAUER:  Yeah.
21              MR. GARDNER:  Hold on one second.
22              MR. SAUER:  Go to page 38.
23              THE WITNESS:  38.
24              MR. SAUER:  Yeah, if you would.
25              THE WITNESS:  Okay.  I'm on page
```

```
 1    38, John.
 2   BY MR. SAUER:
 3          Q.   Oh, sorry, I'm on page 28.  My
 4   mistake.
 5          A.   All right.
 6          Q.   38 asks that here, you see where it
 7   says CISA, and it says:  CISA responds that
 8   meetings taking place with the social media
 9   platforms relating to misinformation include,
10   but are not limited to, and then there's a
11   bullet list; right?
12          A.   I think that is 38, not 28.
13          Q.   Yeah, it should be on page 38?
14          A.   Sorry.  I thought you said 28.  Let
15   me get back down there.
16          Q.   Oh, I meant I was mistaken.
17          A.   Okay.  So there's a table, am I
18   looking below the table or above the table?
19   Below the table?
20          Q.   Yeah.
21          A.   Got you.  Okay.
22          Q.   Okay.
23          A.   I'm sorry, what am I looking for?
24          Q.   Were you involved in identifying
25   meetings between CISA and social media platforms
```

```
 1      relating to misinformation in responding to
 2      discovery requests?
 3              A.   Yes, I believe I was.
 4              Q.   What meetings did you identify?
 5              A.   Certainly these, the recurring
 6      meetings listed here, that we talked about, the
 7      preparation meeting we talked about, going
 8      through the list, MDM, joint MDM working group,
 9      I think I missed -- those are the ones I would
10      have identified.
11              Q.   Start with the first one, first
12      bullet point, a recurring meeting usually
13      entitled USG industry meeting, which has
14      generally had a monthly cadence; right?
15              A.   Yep.
16              Q.   And that is the one that you refer
17      to as the sync meeting between industry and
18      social media platforms; correct?  I'm sorry,
19      industry --
20              A.   Right.  Yes, that's correct.
21              Q.   And you list there, I think seven
22      or eight social media platforms, and the
23      response, Google, Facebook, Twitter, Reddit,
24      Microsoft, and then Verizon Media, Pinterest,
25      LinkedIn and Wiki Media Foundation; correct?
```

```
 1          A.   Right, that's correct.
 2          Q.   And when you say this generally has
 3   a -- had a monthly cadence, in fact, far away
 4   from elections it was only quarterly, and then
 5   it became monthly close to elections, and became
 6   weekly before the 2020 election; right?
 7          A.   I would say from summer of 2018 to
 8   2020 they were -- to early 2020 they were
 9   quarterly.  Sometime in 2020 they became monthly
10   and then as we got closer to the election in
11   2020 they became weekly.
12          Q.   Why did they become weekly close to
13   the election?
14          A.   They were mostly just touch points
15   in case anything kind of popped up.  Those are
16   much less formal than the monthly ones.  We
17   didn't have an agenda for those, just an
18   opportunity for folks to share, if they had any
19   questions or anything like that.
20          Q.   What sort of stuff did folks share
21   in these weekly touch point meetings?
22          A.   So from a CISA perspective, we
23   generally provide updates on any election
24   security-related issues.  So if -- you know, if
25   there were any administrative kind of problems
```

```
 1    that say we're having, speaking along those
 2    lines, the other federal partners, if they had
 3    any, again, kind of strategic, unclassified.
 4    Intelligence reporting that they felt was
 5    relevant, they might share that.  And then the
 6    platforms, I don't know what they were sharing
 7    generally.  I don't -- probably just general
 8    trends that they might be seeing on the
 9    platforms, but I don't recall specifically what
10    they talked about.
11         Q.   And all these things that they
12    share are related to election misinformation and
13    misinformation on social media platforms?
14         A.   No.  It also included cyber
15    security, in fact, I would say most of it -- I
16    wouldn't say most of it -- a lot of it was cyber
17    security.  And then there was a little bit on
18    any physical threats that were occurring.
19         Q.   So that -- that's if someone was
20    actually threatening poll workers, something
21    like that?
22         A.   Correct.
23         Q.   And so in addition to physical
24    threats, there were cyber security and issues
25    related to misinformation and disinformation?
```

```
 1              A.   Correct.

 2              Q.   Is anything else discussed in these

 3     meetings?

 4              A.   I mean, I think those are the

 5     main -- main topics that I recall.

 6              Q.   Was -- was the risk of hack and

 7     leak operations or hack and dump operations

 8     discussed in these meetings?

 9              A.   I don't -- I don't recall a

10     specific incident of that, but it's definitely

11     possible.  It's a tactic that had been used in

12     the past.

13              Q.   Did you remember you raising

14     concerns about hack and leak operations?

15              A.   Me, personally, I don't recall

16     myself raising that, but it's possible.

17              Q.   How about -- how about Laura

18     Dehmlow, did she ever raise that, discuss hack

19     and leak operations?

20              A.   Again, I don't know.  It was a

21     tactic that had been used globally, previously.

22     So it wouldn't surprise me if there was some

23     discussion of that somewhere in these meetings.

24              Q.   Do you remember anyone on the

25     government side discussing it?
```

1          A.    Not specifically, no.

2          Q.    **How about on the industry side,**

3   **anyone from the social media platforms**

4   **discussing hack and leak operations?**

5          A.    Yeah, unfortunately, I just don't

6   have that kind of recollection of conversations.

7   So no, I don't specifically remember that.

8   Again, it's possible, and I wouldn't be

9   surprised.

10          Q.    **How about Elvis Chan, you know who**

11   **he is; right?**

12          A.    I do.

13          Q.    **Did he ever -- do you remember him**

14   **ever talking about hack and leak issues in these**

15   **meetings in 2020?**

16          A.    Again, I don't have any specific

17   recollection of that, but it's always possible,

18   for sure.

19          Q.    **How about Matt Masterson?**

20          A.    Same answer, you know, it's

21   possible, but I don't recall specific

22   conversations.

23          Q.    **Let me e-mail you a couple more**

24   **exhibits.**

25          A.    Sure.

**BRIAN J. SCULLY 1/12/2023**

1              **Q.    Do you know Yoel Roth is?**

2              A.    Yes, I know who Yoel Roth is.

3              **Q.    Do you know him personally?**

4              A.    Only in the fact that I've met him

5   a couple times.  He was at meetings, you know,

6   some of these synch meetings he would be at.

7              **Q.    Were these meetings related to**

8   **misinformation with CISA?**

9              A.    Again, these are regular sync

10   meetings that we talked about, it's also I do

11   recall we had some Twitter-only calls, as well,

12   that he participated in, so again, it's general

13   meetings would be of conversations.

14             **Q.    What was -- what was discussed in**

15   **the Twitter-only meetings?**

16             A.    Similar, basic

17   relationship-building stuff would be some of it,

18   so, you know, just going and making sure we know

19   who's who, and having conversations about, you

20   know, just relationship-building sides.  I also

21   believe we had some briefings from them on some

22   of their public reports, if I recall correctly,

23   so things like that.  There wasn't a ton of

24   them.

25              **Q.    Is this public reporting related to**

1    misinformation and disinformation issues?

2         A.   Yeah, again, I don't know if that's

3    what they called it, but that was kind of our

4    interpretation of it.  I think they used

5    coordinated and in-authenticated or so, but I

6    don't recall if Twitter -- if Twitter

7    articulated it.

8         Q.   You would view those briefings in

9    those bilateral meetings with Twitter as

10   relating to misinformation and disinformation on

11   social media?

12        A.   Yeah, some of that, and some of it

13   I'm sure kind of talking him through how

14   elections work, because a lot of education they

15   weren't super familiar with the election

16   administration, how they worked, and a different

17   role and responsibility, you know, about

18   elections.  So again, we tried to educate as

19   much as we could.

20        Q.   Were there bilateral meetings with

21   other social media platforms, like this, where

22   misinformation was discussed in any way?

23        A.   Yeah, again, generally, from a

24   relationship-building standpoint, particularly

25   early on in the process, we would meet -- we met

Case 3:23-cv-00153-TAD-KDM Document 1961 Filed 06/30/23 Page 240 of 456 PageID #: 18933

```
 1    with the platforms just to talk about kind of
 2    what our role, what we would do, kind of how the
 3    relationship should act.
 4              So just as an example, we could
 5    relate to the K-theoretical.  You know, in those
 6    meetings we wanted to make sure that the
 7    platforms understood we would never ask them to
 8    undertake any specific actions.  So we would
 9    reiterate that in all of our meetings.  And, you
10    know, that was something we continued throughout
11    the process.
12              We would educate them on -- on
13    elections, as I mentioned.  We would talk to
14    them a little bit about our resilience-building
15    work, as I discussed.  They would just kind
16    of -- again, relationship-building type stuff,
17    very general kind of conversations.
18         Q.   What you describe as the process,
19    is that the process of, you know, referring
20    disinformation concerns to them, that we've been
21    talking about today?
22         A.   We did have conversations, but I
23    think I was referring to the election processes,
24    how the election processes worked.
25         Q.   You said early, when you said early
```

**BRIAN J. SCULLY  1/12/2023**

```
 1      in the process, you meant early in the election
 2      process?
 3              A.   Oh, yeah, sorry.
 4              Q.   You would have -- you had meetings
 5      with -- bilateral meetings with Twitter and
 6      Facebook and other social media companies?
 7              A.   Right.  So in 2018 we didn't have
 8      any relationships with the platforms, at all.
 9      So in our initial stages of trying to build
10      those relationships we would go meet with each
11      platform one-on-one, just to make sure we could
12      kind of talk to, understand what their concerns
13      are, and then, you know, basic
14      relationship-building stuff.
15              Q.   Did those bilateral meetings happen
16      in 2020, as well?
17              A.   I would say they probably --
18      probably had bilateral meetings in 2020.  I'm
19      not remembering any specific, off the top of my
20      head, but I believe prior to starting the
21      switchboarding work, in 2020, we had
22      conversations with each platform individually.
23              Q.   Those would be when you talk about
24      what you would be doing in the switchboarding
25      area; right?
```

```
 1              A.   Yeah, kind of what we would be
 2    doing, and again, to reaffirm our position that
 3    we would never ask them to take any specific
 4    actions, that they should make decisions based
 5    on their term of service.
 6              Q.   So you're specifically talking
 7    about the fact that you would be sending them
 8    reports about disinformation during the election
 9    cycle?
10              A.   Yeah, we would be forwarding them
11    reports from different election officials, yeah.
12              Q.   Just putting Exhibit 12 back up,
13    here.
14              Let me show you where in your
15    interrogatory responses you disclosed those
16    bilateral meetings with social media platforms
17    here in --
18              MR. GARDNER:  Hold on.  We're --
19    we're pulling 12 back up, John.  Hold on.
20              MR. SAUER:  Page 38 to 39, it
21    actually goes onto 40.
22              MR. GARDNER:  Yeah, hold on.  Whoa
23    whoa, whoa, whoa, yeah, almost there.  You said
24    38, John?
25              MR. SAUER:  Page 38.
```

```
 1   BY MR. SAUER:
 2           Q.   There's a list of five bullet
 3   points.
 4           A.   Okay.  I'm sorry, what was your
 5   question?
 6           Q.   Can you show me where on this
 7   interrogatory response you disclosed, for
 8   example, bilateral meetings between CISA and
 9   Twitter or CISA and Facebook relating to the
10   misinformation reporting that we've been talking
11   about?
12           A.   So I don't want to speak on behalf
13   of whoever submitted the final product, but my
14   assumption would be that they would be on the
15   preparation meeting.  But I'm not -- I'm not
16   sure how they captured those in here.
17           Q.   Were those the same as preparation
18   meetings for the USG industry meeting?
19           A.   I probably wouldn't consider them
20   to be the same, but there's -- there are similar
21   types of meetings.
22                (Exhibit No. 13 was marked for
23   identification.)
24   BY MR. SAUER:
25           Q.   Let's get Exhibit 13 back up.
```

**BRIAN J. SCULLY 1/12/2023**

```
 1                    Do you see this as a document filed
 2      before the FEC, entitled:  Declaration of Yoel
 3      Roth?
 4           A.    Okay.
 5           Q.    And scrolling, have you seen this
 6      document before?
 7           A.    I have not.
 8           Q.    Scroll down to paragraph 11.  Start
 9      with paragraph 10.  Mr. Roth says in this
10      declaration, he says, since 2018 I have had
11      regular meetings with the office of the director
12      of National Intelligence, the Department of
13      Homeland Security, the FBI, and industry peers
14      regarding election security; right?
15           A.    Yep.
16           Q.    Was this a description of the --
17      the sync meetings that we talked about today,
18      between US government and social media
19      platforms?
20                    MR. GARDNER:  Objection, lack of
21      foundation, calls for speculation.
22      BY MR. SAUER:
23           Q.    Do you see that?
24           A.    Yeah, I don't know what he's
25      talking about, obviously I can't tell for
```

**BRIAN J. SCULLY 1/12/2023**

1   certain what he's talking about.

2            Q.   No?   Since 2018 has the Department

3   of Homeland Security had regular meetings with

4   social media platforms --

5            A.   Yep.

6            Q.   -- ODNI and the FBI?

7            MR. GARDNER:   Objection, lack of

8   foundation.

9            A.   Yes.

10            Q.   Yes, it has, because you've

11   testified about them repeatedly today, so there

12   obviously is a foundation, isn't there?

13            You have been personally involved

14   in multiple meetings, these sync meetings,

15   between USG and industry, and they involve seven

16   or eight social media platforms, ODNI, the

17   Department of Homeland Security, specifically

18   CISA, and the FBI, didn't they?

19            A.   We had regular meetings, as I

20   talked about.  Whether or not that is what Yoel

21   is also talking about, here, I can't say.  But I

22   don't think that's a bad inference to make.

23            Q.   Okay.   Scroll down to paragraph 11:

24   During these weekly meetings the federal law

25   enforcement agencies communicated that they

Case 3:23-cv-00571-TAD-KDM Document 2061 Filed 05/04/23 Page 246 of 456 PageID #: 18589

```
 1      expected hack and leak operations by state

 2      actors might occur in the period shortly before

 3      the 2020 presidential election, likely in

 4      October; do you see that?

 5           A.   Yes.

 6           Q.   Do you recall that kind of

 7      communication occurring in any of these sync

 8      meetings that occurred in 2020?

 9           A.   Again, I don't specifically recall.

10      But as I said earlier, it's certainly possible,

11      because it was a common tactic.

12           Q.   But you don't remember any federal

13      agencies talking about hack and leak operations

14      in these meetings, but you don't dispute that it

15      could have happened?

16           A.   That's correct, yes.

17           Q.   Okay.  Next sentence, Mr. Roth

18      says:  I was told in these meetings that the

19      intelligence community expected that individuals

20      associated with political campaigns would be

21      subject to hacking attacks, and that the

22      material obtained through those hacking attacks

23      would likely be disseminated over social media

24      platforms, including Twitter; do you see that?

25           A.   I do.
```

1          Q.   Do you recall that being
2     communicated in any of these sync meetings?
3          A.   Again, it's -- I don't remember
4     specifics, but it would not surprise me if this
5     was discussed.
6          Q.   Next sentence, Mr. Roth says:
7     These expectations of hack and leak operations
8     were discussed throughout 2020.
9               Does that ring a bell?  Do you
10    recall this being raised multiple times and
11    repeatedly in these sync meetings?
12         A.   Again, it's the same response.  I
13    don't have specific memories of every item that
14    was requested or very good memory of the
15    conversations, in general.  But I would
16    definitely not be surprised if these were
17    included in those conversations.
18         Q.   Okay.  And then the very next
19    sentence, spilling onto page 3, I also learned
20    in these meetings that there were rumors that a
21    hack and leak operation would involve Hunter
22    Biden; do you see that?
23         A.   I do.
24         Q.   Do you recall any mention of Hunter
25    Biden in any of these meetings with social media

**BRIAN J. SCULLY  1/12/2023**

```
 1    platforms?

 2          A.   I don't.

 3          Q.   So you don't know -- do you -- do

 4    you dispute that Mr. Roth remembers it

 5    correctly?

 6          A.   I mean, I have no basis to dispute

 7    or not dispute.

 8          Q.   Okay.

 9          A.   These aren't topics that CISA would

10    be briefing on, so it's possible another agency

11    did brief on them.

12          Q.   How about the FBI, do you remember

13    the FBI, Laura Dehmlow and Elvis Chan, saying

14    anything about Hunter Biden during these

15    meetings?

16          A.   I don't.

17          Q.   How about ODNI?

18          A.   I don't, no.

19          Q.   How about DOJ, national security

20    division?

21          A.   I don't, no.

22          Q.   This is dated December 17th, 2020,

23    so that would have been within a couple of

24    months of these meetings, a month or two of the

25    last meeting; is that right?
```

```
 1              A.   I'm sorry, what was -- could you

 2     repeat that?  I just want to make sure I

 3     understand what you're asking.

 4              Q.   I was just scrolling down to the

 5     fourth page of the document, where it's dated

 6     December 17th, 2020.

 7              A.   Oh.

 8              Q.   Do you see that?

 9              A.   Yep.

10              Q.   So this declaration would be

11     executed close in time to the meetings that are

12     being discussed; correct?

13              A.   Correct.

14              MR. SAUER:  I'm going to e-mail you

15     Exhibit 14.

16              MR. GARDNER:  John, did you say 14?

17              MR. SAUER:  Exhibit 14, yeah, do

18     you have that?

19              MR. GARDNER:  Yeah, we already have

20     that, the deposition of Elvis Chan.

21              MR. SAUER:  Yeah.  Sorry, guys.

22              (Exhibit No. 14 was marked for

23     identification.)

24     BY MR. SAUER:

25              Q.   This is the third page of this
```

```
 1    document.

 2              A.   Okay.

 3              Q.   There's an exchanges here where Mr.

 4    Chan is asked -- he refers to the federal law

 5    enforcement agencies, plura, in that sentence,

 6    do you see that answer, yes; do you see where

 7    that is?

 8              A.   Line four?

 9              Q.   Yeah.

10              A.   Is that what you're referring to?

11                   Yeah, you're referring to the

12    question at line four?

13              Q.   Right.

14              A.   Okay.  Yeah, I see that.

15              Q.   And Mr. Chan was asked the question

16    on line eight, whether other federal law

17    enforcement agencies, other than the FBI, talked

18    about hack and leak operations; do you see that?

19              A.   I do.

20              Q.   And he says he doesn't think of any

21    other federal law enforcement agencies, there at

22    line 15.  The only federal law enforcement

23    agency I remember conveying our concern about

24    hack and leak operations was the FBI; right?

25              A.   That's his response, correct.
```

1           Q.   And then he was asked, how about

2    any other agency, not law enforcement.  And he

3    answered, as I mentioned, I believe CISA would

4    have had the same concern as the FBI; right?

5          A.   That was his response, yep.

6           Q.   And I asked him:  That was relayed

7    through Mr. Masterson and Mr. Scully, I think

8    you said, correct?  And he answered, correct;

9    right?

10          A.   Okay.  Yep.

11           Q.   Do you remember either you or

12    Mr. Masterson relaying a concern about hack and

13    leak operations in those meetings?

14          A.   I don't.

15           Q.   Next page of the document, page

16    222, fourth page of the PDF, you testify:  I

17    believe that the senior election official from

18    ODNI would also flag -- flag that as a concern;

19    correct?

20          A.   Yes.  That's what he says, yes.

21           Q.   Do you remember anyone from ODNI

22    raising a concern about hack and leak operations

23    in these meetings?

24          A.   Again, as I said in your previous

25    questions, I don't recall specifics, but it

```
1    wouldn't surprise me if -- if they were
2    mentioned.
3                    MR. SAUER:  I'm sending you Exhibit
4    15 by e-mail.
5                    (Exhibit No's. 15, 16 and 17 were
6    marked for identification.)
7                    MR. GARDNER:  John, are you
8    intending to screen share?
9                    MR. SAUER:  Yeah, I'm doing that
10   right now.
11                   MR. GARDNER:  We're still waiting
12   for the exhibit.
13                   MR. SAUER:  Sorry.  I think I got
14   my exhibits switched up.  Yeah, here, I'm
15   showing you exhibit -- I think it will be
16   Exhibits 15, 16 and 17.  You know, the one that
17   I thought was 15 is 16, the one that I thought
18   was 16 is 15, so I'm showing you Exhibit 16.
19                   MR. GARDNER:  So when we receive
20   your e-mail do you want us to pull up the
21   document marked 16?
22                   MR. SAUER:  Yeah, you should have
23   received it already.
24                   MR. GARDNER:  Yeah, not yet.
25                   MR. SAUER:  There should be an
```

```
1     e-mail with 15, 16 and 17 all attached.
2               MR. GARDNER:  Yeah, not yet.
3               MR. SAUER:  Really?  Well --
4               MR. GARDNER:  Oh, here we go.
5               Do you want us to pull up 16 first?
6               MR. SAUER:  Yeah.
7               MR. GARDNER:  Okay.  John, I have
8     15 here, and I got set up -- I see what's
9     happening.  Hold on.  Yeah, sorry.
10              MR. SAUER:  It's a one-page e-mail,
11    it should be up.
12              MR. GARDNER:  Yep.  Yeah.
13    BY MR. SAUER:
14         Q.  Here's a -- Mr. Scully, you see an
15    e-mail here from Facebook to you and
16    Mr. Masterson, as well as Allison Snell and
17    Geoff Hale; correct?
18         A.  I do.
19         Q.  And there it indicates that there
20    it's called today's industry statement; right?
21         A.  Joint industry statement.
22         Q.  Right.  And they say -- and
23    Facebook says to you, I wanted to ensure you had
24    the statement we will look to release following
25    today's meeting; right?
```

```
 1            A.   Correct.

 2            Q.   And then, under the joint industry

 3      statement, it talks about how there are these

 4      meetings that have been going on; right?

 5            A.   Yes.

 6            Q.   And then it says -- the majority of

 7      the statement says:  At today's meeting we

 8      specifically discussed three things; right?

 9            A.   Yes.

10            Q.   And the second one of those says:

11      Ways to counter targeted attempts to undermine

12      election conversation before, during, and after

13      the election; right?

14            A.   It does.

15            Q.   And the industry statement goes on

16      to say:  This includes preparing for possible

17      so-called hack and leak operations, attempted to

18      use platforms and traditional media to amplify

19      unauthorized information drops; correct?

20            A.   Correct.

21            Q.   Does that -- and so the industry

22      prepared a public statement saying that hack and

23      leak operations were discussed at one of these

24      meetings; correct?

25            A.   Correct.  Yes.
```

```
 1              Q.   Does that refresh your memory, at
 2      all, about hack and leak operations being raised
 3      at these sync meetings in 2020?
 4              A.   Again, I don't have any specific
 5      recollections of the conversations.  But as I
 6      said a few times, now, it doesn't surprise me
 7      that they would discuss the common tactic used
 8      globally.
 9              Q.   Were you aware of any pending
10      investigations, at that time, into possible
11      hack -- actual possible hack and leak
12      operations?
13              A.   No.
14              Q.   I'm showing you what should be
15      Exhibit 15.
16                   MR. GARDNER:  Got it.
17                   THE WITNESS:  Okay.
18      BY MR. SAUER:
19              Q.   And here's an e-mail from Lauren
20      Protentis to people at Facebook and CISA, that
21      refers to the prep USG industry called monthly,
22      in the subject line; correct?
23              A.   Yes, correct.
24              Q.   And I think you testified earlier
25      that Facebook was kind of the point for the
```

```
 1    industry.  And so there would be a preparatory

 2    meetings between CISA and Facebook to kind of

 3    set the agenda for the big monthly meeting that

 4    involved all the platforms and at least four

 5    agencies; right?

 6           A.   That's correct, yeah.

 7           Q.   Okay.  Here it says, among other

 8    things, industry prompts, themes, narratives,

 9    approaches you anticipate for races you think

10    will be targeted, right, is number two?

11           A.   Yes.

12           Q.   Okay.  What's that talking about,

13    are they asking that industry to report back on

14    what themes and narratives on social media they

15    anticipate may happen in certain election races?

16           A.   So I'm not -- I'm not sure what,

17    specifically, they were talking about here.

18    It's possible they were trying to understand if

19    they were particularly they were being targeted

20    by foreign actors, but I don't know, that's --

21           Q.   How about themes and narratives?

22           A.   Yeah, I think that would be

23    pretty --

24           Q.   Go ahead.

25           A.   I think that would be the same kind
```

```
1      of idea.  Again, as I mentioned earlier, in a

2      lot of these calls the intelligence community

3      would provide kind of high-level assessments of

4      unclassified reporting that they had done.

5              Q.   What does industry prompts mean?

6              A.   Generally speaking, it would be the

7      questions that industry had for government.

8              Q.   So industry --

9              A.   For --

10             Q.   Go ahead.

11             A.   Actually, let me rephrase.  Sorry.

12                  I think in this case it's --

13     it's -- I'm not sure, that's how I would have

14     interpreted it, but based on where it is in the

15     agenda I'm not sure that's what Warren meant.

16             Q.   In other words, these questions of

17     government for industry say, hey, social media

18     platforms tell us what themes, narratives,

19     approaches you're anticipating for the upcoming

20     election?

21             A.   No, my -- my interpretation of this

22     is that it's industry questions for government,

23     because the government portion of the agenda.

24     So industry, if possible, would like to hear

25     government's perspective on these questions.
```

 1              Q.    Did government share that with the

 2     social media platforms in these meetings?  Did,

 3     you know, the federal agencies talk about what

 4     themes and narratives and approaches they

 5     anticipated on social media for election races?

 6                    MR. GARDNER:  Objection, compound.

 7                    THE WITNESS:  Yeah, can you just

 8     kind of break that question down for me?

 9     BY MR. SAUER:

10              Q.    In the actual meetings did the

11     federal agencies provide information to the

12     social media platforms about the themes and

13     narratives they anticipated seeing on social

14     media for particular races, election races?

15              A.    I don't think it was ever broken

16     down by particular races.  I think there were --

17     again, there was intelligence.  If there's

18     intelligence that was unclassified they could be

19     shared about, targets and things like that, the

20     intelligence community would share that.

21                    But generally speaking, I don't

22     think that we would necessary get down to the

23     individual race level, but again, I'm not -- I

24     don't have a memory of every specific item that

25     was discussed.

```
 1               Q.   How about do you remember themes
 2      and narratives being discussed, like, hey, we
 3      expect people to be, you know, talking about --
 4      expect, you know, social media postings to
 5      reflect this theme or that narrative?
 6               A.   So I think there are two components
 7      to this one.  I believe there are some
 8      discussion about would we have seen historically
 9      in the past, and may see going forward.  So --
10      so I believe there might have been some
11      discussion around that.
12               And then if -- again, if the intel
13      communities had reporting talked about foreign
14      actor efforts, they would share those.
15               I don't recall, specifically, what
16      was discussed.  So I -- I don't know if -- what
17      level of detail, if any, they got down to in
18      those conversations.
19               And I'm not even -- to be honest,
20      I'm not even sure if I attended this meeting.  I
21      think I either just got back from my detail or
22      it was right before I got back to my detail, so
23      I'm not sure I attended this one.
24               Q.   I'm going to share Exhibit 17.
25               A.   Okay.
```

**BRIAN J. SCULLY  1/12/2023**

```
 1            Q.   And this is a collection of
 2    e-mails, again.
 3                 Here on the first page, in April of
 4    2022, this year, Lauren Protentis is sharing the
 5    agenda for one of these USG sync meetings.  And,
 6    among other things, she says:  One-pager
 7    reminder; do you know what she's talking about?
 8            A.   Yeah, she -- we had asked industry
 9    to provide a one-page summary of their content
10    moderation rules that we could share with
11    election officials.
12            Q.   What's the purpose of that, a
13    one-page summary of their content moderation
14    rules?
15            A.   So we -- we would receive a lot of
16    questions from election officials about how
17    different platforms made decisions about their
18    terms of service.  And we thought this was a way
19    to help the platforms be more transparent with
20    election officials.  So we asked them to just
21    put together kind of a one-page summary.
22            Q.   A one-page summary of basically
23    what their content moderation policies were as
24    applies to election misinformation?
25            A.   Yeah, that we could share with
```

**BRIAN J. SCULLY  1/12/2023**

```
 1    election officials.
 2            Q.    I take it, then, the election
 3    officials when they see something on social
 4    media that they view as disinformation or
 5    misinformation would be educated on whether or
 6    not it violates that platform's policy; is that
 7    right?
 8            A.    I'm not sure that was the full
 9    expectation, but I think it was just to try to
10    provide some transparency and some understanding
11    of how the platforms make a decision.
12            Q.    And why is it useful?  I take it
13    this was your idea, CISA's idea, not -- it
14    wasn't something that the election officials
15    have asked for?
16            A.    To be honest, it asks of maybe
17    before I returned, so I'm not entirely certain,
18    but I suspect it was some combination of
19    election officials asking.  We got a lot of
20    questions over the years about that, and us
21    just, you know, raising it with the platforms
22    the way they're trying to help the election
23    officials.
24            Q.    Jumping ahead, 15743, should be on
25    the 7th page of the PDF, there's a discussion in
```

Case 3:23-cv-00531-TAD-KDM Document 2061 Filed 05/02/23 Page 262 of 456 PageID #: 18345

```
 1    the April --
 2              MR. GARDNER:  Are you at that now?
 3              THE WITNESS:  Sorry, I just
 4    accidentally got out.  I'm going to the page.  I
 5    think I'm there.
 6  BY MR. SAUER:
 7         Q.   There's a discussion, a bullet
 8    point in the agenda for the August 2020 USG
 9    industry meeting of election-day coordination.
10              Do you know what -- what that was
11    discussed under that?
12         A.   Yeah, and just to be clear, you
13    know, we just jumped from 2022 back to 2020;
14    right?
15         Q.   Yeah.
16         A.   Okay.  Yeah, so CISA regularly set
17    up an operation center on election day, around
18    the election.  And the platforms and some of the
19    other agencies do the same.  But I think it was
20    just a conversation about how all the different
21    organizations were going to be managing on
22    election day.
23         Q.   What is the nature of a -- what is
24    CISA's election day operation do, does it
25    receive disinformation reports?
```

**BRIAN J. SCULLY 1/12/2023**

```
 1              A.   It's more of a -- so just taking a
 2      step back, right, essentially what CISA does is
 3      it invites key stakeholders to CISA to
 4      facilitate information sharing about what's
 5      going on within the elections.
 6                   Most of it is cyber related, but
 7      the NAV and NAFTA that we talked about earlier
 8      were there, and so if they heard reporting up
 9      through their members, they might mention it.
10                   Generally speaking, you might
11      have -- in 2020 it was a little different,
12      because of COVID.  But generally speaking, we
13      would have somebody from our team there who we
14      would have a team kind of working on the chats.
15                   And so the switchboard reporting
16      might come in and in 2018, for example, our guy
17      was sitting in the room, in 2020 I think I was
18      the only one in the room, maybe one other from
19      our team.  And then they would -- you know, so
20      that's -- I don't know if that helps clarify.  I
21      think I just talked in mode right there.
22              Q.   When you say in the room, is there,
23      like, a physical location where CISA and NASED
24      and NASS and social media platforms all have
25      people or what room are we talking about?
```

```
 1              A.   Yeah, so in 2020, CISA had a room
 2    where we had some of our stakeholders attend in
 3    person.  I don't have a full list of who was
 4    there.  It was obviously not substantial, due to
 5    COVID restrictions.  But we would have federal
 6    partners, and we have NASS and NASED there.
 7              I don't know who else was there,
 8    but I believe there was a couple other, you
 9    know, maybe election security vendors, folks
10    like that, just to facilitate information
11    sharing in case an incident occurred.
12              Q.   Who were the federal partners?
13              A.   I don't -- I don't believe in 2020
14    we had too many in the room, but CISA's watch
15    center operations for CISA central I talked
16    about earlier, they're our liaisons for many of
17    the different agencies, and then we had
18    connectivity with FBI, DOJ, NEI, I&A, things
19    like that.  Again, 2020 all you need due to the
20    pandemic.
21              Q.   And part of what happens in this
22    election-day operation is that NASED and NASS
23    may receive misinformation reports from their
24    members and report them up to you guys; right?
25              A.   Generally speaking, it would --
```

**BRIAN J. SCULLY  1/12/2023**

 1    they would handle them themselves, with the

 2    platforms, but I'm sure there were examples of

 3    where they sent it to us.

 4         **Q.   And then would you guys perform the**

 5    **same misinformation routing function and pass**

 6    **that along to the platforms?**

 7         A.   Yeah, correct.

 8         **Q.   Okay.  This happened again in 2022,**

 9    **was there an election-day operation?**

10         A.   It was an election operation center

11    in 2022.  We didn't do switchboarding in 2022,

12    as we discussed earlier.

13         **Q.   You say you didn't do**

14    **switchboarding in 2022, did you relay --**

15         A.   Correct.

16         **Q.   -- misinformation or disinformation**

17    **concerns to social media platforms at any time**

18    **during the 2022 election cycle?**

19         A.   Not that I recall, no.

20         **Q.   How did the state and local**

21    **election officials relay those concerns to the**

22    **social media platforms, did they do a --**

23         A.   Yeah, my understanding was

24    two-fold, one, I think some of the platforms

25    developed a little more robust infrastructure to

```
 1    engage with election officials, themselves.  And
 2    then I also believe that CIS was up and running,
 3    but I'm not certain what -- kind of how it all
 4    worked.
 5          Q.   So you believed that CIS continued
 6    to receive disinformation/misinformation reports
 7    from state and local election officials during
 8    the 2022 election cycle, and relay them directly
 9    to social media platforms?
10          A.   Yeah, I'm speculating a bit on
11    that, because I'm not particularly familiar with
12    what they actually did in 2020, but that was the
13    general understanding I had.
14          Q.   Did they copy you on those reports,
15    like they were doing in 2020?
16          A.   They were not, no.
17          Q.   Why not?  Did you tell them not to?
18    Did you say:  Don't copy us on these or did they
19    just stop?
20          A.   Yeah, we discussed earlier, CISA
21    didn't -- was not doing switchboarding in 2022,
22    so there's no reason for them to copy us.
23          Q.   And did you tell --
24          A.   But I --
25          Q.   Go ahead.
```

```
 1              A.   So I didn't have a conversation,
 2    myself, with CIS about it, so I'm not sure who
 3    told them not to do it.
 4              Q.   Turning back to the 2022 election
 5    day operation, was that another case where CISA,
 6    NASED, NASS, and other federal agencies all had
 7    representatives in one room?
 8              A.    I -- I think there was some federal
 9    representative there, like I said, most of that
10    would -- would be in the ops center.  There were
11    other nongovernment partners there, like -- like
12    I said, like the -- the vendors, election
13    security, election system vendors and folks like
14    that.
15              Q.   What -- what's the ops center?
16              A.   That's essential, that's kind of
17    the 24/7 situational awareness that CISA runs.
18    And my understanding is that it has liaisons
19    from across the federal agencies.
20              Q.   And were you there at the -- at the
21    ops center in 2022 election day?
22              A.   So the room we would be in would be
23    a separate room.  We wouldn't actually be on the
24    ops center floor.  We called it a situational
25    awareness room.
```

**BRIAN J. SCULLY  1/12/2023**

1      Q.    On election -- were you there?

2      A.    I was in the situational awareness

3    room on election day in 2022, yep.

4      Q.    Any misinformation or

5    disinformation concerns arise on election day in

6    2022?

7      A.    I don't think there was too much.

8    I'm not recalling specific incidents.  I would

9    imagine the two were, but I don't think there

10   was very much, if there was.

11     Q.    What happened?

12     A.    I'm sorry, that's not very clear.

13           I just don't recall if there's

14   anything specific.  I have a general sense that

15   there were a couple of items, but I don't think

16   there was very much.

17     Q.    What happened to the ones that did

18   occur or that did arise, did they get routed to

19   different platforms?

20     A.    No, I think it -- no, if any of

21   those were mentioned, I think it was just in

22   general conversation of what might be happening,

23   but we didn't have anything on social media

24   platforms.

25     Q.    Did NASED and NASS route things to

**BRIAN J. SCULLY 1/12/2023**

1    social media platforms?

2            A.   I don't -- I don't know for

3    certain.  I would -- I would guess they did.

4            Q.   **Jumping ahead in Exhibit 17, page**

5    **14545, it's page 12 of the PDF, and here's an**

6    **agenda from one of these sync meetings from July**

7    **of 2022; do you see that?**

8            A.   Is it 14545?

9            Q.   **Yeah, page 12 of the PDF.**

10           A.   Just making sure.  Sorry, it's

11   weird how it shows the pages here.  Yeah, okay.

12   Yep.

13           Q.   **And then Lauren Protentis, here, is**

14   **circulating an agenda for a sync meeting;**

15   **correct?**

16           A.   This looks like it's for a prep

17   meeting.

18           Q.   **Prep meeting?  Okay.**

19                **And then here in item four, it**

20   **says:  CISA elections infrastructure risks,**

21   **Scully; correct?**

22           A.   Yep.

23           Q.   **So is that referring to the plan**

24   **that you -- and do you have a briefing on**

25   **election infrastructure risks at the big sync**

```
 1    meeting?
 2          A.   Yeah, I believe normally Geoff Hale
 3    would do that, I believe this meeting Geoff was
 4    going to be unavailable, so they asked me to
 5    cover the election infrastructure portion of the
 6    agenda.
 7          Q.   Now, what you said about them, what
 8    does that mean, election infrastructure risks,
 9    does that refer to informational infrastructure?
10          A.   No, that's -- again, that's kind of
11    the broader understanding of how elections
12    function, so the systems, physical security,
13    things like that.  It would just be an update on
14    kind of where things stand across kind of the
15    broader election infrastructure community.
16          Q.   Below that, item six, it says:
17    FBI, domestic, adversarial actor update, down
18    below; do you see that?
19          A.   I do.
20          Q.   Do you recall Laura Dehmlow giving
21    a briefing at that meeting you were at about a
22    domestic adversarial actor?
23          A.   I don't, and I -- I -- if I recall
24    correctly, and I don't know if you have the
25    actual agenda for the meeting, I think the --
```

```
 1    that changed.
 2            Q.   Oh, you don't think she gave
 3    that -- that -- that briefing?
 4            A.   I don't believe so, no.
 5            Q.   What kind of domestic adversarial
 6    actors is the FBI's foreign influence task force
 7    concerned about?
 8            A.   I don't know.
 9            Q.   Let's jump ahead to page 7599.
10            MR. GARDNER:  John, before we go
11    on, we've been going about two hours, again.  I
12    think now would probably be a good time for a
13    break.
14            MR. SAUER:  I just got a few more
15    questions about this document.  Can you keep
16    going for a couple more minutes.
17            MR. GARDNER:  Sure, we can do that.
18    BY MR. SAUER:
19            Q.   Let's just -- here, 7599.
20            A.   What page are we on?
21            Q.   That is page 16 of the PDF?
22            A.   Okay.
23            Q.   Do you see here on the bottom half
24    of the page, on July 1st, 2020, Facebook sends
25    e-mail to you and Matt Masterson, Matt and
```

```
 1       Brian, thank you so much for the outreach on our
 2       next sync; right?
 3              A.   Yep.
 4              Q.   And then she gives a proposed
 5       agenda for a meeting that she proposes having on
 6       July 15th of 2020; correct?
 7              A.   Yes.
 8              Q.   And then, in that agenda, there's
 9       an item here, under number two, that says:
10       Hack/leak and USG attribution speed/process; do
11       you see that?
12              A.   Yep.
13              Q.   What was that referring to?
14              A.   I -- I don't recall.  You know, I
15       would have to speculate based on what it says
16       here.
17              Q.   So you don't remember hack/leak
18       being put on the agenda for one of these
19       meetings?
20              A.   Again, as I said earlier, I don't
21       remember all the agenda items on the meetings or
22       specific discussion points.  But I'm not
23       surprised that it's on here, no.
24              Q.   Do you know why Facebook would have
25       put that on?
```

```
 1                MR. GARDNER:  Objection, calls for
 2      speculation.
 3   BY MR. SAUER:
 4           Q.   If you know.
 5           A.   I don't know.
 6           Q.   And then what is --
 7           A.   I mean, again --
 8           Q.   Go ahead.
 9           A.   Sorry, just as I said, you know, a
10      few times, right, it's not surprising, it was a
11      common tactic that was used globally.  But I
12      don't know why they -- if there was a specific
13      reason that they put it on here.
14           Q.   What -- how about that, in the
15      second half of that line, USG attribution
16      speed/process; right?  Do you know what that
17      means?
18           A.   I don't, CISA doesn't do
19      attributions, so I'm not sure what that could be
20      related to.
21           Q.   Attribution, when you say CISA does
22      not do attribution, what does that mean?
23           A.   Well, the way I would look at
24      attribution would be attributing specific actors
25      to something.
```

**BRIAN J. SCULLY  1/12/2023**

```
 1              Q.   That was --
 2              A.   In the MDM context CISA does not do
 3    attribution.
 4              Q.   So attribution is figuring out who
 5    is the actual source of the social media
 6    posting?
 7              A.   I mean, if you're talking about a
 8    social media posting, that would be attribution.
 9    If you're talking about hack and leak, I assume
10    that would be known as the attribution to who
11    the hacker and leaker was.
12              Q.   So this, then, could be a
13    discussion of -- you know -- and by the way,
14    this is listed there under 40 minutes deep dive
15    topics; right?
16              A.   Mm-hmm.
17              Q.   Do you know if you participated in
18    that July 15th, 2020 meeting?
19              A.   I would imagine I did, but I -- you
20    know, I would have to go back and look at my
21    calendar.  I don't know for certain.
22              Q.   You don't know -- sorry.
23                   You don't know about whether there
24    was a deep dive on hack/leak and USG
25    attributions, the process?
```

```
 1                A.   I don't know for certain.  I mean,
 2      I would have to go back.  Do you have the actual
 3      agenda that we used for the meeting or just the
 4      proposed one by -- by Facebook?
 5                Q.   No, let me ask you this:  I take it
 6      you -- you interpret, in the context of hack and
 7      leak, USG attribution, USG is United States
 8      government; right?
 9                A.   Yeah, that's what I would assume it
10      is.
11                Q.   Attribution, I take it, is having
12      the USG, the government, figure out who did the
13      hack and the leak; right?  That's what
14      attribution means in this context?
15                A.   Assuming I was connected to hack
16      and leak, I obviously don't know what this is
17      specifically referring to, but if I were reading
18      that bullet point that's how I would read it,
19      that the attribution was USG attributing a hack
20      and leak.
21                Q.   Okay.  And then the question is
22      how -- how fast speed and how USG would go about
23      doing it; right, speed/process?
24                A.   Again, that's what the agenda says.
25      I don't know exactly what that means.
```

**BRIAN J. SCULLY 1/12/2023**

```
 1                    MR. SAUER:  Let's take a break
 2      there.
 3                    MR. GARDNER:  10 minutes good?
 4                    MR. SAUER:  Yeah.  How long have we
 5      been on the record.
 6                    THE VIDEOGRAPHER:  The time is now
 7      3:34 p.m.  We are off the record.
 8                    (Recess.)
 9                    THE VIDEOGRAPHER:  The time is now
10      3:50.  We are back on the record.
11                    MR. SAUER:  Before we go back to
12      questioning, I'm formally requesting, on the
13      record, a supplementation of the document
14      production directed to CISA custodians.  If you
15      look at those pages where the key custodians are
16      disclosed, we've had testimony today that that
17      list of custodians at ESI should have been
18      searched, should have included the five names
19      that the witness has testified to today, Chad
20      Josiah, Rob Schaul, Adam Zaheer, John Stafford
21      and Pierce Lowary.
22                    And, in fact, I think it's
23      astonishing that four of those names are
24      specifically identified as copied on e-mails
25      from the key custodians, but whose ESI was not
```

1    searched.

2              So I request supplementation by

3    tomorrow, which is the close of fact discovery.

4    We were entitled to that going back to August.

5    And this is the first time we've heard about

6    this, one day before the close of discovery.

7              So I'm asking for those e-mails

8    from those custodians, including their

9    communications with social media platforms, and

10   it now appears there were communications with

11   the EIP, potentially, those be produced by

12   tomorrow.

13              MR. GARDNER:  I understand your

14   request.  We'll take it back.

15              MR. SAUER:  Thanks.

16              (Exhibit No. 18 was marked for

17   identification.)

18   BY MR. SAUER:

19        Q.    Let's go to Exhibit 18, it should

20   be in your e-mail.

21              MR. GARDNER:  Yeah, hold on one

22   second.

23   BY MR. SAUER:

24        Q.    This document is another one of

25   these collective exhibits of a bunch of CISA

1    e-mails involving you.

2              If you look at the first page, in

3    the middle, here, it indicates there's reporting

4    that you are forwarding from the state

5    department's global engagement centers about

6    disinformation on YouTube, and you're forwarding

7    it onto -- to social media platform; do you see

8    that?

9         A.   Yes.

10        Q.   Yeah.  Let me ask this:  What role

11   does the state department's global engagement

12   center have in addressing misinformation and

13   disinformation on social media?

14        A.   I don't know what the specific

15   authorities are.

16        Q.   Do you know what they do,

17   generally?

18        A.   Yeah, but also, just to be clear,

19   that this e-mail is regarding a State Department

20   employee that was targeted overseas, I believe.

21   So I -- to answer your -- to answer your

22   question, I believe they -- they have a mandate

23   to deal with information operations overseas.

24        Q.   Do you interact with them, at all,

25   in your MDM team activities?

**BRIAN J. SCULLY  1/12/2023**

```
 1              A.   Yes.

 2              Q.   How do you interact with them?

 3              A.   In a couple ways.  So one, they do

 4      a lot of reporting on what they're seeing

 5      overseas, particularly as it relates to actions.

 6      So it's a good source of understanding tactics

 7      and things like that, that are occurring

 8      overseas.

 9                   We often see what happens overseas

10      end up showing up domestically.  So it's a good

11      source of information for that.

12                   They also have a tech demo program

13      that they run, where they bring in different

14      tech companies that work in the information

15      operations space.  So we'll go -- we have

16      members of the team that will go and watch some

17      of the demo.

18                   So I think those are the two main

19      ones.  We -- trying to think if there's others.

20              Q.   Do you know George Beebe,

21      B-e-e-b-e?

22              A.   Do I know George?  I'm sorry, could

23      you spell that again?

24              Q.   B-e-e-b-e.

25              A.   The name does not sound familiar.
```

1        Q.   Do you know if the GEC was involved
2    in the Election Integrity Partnership in any
3    way?
4        A.   I don't.  I know you showed me a
5    document earlier, that they were listed, but I
6    don't know what they did.
7        Q.   Okay.  Second page, here, where
8    this lists information report, you said -- it
9    indicates, in the last sentence there, the
10   journalist tells me there's a YouTube channel
11   run by Americans falsely claiming that this
12   diplomatic officer is patient zero for COVID-19;
13   correct?
14       A.   I'm sorry, what page are you on?
15       Q.   Second page of the PDF.
16       A.   Okay.  Yes, that's what the e-mail
17   says.
18       Q.   So you said -- well, maybe
19   overseas, it looks like the thing they're
20   challenging is something posted by Americans;
21   correct?
22       A.   I -- I don't know.  I mean, that's
23   just a YouTube channel run by Americans, that's
24   what they say, yeah.
25       Q.   You forward this onto him; right?

1          A.   I believe that's true, yes.

2          Q.   Scrolling down to page 10718 -- by

3     the way, did you flag these accounts?  If you

4     look here on the 11th page of the PDF for a

5     section --

6          A.   Sorry, page 11 of the PDF?

7          Q.   Yeah, here there's a screen shot of

8     unofficialcogov, and the Twitter handle, says:

9     DM us your weed store location, open

10    parentheses, hoes be mad, but this is a parody

11    account; correct?

12         A.   It appears I forwarded it to

13    Twitter, yes.

14         Q.   Okay.  And then that was the only

15    one, and the next page there's one you forwarded

16    to Twitter that says:  Smoke, weed, erry day, I

17    think they mean every day.  The official

18    (unofficial) Twitter account of the State of

19    Colorado; right?

20         A.   Yeah, it seems to be part of the

21    same e-mail in Colorado.

22         Q.   Those two accounts you forwarded to

23    Twitter, you forward those to Twitter for

24    consideration; correct?

25         A.   Yeah.

**BRIAN J. SCULLY  1/12/2023**

```
 1              Q.   And then, sorry, moving back a
 2       little bit of the document, I apologize, on the
 3       9th page there's an e-mail on September 25th of
 4       2020, from you to Twitter, saying, good morning,
 5       do you all have five minutes for a quick call
 6       today.  I'd like to give you a quick update on
 7       our reporting process this year.  Do you know
 8       what that was about?
 9              A.   I don't --
10              Q.   It looks like --
11              A.   -- know specifically what it's
12       about, no.
13              Q.   It looks like the specific subject
14       you mentioned was:  Election disinfo reporting;
15       correct?
16              A.   Let me scroll down.  Do you have
17       the rest of the e-mail chain?  Obviously it
18       appears to be a reply to something.  Am I
19       missing something, here?
20              Q.   Well, this is all we've got.  It
21       says --
22              A.   Oh, there's no -- there's no
23       header, again.
24              Q.   But -- but Twitter's response to
25       you, says:  Re:  Election disinfo reporting?
```

**BRIAN J. SCULLY  1/12/2023**

```
 1              A.    Yeah.

 2              Q.    Okay.  Do you know -- do you

 3      remember having a call with them about your

 4      process reporting election disinformation on

 5      that date?

 6              A.    I don't.

 7              Q.    Next page, 9703, tenth page of the

 8      PDF, there's an e-mail from Twitter to you and

 9      Matt Masterson, in September of 2020, where it

10      says:  Hi Matthew and Brian, hope you're doing

11      very well.  We want to give you an update today.

12      We're updating our civic integrity policy.  Our

13      existing policy does such and such, and it says,

14      starting next week we will label or remove false

15      or misleading information intended to undermine

16      public confidence in an election or other civic

17      process; right?

18              A.    Yep.

19              Q.    Do you know why they gave you this

20      report?

21              MR. GARDNER:  Objection, calls for

22      speculation.

23              A.    Yeah, I don't know why they

24      specifically -- it looks like there's ways to

25      public information about it, so as I mentioned
```

1    earlier, sometimes they would -- they're putting

2    things out publicly they would just give us a

3    heads up.

4         **Q.   Now, have you ever asked them to**

5    **give you a heads up or Matt Masterson ask them**

6    **to give you a heads up about changes in their**

7    **content moderation policies?**

8         A.   Not that I recall.

9         **Q.   Page 8519, sorry, I'm in the wrong**

10   **spot on the document.**

11        **Let me ask you this:  Do you**

12   **remember sharing a -- with Facebook, a**

13   **disinformation report about CISA and Director**

14   **Krebs, does that ring a bell, where the**

15   **disinformation was disinformation about your own**

16   **agency?**

17        A.   I don't recall that, specifically,

18   no.

19        **Q.   Here it is, 19th page of the PDF.**

20        A.   19?

21        **Q.   Yeah, page 19 of the PDF.**

22        A.   Okay.

23        **Q.   And it says:  Good afternoon -- you**

24   **sent an e-mail on November 5th of 2020 to**

25   **Facebook, saying, good afternoon Facebook,**

```
1        wanted to share this disinfo report about CISA
2        and Director Krebs; do you know what that was
3        about?
4              A.    I don't.
5              Q.    And your second --
6              A.    I don't recall.
7              Q.    The second line says:  IG disinfo
8        report; do you know what IG means?
9              A.    It appears, based on the link in
10       the e-mail, that it was referring to Instagram.
11             Q.    By you don't remember -- you don't
12       remember a specific -- anything specific
13       relating to Director Krebs, do you?
14             A.    No, I don't.
15             Q.    Let's scroll ahead a few pages, to
16       10394.
17                   Well, let me ask this:  Do you
18       remember disinformation about Director Krebs
19       circulating in that timeframe, just after the
20       2020 election?
21             A.    I recall that he was named on an
22       Iranian-driven enemies of the people list.
23       Beyond that, I don't -- I don't recall any other
24       specific MDM related to the director, no.
25             Q.    Okay.  Scroll down to the 22nd page
```

```
 1    of the PDF.
 2            A.    Okay.  Okay.
 3            Q.    Do you see here, you sent an e-mail
 4    to Facebook on November 10th, 2020, saying:
 5    Good morning, Director Krebs is particularly
 6    concerned about the hammer and scorecard
 7    narrative that is making the rounds; do you see
 8    that?
 9            A.    Yep.
10            Q.    Do you know what that was, the
11    hammer and scorecard narrative?
12            A.    If I remember correctly, it was
13    something about the NSA, and maybe a different
14    federal agency, conspiring to change votes or
15    something along those lines.  Like there's new
16    technology that the NSA developed.  I forget the
17    specifics of the narrative, itself, but it's
18    something along those lines.
19            Q.    So this is a narrative on social
20    media suggesting that the federal government is
21    engaging in intellectual or sort of election
22    interference in some way?
23            A.    I think it could have been social
24    media, it could have been other media.  I'm not
25    sure what I was referring to when I said making
```

```
 1    the rounds.  I don't recall.
 2          Q.    Okay.  Well, your next sentence
 3    says:  Wanted to see if you all, meaning
 4    Facebook, have been tracking this narrative and
 5    if there's anything you can share around
 6    amplification; right?
 7          A.    Yep.
 8          Q.    What does amplification mean?
 9          A.    If a particular narrative is being
10    amplified.
11          Q.    So, in other words, you wanted to
12    know -- you're asking Facebook to tell you
13    whether or not that narrative is being amplified
14    on its platform?
15          A.    Correct.  That's how I read that,
16    yeah.
17          Q.    Okay.  And then Facebook responds
18    by saying:  Our teams are actively -- actively
19    monitoring developments on this at this time and
20    to the extent you or USG have information about
21    confirmed misinformation or other information of
22    note, we absolutely welcome that; correct?
23          A.    Yep, that's what they wrote.
24          Q.    And they follow up by saying:
25    Wanted to follow up on the below to say that our
```

**BRIAN J. SCULLY 1/12/2023**

```
 1      teams have confirmed that we have third-party
 2      fact checker verification that the "hammer and
 3      scorecard" narrative is false; right?
 4              A.   Yes, that's what they say.
 5              Q.   And they go on to report to you:
 6      Our systems are labeling and downranking the
 7      contents as identified; correct?
 8              A.   Yes.
 9              Q.   Is that consistent with other
10      e-mails, where they report back to you on how
11      they've taken action against a content that you
12      have flagged?
13              A.   Yeah, generally consistent, I
14      think.
15              Q.   Let's jump ahead to the 10390, that
16      is going to be page 24 of the PDF, and here at
17      the bottom of the page you sent the very same
18      e-mail to Twitter, as well; right?
19              A.   Yep.
20              Q.   Director Krebs is very concerned
21      about the hammer and scorecard narrative, and
22      I'm wondering if you have been tracking this
23      one, if there's anything you can share in terms
24      of sharing and amplification; correct?
25              A.   Yeah, that's what I wrote.
```

**BRIAN J. SCULLY  1/12/2023**

```
 1              Q.   The usual context says:  We have
 2    been tracking this issue.  I will allow Yoel to
 3    follow up with detailed information; right?
 4              A.   Yes.
 5              Q.   And that's Yoel Roth; right?
 6              A.   I believe so, yeah, that's -- let's
 7    see, yep.
 8              Q.   He was then the chief content
 9    modulation officer for Twitter, right, ahead of
10    their trust and safety team?
11              A.   I don't recall what his title was,
12    but he certainly was in charge of some trust and
13    safety, safety stuff.
14              Q.   Trust and safety, that means
15    enforcing content moderation policies; right?
16              A.   I suspect that's one of the
17    responsibilities.
18              Q.   He comes back to you with a kind of
19    detailed report here at the top of the page
20    about what Twitter's been doing on this, he
21    says, we've been tracking the hammer/scorecard
22    issue closely, particularly since Director
23    Krebs's tweet on the subject, which is pretty
24    unambiguous as debunks go; correct?
25              A.   That's what he wrote, yeah.
```

**BRIAN J. SCULLY  1/12/2023**

 1          Q.   Do you recall Director Krebs

 2   debunking this in a tweet?

 3          A.   I suspect, and I keep on, let me

 4   just add, I don't recall Director Krebs'

 5   specific tweet.  Two, its possible, as part of

 6   our universe reality page, and Director Krebs

 7   would put a new item up on our universe reality

 8   page, he would tweet out the new universe

 9   reality entry, but I'm not aware of the specific

10   tweet, but that would be my guess as to what was

11   going on.

12          Q.   Were you aware that the social

13   media platforms were following the rumor page

14   posted by CISA and using that as a debunking

15   method for content on their platforms?

16          A.   We had a sense they were doing

17   that, yeah.

18          Q.   And that's kind of the point of it,

19   right, the point of the rumor page is to debunk

20   things; right?

21          A.   No.  The point of the page is just

22   to provide accurate information about rumors

23   that we were hearing.

24          Q.   Okay.  You were aware, I think you

25   just said, that the social media platforms, like

        1    Twitter, were following the page and using it to
        2    fact check, essentially, things that people were
        3    posting on their platforms?
        4         A.   Yeah.  So the platforms are looking
        5    for a place to get accurate information about
        6    different things that they were seeing on their
        7    platforms.  And I know some of them used the
        8    universe reality page to do that.
        9         Q.   And, in fact, this e-mail indicates
       10    that they used it to debunk the hammer/scorecard
       11    narrative, if the tweet that Director Krebs did
       12    refers to the rumor page; correct?
       13         A.   I'm sorry, could you repeat the
       14    question?
       15         Q.   Actually, let's move on to the page
       16    8625, it's a couple pages down, on page 27 of
       17    the PDF.  Here you're flagging, on Friday,
       18    November 13th of 2020, you've been flagging a
       19    tweet for Twitter.  And at one point you say, at
       20    11:26 p.m. on a Friday night, you e-mail Twitter
       21    and say:  Some Friday night fun for the two of
       22    us, hope you are well; right?
       23         A.   Yeah.
       24         Q.   So you were forwarding and routing
       25    disinformation concerns to social media

```
 1       platforms near midnight on a Friday?
 2              A.    It appears so.
 3              Q.    And they were responding in
 4       realtime, for example, 7 minutes later, at 11:33
 5       p.m., Twitter's responding to you late on a
 6       Friday night; correct?
 7              A.    Yeah.
 8              Q.    And she says, among other things,
 9       we have labeled so many tweets tonight, so I'm
10       afraid that the answer is there isn't any
11       tonight; correct?
12              A.    I'm sorry, what are you asking?
13              Q.    Directly above, she said:  We've
14       labeled so many tweets tonight that it isn't
15       ending tonight; correct?
16              A.    We have labeled so many tweets
17       tonight, so I am afraid that for now the answer
18       is that it isn't ending tonight?
19              Q.    Right.
20              A.    Yes, that's what she wrote.
21              Q.    This is based on an exchange a
22       little lower down, that you flagged something on
23       Dominion machines for her, at 11:20 p.m.  And
24       she responded at 11:21 p.m., within one minute,
25       saying, thanks, Brian, we will escalate;
```

**BRIAN J. SCULLY  1/12/2023**

```
 1    correct?
 2            A.   Yep, that's what the timestamps
 3    say.
 4            Q.   Were you getting -- you were kind
 5    of reporting misinformation on social media late
 6    at night to social media platforms during this
 7    timeframe?
 8            A.   I accidently closed -- that's page
 9    24?
10            Q.   Yeah.
11            A.   Sorry.  Yeah, as I said, if I were
12    on my phone, and I saw something come in, I
13    would push it along.
14            Q.   Jump ahead to -- and was it common
15    for Twitter or Facebook or other platforms to
16    respond almost immediately, even near midnight
17    on a Friday?
18            A.   I mean, it's hard to say common.  I
19    know it happened.  They were generally pretty
20    responsive.  Common's a pretty loose term so,
21    you know, I don't know how to respond to that.
22            Q.   But you say they were generally
23    responsive, and that includes prompt in their
24    responses to you?
25            A.   Correct.  Right.  So they were
```

**BRIAN J. SCULLY 1/12/2023**

```
 1    prompt in letting me know that they had received
 2    any e-mail that I sent them, that's essentially
 3    what I was talking about.
 4            Q.    Let's go to 8557, it's page 42 of
 5    the PDF.
 6            A.    42?  Okay.
 7            Q.    Here it looks like Facebook is
 8    e-mailing Lauren Protentis and saying that:  I
 9    wanted to share our account security doc that
10    we've been working on, and we're grateful for
11    any feedback; right?
12            A.    Yep.
13            Q.    Do you know what account security
14    document they're talking about, here in April
15    15th of 2022?
16            MR. GARDNER:  Objection, calls for
17    speculation.
18            A.    Yeah, I don't know what specific
19    documents they're talking about.
20            Q.    Is it possible this is the
21    one-pager that we were talking about earlier,
22    does that ring a bell?
23            MR. GARDNER:  Objection, calls --
24    objection, calls for speculation.
25            A.    Yeah, I don't -- I don't -- I don't
```

Case 3:23-cv-00571-TAD-KDM Document 20-61 Filed 06/04/23 Page 295 of 456 PageID #:
13008

Case 3:23-cv-00571-TAD-KDM Document 20-61 Filed 06/04/23 Page 295 of 456 PageID #:
13008

BRIAN J. SCULLY 1/12/2023

Page 295

```
 1    know.
 2             Q.    Okay.   Next page, Lauren Protentis,
 3    thanks so much for sending, this looks great.
 4    The only thing I recommend is any steps for
 5    flagging or escalating MDM content, if possible;
 6    right?
 7             A.    Yeah, that's what Lauren said.
 8             Q.    And she said:  I think then that
 9    this -- I think, then, that would make this a
10    comprehensive product on both the critical needs
11    of officials, account security, and MDM
12    concerns; correct?
13             A.    Yeah, that's what she wrote.
14             Q.    She says:  We discussed this a bit
15    in our in-person meting a few weeks ago; right?
16             A.    Yep.
17             Q.    Okay.   Were you aware of Lauren
18    asking for Facebook to produce a document and
19    asking them to include steps for planning or
20    escalating MDM content for officials?
21             A.    I was not aware of this document,
22    no.  I know that the -- I knew those
23    conversations about the one-pagers we discussed
24    earlier, but I'm not -- I'm not entirely sure
25    what this is referring to.
```

1          Q.   Well, I think you said earlier the

2    one-pagers would talk about what their content

3    moderation policies are?

4          A.   Right.

5          Q.   If you look higher, on that same

6    page, Facebook is replying to Lauren and saying,

7    would it be -- would it work to just provide my

8    e-mail when you share out this one-pager; right?

9    Do you see that?

10         A.   So I'm scrolling up.

11         Q.   When you share out this one-pager;

12   do you see that?

13         A.   Yes.

14         Q.   Okay.  So -- so does it seem that

15   Lauren is talking about the one-pager that all

16   the social media platforms were asked to provide

17   for state and local elections; is that what's

18   going on?

19         A.   Again, I'm not sure.  It could be

20   two different one-pagers that she's talking

21   about, one on account security and one that

22   Lauren was working on, I wouldn't be -- again, I

23   wouldn't be surprised if they were similar, but

24   I -- I can't -- I don't know.

25         Q.   Regardless, for the purpose of this

**BRIAN J. SCULLY 1/12/2023**

```
 1      one-pager, Lauren is specifically asking that

 2      they add to it a procedure for state officials

 3      to flag and escalate MDM content; correct?

 4             A.   It appears she's asking for a

 5      process for election officials to report MDM

 6      content to Facebook, yeah.

 7             Q.   Jump ahead to 12223, here on the --

 8      starting at the 48th page of the PDF and

 9      spilling to the 49th page, there's another

10      e-mail from Lauren Protentis, this time to

11      people at Microsoft, which is subject is

12      one-pager for election officials; do you see

13      that?

14             A.   Did you say 48?

15             Q.   Yeah, 48, spilling over onto 49,

16      it's -- the header's on 48 and the -- oh, I'm

17      sorry, 43.  Bad eyesight.  Sorry.  It really

18      looks like an 8.

19             A.   That's okay.

20             Q.   Sorry, 43.

21             A.   I understand that.

22                  Okay.  So one-pager for election

23      officials, got the header, okay.

24             Q.   And in this e-mail Lauren says to

25      Microsoft:  META is working with industry
```

**BRIAN J. SCULLY  1/12/2023**

```
 1      partners to create one-pagers for election
 2      officials, in the lead-up to the midterms, that
 3      provide steps to create secure accounts --
 4      secure accounts and to report MDM; do you see
 5      that?
 6              A.   I do.
 7              Q.   And she said:  We'll be sharing
 8      these products at our various engagements with
 9      officials, presumably meaning state and local
10      election officials; right?
11              MR. GARDNER:  Objection, calls for
12      speculation.
13              A.   Yeah, I mean, obviously, I don't
14      know what she means by officials, but I think
15      that's a fair assumption.
16              Q.   And that's a one-pager for election
17      officials; correct?
18              A.   Yes.
19              Q.   Skipping ahead to 22053, page 45 of
20      the PDF, going onto 46.
21              A.   Okay.
22              Q.   You see here, on May 11, 2022,
23      Lauren Protentis is writing to Twitter:  Hope
24      this e-mail finds you well, wanted to circle
25      back on this and see if you have any questions.
```

 1    The team has a few upcoming engagements with
 2    elections officials for this one-pager, would be
 3    particularly helpful to share as a leave behind;
 4    correct?
 5         A.    Yes, that's what she's written.
 6         Q.    And Twitter goes back and says:
 7    I'll have a one-pager for you later today, just
 8    getting the final signoff; right?
 9         A.    Correct.
10         Q.    And then, once he sends it to him,
11    scrolling back up, first, she says:  State and
12    local officials in New Hampshire, Illinois, will
13    be the first recipients of this; right?  There
14    at the top of the page.
15              The first line on page 45 of the
16    PDF Lauren says --
17         A.    Yeah, the e-mail chain is a little
18    funky, so I was just trying to read and make
19    sure the e-mails were connected.
20              Okay.  So Twitter provided the
21    one-pager.  Lauren said thanks.  State and local
22    officials in New Hampshire and Illinois will be
23    the first recipients to this?  Okay.  Sorry.
24         Q.    Then she follows up with another
25    e-mail, saying:  Actually, one question, is

```
 1      there a way to include something about how to
 2      report disinformation; do you see that?
 3              A.   Yep.  Yep.
 4              Q.   And Twitter says:  The best way for
 5      them to do that is to contact gov@twitter.com;
 6      right?
 7              A.   Yep.
 8              Q.   And I can add that to the doc if
 9      that would be helpful; correct?
10              A.   Correct.
11              Q.   And Lauren says:  That would be so
12      helpful if you could add that to the doc.  Thank
13      you; right?
14              A.   Yep.
15              Q.   And Twitter says:  They do; right?
16              A.   Mm-hmm.
17              Q.   So that's the second time she's
18      pushed the social media platform to expand the
19      one-pager to include a reporting process for MDM
20      for the state and local election officials;
21      correct?
22              A.   I'm not sure that's how I would
23      characterize it.  I think she's just trying to
24      make sure that election officials have the
25      information they need if they want to report.
```

**BRIAN J. SCULLY  1/12/2023**

```
 1    I'm not sure it's expanding.  I don't know.
 2    You're making it more dramatic than it was, I
 3    think.
 4           Q.   Well, suffice to say that she's
 5    asking Twitter to include information
 6    specifically about how do you report MDM;
 7    correct?
 8           A.   About how election officials should
 9    support MDM, correct.
10           Q.   And Twitter had not included that
11    in theirs, and she asked them to put it in and
12    they did; right?
13           A.   It appears so, yeah.
14           Q.   Same thing happened, actually, with
15    YouTube in your earlier e-mail, right, they
16    hadn't included it in a one-pager, and she asked
17    them to put it in; correct?
18           A.   I don't recall that e-mail.  Which
19    e-mail is that?
20                (Exhibit No. 27 was marked for
21    identification.)
22    BY MR. SAUER:
23           Q.   Let's move on, actually.
24                I'm going to e-mail you some new
25    exhibits.
```

**BRIAN J. SCULLY 1/12/2023**

```
 1              I'm pulling up Exhibit 27, which
 2     should also be popping up in your inbox.
 3     There's a news report entitled:  CISA expands
 4     efforts to fight election disinformation ahead
 5     of challenging 2024 vote; do you see that?
 6              MR. GARDNER:  Yeah.  I'm sorry,
 7     John, we're still waiting for your -- oh, just
 8     got it.  Hold on.  Hold up.  You said 27?
 9              MR. SAUER:  Yeah.
10              MR. GARDNER:  Here you go.
11              THE WITNESS:  Okay.
12     BY MR. SAUER:
13         Q.   Do you see the headline:  CISA
14     expands efforts to fight election disinformation
15     ahead of challenging 2024 vote; do you see that?
16         A.   I do.
17         Q.   What steps are you aware of CISA
18     taking to expand its efforts to fight election
19     disinformation going into the next election
20     cycle, 2024?
21         A.   At this time, I'm not aware of any.
22         Q.   This is dated August 12th, 2022, if
23     you scroll down.
24         A.   Sure.
25         Q.   Were you aware of any discussions
```

```
1      or efforts -- any efforts at that time?
2              A.   When this was written, in August of
3      2022?  I'm sorry, what time?
4              Q.   Well, I'm just saying, are you
5      aware, around August of 2022, did CISA -- was
6      CISA expanding efforts to fight disinformation?
7              A.   No, no specific efforts, that I'm
8      aware of, I believe there might have been some
9      additional funding requested in the budget, but
10     I'm not sure if that actually went up or not.
11             Q.   What -- what efforts did CISA
12     undertake to fight election disinformation
13     during the 2022 election cycle?
14             A.   We put out a couple of sets of
15     products.
16             Q.   Anything else?
17             A.   Not -- not that I recall.  We
18     honestly we didn't do a ton in 2022.
19             Q.   What were you guys doing, you're
20     the MDM team, what did you do to fight MDM?
21             A.   So again, our -- as I mentioned,
22     our role is to build resilience, so we put out
23     the two sets of products, as I mentioned.
24     Earlier in 2022, we put out additional products.
25     I'm sure we gave some stakeholders to build
```

```
 1    relationships.
 2              But generally speaking, we did a
 3    lot of foundational work to better understand
 4    how it functions, those sorts of things, as
 5    opposed to very election-specific activities.
 6              Q.    Here in the article it says:  The
 7    danger -- in the second paragraph -- it says:
 8    The danger of disinformation has become an
 9    incredibly difficult problem, CISA Director Jen
10    Easterly said on Friday; do you see that?
11              A.    I do.
12              Q.    And it goes on in his report:  That
13    Easterly has taken several specific steps to
14    fight the problem, including bringing Kim Wyman,
15    former Secretary of State of Washington into
16    CISA to bolster its election work; correct?
17              A.    That's what the article says, yep.
18              Q.    What has Kim Wyman done to fight
19    election-related disinformation at CISA?
20              MR. GARDNER:  Objection.
21    Objection, lack of foundation, calls for
22    speculation.
23    BY MR. SAUER:
24              Q.    You may answer.
25              A.    Yeah, can you be more specific
```

**BRIAN J. SCULLY  1/12/2023**

1    about what you're trying to get to?

2          Q.   **Well, what does Kim Wyman do at**

3    **CISA?**

4          A.   Kim Wyman is essentially the new

5    Matt Masterson.  So she's a senior advisor to

6    the director on election security.  Most of her

7    work has been engagement with election

8    officials.  I also think she was CISA's

9    representative on the CSAC for MDM.

10         So beyond some public speaking

11   and -- and the CSAC work, I'm not sure what else

12   she would have done, would have been doing on

13   MDM.

14         Q.   **Down here at the very last**

15   **paragraph, second page of the document, sorry,**

16   **this is hard to highlight, very last paragraph,**

17   **it says:  While it's not CISA's role to police**

18   **social media Easterly said her team has**

19   **discussions with platforms, but they're more to**

20   **understand large trends, not specific tweets; is**

21   **that right?**

22         A.   That's what the article says, yeah.

23         Q.   **Do you have discussions with**

24   **platforms discussing large trends of online**

25   **disinformation?**

```
 1            A.   Yeah, I think that's consistent
 2     with what we talked about from the sync meetings
 3     and the discussions around the public reporting
 4     that the platforms have done.
 5            Q.   Any other time when there would
 6     be -- where there was discussions with platforms
 7     about disinformation trends?
 8            A.   I think it's just the two, the
 9     normal sync meetings we discussed, and then the
10     normal if they were putting up public reporting
11     we might get a briefing on it.  I'm trying to
12     think if we ever received -- yeah, I think those
13     are the big things.  We may have done a briefing
14     where we had a platform maybe talk about -- talk
15     with election officials, but I'm not sure if I'm
16     remembering that correctly, so just those two, I
17     think, would be the main ones.
18                 (Exhibit No. 28 was marked for
19     identification.)
20                 MR. SAUER:  Exhibit 28.
21                 MR. GARDNER:  Should be right
22     there.
23                 THE WITNESS:  Okay.
24     BY MR. SAUER:
25            Q.   Should be on the screen share, too.
```

```
 1                    Here's an e-mail chain, starting
 2      with Facebook sending an e-mail directly to Jen
 3      Easterly, saying she had spoken to Facebook
 4      about receiving a briefing from us on 2022
 5      election approach; do you see that there, the
 6      second page of the document, the beginning of
 7      the chain?
 8             A.   I do.
 9             Q.   Were you aware that Easterly had
10      reached out to Facebook directly and asked for,
11      I guess in January of 2022, a briefing on how
12      Facebook planned to approach the election?
13             A.   I was not.
14             Q.   Facebook says:  We're happy to do
15      this with your team at your convenience, and
16      we'd also love to discuss further how we might
17      help support the JCDC effort; do you see that?
18             A.   I do.
19             Q.   What does JCDC stand for?
20             A.   I was afraid you were going to ask
21      me that.  I don't know exactly what it -- what
22      it stands for, I think it's joint cyber
23      something or another.  Sorry, I -- I forget the
24      exact acronym, too many acronyms.
25             Q.   Is it a committee or a subdivision
```

 1    within CISA or within DHS?

 2            A.   I believe it's a -- it's an effort

 3    by CISA to -- to collaborate with private sector

 4    on cyber defense.

 5            Q.   Okay.  And Director Easterly

 6    responds to Facebook saying:  Looping in Kris

 7    and teammates to please follow up; do you see

 8    that?

 9            A.   I do.

10            Q.   And then Kris Rose; do you know who

11    Kris Rose is?

12            A.   My understanding is counselor for

13    the director, for Director Easterly.

14            Q.   So -- and he says:  Thank you,

15    Director.  Moving you to BCC; does that stand

16    for blind carbon copy?

17            A.   That would be my understanding.

18            Q.   And he says per Geoff, G-e-o-f-f, I

19    presume that's a Geoff Hale; right?

20            A.   Yeah.

21            Q.   Sounds like we may want to discuss

22    three primary topics that include 2022

23    elections; right?

24            A.   Mm-hmm.

25            Q.   Risk management in the face of

```
 1      influence of operations; do you know what that
 2      means?
 3              A.   I mean, I don't know what context
 4      he was saying it here, but generally speaking,
 5      that's CISA's mission to reduce risks to
 6      critical infrastructure.  So I assume it's risk
 7      management from critical infrastructure to
 8      influence of operations.
 9              Q.   And JCDC, that's the thing you
10      testified before?
11              A.   Yeah.
12              Q.   Do you know -- let me ask you this:
13      Were you included in this meeting between
14      Director Easterly and Facebook?
15              A.   I was not, in fact, I don't know if
16      the meeting actually ever occurred.
17              Q.   Do you know if Geoff Hale
18      participated?
19              A.   I -- I don't.
20                   (Exhibit No. 29 was marked for
21      identification.)
22      BY MR. SAUER:
23              Q.   Let's look at Exhibit 29.
24              A.   Okay.
25              Q.   Here's a series of text messages
```

```
 1      that were produced to us as coming from Director

 2      Easterly.

 3                    So do you see the blue text, that

 4      would be Director Easterly, the other side, in

 5      the gray, is the interlocutor here on the first

 6      page is this gentleman from Facebook; do you see

 7      that?

 8           A.    Yeah.

 9           Q.    This -- he -- he -- he issued a

10      series of texts.  Do you know why he would be

11      texting Director Easterly, does he know her?

12                    MR. GARDNER:  Objection, compound.

13      Objection, calls for speculation.

14           A.    Yeah, I -- I don't know is the

15      short answer.  I don't know what their

16      relationship is.

17           Q.    Do you know him, Mr. Gleicher?

18           A.    Yeah, I know Nathaniel Gleicher,

19      yeah.

20           Q.    Does he interact with CISA about

21      misinformation issues on Facebook?

22           A.    He does, he participates in the

23      monthly regular meetings that we talked about.

24           Q.    What else does he do, do you know,

25      for Facebook on --
```

```
1              A.   I'm sorry, what was the last part?
2              Q.   What else does he do for Facebook
3    on misinformation?
4              A.   Again, I think he would articulate
5    the inoffensive behavior, coordinating
6    inoffensive behavior.  So I don't know if he
7    would talk about it in the context of
8    disinformation.  But my understanding is he
9    leads the team one of the teams that deals with
10   the coordinated inoffensive behavior.
11             Q.   Let me ask you about Rob Silvers.
12   Do you know who Rob Silvers?
13             A.   Yes.
14             Q.   Who's Rob Silvers?
15             A.   He heads up the DHS office of
16   policy.  I don't know what his back title is,
17   assistant secretary or secretary, something like
18   that.
19             Q.   So he's in the secretary's office?
20             A.   I believe he reports up to the
21   secretary, yeah.
22             Q.   He -- he -- and Mr. Gleicher says
23   to Jen Easterly:  Do you have any context you
24   can share in the role Rob Silvers is playing on
25   disinfo; right?
```

**BRIAN J. SCULLY 1/12/2023**

Page 312

```
 1              A.    Yep, that's what the text says.
 2              Q.    I understand his team is a task
 3     force set up, and it was suggested that his team
 4     is handing policy on disinfo while CISA is
 5     handling operations; right?
 6              A.    Yeah, that's what Nathaniel wrote.
 7              Q.    What is -- what was your
 8     understanding of Rob Silver being involved in
 9     policy on disinformation?
10              A.    So that is the DHS office of
11     policy.  He would be involved in most, I would
12     say, policy activities related to any topic that
13     crossed the department, including
14     disinformation.
15              Q.    And Director Easterly says she's
16     happy to chat with Mr. Gleicher; right?
17              A.    Yep.
18              Q.    You don't know if they actually
19     talked to each other, do you?
20              A.    I don't.
21              Q.    She goes on to say:  Rob is running
22     a governance board to look at potential new
23     areas of confronting MDM; correct?
24              A.    That's what she wrote, yeah.
25              Q.    Then she says:  It doesn't change
```

```
 1      or impact anything, we, meaning CISA, are doing
 2      or have already established; right?
 3              A.   Yes, that's what she wrote.
 4              Q.   What were the potential -- what
 5      potential new areas of confronting MDM were
 6      discussed, do you know?
 7                   MR. GARDNER:  Objection, lack of
 8      foundation.
 9              A.   I don't have any clue.
10              Q.   Next page, there's an e-mail from
11      Matt Masterson to the director; right?
12              A.   Yep.
13              Q.   This is a -- Matt Masterson know
14      the director well, I take it he was a political
15      appointee, did you say that?
16              A.   In previous administration --
17      excuse me -- yeah, he was a political appointee.
18      I don't know what his relationship with the
19      director was, so I don't know how well he knew
20      her.
21              Q.   What was the director's role in the
22      previous administration, was she at CISA?
23              A.   No.  Director Easterly was not at
24      CISA, no.
25              Q.   Who was she?
```

```
 1              A.    I'm sorry?

 2              Q.    Was she in government?

 3              A.    Prior to the -- in the previous

 4    administration?

 5              Q.    Yeah.

 6              A.    I don't know.  I think her

 7    immediate previous job was in the private

 8    sector, but I don't know how long and if she

 9    spent any time, at all, in the -- in the

10    previous administration in government.

11              Q.    And here, Director Easterly says to

12    Matt Masterson, just trying to get us in a place

13    where FED can work with platforms to better

14    understand the mis, dis trends so relevant

15    agencies can try to prebunk/debunk as useful;

16    correct?

17              A.    That's what she wrote, yeah.

18              Q.    And that discussion of trends is

19    similar to her statement in the media article we

20    just looked at about how CISA is interacting

21    with social media platforms to identify trends;

22    correct?

23              A.    She mentioned trends in both,

24    correct.

25              Q.    And here she -- the reason she
```

**BRIAN J. SCULLY  1/12/2023**

Page 315

```
 1    wants to understand the trends from the
 2    platforms is so that the relevant agencies can
 3    try to prebunk or debunk the mis and
 4    disinformation; correct?
 5           A.   Yeah, I think that's what she's
 6    saying.
 7           Q.   Can you do that at CISA, when you
 8    find out about a trend do you go try to work
 9    with another federal agency to prebunk or debunk
10    it?
11           A.   So again, from a resilience-
12    building perspective, you know, what we try to
13    do is provide accurate information about those
14    issues and topics that are relevant to us.  So
15    from an election perspective we would try to
16    provide appropriate information about elections,
17    so that the universe reality page would be an
18    example of that, it would fall more potentially
19    into the debunking side.
20                Prebunking is trying to understand
21    ahead of time what could happen so you could
22    fill information gaps.
23                And so that's generally kind of how
24    resilience works.  So yeah, we would -- we would
25    try to do some of that.
```

**BRIAN J. SCULLY 1/12/2023**

```
 1              I don't know -- so we worked a
 2     little bit with the FBI, on products or
 3     resilience-based products, as I mentioned.  I
 4     say that's probably -- we worked, as I mentioned
 5     earlier, we worked with the GAC initiative about
 6     tactics and such.
 7              So those are the types of things
 8     that we would do to, again, help people
 9     understand how MDM works and steps they can take
10     to reduce the risks.
11         Q.   Her next text here, Director
12     Easterly's next text says:  Not our mission, but
13     was looking to play a coord role so not every
14     D/A is independently reaching out to platforms
15     which could cause a lot of chaos; right?
16         A.   That's what she wrote, yep.
17         Q.   What does D/A mean, is that
18     department or agency?
19              MR. GARDNER:  Objection, calls for
20     speculation.
21     BY MR. SAUER:
22         Q.   If you know.
23         A.   That's -- that is one of our common
24     abbreviations for department and agency, but I'm
25     not sure if that's what she's referring to here.
```

```
 1              Q.   Do you know -- let me ask this:  Do
 2      you believe that if every federal department and
 3      agency is independently reaching out to the
 4      platforms that could cause chaos?
 5              A.   Yeah, I think chaos might be a
 6      little strong.  But, you know, it does create
 7      challenges and provides the platforms
 8      opportunities to play departments off each
 9      other.
10              Q.   Does -- does CISA try to play a
11      coordinating role in that, in other words,
12      coordinating between the federal agencies and
13      the social media platforms on disinformation and
14      misinformation issues?
15              A.   So we did do that as it relates to
16      the sync meetings we discussed throughout the
17      testimony.  Beyond that, we didn't -- we didn't
18      attempt to play a substantial role in terms of
19      coordinating between.
20              Q.   Let me ask you this:  Matt
21      Masterson responds to this e-mail or this text
22      and says:  We'll get there, and that kind of
23      leadership really helps.  Platforms have got to
24      get more comfortable with government.  It's
25      really interesting how hesitant they remain;
```

```
 1      correct?
 2              A.    That's something I wrote.
 3              Q.    Is that consistent with your
 4      experience that the social media platforms have
 5      to be kind of pushed or encouraged to coordinate
 6      with the government on misinformation issues?
 7              A.    I don't think that's how I would
 8      characterize it.  You know, we operate in a
 9      voluntary kind of manner, so it's voluntary
10      whether -- for CISA, again, for CISA, the MDM
11      team, so it's always up to the platforms what
12      level of engagement they want to have with us.
13              Q.    Do you know whether Masterson and
14      Easterly had any further discussion of these
15      issues?
16              A.    I don't know.
17              Q.    Let me send you a couple more
18      exhibits.  And while they are coming, do you
19      know, were you involved, at all, in the
20      formation --
21              MR. GARDNER:  I'm sorry, John, I'm
22      sorry, the witness just asked me if we can take
23      a break.
24              MR. SAUER:  Oh.
25              THE WITNESS:  Just a few minutes,
```

**BRIAN J. SCULLY  1/12/2023**

```
 1    bathroom break.
 2                 MR. SAUER:  Well, why don't we make
 3    it five, and try to make it the last break of
 4    the day.  How long have we been on the record?
 5                 MR. SCOTT:  We got back on at 3:50,
 6    so it's 4:40, so it's 50 minutes in, we have an
 7    hour and 10 minutes left.
 8                 MR. GARDNER:  He's been reliable.
 9    We need to do this off the record, first of all.
10                 THE VIDEOGRAPHER:  The time is now
11    4:42.  We are off the record.
12                 (Recess.)
13                 THE VIDEOGRAPHER:  The time is
14    4:53.  We are back on the record.
15                 (Exhibit No. 30 was marked for
16    identification.)
17    BY MR. SAUER:
18          Q.    Exhibit 30 should be in your inbox.
19    I'll put it up on the screen share.
20                 Here's an article in The Intercept
21    called Truth Cops, Leaked Documents Outline
22    DHSA's Plans to Police Disinformation; do you
23    see that?
24          A.    Yeah, we don't have it on here, but
25    I saw the headline in your screen share.
```

1          Q.   Okay.  Sorry.  But scrolling down,
2     still on the first page, it says:  The
3     Department of Homeland Security is quietly
4     broadening its effort to curb speech it
5     considers dangerous; do you see that?
6          A.   I see that in the article, yep.
7          Q.   Are you aware of DHS broadening its
8     efforts to address disinformation?
9          A.   I am not, no.
10         Q.   Has CISA been expanding its MDM
11    team?
12         A.   As I mentioned earlier, we have
13    not.
14         Q.   Let me ask you this:  Scrolling
15    down here, third page of the document, it says:
16    There is also a formalized process for
17    government officials to directly flag content on
18    Facebook or Instagram and request that it be
19    throttled or suppressed through a special
20    Facebook portal that requires a government or
21    law enforcement e-mail to use; do you see that?
22         A.   Yeah, I see that in the article.
23         Q.   And it actually provides a link for
24    it, Facebook.com/Xtakedowns/login; are you aware
25    of that reporting channel for government

```
 1     officials?
 2             A.   I am not, no.
 3             Q.   On the next page, fourth page of
 4     the document, it says:  According to a draft
 5     copy of DHS's quadrennial Homeland Security
 6     review, DHS's capstone report outlining the
 7     department's strategy and priorities in the
 8     coming years, the department plans to target
 9     inaccurate information on a wide range of
10     topics; do you see that?
11             A.   Yeah, I see that in the article.
12             Q.   Are you aware of the document
13     that's a draft of the quadrennial Homeland
14     Security review?
15             A.   I know it says quadrennial Homeland
16     Security review is, I don't know if I've seen
17     the draft of the most recent one.
18             Q.   Have you seen any drafts of the
19     most recent one?
20             A.   Not that I recall.
21             Q.   When does it -- when does it get
22     finalized?
23             A.   I -- I -- I don't know.
24             Q.   It says:  Including the origins of
25     the COVID-19 pandemic and the efforts of the
```

**BRIAN J. SCULLY 1/12/2023**

Page 322

1      COVID-19 vaccines, racial justice, US withdrawal

2      from Afghanistan, and the nature of US support

3      for Ukraine, in quotes; do you see that?

4             A.    I do.

5             Q.    Are you aware of discussions

6      anywhere in DHS about addressing misinformation

7      about the origins of the COVID-19 pandemic?

8             A.    I am not.

9             Q.    So how about the efficacy of

10     COVID-19 vaccines?

11            A.    Yes, I'm aware of some discussions

12     on that.

13            Q.    What discussions are you aware of?

14            A.    So it was a -- as I mentioned

15     earlier, our building critical infrastructure

16     help in public health is one of the sectors of

17     critical infrastructure, so we engage with CDC

18     and HHS to help them.  We've also put out one

19     product, sometime in mid 2020, for

20     infrastructure stakeholders about COVID-related

21     disinformation.

22            Q.    What do you do to assist CDC and

23     HSH?

24            A.    For the most part, not a lot, to be

25     honest.  Like I said, we did the one product

```
 1   related to them, and we just participate in

 2   meetings with them.  From our perspective,

 3   again, we're trying to understand trends, how

 4   this information is spreading tactics so we can

 5   help the public, the public and organizations,

 6   critical infrastructure organizations, as well

 7   as some others, understand the risks from MDM

 8   and how it works and what they can do about it.

 9           Q.   Do you -- do you obtain information

10   from CDC and HHS about how COVID vaccine

11   misinformation spreads?

12           A.   I believe that they provided some

13   briefings on that, yeah.

14           Q.   And do you also provide briefings

15   to them or information to them?

16           A.   We did some work on the kind of

17   bio-lab narratives, so this is essentially

18   foreign governments, whenever anything happens,

19   whether biological and sometimes not, they will

20   point to US biolabs as being the culprit behind

21   it, and so as part of our resilience-building

22   efforts we're trying to understand how foreign

23   actors have used that narrative over time.

24                And so we, starting back in the

25   '80s, probably since back in the '80s, the
```

**BRIAN J. SCULLY 1/12/2023**

```
 1     Russians were using that.  Usually they're
 2     saying at Fort Detrick or some other kind of US
 3     entity is a biolab, and that's where whatever it
 4     starts.
 5                 We saw this with COVID.  We saw
 6     this Monkey Pox.  We saw this around Ukraine.
 7     And so, again, just helping people understand
 8     that a lot of these disinformation narratives
 9     are recycled over time, for different issues, as
10     a way to help build resilience.
11          Q.    How about racial justice, are you
12     doing anything to address misinformation about
13     racial justice issue?
14          A.    CISA has not, to my knowledge, done
15     anything related to racial justice.
16          Q.    How about other DHS components, do
17     they do anything on that?
18          A.    Not that I'm aware of, but
19     obviously I don't know everything that they do.
20          Q.    How about US withdrawal from
21     Afghanistan, does CISA work on that?
22          A.    Not that I'm aware of.
23          Q.    And how about other DHS components?
24                MR. GARDNER:  Objection, calls for
25     speculation.
```

**BRIAN J. SCULLY  1/12/2023**

```
 1              A.   Yeah, I -- I'm not aware of what
 2    other components are doing.
 3              Q.   And then the nature of US support
 4    to Ukraine?
 5              A.   So there was a department stood
 6    out, what's called the Unified Coordination
 7    Group, when Russia invaded Ukraine, to
 8    coordinate DHS activities related to the crisis.
 9    As a part of that there was an MDM component,
10    and a member of the MDM team was detailed to
11    lead the MDM component of the Russian/Ukraine
12    work.  I believe it lasted about two months.
13              Q.   What did they do?
14              A.   The Unified Coordination Group.
15    Sorry.
16              Q.   What did that group do?
17              A.   So most of it took place while I
18    was out, so I don't have a super clear
19    understanding of everything, but generally
20    speaking, they provided a -- they would monitor
21    open source researching.
22              So we talk about third-party
23    researchers, we put out reports, and things like
24    that, and they would provide situational
25    awareness, at least from our perspective, CISA
```

**BRIAN J. SCULLY  1/12/2023**

1    perspective, they would provide situational

2    awareness up to the MDM Unified Coordination

3    Group.

4         **Q.   Who at CISA participated in that?**

5         A.   So Rob Schaul from the MDM team was

6    detailed to the Unified Coordination Group, and

7    then several members of the team would have been

8    monitoring open source.

9              So we have the open source

10   reporting.  These are third-party research

11   reports, things like that, to point to

12   information to just make leadership aware.

13        **Q.   Did they -- did that group**

14   **communicate with social media platforms about**

15   **disinformation relating to Ukraine?**

16        A.   By that group, do you mean Unified

17   Coordination Group?

18        **Q.   Correct.**

19        A.   I -- I don't know.

20        **Q.   Rob Schaul would know that?**

21        A.   He led the team, so I suspect he

22   might.

23        **Q.   Do you know if that team**

24   **communicated with social media platforms, at**

25   **all?**

**BRIAN J. SCULLY  1/12/2023**

```
 1            A.   I don't know.  There was a call, at
 2      some point, early, between -- between critical
 3      infrastructure and I believe some social media
 4      around that, but I wasn't around for that call
 5      so I don't really know the nature of what was
 6      discussed or anything along those lines.
 7            Q.   There was a call between -- and I'm
 8      sorry, I couldn't hear clearly what you said --
 9      there was a call between social media platforms
10      and -- and who?
11            A.   So I believe the way I understand
12      the call is it facilitated a call with critical
13      infrastructure, the critical infrastructure
14      community, to private sector companies, sector
15      risk management agencies, folks that were
16      involved in critical infrastructure security.  I
17      believe, my understanding is that call did
18      include some social media platforms.
19            Q.   And you -- but you don't know what
20      was said in that call?
21            A.   No, I wasn't -- I wasn't back at
22      CISA yet.
23            Q.   Do you know when the call occurred?
24            A.   It would have been in probably the
25      February -- February time -- timeframe, I would
```

**BRIAN J. SCULLY  1/12/2023**

```
 1    think.
 2            Q.    February 2022?
 3            A.    Correct.
 4                  (Exhibit No. 31 was marked for
 5    identification.)
 6  BY MR. SAUER:
 7            Q.    I'm putting up Exhibit 31 on the
 8    screen share.  You should have it in front of
 9    you.
10            A.    Okay.  I got it.
11            Q.    Here's a report from the Office of
12    the Inspector General, entitled:  DHS needs a
13    unified strategy to counter disinformation
14    campaigns; do you see that?
15            A.    I do.
16            Q.    Are you familiar with this OIG
17    report?
18            A.    Mostly familiar with it, yeah.
19            Q.    Were you aware that they -- do you
20    know what the day of the report is?
21            A.    Says August 10th, 2022.
22            Q.    And I take it this report is
23    recommending that here to what we have found,
24    DHS needs unified strategy or -- to address
25    disinformation; right?  Right here, it says:
```

 1      DHS does not yet have a unified department-wide

 2      strategy to effectively counter disinformation

 3      that originates from both foreign and domestic

 4      sources; correct?

 5              A.    I'm trying to find that.  Okay.

 6              Q.    Yeah.

 7              A.    DHS does not yet have a unified

 8      strategy.  Correct, yeah, that's what's written

 9      there.

10              Q.    Do you share that view, do you

11      think DHS lacks a department-wide strategy?

12              A.    Yes.

13              Q.    Do you think that different

14      components of DHS are engaging in different sort

15      of MDM-related activities without coordinating

16      with each other?

17              A.    Yeah, I think that's a fair

18      assumption.

19              Q.    Were you aware that this

20      recommendation was made for DHS to do internal

21      and external coordination better?

22              A.    Was I aware that this report was

23      stating that DHS needs to do better in internal

24      and external coordination?

25              Q.    Yeah.

```
 1              A.   I -- I don't know if that's what it
 2      says, is there a page in here where that
 3      recommendation is or those recommendations?
 4              Q.   Let's go to page 7.
 5              A.   Is this PDF 7 or document page 7?
 6              Q.   Good question.  It's PDF 9,
 7      document --
 8              A.   PDF 9?  Okay.
 9              Q.   It's here underneath the graphic
10      novels images, there's a paragraph that begins:
11      More recently; do you see that?
12              A.   Yep.
13              Q.   It says:  In January 2021 CISA
14      transitioned its countering foreign influence
15      task force to promote more flexibility to focus
16      on general MDM; right?
17              A.   Mm-hmm, that's what it says.
18              Q.   And that CISA's got 15 dedicated
19      part- and full-time staff; is that still true?
20              A.   No.
21              Q.   I'm sorry, the MDM team has 15
22      staff; is that still true?
23              A.   No.
24              Q.   How many does it have?
25              A.   Right now, we have five full-time
```

**BRIAN J. SCULLY  1/12/2023**

```
 1    staff plus one on maternity leave, so six.  And
 2    then we have one, two, two contractor's
 3    support -- no, three contractor's supporting us.
 4            Q.   Did at some time you have 15 people
 5    working on this on the MDM team?
 6            A.   I suspect at the height of the team
 7    if you add in all the contractors there it
 8    probably got close to 15, but I'm not sure of
 9    the exact number.
10            Q.   When was the height of the team?
11            A.   Staff plus contractors was
12    probably -- good question.  When was the height
13    of the team?  We didn't have much contract
14    support in 2020, so I would probably say 2021,
15    while I was gone.
16            Q.   It says:  The MDM team focuses on
17    disinformation activities targeting elections
18    and critical infrastructure.  According to a
19    CISA official, the MDM team counters all types
20    of disinformation, to be responsive to current
21    events; is that right?
22            A.   That's what the document says, yep.
23            Q.   Is that true that the MDM team
24    counters all types of disinformation to be
25    responsive to current events?
```

**BRIAN J. SCULLY  1/12/2023**

```
 1                A.   We, again, try to build resilience
 2     and reduce risks to critical infrastructure.  So
 3     I -- you know, if the event could impact
 4     critical infrastructure, that would be something
 5     we would consider addressing.
 6                Q.   Does critical infrastructure
 7     include cognitive infrastructure?
 8                A.   Not through national policy.
 9                Q.   Okay.  Let me go two pages further,
10     paragraph -- page 9, it says:  For example,
11     according to an ODNI official, prior to the
12     November 2020 elections CISA and I&A joined in
13     weekly teleconferences to coordinate
14     intelligence community activities to counter
15     election-related disinformation; correct?
16                A.   That's what the document says, yes.
17                Q.   Were you aware of those calls,
18     that's a coordinating call between CISA, I&A and
19     ODNI?
20                A.   No, that was a coordinate -- so
21     yeah, from the call, but the calls were DNI-led
22     coordination calls of the intelligence
23     community.  CISA was there mostly from an
24     observer standpoint, to do as an election
25     security lead.  But it was -- it was an intel
```

**BRIAN J. SCULLY 1/12/2023**

1    community-focused coordination and conversation.

2    **Q.   Who from CISA participated in those**

3    **calls?**

4         A.   I think it was just a random -- a

5    random mix.  Geoff did not generally participate

6    in them.  I didn't generally participate in

7    them, although I think I did maybe once or

8    twice, normally somebody at the staff level.

9              Yeah, we have an intel office in

10   CISA, so I suspect that at least somebody from

11   the intel office was on the calls.  But I think

12   it was just, you know, it was who's available at

13   the staff level would go participate at that

14   time.

15        **Q.   Was disinformation, you know, how**

16   **to combat disinformation on social media, is**

17   **that discussed in these calls?**

18             MR. GARDNER:  Objection, calls for

19   speculation, lack of foundation.

20        A.   My understanding, my recollection

21   of the calls, at least the couple I was on, it

22   was generally the intel community talking about

23   what products they were developing, what

24   analysis they were doing, things along those

25   lines.

```
 1              Q.   The next sentence says:  The office
 2    of the DNI official stated the teleconferences
 3    continue to occur every two weeks after the 2020
 4    elections, and were still taking place at the
 5    time of this audit in August of 2022; do you see
 6    that?
 7              A.   I do.
 8              Q.   Yeah, what -- are those calls still
 9    going on today, every two weeks?
10              A.   I don't know.  That was -- that's
11    a -- THAT they're still continuing to November
12    of 2022 is news to me.  So yeah, I don't -- as
13    far as I know, we weren't participating in them.
14    I wouldn't be surprised if there was some calls
15    going on, but I don't recall.  The intel
16    community doesn't tell community things when I
17    was involved in that.
18              Q.   Why don't I e-mail you another
19    exhibit, 27.
20              MR. GARDNER:  John, if you just
21    spoke, I couldn't hear you, but sound wasn't
22    coming through.
23              MR. SAUER:  I'm sorry.  Yeah,
24    actually, I'm going to skip that one.  I meant
25    Exhibit 23, which I'm now e-mailing you.
```

```
 1                    MR. GARDNER:  Not Exhibit 27?
 2                    MR. SAUER:  27 should look familiar
 3      to you.  We talked about it already.
 4                    MR. GARDNER:  Okay.  Just to be
 5      clear, are we talking about 27 now or a
 6      different exhibit?
 7                    MR. SAUER:  23.
 8                    MR. GARDNER:  Okay.  Don't have
 9      that yet, but as soon as we do.
10                    MR. SAUER:  And I'm putting it up
11      on the screen share, too.
12                    (Exhibit No. 23 was marked for
13      identification.)
14      BY MR. SAUER:
15           Q.   Here's a November 2021 report on
16      public comments by Director Easterly and The
17      Hill; do you see that?
18           A.   Yes.
19           Q.   It says:  The title is cyber agency
20      beefing up disinformation misinformation team;
21      correct?
22           A.   Correct.
23           Q.   And in the first paragraph says:
24      CISA is beefing up its disinformation and
25      misinformation team in the wake of a dismissive
```

**BRIAN J. SCULLY  1/12/2023**

1    precedential election that saw a proliferation

2    of misleading online information; correct?

3                A.    Yeah, that's what the article says.

4                Q.    Were you aware of efforts to beef

5    up the misinformation team in November of '21?

6                A.    No, not specific efforts.  I was

7    over at the National Security Council at the

8    time.

9                Q.    When did you come back from that

10   detail?

11               A.    The detail officially ended in

12   early March, and I took some leave and started

13   back at CISA in early to mid April.

14               Q.    And the director says in the next

15   paragraph:  I'm actually going to grow and

16   strengthen my misinformation and disinformation

17   team; do you see that?

18               A.    I do.

19               Q.    I know you were on detail then, are

20   you aware of efforts to grow and strengthen the

21   team, for example, by adding new people?

22               A.    Again as I mentioned earlier in my

23   testimony, my understanding is there was some

24   budget increase that was proposed.  I don't -- I

25   don't know if that moved forward or not, from

BRIAN J. SCULLY  1/12/2023

```
 1    the department.
 2              Q.    Is the -- do these remarks coincide
 3    with what you said was kind of the high point,
 4    when you had 15 people on the MDM team, was that
 5    around, you know, November 2021?
 6              A.    It's hard to say for sure.  I'm
 7    not -- I'm not sure how they're counting
 8    positions.  So I don't think we ever had 15
 9    federal employees.  So there's, you know, it
10    seems to me like they were probably counting
11    contract support, so -- so it's hard for me to
12    say exactly when that would have been.
13              Q.    You say there was, in this
14    timeframe, some attempt to get budget authority
15    to add people to the MDM team?
16              A.    It was my understanding that there
17    was a request for additional funds made to the
18    budget.  But again, I don't know, the budget
19    process is a little bit of a mystery to me, so
20    I'm not sure what exactly happened along the
21    way, if it ended up in the -- you know, in the
22    budget requests or what.
23              Q.    The next paragraph says that
24    Easterly noted that earlier this week she had a
25    meeting with six of the nation's experts in that
```

```
 1      misinformation and disinformation space; do you
 2      see that?
 3              A.   I do.
 4              Q.   Do you know who she met with?
 5              A.   I don't.
 6              Q.   Do you know who are six of the
 7      nation's experts in disinformation and
 8      misinformation?
 9              A.   I mean, I could come up with a list
10      of experts.  I don't know if that's who she met
11      with.
12              Q.   She stressed her concerns around
13      this being a top threat for CISA; correct?
14              A.   That's what the article says, yep.
15              Q.   And it goes on to quote her,
16      saying:  One could argue we're in the business
17      of critical infrastructure, and the most
18      critical infrastructure is our cognitive
19      infrastructure; correct?
20              A.   That's what the quote says, yep.
21              Q.   Do you -- do you -- do you -- does
22      the MDM team view protecting our cognitive
23      infrastructure as part of its mission?
24              A.   No.  We look at the -- again, the
25      international policy there's, like, 16 sectors,
```

1    and those are the critical infrastructure

2    factors we look to protect.  So we wouldn't

3    include cognitive infrastructure in that list.

4           **Q.  One of them is election**

5    **infrastructure; is that right?**

6           A.  Election infrastructure is actually

7    a subsector of the government's stability

8    structure.

9           **Q.  So if someone posts information on**

10   **social media implying that, you know, ballots**

11   **were being shredded by poll workers, what**

12   **infrastructure is that a threat to?**

13          MR. GARDNER:  Objection, calls for

14   a hypothetical.

15          A.  Yeah, I would rather not answer

16   hypotheticals.

17          **Q.  You have no instruction not to**

18   **answer, please answer the question.**

19          MR. GARDNER:  Same objection.

20          A.  Yeah, I'm not answering a

21   hypothetical.

22          **Q.  Please answer the questions.  If**

23   **someone posts on social media --**

24          A.  Can you give me an example of the

25   post?

1          Q.   If you look at all the posts we

2     looked at earlier in your e-mails, where, for

3     example, suppose someone posts the hammer and

4     scorecard conspiracy on social media, and

5     Director Krebs tells you to reach out to social

6     media platforms to see what they're doing about

7     it, how does the posting about the hammer and

8     scorecard narrative on social media threaten

9     critical infrastructure?

10          A.   So it -- so generally speaking,

11     this mis, mal-information threatens critical

12     infrastructure in a number of ways, it could be

13     operational impact, so in the case of the

14     elections, disrupting election operations,

15     things along those lines.  It could be human

16     impact, so again, see election example, there's

17     a lot of threats of violence made against

18     election officials, making it harder to do their

19     jobs.

20               So a multitude of ways that

21     disinformation could impact critical

22     infrastructure, like I said, we -- you know,

23     there's financial, there's reputational, there's

24     just a multitude of ways that this

25     disinformation could affect critical

```
 1    infrastructure.
 2            Q.   Does infrastructure have a
 3    reputational interest?
 4            A.   Does infrastructure have a
 5    reputational interest?
 6                 MR. GARDNER:  Objection, vague.
 7                 THE WITNESS:  Yeah, could you be a
 8    little more specific.
 9    BY MR. SAUER:
10            Q.   You just used the word, you said
11    there's financial, there's reputational, what do
12    you mean by that?  What is the reputational
13    threat to critical infrastructure from social
14    media postings?
15            A.   Well, I wouldn't -- I wasn't saying
16    specifically from social media postings.  I was
17    saying from fraud, from mis, dis and
18    mal-information, a reputational risk could come
19    about if the integrity or the public confidence
20    in a particular sector was critical to that
21    sector's functioning.
22                 So I think the financial services
23    would probably be a good example.  So if there's
24    a loss of confidence by the American public in
25    financial services, financial systems of the
```

1    United States, that could create national

2    security concerns.

3         Q.   **Explain that to me, how would a**

4    **loss of confidence in the financial system**

5    **create national security concerns?**

6         A.   Lots of ways, you can have runs on

7    banks, such as the banking, you could have, you

8    know, other sorts of issues related to that, so

9    yeah, so there's -- you know, if there's a loss

10   of confidence, if there's a run on banks and

11   there's a run on the financial systems, those

12   sorts of things can create physical harms,

13   operational harms.

14        So again, if we go back to the list

15   of potential harms, the reputational could lead

16   to operational, right?  So banks could be

17   overwhelmed with people showing up trying to

18   take money out.  They could be overwhelmed with

19   people showing up elsewhere at other facilities

20   and disrupt our operations.  So it's a full

21   range of potential risks.  A lot of these are

22   cascading, and so, yeah.

23        Q.   **So is it part of the MDM team's job**

24   **and CISA's job to counter disinformation that**

25   **creates reputational risks to, for example, the**

```
 1      financial services industry?
 2              A.   So again, our mission is to build
 3      resilience.  And so we would work -- if the
 4      financial services sector wanted us to work with
 5      them, to develop products to help them
 6      understand how mis, dis and mal-information
 7      could impact their -- their sector, we would --
 8      we would work with them on that yes.
 9              Q.   What sorts of mis, dis and
10      mal-information might undermine confidence in
11      the financial services?
12              A.   I don't know.  We haven't -- we
13      haven't dealt with that.  We're not financial
14      services experts, so we generally defer to a
15      department or agency.
16              So in this case, Treasury, the
17      sector risk management agency responsible for
18      the financial services sector, so our expertise
19      with the MDM team is understanding MDM and
20      potentially to mitigate risks and to build
21      resilience, and so we wouldn't be the experts on
22      the actual financial services MDM.
23              Q.   So everything you just said about
24      the financial services was a lengthy
25      hypothetical?
```

**BRIAN J. SCULLY 1/12/2023**

```
 1              A.   Like I said, I don't like getting
 2     into hypotheticals.
 3              Q.   You did for awhile, there.
 4                   Scrolling down in the same
 5     document, it says -- there's a quote from
 6     Director Easterly, where she says now --
 7                   MR. GARDNER:  Sorry, hold on.
 8                   MR. SAUER:  Can you guys hear me
 9     now?
10                   MR. GARDNER:  Yeah.
11                   MR. SAUER:  Okay.
12     BY MR. SAUER:
13              Q.   Quote from Director Easterly, we
14     now live in a world where people talk about
15     alternative facts, post truth, which I think is
16     really, really dangerous, if you get to pick
17     your own facts, and it's particularly corrosive
18     when you talk about matters of election
19     security; right?
20              A.   That's the quote, yeah.
21              Q.   And is that kind of consistent with
22     what the MDM team does, it tries to prevent a
23     situation where Americans get to pick their own
24     facts?
25                   MR. GARDNER:  Objection, vague.
```

```
 1              A.   I -- I -- that's -- no, that's not
 2      consistent with what we do.
 3              Q.   So that's -- that's not a -- you
 4      don't think Director Easterly's description is
 5      very fair?
 6              MR. GARDNER:  Objection,
 7      mischaracterizes the witness's previous
 8      testimony.
 9              A.   Yeah, if I understand your question
10      you said that CISA played a role in alternate
11      facts and post truths and things like that, and
12      CISA does not do that sort of thing.
13              MR. SAUER:  Sending you a few more
14      exhibits by e-mail.  You should be getting two
15      e-mails, the first one with three attachments,
16      and the second one with one.
17              It may take a minute.  It's loading
18      slowly on my end.  Okay.  I'm opening Exhibit
19      49, and I'll put that on the screen share.
20              (Exhibit No. 49 was marked for
21      identification.)
22      BY MR. SAUER:
23              Q.   Did you give an interview to the
24      Berkman Klein Center on June 18th of 2020?
25              A.   I don't recall the specific date,
```

```
 1    but I did give them an interview, so that's
 2    probably about right.
 3              Q.   And this is an interview by The
 4    Breakdown.  And do you recall doing this
 5    interview?
 6              A.   I do.
 7              Q.   On the third page of the document,
 8    you say:  For us, in particular -- oops, it
 9    didn't highlight well -- for us, in particular,
10    you see here, it's the second bullet -- for us,
11    in particular, we're trying to reduce the amount
12    that Americans engage with disinformation;
13    right?
14              A.   Yes.
15              Q.   Is that -- to your mind, is that a
16    good summary of what the MDM team does, it tries
17    to reduce the amount that Americans engage with
18    disinformation?
19              A.   That's the general idea behind
20    resilience-building, yeah.
21              Q.   What is engaging with
22    disinformation?
23              A.   Amplifying it, re-tweeting it,
24    resending it, things like that.
25              Q.   How about liking it on social
```

```
 1     media, is that a form of engagement?
 2             A.   Yep.
 3             Q.   How about just reading it, is that
 4     a form of engagement?
 5             A.   No.
 6             Q.   So if you're reading disinformation
 7     is not engagement with it?
 8             A.   Correct.
 9             Q.   But -- but so engagement is taking
10     some affirmative step further, like you said,
11     amplify, like, repost, that's kind of
12     disinformation, in your view, I'm sorry, that's
13     engagement; correct?
14             A.   Yes.
15             Q.   And it's part of CISA's or the --
16     CISA's job to try to reduce the amount that that
17     happens; right?
18             A.   I wouldn't characterize it that
19     way.  I would say the ultimate goal of building
20     resilience is that people are less likely to
21     amplify mis and disinformation.
22             Q.   And that's what you're trying to do
23     at the MDM team, is reduce the amount that
24     Americans engage with disinformation?
25             A.   Yeah, through public awareness and
```

1     public engagement and things like that, yep.

2            Q.    The last page of the document, you

3     say -- here there's a paragraph where you say:

4     The question is, we have people calling for more

5     monitoring of speech on platforms.  And then you

6     go on to say:  We have to built the platforms

7     that this is a lie and they need to take it down

8     or we're asking the platforms to do that; right?

9            A.    Yeah, that's what -- that's what

10    the quote is, yep.

11           Q.    Okay.  Is that, in fact, what the

12    MDM team is doing or I guess it was countering

13    foreign influence task force team was doing in

14    2020 when it was routing disinformation concerns

15    to Facebook, were you telling them to --

16           A.    No.

17           Q.    Go ahead.

18           A.    No.  Essentially what this quote is

19    saying is that in the general conversation about

20    how to address mis and disinformation there are

21    a lot of people saying that we should -- the

22    government should be the ones taking things

23    down, or the government should be asking the

24    platforms to do certain things, and that's not

25    necessarily the right spot for government to be.

1              Q.   So when you say:  We have to tell
2       the platforms that this is a lie and they need
3       to take it down, you're attributing that view to
4       other people, not yourself?
5              A.   Yeah, so that's generally what we
6       hear a lot, you go out and you talk to different
7       groups about disinformation that's just a common
8       theme that we would hear from people that we
9       should be doing.
10             And as I mentioned, the rest of the
11      quote is -- is -- it's just not a question of
12      what we should be doing.  There's lots of issues
13      and things like that there.  So that's what I
14      was trying to get across there.
15             (Exhibit No. 52 was marked for
16      identification.)
17   BY MR. SAUER:
18             Q.   Exhibit 52.
19             A.   52?  I've got it.
20             MR. SAUER:  How long have we been
21      on the record.
22             MR. SCOTT:  So I have an unofficial
23      tally of six hours and 32 minutes.
24             MR. SAUER:  Okay.  Exhibit --
25             MR. GARDNER:  I agree.

```
 1    BY MR. SAUER:

 2              Q.    Exhibit 52, if we go in this

 3    e-mail -- excuse me, there's an e-mail from

 4    Lauren Protentis copying Allison Snell and Geoff

 5    Hale and Rob Schaul to a contact at Google; do

 6    you see that?

 7              A.    Mm-hmm.

 8              Q.    And she says, this is in February

 9    17th of 2022; do you see that?

10              A.    I do.

11              Q.    And she says:  Hi Richard, I hope

12    this e-mail finds you well.  The Department of

13    Treasury has asked our team for an appropriate

14    POCs -- I assume that means points of contact --

15    to discuss social media and influence matters.

16    We would like to make a connection to Google, if

17    you're amenable; do you see that?

18              A.    I do.

19              Q.    What -- do you know why Treasury

20    reached out to CISA to get a contact for -- at

21    social media platforms to discuss social media

22    and influence matters?

23              MR. GARDNER:  Objection, lack of

24    foundation.

25              A.    I -- I don't know why Treasury
```

```
 1    reached out, but CISA obviously, as we discussed
 2    earlier, has points of contact in various social
 3    media companies.
 4           Q.   Does that happen from time to time,
 5    that other agencies would reach out to CISA and
 6    say:  Can you put us in touch with a social
 7    media contact?
 8           A.   It's -- it's happened a couple
 9    times.  I don't -- I don't -- I don't recall how
10    many, and it's -- it's been awhile, I think,
11    but -- so if that qualifies as time to time.
12           Q.   Do you know what Lauren Protentis
13    meant when she talked about social media
14    influence matters, do you know what that means?
15           MR. GARDNER:  Objection, calls for
16    speculation.
17           A.   Yeah, I don't know what she means.
18           Q.   Were you on detail when this e-mail
19    was sent?
20           A.   I was.
21           Q.   Do you remember any discussions
22    with anyone about the Department of Treasury
23    reaching out to discuss -- I'm sorry -- wanting
24    to be put in place in contact with social media
25    platforms?
```

**BRIAN J. SCULLY 1/12/2023**

```
1                A.    I don't, no.

2                Q.    There's a follow up e-mail from

3      Ms. Protentis, saying:  Apologies for the second

4      e-mail, this is somewhat time sensitive.  Do you

5      know why Treasury was raising a time sensitive

6      concern -- concern?

7                     MR. GARDNER:  Objection, calls for

8      speculation.

9                A.    I don't know.

10               Q.    Do you know if Treasury ever

11     connected with the social media platform?

12               A.    I don't know.

13                    (Exhibit No. 46 was marked for

14     identification.)

15     BY MR. SAUER:

16               Q.    I'm pulling up Exhibit 46.  It

17     should be in the second e-mail I sent you a

18     moment ago.

19               A.    I got it.

20               Q.    Here's a draft report to the CISA

21     director, dated June 22nd, 2022; correct?

22               A.    Yes.

23               Q.    This is from the CISA cyber

24     security advisory committee; correct?

25               A.    It appears so, yep.
```

```
 1              Q.   I believe you said in your
 2      interrogatory responses that this also has an
 3      MDM subcommittee; is that right?
 4              A.   Yes, that's correct.
 5              Q.   Do you participate in those
 6      committees, either the security advisory
 7      committee or the MDM subcommittee?
 8              A.   I don't.
 9              Q.   Who participates from -- does
10      anyone participate from the MDM team in those --
11      those committees?
12              A.   Not from the MDM team, no.
13              Q.   So no one on the MDM team
14      participates in the committees?
15              A.   No.
16              Q.   Who from CISA participates, do you
17      know?
18              A.   Kim Wyman is, as I mentioned
19      earlier, I think, that was one of her
20      responsibilities, and then Geoff Hale
21      participated.
22              Q.   And then who else, from outside
23      CISA, participates in these meetings?
24                   MR. GARDNER:  Objection, lack of
25      foundation.
```

**BRIAN J. SCULLY 1/12/2023**

```
 1              A.   I don't know who's -- I don't know
 2     who's in the -- the participant list.  I believe
 3     it's all publicly available online.
 4              Q.   Turning to the second page of this
 5     document.
 6              A.   Okay.  Recommendations?
 7              Q.   Yeah.  First bullet point, do you
 8     see there, it says:  CISA should focus on MD --
 9     I assume that's mis and disinformation?
10              A.   Is that a question?
11              Q.   Yeah.  Is that --
12              MR. GARDNER:  Objection, calls for
13     speculation, lack of foundation.
14     BY MR. SAUER:
15              Q.   Does MD refer to mis and
16     disinformation?
17              A.   In the context, I would say that it
18     does, but I don't -- I don't know what they
19     meant by it.
20              Q.   It says:  CISA should focus on MD
21     that risks undermining critical functions of
22     American society, including sub-bullet one, MD
23     that suppresses election participation or
24     falsely undermines confidence in election
25     procedures and outcomes; correct?
```

```
 1              A.    Correct.
 2              Q.    So the advisory committee is
 3     recommending that CISA focus on election-related
 4     disinformation; right?
 5                    MR. GARDNER:  Objection, lack of
 6     foundation.
 7              A.    That's how I would read that
 8     sentence, correct.
 9              Q.    Okay.  Second bullet point says:
10     MD that undermines critical functions carried
11     out by other key democratic institutions, such
12     as the courts or by other sectors, such as the
13     financial system or public health measures;
14     right?
15              A.    That's what it says, yep.
16              Q.    You talked about the financial
17     system, earlier, and interestingly that's raised
18     in this recommendation.  Are you aware of CISA
19     doing anything to address MD that undermines the
20     financial system?
21              A.    So we've -- as I mentioned earlier,
22     we -- we're working with Treasury to develop a
23     product to help the financial services sector
24     understand MDM risks to the sector.
25              Q.    What risks have there been to that
```

```
 1      sector?  And I don't remember any runs on banks,
 2      you know, recently, what risks?
 3              A.   So again, as I mentioned earlier,
 4      we're not the experts in financial services, so
 5      we, you know, depend on the financial services
 6      sector to kind of work us through, help us work
 7      through what those risks are, we're pretty early
 8      in the process, so we're still kind of working
 9      through those sorts of questions.
10              Q.   Do you know what, what was the
11      impetus for doing that product in the first
12      place?  Was someone worried about MDM that would
13      undermine financial services?
14              A.   I -- I don't -- I don't know why
15      Treasury reached out to us and discussed that, I
16      don't recall.
17              Q.   Is that unrelated to the last
18      e-mail we saw, where they wanted to talk to
19      social media platforms about social media and
20      influence matters?
21              MR. GARDNER:  Objection, calls for
22      speculation, lack of foundation.
23              A.   Yeah, I don't know.  I don't know
24      if the two are connected.
25              Q.   Okay.  The bottom of the same page,
```

```
1       there's a bullet recommending that CISA should
2       consider MD across the information ecosystem;
3       right?
4            A.   Yep.
5            Q.   And it goes down in the second
6       sub-bullet there, it says:  CISA should approach
7       the MD problems with the entire information
8       ecosystem in mind, this includes social media
9       platforms of all sizes, mainstream media, cable
10      news, hyper partisan media, talk radio and other
11      online resources; do you see that?
12           A.   I do.
13           Q.   Has CISA been taking steps to
14      consider or address misinformation in these
15      other venues, besides social media, for example,
16      mainstream media?
17           A.   No.  What I would say is that,
18      generally speaking, we -- we -- I believe it's
19      generally too much of a focus on just the social
20      media platform, and MDM that kind of flows
21      through social media.  When potentially it's MDM
22      that flows through all different sources of
23      media communication.
24                So that's kind of how we think
25      about it, we try not to just focus on MDM, but
```

```
 1    we don't do anything counter to your point.
 2    Again, we built resilience helping people
 3    understand what's going on and how to mitigate
 4    the risks.
 5              Q.   Do you try to build resilience to
 6    MDM on -- in cable news?
 7              A.   I mean, generically speaking, all
 8    of our resilience activity would be useful
 9    regardless of how -- we try to make it as broad
10    as possible so it's applicable anywhere that
11    somebody may come across MDM.
12              Q.   How about hyper partisan media,
13    what does that mean, do you know?
14              MR. GARDNER:  Objection, calls for
15    speculation.
16              A.   I don't know what it's meant in
17    this context, but again, we try to be general
18    enough in our kind of guidance to help people
19    understand.
20              We're essentially agnostic of where
21    it's coming from, we just want people to be able
22    to understand where -- what it is, how it works,
23    and things they can do to mitigate those risks.
24              Q.   I take it, then, the MDM team would
25    agree with this recommendation that CISA should
```

 1      approach the MDM problem, you know, with a whole
 2      information universe in mind, including
 3      mainstream media, cable news, hyper partisan
 4      media, talk radio, and other online resources?
 5                      MR. GARDNER:  Objection, form.
 6              A.   What I would say, from a
 7      resilience-building standpoint, we generally
 8      don't -- try not to hone too much on any one
 9      particular medium for communication.  There's
10      obviously tactics that fall across multiple, but
11      we don't generally try to hone in on any one in
12      particular.
13                      (Exhibit No. 59 was marked for
14      identification.)
15      BY MR. SAUER:
16              Q.   I'm pulling up Exhibit 59.
17              A.   Okay.
18              Q.   And then here's a cyber security
19      advisory committee e-mail to a group, I assume
20      it's the committee members; does that look right
21      to you or do you not know?
22                      MR. GARDNER:  Objection, lack of
23      foundation, calls for speculation.
24              A.   Yeah, I don't -- I don't know who
25      all the members are, so it would be hard for me

1    to say if that's the case.

2              Q.    Here's some people that are copied

3    on this e-mail from the CISA cyber security

4    advisory committee e-mail, the first one is Kate

5    Starbird; right?

6              A.    Yeah.

7              Q.    Do you know who she is?

8              A.    She's a professor at the University

9    of Washington.

10             Q.    She was involved in the Election

11   Integrity Partnership that we talked about

12   earlier; right?

13             A.    I believe so, yeah.

14             Q.    Next one is Vijaya Gadde or Gadde,

15   do you know who she is?

16             A.    I don't know.

17             Q.    Was she a senior official at

18   Twitter, at the time, do you know?

19             MR. GARDNER:  Objection, calls for

20   speculation.

21             A.    I don't know.

22             Q.    I see you've got Kim Wyman and

23   Geoff Hale on this e-mail.  They were the two

24   that you testified earlier are involved in the

25   cyber security advisory committee for CISA;

Case 3:23-cv-00571-TAD-KDM Document 20-61 Filed 06/30/23 Page 361 of 456 PageID #: 13434

```
 1    right?
 2           A.   Yep.
 3           Q.   And then lower down, there's a list
 4    of -- we have identified a list of potential
 5    subject matter experts to potentially brief at
 6    our biweekly meetings, bios attached; do you see
 7    that?
 8           A.   I do.
 9           Q.   So -- and that's a list of, I take
10    it, experts who would provide briefings at the
11    advisory committee's meetings; is that how you
12    read that?
13           MR. GARDNER:  Objection, lack of
14    foundation, calls for speculation.
15           A.   So the paragraph reads:  Identify a
16    list of subject matter experts.  Please be
17    prepared to provide your feedback.  I'm sorry,
18    what was your question again?
19           Q.   Let me just ask:  Is the third
20    expert on the list is Renée DiResta; right?
21           A.   Yeah.
22           Q.   And she's at Stanford Internet
23    Observatory; right?
24           A.   Correct.
25           Q.   You were involved in conversations
```

```
 1     with her, because she was a part of the Election
 2     Integrity Partnership; right?
 3          A.   We should have Stanford Internet
 4     Observatory, we were certainly involved in
 5     conversations with her, as I talked about
 6     earlier.
 7          Q.   And those conversations were
 8     related to the commencement of the Election
 9     Integrity Partnership; right?
10          A.   I -- I don't know if she was
11     involved in the early conversations, before it
12     stood up.  I know Stamos was there, I don't know
13     if Renée was there in those early conversations.
14          Q.   Was she in some conversations
15     between -- with you about the EIP?
16          A.   As I mentioned before, she briefed
17     us about the 2022 EIP work.  I don't recall
18     conversations in 2020, but again, it wouldn't
19     surprise me if she was involved in those.
20               MR. SAUER:  Let's go off the
21     record.
22               THE VIDEOGRAPHER:  The time is now
23     5:46 p.m.  We are off the record.
24               (Recess.)
25               THE VIDEOGRAPHER:  The time is now
```

**BRIAN J. SCULLY  1/12/2023**

```
1      5:53 p.m.  We're back on the record.
2                    MR. SAUER:  Are we back on the
3      record?
4                    THE VIDEOGRAPHER:  Yes.
5                    MR. SAUER:  Oh, sorry.
6                    (Exhibit No. 19 was marked for
7      identification.)
8      BY MR. SAUER:
9           Q.    Exhibit 19, I put it on the screen
10     share.
11                 Here's a proposal from CIS, Center
12     For Internet Security, to create an election
13     misinformation reporting portal, and it talks
14     about the benefits to election officials being
15     in a single place for reporting mis and
16     disinformation across multiple social media
17     platforms.
18                 Do you know if this proposal was
19     ever implemented to create a single election
20     misinformation reporting portal?
21          A.    I -- I don't know.  I'm not
22     entirely sure.  I don't know that I've seen
23     this, I don't know if I've seen this proposal
24     before, so I'm not certain.
25          Q.    So you don't know?
```

**BRIAN J. SCULLY 1/12/2023**

```
 1            A.   It sounds like what they were
 2      trying to do, that we discussed earlier, but I
 3      don't know to what extent it was, to your
 4      question, to what extent it was stood up or
 5      established.
 6            Q.   You don't know to what extent that
 7      CIS managed to implement this proposal for an
 8      elections misinformation reporting portal?
 9            A.   Yeah, or if they -- if they did it
10      at all.
11            (Exhibit No. 21 was marked for
12      identification.)
13  BY MR. SAUER:
14            Q.   Exhibit 21, it's on the screen
15      share, this is a CNN political report, September
16      of 2022.  If you go to the third -- fourth page
17      of the document, in this report it says:  While
18      the anti-doxing and foreign influence parts of
19      the proposal remain stalled, work on the online,
20      quote, portal for election officials to flag
21      misinformation to social media platforms
22      predated the proposal and continues today,
23      according to people familiar with it.
24                So are you aware of ongoing work,
25      at least as of September of 2022, to set up an
```

**BRIAN J. SCULLY  1/12/2023**

```
 1      online portal for election officials to flag
 2      misinformation to social media platforms.
 3              A.   So I think as I testified to
 4      earlier, my understanding is that CIS did do
 5      something along the lines, I just don't know the
 6      extent of it.
 7              Q.   And you don't know whether or when
 8      it -- it might be completed?
 9              A.   Correct.
10              (Exhibit No. 24 was marked for
11      identification.)
12   BY MR. SAUER:
13              Q.   Exhibit 24, here's a CISA bulletin
14      that's on your website called --
15              A.   Mm-hmm.
16              Q.   -- misinformation, you go to the
17      third page.
18              A.   Correct.
19              Q.   Are you familiar with this
20      bulletin?
21              A.   Actually, I think this may be our
22      website.  I'm not sure if it's a bulletin.
23              Q.   It is on your website.  I don't
24      know if it's a bulletin, either.
25                   Let me ask you this:  Here on the
```

```
 1      third page, it says:  Bridging election
 2      stakeholders and social media, and under there
 3      it says:  The MDM team serves as a switchboard
 4      for routing disinformation concerns to
 5      appropriate social media platforms and law
 6      enforcement; correct.
 7              A.   It does, yep.
 8              Q.   You guys refer stuff to law
 9      enforcement, too?
10              A.   Yes, if there was -- particularly
11      if there was violence, promoted in whatever was
12      sent to us from an election official.
13              Q.   Anything else involved that would
14      be reported to law enforcement, other than
15      threats of violence?
16              A.   So we would generally share
17      whatever we received from the election officials
18      with the FBI, in case there was an ongoing
19      investigation related to whatever it was that we
20      forwarded to them.
21              Q.   And is this still true, I mean,
22      it's on your website today, is it still true
23      that the MDM team serves as a switchboard for
24      routing disinformation concerns to appropriate
25      social media platforms?
```

```
 1                A.   No.  Like I said earlier, we didn't
 2      do this in 2022, so we should change that to
 3      served.  Thank you for finding that.
 4                Q.   And I take it you -- you testified
 5      earlier that that decision was made in late
 6      April or early May of 2022?
 7                A.   That's my recollection.
 8                Q.   Do you know why the decision was
 9      made?
10                A.   I don't, but as I also mentioned,
11      it was something that we were comfortable with,
12      from the MDM team perspective, because of heavy
13      burden on our resources.
14                Q.   You anticipate serving in a
15      switchboard in the future or do you not know
16      whether you will?
17                A.   That's not my decision to make,
18      so -- so I don't want to speak on behalf of the
19      director or future directors.
20                Q.   You don't know what the director's
21      plans are for the future when it comes to
22      serving as a switchboard for routing
23      disinformation concerns?
24                A.   I don't know what direct --
25      Director Easterly's position is, and obviously I
```

**BRIAN J. SCULLY  1/12/2023**

```
 1      wouldn't know any future director's position on
 2      that, either.
 3                    (Exhibit No. 6 was marked for
 4      identification.)
 5   BY MR. SAUER:
 6            Q.    Exhibit 6?
 7            A.    Okay.
 8            Q.    Here's a public comments by Renée
 9      DiResta about -- about the Election Integrity
10      Project.  And let me put it on the screen share.
11                    On the third page, call -- which is
12      called page 2 of the transcript, she talks -- or
13      sorry, it's quoting Alex Stamos, saying that the
14      EIP started with our team at Stanford sending a
15      group of interns to work with CISA; right?  Do
16      you see that?
17            A.    Yep.
18            Q.    It talks about the sort of stuff we
19      talked about the gap earlier, about how there's
20      a lack of capability, about disinformation.
21                    But Stamos says they lack a funding
22      and legal authorization to do the kinds of work
23      that will be necessary to truly understand how
24      election disinformation was operated; correct?
25            A.    That's what he says, yep.
```

```
 1              Q.   And he goes on to say:  Our
 2     partners in government, most particularly those
 3     in CISA and DHS, but also state and local
 4     governments whom we worked with; correct?
 5              A.   He says that, yes.
 6              Q.   Were CISA and DHS partners of the
 7     EIP, in your view?
 8              A.   We generally describe any external
 9     organization that we have a relationship as a
10     partner.  So I think that probably, you know --
11     so yeah.
12              Q.   Okay.  So in a sense that you were
13     a partner of the EIP, fair to say?
14              A.   Again, we would say that of any
15     external entity that we have a relationship
16     with.
17              (Exhibit No. 7 was marked for
18     identification.)
19     BY MR. SAUER:
20              Q.   On the screen share I put Exhibit
21     7, which is now public comments from Renée
22     DiResta from the EIP; do you see it up there?
23              A.   Sorry, you are an on Exhibit 7?
24              Q.   Yeah.
25              A.   Yep.
```

```
 1              Q.   If you go to page 2 of the
 2     transcript, which is page 4 of the PDF, and
 3     it -- it quotes Renée DiResta, again, talking
 4     about the students from Stanford doing an
 5     internship at CISA and identifying a gap, right,
 6     that was the word we used earlier?
 7              A.   Mm-hmm.
 8              Q.   It talks about how there was no
 9     clear federal lead to coordinate, and it wasn't
10     prepared to identify it; correct?
11              A.   I don't --
12              Q.   It says that gap, the federal
13     government wasn't prepared to identify and
14     analyze election mis and disinfo; correct?
15              A.   Correct.  That's what she says,
16     yep.
17              Q.   And she says there was no clear
18     federal lead to coordinate the work and so
19     forth?
20              A.   Correct.
21              Q.   And she says:  There were unclear
22     legal authorities, including very clear first
23     amendment questions; right?
24              A.   That's what she says.
25              Q.   That's a reference to the federal
```

**BRIAN J. SCULLY 1/12/2023**

```
 1      government taking the leadership role and
 2      analyzing to respond to election mis and
 3      disinformation; correct?
 4              A.   I'm not seeing that in here, is
 5      that a sentence or are you asking me to --
 6              Q.   I'm just --
 7              A.   -- interpret what Renée is saying?
 8              Q.   Yeah, interpret, is that how you
 9      read it?  That's how I read it.
10              MR. GARDNER:  I'm sorry, can you --
11      John, can you re-ask that question?
12  BY MR. SAUER:
13              Q.   Let me ask you this:  Were there
14      any discussions of -- that you're aware of,
15      relating to the EIP, that related to unclear
16      legal authorities, including very real first
17      amendment questions, when it comes to direct
18      involvement of the federal government?
19              A.   I'm not aware, but, in general,
20      conversations about MDM, first amendment comes
21      up.
22              Q.   Did it come up with the CISA
23      interns who originated the idea of the EIP?
24              A.   I don't -- I don't recall that
25      being the nature of the conversation.  I think
```

```
 1    it was really mostly around gaps for election
 2    officials.  But as you probably picked up, I
 3    don't remember in detail the conversations that
 4    well that long ago.
 5              MR. SAUER:  I think that's all the
 6    questions I have.
 7              MR. GARDNER:  Well, the government
 8    has no questions.  We just, again, we emphasize
 9    that the witness will read and sign.
10              THE VIDEOGRAPHER:  This
11    concludes -- this concludes the deposition of
12    Brian Scully.  The time is now 6:04 p.m.  We are
13    off the record.
14              THE REPORTER:  Mr. Sauer, when do
15    you need the transcript?
16              MR. SAUER:  Could we have it
17    expedited within two days, that's -- Ben, I
18    think our standard request for these is two
19    business days?
20              MR. GARDNER:  Yes.
21              THE REPORTER:  And Mr. Gardner,
22    will you be purchasing a copy.
23              MR. GARDNER:  Yes, ma'am, we'll be
24    purchasing a copy.
25              THE REPORTER:  And you want the
```

```
 1    same delivery?

 2              MR. GARDNER:  Yes, ma'am.

 3              THE REPORTER:  Is it okay if I

 4    e-mail you spelling questions on Monday?

 5              MR. GARDNER:  You have until

 6    Tuesday, with the holiday.

 7              (Signature having not been waived,

 8    the deposition of BRIAN SCULLY was concluded at

 9    6:04 p.m.)

10              ACKNOWLEDGMENT OF DEPONENT

11         I, BRIAN SCULLY, do hereby acknowledge

12    that I have read and examined the foregoing

13    testimony, and the same is a true, correct and

14    complete transcription of the testimony given by

15    me and any corrections appear on the attached

16    Errata sheet signed by me.

17

18    _____    _____

19       (DATE)                  (SIGNATURE)

20

21

22

23

24

25
```

```
 1              CERTIFICATE OF SHORTHAND REPORTER

 2              I, Cassandra E. Ellis, Registered

 3    Professional Reporter, the officer before whom the

 4    foregoing proceedings were taken, do hereby

 5    certify that the foregoing transcript is a true

 6    and correct record of the proceedings; that said

 7    proceedings were taken by me stenographically and

 8    thereafter reduced to typewriting under my

 9    supervision; and that I am neither counsel for,

10    related to, nor employed by any of the parties to

11    this case and have no interest, financial or

12    otherwise, in its outcome.

13              IN WITNESS WHEREOF, I have hereunto set

14    my hand this 17th day of January 2023.

15

16

17    _____

18    CASSANDRA E. ELLIS, CSR-HI, CSR-VA, CCR-WA, RPR,

19    CRR

20    REALTIME SYSTEMS ADMINISTRATOR

21    NOTARY PUBLIC

22

23

24

25
```

```
 1                           LEXITAS LEGAL

 2

 3    January 17, 2023

 4

 5    JOSHUA E. GARDNER, ESQUIRE
      DEPARTMENT OF JUSTICE
 6    1100 L STREET, NORTHWEST
      WASHINGTON, D.C.  20530

 7

 8    IN RE: THE STATE OF MISSOURI, et al. v. JOSEPH R.
              BIDEN, JR., et al.

 9

10    Dear JOSHUA E. GARDNER:

11    Please find enclosed your copies of the deposition of

12    BRIAN J. SCULLY taken on January 12, 2023 in the

13    above-referenced case. Also enclosed is the original

14    signature page and errata sheets.

15    Please have the witness read your copy of the

16    transcript, indicate any changes and/or corrections

17    desired on the errata sheets, and sign the signature

18    page before a notary public.

19    Please return the errata sheets and notarized

20    signature page within 30 days to our office at 1608

21    Locust Street, Kansas City, MO 64108 for filing.

22    Sincerely,

23

24    Lexitas Legal

25    Enclosures
```

```
 1                         ERRATA SHEET

 2      Witness Name: BRIAN J. SCULLY

 3      Case Name: THE STATE OF MISSOURI, et al. v. JOSEPH R.
                     BIDEN, JR., et al.
 4      Date Taken: JANUARY 12, 2023

 5      Page #_____    Line #_____

 6      Should read: _____

 7      Reason for change: _____

 8

 9      Page #_____    Line #_____

10      Should read: _____

11      Reason for change: _____

12

13      Page #_____    Line #_____

14      Should read: _____

15      Reason for change: _____

16

17      Page #_____    Line #_____

18      Should read: _____

19      Reason for change: _____

20

21      Page #_____    Line #_____

22      Should read: _____

23      Reason for change: _____

24

25      Witness Signature: _____
```

```
 1    STATE OF _____)

 2

 3    COUNTY OF _____)

 4

 5    I, BRIAN J. SCULLY, do hereby certify:

 6         That I have read the foregoing deposition;

 7         That I have made such changes in form

 8    and/or substance to the within deposition as might

 9    be necessary to render the same true and correct;

10         That having made such changes thereon, I

11    hereby subscribe my name to the deposition.

12         I declare under penalty of perjury that the

13    foregoing is true and correct.

14         Executed this _____ day of _____,

15    20___, at _____.

16

17

18

19                           _____

20                           BRIAN J. SCULLY

21

22                           _____

23                           NOTARY PUBLIC

24    My Commission Expires:

25
```

**BRIAN J. SCULLY  1/12/2023**

| A | | | | |
|---|---|---|---|---|
| **A-a-r-o-n** 103:6 | 205:24 206:7,22 207:8 230:13 281:3,22 298:3,4 | 105:3,5 130:17 137:20 278:25 304:5 312:12 | **addition** 75:9 184:13 235:23 | **administ...** 234:25 **Administ...** 2:8 374:20 |
| **A-l-e-x** 167:6 | **accurate** 290:22 291:5 315:13 | 325:8 329:15 331:17 332:14 | **additional** 40:22 41:3 88:14 209:17 210:3 220:7,17 222:19 303:9,24 337:17 | **admonition** 196:7 **adopt** 132:18 **adversarial** 270:17,22 271:5 |
| **A-y-e-l-e-t** 187:18 | **acknowledge** 373:11 **ACKNOWLE...** 373:10 | **activity** 64:25 152:10 166:1 358:8 | | **advisor** 195:19 305:5 |
| **a.m** 1:16 10:4 226:19 | **acronym** 307:24 **acronyms** 307:24 | **actor** 37:23 259:14 270:17,22 | **Addition...** 117:25 **address** 66:15 120:8,12 120:13 128:11 131:18 137:21 157:5 198:21 203:19 205:6 320:8 324:12 328:24 348:20 355:19 357:14 | **advisory** 37:17 352:24 353:6 355:2 359:19 360:4,25 361:11 |
| **Aaron** 103:2 103:5,6 112:16,17 112:17 157:19,21 157:21 217:4 227:18 | **act** 35:6 229:6 240:3 | **actors** 27:12 27:21 38:1 38:2,4,8 38:10,12 39:21 246:2 256:20 271:6 273:24 323:23 | | **advocating** 132:17 **aegis** 73:22 **affect** 57:21 340:25 **affirmative** 347:10 **Afghanistan** 322:2 324:21 |
| **abbrevia...** 316:24 | **acted** 165:13 **acting** 121:3 **action** 94:12 95:14 177:9,13 178:6,6 200:14 288:11 | | | |
| **ability** 92:24,25 93:19 94:6 94:11,17 | | | | |
| **able** 358:21 | | **actual** 36:19 61:16 155:15 193:15 255:11 258:10 270:25 274:5 275:2 343:22 | | **afraid** 292:10,17 307:20 |
| **above-re...** 375:13 | **actioned** 164:10 165:3 168:14 177:4 | | **addressed** 163:20 **addresses** 214:19,24 **addressing** 58:24 151:7 278:12 322:6 332:5 | **afternoon** 163:7 173:17,19 176:1 284:23,25 |
| **absence** 19:5 20:6 | | | | |
| **absolutely** 287:22 | **actions** 40:9 40:15,25 240:8 242:4 279:5 | | | **afters** 122:20 |
| **academia** 44:6 | | **Adam** 33:12 276:20 **add** 171:2 290:4 297:2 300:8,12 331:7 337:15 | | **agencies** 25:11,17 25:22 37:12 73:11,16 73:21 92:2 92:10,14 92:25 |
| **academic** 46:10,21 47:2 | **active** 19:9 33:24 125:22 137:20 | | **administ...** 25:3 **administ...** 25:4 239:16 313:16,22 314:4,10 | |
| **accident...** 262:4 | | | | |
| **accidently** 293:8 | **actively** 287:18,18 | | | |
| **account** 206:17 207:5 230:13 281:11,18 294:9,13 295:11 296:21 | **activities** 16:8 21:14 43:21 69:22 90:9 | **adding** 119:14 336:21 | | |
| **accounts** | | | | |

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 93:20 | 272:21 | 293:14 | **alleged** | **analyses** |
| 95:15 | 275:3,24 | 297:7 | 200:3 | 125:24 |
| 136:24 | **agents** | 298:19 | 217:8 | **analysis** |
| 245:25 | 220:11 | 302:4,15 | 225:16 | 16:22 26:3 |
| 246:13 | **agnostic** | 315:21 | **Alliance** | 43:20,21 |
| 250:5,17 | 358:20 | 348:17 | 47:7 | 43:24 |
| 250:21 | **ago** 101:5 | **aided** 118:1 | **Allison** 28:8 | 59:16 60:6 |
| 256:5 | 295:15 | 118:15 | 253:16 | 60:17 |
| 258:3,11 | 352:18 | **aimed** 17:5 | 350:4 | 123:1 |
| 262:19 | 372:4 | **al** 1:6,10 | **allow** 151:14 | 144:16,16 |
| 264:17 | **agree** 42:5,7 | 10:6,8 | 289:2 | 147:6,9 |
| 267:6,19 | 95:19 | 375:8,8 | **allows** 148:4 | 172:1 |
| 314:15 | 349:25 | 376:3,3 | **alternate** | 187:15 |
| 315:2 | 358:25 | **alert** 27:5 | 62:21 | 225:13 |
| 317:12 | **agreed** 86:20 | **Alethia** | 345:10 | 333:24 |
| 327:15 | **agreement** | 47:14 | **alternative** | **analyst** |
| 351:5 | 2:2 212:7 | **Alex** 43:14 | 344:15 | 28:19 |
| **agency** 4:7 | **ahead** 8:18 | 70:5,14 | **amenable** | 43:14,16 |
| 8:12 15:25 | 53:12 73:5 | 72:16 76:9 | 350:17 | 167:25 |
| 72:2 90:17 | 87:23 | 76:14,15 | **amended** 6:22 | 171:18 |
| 91:5 94:21 | 89:14 | 77:8,17 | 190:18 | **analysts** |
| 95:5 | 113:3 | 86:2 88:8 | **amendment** | 108:12 |
| 141:24 | 122:2 | 89:6 99:10 | 95:14 | 109:18,22 |
| 178:11 | 124:8 | 102:2 | 153:5 | 187:10 |
| 248:10 | 126:11 | 111:22 | 370:23 | **analysts'** |
| 250:23 | 141:15 | 116:21,24 | 371:17,20 | 29:3 |
| 251:2 | 144:6 | 117:2,8,16 | **American** | **analytic** |
| 284:16 | 146:20 | 134:21 | 46:25 | 44:12 |
| 286:14 | 161:23 | 136:5,9,13 | 341:24 | 184:4 |
| 315:9 | 162:5 | 136:15 | 354:22 | **analyze** |
| 316:18,24 | 173:2,9 | 139:7,11 | **Americans** | 182:9 |
| 317:3 | 195:4 | 139:21,23 | 280:11,20 | 370:14 |
| 335:19 | 203:25 | 142:12 | 280:23 | **analyzing** |
| 343:15,17 | 204:5 | 166:19 | 344:23 | 371:2 |
| **agenda** 21:9 | 215:21 | 167:3,6 | 346:12,17 | **and/or** |
| 30:18,20 | 218:14,15 | 171:11,12 | 347:24 | 375:16 |
| 30:22,23 | 221:7 | 171:14 | **amount** 50:23 | 377:8 |
| 34:5 | 222:8,10 | 179:18 | 346:11,17 | **Announce...** |
| 128:14,15 | 225:20 | 181:10,14 | 347:16,23 | 8:15 |
| 129:2 | 256:24 | 182:17,17 | **amplific...** | **announces** |
| 169:9 | 257:10 | 184:14 | 287:6,8 | 217:11 |
| 234:17 | 261:24 | 185:2,4,12 | 288:24 | **announcing** |
| 256:3 | 266:25 | 191:25 | **amplified** | 35:9 |
| 257:15,23 | 269:4 | 192:12 | 287:10,13 | **answer** 13:1 |
| 260:5 | 271:9 | 196:24 | **amplify** | 34:19 35:5 |
| 262:8 | 273:8 | 197:7 | 254:18 | 51:2 53:3 |
| 269:6,14 | 285:15 | 198:19 | 347:11,21 | 71:23 80:7 |
| 270:6,25 | 288:15 | 199:6,16 | **Amplifying** | 93:4 133:3 |
| 272:5,8,18 | 289:9 | 368:13 | 346:23 | 133:23 |

**BRIAN J. SCULLY  1/12/2023**

148:10
150:22,22
152:24
153:10,20
153:21
156:2,11
162:1
163:13
167:13
180:24
185:9
198:14
202:21
237:20
250:6
278:21,21
292:10,17
304:24
310:15
339:15,18
339:18,22
**answered**
126:6
146:17
162:1
202:16
230:20
251:3,8
**answering**
339:20
**answers**
150:19
**anti-doxing**
364:18
**anticipate**
256:9,15
367:14
**anticipated**
258:5,13
**anticipa...**
257:19
**anybody**
129:14
**API** 146:7,9
146:13,13
146:14
**Apologies**
352:3
**apologize**

14:4  55:7
107:11
282:2
**appear** 82:25
205:23
373:15
**appeared**
225:15
**appearing**
192:10
**appears**
159:17
162:23
173:15
192:15
196:16
199:25
200:1
207:23
211:20
226:10
228:22
230:16
277:10
281:12
282:18
285:9
292:2
297:4
301:13
352:25
**applicable**
358:10
**applied**
224:17
**applies**
153:1
260:24
**apply** 17:17
**appointee**
130:4,8,12
313:15,17
**approach**
39:15  85:9
97:5  307:5
307:12
357:6
359:1
**approaches**

256:9
257:19
258:4
**approaching**
163:11
**appropriate**
17:7  95:15
315:16
350:13
366:5,24
**April** 22:3,6
22:7,16,20
22:25  23:9
23:11
260:3
262:1
294:14
336:13
367:6
**April-ish**
12:6
**April/May**
12:6
**area** 241:25
**areas** 312:23
313:5
**argue** 338:16
**Arizona**
225:7,18
**Arizona's**
225:2
**arose** 147:4
**arrangement**
121:9
187:2
**arranging**
214:1
**arrived** 86:8
**arrives**
14:25
**arrow** 105:16
105:17
106:17
**article** 8:7
8:11,16
9:5,15
304:6,17
305:22
314:19

319:20
320:6,22
321:11
336:3
338:14
**articles**
124:2,5,13
**articulate**
311:4
**articulated**
239:7
**artifact**
60:3
**Ashwin**
187:20
**asked** 63:13
101:9
126:5
136:13,23
140:6
146:16
147:13
161:25
163:22
202:16
218:23
219:4
220:18,20
223:3
230:19
250:4,15
251:1,6
260:8,20
261:15
270:4
284:4
296:16
301:11,16
307:10
318:22
350:13
**asking** 13:11
13:23  57:3
66:24  74:7
74:10
91:10
92:11,12
92:13  93:6
93:14  94:9

94:10
100:20
107:1
128:9
130:21
132:24,25
133:4
135:11,11
137:1
156:3
172:15
222:18
228:24
249:3
256:13
261:19
277:7
287:12
292:12
295:18,19
297:1,4
301:5
348:8,23
371:5
**asks** 100:23
232:6
261:16
**assembled**
97:7
**assembling**
97:14
**assembly**
97:16
**asserted**
166:12
**assess**
144:18
**assessed**
109:22
**assessing**
96:10,18
123:8
**assessments**
257:3
**assignment**
19:19
**assist**
322:22
**assistance**

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 101:10 | atlassia... | 273:22,24 | awake 175:9 | 326:12 |
| assistant | 205:15 | 274:3,4,8 | aware 17:13 | 328:19 |
| 195:11 | attached 5:7 | 274:10 | 17:16 18:1 | 329:19,22 |
| 196:14 | 6:2 7:2 | 275:7,11 | 52:2 61:22 | 332:17 |
| 311:17 | 8:2 9:2 | 275:14,19 | 75:5,12 | 336:4,20 |
| assisting | 253:1 | attribut... | 77:6,7,22 | 355:18 |
| 84:25 | 361:6 | 273:19 | 78:17,18 | 364:24 |
| associated | 373:15 | 274:25 | 79:3 80:22 | 371:14,19 |
| 135:7 | attachments | Audio 5:14 | 106:21 | awareness |
| 146:2 | 345:15 | 5:18 | 107:3,6,8 | 16:12 |
| 246:20 | attacks | audit 17:3 | 112:18 | 17:11 |
| Association | 246:21,22 | 334:5 | 124:22 | 21:15 |
| 50:8,9 | attempt 66:4 | August 9:23 | 127:5,10 | 65:15 |
| 101:16,18 | 134:11 | 15:9 | 128:8,12 | 68:17 |
| 101:19 | 211:25 | 104:25 | 129:16,18 | 131:6 |
| 103:13 | 317:18 | 262:8 | 132:8,10 | 155:7 |
| Assortment | 337:14 | 277:4 | 133:8,11 | 267:17,25 |
| 6:4,13 | attempted | 302:22 | 138:13 | 268:2 |
| 7:12,17 | 254:17 | 303:2,5 | 147:14,23 | 325:25 |
| assume 20:12 | attempts | 328:21 | 152:3 | 326:2 |
| 105:6 | 254:11 | 334:5 | 158:4,17 | 347:25 |
| 166:6 | attend 264:2 | authenti... | 160:10 | awful 55:6 |
| 177:18 | attended | 223:6,25 | 163:8 | awhile 344:3 |
| 180:6 | 259:20,23 | authorities | 164:5 | 351:10 |
| 205:20 | attention | 85:1 91:20 | 172:9,14 | Ayelet |
| 219:19 | 15:2,15 | 92:10 | 188:10 | 186:17,20 |
| 226:12 | 17:23 18:2 | 93:16 | 196:17 | 187:17 |
| 274:9 | 20:23 | 278:15 | 197:13 | |
| 275:9 | 69:25 | 370:22 | 202:19,21 | **B** |
| 309:6 | 173:1 | 371:16 | 202:22,23 | B 5:6 6:1 |
| 350:14 | 196:21 | authority | 203:6 | 7:1 8:1 |
| 354:9 | 197:20 | 26:19 | 207:12 | 9:1 219:1 |
| 359:19 | 203:3 | 91:17 92:1 | 211:4,22 | B-e-e-b-e |
| assumed | attorney 3:7 | 92:14,19 | 215:8 | 279:21,24 |
| 158:21 | 10:20,23 | 92:24 94:1 | 222:5 | back 19:12 |
| Assuming | 13:18 | 96:3,24 | 255:9 | 19:21 |
| 275:15 | 35:10 | 337:14 | 290:9,12 | 20:23 22:3 |
| assumption | attorneys | authoriz... | 290:24 | 24:9 32:6 |
| 118:20 | 10:17 | 368:22 | 295:17,21 | 33:9,23 |
| 230:25 | 34:12 | available | 302:17,21 | 35:3 37:14 |
| 243:14 | 165:18 | 43:8,13 | 302:25 | 42:20 |
| 298:15 | attributing | 82:16 | 303:5,8 | 51:14 |
| 329:18 | 273:24 | 113:15 | 307:9 | 58:10 |
| astonishing | 275:19 | 145:1,14 | 320:7,24 | 71:25 72:1 |
| 276:23 | 349:3 | 195:6 | 321:12 | 76:6 78:19 |
| Atlanta | attribution | 333:12 | 322:5,11 | 80:19 |
| 48:19 | 122:25 | 354:3 | 322:13 | 83:13 85:5 |
| Atlantic | 272:10 | avoid 120:25 | 324:18,22 | 106:19,22 |
| 5:15 | 273:15,21 | 211:25 | 325:1 | 107:1 |

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 141:1 | 342:14 | 222:21 | 51:7 52:7 | 224:1 |
| 147:9 | 363:1,2 | **bathroom** | 53:4,8,19 | 233:3 |
| 163:19 | **bad** 245:22 | 319:1 | 53:22 54:6 | 238:21 |
| 164:4,12 | 297:17 | **BCC** 308:15 | 55:5 60:25 | 241:20 |
| 164:17,22 | **bag** 64:9 | **Beckman** | 61:2,14 | 251:3,17 |
| 165:8,10 | **ballots** | 28:16,22 | 64:13 67:6 | 259:7,10 |
| 165:10 | 218:25 | **Beebe** 279:20 | 67:11 | 264:8,13 |
| 166:16,19 | 219:2,12 | **beef** 336:4 | 72:22 73:1 | 266:2 |
| 168:13,17 | 339:10 | **beefing** 8:12 | 76:8,11,17 | 270:2,3 |
| 170:11,14 | **bandwidth** | 335:20,24 | 76:22,25 | 271:4 |
| 173:1 | 57:20 | **began** 183:13 | 77:20 78:6 | 278:20,22 |
| 176:21 | **banking** | **beginning** | 85:22 | 281:1 |
| 177:12,19 | 342:7 | 23:13 | 88:23 89:3 | 289:6 |
| 179:15 | **banks** 342:7 | 126:17 | 90:4 92:23 | 303:8 |
| 180:4 | 342:10,16 | 157:11 | 100:23 | 308:2 |
| 183:9,11 | 356:1 | 307:6 | 111:13 | 311:20 |
| 197:25 | **based** 17:21 | **begins** | 112:23 | 317:2 |
| 201:17 | 41:9,14 | 125:18 | 113:1 | 323:12 |
| 209:12 | 113:15 | 330:10 | 119:6 | 325:12 |
| 218:12 | 114:17 | **behalf** 3:2 | 120:14 | 327:3,11 |
| 219:22 | 154:15 | 3:16 4:2 | 124:1 | 327:17 |
| 220:12 | 209:17 | 10:20 11:1 | 127:20 | 353:1 |
| 221:4 | 242:4 | 16:24 28:2 | 134:13,22 | 354:2 |
| 223:11 | 257:14 | 28:3 35:11 | 136:3,7 | 357:18 |
| 224:19 | 272:15 | 106:11 | 137:10,23 | 360:13 |
| 229:12 | 285:9 | 189:18 | 139:11,14 | **believed** |
| 231:4,15 | 292:21 | 243:12 | 139:22,25 | 27:21 |
| 232:15 | **basic** 238:16 | 367:18 | 143:1 | 266:5 |
| 242:12,19 | 241:13 | **behavior** | 144:23 | **bell** 126:1 |
| 243:25 | **basically** | 41:23 42:3 | 151:17,18 | 197:16 |
| 256:13 | 30:16 45:6 | 42:10,16 | 151:19 | 213:24 |
| 259:21,22 | 56:15 | 115:2 | 155:2 | 247:9 |
| 262:13 | 59:24 | 176:9 | 159:20 | 284:14 |
| 263:2 | 60:22 | 311:5,6,10 | 161:16 | 294:22 |
| 267:4 | 86:24 | **beings** 28:22 | 164:24 | **Ben** 372:17 |
| 274:20 | 260:22 | **believe** | 166:6 | **benefits** |
| 275:2 | **basis** 35:6 | 19:18 20:2 | 168:22 | 363:14 |
| 276:10,11 | 219:15 | 22:3,13 | 179:6 | **Berkman** |
| 277:4,14 | 248:6 | 24:7,13,19 | 183:19 | 345:24 |
| 282:1 | **Bates** 6:4,14 | 26:20 | 184:19 | **best** 61:9 |
| 288:10 | 6:20 7:8 | 28:16 29:6 | 187:1,21 | 85:9 101:8 |
| 289:18 | 7:10,12,17 | 30:25 31:2 | 188:3,24 | 133:3 |
| 298:25 | 8:5,20,22 | 32:21 33:1 | 189:6 | 166:3 |
| 299:6,11 | 9:13,18,20 | 33:9,16 | 201:15,15 | 300:4 |
| 311:16 | 160:22 | 35:17 | 212:23 | **better** 48:14 |
| 319:5,14 | 162:5 | 38:17,21 | 214:6 | 64:25 |
| 323:24,25 | 173:9 | 39:18 | 219:18 | 154:5 |
| 327:21 | 201:20 | 46:24 | 220:9 | 164:19,24 |
| 336:9,13 | 214:8,10 | 48:12,21 | 223:21,23 | 304:3 |

| | | | | |
|---|---|---|---|---|
| 314:13 | 295:14 | 212:5 | 54:10 55:3 | 179:2 |
| 329:21,23 | 316:2 | 258:8 | 55:21 56:3 | **bucket** 44:11 |
| **beyond** 32:8 | 337:19 | 271:13 | 56:8 70:6 | **budget** 303:9 |
| 77:23 | **biweekly** | 276:1 | 70:8,25 | 336:24 |
| 78:12 | 24:19,19 | 318:23 | 71:5,7,11 | 337:14,18 |
| 85:16 | 31:23 | 319:1,3 | 80:14 | 337:18,22 |
| 100:15,16 | 361:6 | **Breakdown** | 128:5 | **build** 16:4 |
| 131:13 | **black** 105:17 | 9:15 346:4 | 132:5 | 153:25 |
| 136:19 | 154:16 | **Brian** 1:14 | 140:1,19 | 241:9 |
| 168:19,24 | **blanking** | 2:1 5:2,8 | 140:22 | 303:22,25 |
| 180:4 | 103:2 | 6:3 7:3 | 141:2 | 324:10 |
| 285:23 | **blind** 308:16 | 8:3 9:3,15 | 248:10 | 332:1 |
| 305:10 | **block** 119:25 | 10:5 11:12 | 269:24 | 343:2,20 |
| 317:17 | **blog** 82:14 | 11:18 | 270:21 | 358:5 |
| **Biden** 1:9 | 82:14,18 | 158:3 | 271:3 | **building** 3:8 |
| 10:7 | 114:17 | 176:3 | 306:11,13 | 16:8 46:1 |
| 247:22,25 | 115:7 | 191:21 | 307:4,11 | 131:4 |
| 248:14 | 116:13 | 200:10 | **briefings** | 315:12 |
| 375:8 | **blue** 310:3 | 208:9 | 27:6 39:23 | 322:15 |
| 376:3 | **blur** 55:10 | 219:4 | 49:13 | 347:19 |
| **big** 141:8 | **board** 312:22 | 229:22,24 | 74:19 81:1 | **builds** 44:5 |
| 256:3 | **bolster** | 230:12 | 82:7,8 | 46:12 |
| 269:25 | 304:16 | 272:1 | 238:21 | **built** 348:6 |
| 306:13 | **bots** 115:2 | 283:10 | 239:8 | 358:2 |
| **bilateral** | **bottom** 83:4 | 292:25 | 323:13,14 | **bullet** |
| 36:22 45:4 | 106:18 | 372:12 | 361:10 | 232:11 |
| 239:9,20 | 109:1 | 373:8,11 | **briefly** | 233:12 |
| 241:5,15 | 111:11 | 375:12 | 203:25 | 243:2 |
| 241:18 | 149:21 | 376:2 | **briefs** 25:19 | 262:7 |
| 242:16 | 160:23 | 377:5,20 | 159:2 | 275:18 |
| 243:8 | 173:20 | **Bridging** | **bring** 28:19 | 346:10 |
| **bio-lab** | 191:8 | 366:1 | 279:13 | 354:7 |
| 323:17 | 203:15 | **brief** 52:19 | **bringing** | 355:9 |
| **biolab** 324:3 | 217:4 | 72:6 | 304:14 | 357:1 |
| **biolabs** | 271:23 | 114:15,17 | **broad** 74:5 | **bulletin** |
| 323:20 | 288:17 | 140:2 | 77:13 | 365:13,20 |
| **biological** | 356:25 | 141:9 | 133:18,23 | 365:22,24 |
| 323:19 | **box** 3:10 | 248:11 | 358:9 | **bulletins** |
| **bios** 361:6 | 154:16 | 361:5 | **broadening** | 43:9 |
| **bit** 14:11 | 212:22 | **briefed** 70:2 | 320:4,7 | **bunch** 277:25 |
| 26:22 73:5 | **branch** 11:21 | 70:3 80:24 | **broader** 61:3 | **burden** |
| 102:12 | **Brand** 11:21 | 137:6 | 61:4 | 367:13 |
| 143:4 | **break** 35:12 | 142:18 | 270:11,15 | **business** |
| 172:25 | 151:3 | 362:16 | **broadly** | 76:17,19 |
| 197:11 | 172:22 | **briefing** | 90:11 | 76:21 |
| 235:17 | 181:4 | 21:14 | **broken** | 338:16 |
| 240:14 | 183:2 | 28:18 52:7 | 258:15 | 372:19 |
| 266:10 | 189:21 | 53:14,18 | **brought** | |
| 282:2 | 192:25 | 53:20 54:3 | 17:22 | **C** |

**BRIAN J. SCULLY 1/12/2023**

**C** 3:1 4:1,1
5:1 6:1
7:1 8:1
9:1 10:1
**C-a-b-l-e**
188:7
**cable** 9:24
188:7
196:17
197:18
198:1
357:9
358:6
359:3
**Cable's**
195:5
**cadence**
233:14
234:3
**calendar**
34:6
274:21
**California**
2:5 163:10
**call** 35:11
41:20
85:24 99:9
99:12,15
99:21,25
101:4
103:4
111:22
130:3
282:5
283:3
327:1,4,7
327:9,12
327:12,17
327:20,23
332:18,21
368:11
**called** 23:16
26:4 48:6
93:10
103:24
112:16
118:7,11
174:13
239:3

253:20
255:21
267:24
319:21
325:6
365:14
368:12
**calling**
348:4
**calls** 21:8
71:20 72:4
87:17 92:5
92:17
94:15
95:20
96:25
98:11
103:17
108:20
111:8
115:9
118:16
122:22
142:7
149:18
150:19
152:21
153:18
178:15
194:14
198:5
201:4
202:15
204:12,23
231:10
238:11
244:21
257:2
273:1
283:21
294:16,23
294:24
298:11
304:21
310:13
316:19
324:24
332:17,21
332:22

333:3,11
333:17,18
333:21
334:8,14
339:13
351:15
352:7
354:12
356:21
358:14
359:23
360:19
361:14
**Camargo**
186:1
**campaign**
44:16
**campaigns**
9:10 127:1
246:20
328:14
**capabili...**
57:10
108:7
**capability**
57:14
93:25 94:3
151:13
368:20
**capacities**
93:15
**capacity**
57:14,20
76:16
91:19
**Capps** 3:5
35:10
**capstone**
321:6
**captured**
166:4
243:16
**carbon**
308:16
**carefully**
13:10
**carried**
355:10
**cascading**

342:22
**case** 10:8
153:13
158:4
174:10
176:9,12
177:2
188:23
190:10
201:16
210:20,25
211:5,11
217:16
221:9
234:15
257:12
264:11
267:5
340:13
343:16
360:1
366:18
374:11
375:13
376:3
**Cassandra**
1:23 2:2
10:14
374:2,18
**catch** 91:9
**categories**
52:22
**caught**
166:21,23
**cause** 316:15
317:4
**CCR-WA**
374:18
**CDC** 135:12
140:12
322:17,22
323:10
**center** 11:22
29:7 50:6
52:11 59:7
59:9,16
60:6,17
61:7 62:23
63:19

67:13,21
72:20
79:13,16
79:21,25
101:14,21
110:18
112:6
119:9,20
119:24
129:11
141:23
142:4
147:6,18
147:21
149:24
179:8
201:24
262:17
264:15
265:10
267:10,15
267:21,24
278:12
345:24
363:11
**centers**
64:19
112:11
278:5
**central**
119:24
120:11
157:4
264:15
**certain**
26:18,24
53:5 61:15
71:12 90:3
104:24
106:16
115:22
137:18
169:17
187:7
199:25
245:1
256:15
261:17
266:3

269:3
274:21
275:1
348:24
363:24
**certainly**
26:21
67:11
93:25
129:6
182:16
207:18
233:5
246:10
289:12
362:4
**certainty**
75:15
176:10
**CERTIFICATE**
374:1
**Certified**
2:3,4,5,7
4:20
**certify**
374:5
377:5
**CFI** 45:1
**CFITF** 118:11
118:14
120:13
157:5
189:8
198:20
199:7
217:19,22
**Chad** 42:22
43:18
166:17,18
166:24
179:18
184:13
191:24
192:11
276:19
**chain** 130:6
157:12
173:13
175:23

206:13
217:4
223:1,12
223:16
226:6
282:17
299:17
307:1,7
**chains**
180:25
**challenges**
317:7
**challenging**
14:15
280:20
302:5,15
**challeng...**
8:18
**Chan** 7:7
29:22
237:10
248:13
249:20
250:4,15
**change** 28:20
127:24
128:10
180:7
286:14
312:25
367:2
376:7,11
376:15,19
376:23
**changed**
127:10,14
271:1
**changes**
126:24
127:21
128:6,16
129:12
133:2,5,9
134:1,4
284:6
375:16
377:7,10
**changing**
127:6

132:12
133:16
150:15
**channel**
280:10,23
320:25
**channels**
146:23
**chaos** 316:15
317:4,5
**chapter**
126:14
**characte...**
121:14
300:23
318:8
347:18
**charge**
289:12
**chart** 9:23
15:9,12
18:3 22:12
42:21
130:9,13
166:17
167:4
171:22
**chat** 312:16
**chats** 263:14
**check** 30:20
291:2
**checked**
70:23
**checker**
288:2
**checking**
227:5
**chief** 15:17
15:22 28:9
289:8
**chose** 93:25
**chosen** 94:2
**Christopher**
191:20
**CIA** 210:20
**circle**
298:24
**circulating**
45:18

269:14
285:19
**circumst...**
223:7
**CIS** 59:6
60:9 61:23
62:4,7,12
64:3,17,24
65:3,11,21
65:21,22
66:3,8,15
66:19 67:4
67:24 68:3
68:7,13,15
68:19,21
80:11
101:24
102:5,6,13
102:15,24
102:25
103:1,4,5
103:9
104:23
106:10,12
107:25
110:22
112:19
119:2
120:6,21
121:2,6,11
121:18
148:2,3,12
148:18,21
148:25
149:5,9,14
157:10,14
157:15,17
157:22
158:15
162:21
165:6,8
168:5,13
174:23
201:24
202:24
203:16
204:1
205:4,11
205:14,14

208:9,17
208:25
210:20,24
211:10,19
212:8
213:17,20
214:14
217:5
228:3,6,14
229:17
230:4,24
231:2
266:2,5
267:2
363:11
364:7
365:4
**CIS's** 210:25
211:5
**CIS-spec...**
112:14
**CISA** 5:18
8:14,16
9:12,12
11:4 15:9
15:23 17:6
17:7 18:25
20:17 24:3
24:24
25:25 28:3
30:14
36:23,24
36:25 37:7
37:11,12
39:15 42:9
44:23
45:24 46:6
49:5,6
50:13 51:9
51:19 52:1
53:21
55:12,13
55:14,17
58:16,20
58:21,22
61:8,9,22
62:12 63:6
63:16 64:1
64:8,16,19

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 65:3 66:2 | 164:8,11 | 267:5,17 | 369:3,6 | 182:20 |
| 66:7,11 | 164:12 | 269:20 | 370:5 | 199:20 |
| 67:6,11 | 165:22 | 273:18,21 | 371:22 | 218:8,17 |
| 70:17 71:6 | 167:21,22 | 274:2 | **CISA's** 23:24 | 262:12 |
| 71:11 | 169:5,25 | 276:14 | 25:5 62:16 | 268:12 |
| 72:23 | 170:6,24 | 277:25 | 66:14 | 278:18 |
| 73:25,25 | 171:17,19 | 284:13 | 101:9 | 325:18 |
| 74:4 75:6 | 172:5 | 285:1 | 119:24 | 335:5 |
| 75:13 | 178:20 | 290:14 | 150:15 | 370:9,17 |
| 76:14 | 183:15,21 | 302:3,13 | 151:6,9,9 | 370:22 |
| 77:18 | 184:1 | 302:17 | 188:22 | **clearing...** |
| 79:20 | 185:16 | 303:5,6,11 | 261:13 | 96:9,17 |
| 88:21,23 | 186:6,15 | 304:9,16 | 262:24 | **clearly** |
| 89:5,22 | 186:25 | 304:19 | 264:14 | 327:8 |
| 90:7 94:25 | 187:9,23 | 305:3 | 305:8,17 | **Clemson** |
| 96:9 97:6 | 188:13 | 308:1,3 | 309:5 | 46:23 |
| 97:12,13 | 189:18,22 | 310:20 | 330:18 | **clips** 124:5 |
| 97:19 99:1 | 191:9,14 | 312:4 | 342:24 | **close** 131:20 |
| 99:14 | 191:19 | 313:1,22 | 347:15,16 | 131:23 |
| 100:11,13 | 192:18 | 313:24 | **citizen** | 234:5,12 |
| 106:3,3,22 | 195:19,23 | 314:20 | 221:15 | 249:11 |
| 108:17,18 | 196:6,10 | 315:7 | **City** 3:11 | 277:3,6 |
| 110:17,25 | 196:19,24 | 317:10 | 375:21 | 331:8 |
| 111:5,6,13 | 197:8,19 | 318:10,10 | **civic** 200:16 | **closed** 293:8 |
| 114:5 | 198:21 | 320:10 | 283:12,16 | **closely** |
| 115:6,13 | 202:4,4 | 324:14,21 | **civil** 16:19 | 289:22 |
| 117:20 | 203:17 | 325:25 | 73:11 | **closer** 31:22 |
| 118:1 | 204:9 | 326:4 | 105:13 | 32:4 174:1 |
| 119:23 | 205:15 | 327:22 | 109:12,16 | 174:17 |
| 120:1,8,11 | 207:1,16 | 330:13 | **claiming** | 234:10 |
| 122:25 | 210:7 | 331:19 | 280:11 | **clue** 178:17 |
| 124:2,13 | 212:8 | 332:12,18 | **clarific...** | 313:9 |
| 124:22 | 217:19 | 332:23 | 218:13 | **CNN** 8:7,7 |
| 126:2 | 218:1,6 | 333:2,10 | 219:5 | 364:15 |
| 129:14,20 | 230:7,12 | 335:24 | 223:3,20 | **coalition** |
| 129:24 | 230:24 | 336:13 | **clarify** 93:5 | 97:7,14,16 |
| 130:17 | 232:7,7,25 | 338:13 | 132:23 | **cognitive** |
| 133:2,9,19 | 234:22 | 345:10,12 | 229:7 | 332:7 |
| 133:25 | 238:8 | 350:20 | 263:20 | 338:18,22 |
| 134:3 | 243:8,9 | 351:1,5 | **clarifying** | 339:3 |
| 137:19 | 245:18 | 352:20,23 | 83:22 | **coincide** |
| 138:4 | 248:9 | 353:16,23 | **clarity** | 337:2 |
| 142:5,14 | 251:3 | 354:8,20 | 104:2 | **collaborate** |
| 142:21 | 255:20 | 355:3,18 | **clear** 66:23 | 308:3 |
| 150:4 | 256:2 | 357:1,6,13 | 66:24 | **collabor...** |
| 151:6 | 262:16 | 358:25 | 104:4,12 | 111:12,13 |
| 154:23 | 263:2,3,23 | 360:3,25 | 130:21 | 111:18 |
| 156:20 | 264:1,15 | 365:13 | 146:22 | **collabor...** |
| 157:4 | 266:20 | 368:15 | 156:3 | 48:11 |

**BRIAN J. SCULLY  1/12/2023**

52:24
81:12
111:17
collabor...
59:25
collabor...
48:24 49:4
colleague
10:21 71:9
collected
146:2
collecting
145:24
collection
156:19
213:14
260:1
collective
277:25
colon 146:4
191:9
Colorado
204:6
205:12,14
205:22
206:5,20
206:21
281:19,21
Columbia 2:9
column 18:6
combat
333:16
combination
261:18
Combined
6:22
come 14:13
20:13
44:22 45:5
45:18 84:3
121:5
123:11
161:9
168:5
263:16
293:12
336:9
338:9
341:18

358:11
371:22
comes 229:12
289:18
367:21
371:17,20
comfortable
92:20
317:24
367:11
coming 64:23
119:13
132:20
310:1
318:18
321:8
334:22
358:21
command
130:6
commence...
98:17
362:8
comment 92:9
96:4
117:24
comments
335:16
368:8
369:21
Commission
377:24
committee
307:25
352:24
353:7
355:2
359:19,20
360:4,25
committee's
361:11
committees
70:18
353:6,11
353:14
common 12:17
158:16
161:19
162:2

210:17
246:11
255:7
273:11
293:14,18
316:23
349:7
Common's
293:20
commonly
158:13
202:24
communicate
18:20
75:19
168:20
326:14
communic...
72:1 78:13
245:25
247:2
326:24
communic...
20:7
communic...
67:23
75:13,24
107:9
132:11
134:3
164:20
communic...
66:2,10
68:4 75:2
103:9
106:25
136:2
146:23
246:7
357:23
359:9
communic...
20:25 21:3
21:18
49:10,11
49:17,18
50:1 53:13
53:16 77:7
77:13,16

77:25
80:20
85:20
87:14
102:6
132:7
133:13,15
133:17
147:24
191:12,15
192:10,20
277:9,10
communities
126:19
259:13
community
39:20 44:6
73:13
84:15
145:21
246:19
257:2
258:20
270:15
327:14
332:14,23
333:22
334:16,16
communit...
333:1
companies
17:8,10,13
109:13
241:6
279:14
327:14
351:3
company
155:2
complaint
190:17
complete
89:21
373:14
completed
365:8
component
325:9,11
components

26:1
154:14
219:10,16
259:6
324:16,23
325:2
329:14
compound
72:3
179:21
212:2
226:25
258:6
310:12
comprehe...
295:10
computer
152:16
concept
83:20 99:1
99:14,18
100:14
concern
42:17
58:25 65:4
66:16
67:17
126:3
153:4
173:13
175:24
208:24
209:2
220:2
250:23
251:4,12
251:18,22
352:6,6
concerned
64:22
271:7
286:6
288:20
concerning
206:20
concerns
23:20 24:4
39:7,13
58:17 65:9

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 66:3 75:4 | confirmed | 81:7 | 140:7,9,12 | contexts |
| 118:25 | 287:21 | 108:18 | 140:14 | 59:19,20 |
| 124:23 | 288:1 | 111:17 | containing | contextual |
| 138:6,10 | conflating | considering | 225:16 | 200:15 |
| 138:11 | 147:20 | 37:23 | content | continue |
| 151:8 | confronting | 226:11 | 17:18,20 | 32:10 |
| 161:22 | 312:23 | considers | 17:24 | 63:13 |
| 172:17 | 313:5 | 320:5 | 23:22 27:3 | 210:20 |
| 180:17 | confused | consisted | 27:19 | 334:3 |
| 189:24 | 13:7 | 144:17 | 40:15 | continued |
| 204:19 | connect | consistent | 123:7 | 170:11 |
| 236:14 | 95:17 | 122:16 | 128:10,16 | 240:10 |
| 240:20 | 100:18 | 288:9,13 | 129:4,11 | 266:5 |
| 241:12 | connected | 306:1 | 139:12 | continues |
| 265:17,21 | 50:4,5,6 | 318:3 | 144:19 | 213:20 |
| 268:5 | 63:1 | 344:21 | 160:5,11 | 364:22 |
| 291:25 | 116:23 | 345:2 | 160:19 | continuing |
| 295:12 | 140:2 | conspiracy | 161:10 | 334:11 |
| 338:12 | 205:23 | 340:4 | 177:8 | contract |
| 342:2,5 | 275:15 | conspiring | 219:22 | 331:13 |
| 348:14 | 299:19 | 286:14 | 260:9,13 | 337:11 |
| 366:4,24 | 352:11 | consult | 260:23 | contractor |
| 367:23 | 356:24 | 34:20 | 284:7 | 154:23,25 |
| conclude | connecting | 190:8 | 288:11 | 155:1,13 |
| 155:23 | 100:21 | consulta... | 289:8,15 | contract... |
| 156:6 | 101:10 | 97:6,12,13 | 290:15 | 331:2,3 |
| concluded | connection | 97:15,24 | 295:5,20 | contractors |
| 373:8 | 98:4 112:5 | 98:2 | 296:2 | 331:7,11 |
| concludes | 124:12 | consulted | 297:3,6 | contributed |
| 372:11,11 | 145:17 | 98:10 | 320:17 | 88:5 |
| concluding | 350:16 | consulting | contents | contribu... |
| 219:15 | connections | 97:18 | 73:6 | 87:24 |
| conclusion | 104:13,15 | contact | 163:20 | convenience |
| 92:5,13,18 | 104:21 | 103:5,16 | 288:7 | 307:15 |
| 93:12 | 135:12,14 | 103:19,23 | context | conversa... |
| 94:15 | connecti... | 104:2,5 | 20:21 | 52:4,5 |
| 95:21 | 264:18 | 112:14 | 40:22 41:3 | 54:14 57:2 |
| 156:4 | connector | 117:18 | 76:10 | 58:7,19 |
| confidence | 109:7 | 157:22 | 139:16,18 | 86:9,10 |
| 27:13,22 | consider | 217:5 | 209:17 | 98:7 101:1 |
| 283:16 | 45:11 | 300:5 | 210:3 | 117:7 |
| 341:19,24 | 100:8 | 350:5,14 | 223:16 | 128:4 |
| 342:4,10 | 243:19 | 350:20 | 274:2 | 133:20 |
| 343:10 | 332:5 | 351:2,7,24 | 275:6,14 | 135:7,17 |
| 354:24 | 357:2,14 | contacts | 289:1 | 137:9 |
| confirm | consider... | 114:13 | 309:3 | 139:13,21 |
| 86:20 | 123:6 | 132:1 | 311:7,23 | 139:23 |
| 218:23 | 281:24 | 135:19 | 354:17 | 141:10 |
| 219:20 | considered | 136:13,23 | 358:17 | 142:19 |

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 179:9 | 295:23 | 117:13 | 43:12,25 | 157:10,19 |
| 181:20 | 361:25 | 119:1 | 46:11 48:3 | 157:23 |
| 211:13 | 362:5,7,11 | 211:18 | 48:4 50:15 | 158:7,8,11 |
| 254:12 | 362:13,14 | 262:9 | 51:3,6,17 | 158:12 |
| 262:20 | 362:18 | 325:6,14 | 57:23 59:8 | 159:7,11 |
| 267:1 | 371:20 | 326:2,6,17 | 59:23 | 160:20 |
| 268:22 | 372:3 | 329:21,24 | 60:20 63:5 | 161:6,7 |
| 333:1 | **conveying** | 332:22 | 63:18 65:4 | 162:22,23 |
| 348:19 | 250:23 | 333:1 | 65:6 67:1 | 163:4 |
| 371:25 | **coord** 316:13 | **coordinator** | 68:6,11 | 167:3 |
| **conversa...** | **coordinate** | 216:1 | 69:23 | 170:9,17 |
| 46:17 47:5 | 29:2 46:12 | **copied** 67:4 | 72:17 73:1 | 170:22 |
| 52:15,19 | 68:13 | 67:7,11 | 73:13,18 | 171:5,16 |
| 52:22 | 74:23 | 203:22,22 | 80:15 | 173:14 |
| 64:24 74:8 | 120:21 | 213:16 | 81:13 | 176:15 |
| 74:12,17 | 130:15 | 276:24 | 84:22 | 180:18 |
| 74:22 75:1 | 212:8 | 360:2 | 89:23 | 182:10 |
| 76:2,10,12 | 214:2 | **copies** | 90:19,20 | 184:12,15 |
| 80:17,22 | 318:5 | 375:11 | 91:6,7,17 | 184:16 |
| 81:1,6,8 | 325:8 | **Cops** 9:4 | 92:2,15 | 185:19 |
| 81:25 82:4 | 332:13,20 | 319:21 | 93:1,13,16 | 191:17 |
| 82:9 85:25 | 370:9,18 | **copy** 66:14 | 93:17 | 192:4 |
| 87:20 98:6 | **coordinated** | 67:20 | 94:12,23 | 193:10 |
| 98:14,16 | 21:6 30:7 | 213:20 | 95:7 96:11 | 195:12,15 |
| 104:9,11 | 30:11,13 | 266:14,18 | 103:10 | 195:20,24 |
| 111:15,19 | 41:22 42:2 | 266:22 | 104:3,18 | 196:25 |
| 112:20,24 | 42:10,15 | 308:16 | 104:19 | 197:4,8,16 |
| 113:2,7,17 | 69:3 115:1 | 321:5 | 105:18 | 198:21 |
| 114:1,9,16 | 239:5 | 372:22,24 | 107:4 | 199:7,13 |
| 114:17 | 311:10 | 375:15 | 108:12 | 199:14 |
| 116:25 | **coordinates** | **copying** | 109:8,14 | 200:7,11 |
| 128:7 | 46:1 | 204:1 | 109:15,23 | 200:14 |
| 133:21,25 | **coordina...** | 218:3,5 | 109:24 | 203:18 |
| 135:10,21 | 30:16 | 350:4 | 110:16 | 204:3,9 |
| 136:4,9 | 54:20 | **corner** | 111:4 | 205:7,17 |
| 139:7,9,11 | 68:10,19 | 107:13 | 112:2,7,8 | 205:24,25 |
| 151:11 | 68:21 69:5 | **correct** | 114:25 | 206:2,3,8 |
| 159:5 | 121:12 | 17:24 | 117:21 | 206:22 |
| 169:1 | 311:5 | 19:11,14 | 118:9 | 207:22 |
| 181:13 | 317:11,12 | 19:23 | 119:3,4 | 208:12 |
| 211:14 | 317:19 | 20:10,16 | 123:10,15 | 209:18 |
| 216:23 | 329:15 | 23:1,4,23 | 125:24 | 210:4,8,22 |
| 237:6,22 | 332:18 | 24:14,15 | 126:19 | 211:19 |
| 238:13,19 | **coordina...** | 26:5,6 | 127:2 | 212:4 |
| 240:17,22 | 21:8 30:14 | 29:13 | 138:12,13 | 214:21 |
| 241:22 | 36:19,21 | 30:12 | 142:5,25 | 215:17 |
| 247:15,17 | 37:2 47:22 | 32:15 37:5 | 149:25 | 217:6,17 |
| 255:5 | 64:15,18 | 37:13 | 150:4,12 | 217:20,21 |
| 259:18 | 68:4 | 41:19 | 150:13 | 217:24,25 |

| | | | | |
|---|---|---|---|---|
| 219:13,24 | 315:4 | 4:12 14:6 | 202:3 | 322:1,7,10 |
| 223:22,23 | 318:1 | 34:20 35:4 | 206:5 | COVID-re... |
| 224:3,4,8 | 326:18 | 69:10 | 207:16 | 322:20 |
| 224:12,13 | 328:3 | 172:22 | 212:14 | create |
| 224:18,20 | 329:4,8 | 374:9 | 237:23 | 109:17 |
| 225:6 | 332:15 | counselor | 238:5 | 142:3 |
| 226:9 | 335:21,22 | 308:12 | 248:23 | 298:1,3 |
| 228:20 | 336:2 | counter 9:9 | 264:8 | 317:6 |
| 229:10,14 | 338:13,19 | 45:2 118:3 | 268:15 | 342:1,5,12 |
| 229:17 | 347:8,13 | 118:6 | 271:16 | 363:12,19 |
| 233:18,20 | 352:21,24 | 254:11 | 279:3 | created |
| 233:25 | 353:4 | 328:13 | 291:16 | 154:24 |
| 234:1 | 354:25 | 329:2 | 303:14 | 165:22 |
| 235:22 | 355:1,8 | 332:14 | 318:17 | creates |
| 236:1 | 361:24 | 342:24 | 333:21 | 56:20 |
| 246:16 | 365:9,18 | 358:1 | 351:8 | 342:25 |
| 249:12,13 | 366:6 | countering | course 13:8 | creating |
| 250:25 | 368:24 | 12:4 | 13:14 | 65:11 |
| 251:8,8,19 | 369:4 | 117:25 | 128:3 | 110:1 |
| 253:17 | 370:10,14 | 118:6 | 147:19 | crisis 325:8 |
| 254:1,19 | 370:15,20 | 130:1 | 180:19 | critical |
| 254:20,24 | 371:3 | 330:14 | court 1:1 | 16:5,9 |
| 254:25 | 373:13 | 348:12 | 2:4 3:8 | 137:24 |
| 255:22,23 | 374:6 | counters | 10:10 11:8 | 147:7,15 |
| 256:6 | 377:9,13 | 331:19,24 | 12:20 47:9 | 154:1,5 |
| 265:7,15 | corrections | counting | 153:3 | 295:10 |
| 269:15,21 | 373:15 | 337:7,10 | 190:20 | 309:6,7 |
| 272:6 | 375:16 | countries | courts | 322:15,17 |
| 280:13,21 | correctly | 38:3 45:3 | 355:12 | 323:6 |
| 281:11,24 | 87:5 | 45:5,7,18 | cover 270:5 | 327:2,12 |
| 282:15 | 159:20 | 46:1 | coverage | 327:13,16 |
| 287:15,22 | 160:13 | country | 127:20 | 331:18 |
| 288:7,24 | 189:15 | 57:13 | covering | 332:2,4,6 |
| 289:24 | 238:22 | County 163:9 | 174:14 | 338:17,18 |
| 291:12 | 248:5 | 228:6,24 | COVID 134:11 | 339:1 |
| 292:6,11 | 270:24 | 229:12 | 138:15 | 340:9,11 |
| 292:15 | 286:12 | 377:3 | 140:6,25 | 340:21,25 |
| 293:1,25 | 306:16 | couple 19:18 | 144:3 | 341:13,20 |
| 295:12 | corrects | 24:18 | 263:12 | 354:21 |
| 297:3 | 167:2 | 33:13 | 264:5 | 355:10 |
| 298:17 | corrosive | 36:16,16 | 323:10 | crossed |
| 299:4,9 | 344:17 | 44:3 49:9 | 324:5 | 312:13 |
| 300:9,10 | council 5:15 | 51:13 | COVID-19 | Crowd 144:18 |
| 300:21 | 20:5 48:20 | 56:12 | 5:13 | 144:22,23 |
| 301:7,9,17 | 71:8,9,15 | 77:21 | 122:12 | 145:2,13 |
| 304:16 | 71:17,19 | 81:25 | 137:22,25 | 146:7 |
| 312:23 | 136:1,8,14 | 111:20 | 138:5 | CRR 374:19 |
| 314:16,22 | 336:7 | 113:2 | 280:12 | CSAC 72:25 |
| 314:24 | counsel 4:4 | 197:23 | 321:25 | 305:9,11 |

CSR-HI
  374:18
CSR-VA
  374:18
culprit
  323:20
curb 320:4
current
  11:19
  331:20,25
currently
  18:24
  32:11
  160:18
custodians
  189:10
  191:15,19
  276:14,15
  276:17,25
  277:8
customs
  220:10
cuts 43:22
cyber 5:19
  8:11 15:24
  29:7 76:25
  96:8
  141:23
  235:14,16
  235:24
  263:6
  307:22
  308:4
  335:19
  352:23
  359:18
  360:3,25
cyber-fo...
  188:15
Cyberscoop
  8:16
Cybersec...
  4:6
cycle 47:24
  52:25 56:9
  129:15
  170:8
  174:19
  185:18

204:22
242:9
265:18
266:8
302:20
303:13

—————————
        D
—————————
D 3:3 4:1
  6:1 7:1
  8:1 9:1
  10:1
D-r-a 186:17
D-r-a-z-e-n
  187:17
D.C 3:21
  375:6
D/A 316:14
  316:17
danger 304:7
  304:8
dangerous
  320:5
  344:16
data 107:14
  107:19
  146:1,1
date 10:3
  86:6 283:5
  345:25
  373:19
  376:4
dated 7:4
  8:19 9:7
  9:10,13,17
  248:22
  249:5
  302:22
  352:21
day 13:13,18
  127:2
  169:8
  175:3
  177:3
  224:5
  262:17,22
  262:24
  267:5,21
  268:3,5

277:6
281:16,17
319:4
328:20
374:14
377:14
day's 15:1
days 372:17
  372:19
  375:20
de-dupli...
  66:4
  211:15
de-dupli...
  214:2
de-dupli...
  211:17
deal 209:15
  278:23
dealing
  162:20
deals 311:9
dealt 343:13
Dear 375:10
debunk 220:4
  224:7,11
  228:25
  290:19
  291:10
  315:3,9
debunking
  220:22
  290:2,14
  315:19
debunks
  289:24
December
  248:22
  249:6
decided 85:8
  116:7
decision
  17:20 22:1
  22:4,5,10
  23:1 164:1
  164:3,16
  178:7
  210:4
  261:11

367:5,8,17
decisions
  49:19
  177:17
  178:8
  242:4
  260:17
declaration
  7:4 244:2
  244:10
  249:10
declare
  377:12
decline
  153:8
declined
  89:24
declining
  51:1
  153:10
  171:6
deconflate
  203:13
dedicated
  330:18
deemed 17:5
deep 274:14
  274:24
DEFENDANT
  3:16
defendants
  1:11 4:2
  6:22 10:8
  11:1,7
defense
  308:4
defer 221:11
  343:14
define 41:22
  42:2
definitely
  96:2
  236:10
  247:16
definition
  92:19
definiti...
  133:24
Dehmlow

29:16
30:11
236:18
248:13
270:20
delibera...
  156:4
delibera...
  155:20
delibera...
  152:22,25
  153:19
  156:1
delivery
  373:1
demo 279:12
  279:17
Democracy
  47:8
democratic
  355:11
department
  3:19 4:13
  10:25 11:4
  11:6,23
  44:23
  244:12
  245:2,17
  278:19
  312:13
  316:18,24
  317:2
  320:3
  321:8
  325:5
  337:1
  343:15
  350:12
  351:22
  375:5
departme...
  278:5,11
  321:7
departme...
  329:1,11
departme...
  92:10
departments
  317:8

**BRIAN J. SCULLY  1/12/2023**

departure
  36:17
depend 356:5
depending
  28:17
  146:3
DEPONENT
  373:10
deposition
  1:14  2:1
  5:8  6:3
  7:3,7  8:3
  9:3  10:5
  10:12
  12:12,16
  249:20
  372:11
  373:8
  375:11
  377:6,8,11
deputy 12:4
  28:9
derived
  123:3
describe
  41:25
  54:25
  59:12  99:9
  240:18
  369:8
described
  42:23
  99:11
  161:20
description
  244:16
  345:4
desired
  375:17
destroy
  219:2
destroyed
  219:12
destroying
  218:25
detail 19:19
  19:22,24
  20:3  71:14
  71:17

182:16
259:17,21
259:22
336:10,11
336:19
351:18
372:3
detailed
  108:11
  136:7
  289:3,19
  325:10
  326:6
details
  27:10
  136:21
Detection
  107:14
determin...
  92:20
determine
  44:15
  56:20
Detrick
  324:2
develop
  16:12
  44:11
  131:5
  343:5
  355:22
developed
  43:3
  265:25
  286:16
developing
  16:17
  39:16
  333:23
development
  172:2
  187:12,15
developm...
  287:19
DHS 8:8  9:8
  25:23,24
  26:1,3
  215:13,16
  220:10

308:1
311:15
312:10
320:7
322:6
324:16,23
325:8
328:12,24
329:1,7,11
329:14,20
329:23
369:3,6
DHS's 9:6
  321:5,6
DHSA's
  319:22
difference
  50:3  148:1
  148:7,11
different
  16:18  21:5
  30:5  32:7
  38:22  45:4
  45:6  46:21
  47:16  49:3
  49:25  90:9
  91:14
  108:4
  128:22
  155:13
  161:11
  216:10
  239:16
  242:11
  260:17
  262:20
  263:11
  264:17
  268:19
  279:13
  286:13
  291:6
  296:20
  324:9
  329:13,14
  335:6
  349:6
  357:22
differently

42:3  146:3
  220:6
difficult
  304:9
difficulty
  83:17
Digital 47:8
  48:21
diplomatic
  280:12
direct 15:2
  15:14
  66:10
  77:25
  79:11
  103:8
  120:1
  147:24
  148:22
  165:9
  173:1
  367:24
  371:17
directed
  276:14
Directing
  18:2
directly
  20:7  27:8
  63:24  64:4
  66:6  67:19
  110:21
  119:13
  120:7
  135:3
  159:7
  161:22
  163:3
  164:20,23
  266:8
  292:13
  307:2,10
  320:17
director
  9:13  12:9
  22:14,14
  34:9  76:5
  76:6,7,8
  77:8,9,16

77:18,20
  78:9
  244:11
  284:13
  285:2,13
  285:18,24
  286:5
  288:20
  289:22
  290:1,4,6
  291:11
  304:9
  305:6
  308:5,13
  308:13,15
  309:14
  310:1,4,11
  312:15
  313:11,14
  313:19,23
  314:11
  316:11
  335:16
  336:14
  340:5
  344:6,13
  345:4
  352:21
  367:19,25
director's
  313:21
  367:20
  368:1
directors
  50:10
  101:20
  367:19
DiResta 54:5
  70:5,20
  72:17
  116:25
  136:9
  139:7,9
  142:13
  361:20
  368:9
  369:22
  370:3
dis 5:20

**BRIAN J. SCULLY 1/12/2023**

| | | | | |
|---|---|---|---|---|
| 8:14 15:17 | 351:23 | 262:7 | 87:3 90:19 | 305:25 |
| 15:23 | **discussed** | 272:22 | 91:7,18 | 306:7 |
| 19:25 | 39:9 84:2 | 274:13 | 92:3,16 | 311:8 |
| 20:14 | 86:14 | 314:18 | 93:1,21 | 312:9,14 |
| 143:14,18 | 94:25 | 318:14 | 94:13,24 | 315:4 |
| 145:20 | 114:7 | **discussions** | 95:7,11 | 317:13 |
| 150:16 | 118:21 | 45:16 | 96:10,18 | 319:22 |
| 314:14 | 129:11 | 52:13 | 106:14,23 | 320:8 |
| 341:17 | 131:8 | 58:15 | 114:24 | 322:21 |
| 343:6,9 | 203:12 | 81:16 | 118:25 | 324:8 |
| **disclose** | 216:17 | 82:21 | 124:24 | 326:15 |
| 171:6 | 236:2,8 | 85:11 95:3 | 126:23 | 328:13,25 |
| 172:20 | 238:14 | 132:21 | 127:9,12 | 329:2 |
| **disclosed** | 239:22 | 137:3 | 130:16,23 | 331:17,20 |
| 172:19 | 240:15 | 150:14 | 138:10 | 331:24 |
| 192:3 | 247:5,8 | 151:5 | 141:22 | 332:15 |
| 193:2 | 249:12 | 178:19 | 142:4,16 | 333:15,16 |
| 242:15 | 254:8,23 | 302:25 | 147:4 | 335:20,24 |
| 243:7 | 258:25 | 305:19,23 | 149:15,24 | 336:16 |
| 276:16 | 259:2,16 | 306:3,6 | 151:8,23 | 338:1,7 |
| **disclosing** | 262:11 | 322:5,11 | 154:21 | 340:21,25 |
| 150:23 | 265:12 | 322:13 | 160:7 | 342:24 |
| **disclosure** | 266:20 | 351:21 | 169:19 | 346:12,18 |
| 150:19 | 295:14,23 | 371:14 | 172:17 | 346:22 |
| 152:21 | 306:9 | **disinfo** | 180:16 | 347:6,12 |
| 153:18 | 313:6 | 282:14,25 | 182:8 | 347:21,24 |
| **discovery** | 317:16 | 285:1,7 | 189:24 | 348:14,20 |
| 188:22,22 | 327:6 | 311:25 | 193:2 | 349:7 |
| 190:10 | 333:17 | 312:4 | 204:18 | 354:9,16 |
| 191:13 | 351:1 | 370:14 | 220:2 | 355:4 |
| 192:21 | 356:15 | **disinfor...** | 235:25 | 363:16 |
| 193:23 | 364:2 | 8:12,18 | 239:1,10 | 366:4,24 |
| 194:5 | **discussing** | 9:6,10,17 | 240:20 | 367:23 |
| 233:2 | 13:12 | 17:5,14,17 | 242:8 | 368:20,24 |
| 277:3,6 | 43:10 | 20:18 | 261:4 | 371:3 |
| **discuss** | 109:2 | 21:22 | 262:25 | **disinfor...** |
| 39:17 | 150:11 | 23:20 24:3 | 265:16 | 266:6 |
| 82:18 | 211:9 | 39:8 40:14 | 268:5 | **dismissive** |
| 85:18 | 236:25 | 41:18,21 | 278:6,13 | 335:25 |
| 133:2,4,9 | 237:4 | 42:1,8,11 | 283:4 | **dispute** |
| 136:15 | 305:24 | 42:13,14 | 284:13,15 | 246:14 |
| 142:9,13 | **discussion** | 42:17 | 284:15 | 248:4,6,7 |
| 181:10,16 | 27:18 | 43:10 | 285:18 | **disputed** |
| 182:12 | 78:15 | 56:15 | 291:25 | 223:14 |
| 236:18 | 89:18 | 57:11,21 | 300:2 | **disputes** |
| 255:7 | 171:22 | 58:17,25 | 302:4,14 | 221:15 |
| 307:16 | 236:23 | 65:4 66:16 | 302:19 | **disrupt** |
| 308:21 | 259:8,11 | 67:5,17 | 303:6,12 | 342:20 |
| 350:15,21 | 261:25 | 75:4 77:3 | 304:8,19 | **disrupting** |

**BRIAN J. SCULLY 1/12/2023**

340:14
**dissemin...**
246:23
**distinction**
81:11
148:6,13
148:16
219:9
**distribute**
115:5
**District** 1:1
1:2 2:8
10:10,10
**dive** 274:14
274:24
**divided**
90:15
**DIVINE** 3:6
**division** 1:3
10:11 33:2
33:3,15
248:20
**DM** 281:9
**DNI** 334:2
**DNI-led**
332:21
**doc** 294:9
300:8,12
**document**
15:8 69:18
72:7,11
98:19
125:2
139:6
156:23
190:20
191:4
194:8,11
194:13
195:10
198:10
207:11,12
219:20
244:1,6
249:5
250:1
251:15
252:21
271:15

276:13
277:24
280:5
282:2
284:10
294:14
295:18,21
305:15
307:6
320:15
321:4,12
330:5,7
331:22
332:16
344:5
346:7
348:2
354:5
364:17
**documents**
6:4,13
7:12,17
9:5 165:17
176:17
294:19
319:21
**doing** 18:24
19:1 40:25
41:17
43:21 46:2
46:4 47:21
49:14
55:18
58:16
68:24 69:2
74:19,20
87:6,8
90:6 106:6
108:4
120:16
121:15,20
121:24
127:24
128:24
131:10
136:12
139:14
140:16
149:10

152:10
166:10,18
169:22
170:19
173:24
174:25
181:25
190:12
196:22
197:24
211:8
216:13
222:4
226:24
231:14
241:24
242:2
252:9
266:15,21
275:23
283:10
289:20
290:16
303:19
305:12
313:1
324:12
325:2
333:24
340:6
346:4
348:12,13
349:9,12
355:19
356:11
370:4
**DOJ** 25:23
32:16,24
33:4,15,19
33:25 34:4
117:20
248:19
264:18
**domestic**
26:16,23
27:16,20
38:4,7,9
123:13
270:17,22

271:5
329:3
**domestic...**
279:10
**domestics**
123:9
**Dominion**
292:23
**downranking**
288:6
**Dr** 72:21
**draft** 9:12
321:4,13
321:17
352:20
**drafting**
43:5
189:14
**drafts**
321:18
**dramatic**
301:2
**Drazen**
186:17,21
187:17
**Dropping**
225:20
**drops** 254:19
**due** 264:4,19
**duly** 11:13
**dump** 236:7
**duplicate**
64:23
208:10,15
208:24
**duplication**
120:25
**duplicative**
210:21
212:1
**duty** 168:23
**Dynamics**
5:13

_____
**E**
_____
**E** 1:23 2:2
3:1,1,17
4:1,1,1,20
5:1,6 6:1

6:1 7:1,1
8:1,1 9:1
9:1 10:1,1
374:2,18
375:5,10
**e-mail** 7:8
7:10 8:20
9:18,20
14:13,16
14:25
66:10,15
66:25
120:7,11
120:13
129:3,9
131:18
157:1,3,5
157:12
161:4,17
162:11
175:19,23
177:6
179:12
180:25
193:13
198:21
199:7,19
201:25
202:13,20
202:22
203:1,19
204:4,10
205:6,6
206:13
208:13
210:11,16
211:6
213:25
214:1,5,19
214:24
217:15,20
217:22
223:1,12
224:1
225:7
226:11
227:18
228:11,15
228:22

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 230:7,8,11 | 14:5 | 102:8 | 367:1,5 | **educate** 25:1 |
| 230:17,17 | 188:18 | 112:23 | 368:19 | 239:18 |
| 230:24 | 294:8 | 115:1 | 370:6 | 240:12 |
| 237:23 | 334:25 | 118:21,23 | **earliest** | **educated** |
| 249:14 | **e-mails** 67:5 | 119:7 | 22:20,24 | 261:5 |
| 252:4,20 | 67:7 | 121:11 | 23:8,10 | **education** |
| 253:1,10 | 131:14 | 126:9 | **early** 22:7 | 16:13 |
| 253:15 | 156:19 | 131:4,19 | 22:23,25 | 131:5 |
| 255:19 | 166:24 | 140:9 | 49:18 | 239:14 |
| 271:25 | 168:3 | 147:22 | 53:14 | **effectively** |
| 277:20 | 170:20 | 150:10 | 63:24 64:6 | 329:2 |
| 278:19 | 171:4 | 156:22 | 70:9 83:24 | **efficacy** |
| 280:16 | 178:22 | 157:5,22 | 88:25 | 322:9 |
| 281:21 | 179:13,17 | 159:1 | 89:25 97:5 | **effort** 12:21 |
| 282:3,17 | 179:23 | 170:3 | 173:18 | 13:5,10 |
| 283:8 | 180:13,15 | 171:21 | 234:8 | 203:13 |
| 284:24 | 180:20 | 174:14 | 239:25 | 307:17 |
| 285:10 | 184:7,11 | 200:22 | 240:25,25 | 308:2 |
| 286:3 | 184:18 | 203:12 | 241:1 | 320:4 |
| 288:18 | 189:11,22 | 208:16 | 327:2 | **efforts** 8:17 |
| 291:9,20 | 192:1 | 246:10 | 336:12,13 | 18:13 96:9 |
| 294:2 | 193:7,7,9 | 255:24 | 356:7 | 118:3 |
| 296:8 | 193:21 | 257:1 | 362:11,13 | 259:14 |
| 297:10,24 | 201:3 | 263:7 | 367:6 | 302:4,14 |
| 298:24 | 202:4,4 | 264:16 | **easier** 14:20 | 302:18 |
| 299:17,25 | 203:17,23 | 265:12 | 144:9 | 303:1,1,6 |
| 301:15,18 | 213:15 | 266:20 | **Easterly** | 303:7,11 |
| 301:19,24 | 215:6 | 272:20 | 22:14 76:5 | 320:8 |
| 307:1,2 | 230:7 | 280:5 | 191:20 | 321:25 |
| 313:10 | 260:2 | 284:1 | 304:10,13 | 323:22 |
| 317:21 | 276:24 | 294:21 | 305:18 | 336:4,6,20 |
| 320:21 | 277:7 | 295:24 | 307:3,9 | **EI-ISAC** |
| 334:18 | 278:1 | 296:1 | 308:5,13 | 60:19 |
| 345:14 | 288:10 | 301:15 | 309:14 | 61:10,23 |
| 350:3,3,12 | 299:19 | 303:24 | 310:2,4,11 | 62:1,2,5,7 |
| 351:18 | 340:2 | 316:5 | 311:23 | 110:17,21 |
| 352:2,4,17 | 345:15 | 320:12 | 312:15 | 110:22,23 |
| 356:18 | **earlier** | 322:15 | 313:23 | 112:10,13 |
| 359:19 | 20:12 55:2 | 336:22 | 314:11 | 112:18 |
| 360:3,4,23 | 56:18,22 | 337:24 | 318:14 | 147:6,14 |
| 373:4 | 63:16 | 340:2 | 335:16 | 147:20,25 |
| **E-mail(s)** | 72:13 | 351:2 | 337:24 | 148:2,3,12 |
| 6:20 | 74:14 | 353:19 | 344:6,13 | 148:21 |
| **e-mailed** | 91:15 | 355:17,21 | **Easterly's** | 149:13,20 |
| 138:18 | 93:10 | 356:3 | 316:12 | 199:12 |
| 156:12 | 96:16 98:5 | 360:12,24 | 345:4 | 204:8 |
| 157:15 | 99:11,19 | 362:6 | 367:25 | 228:7 |
| 194:20 | 100:16 | 364:2 | **ecosystem** | **eight** 196:6 |
| **e-mailing** | 101:17 | 365:4 | 357:2,8 | 196:10,12 |

**BRIAN J. SCULLY  1/12/2023**

233:22
245:16
250:16
EIP 5:9 53:4
54:3 58:14
59:6 62:12
62:24
64:11,13
64:16,24
65:4,10,23
66:2,7,10
66:25 67:4
67:11,16
67:23
68:10,21
73:22 74:1
74:4 75:3
76:12
79:10,24
80:12,15
81:8,11,18
82:13 95:1
97:25 98:3
98:17 99:1
99:12,13
99:13,18
102:7,13
102:15,22
103:9,13
103:21,22
104:2,7,8
105:2,12
105:23
106:5,9,13
106:21
107:2
108:9,12
108:18
109:6,18
109:22
110:2
111:6,7,13
111:14,16
111:18
112:1,5,21
116:1,15
119:2,13
119:14
121:12,15

121:18
122:11
134:11
136:20
147:16
149:5,9
158:10,14
158:18,19
162:22
169:5
171:15
183:21,22
184:23
185:13
198:3
199:11,12
199:13,20
200:2,11
200:19
201:12
202:20
203:9
208:11,17
208:25
209:15,22
210:6,11
210:19,24
211:4,10
211:19
212:7
214:2,6
217:16
228:14
229:22
230:1,12
230:17
277:11
362:15,17
368:14
369:7,13
369:22
371:15,23
EIP's 66:14
115:14
EIP-243
158:11
EIP-spec...
169:14
200:7

EIP243
161:15
EIS 67:7
either 75:17
104:11
137:12
155:14
197:24
215:13,16
216:22
251:11
259:21
353:6
365:24
368:2
election
5:10,16
8:9,17
9:22 16:24
23:25 24:1
24:5,21
25:3,6
26:13
27:22
31:21,22
31:24 32:4
32:5 33:5
36:11 38:8
38:25 41:8
47:24 48:6
48:9,25
49:6 50:7
50:10 51:5
51:20 52:1
52:12,23
52:25
54:18,20
54:24
55:23 56:4
56:8 57:4
57:7,13,19
57:25
58:24
59:14 60:1
60:15,23
60:25 61:1
61:5 62:20
63:12,24
64:1 67:10

68:4,14
69:21,22
73:3,8,10
73:16
74:21 75:7
78:16,20
79:4,5,7
79:10,12
79:17 80:1
80:3 83:20
83:23
84:15,24
85:1 87:1
88:6,13,18
90:10,15
90:19
91:17,19
92:3 93:16
94:23 95:7
95:11 96:6
96:7,8,16
97:19
100:18,21
101:11,19
102:10
106:1,4,13
107:18
110:14
113:11
119:23
120:3,5,14
123:2
126:23,25
127:2,7,15
128:11,24
129:15,24
130:23
131:6,23
132:11
134:19
140:3,22
141:2,3
147:5,5,8
147:9
148:6
149:2,16
163:22,24
164:4,20
165:9,10

168:21
169:8
170:7,7
172:19
174:2,18
174:19
175:11,12
179:7,25
180:19
181:11
185:17
187:22
195:18
202:14
204:18
207:7,9
208:23
215:12,24
216:8,21
216:22
217:9
220:7,23
221:4
228:8
230:1
234:6,10
234:13,23
235:12
239:15
240:23,24
241:1
242:8,11
244:14
246:3
251:17
254:12,13
256:15
257:20
258:5,14
260:11,16
260:20,24
261:1,2,14
261:19,22
262:17,18
262:22,24
264:9
265:10,18
265:21
266:1,7,8

**BRIAN J. SCULLY 1/12/2023**

267:4,12
267:13,21
268:1,3,5
269:25
270:5,8,15
280:2
282:14,25
283:4,16
285:20
286:21
297:5,12
297:22
298:1,10
298:16
300:20,24
301:8
302:4,14
302:18,19
303:12,13
304:16
305:6,7
306:15
307:5,12
315:15
332:24
336:1
339:4,6
340:14,16
340:18
344:18
354:23,24
360:10
362:1,8
363:12,14
363:19
364:20
365:1
366:1,12
366:17
368:9,24
370:14
371:2
372:1
**election...**
262:9
264:22
265:9
**election...**
125:23

126:4
127:8
132:14,19
304:19
332:15
355:3
**election...**
304:5
**elections**
8:4 25:2,8
27:14
48:15
215:10
216:1
234:4,5
239:14,18
240:13
263:5
269:20
270:11
296:17
299:2
308:23
315:16
331:17
332:12
334:4
340:14
364:8
**Ellis** 1:23
2:2 4:20
10:15,15
374:2,18
**Elvis** 7:6
29:22 30:1
237:10
248:13
249:20
**emerging**
109:21
**emphasize**
372:8
**employed**
374:10
**employee**
120:2
278:20
**employees**
337:9

**employment**
196:24
**enable** 73:9
**enclosed**
375:11,13
**Enclosures**
375:25
**encouraged**
318:5
**encouraging**
128:9
**ended** 49:15
51:16
65:18,25
195:14
336:11
337:21
**ends** 19:17
**enemies**
285:22
**enforcement**
95:13
220:11
245:25
250:5,17
250:21,22
251:2
320:21
366:6,9,14
**enforcing**
289:15
**engage** 16:18
184:18
266:1
322:17
346:12,17
347:24
**engaged**
44:25
73:21
130:18
**engagement**
18:13,15
43:19 44:4
46:7 82:2
146:1
172:2,4
187:15
278:5,11

305:7
318:12
347:1,4,7
347:9,13
348:1
**engagements**
18:7,10
19:9 44:22
45:4 298:8
299:1
**engages**
171:3
**engaging**
18:10
73:17
78:20 79:4
286:21
329:14
346:21
**ensure**
253:23
**entailed**
169:13
**enter** 165:25
166:7
**entire**
174:19
180:19
194:8
195:23
219:13
357:7
**entirely**
29:8 77:1
101:20
188:11,16
261:17
295:24
363:22
**entities**
46:21 48:2
109:13
**entitled**
233:13
244:2
277:4
302:3
328:12
**entity**

204:17
324:3
369:15
**entry** 98:23
290:9
**environment**
48:15
152:1
154:6
**Erie** 217:10
**errata**
373:16
375:14,17
375:19
376:1
**erry** 281:16
**escalate**
176:3
206:2
207:25
208:2,11
226:15
292:25
297:3
**escalated**
200:11
**escalating**
158:5
295:5,20
**ESI** 276:17
276:25
**especially**
95:11
164:23
**ESQUIRE** 3:3
3:4,5,6,17
3:18 4:3
4:11 375:5
**essential**
128:6
267:16
**essentially**
17:3 18:12
19:9 28:8
40:17
41:11
43:17
45:13 47:2
54:11,14

**BRIAN J. SCULLY  1/12/2023**

57:12
59:12 62:9
67:24 85:4
86:19
117:15
154:2,7,12
155:19
263:2
291:2
294:2
305:4
323:17
348:18
358:20
**establish**
126:18
**established**
55:24
215:24
313:2
364:5
**et** 1:6,10
10:6,7
375:8,8
376:3,3
**evaluate**
23:21
**evening**
226:7,23
226:24
227:4
**event** 5:14
5:18 78:3
117:4
332:3
**events**
331:21,25
**everybody**
65:20
211:22,23
211:24
**evidence**
219:2
**exact** 85:4
86:5
129:23
134:24
190:2
307:24

331:9
**exactly**
15:21
68:24 93:5
101:21
137:15
152:15,19
221:9
275:25
307:21
337:12,20
**EXAMINATION**
5:2 11:14
**examined**
373:12
**example** 28:7
43:2 44:13
58:16 66:9
78:6
103:12
147:3
161:12
177:2
189:10
221:14
223:3,24
240:4
243:8
263:16
292:4
315:18
332:10
336:21
339:24
340:3,16
341:23
342:25
357:15
**examples**
126:10
158:11
265:2
**excellence**
141:23
142:4
149:24
**Excerpts** 7:6
**exchange**
73:10,17

73:22
292:21
**exchanges**
250:3
**excluded**
95:13
**Exclusive**
8:8
**excuse** 82:14
313:17
350:3
**executed**
249:11
377:14
**executive**
73:6 89:15
**exhibit** 5:8
5:9,11,14
5:18 6:3,4
6:13,20,22
7:3,4,6,8
7:10,12,17
8:3,4,7,11
8:14,16,20
8:22 9:3,4
9:8,12,15
9:18,20,22
9:24 13:25
14:4,4,6,7
69:7,9
138:17,20
156:13,14
168:4
170:20
173:2
179:13
190:13,16
194:19,25
197:25
198:10
212:25
213:14
227:9,12
231:15
242:12
243:22,25
249:15,17
249:22
252:3,5,12

252:15,18
255:15
259:24
269:4
277:16,19
301:20
302:1
306:18,20
309:20,23
319:15,18
328:4,7
334:19,25
335:1,6,12
345:18,20
349:15,18
349:24
350:2
352:13,16
359:13,16
363:6,9
364:11,14
365:10,13
368:3,6
369:17,20
369:23
**exhibits**
188:19
212:14
237:24
252:14,16
277:25
301:25
318:18
345:14
**exist** 166:5
**existed** 98:8
**existing**
283:13
**expand**
300:18
302:18
**expanding**
151:6,9
301:1
303:6
320:10
**expands** 8:17
302:3,14
**expect** 19:15

19:21
259:3,4
**expectation**
175:4,19
193:16
261:9
**expectat...**
247:7
**expected**
246:1,19
**expecting**
179:10
**expedited**
6:24
372:17
**experience**
318:4
**expert**
108:11
361:20
**expertise**
25:6,8
343:18
**experts**
337:25
338:7,10
343:14,21
356:4
361:5,10
361:16
**Expires**
377:24
**explain**
151:21
153:14
223:12
342:3
**explained**
71:3
**explanation**
221:19
229:13,17
**explicit**
90:18 91:5
94:22 95:6
**extensive**
152:3,3
**extent** 53:16
79:24 92:5

| | | | | |
|---|---|---|---|---|
| 94:15 | 225:5,11 | 102:9,12 | **false** 207:9 | 216:16 |
| 100:19 | 225:16 | 102:14,18 | 219:11,17 | 244:13 |
| 121:22 | 233:23 | 103:12 | 224:2 | 245:6,18 |
| 124:17 | 241:6 | 104:22 | 283:14 | 248:12,13 |
| 136:21 | 243:9 | 327:12 | 288:3 | 250:17,24 |
| 137:8 | 253:15,23 | **facilita...** | **falsely** | 251:4 |
| 141:5 | 255:20,25 | 111:25 | 280:11 | 264:18 |
| 150:19,22 | 256:2 | **facilities** | 354:24 | 270:17 |
| 153:17,21 | 271:24 | 342:19 | **familiar** | 316:2 |
| 158:20 | 272:24 | **fact** 43:1 | 15:12,13 | 366:18 |
| 184:7 | 275:4 | 55:11 | 69:17 | **FBI's** 271:6 |
| 287:20 | 284:12,25 | 76:13 87:9 | 77:23,24 | **FBI.gov** |
| 364:3,4,6 | 284:25 | 124:16 | 85:19 | 215:2 |
| 365:6 | 286:4 | 154:20 | 107:1 | **FBI/CISA** |
| **external** | 287:4,12 | 197:22 | 123:19,21 | 206:21 |
| 108:15,18 | 287:17 | 207:6 | 131:9 | **February** |
| 109:2,4,11 | 293:15 | 219:1 | 239:15 | 327:25,25 |
| 133:8,11 | 294:7 | 234:3 | 266:11 | 328:2 |
| 329:21,24 | 295:18 | 235:15 | 279:25 | 350:8 |
| 369:8,15 | 296:6 | 238:4 | 328:16,18 | **FEC** 244:2 |
| **extraord...** | 297:6 | 242:7 | 335:2 | **FED** 314:13 |
| 35:7 | 307:2,3,10 | 276:22 | 364:23 | **federal** |
| **extremely** | 307:12,14 | 277:3 | 365:19 | 16:20 21:5 |
| 192:7 | 308:6 | 288:2 | **familiarity** | 25:11 |
| **eyesight** | 309:14 | 291:2,9 | 182:18 | 31:15 37:1 |
| 297:17 | 310:6,21 | 309:15 | **far** 14:14 | 37:12 44:7 |
| | 310:25 | 348:11 | 17:25 | 55:23 56:5 |
| **F** | 311:2 | **factors** | 107:6,8 | 91:16 92:1 |
| **face** 308:25 | 320:18,20 | 339:2 | 112:17 | 92:14,25 |
| **Facebook** | 348:15 | **facts** 344:15 | 125:1 | 93:19,24 |
| 21:7 27:3 | **Facebook...** | 344:17,24 | 138:13 | 94:6,11,17 |
| 36:23,24 | 144:24 | 345:11 | 172:14 | 96:24 |
| 37:4,11 | **Facebook...** | **fair** 13:23 | 182:23 | 128:9 |
| 38:15 65:3 | 159:13 | 13:24 | 234:3 | 136:24 |
| 78:7 117:3 | **Facebook...** | 298:15 | 334:13 | 149:25 |
| 117:10,12 | 320:24 | 329:17 | **fast** 12:22 | 150:4 |
| 117:16,19 | **faced** 83:23 | 345:5 | 275:22 | 178:11 |
| 127:6 | **facilitate** | 369:13 | **FBI** 25:23 | 235:2 |
| 146:6 | 25:16 | **fairly** 36:9 | 29:10,14 | 245:24 |
| 159:7,17 | 59:25 | 57:8 | 29:19 30:6 | 246:12 |
| 159:18,22 | 74:22 | 114:15,16 | 30:15 | 250:4,16 |
| 176:15 | 103:16 | **fall** 51:17 | 117:20 | 250:21,22 |
| 217:24 | 210:21 | 51:19 | 207:1,16 | 258:3,11 |
| 218:2,7,10 | 220:19 | 170:14 | 214:19,20 | 264:5,12 |
| 218:10,12 | 263:4 | 184:4 | 214:20,21 | 267:6,8,19 |
| 218:19,23 | 264:10 | 186:8,10 | 215:1,8,13 | 286:14,20 |
| 219:4,23 | **facilitated** | 187:6 | 215:16,18 | 315:9 |
| 220:9 | 50:10 | 315:18 | 215:22,25 | 317:2,12 |
| 221:16 | 52:10 | 359:10 | 216:4,5,11 | 337:9 |

**BRIAN J. SCULLY  1/12/2023**

370:9,12
370:18,25
371:18
**feed** 155:8
**feedback**
88:14,17
294:11
361:17
**feel** 167:17
**fellow** 89:4
**felt** 16:10
235:4
**field** 215:23
215:25
216:5
**fifth** 101:4
195:9
**fight** 8:17
302:4,14
302:18
303:6,12
303:20
304:14,18
**figure** 49:20
86:6
102:19
221:17
275:12
**figuring**
274:4
**file** 116:1
**filed** 190:19
244:1
**filing**
375:21
**fill** 58:1,16
58:22
315:22
**filling**
58:20 85:1
**filter** 62:4
**final** 194:10
194:12
243:13
299:8
**finalized**
321:22
**financial**
340:23

341:11,22
341:25,25
342:4,11
343:1,4,11
343:13,18
343:22,24
355:13,16
355:20,23
356:4,5,13
374:11
**find** 62:20
108:25
143:14,17
179:23
180:7
220:24
221:13,24
222:3
224:11
315:8
329:5
375:11
**finding**
367:3
**findings**
47:6
**finds** 298:24
350:12
**finish** 113:3
**first** 6:24
12:15,16
12:19 14:7
24:12
25:21
31:14
55:16
56:25 78:6
81:25
95:14
103:2
109:11
117:15
125:21
144:11
153:5
156:25
157:17,18
185:25
187:18

202:5
213:13
224:1
228:17
233:11,11
253:5
260:3
277:5
278:2
299:11,13
299:15,23
310:5
319:9
320:2
335:23
345:15
354:7
356:11
360:4
370:22
371:16,20
**five** 38:25
180:12
181:1
192:11
201:1
243:2
276:18
282:5
319:3
330:25
**fix** 83:6
**flag** 109:21
110:1
192:2
251:18,18
281:3
297:3
320:17
364:20
365:1
**flagged**
116:12
177:9
206:6
288:12
292:22
**flagging**
21:21

67:17
180:16
207:21
291:17,18
295:5
**Fleischman**
4:11  11:4
**flexibility**
330:15
**flip** 117:22
**flipping**
109:10
**floor** 267:24
**flows** 105:17
106:19
110:22
357:20,22
**focus** 13:22
59:1
330:15
354:8,20
355:3
357:19,25
**focuses**
331:16
**focussed**
61:1
**foggy** 22:19
101:6
**Foley** 71:10
**folks** 29:17
46:22 52:6
52:11
58:11 70:2
70:3 83:23
85:5,20
104:5,23
147:20
165:18
188:25
234:18,20
264:9
267:13
327:15
**follow**
137:21
197:22
287:24,25
289:3

308:7
352:2
**follow-up**
13:19
116:8
**followers**
206:8,17
207:22
**following**
65:18
89:16
115:6,13
115:17
191:14
199:12
203:7
253:24
290:13
291:1
**follows**
11:13
299:24
**force** 12:5
118:1,7
130:2
271:6
312:3
330:15
348:13
**foregoing**
373:12
374:4,5
377:6,13
**foreign** 12:5
26:15,21
39:21 41:9
45:2,9,9
45:14,18
117:25
118:7
122:13
123:3,9,13
130:1
256:20
259:13
271:6
323:18,22
329:3
330:14

**BRIAN J. SCULLY  1/12/2023**

348:13
364:18
**Forensic**
48:22
**forget** 29:17
54:7 102:1
116:22,23
155:13
174:4
186:1
214:4
286:16
307:23
**forgetting**
167:18
**forgot** 30:1
**form** 116:17
148:8
228:18
347:1,4
359:5
377:7
**formal**
234:16
**formalized**
142:15
320:16
**formally**
276:12
**formation**
318:20
**formed** 58:12
73:9
**former**
304:15
**forming**
100:8,10
**Fort** 324:2
**forth** 27:4
127:6
144:20
370:19
**forum** 45:2
**forward** 13:3
13:13 17:6
63:25
106:12
123:5
129:8

159:16,21
168:6,10
175:14,18
175:24
205:16
216:16
217:23
220:2
231:1
259:9
280:25
281:23
336:25
**forwarded**
17:21 24:3
119:11
131:14
135:4
137:13
159:7
178:4
180:20
184:8
189:23
193:2
200:19,20
206:16
207:24
218:1,18
226:7
229:16
281:12,15
281:22
366:20
**forwarding**
23:25 67:8
67:9
134:25
175:6,20
179:25
183:15
184:11
192:1
202:24
205:11
217:7
242:10
278:4,6
291:24

**forwards**
205:5
217:22
**found** 153:3
328:23
**foundation**
39:2 80:5
122:22
145:11
149:18
178:15
196:1
197:2
204:24
214:23
233:25
244:21
245:8,12
304:21
313:8
333:19
350:24
353:25
354:13
355:6
356:22
359:23
361:14
**foundati...**
304:3
**four** 12:1
19:8 31:18
35:24
48:13,13
48:16,17
48:24
89:20 90:1
105:12
110:7
111:11
112:22
113:24,25
141:16,17
184:22
185:12
192:11,25
214:21
250:8,12
256:4

269:19
276:23
**fourth** 44:11
90:5
185:22
249:5
251:16
321:3
364:16
**frame** 99:17
220:5
**framework**
44:14
**Frameworks**
47:8
**framing** 42:7
**fraud** 341:17
**frequency**
31:19
**frequent**
31:20
**frequently**
39:4 64:4
**Friday**
291:17,20
291:21
292:1,6
293:17
304:10
**front** 187:2
328:8
**frozen** 82:24
82:25
**full** 11:17
69:4 80:9
261:8
264:3
342:20
**full-time**
170:10
330:19,25
**fully** 148:16
**fun** 291:21
**function**
25:2 63:17
63:20
161:20
163:18
189:23

193:4,6
265:5
270:12
**functioning**
341:21
**functions**
304:4
354:21
355:10
**fund** 110:23
**funded** 61:8
89:21
**funding**
61:10,12
61:23 62:1
149:1,2
303:9
368:21
**funds** 110:18
337:17
**funky** 299:18
**further**
31:20
102:6
221:17
307:16
318:14
332:9
347:10
**fuse** 5:9
141:3
**future**
367:15,19
367:21
368:1
**fuzzy** 81:11
**FYI** 199:20
**FYSA** 199:11

---
G
---
**G** 10:1
**G-e-o-f-f**
308:18
**G7** 44:25
45:12
**GAC** 316:5
**Gadde** 360:14
360:14
**gaining**

**BRIAN J. SCULLY 1/12/2023**

| | | | | |
|---|---|---|---|---|
| 229:4 | 108:20 | 231:10,18 | 371:10 | 25:14,15 |
| **gap** 49:21 | 111:8 | 231:21 | 372:7,20 | 27:7,10,17 |
| 52:6 56:24 | 115:9,15 | 242:18,22 | 372:21,23 | 29:20 |
| 57:1,12,17 | 115:20 | 244:20 | 373:2,5 | 33:21 36:6 |
| 57:18 58:2 | 116:17 | 245:7 | 375:5,10 | 37:8,19,21 |
| 58:16,20 | 118:16 | 249:16,19 | **gateway** | 38:10,16 |
| 58:23 | 122:21 | 252:7,11 | 123:19,23 | 38:19 41:4 |
| 74:18 | 125:6,9 | 252:19,24 | 124:23 | 41:21,22 |
| 83:22 84:4 | 126:5 | 253:2,4,7 | 125:18,22 | 44:21 |
| 84:6,8,9 | 130:19 | 253:12 | 126:3 | 52:21 57:5 |
| 84:11 85:2 | 138:22 | 255:16 | **gathered** | 59:1 64:7 |
| 85:5,21 | 139:2 | 258:6 | 107:19 | 65:5 67:20 |
| 86:14,21 | 142:6 | 262:2 | **gathering** | 68:13 74:2 |
| 86:22 87:1 | 145:3,6,10 | 271:10,17 | 107:15 | 79:19 |
| 87:9 91:14 | 146:16 | 273:1 | **GEC** 111:3 | 80:18,19 |
| 91:16,18 | 148:8 | 276:3 | 280:1 | 80:23 |
| 92:1,14,23 | 149:17 | 277:13,21 | **Gegovich** | 83:18 94:4 |
| 93:8,10,15 | 150:18 | 283:21 | 141:13 | 107:5,7 |
| 93:18 94:5 | 152:20 | 294:16,23 | **general** 4:12 | 119:7,13 |
| 94:10,17 | 153:7,17 | 298:11 | 21:2 32:22 | 128:2,7,22 |
| 96:15,23 | 155:25 | 302:6,10 | 39:14 | 143:12 |
| 98:7 99:10 | 156:8 | 304:20 | 49:22 60:3 | 153:14 |
| 111:22 | 161:25 | 306:21 | 62:16 | 163:21 |
| 368:19 | 178:14 | 310:12 | 124:14,16 | 176:23 |
| 370:5,12 | 179:21 | 313:7 | 133:1 | 177:16 |
| **gaps** 57:6 | 181:2,8 | 316:19 | 141:6 | 178:18 |
| 96:23 | 183:3,10 | 318:21 | 145:20 | 193:18,19 |
| 315:22 | 185:7 | 319:8 | 235:7 | 212:11 |
| 372:1 | 190:21,24 | 324:24 | 238:12 | 215:11,22 |
| **Garcia-C...** | 194:14,21 | 333:18 | 240:17 | 220:14 |
| 186:3 | 195:25 | 334:20 | 247:15 | 222:5 |
| **Gardner** 3:17 | 196:4 | 335:1,4,8 | 266:13 | 233:14 |
| 10:24,25 | 197:1 | 339:13,19 | 268:14,22 | 234:2,23 |
| 14:12,19 | 198:5,22 | 341:6 | 328:12 | 235:7 |
| 23:2,5 | 199:3 | 344:7,10 | 330:16 | 239:23 |
| 34:15,18 | 201:4 | 344:25 | 346:19 | 257:6 |
| 35:4 53:1 | 202:15 | 345:6 | 348:19 | 258:21 |
| 69:11 | 204:12,20 | 349:25 | 358:17 | 263:10,12 |
| 71:20 72:3 | 204:23 | 350:23 | 371:19 | 264:25 |
| 77:10,19 | 212:2,17 | 351:15 | **General's** | 278:17 |
| 80:4 87:16 | 212:21,23 | 352:7 | 3:7 10:20 | 288:13 |
| 90:25 92:4 | 213:6 | 353:24 | 10:23 | 293:19,22 |
| 92:17 93:2 | 214:22 | 354:12 | 35:10 | 304:2 |
| 93:22 | 215:3 | 355:5 | **generality** | 309:4 |
| 94:14 | 226:25 | 356:21 | 153:22 | 315:23 |
| 95:20,24 | 227:14,19 | 358:14 | 154:10 | 325:19 |
| 96:25 | 227:22 | 359:5,22 | **generally** | 333:5,6,22 |
| 97:20 | 228:18 | 360:19 | 15:21 16:7 | 340:10 |
| 98:11 | 230:19 | 361:13 | 24:24 25:7 | 343:14 |

**BRIAN J. SCULLY  1/12/2023**

349:5
357:18,19
359:7,11
366:16
369:8
**generate**
159:24
**generic**
100:6
**generically**
155:6
358:7
**gentleman**
310:6
**Geoff** 22:11
25:14,25
28:4,10
53:23 54:1
75:25 76:2
130:5,5
191:21
253:17
270:2,3
308:18,19
309:17
333:5
350:4
353:20
360:23
**George**
279:20,22
**Georgetown**
46:24
**getting**
40:18
100:2
102:18
109:4
125:10
203:22
208:16
220:19
228:9
293:4
299:8
344:1
345:14
**gist** 54:14
**give** 12:24

13:1 40:3
50:17,19
87:5
136:17
190:1
210:8
214:16
282:6
283:11
284:2,5,6
339:24
345:23
346:1
**given** 12:12
373:14
**gives** 272:4
**giving** 27:6
55:20
270:20
**Gleicher**
310:17,18
311:22
312:16
**global** 278:5
278:11
**globally**
236:21
255:8
273:11
**go** 12:17
13:3 15:1
34:22
53:12
61:16 83:2
83:5,5,7
88:22
113:3
120:17
124:8
125:6
127:13
152:17
165:17
182:21
183:4
186:10
188:4
191:3
195:4

197:25
198:9
209:4,6
210:1
215:21
217:2
218:14,15
221:3,7,23
222:10
231:22
241:10
253:4
256:24
257:10
266:25
271:10
273:8
274:20
275:2,22
276:11
277:19
279:15,16
288:5
289:24
294:4
302:10
315:8
330:4
332:9
333:13
342:14
348:6,17
349:6
350:2
362:20
364:16
365:16
370:1
**goal** 54:22
347:19
**goes** 13:13
19:12 62:2
62:3,3
90:16
94:19
95:10
109:20
110:21
158:9

200:13
210:1
242:21
254:15
299:6
304:12
312:21
338:15
357:5
369:1
**going** 14:9
14:11 15:1
20:4 21:16
27:2 31:12
32:13
39:22
48:14
50:17,19
50:24
54:16 56:1
77:24
89:14
102:20
122:2,5
125:1
138:16
140:5,24
144:6
156:10
162:8,12
166:20
167:11
172:20
173:9
179:3
181:3
183:24
184:2
193:13
198:23
208:4
209:20
211:10
212:14
218:15
220:11
229:2
230:24
233:7

238:18
249:14
254:4
259:9,24
262:4,21
263:5
270:4
271:11,16
277:4
288:16
290:11
296:18
298:20
301:24
302:19
307:20
334:9,15
334:24
336:15
358:3
**good** 29:24
56:14,21
66:20
109:1
134:13
140:11
163:6
181:4
247:14
271:12
276:3
279:6,10
282:4
284:23,25
286:5
330:6
331:12
341:23
346:16
**Google** 38:16
144:18
233:23
350:5,16
**Google-s...**
161:5
**Gotcha** 79:22
126:15
141:18
218:11

| | | | | |
|---|---|---|---|---|
| gov@twit... | 318:6 | 325:16 | 9:1 | 312:4 |
| 300:5 | 320:17,20 | 326:3,6,13 | H-i-c-k-e-y | handle 215:5 |
| governance | 320:25 | 326:16,17 | 33:17 | 265:1 |
| 312:22 | 348:22,23 | 359:19 | hack 236:6,7 | 281:8 |
| government | 348:25 | 368:15 | 236:14,18 | handling |
| 9:16 21:4 | 369:2 | groups 16:19 | 237:4,14 | 31:5 312:5 |
| 24:14 28:1 | 370:13 | 38:12 46:8 | 246:1,13 | happen 62:15 |
| 38:6 40:4 | 371:1,18 | 47:10,13 | 247:7,21 | 219:25 |
| 40:13 41:2 | 372:7 | 50:7 110:8 | 250:18,24 | 241:15 |
| 44:7 45:14 | governme... | 111:12 | 251:12,22 | 256:15 |
| 45:14 | 94:6,11,17 | 349:7 | 254:17,22 | 315:21 |
| 55:23 61:3 | 109:25 | grow 336:15 | 255:2,11 | 351:4 |
| 73:10,16 | 178:23 | 336:20 | 255:11 | happened |
| 73:20 75:3 | 194:5 | guess 19:8 | 274:9 | 100:25 |
| 78:6 90:16 | 257:25 | 66:1 76:6 | 275:6,13 | 101:7 |
| 90:17 91:4 | 339:7 | 104:25 | 275:15,19 | 106:22 |
| 91:16 92:2 | governments | 111:17 | hack/leak | 139:23 |
| 92:25 | 45:9 | 203:5 | 272:10,17 | 168:17 |
| 93:20,24 | 105:22 | 227:4 | 274:24 | 210:10 |
| 94:21 95:5 | 323:18 | 269:3 | hacker | 229:8 |
| 105:13,16 | 369:4 | 290:10 | 274:11 | 246:15 |
| 105:17,21 | graduated | 307:11 | hacking | 265:8 |
| 106:20 | 172:14 | 348:12 | 246:21,22 | 268:11,17 |
| 109:12,16 | 182:25 | guidance | Hale 22:12 | 293:19 |
| 110:5 | grant 61:14 | 22:14 | 25:14,25 | 301:14 |
| 117:14 | grants 61:12 | 216:21 | 28:4 53:23 | 337:20 |
| 127:23,24 | graphic 43:2 | 358:18 | 54:1 75:25 | 351:8 |
| 128:9 | 105:12 | guy 263:16 | 191:21 | happening |
| 132:5 | 107:13 | guys 63:9 | 253:17 | 117:1 |
| 135:4 | 108:8 | 173:23 | 270:2 | 253:9 |
| 137:13 | 110:8 | 179:16 | 308:19 | 268:22 |
| 140:14 | 330:9 | 185:7 | 309:17 | happens |
| 142:3 | Graphika | 216:13 | 350:5 | 36:22 |
| 146:24 | 47:13 48:3 | 226:23 | 353:20 | 176:13 |
| 149:25 | 48:19 | 249:21 | 360:23 | 264:21 |
| 150:4 | grateful | 264:24 | half 271:23 | 279:9 |
| 153:2 | 294:10 | 265:4 | 273:15 | 323:18 |
| 156:20 | gray 310:5 | 303:19 | hammer 286:6 | 347:17 |
| 179:10 | great 295:3 | 344:8 | 286:11 | happy 14:24 |
| 221:19 | ground 12:18 | 366:8 | 288:2,21 | 307:14 |
| 236:25 | grounds | Gwinnet | 340:3,7 | 312:16 |
| 244:18 | 152:21 | 228:6 | hammer/s... | harassment |
| 257:7,17 | 155:25 | Gwinnett | 289:21 | 8:9 50:24 |
| 257:22,23 | group 47:14 | 228:24 | 291:10 | hard 27:7 |
| 258:1 | 76:23 89:6 | 229:12 | Hampshire | 86:6 |
| 275:8,12 | 111:7 | | 299:12,22 | 177:11 |
| 286:20 | 197:12 | **H** | hand 374:14 | 178:7 |
| 314:2,10 | 233:8 | H 5:6 6:1 | handing | 180:2 |
| 317:24 | 325:7,14 | 7:1 8:1 | 174:5 | 293:18 |

**BRIAN J. SCULLY  1/12/2023**

305:16
337:6,11
359:25
**harder**
340:18
**harms** 342:12
342:13,15
**Harvard**
46:22
**Hawaii** 2:3
**head** 12:25
13:3  130:1
241:20
**headed**
117:12
**header**
199:24
205:18
226:11
282:23
297:23
**header's**
297:16
**heading**
122:10
**headline**
302:13
319:25
**heads** 210:8
284:3,5,6
311:15
**health**
136:24
322:16
355:13
**hear** 257:24
327:8
334:21
344:8
349:6,8
**heard** 22:11
134:6
145:15,17
263:8
277:5
**hearing** 65:3
124:6,11
290:23
**heavy** 367:12

**height** 331:6
331:10,12
**heightened**
126:22
**held** 2:1
10:12
**help** 16:14
44:14,17
100:20
131:6
210:4
216:8
220:4
260:19
261:22
307:17
316:8
322:16,18
323:5
324:10
343:5
355:23
356:6
358:18
**helpful**
155:21,24
162:12
299:3
300:9,12
**helpfully**
220:24
**helping**
58:22,23
100:17
187:12
324:7
358:2
**helps** 43:18
43:18
44:11
90:24
263:20
317:23
**hereunto**
374:13
**hesitant**
317:25
**hey** 14:12
27:2  86:25

139:13
179:2
208:9
224:6
226:19
257:17
259:2
**HHS** 135:12
140:12
322:18
323:10
**Hi** 161:4
228:7
283:10
350:11
**Hickey** 33:12
**high** 3:9
153:22
154:9
337:3
**high-level**
25:18
27:11  40:5
257:3
**higher** 37:22
130:12
296:5
**highlight**
305:16
346:9
**highlighted**
150:5
**highligh...**
98:25
**Hill** 8:11
335:17
**historic...**
259:8
**hoax** 219:13
**hoes** 281:10
**hold** 138:22
139:2,3,3
185:7
186:18
190:22,24
212:24
231:18,21
242:18,19
242:22

253:9
277:21
302:8,8
344:7
**holiday**
373:6
**Homeland**
4:13  11:5
11:23
244:13
245:3,17
320:3
321:5,13
321:15
**hone** 359:8
359:11
**honest** 65:17
91:21
113:20
135:2
148:15
177:24
216:14
259:19
261:16
322:25
**honestly**
22:17  29:6
54:7
124:20
176:18
303:18
**hope** 158:5
283:10
291:22
298:23
350:11
**hosted** 117:5
**hosting**
160:18
**hour** 319:7
**hours** 175:16
177:9
181:3
271:11
349:23
**House** 140:4
140:19
**housed**

141:23
142:4
149:24
150:3
**HSH** 322:23
**human** 28:21
34:9
340:15
**hundred**
26:18
137:17
169:16
**Hunter**
247:21,24
248:14
**hyper** 357:10
358:12
359:3
**hypothet...**
339:14,21
343:25
**hypothet...**
339:16
344:2

| I |
| --- |

**I-S-A-C**
59:21
**I&A** 26:8
27:8  28:14
28:22
264:18
332:12,18
**I&P** 56:25
**IA** 26:4
**idea** 17:19
47:17  49:9
50:14
51:11
57:25  58:2
58:12  84:3
84:10,13
84:24
89:19  90:8
108:3
109:1
132:16
171:15
184:23

**BRIAN J. SCULLY  1/12/2023**

185:5,13
185:21
192:23
215:23
257:1
261:13,13
346:19
371:23
identifi...
14:1 69:8
138:21
156:15
190:14
195:1
213:1
227:10
243:23
249:23
252:6
277:17
301:21
306:19
309:21
319:16
328:5
335:13
345:21
349:16
352:14
359:14
363:7
364:12
365:11
368:4
369:18
identified
57:6 85:4
191:14
192:9
193:22,24
233:10
276:24
288:7
361:4
identify
17:4 27:20
37:25 38:7
38:9 44:9
57:10,15

59:3 60:13
87:3 89:24
233:4
314:21
361:15
370:10,13
identifying
191:11
210:21
232:24
370:5
IG 285:7,8
Illinois
299:12,22
image 154:13
154:14
images
330:10
imagine
180:21
208:18
209:23
221:3
268:9
274:19
immediate
176:14
314:7
immediately
110:4
195:17
205:10,17
293:16
immigration
220:10
impact 152:8
154:4
158:4
313:1
332:3
340:13,16
340:21
343:7
imperson...
206:22
207:8
impetus
356:11
implement

141:22
149:23
364:7
implemented
363:19
implemen...
118:2
implies
222:4
implying
339:10
imposter
205:23
206:7
in-authe...
239:5
in-person
295:15
inaccurate
321:9
inauthentic
41:23 42:3
42:10,15
115:1
inbox 194:23
212:20
227:13
302:2
319:18
inboxes
189:11
192:21
incident
144:19
218:19
221:19
236:10
264:11
incidents
109:21
110:1
268:8
include
18:16
50:25
109:12
232:9
295:19
300:1,19

301:5
308:22
327:18
332:7
339:3
included
39:21
99:16
111:21,25
112:4,5
225:5
235:14
247:17
276:18
301:10,16
309:13
includes
45:3 48:2
61:4 72:16
254:16
293:23
357:8
including
67:15
206:7
246:24
277:8
304:14
312:13
321:24
354:22
359:2
370:22
371:16
incorrect
119:15
increase
336:24
increasing
150:15
154:4
incredibly
304:9
independ...
60:7
316:14
317:3
indicate
54:19

196:12
375:16
indicates
192:22,23
253:19
278:3
280:9
291:9
indication
153:2
indicator
42:19
individual
134:24
193:15
258:23
individu...
241:22
individuals
35:15
38:12
179:24
180:12
246:19
Indraneel
3:18 11:5
Indranee...
3:24
industry
21:4,7
31:15 78:7
117:14
132:5
179:2
233:13,17
233:19
237:2
243:18
244:13
245:15
253:20,21
254:2,15
254:21
255:21
256:1,8,13
257:5,7,8
257:17,22
257:24
260:8

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 262:9 | 179:25 | 154:1,5 | 320:18 | 230:1 |
| 297:25 | 193:10 | 265:25 | **instances** | 280:2 |
| 343:1 | 207:9 | 269:20,25 | 200:18 | 283:12 |
| **industry...** | 220:3,7,17 | 270:5,8,9 | **institut...** | 341:19 |
| 216:18 | 220:20,22 | 270:15 | 97:8 100:3 | 360:11 |
| **inference** | 220:22 | 309:6,7 | 355:11 | 362:2,9 |
| 245:22 | 222:19 | 322:15,17 | **instruct** | 368:9 |
| **influence** | 223:5,14 | 322:20 | 35:5 | **intel** 259:12 |
| 12:5 26:15 | 224:11 | 323:6 | 150:21 | 332:25 |
| 117:25 | 225:19 | 327:3,13 | 152:23 | 333:9,11 |
| 118:7 | 226:8 | 327:13,16 | 153:20 | 333:22 |
| 130:1 | 254:19 | 331:18 | 156:1 | 334:15 |
| 271:6 | 258:11 | 332:2,4,6 | **instruction** | **intellec...** |
| 309:1,8 | 263:4 | 332:7 | 51:2 | 286:21 |
| 330:14 | 264:10 | 338:17,18 | 167:14 | **intellig...** |
| 348:13 | 278:23 | 338:19,23 | 339:17 | 25:18 26:2 |
| 350:15,22 | 279:11,14 | 339:1,3,5 | **instruct...** | 34:9 36:7 |
| 351:14 | 280:8 | 339:6,12 | 156:9 | 36:8 39:20 |
| 356:20 | 283:15,25 | 340:9,12 | **intake** | 95:15 |
| 364:18 | 287:20,21 | 340:22 | 105:17,23 | 235:4 |
| **informal** | 289:3 | 341:1,2,4 | 107:14 | 244:12 |
| 136:4 | 290:22 | 341:13 | **integrity** | 246:19 |
| **information** | 291:5 | **infrequent** | 5:16 48:7 | 257:2 |
| 35:7 39:22 | 300:25 | 32:1 | 48:10,25 | 258:17,18 |
| 40:5,11 | 301:5 | **initial** 52:4 | 49:7 51:5 | 258:20 |
| 45:24,25 | 315:13,16 | 58:14 | 51:20 52:1 | 332:14,22 |
| 48:15 | 315:22 | 86:10 | 52:23 | **intended** |
| 59:15 60:4 | 321:9 | 89:19 | 57:25 68:5 | 283:15 |
| 60:6,16,22 | 323:4,9,15 | 117:13 | 69:21 73:3 | **intending** |
| 73:9,17,21 | 326:12 | 223:5 | 73:8 75:7 | 252:8 |
| 74:1,4,6,7 | 336:2 | 241:9 | 78:16 79:6 | **intensive** |
| 74:9 78:21 | 339:9 | **initially** | 79:7 80:3 | 62:19 63:8 |
| 79:5 82:16 | 357:2,7 | 101:15 | 83:20 | 166:11 |
| 87:5 90:15 | 359:2 | **initiative** | 84:25 88:6 | 173:23 |
| 94:7 | **informat...** | 9:22 90:11 | 88:13,18 | **interact** |
| 105:23 | 17:11 | 316:5 | 97:19 | 278:24 |
| 115:7 | 270:9 | **Injunction** | 107:19 | 279:2 |
| 121:21 | **informed** | 6:25 | 126:25 | 310:20 |
| 137:21 | 72:20 | **inoffensive** | 127:7 | **interacting** |
| 140:20 | 143:21 | 311:5,6,10 | 128:11 | 314:20 |
| 147:6,7,16 | **infrastr...** | **inputs** 109:8 | 132:11 | **interaction** |
| 148:5 | 4:6 12:10 | **inquiry** | 134:19 | 75:10 |
| 150:20,23 | 15:24 16:6 | 208:8 | 141:3 | **interact...** |
| 151:25 | 16:9 59:15 | **Inspector** | 147:8 | 24:10 |
| 152:22 | 60:15 61:1 | 328:12 | 168:21 | 51:25 75:7 |
| 153:18 | 110:14 | **Instagram** | 181:11,15 | 117:10 |
| 154:6 | 137:24 | 146:7 | 200:16 | 121:16 |
| 165:2,8 | 141:24 | 217:11 | 202:14 | **interagency** |
| 166:8 | 147:5 | 285:10 | 228:8 | 18:11 |

| | | | | |
|---|---|---|---|---|
| 36:25 37:1 | 196:14 | 153:16 | 170:6 | 263:3 |
| **Intercept** | 200:1 | 169:12,15 | 187:8 | **involve** |
| 9:4 319:20 | **intern's** | 169:20 | 370:5 | 60:22 |
| **interest** | 182:20 | 170:1,16 | **internships** | 245:15 |
| 9:25 44:10 | **internal** | 172:8,11 | 51:13 | 247:21 |
| 47:4 | 108:12 | 172:11 | 89:22 90:7 | **involved** |
| 159:14 | 120:13 | 182:14 | **interpret** | 16:8 21:19 |
| 161:6 | 133:7 | 185:17 | 275:6 | 21:21 |
| 341:3,5 | 155:20 | 186:11,14 | 371:7,8 | 25:12 26:1 |
| 374:11 | 165:17,21 | 186:23 | **interpre...** | 48:6,20,22 |
| **interested** | 329:20,23 | 188:5 | 239:4 | 51:5 56:4 |
| 27:13 | **internally** | 195:11 | 257:21 | 61:5 73:2 |
| 56:19 | 58:21 | 196:18 | **interpreted** | 75:6 78:2 |
| 143:13 | **internat...** | 201:25 | 257:14 | 80:14,16 |
| **interesting** | 44:4,20,22 | 361:22 | **interrog...** | 80:16 |
| 116:3 | 44:24 | 362:3 | 6:25 192:3 | 81:24 82:3 |
| 192:7,17 | 338:25 | 363:12 | **interrog...** | 82:6,7 |
| 192:18 | **internet** | **interning** | 189:14 | 88:10 |
| 317:25 | 50:6 51:8 | 196:19 | 190:18 | 97:24 |
| **interest...** | 51:10,23 | **interns** 49:9 | 231:16 | 100:3 |
| 122:11 | 52:5,11 | 49:15 | 242:15 | 101:22 |
| 355:17 | 58:9,11 | 50:13,16 | 243:7 | 102:5,9 |
| **interfer...** | 59:7,9 | 50:18,25 | 353:2 | 104:15 |
| 45:2 83:2 | 61:7 62:24 | 51:4,12,13 | **interrupt** | 113:6 |
| 83:3 | 63:19 | 51:14,16 | 13:6 178:1 | 114:9 |
| 122:14 | 64:19 | 51:16,18 | **intersti...** | 117:20 |
| 286:22 | 67:14,21 | 51:19 52:4 | 228:5 | 134:18,19 |
| **interloc...** | 70:15,21 | 57:3 58:4 | **interval** | 134:21,22 |
| 310:5 | 72:16 | 58:20 75:9 | 125:19 | 153:15 |
| **intermit...** | 76:15 78:5 | 84:2,3,11 | **intervening** | 168:3 |
| 31:13 | 78:9 79:14 | 84:20,22 | 89:2 | 169:18 |
| **intern** | 79:17,21 | 84:23 86:7 | **interview** | 170:19 |
| 166:19 | 79:25 80:2 | 86:7,14,20 | 345:23 | 172:10,17 |
| 167:9,10 | 80:17,21 | 86:25 87:4 | 346:1,3,5 | 180:12,14 |
| 167:12 | 80:24 81:6 | 94:25 98:6 | **introduce** | 184:10 |
| 168:22 | 81:13,17 | 170:5,9,10 | 10:18 | 188:20,21 |
| 169:3,4,7 | 82:2 83:24 | 170:12,18 | **introduc...** | 189:13 |
| 169:21,23 | 85:6 89:4 | 171:15 | 126:16 | 192:1 |
| 170:24 | 89:7,11,20 | 184:23 | **invaded** | 207:7 |
| 171:2,7,8 | 101:14,21 | 185:13,20 | 325:7 | 211:18 |
| 172:16 | 101:25 | 187:5,22 | **investig...** | 215:9 |
| 179:19 | 104:18,22 | 197:23 | 366:19 | 232:24 |
| 182:11,13 | 110:18 | 198:2 | **investig...** | 245:13 |
| 182:21 | 112:6,11 | 368:15 | 255:10 | 256:4 |
| 183:14,20 | 117:6 | 371:23 | **invitation** | 280:1 |
| 185:22,25 | 119:9,20 | **interns'** | 153:8 | 312:8,11 |
| 186:5 | 129:11 | 57:25 | **invite** 55:12 | 318:19 |
| 187:11,13 | 142:25 | 58:14 | 55:17 | 327:16 |
| 188:2,8 | 147:18,21 | **internship** | **invites** | 334:17 |

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 360:10,24 | 269:19 | **job** 1:21 | 332:12 | 262:13 |
| 361:25 | 270:16 | 11:20,25 | **joint** 207:16 | **jumping** 73:5 |
| 362:4,11 | 272:9 | 12:8 15:19 | 233:8 | 203:25 |
| 362:19 | 290:7 | 18:10 | 253:21 | 204:5 |
| 366:13 | **items** 30:18 | 115:24 | 254:2 | 261:24 |
| **involvement** | 30:22,23 | 116:1 | 307:22 | 269:4 |
| 49:6,8 | 34:5 | 314:7 | **Joseph** 1:9 | **June** 5:17 |
| 192:19 | 268:15 | 342:23,24 | 4:20 10:7 | 55:4 86:10 |
| 371:18 | 272:21 | 347:16 | 11:18 | 86:17 |
| **involves** | _____ | **jobs** 340:19 | 375:8 | 195:14,19 |
| 59:21 | **J** | **John** 3:3 | 376:3 | 196:13 |
| 81:12 | **J** 1:14 2:1 | 10:19 | **Josh** 3:6 | 345:24 |
| **involving** | 5:2,8 6:3 | 14:12 | 10:24 | 352:21 |
| 156:20 | 7:3 8:3 | 34:18 54:7 | **JOSHUA** 3:17 | **June/July** |
| 278:1 | 9:3 11:12 | 82:23 | 375:5,10 | 86:12 |
| **Iowa** 214:13 | 375:12 | 125:10 | **Joshua.e...** | **junior** 10:7 |
| 214:17 | 376:2 | 138:23 | 3:23 | 43:16 |
| **Iranian-...** | 377:5,20 | 139:2,3 | **Josiah** 42:22 | **jurisdic...** |
| 285:22 | **Jack** 9:24 | 145:7 | 166:18,24 | 17:6 |
| **Isabella** | 188:7 | 167:19 | 179:18 | 114:18 |
| 185:25 | 195:3,5 | 179:19 | 184:14 | 220:16,17 |
| 186:3 | 196:17,20 | 184:14 | 191:24 | 221:11,22 |
| **ISAC** 59:14 | 197:18 | 185:10 | 192:12 | 222:1,5,13 |
| 59:16,21 | 198:1 | 191:25 | 276:20 | **jurisdic...** |
| 60:14,15 | **January** 1:15 | 192:12 | **journalist** | 57:11,17 |
| 60:16 | 10:3 12:2 | 194:21 | 280:10 | 57:22 87:4 |
| 110:15 | 19:20 | 198:12,22 | **JR** 1:9 375:8 | **justice** 3:19 |
| **issue** 208:15 | 71:16 | 212:17,17 | 376:3 | 11:1,6 |
| 289:2,22 | 88:24 | 213:7 | **July** 86:17 | 322:1 |
| 324:13 | 195:19 | 227:19 | 98:25 | 324:11,13 |
| **issued** 222:1 | 196:13 | 231:19 | 104:25 | 324:15 |
| 310:9 | 307:11 | 232:1 | 269:6 | 375:5 |
| **issues** 21:22 | 330:13 | 242:19,24 | 271:24 | _____ |
| 34:21 71:4 | 374:14 | 249:16 | 272:6 | **K** |
| 130:24 | 375:3,12 | 252:7 | 274:18 | **K-theore...** |
| 163:8 | 376:4 | 253:7 | **jump** 89:14 | 240:5 |
| 234:24 | **JCDC** 307:17 | 271:10 | 122:2 | **Kaitlin** |
| 235:24 | 307:19 | 276:20 | 125:1 | 141:13 |
| 237:14 | 309:9 | 302:7 | 126:11 | **Kansas** |
| 239:1 | **Jefferson** | 318:21 | 144:6 | 375:21 |
| 310:21 | 3:11 | 334:20 | 146:20 | **Kate** 72:21 |
| 315:14 | **Jen** 191:19 | 371:11 | 162:5 | 87:25 |
| 317:14 | 304:9 | **John.sau...** | 173:2,8 | 360:4 |
| 318:6,15 | 307:2 | 3:13 | 271:9 | **keep** 180:18 |
| 324:9 | 311:23 | **join** 38:18 | 288:15 | 185:8 |
| 342:8 | **Jessica** 4:3 | **joined** 10:21 | 293:14 | 271:15 |
| 349:12 | 11:3 | 35:11 | 297:7 | 290:3 |
| **item** 247:13 | **Jessica....** | 36:15 | **jumped** 33:12 | **Kent** 3:5 |
| 258:24 | 4:9 | 76:14,15 | 160:13 | 35:9 |

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| **kept** 165:15 | 99:19,24 | 242:1 | 42:6 43:1 | 104:20,21 |
| 190:6 | 100:8,10 | 246:6 | 46:13 47:7 | 104:22,24 |
| **key** 16:13 | 104:8 | 255:25 | 47:10,10 | 105:5,20 |
| 18:11,15 | 105:2,12 | 256:2,25 | 47:16 49:2 | 105:21,24 |
| 189:9 | 112:9 | 257:3 | 53:6 55:22 | 106:2,9,10 |
| 263:3 | 114:13,20 | 258:8 | 55:24 56:6 | 106:15 |
| 276:15,25 | 114:23 | 260:21 | 56:10 57:7 | 107:6,18 |
| 355:11 | 115:3 | 263:14 | 58:23 | 107:21 |
| **kicked** 127:1 | 116:22 | 266:3 | 59:11,18 | 108:5,6,14 |
| **Kim** 28:6 | 119:24 | 267:16 | 59:18 | 108:17,23 |
| 304:14,18 | 120:6,7 | 270:10,14 | 61:11 62:1 | 109:25 |
| 305:2,4 | 121:21,22 | 270:14 | 65:20,22 | 110:20,21 |
| 353:18 | 124:14 | 271:5 | 65:23 | 111:5,10 |
| 360:22 | 128:9 | 289:18 | 66:20,21 | 111:20 |
| **kind** 13:7 | 132:13 | 290:18 | 68:16 69:1 | 113:10,15 |
| 14:14 16:7 | 133:14 | 293:4 | 69:3,4 | 113:21 |
| 18:5 20:7 | 136:4,17 | 315:23 | 70:19 | 114:4 |
| 24:25 25:8 | 136:24,24 | 317:22 | 71:12,24 | 115:7,22 |
| 26:14,16 | 138:10 | 318:5,9 | 72:6 73:20 | 116:24 |
| 27:2,5 | 141:6,6,7 | 323:16 | 73:23 | 117:8 |
| 29:2 30:14 | 141:9 | 324:2 | 74:13 | 118:13,18 |
| 31:18 | 145:1,5 | 337:3 | 75:15 | 119:14 |
| 37:22 | 147:21,22 | 344:21 | 76:19,21 | 120:24 |
| 39:25 | 148:3,17 | 347:11 | 76:24 77:4 | 121:1,3,6 |
| 40:20 | 149:13 | 356:6,8 | 77:15 79:6 | 121:14,16 |
| 41:12,25 | 150:15 | 357:20,24 | 79:9 80:1 | 121:21,24 |
| 42:2,11 | 152:1,5,13 | 358:18 | 80:7,12 | 121:25 |
| 43:21 | 153:13 | **kinds** 24:9 | 81:4,5,15 | 122:24 |
| 44:11,17 | 154:9 | 49:11 | 81:15,16 | 123:2,6,22 |
| 45:1 46:3 | 157:1 | 215:19 | 81:25 82:3 | 123:25 |
| 47:4,15,20 | 161:18 | 368:22 | 82:18 | 124:17,19 |
| 47:22 52:8 | 164:24 | **Klein** 345:24 | 83:18 | 124:21,21 |
| 52:15,19 | 174:12 | **knew** 100:17 | 84:16 85:3 | 127:11,11 |
| 52:25 | 175:16 | 117:2,6,9 | 85:16,24 | 127:16 |
| 55:16 56:3 | 178:5,7 | 176:24 | 85:25 86:5 | 128:3,19 |
| 57:4 58:1 | 182:4 | 192:18 | 86:11 88:3 | 128:21 |
| 58:22 | 187:2,13 | 295:22 | 88:5,10,17 | 129:6,10 |
| 60:10 62:8 | 187:25 | 313:19 | 89:1,12,25 | 129:14,22 |
| 63:14 | 207:4 | **know** 13:2 | 90:2,3,4 | 132:13 |
| 64:22,25 | 211:11,18 | 16:23 22:8 | 91:21 | 133:9 |
| 65:25 66:2 | 217:3 | 22:21 25:5 | 94:11,16 | 134:12,22 |
| 66:4 67:12 | 225:13 | 27:4,9 | 95:5 98:13 | 137:5,8 |
| 68:17 71:2 | 234:15,25 | 28:18 29:1 | 98:15 99:4 | 140:19 |
| 71:3 77:16 | 235:3 | 29:6 30:19 | 99:6,17,23 | 142:11,14 |
| 80:1 81:4 | 237:6 | 31:1,23 | 100:17 | 142:20,22 |
| 81:10,22 | 239:3,13 | 32:12,12 | 101:5 | 142:22 |
| 82:1,13 | 240:1,2,15 | 32:25 34:5 | 102:17 | 143:9,11 |
| 84:13 88:9 | 240:17 | 39:3,4,24 | 103:17 | 144:1,1,2 |
| 94:12 98:3 | 241:12 | 41:10 42:4 | 104:8,10 | 145:12,12 |

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 145:19,21 | 203:8 | 273:12,16 | 327:1,5,19 | 76:23 77:8 |
| 146:9,14 | 204:14 | 274:13,17 | 327:23 | 77:8,9,17 |
| 146:18 | 205:2,3 | 274:20,21 | 328:20 | 77:17,20 |
| 148:16,20 | 207:22 | 274:22,23 | 330:1 | 78:4,9 |
| 148:22 | 208:22 | 275:1,16 | 332:3 | 191:20 |
| 149:19 | 209:20 | 275:25 | 333:12,15 | 284:14 |
| 152:17 | 210:7,18 | 278:14,16 | 334:10,13 | 285:2,13 |
| 154:16 | 210:25 | 279:20,22 | 336:19,25 | 285:18 |
| 158:1,3,22 | 211:2,2,11 | 280:1,4,6 | 337:5,9,18 | 286:5 |
| 159:3 | 211:13 | 280:22 | 337:21 | 288:20 |
| 162:11 | 212:9 | 282:7,11 | 338:4,6,10 | 290:1,6 |
| 163:6,25 | 213:14 | 283:2,19 | 339:10 | 291:11 |
| 164:9,9 | 215:20 | 283:23 | 340:22 | 340:5 |
| 165:25 | 216:7,11 | 285:2,8 | 342:8,9 | **Krebs'** 290:4 |
| 168:5,18 | 216:14 | 286:10 | 343:12 | **Krebs's** |
| 168:25,25 | 220:3 | 287:12 | 350:19,25 | 77:24 |
| 169:13,18 | 221:6 | 291:7 | 351:12,14 | 289:23 |
| 169:21 | 224:13,14 | 293:19,21 | 351:17 | **Krebs-St...** |
| 172:13 | 225:12,14 | 293:21 | 352:5,9,10 | 197:12 |
| 173:24 | 225:18 | 294:1,13 | 352:12 | **Krebs/St...** |
| 174:19 | 228:23 | 294:18 | 353:17 | 76:23 |
| 176:8,16 | 231:9,12 | 295:1,22 | 354:1,1,18 | **Kris** 308:6 |
| 176:18 | 234:24 | 296:24 | 356:2,5,10 | 308:10,11 |
| 177:8,13 | 235:6 | 298:14 | 356:14,23 | **Kristi** 228:7 |
| 177:15,16 | 236:20 | 301:1 | 356:23 | |
| 177:22 | 237:10,20 | 307:21 | 358:13,16 | **L** |
| 178:13,17 | 238:1,2,3 | 308:10 | 359:1,21 | **L** 3:20 375:6 |
| 179:3,8 | 238:5,18 | 309:1,3,12 | 359:24 | **L-i-m-b-i-k** |
| 180:3 | 238:18,20 | 309:15,17 | 360:7,15 | 155:4 |
| 181:19 | 239:2,17 | 310:10,11 | 360:16,18 | **L-o-w-a-r-y** |
| 182:3,4,23 | 240:5,10 | 310:14,15 | 360:21 | 183:18 |
| 182:23,24 | 240:19 | 310:17,18 | 362:10,12 | **Lab** 47:9 |
| 183:24 | 241:13 | 310:24 | 362:12 | 48:22 |
| 185:22 | 244:24 | 311:6,12 | 363:18,21 | **label** 200:15 |
| 187:7,12 | 248:3 | 311:16 | 363:22,23 | 224:17 |
| 187:19,25 | 252:16 | 312:18 | 363:25 | 283:14 |
| 188:6,6,9 | 256:20 | 313:6,13 | 364:3,6 | **labeled** |
| 188:14 | 258:3 | 313:18,19 | 365:5,7,24 | 226:19 |
| 190:2,3,23 | 259:3,4,16 | 314:6,8 | 367:8,15 | 231:5 |
| 192:16 | 260:7 | 315:12 | 367:20,24 | 292:9,14 |
| 193:6,14 | 261:21 | 316:1,22 | 368:1 | 292:16 |
| 193:25 | 262:10,13 | 317:1,6 | 369:10 | **labeling** |
| 194:8,17 | 263:19,20 | 318:8,13 | **knowledge** | 288:6 |
| 194:18 | 264:7,9 | 318:16,19 | 56:7 61:9 | **lack** 80:4 |
| 197:18 | 269:2 | 321:15,16 | 146:19 | 122:21 |
| 198:7,8,11 | 270:24 | 321:23 | 172:12 | 145:11 |
| 198:14 | 271:8 | 324:19 | 324:14 | 149:17 |
| 201:3,6 | 272:14,24 | 326:19,20 | **known** 274:10 | 178:15 |
| 202:12,17 | 273:4,5,9 | 326:23 | **Krebs** 76:7,8 | 195:25 |

**BRIAN J. SCULLY  1/12/2023**

197:1
214:22,23
244:20
245:7
304:21
313:7
333:19
350:23
353:24
354:13
355:5
356:22
359:22
361:13
368:20,21
**lacks** 204:24
329:11
**landed** 164:7
**large** 305:20
305:24
**larger** 14:19
181:15
**lasted**
325:12
**late** 22:7,16
22:25 70:9
104:25
292:5
293:5
367:5
**lateral**
144:17,17
**Laura** 29:16
30:6,10,10
236:17
248:13
270:20
**Lauren** 18:6
28:12
75:18
191:21
255:19
260:4
269:13
294:8
295:2,7,17
296:6,15
296:22
297:1,10

297:24
298:23
299:16,21
300:11
350:4
351:12
**law** 95:13
245:24
250:4,16
250:21,22
251:2
320:21
366:5,8,14
**lawyer** 92:9
**lead** 16:2
18:7,10
19:9 21:7
28:17 29:2
36:1 42:12
42:23
43:24 54:5
78:7
117:16
118:8
325:11
332:25
342:15
370:9,18
**lead-up** 38:8
298:2
**leader**
118:10
**leadership**
97:5
317:23
326:12
371:1
**leading** 33:4
**leads** 43:20
44:4 311:9
**leak** 236:7
236:14,19
237:4,14
246:1,13
247:7,21
250:18,24
251:13,22
254:17,23
255:2,11

274:9
275:7,13
275:16,20
**Leaked** 9:5
319:21
**leaker**
274:11
**learn** 46:3
47:20
**learned**
54:13 71:3
84:14
141:7
144:10
247:19
**learning**
143:18
**leave** 18:23
19:17
28:12 65:6
88:21
299:3
331:1
336:12
**led** 326:21
**left** 43:24
76:13
88:23
167:23
197:19
319:7
**legal** 4:20
10:15,16
92:5,9,12
92:18,20
93:11
94:15
95:21 96:3
368:22
370:22
371:16
375:1,24
**lengthy**
139:13
343:24
**lesson**
144:10
**lessons**
54:13

84:14
141:7
**let's** 34:22
69:9 83:7
146:20
151:3
172:23
173:2,3,8
183:4
197:25
198:9
217:2
231:15
243:25
271:9,19
276:1
277:19
285:15
288:15
289:6
291:15
294:4
301:23
309:23
330:4
362:20
**letter** 167:5
**letting**
294:1
**level** 37:22
45:1 56:5
153:22
154:10
182:16
258:23
259:17
318:12
333:8,13
**levels**
146:23
**Lexitas**
10:16
375:1,24
**liaisons**
264:16
267:18
**lie** 348:7
349:2
**Lightning**

5:15
**like-minded**
97:8
**liking**
346:25
**Limbik** 155:2
155:10
**limit** 127:7
231:6,9
**limited**
36:10
232:10
**line** 85:14
103:8
148:22
202:5,7
250:8,12
250:16,22
255:22
273:15
285:7
299:15
376:5,9,13
376:17,21
**lines** 43:17
58:8 86:25
133:12
207:11
216:24
235:2
286:15,18
327:6
333:25
340:15
365:5
**link** 285:9
320:23
**LinkedIn**
9:24 38:17
195:6
196:3,5,9
196:11
233:25
**links** 96:23
146:1
**list** 72:11
87:25
165:19
232:11

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 233:8,21 | 265:25 | 87:10 | 168:3 | 279:4 |
| 243:2 | 282:2 | 141:2 | 170:20 | 304:3 |
| 264:3 | 292:22 | 177:2 | 175:23 | 316:15 |
| 276:17 | 299:17 | 187:25 | 179:13 | 322:24 |
| 285:22 | 316:2 | 276:4 | 180:13 | 324:8 |
| 338:9 | 317:6 | 314:8 | 212:21 | 340:17 |
| 339:3 | 337:19 | 319:4 | 213:13 | 342:21 |
| 342:14 | 341:8 | 349:20 | 224:10 | 348:21 |
| 354:2 | **live** 198:23 | 372:4 | 232:18,23 | 349:6 |
| 361:3,4,9 | 344:14 | **longer** 18:20 | 291:4 | **lots** 342:6 |
| 361:16,20 | **loading** | 167:22 | 316:13 | 349:12 |
| **listed** 43:23 | 345:17 | **look** 14:7 | **looks** 82:24 | **Louisiana** |
| 110:11,24 | **local** 24:5 | 58:9 69:9 | 161:12,17 | 1:2 10:11 |
| 111:2,5,6 | 54:20,23 | 88:1 90:13 | 162:8 | **love** 307:16 |
| 112:22 | 57:18 | 90:22 | 173:18 | **low** 57:8,9 |
| 180:12 | 58:23 60:1 | 122:9 | 175:25 | **Lowary** |
| 191:19 | 60:23 61:3 | 156:17,25 | 176:5 | 183:16 |
| 192:14 | 79:3 85:1 | 157:1,16 | 195:10,18 | 184:10,22 |
| 233:6 | 91:19 | 162:19 | 197:11 | 185:15 |
| 274:14 | 93:16 96:6 | 173:12 | 198:19 | 192:1 |
| 280:5 | 96:16 | 175:22 | 199:22 | 193:1,22 |
| **listen** 13:10 | 101:10 | 186:2 | 214:17 | 196:25 |
| **listen-only** | 106:11 | 190:22 | 218:22 | 197:7 |
| 28:6,7,11 | 148:5 | 206:14 | 223:2 | 276:21 |
| **lists** 15:16 | 149:16 | 215:1 | 269:16 | **lower** 292:22 |
| 105:12 | 150:20 | 217:3 | 280:19 | 361:3 |
| 192:11 | 164:9,14 | 219:20 | 282:10,13 | **Luke** 28:16 |
| 280:8 | 204:17 | 222:8 | 283:24 | 28:22 29:1 |
| **literally** | 207:7 | 253:24 | 294:7 | |
| 160:13 | 215:10 | 273:23 | 295:3 | |
| **Litigation** | 222:1 | 274:20 | 297:18 | **M** |
| 4:5 | 265:20 | 276:15 | **loom** 8:10 | **ma'am** 372:23 |
| **little** 14:11 | 266:7 | 278:2 | **loop** 107:9 | 373:2 |
| 14:15 | 296:17 | 281:4 | **looping** | **machines** |
| 22:19 | 298:9 | 296:5 | 203:9 | 292:23 |
| 26:22 73:7 | 299:12,21 | 309:23 | 308:6 | **mad** 281:10 |
| 83:1 101:6 | 300:20 | 312:22 | **loose** 293:20 | **Magnets** 5:12 |
| 102:12 | 369:3 | 335:2 | **loss** 341:24 | **main** 21:17 |
| 130:20 | **location** | 338:24 | 342:4,9 | 236:5,5 |
| 143:4 | 263:23 | 339:2 | **lot** 40:6 | 279:18 |
| 146:18 | 281:9 | 340:1 | 45:4 125:7 | 306:17 |
| 172:25 | **Locust** | 359:20 | 159:23 | **mainstream** |
| 181:7 | 375:21 | **looked** | 162:12 | 357:9,16 |
| 182:18 | **logged** 190:7 | 314:20 | 177:21 | 359:3 |
| 197:10 | **logistics** | 340:2 | 235:16 | **maintain** |
| 220:5 | 30:17 | **looking** 15:7 | 239:14 | 146:22 |
| 235:17 | **long** 5:9 | 41:2 59:2 | 257:2 | 170:6 |
| 240:14 | 11:19,24 | 141:14 | 260:15 | **maintained** |
| 263:11 | 27:17 46:3 | 162:14 | 261:19 | 120:9 |
| | | | | **major** 105:13 |

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 110:7 | 26:10 | 98:9 113:9 | 313:11,13 | 300:19 |
| 111:6,12 | 90:18 91:6 | 117:4 | 314:12 | 301:6,9 |
| 126:24 | 94:22 95:6 | 120:2,18 | 317:20 | 303:20,20 |
| **majority** | 278:22 | 129:17 | **Matt's** 85:20 | 305:9,13 |
| 18:12 | **mandates** | 130:23 | **matter** 10:6 | 312:23 |
| 131:3 | 47:16 | 142:24 | 92:23 | 313:5 |
| 180:21 | **manner** 318:9 | 191:20 | 361:5,16 | 316:9 |
| 254:6 | **March** 71:16 | 217:23 | **matters** 4:5 | 318:10 |
| **making** 49:19 | 336:12 | 218:3,5,19 | 344:18 | 320:10 |
| 56:1 85:7 | **marked** 13:25 | 219:5 | 350:15,22 | 323:7 |
| 92:21 | 69:7 | 237:19 | 351:14 | 325:9,10 |
| 122:18 | 138:20 | 251:7,12 | 356:20 | 325:11 |
| 128:5 | 156:14 | 253:16 | **Matthew** 4:11 | 326:2,5 |
| 144:9 | 190:13 | 271:25 | 283:10 | 330:16,21 |
| 173:16 | 194:25 | 283:9 | **matthew....** | 331:5,16 |
| 176:24 | 212:25 | 284:5 | 4:15 | 331:19,23 |
| 178:8,21 | 227:9 | 305:5 | **mature** 46:2 | 337:4,15 |
| 211:21 | 243:22 | 313:11,13 | **May/June** | 338:22 |
| 238:18 | 249:22 | 314:12 | 53:19 | 342:23 |
| 269:10 | 252:6,21 | 317:21 | **MD** 20:17,21 | 343:19,19 |
| 286:7,25 | 277:16 | 318:13 | 354:8,15 | 343:22 |
| 301:2 | 301:20 | **Masterson's** | 354:20,22 | 344:22 |
| 340:18 | 306:18 | 129:19 | 355:10,19 | 346:16 |
| **mal-info...** | 309:20 | **material** | 357:2,7 | 347:23 |
| 5:20 8:15 | 319:15 | 246:22 | **MDM** 11:21 | 348:12 |
| 15:17,23 | 328:4 | **maternity** | 16:5,14 | 353:3,7,10 |
| 20:1,14 | 335:12 | 18:23 | 19:10 | 353:12,13 |
| 143:15,19 | 345:20 | 19:17 | 20:12 | 355:24 |
| 145:20 | 349:15 | 331:1 | 39:15 42:9 | 356:12 |
| 340:11 | 352:13 | **Matt** 11:4 | 44:9,16 | 357:20,21 |
| 341:18 | 359:13 | 75:10,17 | 45:6 56:20 | 357:25 |
| 343:6,10 | 363:6 | 80:13 | 72:24 | 358:6,11 |
| **manage** 16:1 | 364:11 | 81:17 | 75:20 | 358:24 |
| 16:2 43:4 | 365:10 | 82:18 | 118:8 | 359:1 |
| 64:25 | 368:3 | 83:16 | 143:21 | 366:3,23 |
| **managed** | 369:17 | 88:14,23 | 153:25 | 367:12 |
| 18:13 | **Marybeth** | 98:14 | 154:4 | 371:20 |
| 364:7 | 71:10 | 120:2,12 | 166:9,12 | **MDM-related** |
| **management** | **Masterson** | 130:3,7,22 | 171:18,20 | 329:15 |
| 11:22 | 75:11 | 142:24 | 188:11 | **MDM-spec...** |
| 308:25 | 80:13,23 | 191:20 | 189:7 | 113:12 |
| 309:7 | 81:17 | 217:23,25 | 233:8,8 | **mean** 17:2 |
| 327:15 | 82:19 | 218:3,5,19 | 274:2 | 34:2 48:11 |
| 343:17 | 83:16 84:4 | 219:5 | 278:25 | 49:3 55:13 |
| **manages** | 85:17 | 237:19 | 285:24 | 62:8 66:13 |
| 42:25 | 86:13 | 271:25,25 | 295:5,11 | 69:3 71:25 |
| **managing** | 87:22 | 283:9 | 295:20 | 74:5,15 |
| 262:21 | 88:14,18 | 284:5 | 297:3,5 | 82:12 |
| **mandate** | 88:21 89:9 | 305:5 | 298:4 | 103:20 |

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 105:4,25 | **meaning** | 94:13 | 241:6 | 358:12 |
| 108:4 | 287:3 | 105:14 | 242:16 | 359:3,4 |
| 114:2 | 298:9 | 107:20 | 244:18 | 363:16 |
| 115:11,21 | 313:1 | 108:2 | 245:4,16 | 364:21 |
| 121:19 | **means** 118:13 | 109:13,13 | 246:23 | 365:2 |
| 131:17 | 273:17 | 114:24 | 247:25 | 366:2,5,25 |
| 133:17,18 | 275:14,25 | 118:25 | 254:18 | **medium** 359:9 |
| 135:24 | 285:8 | 120:22 | 256:14 | **meet** 133:2 |
| 143:12 | 289:14 | 122:18 | 257:17 | 239:25 |
| 148:15 | 298:14 | 123:5,17 | 258:2,5,12 | 241:10 |
| 149:8 | 309:2 | 126:19 | 258:14 | **meeting** 21:6 |
| 151:21 | 350:14 | 127:5,20 | 259:4 | 24:13 |
| 152:16 | 351:14,17 | 129:12 | 261:4 | 30:17 |
| 160:17 | **meant** 133:4 | 131:20 | 263:24 | 31:14 |
| 165:6 | 142:10,11 | 132:2,12 | 265:17,22 | 36:21,22 |
| 169:4 | 218:15 | 132:17 | 266:9 | 37:2,4 |
| 174:8 | 223:22 | 134:4 | 268:23 | 38:23 |
| 175:2,9 | 232:16 | 138:11 | 269:1 | 47:20 |
| 176:8,16 | 241:1 | 144:4,24 | 274:5,8 | 75:16 |
| 182:2 | 257:15 | 146:3 | 277:9 | 78:10 |
| 183:3 | 334:24 | 151:8 | 278:7,13 | 85:21 86:2 |
| 189:5 | 351:13 | 152:18 | 286:20,24 | 86:13,17 |
| 193:24 | 354:19 | 153:15 | 286:24 | 86:23 |
| 197:17 | 358:16 | 157:10 | 290:13,25 | 87:10 99:1 |
| 204:14 | **measures** | 163:19 | 291:25 | 99:4,7,12 |
| 207:3 | 355:13 | 164:11,13 | 293:5,6 | 99:17 |
| 211:7 | **mechanism** | 165:4 | 296:16 | 100:22 |
| 227:4,23 | 61:16 | 168:7 | 300:18 | 103:8 |
| 227:24 | **meddling** | 172:5,18 | 305:18 | 117:15,17 |
| 231:8 | 175:1 | 180:16 | 314:19,21 | 140:1 |
| 236:4 | **media** 17:4,8 | 189:25 | 317:13 | 233:7,12 |
| 248:6 | 17:10,13 | 192:2 | 318:4 | 233:13,17 |
| 257:5 | 17:16 | 193:3,9 | 326:14,24 | 243:15,18 |
| 270:8 | 18:16,21 | 200:21 | 327:3,9,18 | 248:25 |
| 273:7,22 | 20:8 21:1 | 208:23 | 333:16 | 253:25 |
| 274:7 | 21:5,23 | 210:12 | 339:10,23 | 254:7 |
| 275:1 | 23:21 24:2 | 214:3 | 340:4,6,8 | 256:3 |
| 280:22 | 24:5,10,13 | 220:4,6,25 | 341:14,16 | 259:20 |
| 281:17 | 27:1,23 | 221:20 | 347:1 | 262:9 |
| 287:8 | 38:13 39:2 | 222:17 | 350:15,21 | 269:14,17 |
| 293:18 | 39:8 57:21 | 223:20 | 350:21 | 269:18 |
| 298:13 | 58:17 59:3 | 228:9 | 351:3,7,13 | 270:1,3,21 |
| 309:3 | 64:2 66:5 | 229:4,8 | 351:24 | 270:25 |
| 316:17 | 66:17 67:1 | 232:8,25 | 352:11 | 272:5 |
| 326:16 | 67:18 68:8 | 233:18,22 | 356:19,19 | 274:18 |
| 338:9 | 73:12,12 | 233:24,25 | 357:8,9,10 | 275:3 |
| 341:12 | 73:18 | 235:13 | 357:15,16 | 309:13,16 |
| 358:7,13 | 78:21 79:6 | 237:3 | 357:20,21 | 337:25 |
| 366:21 | 93:21 94:7 | 239:11,21 | 357:23 | **meetings** |

**BRIAN J. SCULLY 1/12/2023**

| | | | | |
|---|---|---|---|---|
| 21:4,9,10 | 241:4,5,15 | memory's | 257:1 | 322:19 |
| 24:19,23 | 241:18 | 22:19 | 268:21 | 336:13 |
| 25:7,12,15 | 242:16 | 101:6 | 282:14 | mid-October |
| 25:16 26:8 | 243:8,18 | mention | 283:25 | 174:21 |
| 28:1,15,23 | 243:21 | 20:11 | 303:21,23 | middle 110:8 |
| 29:11,15 | 244:11,17 | 38:11 | 314:23 | 157:17 |
| 29:23 | 245:3,14 | 39:23,25 | 316:3,4 | 162:20 |
| 30:15 31:6 | 245:14,19 | 103:11 | 320:12 | 208:7 |
| 31:10 | 245:24 | 110:5 | 322:14 | 278:3 |
| 32:10,13 | 246:8,14 | 131:25 | 336:22 | midnight |
| 32:16 33:4 | 246:18 | 159:4 | 349:10 | 175:13 |
| 33:8,20,24 | 247:2,11 | 247:24 | 353:18 | 226:18 |
| 34:6,10 | 247:20,25 | 263:9 | 355:21 | 292:1 |
| 35:16 36:3 | 248:15,24 | mentioned | 356:3 | 293:16 |
| 36:12,18 | 249:11 | 24:12 | 362:16 | midterms |
| 36:19,20 | 251:13,23 | 29:10 39:1 | 367:10 | 8:10 298:2 |
| 37:7,15 | 254:4,24 | 40:23 46:9 | merely | mimic 134:11 |
| 38:7,14 | 255:3 | 48:1,18 | 220:21 | mind 99:8 |
| 39:9 45:21 | 256:2 | 56:18 59:5 | merging | 180:19 |
| 45:23 | 258:2,10 | 59:6 60:11 | 110:2 | 346:15 |
| 50:11 | 260:5 | 63:7,16 | messages | 357:8 |
| 52:10 | 269:6 | 72:15 | 8:22 | 359:2 |
| 74:23 | 272:19,21 | 74:23 | 106:12 | mine 71:9 |
| 77:21 78:1 | 306:2,9 | 80:13 | 120:15 | 83:22 |
| 78:10,16 | 310:23 | 85:13,23 | 178:4 | 180:22 |
| 102:9,12 | 317:16 | 99:19 | 309:25 | minority |
| 102:14,15 | 323:2 | 100:5 | met 141:6 | 122:19 |
| 102:22 | 353:23 | 101:17 | 238:4 | minute 99:9 |
| 103:12 | 361:6,11 | 102:8 | 239:25 | 99:15 |
| 112:1 | member | 111:20 | 338:4,10 | 107:13 |
| 117:14,19 | 183:22 | 112:16,23 | META 297:25 | 156:17 |
| 127:19,22 | 325:10 | 117:4 | method | 292:24 |
| 128:14,20 | members 49:2 | 131:4,19 | 290:15 | 345:17 |
| 128:22 | 97:25 | 139:5,6 | methodology | minutes |
| 132:4,6,21 | 166:12 | 140:5,23 | 154:18,20 | 87:13 |
| 132:23 | 180:7 | 153:24 | meting | 175:25 |
| 133:7,8,12 | 263:9 | 157:4 | 295:15 | 206:2 |
| 178:25 | 264:24 | 159:1 | Michigan | 224:16 |
| 216:18 | 279:16 | 170:3 | 46:25 47:1 | 226:15,18 |
| 232:8,25 | 326:7 | 183:11 | Microchips | 271:16 |
| 233:4,6 | 359:20,25 | 184:5 | 5:12 | 274:14 |
| 234:21 | Memes 5:11 | 187:14 | Microsoft | 276:3 |
| 236:3,8,23 | memories | 189:21 | 38:16,18 | 282:5 |
| 237:15 | 247:13 | 190:5 | 38:19 | 292:4 |
| 238:5,6,7 | memory | 193:14 | 88:22,25 | 318:25 |
| 238:10,13 | 230:22,23 | 198:3 | 233:24 | 319:6,7 |
| 238:15 | 247:14 | 240:13 | 297:11,25 | 349:23 |
| 239:9,20 | 255:1 | 251:3 | mid 22:20 | mis 5:20 |
| 240:6,9 | 258:24 | 252:2 | 23:9,10 | 8:14 15:17 |

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 19:25 | 127:8 | 293:5 | **mix** 333:5 | MOLA_DEF... |
| 20:14,18 | 130:17,24 | 310:21 | **mixed** 64:9 | 8:6 |
| 40:13 | 132:14,19 | 311:3 | **Mm-hmm** 23:18 | MOLA_DEF... |
| 42:11,12 | 137:21 | 317:14 | 110:13 | 7:11 |
| 42:14,16 | 138:6,11 | 318:6 | 139:15 | MOLA_DEF... |
| 57:20 | 141:22 | 322:6 | 163:1,12 | 7:13 |
| 58:24 | 142:3,15 | 323:11 | 166:25 | MOLA_DEF... |
| 90:19 | 144:3 | 324:12 | 274:16 | 7:9 |
| 91:17  92:3 | 149:15,23 | 335:20,25 | 300:16 | MOLA_DEF... |
| 92:15  93:1 | 150:17 | 336:5,16 | 308:24 | 9:14 |
| 93:20 | 151:7 | 338:1,8 | 330:17 | MOLA_DEF... |
| 94:12,23 | 157:3,6,9 | 357:14 | 350:7 | 9:19 |
| 95:7  96:10 | 158:6,14 | 363:13,20 | 365:15 | MOLA_DEF... |
| 96:18 | 160:7 | 364:8,21 | 370:7 | 8:23 |
| 126:22 | 161:9,21 | 365:2,16 | **Mm-mmm** 111:1 | **moment** |
| 127:12 | 164:10 | **misleading** | **MO** 375:21 | 352:18 |
| 143:14,18 | 165:3 | 283:15 | **mode** 28:6,7 | **Monday** 373:4 |
| 145:20 | 169:19 | 336:2 | 28:11 | **money** 61:16 |
| 147:3 | 173:13,24 | **misreading** | 263:21 | 62:3,3 |
| 151:23 | 178:23 | 160:14 | **model** 154:12 | 110:20,22 |
| 314:14 | 179:4,15 | **missed** 233:9 | **modeling** | 342:18 |
| 315:3 | 198:20 | **missing** | 155:9 | **monitor** |
| 340:11 | 200:3 | 282:19 | **moderated** | 57:20  59:3 |
| 341:17 | 201:2,23 | **mission** | 17:24 | 90:18  91:6 |
| 343:6,9 | 208:10 | 26:19  29:7 | **moderation** | 91:17  92:2 |
| 347:21 | 210:25 | 62:25  63:2 | 17:18 | 92:15  93:1 |
| 348:20 | 213:17 | 153:25 | 40:15 | 94:23  95:6 |
| 354:9,15 | 215:9 | 309:5 | 123:7 | 151:14 |
| 363:15 | 216:12 | 316:12 | 128:10,16 | 174:10 |
| 370:14 | 217:9 | 338:23 | 260:10,13 | 175:17 |
| 371:2 | 225:1,17 | 343:2 | 260:23 | 325:20 |
| **mischara...** | 226:8 | **Missouri** 1:5 | 284:7 | **monitored** |
| 23:6  97:21 | 228:17 | 3:7,11 | 289:15 | 108:2 |
| 345:7 | 229:10 | 10:6,20,23 | 296:3 | **monitoring** |
| **misinfor...** | 232:9 | 35:10 | **modulation** | 57:15 |
| 5:10  8:4 | 233:1 | 375:8 | 23:22,22 | 144:24 |
| 8:13  21:22 | 235:12,13 | 376:3 | 289:9 | 150:16 |
| 39:7  41:18 | 235:25 | **mistake** | MOLA_DEF... | 176:6,9 |
| 41:20  42:1 | 238:8 | 232:4 | 7:18 | 178:22 |
| 42:8  43:10 | 239:1,10 | **mistaken** | MOLA_DEF... | 201:2 |
| 45:17  77:3 | 239:22 | 232:16 | 6:5 | 225:15 |
| 91:6 | 243:10 | **misunder...** | MOLA_DEF... | 287:19 |
| 106:23 | 260:24 | 229:5 | 6:21 | 326:8 |
| 114:24 | 261:5 | **mitigate** | MOLA_DEF... | 348:5 |
| 118:3 | 264:23 | 16:15 | 6:14 | **Monkey** 324:6 |
| 120:8,10 | 265:5,16 | 343:20 | MOLA_DEF... | **Monroe** 1:3 |
| 124:24 | 268:4 | 358:3,23 | 9:21 | 10:11 |
| 125:23 | 278:12 | **Mitigation** | MOLA_DEF... | **month** 31:24 |
| 126:4 | 287:21 | 106:19 | 8:21 | 248:24 |

| | | | | |
|---|---|---|---|---|
| monthly | multitude | 259:5 | 33:3,14 | 264:19 |
| 24:17 | 340:20,24 | 286:7,11 | 34:9 35:6 | 300:25 |
| 31:21 32:3 | mystery | 286:17,19 | 50:8,9 | 319:9 |
| 233:14 | 337:19 | 287:4,9,13 | 71:8,9,15 | 348:7 |
| 234:3,5,9 | | 288:3,21 | 71:17,18 | 349:2 |
| 234:16 | **N** | 291:11 | 101:16,17 | 372:15 |
| 255:21 | N 3:1 4:1,1 | 323:23 | 101:19 | needed |
| 256:3 | 4:1 5:1,1 | 340:8 | 103:13 | 127:12 |
| 310:23 | 6:1,1 7:1 | narratives | 135:25 | 174:10 |
| months 19:8 | 7:1 8:1,1 | 109:22 | 136:8,14 | 215:14 |
| 24:11 | 9:1,1 10:1 | 110:2 | 178:11 | 216:9 |
| 196:6,10 | NAFTA 263:7 | 144:3 | 244:12 | 220:6 |
| 196:13 | name 10:14 | 151:14 | 248:19 | needle 81:5 |
| 248:24 | 10:15 | 152:1,8 | 332:8 | 81:10 |
| 325:12 | 11:17 | 155:7 | 336:7 | needs 9:8 |
| morning | 32:20 | 256:8,14 | 342:1,5 | 57:1 |
| 173:18 | 35:20 36:1 | 256:21 | NATO 44:25 | 295:10 |
| 175:5 | 54:6,7 | 257:18 | 45:12 | 328:12,24 |
| 176:1 | 76:22 | 258:4,13 | nature 69:4 | 329:23 |
| 282:4 | 103:2,3 | 259:2 | 113:18 | nefarious |
| 286:5 | 166:20 | 323:17 | 139:9 | 229:6 |
| mouth 69:6 | 167:5,6,10 | 324:8 | 145:13 | NEI 264:18 |
| move 179:5 | 167:11 | NASED 103:13 | 169:17 | neither |
| 291:15 | 171:7,10 | 103:23 | 203:23 | 374:9 |
| 301:23 | 172:16,19 | 104:2,23 | 262:23 | Nelson 4:3 |
| moved 64:3 | 172:21 | 107:25 | 322:2 | 11:3 |
| 336:25 | 186:1 | 112:1 | 325:3 | network |
| moving | 187:18 | 263:23 | 327:5 | 220:4 |
| 172:25 | 194:4 | 264:6,22 | 371:25 | never 27:18 |
| 208:3 | 279:25 | 267:6 | NAV 263:7 | 133:4 |
| 282:1 | 376:2,3 | 268:25 | near 292:1 | 240:7 |
| 308:15 | 377:11 | NASOS 103:23 | 293:16 | 242:3 |
| MS-ISAC | named 179:20 | NASS 103:25 | necessarily | new 41:5 |
| 60:19 | 182:12 | 104:3,23 | 36:18 58:5 | 44:9 |
| multi-state | 285:21 | 107:25 | 62:18 | 114:19 |
| 59:14 | names 29:3 | 112:1 | 65:13 | 142:14 |
| multilat... | 30:9 50:17 | 263:24 | 76:11 | 188:19 |
| 45:1,12 | 50:20 | 264:6,22 | 100:7 | 286:15 |
| multiple | 100:5 | 267:6 | 149:11 | 290:7,8 |
| 59:22 | 167:18 | 268:25 | 151:24 | 299:12,22 |
| 201:10 | 188:24 | Nathaniel | 348:25 | 301:24 |
| 230:20 | 189:2,4,6 | 310:18 | necessary | 305:4 |
| 245:14 | 189:9 | 312:6 | 258:22 | 312:22 |
| 247:10 | 192:6 | nation's | 368:23 | 313:5 |
| 359:10 | 276:18,23 | 337:25 | 377:9 | 336:21 |
| 363:16 | narrative | 338:7 | need 34:19 | news 109:13 |
| multistate | 5:12 56:16 | national | 100:17 | 124:16 |
| 60:14 61:2 | 154:4 | 11:22 16:5 | 199:21 | 302:3 |
| 61:6 | 219:10,16 | 20:5 33:1 | 227:22 | 334:12 |

**BRIAN J. SCULLY 1/12/2023**

357:10
358:6
359:3
**night** 175:1
175:8,10
175:12
179:7
291:20,21
292:6
293:6
**nights**
173:25
**No's** 252:5
**nod** 12:24
**non-profit**
47:7 59:13
148:3
**nongover...**
267:11
**nongover...**
45:9,13
**normal** 26:10
130:6
201:7
306:9,10
**normally**
41:25
165:18
178:3
270:2
333:8
**Northwest**
3:20 375:6
**notarized**
375:19
**notary** 2:8
374:21
375:18
377:23
**notation**
165:14
**note** 178:3
201:14
287:22
**noted** 337:24
**notes** 109:18
**notice**
202:24
203:4

**noticed**
228:16
**notifica...**
178:5
**notified**
165:13
**notifies**
177:3
**notify** 67:16
68:7 129:4
140:18
160:8
**notifying**
179:24
**notion** 94:20
216:15
**novels** 43:3
330:10
**November**
213:15,17
214:13
217:8
223:4
226:6
284:24
286:4
291:18
332:12
334:11
335:15
336:5
337:5
**NRMC** 9:22
**NSA** 286:13
286:16
**NSD** 33:7
**number** 10:8
113:22
160:22
162:5,22
171:3,7,8
172:16
190:2
201:16
210:20
214:20,20
214:21
217:16
256:10

272:9
331:9
340:12
**numbers**
162:11
211:1,5,11
**numeral**
141:16
**numerical**
14:5

_____

**O**

**O** 4:1  5:1
6:1  7:1
8:1  9:1
10:1
**Oberes**
157:18,25
**object**
152:20
155:25
**objection**
23:2,5
53:1 71:20
72:3 77:10
77:19 80:4
87:16 92:4
92:17 93:2
93:22
94:14
95:20,24
96:25
97:20
98:11
108:20
111:8
115:9,15
115:20
116:17
118:16
122:21
126:5
130:19
142:6
145:3,6,10
146:16
148:8
149:17
150:18

153:6
161:25
178:14,15
179:21
194:14
195:25
196:4
197:1
198:5
201:4
202:15
204:12,20
204:23
212:2
214:22
226:25
228:18
230:19
231:10
244:20
245:7
258:6
273:1
283:21
294:16,23
294:24
298:11
304:20,21
310:12,13
313:7
316:19
324:24
333:18
339:13,19
341:6
344:25
345:6
350:23
351:15
352:7
353:24
354:12
355:5
356:21
358:14
359:5,22
360:19
361:13
**objections**

6:23 156:8
215:3
**Observatory**
51:8,10,23
52:6 58:9
58:12
70:15,21
72:16
76:15 78:5
78:9 80:18
80:21,24
81:7,13,18
82:2 83:24
85:6 89:4
89:7,11,21
102:1
104:18,23
117:6
142:25
169:12,16
169:20
170:1,16
172:8,12
182:14
185:17
186:11,14
186:24
188:5
195:11
196:18
361:23
362:4
**observer**
332:24
**obtain** 323:9
**obtained**
246:22
**obviously**
12:19 16:1
16:19,23
17:23
28:11
38:15 42:6
51:12
77:24 87:7
87:21 88:9
107:24
120:12
175:11

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 182:17 | 245:6,16 | 332:11 | 261:1,3,14 | 15:18 19:7 |
| 184:7 | 248:17 | 334:2 | 261:19,23 | 23:13 |
| 194:10 | 251:18,21 | 360:17 | 265:21 | 34:12 |
| 210:15 | 332:11,19 | 366:12 | 266:1,7 | 44:19 |
| 244:25 | **office** 3:7 | **officially** | 295:11,20 | 61:11 |
| 245:12 | 4:12 10:20 | 89:12 | 297:2,5,12 | 87:23 |
| 264:4 | 10:23 11:6 | 336:11 | 297:23 | 88:12 |
| 275:16 | 12:10 26:2 | **officials** | 298:2,9,10 | 89:24 91:2 |
| 282:17 | 34:8 35:11 | 8:9 16:25 | 298:14,17 | 97:4 |
| 298:13 | 44:24 | 24:1,1,5 | 299:2,12 | 100:19 |
| 324:19 | 204:7 | 45:15 | 299:22 | 103:20 |
| 351:1 | 205:12 | 52:12 | 300:20,24 | 104:1,6 |
| 359:10 | 206:6,15 | 54:18,21 | 301:8 | 109:10 |
| 367:25 | 206:19 | 54:24 57:4 | 305:8 | 114:7 |
| **occur** 24:16 | 214:13,18 | 57:8,19 | 306:15 | 115:18 |
| 53:18 55:3 | 215:25 | 58:24 60:1 | 320:17 | 119:5 |
| 70:6,8 | 216:1 | 60:23 61:2 | 321:1 | 125:15,16 |
| 86:3 87:10 | 225:2 | 61:5 62:20 | 340:18 | 125:17 |
| 246:2 | 244:11 | 63:12,24 | 363:14 | 126:13 |
| 268:18 | 311:15,19 | 64:1 73:10 | 364:20 | 130:15 |
| 334:3 | 312:10 | 73:16 75:3 | 365:1 | 131:1,25 |
| **occurred** | 328:11 | 78:20 79:4 | 366:17 | 135:6 |
| 78:4 | 333:9,11 | 79:10,12 | 372:2 | 141:20,20 |
| 104:11 | 334:1 | 80:2 83:23 | **oh** 19:21 | 144:14 |
| 138:14 | 375:20 | 87:1 96:7 | 29:24 89:1 | 145:23 |
| 200:19 | **officer** | 96:17 | 89:5 | 146:12,21 |
| 246:8 | 280:12 | 100:18,21 | 131:19,25 | 146:22 |
| 264:11 | 289:9 | 101:11 | 161:14 | 150:14 |
| 309:16 | 374:3 | 102:10 | 162:17 | 151:11 |
| 327:23 | **officers** | 106:1,4,11 | 163:15 | 158:2,17 |
| **occurring** | 216:5,5 | 106:13 | 167:19 | 160:21 |
| 235:18 | **offices** 57:8 | 110:5 | 183:4 | 162:10 |
| 246:7 | 57:13 | 119:23 | 192:8 | 167:8,16 |
| 279:7 | 90:16 | 120:4,5,15 | 225:25 | 167:24 |
| **October** 5:21 | 215:23 | 123:2 | 227:21 | 170:13,23 |
| 24:18 | **official** | 131:7,24 | 232:3,16 | 171:2 |
| 156:19 | 17:4 49:1 | 148:6 | 241:3 | 173:7,11 |
| 157:2 | 50:7 67:10 | 149:16 | 249:7 | 173:12 |
| 168:4 | 68:14 | 164:5,21 | 253:4 | 183:3 |
| 173:14 | 163:22,24 | 204:18 | 271:2 | 184:25 |
| 198:19 | 164:9,14 | 207:8 | 282:22 | 186:5 |
| 199:6 | 165:9,11 | 215:10,12 | 297:16 | 189:13 |
| 208:21 | 180:1 | 215:24 | 302:7 | 190:17 |
| 246:4 | 220:7,23 | 216:4,8,21 | 318:24 | 191:1,6 |
| **odd** 29:8 | 221:4,18 | 216:22 | 363:5 | 194:24,24 |
| **ODNI** 25:23 | 221:21,24 | 223:5 | **OIG** 9:8 | 198:15 |
| 34:8 35:15 | 251:17 | 242:11 | 328:16 | 205:15 |
| 36:2 37:14 | 281:17 | 260:11,16 | **okay** 13:9 | 206:4 |
| 117:20 | 331:19 | 260:20 | 14:24 15:7 | 207:20 |

| | | | | |
|---|---|---|---|---|
| 208:6,20 | 299:20,23 | 300:19 | 148:23 | 159:18 |
| 209:14 | 302:11 | 301:16 | 318:8 | 304:5 |
| 210:19 | 306:23 | **one-pagers** | **operated** | **ops** 119:24 |
| 211:9 | 308:5 | 295:23 | 53:6 | 267:10,15 |
| 212:23 | 309:24 | 296:2,20 | 155:16 | 267:21,24 |
| 214:7,11 | 320:1 | 298:1 | 368:24 | **option** 85:23 |
| 215:7 | 328:10 | **ones** 38:20 | **operating** | **options** |
| 216:11 | 329:5 | 114:2,3 | 56:11 | 216:10 |
| 217:2 | 330:8 | 121:17 | 95:16 | **oral** 135:7 |
| 219:25 | 332:9 | 168:3 | 148:20 | **order** 14:5 |
| 223:17 | 335:4,8 | 185:3 | **operation** | **ordinary** |
| 224:5 | 344:11 | 189:17,20 | 247:21 | 178:12 |
| 225:14 | 345:18 | 228:16 | 262:17,24 | **Oregon** |
| 226:3,5 | 348:11 | 233:9 | 264:22 | 201:23 |
| 227:16 | 349:24 | 234:16 | 265:9,10 | **org** 15:8,12 |
| 231:25 | 354:6 | 268:17 | 267:5 | 18:2 22:12 |
| 232:17,21 | 355:9 | 279:19 | **operational** | 42:21 |
| 232:22 | 356:25 | 306:17 | 98:20,24 | 130:8,13 |
| 243:4 | 359:17 | 348:22 | 155:18 | 166:17 |
| 244:4 | 368:7 | **ongoing** | 340:13 | 167:4 |
| 245:23 | 369:12 | 364:24 | 342:13,16 | 171:21 |
| 246:17 | 373:3 | 366:18 | **operations** | **organiza...** |
| 247:18 | **omitted** | **online** 94:8 | 39:22 | 49:24 62:2 |
| 248:8 | 215:5 | 114:23 | 96:11,19 | 147:23 |
| 250:2,14 | **On-call** | 150:16 | 179:8 | 148:19 |
| 251:10 | 107:14 | 151:15,23 | 236:7,7,14 | 369:9 |
| 253:7 | **once** 81:22 | 155:8 | 236:19 | **organiza...** |
| 255:17 | 203:16 | 158:14 | 237:4 | 9:23 130:4 |
| 256:7,12 | 204:1 | 195:6 | 246:1,13 | **organiza...** |
| 259:25 | 213:20 | 228:17 | 247:7 | 16:21 |
| 262:16 | 299:10 | 305:24 | 250:18,24 | 45:10,12 |
| 265:8 | 333:7 | 336:2 | 251:13,22 | 47:14,16 |
| 269:11,18 | **one's** 35:20 | 354:3 | 254:17,23 | 48:5,13,17 |
| 271:22 | 35:20,21 | 357:11 | 255:2,12 | 50:2 73:11 |
| 275:21 | **one-on-one** | 359:4 | 264:15 | 148:19 |
| 280:7,16 | 241:11 | 364:19 | 278:23 | 262:21 |
| 281:14 | **one-page** | 365:1 | 279:15 | 323:5,6 |
| 283:2 | 253:10 | **oops** 346:8 | 309:1,8 | **original** |
| 284:22 | 260:9,13 | **open** 16:22 | 312:5 | 375:13 |
| 285:25 | 260:21,22 | 164:2 | 340:14 | **originated** |
| 286:2,2 | **one-pager** | 281:9 | 342:20 | 90:8 94:25 |
| 287:2,17 | 260:6 | 325:21 | **opportun...** | 123:8 |
| 290:24 | 294:21 | 326:8,9 | 317:8 | 171:15 |
| 294:6 | 296:8,11 | **opening** | **opportunity** | 184:23 |
| 295:2,17 | 296:15 | 345:18 | 13:19 | 185:13,21 |
| 296:14 | 297:1,12 | **operate** | 234:18 | 198:2 |
| 297:19,22 | 297:22 | 52:25 53:4 | **opposed** | 228:14 |
| 297:23 | 298:16 | 61:23 62:7 | 91:18 | 371:23 |
| 298:21 | 299:2,7,21 | 110:19 | 92:24 | **originates** |

| | | | | |
|---|---|---|---|---|
| 95:12 | **P** | 173:3,4,5 | 285:25 | 322:7 |
| 329:3 | **P** 3:1,1 4:1 | 173:9,10 | 288:16,17 | **panels** |
| **originating** | 4:1 10:1 | 173:11,20 | 289:19 | 187:14 |
| 83:19 | 11:21 | 191:3,6,8 | 290:6,8,13 | **paragraph** |
| **originator** | **P-a-t-t-o-n** | 195:9 | 290:19,21 | 110:4 |
| 201:13 | 32:21 | 197:11 | 291:1,8,12 | 147:2 |
| **origins** | **p.m** 157:2 | 198:9,11 | 291:15,16 | 150:2 |
| 321:24 | 173:19 | 198:16 | 293:8 | 192:6,8 |
| 322:7 | 175:25 | 199:16 | 294:4 | 244:8,9 |
| **outcome** | 177:3 | 201:17,22 | 295:2 | 245:23 |
| 374:12 | 183:9 | 203:14,15 | 296:6 | 304:7 |
| **outcomes** | 209:9,12 | 204:1,1,5 | 297:8,9 | 305:15,16 |
| 27:22 | 276:7 | 204:7 | 298:19 | 330:10 |
| 354:25 | 291:20 | 205:8,10 | 299:14,15 | 332:10 |
| **Outline** 9:5 | 292:5,23 | 206:9 | 305:15 | 335:23 |
| 319:21 | 292:24 | 208:3,4 | 307:6 | 336:15 |
| **outlining** | 362:23 | 213:14 | 310:6 | 337:23 |
| 321:6 | 363:1 | 214:7,9 | 313:10 | 348:3 |
| **outputs** | 372:12 | 216:25 | 315:17 | 361:15 |
| 109:8 | 373:9 | 222:20 | 320:2,15 | **parentheses** |
| **outreach** | **P.O** 3:10 | 224:21,22 | 321:3,3 | 281:10 |
| 18:13,15 | **PA** 217:10 | 225:5,11 | 330:2,4,5 | **parody** |
| 272:1 | **page** 5:2,8 | 225:16,20 | 332:10 | 205:24 |
| **outside** | 6:3 7:3 | 225:25 | 346:7 | 206:6 |
| 134:3 | 8:3 9:3 | 226:2,4 | 348:2 | 281:10 |
| 151:6 | 15:16 | 227:17 | 354:4 | **part** 11:22 |
| 353:22 | 72:11 73:7 | 228:2 | 356:25 | 20:2 51:23 |
| **overall** 96:8 | 87:23 | 231:22,25 | 364:16 | 61:8 63:25 |
| **overlapped** | 89:14,16 | 232:3,13 | 365:17 | 75:16,20 |
| 195:22 | 90:21 | 242:20,25 | 366:1 | 78:23 |
| **overseas** | 98:19 | 247:19 | 368:11,12 | 104:7 |
| 41:11 | 105:8,11 | 249:5,25 | 370:1,2 | 106:7 |
| 278:20,23 | 108:12,24 | 251:15,15 | 375:14,18 | 110:22 |
| 279:5,8,9 | 109:2,11 | 251:16 | 375:20 | 115:25 |
| 280:19 | 110:9 | 260:3 | 376:5,9,13 | 128:7,21 |
| **oversee** | 117:22 | 261:25 | 376:17,21 | 147:22 |
| 25:15 | 122:2,5,10 | 262:4 | **pages** 1:22 | 149:10 |
| **overseeing** | 125:2,5,14 | 269:4,5,9 | 160:22 | 169:4,5,7 |
| 59:21 | 126:11,12 | 271:9,20 | 206:5 | 169:24 |
| **oversees** | 141:15 | 271:21,24 | 208:4 | 181:14 |
| 59:13 | 144:6,7 | 278:2 | 269:11 | 189:7 |
| **overtaxing** | 145:23 | 280:7,14 | 276:15 | 192:3 |
| 211:15 | 146:20 | 280:15 | 285:15 | 193:3,5 |
| **overview** | 149:22 | 281:2,4,6 | 291:16 | 201:7 |
| 136:17 | 156:25 | 281:15 | 332:9 | 203:12 |
| **overwhelmed** | 157:17 | 282:3 | **paid** 203:2 | 264:21 |
| 342:17,18 | 160:22,25 | 283:7,7 | **pandemic** | 281:20 |
| **overwhel...** | 162:7,9,11 | 284:9,19 | 264:20 | 290:5 |
| 65:1 | 162:16,20 | 284:21 | 321:25 | 311:1 |

| | | | | |
|---|---|---|---|---|
| 322:24 | 181:19,21 | 369:10,13 | 364:18 | 291:17 |
| 323:21 | 334:13 | **partners** | **pass** 106:5 | 294:5 |
| 325:9 | **particip...** | 16:20 | 123:16 | 297:8 |
| 338:23 | 126:18 | 18:11,12 | 163:8 | 298:20 |
| 342:23 | 354:23 | 21:5 37:1 | 265:5 | 299:16 |
| 347:15 | **particular** | 44:5,20,22 | **passed** 56:23 | 330:5,6,8 |
| 362:1 | 11:25 | 46:11 | 162:24 | 370:2 |
| **part-** 330:19 | 23:20 | 109:17 | **passing** | **peers** 244:13 |
| **part-time** | 30:18,22 | 110:1 | 141:10 | **penalty** |
| 170:6,12 | 31:9 42:17 | 204:9 | **patient** | 377:12 |
| 184:3 | 65:8 74:10 | 224:2 | 280:12 | **pending** |
| **participant** | 85:22 | 228:8 | **Patton** 32:17 | 255:9 |
| 354:2 | 112:15 | 235:2 | 32:17 | **Pennsylv...** |
| **particip...** | 136:5 | 264:6,12 | **pay** 196:21 | 218:18 |
| 72:11,12 | 152:7 | 267:11 | 197:20 | 219:19,22 |
| 128:23 | 154:14 | 298:1 | **PDF** 89:16,17 | 223:4,13 |
| **participate** | 159:24 | 369:2,6 | 122:6 | 223:21,25 |
| 55:12,16 | 179:11 | **partnership** | 125:5,12 | **people** 18:4 |
| 131:11 | 209:1 | 5:16 48:7 | 125:14 | 29:19 30:5 |
| 132:7 | 211:16 | 48:10,25 | 126:12 | 36:2 46:24 |
| 323:1 | 258:14,16 | 49:2,7 | 144:8 | 54:8 56:4 |
| 333:5,6,13 | 287:9 | 51:6,20,24 | 160:25 | 103:4 |
| 353:5,10 | 341:20 | 52:2,24 | 162:7,9,11 | 112:10,13 |
| **particip...** | 346:8,9,11 | 58:1,6 | 173:6,10 | 112:14 |
| 25:22 26:3 | 359:9,12 | 68:5 69:21 | 198:11,16 | 114:1,5 |
| 28:2,23 | **particul...** | 73:3,8 | 201:18 | 115:6,12 |
| 29:14 33:7 | 33:23 | 75:8 78:16 | 203:14 | 134:18,19 |
| 34:10 | 52:16 | 79:8 80:3 | 204:8 | 140:18 |
| 35:15 | 56:19 82:6 | 83:20 | 205:10 | 152:18 |
| 38:14,17 | 174:17 | 84:25 85:8 | 206:10,11 | 154:23 |
| 38:23 39:3 | 239:24 | 88:6,13,19 | 208:5 | 159:23 |
| 55:14 71:5 | 256:19 | 89:19 | 214:10 | 168:2 |
| 77:21 | 266:11 | 97:19 | 217:1 | 174:8,22 |
| 78:10 | 279:5 | 99:21,24 | 222:21 | 175:16 |
| 132:3 | 286:5 | 100:9,11 | 224:22 | 176:5 |
| 238:12 | 289:22 | 107:19 | 225:25 | 178:12 |
| 274:17 | 299:3 | 132:11 | 226:4 | 179:3 |
| 309:18 | 344:17 | 134:20 | 227:17 | 181:22 |
| 326:4 | 366:10 | 141:4 | 228:3 | 189:7 |
| 333:2 | 369:2 | 147:8 | 251:16 | 191:11,24 |
| 353:21 | **parties** | 168:21 | 261:25 | 192:9,11 |
| **particip...** | 10:18 | 181:12,15 | 269:5,9 | 192:19 |
| 28:2 | 374:10 | 202:14 | 271:21 | 193:1,18 |
| 310:22 | **partisan** | 228:8 | 280:15 | 193:19,21 |
| 353:9,14 | 357:10 | 230:2 | 281:4,6 | 201:1 |
| 353:16,23 | 358:12 | 280:2 | 283:8 | 255:20 |
| **particip...** | 359:3 | 360:11 | 284:19,21 | 259:3 |
| 33:4 39:5 | **partner** 96:7 | 362:2,9 | 286:1 | 263:25 |
| 76:4 | 97:8 | **parts** 30:5 | 288:16 | 285:22 |

**BRIAN J. SCULLY 1/12/2023**

291:2
297:11
316:8
324:7
331:4
336:21
337:4,15
342:17,19
344:14
347:20
348:4,21
349:4,8
358:2,18
358:21
360:2
364:23
**perceive**
96:23
**percent**
26:18,24
61:15
122:12,13
137:18
149:12
169:16
**percentage**
123:3
**perform**
265:4
**performed**
63:16
**performing**
161:19
**performs**
63:20
**period** 20:24
21:20
28:23
31:11 41:7
162:3
180:22
246:2
**periodic...**
30:4 162:4
164:15
165:20
**perjury**
377:12
**perking**

152:2
**person** 20:7
53:25
117:18
129:24
171:3
219:11
264:3
**person's**
36:1 103:1
**personally**
236:15
238:3
245:13
**perspective**
24:25
39:15
42:10
45:25 46:7
47:13
234:22
257:25
315:12,15
323:2
325:25
326:1
367:12
**pertained**
30:15
**phone** 99:9
99:12,15
227:5
293:12
**phones**
174:10
175:17
176:6
**phonetic**
47:14
71:10
141:13
**phrase** 56:22
**physical**
235:18,23
263:23
270:12
342:12
**pick** 32:4
174:6

344:16,23
**picked** 372:2
**piece** 220:13
**Pierce**
183:15
184:10,20
184:22
191:25
193:1,22
196:25
197:7
276:21
**pilighting**
151:21,22
**pilot** 151:18
152:15,19
153:14
154:7
155:6,11
155:17
**piloted**
151:16
**piloting**
151:13,22
152:2,5
**pilots**
155:14
**pinging**
176:20
**Pinterest**
233:24
**place** 56:25
135:25
232:8
291:5
314:12
325:17
334:4
351:24
356:12
363:15
**placed**
128:13,15
**places**
220:11
**plaintiff**
3:2 10:7
**plaintiffs**
1:7 6:23

10:21
35:11
**plan** 8:8 9:6
32:9
269:23
**planned**
136:17
307:12
**planning**
295:19
**plans** 54:12
54:15
319:22
321:8
367:21
**platform**
21:11 64:3
65:16
66:17
67:10,18
68:9
120:25
126:17
133:2,9
134:4
146:4
160:9
161:11,22
163:2
164:2,7,12
165:4,7,16
168:7,16
179:14
180:8,9
200:21
208:24
220:25
222:17
223:21
241:11,22
278:7
287:14
300:18
306:14
352:11
357:20
**platform's**
261:6
**platforms**

17:16
18:17,21
20:8 21:1
21:6,23
23:21 24:2
24:6,11,14
25:1,9
27:1 38:13
39:8 40:2
40:4,7,8
40:10,15
40:24
41:19,21
42:6 58:18
59:4 64:5
64:14,22
65:1,12
66:5 67:1
67:7 73:12
73:18
78:22 79:7
94:8
105:14
106:8
107:2,10
119:1,11
120:22
121:7,8
122:18
123:6,17
126:24
127:5
128:2,25
129:12
131:21
132:2,12
132:17
133:5,16
138:12
158:5
160:1,3,5
160:8,10
160:14,17
161:10,23
163:19
164:19
168:11
172:5,18
178:21,21

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 179:7,10 | 315:2 | **plus** 193:1 | 284:7 | 62:16 |
| 179:14,24 | 316:14 | 331:1,11 | 289:15 | 153:8 |
| 180:16 | 317:4,7,13 | **POCs** 350:14 | 296:3 | 242:2 |
| 184:9,11 | 317:23 | **point** 34:1 | **policy** 12:9 | 367:25 |
| 189:25 | 318:4,11 | 58:4 64:21 | 126:13 | 368:1 |
| 192:2 | 326:14,24 | 101:9,23 | 129:4,12 | **positions** |
| 193:3,10 | 327:9,18 | 102:4 | 133:2 | 337:8 |
| 203:13 | 340:6 | 103:3 | 134:1,4 | **possibility** |
| 210:13 | 348:5,6,8 | 174:7 | 200:16 | 99:20 |
| 212:9 | 348:24 | 233:12 | 209:21 | **possible** |
| 214:3 | 349:2 | 234:21 | 261:6 | 22:18 39:6 |
| 220:6,18 | 350:21 | 255:25 | 283:12,13 | 75:14 95:9 |
| 221:20 | 351:25 | 262:8 | 311:16 | 98:10 |
| 229:9 | 356:19 | 275:18 | 312:4,9,11 | 129:6 |
| 232:9,25 | 357:9 | 290:18,19 | 312:12 | 133:18 |
| 233:18,22 | 363:17 | 290:21 | 332:8 | 147:19 |
| 235:6,9,13 | 364:21 | 291:19 | 338:25 | 190:12 |
| 237:3 | 365:2 | 323:20 | **political** | 193:20 |
| 239:21 | 366:5,25 | 326:11 | 130:4,7,12 | 198:1 |
| 240:1,7 | **play** 59:1 | 327:2 | 246:20 | 200:22 |
| 241:8 | 62:18,22 | 337:3 | 313:14,17 | 208:11 |
| 242:16 | 64:11 | 354:7 | 364:15 | 210:18 |
| 244:19 | 100:13 | 355:9 | **Politics** 8:7 | 216:10,20 |
| 245:4,16 | 152:13 | 358:1 | **poll** 217:10 | 224:14 |
| 246:24 | 168:9 | **points** 128:5 | 219:1,11 | 236:11,16 |
| 248:1 | 316:13 | 135:19 | 235:20 | 237:8,17 |
| 254:18 | 317:8,10 | 234:14 | 339:11 | 237:21 |
| 256:4 | 317:18 | 243:3 | **popped** | 246:10 |
| 257:18 | **played** | 272:22 | 234:15 | 248:10 |
| 258:2,12 | 149:20 | 350:14 | **popping** 27:3 | 254:16 |
| 260:17,19 | 182:5 | 351:2 | 302:2 | 255:10,11 |
| 261:11,21 | 345:10 | **police** 9:6 | **portal** 8:5 | 256:18 |
| 262:18 | **playing** 19:4 | 305:17 | 320:20 | 257:24 |
| 263:24 | 63:6 | 319:22 | 363:13,20 | 290:5 |
| 265:2,6,17 | 311:24 | **policies** | 364:8,20 | 294:20 |
| 265:22,24 | **please** 10:17 | 17:18,21 | 365:1 | 295:5 |
| 266:9 | 11:9,16 | 21:13 | **portfolio** | 358:10 |
| 268:19,24 | 130:21 | 23:22 | 20:3 | **possibly** |
| 269:1 | 145:7 | 121:23 | **portion** | 22:25 |
| 277:9 | 167:10 | 123:7 | 129:1 | 23:13 |
| 290:13,15 | 185:9 | 126:17,25 | 257:23 | 231:14 |
| 290:25 | 205:22 | 127:7,11 | 270:5 | **post** 198:23 |
| 291:3,4,7 | 218:23 | 127:14,25 | **portions** | 225:4 |
| 292:1 | 308:7 | 128:10,17 | 70:1 | 227:20 |
| 293:6,15 | 339:18,22 | 132:13,18 | **portrayed** | 228:9 |
| 296:16 | 361:16 | 133:5,10 | 229:6 | 229:4,9,13 |
| 305:19,24 | 375:11,15 | 133:17 | **poses** 56:16 | 339:25 |
| 306:4,6 | 375:19 | 177:5 | **position** | 344:15 |
| 314:13,21 | **plura** 250:5 | 260:23 | 35:21,21 | 345:11 |

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| post-ele... | 161:19 | 99:18 | prior 21:8 | 113:23 |
| 227:6 | 162:3 | presiden... | 24:21 | 124:5,15 |
| posted 82:19 | 200:25 | 147:4 | 36:12,17 | 124:17 |
| 116:9 | 209:21 | 246:3 | 36:19 | 174:20 |
| 280:20 | 210:14 | press 129:6 | 74:21 | 180:25 |
| 290:14 | pre-marked | presumably | 117:8 | 181:4 |
| posting | 14:6 | 204:11 | 241:20 | 211:8 |
| 159:25 | pre-mate... | 298:9 | 314:3 | 230:25 |
| 274:6,8 | 28:12 | presume | 332:11 | 235:7 |
| 291:3 | prebunk | 308:19 | priorities | 241:17,18 |
| 340:7 | 315:3,9 | pretty 56:14 | 321:7 | 243:19 |
| postings | prebunk/... | 56:21 | priority | 271:12 |
| 259:4 | 314:15 | 180:5 | 16:3 | 316:4 |
| 341:14,16 | Prebunking | 256:23 | privacy | 323:25 |
| posts 82:14 | 315:20 | 289:23 | 152:4,12 | 327:24 |
| 82:14,18 | preceden... | 293:19,20 | 155:18 | 331:8,12 |
| 114:17 | 336:1 | 356:7 | 165:18 | 331:14 |
| 115:7 | predated | prevent | private | 337:10 |
| 116:13 | 364:22 | 344:22 | 16:20 | 341:23 |
| 225:15 | predict | previous | 18:11 44:7 | 346:2 |
| 339:9,23 | 152:8 | 23:6 97:21 | 47:12 | 369:10 |
| 340:1,3 | 154:3 | 117:2 | 221:15 | 372:2 |
| potential | predictive | 251:24 | 225:4,10 | problem |
| 17:13 25:3 | 152:10 | 313:16,22 | 225:16 | 65:25 |
| 27:15 38:2 | 154:12 | 314:3,7,10 | 308:3 | 304:9,14 |
| 155:7 | 155:9 | 345:7 | 314:7 | 359:1 |
| 312:22 | Prelimin... | previously | 327:14 | problems |
| 313:4,5 | 6:24 | 190:5 | privilege | 234:25 |
| 342:15,21 | prep 255:21 | 205:24 | 34:16,21 | 357:7 |
| 361:4 | 269:16,18 | 236:21 | 150:21,24 | procedure |
| potentially | preparation | primaries | 152:23 | 297:2 |
| 19:18 | 233:7 | 28:5 | 153:1,19 | procedures |
| 39:21 | 243:15,17 | primarily | 156:1 | 109:21 |
| 40:21 | preparatory | 46:7 54:1 | Pro-Trump | 121:23 |
| 57:16 87:6 | 37:6 256:1 | 174:3 | 217:12 | 354:25 |
| 100:2 | prepared | primary | 218:25 | proceed |
| 140:5 | 194:3 | 75:10 | proactive | 11:11 35:8 |
| 277:11 | 254:22 | 83:21 | 20:21 | proceedings |
| 315:18 | 361:17 | 308:22 | proactively | 374:4,6,7 |
| 343:20 | 370:10,13 | principal | 228:24 | process 43:4 |
| 357:21 | preparing | 29:2 103:5 | probably | 43:5,5 |
| 361:5 | 188:21 | 120:4 | 19:19 | 49:19 64:7 |
| Pox 324:6 | 190:9 | 167:19 | 22:20 | 64:8 65:12 |
| practical | 254:16 | 180:23 | 23:12 50:4 | 65:14 |
| 92:23 | present 4:19 | principally | 74:16,25 | 67:12 |
| 93:11 | 10:17 | 16:11 | 80:18,25 | 83:25 85:4 |
| practice | 20:24 | 38:25 | 86:8,9,11 | 85:7 106:7 |
| 62:6 65:19 | 28:25 99:1 | 49:16,16 | 86:12 | 118:2,15 |
| 66:13,18 | 99:13,13 | 63:9 | 113:9,12 | 150:20 |

| | | | | |
|---|---|---|---|---|
| 152:22 | 16:12,13 | 366:11 | 24:25 25:8 | 53:9 56:12 |
| 153:1,19 | 16:17 | **promoting** | 25:17 | 56:13 |
| 156:1 | 39:16,18 | 77:5 | 40:21 | 72:20 |
| 164:23 | 43:1,4,7,9 | **prompt** | 61:23 62:1 | 74:24 81:2 |
| 201:7 | 44:12 | 293:23 | 94:7 98:20 | 81:20 |
| 211:17 | 56:21 | 294:1 | 135:13,19 | 82:10,11 |
| 239:25 | 131:5 | **promptly** | 220:3,18 | 82:22 |
| 240:11,18 | 207:16 | 176:7,21 | 222:13 | 112:25 |
| 240:19 | 298:8 | **prompts** | 234:23 | 113:1,7,18 |
| 241:1,2 | 303:15,23 | 256:8 | 257:3 | 114:8 |
| 274:25 | 303:24 | 257:5 | 258:11 | 115:14,17 |
| 282:7 | 316:2,3 | **proposal** | 260:9 | 127:20 |
| 283:4,17 | 333:23 | 363:11,18 | 261:10 | 131:5,6 |
| 297:5 | 343:5 | 363:23 | 290:22 | 134:14 |
| 300:19 | **Professi...** | 364:7,19 | 296:7,16 | 137:11,14 |
| 320:16 | 2:6 374:3 | 364:22 | 298:3 | 138:3,19 |
| 337:19 | **professor** | **proposed** | 315:13,16 | 138:25 |
| 356:8 | 360:8 | 272:4 | 323:14 | 145:1,1 |
| **processes** | **profile** 9:24 | 275:4 | 325:24 | 220:16 |
| 177:21 | 195:6 | 336:24 | 326:1 | 221:1,3,10 |
| 203:6 | 196:3,5,9 | **proposes** | 361:10,17 | 221:14 |
| 240:23,24 | 196:11 | 272:5 | **provided** | 222:14 |
| **produce** | **program** | **protect** 8:8 | 61:12,13 | 238:22,25 |
| 295:18 | 148:4 | 339:2 | 64:4 88:18 | 254:22 |
| **produced** | 152:17 | **protected** | 109:8 | 283:16,25 |
| 156:20 | 279:12 | 35:7 | 188:24 | 305:10 |
| 191:16 | **programming** | **protecting** | 189:2,6,9 | 306:3,10 |
| 192:10 | 155:15 | 338:22 | 209:17 | 322:16 |
| 277:11 | **project** 5:11 | **Protection** | 220:12 | 323:5,5 |
| 310:1 | 51:10 | 12:11 | 223:5,20 | 335:16 |
| **product** | 134:7,9,15 | **Protentis** | 299:20 | 341:19,24 |
| 28:18 | 135:8,22 | 18:7 19:15 | 323:12 | 347:25 |
| 43:12 | 136:10,18 | 31:5 36:13 | 325:20 | 348:1 |
| 131:6 | 137:4,17 | 42:22 | **provides** | 355:13 |
| 137:24 | 139:8 | 75:18 | 61:10 | 368:8 |
| 143:24 | 141:3,14 | 191:21 | 317:7 | 369:21 |
| 154:24 | 144:2 | 255:20 | 320:23 | 374:21 |
| 155:10 | 153:14 | 260:4 | **providing** | 375:18 |
| 172:2 | **Project's** | 269:13 | 128:23 | 377:23 |
| 187:11,15 | 138:19,25 | 294:8 | **public** 2:8 | **publicly** |
| 243:13 | **projects** | 295:2 | 9:25 16:12 | 43:8 47:19 |
| 295:10 | 187:13 | 297:10 | 21:12,12 | 82:15 |
| 322:19,25 | 188:16 | 298:23 | 21:13 40:6 | 145:13 |
| 355:23 | **prolifer...** | 350:4 | 40:18,19 | 190:19 |
| 356:11 | 336:1 | 351:12 | 40:21,24 | 195:5 |
| **production** | **promote** | 352:3 | 41:14 | 284:2 |
| 42:25 | 330:15 | **Protentis's** | 46:15,15 | 354:3 |
| 276:14 | **promoted** | 21:1 | 50:24 | **published** |
| **products** | | **provide** | 52:17 53:8 | 26:12 |

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| pull 14:9,16 | 46:14 | 156:18 | 339:18 | quietly |
| 138:16 | 47:18 53:8 | 242:12 | 345:9 | 320:3 |
| 154:14 | 59:6 62:11 | 284:1 | 348:4 | quote 338:15 |
| 212:15 | 62:12 69:5 | 306:10 | 349:11 | 338:20 |
| 222:6 | 74:24 | 328:7 | 354:10 | 344:5,13 |
| 252:20 | 82:10,13 | 335:10 | 361:18 | 344:20 |
| 253:5 | 101:13,15 | | 364:4 | 348:10,18 |
| pulled 221:2 | 101:23,24 | —— Q —— | 371:11 | 349:11 |
| pulling | 101:25 | quadrennial | questioning | 364:20 |
| 242:19 | 102:4,24 | 321:5,13 | 276:12 | quotes 322:3 |
| 302:1 | 103:16,19 | 321:15 | questions | 370:3 |
| 352:16 | 103:21 | qualifies | 13:2,19,21 | quoting |
| 359:16 | 104:2,4 | 351:11 | 13:22 41:2 | 368:13 |
| pulls 44:8 | 112:12,13 | quarterly | 46:14 57:3 | —— R —— |
| pundit | 112:24 | 32:1,13 | 74:25 81:2 | R 1:9 3:1 |
| 123:20,23 | 120:14 | 234:4,9 | 81:20 | 4:1 10:1,7 |
| 124:23 | 129:7 | question | 112:25 | 375:8 |
| 125:18,22 | 165:14 | 13:10,11 | 114:10,20 | 376:3 |
| 126:3 | 207:15,15 | 34:13,14 | 116:7,8 | race 258:23 |
| purchasing | 221:10 | 34:19 35:5 | 122:1 | races 256:9 |
| 372:22,24 | 222:6 | 51:2 66:21 | 127:23 | 256:15 |
| purpose 16:4 | 231:15 | 94:5 | 181:7 | 258:5,14 |
| 17:9 24:20 | 260:21 | 114:18 | 234:19 | 258:14,16 |
| 24:22 27:6 | 272:18,25 | 116:18 | 251:25 | racial 322:1 |
| 45:16,20 | 273:13 | 119:15 | 257:7,16 | 324:11,13 |
| 45:22,23 | 290:7 | 134:13 | 257:22,25 | 324:15 |
| 103:7 | 301:11,17 | 146:4,12 | 260:16 | radar 124:3 |
| 260:12 | 303:14,22 | 151:1 | 261:20 | 124:10 |
| 296:25 | 303:24 | 153:11,22 | 271:15 | radio 357:10 |
| purposes | 319:19 | 167:14 | 298:25 | 359:4 |
| 17:12 | 322:18 | 179:23 | 339:22 | raise 30:19 |
| 155:18 | 325:23 | 180:10,24 | 356:9 | 30:22,24 |
| pursuant 2:2 | 345:19 | 181:6 | 370:23 | 37:17 |
| 200:16 | 351:6,24 | 185:9 | 371:17 | 99:20 |
| push 64:2 | 363:9 | 186:19,20 | 372:6,8 | 128:25 |
| 164:4 | 368:10 | 197:6 | 373:4 | 236:18 |
| 165:7,10 | 369:20 | 213:8 | queue 105:18 | raised 31:2 |
| 175:11,14 | puts 47:3 | 218:24 | 105:23 | 247:10 |
| 175:18 | putting | 220:10 | quick 34:13 | 255:2 |
| 183:15 | 21:12 | 223:18,19 | 36:9 125:3 | 355:17 |
| 293:13 | 30:20 34:5 | 243:5 | 282:5,6 | raising |
| pushed | 43:1 52:9 | 250:12,15 | quickly | 124:23 |
| 300:18 | 52:16 | 258:8 | 34:20 | 126:2 |
| 318:5 | 56:24 | 275:21 | 47:10 | 236:13,16 |
| pushing | 84:24 | 278:22 | 176:10 | 251:22 |
| 147:8 | 85:11 | 291:14 | 177:18,20 | 261:21 |
| put 26:9 | 97:18 | 299:25 | 179:5 | 352:5 |
| 40:6,24 | 100:14 | 330:6 | 228:10 | Ramaswami |
| 41:15 | 112:5,10 | 331:12 | 229:5 | |

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 187:20 | 371:9,9 | 292:4 | 113:5,13 | 251:25 |
| **ramped** 174:1 | 372:9 | 374:20 | 113:16,19 | 259:15 |
| **ramping** | 373:12 | **reason** 56:11 | 113:20 | 265:19 |
| 105:2,5 | 375:15 | 68:12 | 114:3 | 268:13 |
| **random** 333:4 | 376:6,10 | 266:22 | 116:19 | 270:20,23 |
| 333:5 | 376:14,18 | 273:13 | 117:14 | 272:14 |
| **range** 46:20 | 376:22 | 314:25 | 119:12 | 284:8,17 |
| 171:25 | 377:6 | 376:7,11 | 120:15 | 285:6,21 |
| 231:13 | **reading** 91:1 | 376:15,19 | 121:1 | 285:23 |
| 321:9 | 95:25 | 376:23 | 124:9,15 | 287:1 |
| 342:21 | 124:19 | **reasonable** | 126:2,8,10 | 289:11 |
| **rapid** 147:9 | 150:6 | 230:25 | 127:14 | 290:1,4 |
| **rationale** | 159:20 | **reasons** | 128:1,13 | 301:18 |
| 68:18 | 160:12 | 130:5 | 128:18 | 303:17 |
| **re-ask** | 161:16 | **recall** 21:24 | 129:5,8 | 321:20 |
| 185:10 | 211:20 | 22:9,17 | 132:20 | 334:15 |
| 371:11 | 275:17 | 24:8 26:20 | 133:6,13 | 345:25 |
| **re-tweeting** | 347:3,6 | 27:9,18,24 | 133:20,23 | 346:4 |
| 346:23 | **reads** 207:5 | 29:3,16 | 134:2,23 | 351:9 |
| **reach** 116:7 | 228:11 | 31:7,8 | 135:18 | 356:16 |
| 221:25 | 361:15 | 32:19 | 137:5,15 | 362:17 |
| 222:12 | **ready** 40:18 | 33:22 34:3 | 139:20 | 371:24 |
| 340:5 | **reaffirm** | 37:18,20 | 140:16,23 | **recalling** |
| 351:5 | 242:2 | 38:5,12,20 | 141:8 | 52:20 |
| **reached** 65:8 | **real** 78:12 | 39:5 41:9 | 142:17,19 | 268:8 |
| 116:16 | 371:16 | 54:2,9 | 143:6,7 | **receive** |
| 228:23 | **reality** | 55:19 | 151:5 | 71:11 |
| 307:10 | 290:6,7,9 | 56:13 | 168:15 | 79:25 |
| 350:20 | 291:8 | 65:18,24 | 179:6 | 106:4 |
| 351:1 | 315:17 | 66:6 67:14 | 182:2,15 | 119:7,8 |
| 356:15 | **realize** | 67:20 | 189:15 | 123:4 |
| **reaching** | 199:1 | 75:14 76:3 | 190:11,12 | 131:13 |
| 224:2 | **really** 30:7 | 76:3 78:2 | 194:6 | 174:3,23 |
| 316:14 | 30:8 77:11 | 78:3 80:25 | 200:23 | 178:5 |
| 317:3 | 104:10 | 82:20 | 203:11,21 | 252:19 |
| 351:23 | 188:1,16 | 86:15,17 | 209:25 | 260:15 |
| **read** 11:2 | 196:21 | 87:20 | 210:14 | 262:25 |
| 69:24 70:1 | 197:20,22 | 90:12 95:2 | 211:12,14 | 264:23 |
| 90:23 91:8 | 203:25 | 95:9 97:13 | 214:4 | 266:6 |
| 96:20 | 253:3 | 97:15,17 | 216:19,23 | **received** |
| 143:2,4,5 | 297:17 | 97:23 | 218:13 | 22:13 |
| 143:6,7,9 | 317:23,25 | 99:16 | 235:9 | 23:25 |
| 143:11,12 | 327:5 | 100:4,5 | 236:5,9,15 | 49:13 52:7 |
| 219:21 | 344:16,16 | 101:3,20 | 237:21 | 67:9 68:14 |
| 275:18 | 372:1 | 102:23 | 238:11,22 | 71:7 79:20 |
| 287:15 | **realtime** 2:7 | 103:1,18 | 239:6 | 109:8 |
| 299:18 | 2:7 73:9 | 103:18 | 246:6,9 | 120:5 |
| 355:7 | 73:17,21 | 106:6,24 | 247:1,10 | 123:1 |
| 361:12 | 78:21 79:4 | 112:12,21 | 247:24 | 137:10 |

**BRIAN J. SCULLY 1/12/2023**

157:13
159:6
165:8
168:9
175:13
176:24
177:1,24
178:3
180:4,9
193:12
200:3,10
231:2
252:23
294:1
306:12
366:17
**receives**
149:14
**receiving**
63:23 64:1
107:24
166:10
182:8
215:9,18
307:4
**recess** 34:20
35:1 83:11
183:7
209:10
276:8
319:12
362:24
**recipients**
214:20
299:13,23
**recognize**
15:8
**Recognizing**
126:21
**recollec...**
38:11
67:12
101:9
103:15
128:25
133:3
136:25
147:18
150:9

184:21
237:6,17
333:20
367:7
**recollec...**
41:7 55:6
255:5
**recommend**
295:4
**recommen...**
141:21
150:12
329:20
330:3
355:18
358:25
**recommen...**
141:19
149:23
330:3
354:6
**recommen...**
328:23
355:3
357:1
**recommends**
142:2
150:3
**record** 10:3
11:17
34:23,25
35:3,9
83:2,6,8
83:10,13
183:4,6,9
183:11
209:5,7,9
209:12
276:5,7,10
276:13
319:4,9,11
319:14
349:21
362:21,23
363:1,3
372:13
374:6
**recorded**
10:5

**records**
188:25
**recurring**
233:5,12
**recycled**
324:9
**red** 106:17
**redacted**
214:20
**Reddit** 38:16
233:23
**reduce** 309:5
316:10
332:2
346:11,17
347:16,23
**reduced**
374:8
**refer** 20:18
182:6
233:16
270:9
354:15
366:8
**reference**
73:15
105:25
144:13,15
145:24,25
149:22
370:25
**referenced**
201:13
**referencing**
91:22
118:19,20
**referred**
60:18 98:5
201:10
**referring**
20:14 43:7
57:1 73:23
78:24
79:11,13
79:15 84:5
99:5,7,23
105:20
158:3
185:23

214:25
240:19,23
250:10,11
269:23
272:13
275:17
285:10
286:25
295:25
316:25
**refers** 20:17
23:19
146:14
250:4
255:21
291:12
**reflect**
259:5
**reflected**
201:9
**reflects**
47:4
**refresh**
230:22
255:1
**refreshes**
230:23
**refusing**
167:13
**regarding**
244:14
278:19
**regardless**
296:25
358:9
**Registered**
2:6 374:2
**regular** 21:3
40:7,24
82:13,14
127:19
128:3
141:17
238:9
244:11
245:3,19
310:23
**regularly**
116:1

262:16
**reiterate**
240:9
**rejects** 8:8
**relate** 19:24
41:17
156:21
159:17
240:5
**related** 6:25
26:12 77:2
81:18
122:12,13
122:19
127:15
130:17,24
133:14,15
137:3,25
138:5,15
143:14
150:23
159:19
161:10
235:12,25
238:7,25
263:6
273:20
285:24
312:12
323:1
324:15
325:8
342:8
362:8
366:19
371:15
374:10
**relates**
157:9
162:19
279:5
317:15
**relating**
97:13
98:16
113:18
128:24
135:21
137:22

| | | | | |
|---|---|---|---|---|
| 143:16,18 | 266:8 | 150:11 | 142:13 | 145:23 |
| 232:9 | **relayed** | 151:12 | 361:20 | 157:9,13 |
| 233:1 | 251:6 | 171:23 | 362:13 | 157:16 |
| 239:10 | **relaying** | 176:20 | 368:8 | 159:6 |
| 243:9 | 180:23 | 194:3 | 369:21 | 161:9,21 |
| 285:13 | 251:12 | 207:14,17 | 370:3 | 162:21 |
| 326:15 | **release** | 208:20,23 | 371:7 | 163:19 |
| 371:15 | 253:24 | 209:1 | **repeat** 19:3 | 164:12,22 |
| **relation** | **released** | 210:16 | 139:17 | 168:13,18 |
| 76:12 | 39:17 | 211:9 | 151:1 | 173:16 |
| 97:16 | 70:12 | 236:13,24 | 186:19 | 198:20 |
| 104:9 | **releases** | 237:7,13 | 197:5 | 200:3,7,10 |
| **relation...** | 129:7 | 246:12 | 223:17 | 200:19 |
| 47:18 | **relevant** | 247:3 | 249:2 | 201:13,23 |
| 55:25 | 135:19 | 248:12 | 291:13 | 203:16 |
| 65:23 | 160:4 | 250:23 | **repeatedly** | 204:6 |
| 67:25 68:3 | 189:10 | 251:11,21 | 245:11 | 205:11 |
| 76:9 79:9 | 191:12,15 | 259:1 | 247:11 | 209:16 |
| 80:9 | 192:20 | 272:17,21 | **rephrase** | 210:11 |
| 102:16 | 235:5 | 283:3 | 257:11 | 213:17 |
| 121:13,20 | 314:14 | 284:12 | **reply** 282:18 | 214:12 |
| 148:21 | 315:2,14 | 285:11,12 | **replying** | 215:12,15 |
| 149:8,10 | **reliable** | 285:18 | 296:6 | 216:2,9 |
| 187:8 | 319:8 | 286:12 | **report** 9:8 | 217:8,17 |
| 240:3 | **rely** 13:2 | 351:21 | 9:12 21:13 | 225:1,10 |
| 310:16 | **remain** 51:15 | 356:1 | 40:12 47:3 | 226:8 |
| 313:18 | 317:25 | 372:3 | 56:13 | 228:3,6 |
| 369:9,15 | 364:19 | **remembering** | 64:13 | 229:18,19 |
| **relation...** | **remained** | 241:19 | 68:18 | 231:2 |
| 238:17,20 | 51:13 | 306:16 | 69:20 | 256:13 |
| 239:24 | **remarks** | **remembers** | 70:12 | 264:24 |
| 240:16 | 337:2 | 248:4 | 71:18 72:2 | 280:8 |
| 241:14 | **remember** | **reminder** | 94:21 | 283:20 |
| **relation...** | 28:21 30:2 | 29:24 | 96:23 | 284:13 |
| 44:5 46:13 | 30:8,8 | 60:16 | 105:12 | 285:1,8 |
| 46:19,20 | 33:11,25 | 260:7 | 106:4 | 288:5,10 |
| 120:3 | 34:4 35:19 | **remove** | 117:23 | 289:19 |
| 131:20,23 | 35:20,25 | 283:14 | 118:13 | 297:5 |
| 215:25 | 36:1 37:15 | **removed** | 122:3 | 298:4 |
| 241:8,10 | 39:24 55:2 | 229:9 | 123:11 | 300:2,25 |
| 304:1 | 62:13 | **render** 377:9 | 127:17 | 301:6 |
| **relatively** | 70:24 | **Renée** 54:5 | 129:25 | 302:3 |
| 176:10 | 71:13 | 70:5,20 | 138:25 | 304:12 |
| 177:18,19 | 86:23 | 72:17 | 140:3,3 | 321:6 |
| **relay** 164:13 | 87:19 95:3 | 116:22,25 | 141:1,3,15 | 328:11,17 |
| 220:21 | 98:2 | 117:6 | 141:15 | 328:20,22 |
| 221:18,21 | 104:14 | 134:22 | 142:18,23 | 329:22 |
| 222:16 | 116:11 | 136:6,9 | 143:2,21 | 335:15 |
| 265:14,21 | 124:6,11 | 139:7,9,23 | 144:7,11 | 352:20 |

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 364:15,17 | 79:17,20 | 40:21 | 178:10 | 209:18 |
| **reported** | 79:25 81:2 | 46:15 | 267:9 | 221:17 |
| 1:23 68:11 | 81:3,20 | 56:12 | 305:9 | 326:10 |
| 68:22 | 82:10,11 | 106:23 | **represen...** | **researchers** |
| 119:2 | 82:22 | 107:2,24 | 29:11 | 143:14,17 |
| 120:24 | 106:21 | 112:25 | 111:16 | 145:22 |
| 130:5,6,9 | 114:8 | 113:1,7,18 | 112:21 | 325:23 |
| 160:9,19 | 116:1 | 115:14,17 | 181:1 | **researching** |
| 163:20,25 | 118:2,15 | 122:17 | 267:7 | 325:21 |
| 164:10 | 119:8,12 | 123:4 | **reputati...** | **resending** |
| 165:2 | 120:5,8,21 | 134:14,25 | 340:23 | 346:24 |
| 199:11 | 121:1,5 | 137:10,11 | 341:3,5,11 | **reserve** 11:2 |
| 366:14 | 159:13 | 137:14 | 341:12,18 | **resilience** |
| **reporter** 2:3 | 161:5 | 149:14 | 342:15,25 | 16:5,8 |
| 2:4,5,6,7 | 163:9 | 157:3,6 | **request** 45:7 | 42:23 |
| 11:9 12:21 | 173:13 | 165:23 | 277:2,14 | 45:25 |
| 47:9 | 193:10 | 166:1 | 320:18 | 118:2 |
| 138:19 | 198:21 | 173:24 | 337:17 | 131:4 |
| 168:14 | 201:2,25 | 176:7,22 | 372:18 | 303:22 |
| 196:7 | 202:13,19 | 177:10 | **requested** | 315:24 |
| 209:4 | 204:8,18 | 178:12,23 | 247:14 | 324:10 |
| 223:22 | 205:6,22 | 179:4 | 303:9 | 332:1 |
| 372:14,21 | 206:24 | 182:8 | **requesting** | 343:3,21 |
| 372:25 | 207:2 | 193:2 | 276:12 | 347:20 |
| 373:3 | 208:10,15 | 199:13 | **requests** | 358:2,5,8 |
| 374:1,3 | 210:2,7,12 | 202:25 | 191:13,16 | **resilience-** |
| **reporter's** | 210:25 | 203:9 | 192:21 | 315:11 |
| 10:14 | 212:9 | 208:10,16 | 233:2 | **resilien...** |
| **reporting** | 228:14 | 208:25 | 337:22 | 316:3 |
| 8:5 16:22 | 235:4 | 210:21 | **requirement** | **resilien...** |
| 23:25 | 238:25 | 212:1 | 115:24 | 240:14 |
| 26:10,11 | 243:10 | 214:2 | 227:8 | 323:21 |
| 26:14,16 | 257:4 | 215:9,19 | **requirem...** | 346:20 |
| 27:8 36:8 | 259:13 | 216:12 | 155:19 | 359:7 |
| 39:20 40:6 | 263:8,15 | 223:11 | **requires** | **resource** |
| 40:24 | 278:3 | 231:4 | 320:20 | 62:19 63:8 |
| 41:14 44:9 | 279:4 | 238:22 | **research** | 166:11 |
| 46:14 | 282:7,14 | 242:8,11 | 44:6,9 | 173:23 |
| 47:19 | 282:25 | 262:25 | 46:11,16 | **resourced** |
| 50:24 | 283:4 | 264:23 | 46:17 47:3 | 57:9 |
| 52:17 53:9 | 293:5 | 266:6,14 | 47:6,9,19 | **resources** |
| 63:23 | 300:19 | 311:20 | 48:22 | 87:2,8 |
| 64:23 66:3 | 306:3,10 | 325:23 | 49:23 50:1 | 357:11 |
| 66:16 68:8 | 320:25 | 326:11 | 73:12 | 359:4 |
| 68:14 | 326:10 | **repost** | 144:17 | 367:13 |
| 71:25 | 363:13,15 | 347:11 | 145:20 | **respect** |
| 74:24 | 363:20 | **represent** | 187:13,16 | 40:16 |
| 79:11,13 | 364:8 | 10:18 11:7 | 195:10 | 93:15,19 |
| | **reports** 40:7 | **represen...** | 196:14 | 142:15 |

**BRIAN J. SCULLY  1/12/2023**

respond
 13:11,23
 93:20
 176:6
 199:22
 223:10
 293:16,21
 371:2
responded
 176:10
 180:3
 199:15
 200:9
 209:15
 219:8
 292:24
responding
 5:19
 179:15
 190:10
 233:1
 292:3,5
responds
 176:2
 206:1
 224:17
 226:14,17
 232:7
 287:17
 308:6
 317:21
response
 9:16 43:24
 107:15
 133:7
 147:9
 165:7
 177:23
 191:12,16
 192:21
 205:19
 219:14
 220:12
 233:23
 243:7
 247:12
 250:25
 251:5
 282:24

responses
 6:23
 176:14
 188:22
 189:14
 190:19
 193:23
 194:5
 226:12
 231:17
 242:15
 293:24
 353:2
responsi...
 90:14
 289:17
 353:20
responsi...
 239:17
responsible
 60:10
 63:10,12
 115:25
 169:22
 175:20
 343:17
responsive
 176:21,23
 178:10
 293:20,23
 331:20,25
rest 134:23
 186:1
 282:17
 349:10
restrict
 132:13
restricted
 95:16
restrict...
 264:5
restrictive
 132:18
 78:24
result 96:6
results 13:6
return 19:16
 375:19
returned
 165:16

 261:17
returns
 18:24
 176:19
review 43:5
 165:19
 174:22
 189:17
 201:3
 321:6,14
 321:16
reviewed
 189:15,20
 194:2,7,12
 207:10,13
reviewing
 207:14
reviews
 25:18
rhetoric
 126:22
Richard
 161:4
 350:11
right 11:2
 14:6 15:15
 18:6 19:13
 20:15,19
 29:12
 31:13,24
 43:11
 44:13 48:7
 50:14
 51:21
 57:22 59:7
 59:22 60:2
 60:19,24
 61:24
 63:10,15
 63:17,21
 68:5 70:15
 70:22
 78:24
 81:14 82:8
 85:2 88:9
 89:22
 91:15,18
 91:20 93:8
 96:19,24

 101:11
 102:14
 105:14
 109:18
 110:5,7,9
 110:12,15
 110:19
 111:3,23
 112:16
 116:4
 118:8
 120:19
 122:4,7
 123:18
 125:10
 137:15
 140:10
 141:4,4
 146:7
 147:10
 148:18
 157:17
 159:14,15
 161:2,11
 162:10,19
 162:25
 163:3,11
 164:14
 167:18
 170:21
 173:11,17
 176:7
 177:5
 179:20
 181:6
 183:23
 189:12,25
 190:25,25
 191:6,22
 192:13
 193:4
 196:11
 198:17,18
 199:23
 200:4
 202:5
 207:2
 208:1
 211:1,23

 212:11
 214:19
 217:5,9
 218:13
 219:6
 223:14
 226:2,15
 226:20
 227:15
 228:6,10
 228:17,25
 229:19,24
 230:2,9,14
 230:18
 231:2,6
 232:5,11
 233:14,20
 234:1,6
 237:11
 241:7,25
 244:14
 248:25
 250:13,24
 251:4,9
 252:10
 253:20,22
 253:25
 254:4,8,13
 256:5,10
 259:22
 261:7
 262:14
 263:2,21
 264:24
 272:2
 273:10,16
 274:15
 275:8,13
 275:23
 280:25
 281:19
 283:17
 287:6
 288:3,18
 289:3,5,9
 289:15
 290:19,20
 291:22
 292:19

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 293:25 | 327:15 | 100:14 | 23:19 | 167:2 |
| 294:11 | 341:18 | 129:20 | 58:17 | **safety** |
| 295:6,15 | 343:17 | 147:7,15 | 118:24 | 289:10,13 |
| 296:4,8 | **risks** 16:15 | 149:20 | 138:10 | 289:13,14 |
| 298:10 | 56:17 | 150:15 | 172:17 | **Salahuddin** |
| 299:8,13 | 154:5 | 151:7,9,9 | 189:24 | 218:2 |
| 300:6,13 | 269:20,25 | 167:21,24 | 265:5 | **Saleela** |
| 300:15 | 270:8 | 168:10 | 291:24 | 218:2 |
| 301:12,15 | 309:5 | 171:17 | 348:14 | **sat** 133:21 |
| 305:21 | 316:10 | 182:4,20 | 366:4,24 | **Saturday** |
| 306:21 | 323:7 | 239:17 | 367:22 | 173:17,18 |
| 308:19,23 | 332:2 | 240:2 | **RPR** 1:23 | 173:19 |
| 311:25 | 342:21,25 | 278:10 | 374:18 | 176:1,1,11 |
| 312:5,16 | 343:20 | 303:22 | **rules** 12:18 | **Sauer** 3:3 |
| 313:2,11 | 354:21 | 305:17 | 126:18 | 5:3 10:19 |
| 316:15 | 355:24,25 | 311:24 | 152:4,13 | 10:19 |
| 328:25,25 | 356:2,7 | 313:21 | 155:16 | 11:15 14:2 |
| 330:16,25 | 358:4,23 | 316:13 | 260:10,14 | 14:17,23 |
| 331:21 | **Rob** 43:20,23 | 317:11,18 | **rumor** 290:13 | 23:3 34:12 |
| 339:5 | 166:17,18 | 345:10 | 290:19 | 35:8,13 |
| 342:16 | 167:1 | 371:1 | 291:12 | 53:2 69:9 |
| 344:19 | 179:18 | **roll** 142:15 | **rumors** | 69:13 |
| 346:2,13 | 184:14 | **Roman** 73:7 | 247:20 | 71:22 80:6 |
| 347:17 | 191:25 | 141:16 | 290:22 | 83:1,7,14 |
| 348:8,25 | 276:20 | **room** 10:22 | **run** 62:8 | 87:18 91:3 |
| 353:3 | 311:11,12 | 119:25 | 279:13 | 92:6 93:3 |
| 355:4,14 | 311:14,24 | 263:17,18 | 280:11,23 | 95:22 |
| 357:3 | 312:8,21 | 263:22,25 | 342:10,11 | 108:22 |
| 359:20 | 326:5,20 | 264:1,14 | **running** | 122:23 |
| 360:5,12 | 350:5 | 267:7,22 | 60:10 | 125:13 |
| 361:1,20 | **Robert** | 267:23,25 | 81:23 | 126:7 |
| 361:23 | 192:12 | 268:3 | 266:2 | 138:16,24 |
| 362:2,9 | **robust** | **Rose** 308:10 | 312:21 | 139:4 |
| 368:15 | 265:25 | 308:11 | **runs** 148:4 | 145:4,9 |
| 370:5,23 | **Robyn** 10:15 | **Roth** 7:4 | 267:17 | 148:9 |
| **rigorous** | **Rodney** 32:17 | 238:1,2 | 342:6 | 151:3,4 |
| 222:4 | 33:9 | 244:3,9 | 356:1 | 152:25 |
| **ring** 126:1 | **role** 18:25 | 246:17 | **Russia** 325:7 | 153:9 |
| 197:16 | 19:4 23:24 | 247:6 | **Russian/...** | 156:3,5,12 |
| 213:24 | 25:7,10,13 | 248:4 | 325:11 | 156:16 |
| 247:9 | 25:14 | 289:5 | **Russians** | 172:22,24 |
| 284:14 | 42:24 | **roughly** | 324:1 | 181:5,9 |
| 294:22 | 55:18,22 | 148:17 | | 183:1,17 |
| **risk** 11:22 | 59:2 62:17 | **rounds** 286:7 | **S** | 185:8,11 |
| 44:14,16 | 62:18,21 | 287:1 | **S** 3:1 4:1 | 190:15 |
| 56:20 | 62:22 63:3 | **route** 268:25 | 5:1,6 6:1 | 191:2 |
| 236:6 | 63:7,13 | **routed** | 7:1 8:1 | 194:16,19 |
| 308:25 | 64:12 | 268:18 | 9:1 10:1 | 194:22 |
| 309:6 | 83:19,21 | **routing** | **S-c-h-a-u-l** | 195:2 |

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 196:2 | 344:12 | 338:16 | 225:4,8 | 331:16,22 |
| 197:3 | 345:13,22 | 341:15,17 | 229:20 | 332:10,16 |
| 198:25 | 349:17,20 | 348:19,21 | 230:4 | 334:1 |
| 199:5 | 349:24 | 352:3 | 231:5 | 335:19,23 |
| 204:21 | 350:1 | 368:13 | 232:7,7 | 336:3,14 |
| 205:1 | 352:15 | 371:7 | 244:9,10 | 337:23 |
| 209:6,13 | 354:14 | **says** 73:8 | 246:18 | 338:14,20 |
| 212:3,13 | 359:15 | 88:12 | 247:6 | 344:5,6 |
| 212:19,22 | 362:20 | 89:19  91:4 | 250:20 | 350:8,11 |
| 213:2,9 | 363:2,5,8 | 91:11,12 | 251:20 | 354:8,20 |
| 215:4 | 364:13 | 94:21 | 253:23 | 355:9,15 |
| 227:1,11 | 365:12 | 95:18  96:5 | 254:6,7,10 | 357:6 |
| 227:21,24 | 368:5 | 96:13  97:4 | 256:7 | 364:17 |
| 228:1,19 | 369:19 | 97:12 | 260:6 | 366:1,3 |
| 230:21 | 371:12 | 98:25 | 269:20 | 368:21,25 |
| 231:20,22 | 372:5,14 | 107:14 | 270:16 | 369:5 |
| 231:24 | 372:16 | 108:10 | 272:9,15 | 370:12,15 |
| 232:2 | **sausage** 85:7 | 109:6,16 | 275:24 | 370:17,21 |
| 242:20,25 | **saw** 12:24 | 109:19,24 | 280:17 | 370:24 |
| 243:1,24 | 116:2 | 110:7 | 281:8,16 | **SCHAU** 4:3 |
| 244:22 | 215:12 | 111:11 | 282:21,25 | **Schaul** 43:20 |
| 249:14,17 | 293:12 | 117:24 | 283:10,13 | 43:23 |
| 249:21,24 | 319:25 | 118:14 | 284:23 | 46:10 |
| 252:3,9,13 | 324:5,5,6 | 122:11 | 285:7 | 166:18 |
| 252:22,25 | 336:1 | 125:21,25 | 287:3 | 167:2 |
| 253:3,6,10 | 356:18 | 126:17,21 | 289:1,21 | 179:18 |
| 253:13 | **saying** 27:1 | 142:8 | 292:8 | 184:14 |
| 255:18 | 27:2  34:1 | 144:16 | 295:14 | 191:25 |
| 258:9 | 91:16 | 145:25 | 297:24 | 192:12 |
| 262:6 | 152:18 | 146:13 | 299:6,11 | 276:20 |
| 271:14,18 | 199:20,22 | 147:2,2,11 | 299:16 | 326:5,20 |
| 273:3 | 203:10 | 150:8 | 300:4,11 | 350:5 |
| 276:1,4,11 | 223:13 | 158:8 | 300:15 | **schedule** |
| 277:15,18 | 248:13 | 175:24 | 304:6,7,17 | 174:8 |
| 277:23 | 254:22 | 176:2 | 305:17,22 | **scorecard** |
| 301:22 | 282:4 | 177:6 | 307:14 | 286:6,11 |
| 302:9,12 | 284:25 | 191:9 | 308:14,18 | 288:3,21 |
| 304:23 | 286:4 | 192:8 | 311:22 | 340:4,8 |
| 306:20,24 | 287:18,24 | 195:13,16 | 312:1,15 | **Scott** 3:4 |
| 309:22 | 292:25 | 195:21 | 312:25 | 10:22 |
| 316:21 | 294:8 | 196:5 | 314:11 | 82:23 |
| 318:24 | 296:6 | 197:17 | 316:12 | 319:5 |
| 319:2,17 | 299:25 | 199:11 | 317:22 | 349:22 |
| 328:6 | 303:4 | 204:10,11 | 320:2,15 | **screen** 14:10 |
| 334:23 | 307:3 | 206:20,23 | 321:4,15 | 14:10,18 |
| 335:2,7,10 | 308:6 | 208:9,13 | 321:24 | 15:3,4 |
| 335:14 | 309:4 | 210:6,19 | 328:21,25 | 42:21 |
| 341:9 | 315:6 | 217:10 | 330:2,13 | 69:14  72:8 |
| 344:8,11 | 324:2 | 223:4 | 330:17 | 78:19  88:1 |

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 90:22 | 72:10 | 155:11 | 327:14,14 | 136:8,14 |
| 105:8,9 | 160:21 | 186:18 | 341:20 | 141:24,24 |
| 107:11,12 | 198:13 | 188:18 | 343:4,7,17 | 147:19,21 |
| 117:23 | 203:15 | 202:7 | 343:18 | 178:11 |
| 124:4 | 205:4 | 214:16 | 355:23,24 | 187:22 |
| 138:17 | 207:20 | 231:19,21 | 356:1,6 | 195:18 |
| 156:18 | 214:15 | 254:10 | **sector's** | 201:25 |
| 191:4 | 222:23 | 273:15 | 341:21 | 235:15,17 |
| 198:24 | 223:10,15 | 277:22 | **sectors** 60:5 | 235:24 |
| 199:2 | 244:5 | 280:7,15 | 60:8 | 244:13,14 |
| 206:14,16 | 249:4 | 285:5,7 | 322:16 | 245:3,17 |
| 209:3 | 281:2 | 300:17 | 338:25 | 248:19 |
| 212:15 | 296:10 | 304:7 | 355:12 | 264:9 |
| 213:4,10 | 299:11 | 305:15 | **secure** 298:3 | 267:13 |
| 215:2 | 320:1,14 | 307:6 | 298:4 | 270:12 |
| 222:21 | 344:4 | 345:16 | **Securing** | 294:9,13 |
| 225:5 | **Scully** 1:14 | 346:10 | 47:8 | 295:11 |
| 227:20 | 2:1 5:2,8 | 352:3,17 | **security** 4:7 | 296:21 |
| 252:8 | 6:3 7:3 | 354:4 | 4:13 5:19 | 305:6 |
| 281:7 | 8:3 9:3,16 | 355:9 | 9:22 11:5 | 320:3 |
| 306:25 | 10:5 11:12 | 357:5 | 11:23 | 321:5,14 |
| 319:19,25 | 11:16,18 | **Secretaries** | 15:24,24 | 321:16 |
| 328:8 | 83:15 | 50:8 | 20:5 25:6 | 327:16 |
| 335:11 | 188:21 | 103:14 | 26:13 33:1 | 332:25 |
| 345:19 | 191:21 | **secretary** | 33:3,15 | 336:7 |
| 363:9 | 209:14 | 204:6 | 35:6 50:6 | 342:2,5 |
| 364:14 | 219:4 | 205:12 | 52:12 | 344:19 |
| 368:10 | 251:7 | 206:5,15 | 55:23 56:5 | 352:24 |
| 369:20 | 253:14 | 206:19 | 59:7,10 | 353:6 |
| **screwy** 209:3 | 269:21 | 207:4 | 61:7 62:24 | 359:18 |
| **scroll** 87:23 | 372:12 | 214:13,18 | 63:20 | 360:3,25 |
| 105:7 | 373:8,11 | 225:1,18 | 64:20 | 363:12 |
| 108:24 | 375:12 | 304:15 | 67:14,21 | **security...** |
| 125:10 | 376:2 | 311:17,17 | 71:8,9,15 | 234:24 |
| 157:11 | 377:5,20 | 311:21 | 71:17,19 | **see** 14:10,15 |
| 192:5 | **search** | **secretary's** | 76:25 | 14:17,21 |
| 195:9 | 192:20 | 101:18 | 79:14,17 | 14:22 15:4 |
| 197:10 | 222:4 | 311:19 | 79:21 80:1 | 15:16 18:6 |
| 201:17 | **searched** | **section** | 80:2 90:10 | 27:2 30:21 |
| 206:4 | 188:25 | 108:11 | 90:15 96:8 | 41:11 62:9 |
| 214:7 | 276:18 | 109:2 | 101:14,21 | 69:14 72:7 |
| 216:25 | 277:1 | 125:18 | 110:18 | 73:7,14 |
| 224:6,21 | **searches** | 193:25 | 112:6,11 | 78:22 83:1 |
| 244:8 | 144:18 | 281:5 | 113:12 | 87:25 88:1 |
| 245:23 | **sec** 190:24 | **sector** 16:20 | 119:10,21 | 88:8,15 |
| 282:16 | **second** 35:21 | 18:12 44:8 | 127:15 | 91:10,12 |
| 285:15,25 | 82:23 | 47:12 60:4 | 128:24 | 97:8 98:20 |
| 302:23 | 98:23 | 60:5 308:3 | 129:11,24 | 99:2,3 |
| **scrolling** | 138:22 | 314:8 | 135:25 | 105:7,11 |

BRIAN J. SCULLY  1/12/2023

| | | | | |
|---|---|---|---|---|
| 105:15 | 246:4,24 | 27:15 40:8 | 199:6 | **sentence** |
| 106:17 | 247:22 | 40:14,20 | 205:14,14 | 73:14 |
| 107:15 | 249:8 | 41:5,13 | 271:24 | 78:24 |
| 109:3 | 250:6,6,14 | 47:21 | 299:10 | 95:18,19 |
| 117:23 | 250:18 | 52:17 | **senior** 4:4 | 96:1,5,12 |
| 118:3 | 253:8,14 | 82:15 83:4 | 22:12 | 96:20 97:4 |
| 122:14 | 259:9 | 114:12 | 129:22,23 | 109:11 |
| 123:12 | 261:3 | 194:4 | 251:17 | 118:4 |
| 125:3,17 | 269:7 | 235:8 | 305:5 | 122:10 |
| 125:20 | 270:18 | 258:13 | 360:17 | 125:21 |
| 141:25 | 271:23 | 279:4 | **sense** 49:8 | 142:8 |
| 144:20 | 272:11 | 291:6 | 56:3 63:23 | 147:1,11 |
| 146:4,8,24 | 278:7 | 371:4 | 74:9 | 150:7 |
| 150:4 | 279:9 | **seen** 20:20 | 120:23 | 207:5 |
| 152:5 | 286:3,7 | 50:23 | 136:11 | 246:17 |
| 154:19 | 287:3 | 124:18 | 152:12 | 247:6,19 |
| 156:23 | 289:7 | 244:5 | 268:14 | 250:5 |
| 157:6 | 296:9,12 | 259:8 | 290:16 | 280:9 |
| 163:10 | 297:12 | 321:16,18 | 369:12 | 287:2 |
| 165:19 | 298:4,22 | 363:22,23 | **sensitive** | 334:1 |
| 166:21,23 | 298:25 | **semester** | 352:4,5 | 355:8 |
| 170:4 | 300:2 | 170:15 | **sent** 66:5,25 | 371:5 |
| 173:20 | 302:5,13 | **senate** | 67:7 69:10 | **sentences** |
| 176:3 | 302:15 | 197:16 | 106:13 | 90:14,25 |
| 191:9,17 | 304:10 | **send** 106:8,9 | 121:4 | **separate** |
| 192:6 | 307:5,17 | 107:2 | 134:13,17 | 37:3 155:5 |
| 194:10 | 308:7 | 109:17 | 135:3 | 180:13 |
| 195:6 | 310:3,6 | 119:23 | 168:16 | 267:23 |
| 198:18 | 319:23 | 120:1,15 | 180:8 | **separately** |
| 199:1,16 | 320:5,6,21 | 131:15,17 | 190:6 | 129:3 |
| 201:22,25 | 320:22 | 210:2 | 193:6,9,12 | **separation** |
| 202:8 | 321:10,11 | 212:13,18 | 193:15 | 108:21 |
| 203:19 | 322:3 | 318:17 | 199:19 | **September** |
| 204:7 | 328:14 | **sending** | 201:24 | 18:23 |
| 205:22 | 330:11 | 66:25 | 202:3,7 | 19:13 |
| 206:5,11 | 334:5 | 134:24 | 203:17 | 20:24 |
| 206:15 | 335:17 | 157:3 | 212:22 | 21:20 |
| 208:7 | 336:17 | 180:14 | 214:14,18 | 24:11 |
| 213:3,10 | 338:2 | 193:21 | 217:19 | 28:24 |
| 213:16,21 | 340:6,16 | 211:21,24 | 226:13 | 31:12 |
| 214:12,14 | 346:10 | 211:25 | 230:5,11 | 36:10,13 |
| 214:24 | 350:6,9,17 | 242:7 | 265:3 | 38:24 39:5 |
| 215:1 | 354:8 | 252:3 | 284:24 | 41:8 282:3 |
| 222:1,21 | 357:11 | 295:3 | 286:3 | 283:9 |
| 223:8 | 360:22 | 307:2 | 288:17 | 364:15,25 |
| 225:2 | 361:6 | 345:13 | 294:2 | **sequential** |
| 228:2 | 368:16 | 368:14 | 351:19 | 170:5 |
| 232:6 | 369:22 | **sends** 176:19 | 352:17 | **series** |
| 244:1,23 | **seeing** 27:12 | 198:19 | 366:12 | 309:25 |

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 310:10 | **seven** 233:21 | 328:8 | **shifted** | 372:9 |
| **serve** 60:7 | 245:15 | 329:10 | 113:15 | 375:17 |
| 70:17 | **shaking** 13:3 | 335:11 | **shifts** 166:9 | **signature** |
| 109:6 | **share** 14:10 | 345:19 | 166:13,14 | 373:7,19 |
| 189:23 | 14:10,18 | 363:10 | 174:13,21 | 375:14,17 |
| **served** 19:8 | 15:3,4 | 364:15 | 174:25 | 375:20 |
| 147:7 | 17:7 25:19 | 366:16 | 193:9,11 | 376:25 |
| 367:3 | 36:9 40:5 | 368:10 | **short** 104:17 | **signed** |
| **serves** 366:3 | 40:10,17 | 369:20 | 151:18 | 157:18 |
| 366:23 | 40:20 41:1 | **shared** 74:8 | 310:15 | 373:16 |
| **service** | 41:12 | 74:9 80:11 | **shorthand** | **significant** |
| 144:24 | 45:24,25 | 84:11,19 | 2:3,5 | 126:24 |
| 242:5 | 59:3 69:15 | 84:21 | 20:12 | 128:6 |
| 260:18 | 72:8 74:1 | 121:7,8,21 | 374:1 | 153:4 |
| **services** | 74:4,6 | 141:6 | **shortly** | **signoff** |
| 341:22,25 | 78:19 88:1 | 161:11 | 246:2 | 299:8 |
| 343:1,4,11 | 90:22 | 205:24 | **shot** 206:16 | **Silver** 312:8 |
| 343:14,18 | 105:8,9 | 213:6 | 225:6 | **Silvers** |
| 343:22,24 | 107:12 | 258:19 | 281:7 | 311:11,12 |
| 355:23 | 117:23 | **shares** | **show** 176:17 | 311:14,24 |
| 356:4,5,13 | 138:17 | 196:23 | 190:16 | **similar** |
| **serving** 20:6 | 156:18 | **sharing** 17:9 | 242:14 | 52:24 |
| 63:13 | 160:3,15 | 59:15,25 | 243:6 | 54:17 |
| 147:15 | 160:16,17 | 60:4,6,17 | **showed** 280:4 | 93:18 |
| 163:18 | 163:11 | 60:22 | **showing** 14:3 | 100:3 |
| 367:14,22 | 164:17 | 78:21 79:5 | 160:5 | 134:23 |
| **set** 6:24 | 191:5 | 80:10 | 227:12 | 136:19 |
| 16:3 21:9 | 199:2 | 121:24 | 252:15,18 | 139:12 |
| 47:20 58:1 | 206:14 | 147:6,7,15 | 255:14 | 140:6,25 |
| 61:4 63:14 | 211:11 | 147:15 | 279:10 | 238:16 |
| 68:16 88:9 | 212:15 | 148:5 | 342:17,19 | 243:20 |
| 103:8 | 213:4,11 | 164:3 | **shown** 229:7 | 296:23 |
| 165:17 | 215:2 | 235:6 | **shows** 157:2 | 314:19 |
| 179:7,17 | 222:22 | 260:4 | 205:11 | **simultan...** |
| 181:7 | 234:18,20 | 263:4 | 269:11 | 196:23 |
| 253:8 | 235:5,12 | 264:11 | **shredded** | **simultan...** |
| 256:3 | 252:8 | 284:12 | 339:11 | 169:24 |
| 262:16 | 258:1,20 | 288:24 | **side** 15:15 | 183:21 |
| 312:3 | 259:14,24 | 298:7 | 28:1 38:7 | 185:16 |
| 364:25 | 260:10,25 | **sheet** 43:2 | 40:4 43:24 | 195:23 |
| 374:13 | 285:1 | 373:16 | 44:18 54:4 | 197:8 |
| **sets** 39:18 | 287:5 | 376:1 | 127:23 | 200:2 |
| 303:14,23 | 288:23 | **sheets** | 236:25 | **Sincerely** |
| **setting** | 294:9 | 375:14,17 | 237:2 | 375:22 |
| 65:20 | 296:8,11 | 375:19 | 310:4 | **single** |
| 99:20 | 299:3 | **shift** 174:15 | 315:19 | 363:15,19 |
| 159:2 | 306:25 | 175:3 | **sides** 40:3 | **SIO** 97:5 |
| **settle** 62:23 | 311:24 | 180:15 | 238:20 | 104:4,12 |
| **setup** 119:25 | 319:19,25 | 193:15,20 | **sign** 11:2 | 104:15,17 |

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 181:14,17 | 253:16 | 168:7 | 317:13 | **sorry** 16:9 |
| 182:19 | 350:4 | 172:5,18 | 318:4 | 19:2 23:5 |
| 183:15,22 | **so-called** | 180:15 | 326:14,24 | 29:9 30:9 |
| 183:23 | 126:4 | 189:24 | 327:3,9,18 | 31:9 37:10 |
| 187:2,3,3 | 254:17 | 192:2 | 333:16 | 40:2 47:9 |
| 187:4,6 | **social** 17:4 | 193:3,9 | 339:10,23 | 55:1 60:12 |
| 195:15,24 | 17:8,10,12 | 200:20 | 340:4,5,8 | 66:14,23 |
| 196:24 | 17:16 | 208:23 | 341:13,16 | 67:3 70:7 |
| 197:8 | 18:16,21 | 210:12 | 346:25 | 76:20 84:5 |
| **sir** 15:5 | 20:8 21:1 | 214:3 | 350:15,21 | 86:6,7 |
| 153:11 | 21:5,23 | 220:4,6,25 | 350:21 | 90:21 91:8 |
| **sit** 130:8 | 23:20 24:2 | 221:20 | 351:2,6,13 | 95:25 |
| **sitting** | 24:5,10,13 | 222:16 | 351:24 | 100:15 |
| 263:17 | 27:1,22 | 223:20 | 352:11 | 104:1 |
| **situation** | 38:13 39:8 | 228:9 | 356:19,19 | 113:3 |
| 161:8 | 57:21 | 229:4,8 | 357:8,15 | 114:16 |
| 223:2 | 58:17 59:3 | 232:8,25 | 357:19,21 | 122:7 |
| 228:13 | 64:2 66:5 | 233:18,22 | 363:16 | 125:8,12 |
| 344:23 | 66:16,25 | 235:13 | 364:21 | 125:15 |
| **situational** | 67:17 68:8 | 237:3 | 365:2 | 138:2 |
| 155:7 | 73:11,18 | 239:11,21 | 366:2,5,25 | 139:17 |
| 267:17,24 | 78:21 79:6 | 241:6 | **society** | 143:16 |
| 268:2 | 93:21 94:7 | 242:16 | 16:19 | 145:6,7,10 |
| 325:24 | 94:13 | 244:18 | 73:11 | 147:2 |
| 326:1 | 107:20 | 245:4,16 | 105:13 | 150:25 |
| **six** 73:7,7 | 108:2 | 246:23 | 109:12,17 | 151:22 |
| 126:14 | 109:13 | 247:25 | 354:22 | 155:3 |
| 270:16 | 114:24 | 256:14 | **solving** | 163:13,15 |
| 331:1 | 118:25 | 257:17 | 65:25 | 164:13 |
| 337:25 | 120:22 | 258:2,5,12 | **somebody** | 166:17 |
| 338:6 | 122:18 | 258:13 | 62:22 | 167:20 |
| 349:23 | 123:5,17 | 259:4 | 102:2 | 168:4 |
| **size** 105:9 | 126:18 | 261:3 | 133:19 | 171:23 |
| **sizes** 357:9 | 127:5 | 263:24 | 135:4 | 173:8 |
| **skip** 334:24 | 129:12 | 265:17,22 | 168:6 | 178:1 |
| **skipping** | 131:20 | 266:9 | 174:12 | 186:2,18 |
| 141:15 | 132:1,12 | 268:23 | 224:14 | 195:4 |
| 298:19 | 132:17 | 269:1 | 227:5 | 196:8 |
| **slash** 28:9 | 134:4 | 274:5,8 | 263:13 | 197:5 |
| **slightly** | 138:11 | 277:9 | 333:8,10 | 198:22,25 |
| 91:14 | 144:4,24 | 278:7,13 | 358:11 | 214:9,15 |
| **slowly** | 146:3 | 286:19,23 | **somewhat** | 218:4,9,14 |
| 345:18 | 151:8 | 290:12,25 | 15:13 | 221:8 |
| **small** 122:19 | 152:18 | 291:25 | 105:10 | 222:11 |
| 193:25 | 153:15 | 293:5,6 | 352:4 | 223:15,17 |
| **Smoke** 281:16 | 157:9 | 296:16 | **Sonoma** 163:9 | 225:22,23 |
| **smoothly** | 163:19 | 300:18 | **soon** 14:15 | 225:25 |
| 15:2 | 164:11,13 | 305:18 | 198:14 | 226:1,1,4 |
| **Snell** 28:8 | 165:3 | 314:21 | 335:9 | 227:19 |

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 232:3,14 | 100:9 | 279:15 | **specific** | 133:22 |
| 232:23 | 102:11 | 338:1 | 27:19,20 | 135:9 |
| 233:18 | 114:21 | **speak** 14:20 | 37:17,25 | 149:9 |
| 241:3 | 115:7 | 27:8 36:2 | 38:11 | 150:3 |
| 243:4 | 123:24 | 42:5 56:2 | 39:24 | 207:17 |
| 249:1,21 | 130:16,16 | 58:3 61:21 | 56:15,24 | 235:9 |
| 252:13 | 131:1,7 | 64:16 | 74:6,14,16 | 237:1,7 |
| 253:9 | 151:20 | 67:13 | 75:3 90:12 | 242:6 |
| 257:11 | 152:4 | 87:22 | 116:12 | 245:17 |
| 262:3 | 179:12 | 115:16 | 120:10 | 246:9 |
| 268:12 | 206:25 | 131:16 | 129:9 | 254:8 |
| 269:10 | 220:22 | 149:11 | 133:21 | 256:17 |
| 273:9 | 234:20 | 161:24 | 143:24 | 259:15 |
| 274:22 | 286:21 | 177:20 | 216:23 | 275:17 |
| 279:22 | 329:14 | 207:3 | 220:12 | 276:24 |
| 280:14 | 345:12 | 243:12 | 236:10 | 282:11 |
| 281:6 | 368:18 | 367:18 | 237:16,21 | 283:24 |
| 282:1 | **sorts** 20:25 | **speaking** | 240:8 | 284:17 |
| 284:9 | 25:21 | 15:22 16:7 | 241:19 | 297:1 |
| 291:13 | 26:25 | 24:24 27:7 | 242:3 | 301:6 |
| 292:12 | 27:16 | 27:10,17 | 247:13 | 341:16 |
| 293:11 | 40:13 | 33:21 36:6 | 255:4 | **specificity** |
| 297:17,17 | 129:1 | 37:19,21 | 258:24 | 211:13 |
| 297:20 | 147:24 | 65:5 74:2 | 268:8,14 | **specifics** |
| 299:23 | 304:4 | 79:19 | 272:22 | 37:20 |
| 302:6 | 342:8,12 | 83:18 94:4 | 273:12,24 | 39:24 |
| 303:3 | 343:9 | 107:5 | 278:14 | 80:10 |
| 305:15 | 356:9 | 119:14 | 282:13 | 107:21 |
| 307:23 | **sound** 279:25 | 128:2,7 | 285:12,12 | 141:9 |
| 311:1 | 334:21 | 143:13 | 285:24 | 181:20 |
| 314:1 | **sounded** | 177:17 | 290:5,9 | 247:4 |
| 318:21,22 | 54:16 | 215:11,22 | 294:18 | 251:25 |
| 320:1 | **sounds** 96:14 | 220:14 | 303:7 | 286:17 |
| 325:15 | 160:13 | 235:1 | 304:13,25 | **specify** |
| 327:8 | 207:18 | 257:6 | 305:20 | 115:11 |
| 330:21 | 308:21 | 258:21 | 336:6 | 200:13 |
| 334:23 | 364:1 | 263:10,12 | 341:8 | **speculate** |
| 344:7 | **source** 16:22 | 264:25 | 345:25 | 91:23 97:2 |
| 347:12 | 42:16 | 304:2 | **specific...** | 216:6 |
| 351:23 | 123:14 | 305:10 | 37:16 | 231:14 |
| 361:17 | 274:5 | 309:4 | 65:24 74:3 | 272:15 |
| 363:5 | 279:6,11 | 325:20 | 84:6 99:6 | **speculating** |
| 368:13 | 325:21 | 340:10 | 103:20 | 68:23 |
| 369:23 | 326:8,9 | 357:18 | 105:24 | 266:10 |
| 371:10 | **sources** 24:4 | 358:7 | 113:10,14 | **speculation** |
| **sort** 18:3 | 123:9 | **special** 4:4 | 113:21 | 71:21 72:4 |
| 30:23 | 329:4 | 320:19 | 118:19 | 87:17 97:1 |
| 47:15 | 357:22 | **Specialist** | 121:19 | 98:12 |
| 99:20 | **space** 25:6 | 4:20 | 124:9 | 111:9 |

**BRIAN J. SCULLY  1/12/2023**

115:10
118:17
122:22
142:7
149:18
178:16
194:15
198:6
201:5
202:16
204:13,24
231:11
244:21
273:2
283:22
294:17,24
298:12
304:22
310:13
316:20
324:25
333:19
351:16
352:8
354:13
356:22
358:15
359:23
360:20
361:14
**speech** 320:4
348:5
**speed** 275:22
**speed/pr...**
272:10
273:16
275:23
**spell** 32:20
155:3
167:5
279:23
**spelling**
373:4
**spend** 87:7
**spent** 314:9
**spilling**
247:19
297:9,15
**split** 107:11

**spoke** 78:4
334:21
**spoken** 307:3
**spot** 284:10
348:25
**spread** 32:6
144:19
158:10
**spreader**
126:3
**spreaders**
125:23
**spreading**
114:23
124:24
160:8
207:8
323:4
**spreads**
323:11
**spreadsheet**
165:15,22
166:2,5,8
190:6,9
193:14
201:10,14
**spring** 70:9
89:10
**stability**
339:7
**staff** 16:2
28:9 53:25
54:6 57:8
113:10,12
113:13
148:25,25
149:1
171:8
330:19,22
331:1,11
333:8,13
**staffing**
173:23
**Stafford**
167:19
179:19
184:14
191:25
192:13

276:20
**stage** 47:7
174:2
**stages** 241:9
**stakeholder**
108:19
110:8
111:7,12
**stakehol...**
16:13,19
18:11,16
20:9 44:15
97:7
105:13,22
108:11,15
108:25
109:3,5,7
109:12
137:25
147:10
152:9
263:3
264:2
303:25
322:20
366:2
**stalled**
364:19
Stamos 70:5
70:14
72:17 76:9
76:14,15
77:8,17,22
77:25 78:7
85:22,23
86:3,11,16
87:15 88:8
98:7 99:10
99:16
101:2
111:22
116:20,24
117:2,5
136:9
139:7
142:12
362:12
368:13,21
**Stamos's**

89:6
**Stamped** 6:5
6:14,21
7:9,10,13
7:18 8:5
8:21,22
9:14,19,20
**stand** 270:14
307:19
308:15
**standard**
66:18
180:5
187:13
200:25
372:18
**standing**
179:3
**standpoint**
46:22
143:25
154:21
239:24
332:24
359:7
**stands** 59:16
146:10
307:22
**Stanford**
46:23 48:2
48:18
49:20
50:22,22
51:8,10,15
51:22 52:5
52:11 58:9
58:11
70:14,21
70:21
72:16
74:18
76:14 78:4
78:5,8
80:17,21
80:23 81:6
81:12,17
82:2 83:24
85:6 89:4
89:6,11,20

100:7
101:25
104:18,22
117:5
142:2,25
147:20
169:7,12
169:15,20
169:25
170:11,14
170:15
172:8,11
172:11
182:7,13
182:24
185:16
186:11,11
186:13,23
188:2,5,8
195:11
196:15,18
204:9,11
204:15,16
204:17
361:22
362:3
368:14
370:4
**Stanford's**
134:10
**Starbird**
72:21
87:25
360:5
**start** 14:3
212:6
233:11
244:8
**started** 12:2
24:17 32:2
76:17
88:24
89:13
117:1
174:4,5,20
174:21
336:12
368:14
**starting**

**BRIAN J. SCULLY 1/12/2023**

| | | | | |
|---|---|---|---|---|
| 12:5 18:6 | 377:1 | **stead** 21:1 | 338:12 | **subdivision** |
| 98:3 | **state's** | **stenogra...** | **string** 7:8 | 15:9 |
| 241:20 | 204:6 | 374:7 | 9:18 | 307:25 |
| 283:14 | 205:12 | **step** 80:19 | **strong** 96:7 | **subject** |
| 297:8 | 206:6,15 | 106:25 | 317:6 | 150:20 |
| 307:1 | 206:19 | 263:2 | **structure** | 152:22 |
| 323:24 | 214:13,18 | 347:10 | 339:8 | 153:19 |
| **starts** 324:4 | **state/local** | **steps** 16:14 | **stuck** 188:1 | 217:15 |
| **state** 1:5 | 24:1 | 123:12 | **student** | 246:21 |
| 10:6 11:16 | **stated** | 171:25 | 169:7 | 255:22 |
| 24:4 38:2 | 148:18 | 221:13 | **students** | 282:13 |
| 44:23 50:9 | 334:2 | 231:6,8 | 50:22,23 | 289:23 |
| 50:9 54:20 | **statement** | 295:4,19 | 51:15 | 297:11 |
| 54:23 | 21:12,13 | 298:3 | 89:20 90:1 | 361:5,16 |
| 57:18 | 218:18 | 302:17 | 97:5 370:4 | **submitted** |
| 58:23 60:1 | 219:21 | 304:13 | **studies** | 108:9,10 |
| 60:23 61:3 | 220:16 | 316:9 | 170:11 | 189:18 |
| 79:3 85:1 | 221:1,3,10 | 357:13 | **study** 95:15 | 199:21 |
| 91:19 | 221:15,22 | **stood** 60:7 | **stuff** 15:3 | 200:4 |
| 93:15 96:6 | 221:24 | 80:20 | 53:17 | 243:13 |
| 96:16 | 222:2,6 | 104:9 | 64:13 96:3 | **submitting** |
| 101:10,18 | 253:20,21 | 325:5 | 115:3 | 105:22 |
| 101:19 | 253:24 | 362:12 | 116:3,8 | **subscribe** |
| 103:14 | 254:3,7,15 | 364:4 | 121:24 | 145:2 |
| 106:11 | 254:22 | **stop** 266:19 | 166:13 | 377:11 |
| 148:5 | 314:19 | **store** 281:9 | 169:15 | **subsector** |
| 149:15 | **statements** | **stories** | 177:21 | 59:15 |
| 164:8,14 | 127:21 | 124:19 | 184:4 | 60:15 |
| 204:17 | 219:18 | **straight** | 187:11 | 339:7 |
| 207:4,7 | 222:14 | 120:18 | 188:11 | **subsidiary** |
| 215:10 | 225:10 | **strategic** | 189:11 | 38:18 |
| 221:25 | **states** 1:1 | 25:18 36:7 | 227:6 | **substance** |
| 223:4 | 10:9,25 | 36:8 37:22 | 234:20 | 377:8 |
| 225:2,19 | 41:12 | 235:3 | 238:17 | **substantial** |
| 246:1 | 45:19 | **strategi...** | 240:16 | 50:23 |
| 265:20 | 59:22 | 27:11 | 241:14 | 135:23 |
| 266:7 | 90:18 91:5 | **strategy** 9:9 | 289:13 | 153:4 |
| 278:4,11 | 94:22 95:6 | 12:10 | 366:8 | 264:4 |
| 278:19 | 95:12,16 | 321:7 | 368:18 | 317:18 |
| 281:18 | 147:10 | 328:13,24 | **sub-bullet** | **substant...** |
| 296:17 | 223:25 | 329:2,8,11 | 354:22 | 136:1 |
| 297:2 | 275:7 | **streamlined** | 357:6 | **suffice** |
| 298:9 | 342:1 | 65:11,14 | **subcommi...** | 301:4 |
| 299:11,21 | **stating** | **Street** 3:9 | 72:24,25 | **suggested** |
| 300:20 | 329:23 | 3:20 375:6 | 353:3,7 | 312:3 |
| 304:15 | **statutory** | 375:21 | **subcommi...** | **suggesting** |
| 369:3 | 61:20 | **strengthen** | 70:18 | 95:4 |
| 375:8 | **stay** 107:12 | 336:16,20 | **subcompo...** | 286:20 |
| 376:3 | 173:3 | **stressed** | 118:1 | **summarized** |

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 74:13 | suppose | 187:2,4 | 362:19 | 170:19 |
| summary 36:9 | 17:25 | 188:11,16 | surprised | 171:1,4 |
| 73:7 74:15 | 45:11 | 197:23 | 52:18 76:1 | 173:25 |
| 89:15 | 219:12 | 198:4 | 237:9 | 184:6,18 |
| 260:9,13 | 221:14 | 201:8 | 247:16 | 189:23 |
| 260:21,22 | 340:3 | 203:2 | 272:23 | 193:4,6 |
| 346:16 | supposedly | 207:10,12 | 296:23 | 213:15 |
| summer 36:16 | 218:25 | 211:15,21 | 334:14 | 216:13 |
| 36:17 70:9 | suppressed | 218:7 | surprising | 241:21,24 |
| 86:4 97:6 | 320:19 | 219:9 | 273:10 | 265:11,14 |
| 117:1 | suppresses | 221:2 | suspect | 266:21 |
| 151:18 | 354:23 | 223:16,19 | 103:3 | switched |
| 170:9,10 | Supreme 3:8 | 237:18,25 | 108:24 | 252:14 |
| 186:7,14 | Sur 3:18 | 238:18 | 163:7 | sworn 11:10 |
| 187:8,24 | 11:5 | 239:13 | 261:18 | 11:13 |
| 188:10 | sure 11:18 | 240:6 | 289:16 | sync 21:4 |
| 234:7 | 15:1 16:10 | 241:11 | 290:3 | 24:13 |
| Summit 5:19 | 17:12 | 243:16 | 326:21 | 36:20 78:7 |
| super 239:15 | 20:20 | 249:2 | 331:6 | 127:19,22 |
| 325:18 | 26:22 29:8 | 256:16 | 333:10 | 128:14 |
| supervision | 34:2 42:13 | 257:13,15 | swear 11:9 | 132:4 |
| 374:9 | 52:14 | 259:20,23 | switchboard | 233:17 |
| supervisor | 54:24 56:1 | 261:8 | 16:24 17:1 | 238:9 |
| 22:13 | 57:2 60:14 | 265:2 | 168:10 | 244:17 |
| 140:22 | 61:4 62:5 | 267:2 | 263:15 | 245:14 |
| 141:11 | 63:1 65:1 | 269:10 | 366:3,23 | 246:7 |
| suppleme... | 65:15 | 271:17 | 367:15,22 | 247:2,11 |
| 276:13 | 66:12 67:3 | 273:19 | switchbo... | 255:3 |
| 277:2 | 68:25 | 286:25 | 131:16 | 260:5 |
| supply | 74:12 77:1 | 295:24 | 179:16 | 269:6,14 |
| 220:24 | 79:11,14 | 296:19 | switchbo... | 269:25 |
| support | 80:8 84:12 | 299:19 | 64:16 | 272:2 |
| 54:18 | 85:13 93:6 | 300:22,24 | switchbo... | 306:2,9 |
| 184:4 | 102:15 | 301:1 | 21:25 22:2 | 317:16 |
| 220:8 | 124:18 | 302:24 | 23:17,19 | synch 178:25 |
| 301:9 | 132:9 | 303:10,25 | 23:24 | 238:6 |
| 307:17 | 135:2 | 305:11 | 62:17 63:3 | syncs 132:5 |
| 322:2 | 140:21 | 306:15 | 63:7,17,20 | system 96:8 |
| 325:3 | 149:7,12 | 316:25 | 64:7,9,12 | 158:20,24 |
| 331:3,14 | 151:1 | 331:8 | 118:21,22 | 159:4 |
| 337:11 | 152:2,9 | 337:6,7,20 | 118:24 | 181:23,25 |
| supported | 161:1 | 363:22 | 131:9,12 | 182:1,3,7 |
| 90:10 | 162:13 | 365:22 | 138:4,5,8 | 182:7 |
| 149:2 | 166:4 | surprise | 149:3,5,20 | 267:13 |
| supporting | 176:17,24 | 80:11 | 156:21 | 342:4 |
| 187:1 | 178:21 | 236:22 | 161:20 | 355:13,17 |
| 331:3 | 181:8,13 | 247:4 | 163:18 | 355:20 |
| supports | 184:7 | 252:1 | 166:1 | systems 2:7 |
| 43:17,20 | 185:23 | 255:6 | 169:1 | 270:12 |

**BRIAN J. SCULLY  1/12/2023**

288:6
341:25
342:11
374:20

---

**T**

**T** 4:1  5:1,1
5:6  6:1,1
7:1,1  8:1
8:1  9:1,1
**table** 73:6
232:17,18
232:18,19
**tactic**
114:19
236:11,21
246:11
255:7
273:11
**tactics** 41:5
41:13
114:11,22
114:23
116:12
279:6
316:6
323:4
359:10
**take** 16:15
31:10,19
43:8  50:13
57:24
60:21  63:2
63:6  65:10
80:19  81:9
81:10  85:9
89:10
94:12
96:22
103:7
106:25
111:21
112:4,9
116:2
118:6,23
120:20
121:10
123:12
133:6

137:20
140:8
141:2
142:14
147:13
157:8
158:6
170:13
179:16
183:1
190:1,21
219:20
221:13,23
231:8
242:3
261:2,12
275:5,11
276:1
277:14
313:14
316:9
318:22
328:22
342:18
345:17
348:7
349:3
358:24
361:9
367:4
**takeaways**
141:8
143:20
**taken** 177:13
178:6
288:11
304:13
374:4,7
375:12
376:4
**talk** 5:15
12:21
26:11  41:3
41:4  45:5
47:13  84:4
99:25
100:10
102:19
111:22

116:15
127:18
128:3
133:21
172:4,23
208:9
209:21,24
240:1,13
241:12,23
258:3
296:2
306:14,14
311:7
325:22
344:14,18
349:6
356:18
357:10
359:4
**talked** 26:20
26:21,22
46:22,24
58:10  63:3
65:10,11
72:13  82:1
85:5,21
91:15
93:14
96:15
99:11
100:16
121:17
132:4
140:21
142:21
147:22
157:22
161:13
171:21
173:22
179:1
181:18
208:15
213:25
216:18,20
233:6,7
235:10
238:10
244:17

245:20
250:17
259:13
263:7,21
264:15
306:2
310:23
312:19
335:3
351:13
355:16
360:11
362:5
368:19
**talking**
28:24  31:2
31:11,17
41:7  45:14
47:10
56:24
83:15
91:14
96:15
114:25
145:19
163:5
185:8
206:12,13
208:14,21
210:24
217:12
237:14
239:13
240:21
242:6
243:10
244:25
245:1,21
246:13
256:12,17
259:3
260:7
263:25
274:7,9
294:3,14
294:19,21
296:15,20
333:22
335:5

370:3
**talks** 44:19
78:20
90:14
108:9
146:6
254:3
363:13
368:12,18
370:8
**tally** 349:23
**tangential**
13:13
**Tangle**
144:18,22
144:23
145:2,13
146:7
**target** 57:16
321:8
**targeted**
114:19
254:11
256:10,19
278:20
**targeting**
16:5  57:11
87:3  96:10
96:18
154:1
331:17
**targets**
258:19
**task** 12:5
118:1,7
130:2
271:6
312:2
330:15
348:13
**tasked**
174:13,14
**tasks** 90:12
**team** 8:13,15
15:17,23
16:2,2,4
18:4,8
19:10
36:14

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 39:15 | 348:12,13 | 221:17 | 317:17 | 114:21 |
| 42:24 | 350:13 | 348:15 | 336:23 | 143:6,8 |
| 44:10 | 353:10,12 | **tells** 280:10 | 345:8 | 210:17 |
| 75:20 | 353:13 | 340:5 | 373:13,14 | 219:13 |
| 102:3 | 358:24 | **tended** 216:5 | **text** 8:22 | 280:19 |
| 113:13 | 366:3,23 | **tenth** 283:7 | 217:4 | 295:4 |
| 115:19,25 | 367:12 | **term** 138:9,9 | 309:25 | 301:14 |
| 117:12 | 368:14 | 242:5 | 310:3 | 309:9 |
| 118:8,10 | **team's** | 293:20 | 312:1 | 345:12 |
| 118:15 | 342:23 | **terminology** | 316:11,12 | **things** 16:3 |
| 131:18 | **teammates** | 127:13 | 317:21 | 25:4 26:25 |
| 143:22 | 308:7 | **terms** 31:18 | **texting** | 27:11,17 |
| 159:14 | **teams** 42:9 | 54:18 | 310:11 | 41:17 43:5 |
| 161:6 | 287:18 | 83:22 | **texts** 310:10 | 44:3,18 |
| 166:9,12 | 288:1 | 154:4 | **thank** 29:24 | 46:16 |
| 171:18,20 | 311:9 | 155:21 | 87:24 | 55:10 69:4 |
| 174:5 | **tech** 279:12 | 166:10 | 88:14 | 71:4 |
| 180:7 | 279:14 | 184:6 | 183:10 | 113:16 |
| 188:25 | **technical** | 260:18 | 199:4 | 114:11,19 |
| 189:4,7 | 83:17,17 | 288:23 | 206:2 | 115:2 |
| 263:13,14 | 146:19 | 317:18 | 224:17 | 124:19 |
| 263:19 | 195:18 | **terrorism** | 227:21 | 129:1 |
| 278:25 | **technically** | 26:23 | 272:1 | 131:7 |
| 279:16 | 130:9 | 27:16 | 300:12 | 144:9 |
| 289:10 | 175:2 | **test** 152:11 | 308:14 | 159:3 |
| 299:1 | **technique** | 154:7,10 | 367:3 | 168:14 |
| 303:20 | 115:4 | 154:17 | **thanked** 89:9 | 174:9 |
| 305:18 | Technolo... | **testified** | **thanks** 176:2 | 207:1 |
| 307:15 | 9:25 | 11:13 | 199:16 | 216:16 |
| 311:9 | **technology** | 150:10 | 200:10 | 235:11 |
| 312:2,3 | 286:16 | 156:22 | 277:15 | 238:23 |
| 318:11 | **teleconf...** | 192:25 | 292:25 | 254:8 |
| 320:11 | 332:13 | 193:8 | 295:3 | 256:8 |
| 325:10 | 334:2 | 245:11 | 299:21 | 258:19 |
| 326:5,7,21 | **tell** 111:19 | 255:24 | **theft** 76:25 | 260:6 |
| 326:23 | 118:22 | 276:19 | **theirs** 67:15 | 264:18 |
| 330:21 | 158:13 | 309:10 | 301:11 | 268:25 |
| 331:5,6,10 | 198:14 | 360:24 | **theme** 259:5 | 270:13,14 |
| 331:13,16 | 211:23 | 365:3 | 349:8 | 279:7 |
| 331:19,23 | 214:5 | 367:4 | **themes** 256:8 | 284:2 |
| 335:20,25 | 215:11 | **testify** | 256:14,21 | 290:20 |
| 336:5,17 | 244:25 | 251:16 | 257:18 | 291:2,6 |
| 336:21 | 257:18 | **testimony** | 258:4,12 | 292:8 |
| 337:4,15 | 266:17,23 | 23:7 89:25 | 259:1 | 304:4 |
| 338:22 | 287:12 | 97:22 | **theory** 154:8 | 306:13 |
| 343:19 | 334:16 | 118:23 | 154:10 | 316:7 |
| 344:22 | 349:1 | 119:6 | **thereon** | 325:23 |
| 346:16 | **telling** | 202:18 | 377:10 | 326:11 |
| 347:23 | 35:18 | 276:16 | **thing** 88:9 | 333:24 |

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 334:16 | 125:6 | 255:24 | 371:25 | **threats** 25:3 |
| 340:15 | 128:1,21 | 256:9,22 | 372:5,18 | 26:16,21 |
| 342:12 | 131:22 | 256:25 | **thinking** | 26:23 |
| 345:11 | 134:21 | 257:12 | 37:23 | 27:16 |
| 346:24 | 135:24 | 258:15,16 | 53:15 58:5 | 235:18,24 |
| 348:1,22 | 136:13 | 258:22 | 85:15 87:6 | 340:17 |
| 348:24 | 137:7,8,16 | 259:6,21 | 99:22 | 366:15 |
| 349:13 | 139:20 | 261:9 | 100:2 | **three** 19:8 |
| 358:23 | 140:2,4,17 | 262:5,19 | **third** 72:10 | 35:17,23 |
| **think** 15:1 | 142:17 | 263:17,21 | 90:4 | 43:17,22 |
| 19:12 | 143:4,5,23 | 265:24 | 119:25 | 44:8 48:18 |
| 20:17 | 144:10 | 267:8 | 249:25 | 50:11 |
| 24:18 | 149:4 | 268:7,9,15 | 320:15 | 110:11 |
| 26:23 | 150:10 | 268:20,21 | 346:7 | 119:8,17 |
| 38:25 47:3 | 156:21 | 270:25 | 361:19 | 187:14 |
| 48:1,17 | 157:4 | 271:2,12 | 364:16 | 191:17 |
| 49:1 50:3 | 158:16 | 276:22 | 365:17 | 214:19,21 |
| 53:23,24 | 162:16,18 | 279:18,19 | 366:1 | 215:5 |
| 54:22 55:1 | 165:14 | 281:17 | 368:11 | 254:8 |
| 55:7,22,25 | 166:20,22 | 286:23 | **third-party** | 308:22 |
| 56:11,16 | 167:1 | 288:14 | 288:1 | 331:3 |
| 58:4,7,10 | 169:2 | 290:24 | 325:22 | 345:15 |
| 58:13 59:5 | 173:5 | 295:8,9 | 326:10 | **throttled** |
| 60:18 | 174:2,13 | 296:1 | **thought** | 320:19 |
| 65:13,17 | 175:10 | 298:14 | 56:14,20 | **throw** 217:11 |
| 65:19,22 | 177:17 | 300:23 | 58:14 | **Thursday** |
| 66:7 71:1 | 180:4,20 | 301:3 | 100:1 | 1:15 157:2 |
| 72:15 | 181:3,18 | 305:8 | 116:3 | **ticket** |
| 74:15 | 182:16 | 306:1,8,12 | 145:7 | 144:16 |
| 80:14 | 187:3,3 | 306:12,17 | 159:13 | 146:2 |
| 81:19 82:5 | 192:5 | 307:22 | 160:4 | 158:10,18 |
| 82:8 83:15 | 194:7 | 311:4 | 161:5 | 161:15 |
| 84:14 | 197:14 | 314:6 | 227:25 | 162:19,22 |
| 87:11 | 198:16 | 315:5 | 232:14 | 199:13 |
| 88:24 | 204:16 | 317:5 | 252:17,17 | **ticketing** |
| 90:11 | 212:11 | 318:7 | 260:18 | 158:20,23 |
| 91:25 92:7 | 215:20 | 328:1 | **thread** 81:5 | 159:4 |
| 92:12,13 | 220:5 | 329:11,13 | 81:10 | 181:22,25 |
| 93:18,24 | 222:3 | 329:17 | **threat** 37:17 | 182:1,3,6 |
| 94:2 100:6 | 227:14 | 333:4,7,11 | 37:23 38:1 | **tickets** |
| 100:7,17 | 232:12 | 337:8 | 338:13 | 108:9,10 |
| 101:4,15 | 233:9,21 | 341:22 | 339:12 | 109:17 |
| 106:1,15 | 236:4 | 344:15 | 341:13 | 110:1 |
| 112:15 | 239:4 | 345:4 | **threaten** | 122:12 |
| 113:4,4 | 240:23 | 351:10 | 340:8 | **tier** 106:18 |
| 117:7 | 245:22 | 353:19 | **threatening** | 107:14 |
| 119:15 | 250:20 | 357:24 | 235:20 | **tiered** |
| 124:14,15 | 251:7 | 365:3,21 | **threatens** | 144:15 |
| 124:16 | 252:13,15 | 369:10 | 340:11 | **time** 10:4 |

**BRIAN J. SCULLY  1/12/2023**

22:15,18
22:22
28:24
30:17,25
34:24 35:2
41:7 46:3
55:16
70:12 78:8
83:9,12
87:7 90:7
100:25
105:2,6
127:16
139:10,24
141:12
142:23
158:17
164:25
169:4,5,8
169:24
180:22
181:4
183:5,8
186:24
209:8,11
218:1
220:1,1,9
249:11
255:10
265:17
271:12
276:6,9
277:5
287:19
297:10
300:17
302:21
303:1,3
306:5
314:9
315:21
319:10,13
323:23
324:9
327:25
331:4
333:14
334:5
336:8

351:4,4,11
351:11
352:4,5
360:18
362:22,25
372:12
**timeframe**
31:1 36:10
39:10,18
55:6 71:15
85:10 86:8
86:18
87:15,21
104:20
122:19
129:20
170:24
177:7
227:2
285:19
293:7
327:25
337:14
**timeline**
55:6,8
98:20,24
178:8,18
179:11
**timelines**
101:6
176:19
**times** 38:22
174:15,15
174:16
177:22
201:10
230:20
238:5
247:10
255:6
273:10
351:9
**timestamps**
293:2
**timing**
177:20
**tiny** 73:5
**tips** 66:14
202:14

214:5
**tips@202...**
203:1
230:17
**tips@202...**
202:8
204:2
205:13
213:21
230:9,14
**tips@202...**
203:18
**tips2202...**
205:5
**title** 11:20
15:19 29:5
29:9 32:24
32:25
129:19,23
289:11
311:16
335:19
**today** 11:3
13:3 14:8
20:13
240:21
244:17
245:11
276:16,19
282:6
283:11
299:7
334:9
364:22
366:22
**today's** 10:3
253:20,25
254:7
**Todd** 3:4
10:22
**Todd.sco...**
3:14
**told** 86:25
215:15
246:18
267:3
**tomorrow**
277:3,12
**ton** 238:23

303:18
**tonight**
292:9,11
292:14,15
292:17,18
**tool** 145:21
**tools** 108:6
155:21
231:13
**top** 15:7
83:4
157:16
163:6
201:22
241:19
289:19
299:14
338:13
**topic** 13:13
181:6
312:12
**topics** 236:5
248:9
274:15
308:22
315:14
321:10
**total** 180:20
**touch** 59:6
62:12,12
101:13,16
101:24
102:1,5,25
112:6,10
112:13
234:14,21
351:6
**track** 45:17
151:23,24
152:17
153:15
165:22
**tracked**
144:2
161:15
**tracking**
150:16
158:10,14
165:15,19

169:19
190:6,8
228:9
229:3
287:4
288:22
289:2,21
**traction**
228:10
229:4
**traditional**
254:18
**traffic**
159:24
**transcribed**
12:20
**transcript**
5:7 6:2
7:2 8:2
9:2 13:7
368:12
370:2
372:15
374:5
375:16
**transcri...**
5:14,18
373:14
**transiti...**
330:14
**transpar...**
261:10
**transparent**
260:19
**Treasury**
343:16
350:13,19
350:25
351:22
352:5,10
355:22
356:15
**trend** 40:5
315:8
**trending**
231:6,9
**trends** 41:13
235:8
305:20,24

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 306:7 | 347:16 | 290:10 | 283:8 | 223:11 |
| 314:14,18 | 357:25 | 291:11,19 | 288:18 | 226:14,19 |
| 314:21,23 | 358:5,9,17 | **tweets** | 289:9 | 230:7,12 |
| 315:1 | 359:8,11 | 159:17 | 291:1,19 | 248:24 |
| 323:3 | **trying** 49:20 | 177:4 | 291:20 | 256:10 |
| **triage** | 54:18 91:8 | 226:19 | 293:15 | 259:6 |
| 107:15 | 91:23 93:7 | 292:9,14 | 298:23 | 268:9 |
| **Trick** 213:8 | 94:4 97:3 | 292:16 | 299:6,20 | 271:11 |
| **tried** 239:18 | 131:5 | 305:20 | 300:4,15 | 272:9 |
| **tries** 344:22 | 135:23 | **twice** 333:8 | 301:5,10 | 279:18 |
| 346:16 | 152:7 | **Twitter** 27:3 | 360:18 | 281:22 |
| **trouble** | 154:2,7,17 | 38:15 65:2 | **Twitter's** | 290:5 |
| 98:24 | 154:19 | 65:8 127:5 | 282:24 | 291:21 |
| **true** 17:25 | 216:7 | 146:13,13 | 289:20 | 296:20 |
| 95:11 | 219:9 | 159:18,19 | 292:5 | 303:23 |
| 211:3 | 229:1 | 159:25 | **Twitter-...** | 306:8,16 |
| 281:1 | 241:9 | 162:25 | 238:11,15 | 325:12 |
| 330:19,22 | 256:18 | 163:5 | **two** 21:2,2 | 331:2,2 |
| 331:23 | 261:22 | 173:14 | 21:11,17 | 332:9 |
| 366:21,22 | 279:19 | 176:2,6,15 | 24:9,19 | 334:3,9 |
| 373:13 | 299:18 | 199:12,21 | 29:21 | 345:14 |
| 374:5 | 300:23 | 199:23 | 30:18 | 356:24 |
| 377:9,13 | 305:1 | 200:4,9 | 35:17 37:6 | 360:23 |
| **truly** 368:23 | 306:11 | 205:17,19 | 38:23 | 372:17,18 |
| **trust** 289:10 | 314:12 | 206:1,16 | 39:18 44:5 | **two-fifths** |
| 289:12,14 | 315:20 | 207:25,25 | 51:16,18 | 119:10 |
| **trusted** | 323:3,22 | 208:8 | 52:8 54:8 | **two-fold** |
| 108:10,14 | 329:5 | 209:1,16 | 59:19,20 | 265:24 |
| 108:18 | 342:17 | 210:2 | 60:10,12 | **tying** 90:11 |
| **truth** 9:4 | 346:11 | 211:16 | 67:25 75:9 | **type** 27:16 |
| 221:18 | 347:22 | 212:1,10 | 86:11 90:3 | 40:10 |
| 319:21 | 349:14 | 221:16 | 90:14 | 44:12 74:7 |
| 344:15 | 364:2 | 223:2 | 101:17 | 119:25 |
| **truths** | **Tuesday** | 224:6,7,16 | 113:24,25 | 240:16 |
| 345:11 | 226:6 | 226:9,12 | 117:7 | **types** 21:3 |
| **try** 13:1 | 373:6 | 226:14,17 | 119:16,21 | 21:17 |
| 25:1 27:21 | **turn** 139:5 | 226:22 | 119:22 | 243:21 |
| 46:3 47:5 | **turning** | 227:3 | 125:11 | 316:7 |
| 47:5 57:10 | 20:23 24:9 | 229:16,19 | 170:3,5 | 331:19,24 |
| 62:20 83:6 | 37:14 | 231:4,12 | 171:3,7,8 | **typewriting** |
| 220:8,19 | 42:20 | 233:23 | 181:3 | 374:8 |
| 229:9 | 78:19 | 239:6,6,9 | 184:25 | **typical** |
| 261:9 | 177:8 | 241:5 | 185:20 | 177:7,14 |
| 314:15 | 267:4 | 243:9 | 188:19 | 178:8 |
| 315:3,8,12 | 354:4 | 246:24 | 191:16 | 187:11 |
| 315:15,25 | **tweet** 224:18 | 281:8,13 | 193:18,19 | **typically** |
| 317:10 | 231:5 | 281:16,18 | 193:21 | 42:11 |
| 319:3 | 289:23 | 281:23,23 | 207:22 | |
| 332:1 | 290:2,5,8 | 282:4 | 214:20 | **U** |

| | | | | |
|---|---|---|---|---|
| **U** 4:1  6:1 | 13:15,17 | 134:10 | 342:1 | **useful** |
| 7:1  8:1 | 16:14 | 143:13 | **universe** | 140:15 |
| 9:1 | 44:15  47:6 | 147:17 | 290:6,7,8 | 156:7 |
| **U.S** 4:13 | 48:14 | 148:2,17 | 291:8 | 261:12 |
| **uh-huh** 13:2 | 56:23 | 148:24 | 315:17 | 314:15 |
| **uhn-uhn** 13:3 | 59:13 | 154:6 | 359:2 | 358:8 |
| **Ukraine** | 79:24  93:7 | 169:6,11 | **University** | **usefully** |
| 322:3 | 94:5 | 170:17 | 46:23,25 | 144:7 |
| 324:6 | 143:17 | 179:22 | 46:25  47:1 | **uses** 217:16 |
| 325:4,7 | 151:2,25 | 182:20 | 48:3,18 | **USG** 179:1 |
| 326:15 | 152:19 | 261:10 | 72:19 | 216:17 |
| **ultimate** | 153:7 | 265:23 | 360:8 | 233:13 |
| 347:19 | 154:3,16 | 266:13 | **unofficial** | 243:18 |
| **umbrella** | 219:9 | 267:18 | 281:18 | 245:15 |
| 148:18 | 223:13,16 | 270:11 | 349:22 | 255:21 |
| **unable** 92:15 | 241:12 | 279:6 | **unoffici...** | 260:5 |
| **unambiguous** | 249:3 | 308:12,17 | 281:8 | 262:8 |
| 289:24 | 256:18 | 311:8 | **unpack** | 272:10 |
| **unauthor...** | 277:13 | 312:8 | 102:11 | 273:15 |
| 254:19 | 297:21 | 325:19 | **unrelated** | 274:24 |
| **unavailable** | 304:3 | 327:17 | 356:17 | 275:7,7,12 |
| 270:4 | 305:20 | 333:20 | **unsure** 90:4 | 275:19,22 |
| **unclassi...** | 312:2 | 336:23 | **unusual** | 287:20 |
| 25:20  26:9 | 314:14 | 337:16 | 225:9 | **usual** 289:1 |
| 36:7  235:3 | 315:1,20 | 343:19 | **upcoming** | **usually** 30:6 |
| 257:4 | 316:9 | 365:4 | 257:19 | 233:12 |
| 258:18 | 323:3,7,22 | **understood** | 299:1 | 324:1 |
| **unclear** | 324:7 | 149:8 | **update** 129:4 | |
| 370:21 | 327:11 | 158:19 | 270:13,17 | **V** |
| 371:15 | 343:6 | 240:7 | 282:6 | **v** 1:8  375:8 |
| **undermine** | 345:9 | **undertake** | 283:11 | 376:3 |
| 27:21 | 355:24 | 240:8 | **updates** | **V-i-r-a-...** |
| 254:11 | 358:3,19 | 303:12 | 128:23 | 139:1 |
| 283:15 | 358:22 | **unfortun...** | 234:23 | **vaccine** |
| 343:10 | 368:23 | 14:14 | **updating** | 323:10 |
| 356:13 | **understa...** | 237:5 | 283:12 | **vaccines** |
| **undermines** | 17:15 | **unified** 9:9 | **upfront** | 5:13  144:3 |
| 354:24 | 56:19 | 325:6,14 | 37:20 | 322:1,10 |
| 355:10,19 | 59:17 | 326:2,6,16 | **use** 20:13,20 | **vague** 53:1 |
| **undermining** | 61:19,25 | 328:13,24 | 39:22  94:1 | 77:10,11 |
| 27:13 | 67:22  68:3 | 329:1,7 | 94:3 | 77:14 |
| 354:21 | 68:9,20 | **United** 1:1 | 109:20 | 87:16  93:2 |
| **underneath** | 73:4  78:13 | 10:9,25 | 126:22 | 93:23 |
| 28:10 | 89:8 | 41:12 | 138:9 | 130:19 |
| 148:19 | 107:23 | 45:19 | 145:22 | 341:6 |
| 330:9 | 108:1 | 90:17  91:5 | 210:20 | 344:25 |
| **underpin...** | 121:11 | 94:22  95:5 | 231:13 | **validate** |
| 223:7 | 122:17 | 95:12,16 | 254:18 | 224:3 |
| **understand** | 123:23 | 275:7 | 320:21 | **variance** |

**BRIAN J. SCULLY  1/12/2023**

153:25
**varies** 44:21
**various** 66:3
298:8
351:2
**vast** 180:21
**vehicle**
61:16
149:14
**vendors**
264:9
267:12,13
**venues**
357:15
**verbal** 13:1
**verifica...**
288:2
**verifying**
98:7
**Verizon**
233:24
**versus** 10:7
**video** 4:20
10:4 82:24
145:24
146:1
223:6
224:7
**videogra...**
10:2,16
11:8,11
34:24 35:2
83:9,12
183:5,8
209:8,11
276:6,9
319:10,13
362:22,25
363:4
372:10
**videos** 224:1
**Videotaped**
1:14
**view** 58:22
146:1
239:8
261:4
329:10
338:22

347:12
349:3
369:7
**viewed** 71:4
**Vijaya**
360:14
**violates**
261:6
**violations**
153:5
177:4
**violence**
340:17
366:11,15
**VIPs** 80:20
**Virality**
5:11 134:6
134:9,15
135:8,21
136:10,18
137:3,17
138:18,24
138:25
139:8
141:14
144:2
**visible**
105:9
**voluntary**
318:9,9
**volunteer**
89:21
**vote** 8:19
302:5,15
**votes** 217:12
286:14
**voting** 96:11
96:19
**voting-r...**
147:3
_____
| W |
W 3:9
**wait** 14:24
**waiting**
174:9
212:16
252:11
302:7

**waived** 373:7
**wake** 335:25
**walk** 18:3
**walked** 54:11
71:1
**Walter**
157:18,24
**want** 14:20
14:25
15:14  27:4
34:19  42:5
45:5  56:2
58:3  61:21
63:11  69:5
77:15  87:7
91:22  92:9
93:6  96:3
97:2
113:22
117:22
127:13
133:24
149:11
154:15
207:3
216:6
221:8
227:20,23
243:12
249:2
252:20
253:5
283:11
300:25
308:21
318:12
358:21
367:18
372:25
**wanted** 30:19
30:22
62:18,25
63:9  65:14
68:15  72:6
86:19
121:2
152:6,11
152:12
163:8,25

164:9
178:2
183:12
216:2
218:7
240:6
253:23
285:1
287:3,11
287:25
294:9
298:24
343:4
356:18
**wanting**
351:23
**wants** 13:18
315:1
**warned** 207:1
**warning**
207:7
**warnings**
206:22
**warrant**
207:2
**Warren** 43:18
257:15
**Washington**
2:4  3:21
46:23  48:3
48:19
72:20
304:15
360:9
375:6
**wasn't** 62:17
63:8  67:12
75:20  76:6
87:8  106:7
128:6
139:12
151:24
170:5
175:4
199:1
201:7
203:5,6
227:8
238:23

261:14
327:4,21
327:21
334:21
341:15
370:9,13
**watch** 264:14
279:16
**watching**
179:4
**way** 41:11
62:21
67:18
81:18
84:25  85:8
101:15
108:2
119:25
125:3
133:19
148:23
164:11,20
196:16
216:22
239:22
260:18
261:22
273:23
274:13
280:3
281:3
286:22
300:1,4
324:10
327:11
337:21
347:19
**ways** 108:4
119:8,16
119:17,22
120:4
159:23
254:11
279:3
283:24
340:12,20
340:24
342:6
**we'll** 14:16

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 34:19 45:6 | 240:20 | 170:10,14 | 213:8 | 135:24 |
| 108:25 | 243:10 | 185:15 | 231:23,25 | 136:4 |
| 207:25 | 271:11 | 197:11,15 | 255:17 | 137:6 |
| 277:14 | 276:16 | 197:19 | 258:7 | 143:21 |
| 279:15 | 277:5 | 207:11,13 | 262:3 | 149:3 |
| 298:7 | 282:20 | 210:15 | 276:19 | 152:4,6 |
| 317:22 | 289:21 | 303:10 | 302:11 | 159:3 |
| 372:23 | 292:13 | **weren't** 59:2 | 306:23 | 169:12,13 |
| **we're** 28:24 | 294:10 | 65:1 152:9 | 318:22,25 | 169:22 |
| 31:1,17,17 | 322:18 | 211:15 | 341:7 | 172:1,3,7 |
| 34:25 35:3 | 355:21 | 239:15 | 372:9 | 181:14,17 |
| 41:7 44:13 | **Web** 8:7,11 | 334:13 | 374:13 | 182:13,17 |
| 45:13 | **website** | **Western** 1:2 | 375:15 | 184:5 |
| 125:10 | 43:13 | 10:10 | 376:2,25 | 185:16 |
| 139:13 | 123:24 | **WHEREOF** | **witness's** | 186:10,13 |
| 168:3 | 138:3 | 374:13 | 23:6 97:21 | 186:23 |
| 170:20 | 365:14,22 | **White** 140:4 | 345:7 | 187:5,13 |
| 173:5 | 365:23 | 140:18 | **wondering** | 188:1,4,11 |
| 175:23 | 366:22 | **whoa** 242:22 | 288:22 | 196:20 |
| 179:3,13 | **weed** 281:9 | 242:23,23 | **word** 82:9 | 197:12,15 |
| 180:13 | 281:16 | 242:23 | 93:8,11 | 197:21 |
| 183:6 | **week** 86:11 | **wide** 321:9 | 168:5 | 229:8 |
| 204:7 | 208:22 | **Wiki** 39:2 | 341:10 | 239:14 |
| 206:24 | 283:14 | 233:25 | 370:6 | 240:15 |
| 208:21 | 337:24 | **Wilson** | **words** 65:2 | 241:21 |
| 209:9 | **weekend** | 157:19 | 68:2 69:6 | 279:14 |
| 224:2 | 174:16 | 217:4 | 69:20 | 296:7 |
| 229:3 | **weekends** | 227:18 | 123:11 | 304:3,16 |
| 235:1 | 173:25 | **withdraw** | 149:4 | 305:7,11 |
| 242:18,19 | 174:4,6 | 153:6 | 160:6 | 314:13 |
| 252:11 | **weekly** 31:23 | **withdrawal** | 170:4 | 315:8 |
| 283:12 | 234:6,11 | 322:1 | 180:11 | 323:16 |
| 294:10 | 234:12,21 | 324:20 | 257:16 | 324:21 |
| 302:7 | 245:24 | **witness** | 287:11 | 325:12 |
| 307:14 | 332:13 | 10:22 11:2 | 317:11 | 343:3,4,8 |
| 323:3,22 | **weeks** 19:18 | 11:9,10 | **work** 16:24 | 356:6,6 |
| 338:16 | 127:1 | 14:21,22 | 17:1 25:9 | 362:17 |
| 343:13 | 295:15 | 34:17 35:5 | 43:3,9,18 | 364:19,24 |
| 346:11 | 334:3,9 | 83:3 91:2 | 43:19,20 | 368:15,22 |
| 348:8 | **weird** 130:7 | 125:8,11 | 46:5 47:4 | 370:18 |
| 355:22 | 269:11 | 150:21,25 | 47:15 | **worked** 38:19 |
| 356:4,7,8 | **welcome** | 152:23 | 49:14 | 51:7,19,22 |
| 358:20 | 287:22 | 153:20 | 52:13 | 64:10 66:8 |
| 363:1 | **went** 51:14 | 156:2,10 | 54:23 89:5 | 89:3 |
| **we've** 31:10 | 58:10 78:8 | 183:12,14 | 102:20 | 104:12 |
| 43:3 46:22 | 85:5,16 | 190:23 | 112:18 | 112:18 |
| 69:11 | 89:5 117:4 | 191:1 | 130:22 | 149:12 |
| 181:2 | 135:3 | 194:24 | 131:1,3,9 | 152:11 |
| 192:9 | 164:25 | 196:8 | 131:12 | 154:20 |

**BRIAN J. SCULLY  1/12/2023**

168:22
169:3,7
170:15
183:20
187:4
196:5,9
197:8
239:16
240:24
266:4
316:1,4,5
369:4
**worker**
217:10
218:24
219:1,11
**workers**
235:20
339:11
**working** 31:1
44:14
49:15 51:9
51:16
62:20,25
142:24
168:24
169:4,5,9
169:24,25
172:10
181:22,24
186:15,24
187:6
190:9
195:23
196:18
200:2
226:22
227:3
233:8
263:14
294:10
296:22
297:25
331:5
355:22
356:8
**works** 16:14
46:4 62:5
72:21

171:20
182:3
315:24
316:9
323:8
358:22
**world** 344:14
**worried**
356:12
**wouldn't**
17:23
41:25
52:18
55:14,15
75:15 76:1
80:11
107:6
162:2
169:2
174:18
177:16
193:14
194:6
198:7,7
220:1
230:23
235:16
236:22
237:8
243:19
252:1
267:23
296:22,23
334:14
339:2
341:15
343:21
347:18
362:18
368:1
**woven** 60:3
**writing**
124:12
298:23
**written** 43:8
43:9 124:1
188:22
190:10
299:5

303:2
329:8
**wrong** 61:20
284:9
**wrongdoing**
153:2
**wrote** 209:19
211:8
229:11
287:23
288:25
289:25
292:20
295:13
312:6,24
313:3
314:17
316:16
318:2
**Wyman** 28:6
304:14,18
305:2,4
353:18
360:22

---
**X**
**x** 1:4,12 5:6
6:1 7:1
8:1 9:1
**XII** 87:23

---
**Y**
**yeah** 14:22
15:21
17:25
18:18 20:3
20:22 23:8
23:15
30:16 31:7
31:9,14,17
33:16,22
34:17,18
38:2 42:13
42:18
45:11
47:25 48:9
48:21
49:22
50:19 54:9

60:3 62:9
62:10 63:6
63:22 65:5
66:6 67:2
67:3,24
68:1 69:11
70:1,13
71:24 72:5
72:14,15
73:1,4,14
74:15
77:11
78:23 79:1
79:2,19
80:8 84:7
84:8 86:5
86:7,24
88:3,4
91:12 92:8
92:19 93:5
93:17
94:16 96:2
96:12,21
96:22 97:2
97:23
98:13
101:12
102:8
103:15
104:1
105:4
106:14
108:3
110:24
111:10
115:11,21
116:5,10
118:9,18
123:21
124:15
125:5,9
126:14
130:14,20
131:17
136:25
137:15
138:13
139:2,25
140:11

141:5
143:1
144:12
145:9
146:8,18
147:12
148:13
149:19
150:1,6,7
150:8
151:10
152:25
153:24
154:9
156:10
157:13,20
158:25
159:21
160:12,15
161:14
162:18,23
164:15,24
166:3
168:8
169:14
174:17
175:9
176:25
178:2,17
180:9,18
183:19
188:3
189:19
190:1,25
192:7
194:18
195:16
198:7
199:3,24
200:5,15
200:17
201:6,11
202:17,21
203:5,19
204:14
208:13,19
209:6
212:5,12
212:19,21

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 217:14 | 287:16 | 351:17 | 244:15 | **Z** |
| 218:6 | 288:13,25 | 354:7,11 | 245:5 | **Z-a-h-e-e-r** |
| 219:8,14 | 289:6,25 | 356:23 | 249:9 | 167:7 |
| 222:3,18 | 290:17 | 359:24 | 251:5,10 | **Zaheer** 43:14 |
| 222:24 | 291:4,23 | 360:6,13 | 253:12 | 166:19 |
| 226:10 | 292:7 | 361:21 | 268:3 | 167:3 |
| 227:14 | 293:10,11 | 364:9 | 269:12,22 | 171:13,14 |
| 228:4,12 | 294:18,25 | 369:11,24 | 272:3,12 | 179:19 |
| 228:22 | 295:7,13 | 371:8 | 283:18 | 181:11 |
| 229:1,2,3 | 297:6,15 | **year** 19:22 | 286:9 | 184:14 |
| 229:11,21 | 298:13 | 47:23 89:2 | 287:7,23 | 185:3,12 |
| 231:12,18 | 299:17 | 195:23 | 288:19 | 191:25 |
| 231:20,24 | 301:13 | 260:4 | 289:7 | 192:12 |
| 232:13,20 | 302:6,9 | 282:7 | 293:2 | 196:25 |
| 237:5 | 304:25 | **years** 12:1 | 294:12 | 197:7 |
| 239:2,12 | 305:22 | 31:13,18 | 295:16 | 198:19 |
| 239:23 | 306:1,12 | 101:5 | 300:3,3,7 | 199:6 |
| 241:3 | 308:20 | 261:20 | 300:14 | 276:20 |
| 242:1,10 | 309:11 | 321:8 | 304:17 | **zero** 280:12 |
| 242:11,22 | 310:8,14 | **yep** 12:23 | 312:1,17 | **zoom** 10:13 |
| 242:23 | 310:18,19 | 48:8 72:9 | 313:12 | 14:11,18 |
| 244:24 | 311:21 | 99:3 | 316:16 | 90:23 |
| 249:17,19 | 312:6,24 | 105:15,19 | 320:6 | |
| 249:21 | 313:17 | 109:5,9 | 330:12 | **0** |
| 250:9,11 | 314:5,17 | 110:6,10 | 331:22 | **01/28/2022** |
| 250:14 | 315:5,24 | 111:24 | 338:14,20 | 8:20 |
| 252:9,14 | 317:5 | 119:19 | 347:2 | **02/11/2022** |
| 252:22,24 | 319:24 | 125:16 | 348:1,10 | 9:20 |
| 253:2,6,9 | 320:22 | 126:9 | 352:25 | **02/17/2022** |
| 253:12 | 321:11 | 177:6 | 355:15 | 9:18 |
| 256:6,22 | 323:13 | 191:23 | 357:4 | **04/14/2022** |
| 258:7 | 325:1 | 195:13 | 361:2 | 7:8 |
| 260:8,25 | 328:18 | 196:16 | 366:7 | **06/18/2020** |
| 262:12,15 | 329:6,8,17 | 199:8 | 368:17,25 | 9:17 |
| 262:16 | 329:25 | 200:8 | 369:25 | **06/22/2022** |
| 264:1 | 332:21 | 201:19,21 | 370:16 | 9:13 |
| 265:7,23 | 333:9 | 202:6 | **Yoel** 7:4 | **08/10/2022** |
| 266:10,20 | 334:8,12 | 204:10 | 238:1,2 | 9:11 |
| 269:9,11 | 334:23 | 206:23 | 244:2 | **08/12/2022** |
| 270:2 | 336:3 | 210:5,9,23 | 245:20 | 8:19 |
| 275:9 | 339:15,20 | 211:7 | 289:2,5 | **09/16/2020** |
| 276:4 | 341:7 | 222:25 | **YouTube** | 7:10 |
| 277:21 | 342:9,22 | 225:8 | 127:6 | |
| 278:10,18 | 344:10,20 | 226:16 | 146:13 | **1** |
| 280:24 | 345:9 | 229:25 | 159:20,24 | **1** 1:22 5:9 |
| 281:7,20 | 346:20 | 230:3,10 | 278:6 | 69:7,10 |
| 281:25 | 347:25 | 230:15 | 280:10,23 | **1.4** 108:11 |
| 283:1,23 | 348:9 | 231:3 | 301:15 | 109:2 |
| 284:21 | 349:5 | 233:15 | | **1:41** 183:9 |

**BRIAN J. SCULLY 1/12/2023**

**10** 6:13
87:12 99:9
99:15
212:14,15
212:25
214:10
244:9
276:3
319:7
**10/18/2022**
8:14
**10/31/2022**
9:7
**10:27** 83:10
**10:40** 83:13
**100** 26:24
61:15
149:12
**101** 45:6
**102** 98-300
7:19
**103** 89-391
7:21
**103** 90 288:15
**103** 92-394
7:21
**103** 94 285:16
**104** 10-412
7:22
**104** 20-422
6:16
**104** 49-453
6:15
**104** 92-494
6:12
**105** 12 208:3
**105** 12-516
6:11
**105** 23-526
6:11
**105** 38-541
6:10
**105** 39 204:1
**105** 64-565
7:20
**106** 03 173:9
**106** 03-605
6:7
**106** 79-682

6:6
**107** 18 7:19
281:2
**10th** 173:14
226:7
286:4
328:21
**11** 5:3 6:20
108:12,25
109:2,4
173:5
212:14
227:9,12
244:8
245:23
281:6
298:22
**11/29/2022**
7:6
**11:00** 175:7
175:10
**11:20** 292:23
**11:21** 292:24
**11:26** 291:20
**11:33** 292:4
**1100** 3:20
375:6
**11th** 281:4
**121** 1:15 6:22
109:11
110:9
162:9
190:13,16
231:15,19
242:12,19
269:5,9
375:12
376:4
**12/01/2020**
6:20
**12/17/2020**
7:5
**12:00** 175:7
175:10
**12:11** 226:18
**12:34** 183:6
**12:52** 173:19
175:24
**120** 76-079

7:15
**122** 23 297:7
**122** 23-22...
7:23
**12th** 10:3
302:22
**13** 7:4 9:22
243:22,25
**135** 99 7:16
**136** 03 214:8
214:10
**136** 03-609
6:15
**136** 61-66...
6:7
**136** 96-701
7:16
**137** 29-734
6:8
**138** 5:11
**138** 046 1:21
**13th** 291:18
**14** 7:6 206:7
206:17
249:15,16
249:17,22
**143** 146:20
**144** 48 2:6
**145** 26-529
7:14
**145** 45 7:13
269:5,8
**145** 45-547
7:15
**145** 52-553
7:14
**15** 7:8 87:12
99:9,15
206:1
250:22
252:4,5,16
252:17,18
253:1,8
255:15
330:18,21
331:4,8
337:4,8
**156** 6:4
**157** 41-743

7:14
**157** 43 261:24
**15th** 272:6
274:18
294:15
**16** 7:10
252:5,16
252:17,18
252:18,21
253:1,5
271:21
338:25
**160** 8 375:20
**177** :12
224:16
252:5,16
253:1
259:24
269:4
375:3
**17th** 248:22
249:6
350:9
374:14
**187** :17
173:10,11
277:16,19
**18th** 345:24
**198** :4 191:3
191:6,7,8
284:20,21
363:6,9
**190** 6:22
**194** 9:24
**196** 125:2,15
**19th** 284:19
**1st** 157:2
271:24

_____
**2**
_____
**2** 5:11 89:14
138:17,20
368:12
370:1
**2:11** 209:9
**2:13** 209:12
**20** 117:1
175:25
377:15

**200** 180:20
189:22
190:2
**2018** 12:6
31:16,25
32:7 57:7
84:14
117:16
234:7
241:7
244:10
245:2
263:16
**2019** 12:2
31:25 32:7
195:12
**202** 3:22 4:8
4:14
**2020** 5:10
16:23 32:2
32:8 33:5
33:23
35:22
47:24
48:12
51:19
54:13,17
55:14
62:13 63:7
63:15,18
63:25
69:22 72:2
75:21 86:4
86:18 96:6
98:25
107:20
118:11
121:2
126:23
127:9,14
129:15,21
130:18,24
132:21
133:14,25
134:4
147:4,16
149:2,6
151:18,19
153:15

**BRIAN J. SCULLY  1/12/2023**

| | | | | |
|---|---|---|---|---|
| 156:19 | **2021** 5:17,19 | 303:18,24 | **252** 7:8,10 | **35** 122:2,4,8 |
| 161:21 | 5:21 64:3 | 307:4,11 | 7:12 | 222:20 |
| 169:24 | 69:22 | 308:22 | **25th** 282:3 | **352** 9:12 |
| 170:8 | 70:10 | 328:2,21 | **27** 5:21 8:16 | **359** 9:20 |
| 172:18 | 71:16 | 334:5,12 | 216:25 | **363** 8:4 |
| 184:17 | 88:24 | 350:9 | 291:16 | **364** 8:7 |
| 185:17 | 89:10 | 352:21 | 301:20 | **365** 8:14 |
| 186:7 | 142:24 | 362:17 | 302:1,8 | **368** 5:14 |
| 187:23,24 | 167:23 | 364:16,25 | 334:19 | **369** 5:18 |
| 189:25 | 195:12,14 | 367:2,6 | 335:1,2,5 | **376** 1:22 |
| 195:19 | 195:19 | **2023** 1:15 | **277** 7:17 | **38** 231:22,23 |
| 196:13 | 196:13 | 10:3 32:10 | **27th** 208:21 | 232:1,6,12 |
| 202:14 | 330:13 | 32:14 | **28** 8:20 | 232:13 |
| 204:22 | 331:14 | 374:14 | 232:3,12 | 242:20,24 |
| 207:15 | 335:15 | 375:3,12 | 232:14 | 242:25 |
| 208:22 | 337:5 | 376:4 | 306:18,20 | **39** 242:20 |
| 213:16,18 | **2022** 9:23 | **2024** 8:19 | **29** 8:22 | **3rd** 217:8 |
| 214:6 | 15:9 19:13 | 19:20 | 309:20,23 | |
| 234:6,8,8 | 20:24 | 302:5,15 | **2nd** 213:17 | **4** |
| 234:9,11 | 21:20,25 | 302:20 | 214:14 | **4** 141:15,16 |
| 237:15 | 22:2,6 | **2053** 0 3:21 | | 141:16 |
| 241:16,18 | 24:12 | 375:6 | **3** | 370:2 |
| 241:21 | 28:16,24 | **20th** 89:16 | **3** 106:18 | **4:23** 157:2 |
| 246:3,8 | 33:22 | **21** 8:7 336:5 | 247:19 | **4:40** 319:6 |
| 247:8 | 34:11 | 364:11,14 | **3:00** 175:5 | **4:42** 319:11 |
| 248:22 | 35:16 36:3 | **211** 126:11 | **3:22-cv-...** | **4:53** 319:14 |
| 249:6 | 36:13 | 126:13 | 1:8 10:9 | **40** 242:21 |
| 255:3 | 37:15 38:8 | **212** 6:13 | **3:34** 276:7 | 274:14 |
| 262:8,13 | 38:24 39:9 | **213** 125:5 | **3:50** 276:10 | **42** 294:4,6 |
| 263:11,17 | 41:8,9 | **214** 125:14 | 319:5 | **43** 297:17,20 |
| 264:1,13 | 52:25 53:7 | **2205** 3 298:19 | **30** 9:4 144:6 | **45** 298:19 |
| 264:19 | 53:19 | **221** 3:9 | 144:7 | 299:15 |
| 266:12,15 | 54:12,15 | **222** 251:16 | 319:15,18 | **46** 9:12 |
| 271:24 | 55:4 56:8 | **227** 6:20 | 375:20 | 224:23,24 |
| 272:6 | 71:16 | **229** 126:12 | **301** 8:16 | 298:20 |
| 274:18 | 88:25 | **22nd** 285:25 | **306** 8:20 | 352:13,16 |
| 282:4 | 260:4 | 352:21 | **309** 8:22 | **475** 2:3 |
| 283:9 | 262:13 | **23** 8:11 | **30th** 198:19 | **48** 297:14,15 |
| 284:24 | 265:8,11 | 334:25 | 199:6 | 297:16 |
| 285:20 | 265:11,14 | 335:7,12 | **31** 9:8 328:4 | **48th** 297:8 |
| 286:4 | 265:18 | **23rd** 19:18 | 328:7 | **49** 9:15 |
| 291:18 | 266:8,21 | **24** 5:17 8:14 | **319** 9:4 | 297:15 |
| 322:19 | 267:4,21 | 288:16 | **32** 349:23 | 345:19,20 |
| 331:14 | 268:3,6 | 293:9 | **328** 9:8 | **49th** 297:9 |
| 332:12 | 269:7 | 365:10,13 | **33** 201:17 | |
| 334:3 | 294:15 | **24/7** 174:9 | **335** 8:11 | **5** |
| 345:24 | 298:22 | 267:17 | **345** 9:15 | **5:46** 362:23 |
| 348:14 | 302:22 | **243** 7:4 | **348** 4 2:4 | **5:53** 363:1 |
| 362:18 | 303:3,5,13 | **249** 7:6 | **349** 9:18 | **50** 319:6 |

**BRIAN J. SCULLY  1/12/2023**

**51** 203:14
**514-3259**
  3:22
**52** 9:18
  203:15
  349:15,18
  349:19
  350:2
**53** 122:5
**54** 225:24,25
**55** 204:1
**56** 162:16
**573** 3:12
**58** 205:10
**59** 9:20
  204:7
  206:10,11
  226:4,5
  359:13,16
**5th** 284:24
_____
**6**
**6** 5:14  368:3
  368:6
**6:04** 372:12
  373:9
**6:30** 177:3
**61** 9:22
  13:25  14:7
**62** 9:24
  194:19,21
  194:22,25
  198:16
**63** 208:4
**64108** 375:21
**65101** 3:11
**69** 5:9
**6th** 223:4
_____
**7**
**7** 5:18
  160:25
  292:4
  330:4,5,5
  369:17,21
  369:23
**7:23** 226:7,9
**746-8414**
  4:14

**7484-487**
  7:20
**751-8870**
  3:12
**7552-554**
  7:20
**7564-566**
  6:10
**7565** 204:5
**7574-576** 6:9
**7583-587** 6:9
**7598-600**
  7:15
**7599** 271:9
  271:19
**7633-634** 6:8
**7654-659**
  7:15
**7th** 261:25
_____
**8**
**8** 105:8,11
  297:18
**80s** 323:25
  323:25
**8188-189**
  7:19
**823848** 2:6
**8349** 201:20
  201:21
**8349-352** 6:8
**8356** 162:6
**8357** 162:14
**8496-498**
  6:11
**8519** 7:20
  284:9
**8521-522**
  6:16
**8554-557**
  7:23
**8557** 294:4
**8586-587**
  7:22
**8595** 7:22
**86-3** 190:20
**8623-627**
  7:22
**8625** 291:16

**8625-627**
  7:21
**8628-630**
  6:19
**8631-632**
  6:19
**8634** 6:18
**8636-639**
  6:18
**864** 225:20
**8640-643**
  6:19
**8649-650**
  6:18
**8660-662**
  6:17
**8663** 222:21
  222:23
**8663-667**
  6:17
**8668-669**
  6:18
**8669** 224:21
**8679** 6:17
**8689** 6:17
**8693-694**
  6:16
**8695** 6:17
**8696-700**
  6:15
**870-3578** 4:8
**8710-711**
  6:16
**8739-741**
  6:15
**8756-758**
  6:12
**8768-769**
  6:10
**8769** 198:9
**8778-780**
  6:12
**899** 3:10
_____
**9**
**9** 6:4  156:13
  156:14
  168:4,4
  170:20

  173:2
  179:13
  197:25
  198:10
  330:6,8
  332:10
**9:06** 1:16
  10:4
**9:32** 34:25
**9:34** 35:3
**954** 225:21
**9603-605** 6:9
**9676** 160:22
  160:24
**9676-680...**
  6:6
**9703** 7:19
  283:7
**9th** 98:25
  282:3