# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

| | |
|---|---|
| JILL HINES, ET AL. | |
| *Plaintiffs,* | Case No. 3:23-cv-571 |
| *v.* | Chief Judge Terry A. Doughty |
| ALEX STAMOS, ET AL., | Magistrate Judge Kayla D. McClusky |
| *Defendants.* | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION
TO COMPEL INDIVIDUAL ARBITRATION, DISMISS PLAINTIFFS'
CLASS CLAIMS, AND STAY ALL PROCEEDINGS, OR ALTERNATIVELY
TO TRANSFER VENUE UNDER 28 U.S.C. § 1404**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................ 3

    A.   Plaintiffs' Complaint ............................................................................................ 3

    B.   The Terms of Service .......................................................................................... 4

ARGUMENT ..................................................................................................................... 7

I.    The Court Should Compel All of Plaintiffs' Claims to Individual Arbitration, Dismiss Plaintiffs' Class Claims, and Stay this Litigation Pending Arbitration ............... 7

    A.   Plaintiffs Entered into Binding Arbitration Agreements, and Defendants Are Entitled to Enforce Those Agreements ...................................................... 8

        1.   Plaintiffs Rely on the Written Terms Containing the Arbitration Provision ............................................................................................ 10

        2.   Plaintiffs Allege Substantially Interdependent and Concerted Misconduct .............................................................................. 14

        3.   Plaintiffs' Attempt to Evade Arbitration Cannot Succeed ...................... 16

    B.   Plaintiffs' Claims Fall Within the Broad Scope of the Arbitration Agreements ........ 16

        1.   The Twitter Agreement Assigns Questions of Scope to the Arbitrator ........................................................................................ 17

        2.   Plaintiffs' Claims Fall Within the Arbitration Agreement's Scope .......... 18

    C.   The Court Should Strike the Class Claims and Compel Plaintiffs to Individual Arbitration ................................................................................... 21

    D.   The Court Should Stay Proceedings Pending Arbitration ......................................... 22

II.    If the Court Does Not Compel Arbitration, It Should Transfer this Action to the Northern District of California Under 28 U.S.C. § 1404 ................................. 23

CONCLUSION ................................................................................................................. 25

CERTIFICATE OF SERVICE ........................................................................................... 28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acad. of Sacred Heart of New Orleans v. Certain Underwriters at Lloyd's London*,
   2023 WL 246832 (E.D. La. Jan. 18, 2023)................................................................9

*Al Copeland Invs., L.L.C. v. First Specialty Ins. Corp.*,
   884 F.3d 540 (5th Cir. 2018) ..................................................................25

*Am. Express Co. v. Italian Colors Rest.*,
   570 U.S. 228 (2013)..................................................................22

*In re Apple & AT & TM Antitrust Litig.*,
   826 F.Supp.2d 1168 (N.D. Cal. 2011) ..........................................................13, 21

*Arthur Andersen LLP v. Carlisle*,
   556 U.S. 624 (2009)..................................................................7

*AT & T Techs., Inc. v. Commc'ns Workers of Am.*,
   475 U.S. 643 (1986)..................................................................18

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011)..................................................................22

*Atlantic Marine Constr. Co. v. U.S. Dist. Court*,
   571 U.S. 49 (2013)..................................................................23, 25

*B & T Rentals Inc. v. True Performance Directional Drilling LLC*,
   2021 WL 3660980 (W.D. La. Mar. 4, 2021) ........................................................24

*Banks v. Waitr Holdings, Inc.*,
   2019 WL 6883672 (W.D. La. Dec. 17, 2019) ......................................................22

*Boxley v. Fam. Dollar Stores, Inc.*,
   2020 WL 2104945 (W.D. La. May 1, 2020) ......................................................23

*Brown v. Pac. Life Ins. Co.*,
   462 F.3d 384 (5th Cir. 2006) ................................................................7, 9, 14, 15

*Chartwell Staffing Servs. Inc. v. Atl. Sols. Grp. Inc.*,
   2020 WL 620294 (C.D. Cal. Jan. 9, 2020) ......................................................15

*Crawford Pro. Drugs, Inc. v. CVS Caremark Corp.*,
   748 F.3d 249 (5th Cir. 2014) ................................................................ *passim*

*Epic Sys. Corp. v. Lewis*,
   138 S. Ct. 1612 (2018) ...................................................................................................7

*Exec. Strategies Corp. v. Sabre Indus. Inc.*,
   2020 WL 7213002 (W.D. La. Dec. 7, 2020) .........................................................18

*First Options of Chi., Inc. v. Kaplan*,
   514 U.S. 938 (1995) .......................................................................................................17

*Franklin v. Cmty. Reg'l Med. Ctr.*,
   998 F.3d 867 (9th Cir. 2021) .................................................................... *passim*

*Goldman v. KPMG LLP*,
   173 Cal. App. 4th 209 (2009) ...................................................................................10

*Grigson v. Creative Artists Agency L.L.C.*,
   210 F.3d 524 (5th Cir. 2000) ................................................................... *passim*

*Hardee v. CMH Homes, Inc.*,
   2021 WL 2187932 (E.D. La. May 28, 2021) ..........................................................21

*Haynsworth v. The Corp.*,
   121 F.3d 956 (5th Cir. 1997) ....................................................................................24

*Hellenic Inv. Fund, Inc. v. Det Norske Veritas*,
   464 F.3d 514 (5th Cir. 2006) ....................................................................................24

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
   139 S. Ct. 524 (2019) ...................................................................................................17

*Higginbotham v. Ace Cash Express, Inc.*,
   2012 WL 13136455 (W.D. Tex. Jan. 5, 2012) .......................................................22

*Jia v. Nerium Int'l, LLC*,
   2019 WL 3947712 (N.D. Tex. Aug. 21, 2019) .......................................................22

*Jureczki v. Bank One Tex., N.A.*,
   252 F. Supp. 2d 368 (S.D. Tex. 2003) ...................................................................21

*Jureczki v. Bank One Tex., N.A.*,
   75 F. App'x 272 (5th Cir. 2003) ........................................................................20, 21

*Koenig v. Ritz-Carlton Hotel Co., LLC*,
   2021 WL 5855608 (E.D. La. June 24, 2021) .........................................................15

*Kramer v. Toyota Motor Corp.*,
   705 F.3d 1122 (9th Cir. 2013) ...................................................................................10

*Lamps Plus, Inc. v. Varela*,
139 S. Ct. 1407 (2019) ........................................................................22

*Metalclad Corp. v. Ventana Env't Organizational P'ship*,
109 Cal. App. 4th 1705 (2003) ...........................................................10

*Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*,
460 U.S. 1 (1983) ................................................................................18

*Newman v. Plains All Am. Pipeline, L.P.*,
23 F.4th 393 (5th Cir. 2022) ...............................................................11

*Noble Cap. Grp., L.L.C. v. US Cap. Partners, Inc.*,
2021 WL 3477481 (5th Cir. Aug. 6, 2021) ...........................................9

*Novak v. Almatis Inc.*,
2007 WL 9702686 (M.D. La. Apr. 10, 2007) .......................................24

*O'Conner v. AT & T Corp.*,
2013 WL 3107496 (M.D. La. June 18, 2013) .................................13, 15

*Ottemann v. Knights of Columbus*,
36 F.4th 600 (5th Cir. 2022) .................................................................9

*Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*,
687 F.3d 671 (5th Cir. 2012) ...............................................................18

*Ryan v. Thunder Restorations, Inc.*,
2011 WL 2680482 (E.D. La. July 8, 2011) ...........................................20

*Salas v. Universal Credit Servs., LLC*,
2019 WL 1242448 (S.D. Cal. Mar. 18, 2019) .......................................16

*Stinger v. Chase Bank, USA, NA*,
265 F. App'x 224 (5th Cir. 2008) .........................................................20

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
559 U.S. 662 (2010) ............................................................................22

*Swiger v. Rosette*,
989 F.3d 501 (6th Cir. 2021) ...............................................................11

*Uptown Drug Co., Inc. v. CVS Caremark Corp.*,
962 F. Supp. 2d 1172 (N.D. Cal. 2013) ...............................................13

*Van Rooyen v. Greystone Home Builders, LLC*,
295 F. Supp. 3d 735 (N.D. Tex. 2018) .................................................24

*Vartec Telecom, Inc. v. BCE Inc.*,
   2003 WL 22364302 (N.D. Tex. Oct. 9, 2003) .......................................................................24

**Statutes**

9 U.S.C.
   § 2 ..........................................................................................................................................7
   § 3 ..................................................................................................................................7, 23
   § 4 ..................................................................................................................................7, 22

28 U.S.C.
   § 1404 ..............................................................................................................................1, 2, 25
   § 1406 ....................................................................................................................................25

42 U.S.C.
   § 1983 ......................................................................................................................................4
   § 1985(3) .................................................................................................................................4

**Rules**

Federal Rule of Civil Procedure 12(b)(3) ....................................................................................25

Defendants Alex Stamos, Renée DiResta, the Board of Trustees of the Leland Stanford Junior University, the Leland Stanford Junior University, the Stanford Internet Observatory (SIO), Kate Starbird, Graphika, Camille François, the Atlantic Council, the Atlantic Counsel's Digital Forensic Research Lab (DFRLab), and Graham Brookie (together, "Defendants") jointly move to compel individual arbitration of all claims in this case, to dismiss the class claims, and to stay all proceedings pending arbitration. If the Court concludes that any of Plaintiffs' claims may proceed in court, Defendants move to transfer venue to the Northern District of California under 28 U.S.C. § 1404.

Defendants have also moved to dismiss under Rules 12(b)(1), (2), (3), and (6), but the Court should decide this motion before addressing any merits-based ground for dismissal, *i.e.*, before deciding whether the Complaint states a claim upon which relief may be granted under Rule 12(b)(6).

## INTRODUCTION

Defendants are academic institutions, researchers, and nonprofits who exercised their own free speech rights to identify and speak out about mis- and disinformation on social media on issues of public concern. Defendants vigorously deny the allegations in the complaint, and if this case proceeds in this Court, it should be dismissed for the reasons explained in the contemporaneously filed motion to dismiss, including lack of personal jurisdiction. But this lawsuit may not proceed in this forum in the first place because Plaintiffs' claims are subject to binding arbitration agreements.

Plaintiffs Jim Hoft and Jill Hines allege that Defendants "colluded" with certain social media platforms to "censor" Plaintiffs' speech on those platforms. They allege that their social media accounts or posts were flagged or suspended by Facebook and Twitter as a consequence of this alleged collusion, and that such treatment of their social media accounts and posts violat-

ed their rights under federal law and their contractual terms of service with the social media platforms.

Plaintiffs' suit is premised on their acknowledgment that, when they created and used their social media accounts, they entered into binding terms of service agreements with the relevant social media platforms. Those terms of service contain arbitration agreements and class-action waivers that cover Plaintiffs' claims—all of which arise out of the terms of service and Plaintiffs' use of their social media accounts. Indeed, this dispute centers around the application of the terms of service by social media companies to flag or remove Plaintiffs' posts, allegedly in coordination with Defendants. The Federal Arbitration Act ("FAA") requires this Court to enforce these binding agreements by compelling Plaintiffs to submit their individual claims against Defendants to binding arbitration, dismissing Plaintiffs' class claims with prejudice, and staying this proceeding pending resolution of the arbitration process.

Plaintiffs cannot evade the arbitration agreements by simply choosing to omit the social media companies as defendants, as they have done here. And it is of no consequence that Defendants were not direct parties to the arbitration agreements. On the contrary, under Fifth Circuit and the relevant state-law precedent, non-signatory defendants may enforce arbitration agreements in precisely these circumstances, including where (as here) a signatory plaintiff alleges that a non-signatory defendant has colluded with another signatory, and where (as here) a signatory plaintiff brings claims against a non-signatory defendant that rely on the contract of which the arbitration agreement is a part. Any other result would be inequitable and inconsistent with the policies underlying the FAA.

If the Court concludes that any of Plaintiffs' claims may proceed in court, however, the Court should transfer this case to the Northern District of California under 28 U.S.C. § 1404.

Plaintiffs agreed that any non-arbitrable claims arising out of their use of the social media plat-

forms at issue in this case would be brought exclusively in the Northern District of California.

## BACKGROUND

### A.    Plaintiffs' Complaint

Plaintiffs in this case are Jim Hoft and Jill Hines, who bring federal and state causes of

action stemming from alleged censorship of their online speech on non-defendant social media

platforms. Plaintiff Hoft's claims stem out of his ownership and operation of his business, The

Gateway Pundit, which he describes as "one of the most popular news sites in the country."

Compl. ¶ 9. Plaintiff Hoft alleges that he maintains The Gateway Pundit's social-media accounts

on Facebook, Instagram, YouTube, and Twitter. *Id.* ¶¶ 9, 367. Plaintiff Hoft alleges that The

Gateway Pundit has experienced "censorship" on both Facebook and Twitter. *Id.* ¶ 368.

Plaintiff Hines' claims stem from her operation of two "Facebook groups," Health Free-

dom Louisiana and Reopen Louisiana. *Id.* ¶¶ 345, 360. She alleges that her and her groups'

speech was "restricted" or "censored" on Facebook. *Id.* ¶¶ 357, 360, 362. She does not allege in-

jury from the operation of any other social media account on any other platform (or even that she

operates any other social media account on any other platform).

Plaintiffs allege that Defendants, through their work in the Election Integrity Partnership

(EIP) and the Virality Project (VP), "collude[d] with social-media platforms," including Face-

book and Twitter, "to monitor and censor disfavored speakers and content." *Id.* ¶¶ 2, 127; *see id.*

at 26, 58. They allege, among other things, that Defendants identified content to social media

companies as containing mis- or disinformation and pushed social media companies to adopt

policies that resulted in flagging or taking down more posts or accounts. *Id.* ¶¶ 47, 125. And

Plaintiffs allege that, as part of this alleged "collu[sion]," *id.* ¶ 2, Defendants had "privileged ac-

cess" to some social media companies' platforms, *id.* ¶¶ 293-94.

Plaintiffs allege that "censorship" of their Facebook and Twitter activity has resulted in "economic and non-economic losses." *Id.* ¶ 353. They both allege the "loss of profits and economic value from the freedom of engaging in uncensored speech on social media and online platforms, [and] the loss of business and economic opportunities from social-media censorship." *Id.* ¶ 415. They bring claims for "civil rights conspiracy" under 42 U.S.C. § 1985(3) (Count One); "deprivation of rights" under 42 U.S.C. § 1983 (Count Two); "tortious interference with contractual and business relationships"—in particular, with the "contractual agreements" that are "create[d]" when Plaintiffs "accept the social-media platform(s) terms of service" (Count Three); and "breach of duty" (Count Four).

## B.    The Terms of Service

Plaintiffs explain in the complaint that "[s]ocial-media platforms such as Facebook, Twitter, and YouTube require users and account holders to agree to Terms of Service and/or similar contractual agreements as a condition of creating an account." Compl. ¶ 34. "Plaintiffs and Class members herein were required to do so here to create the social-media accounts affected by Defendants' conduct." *Id.* The relevant agreements include:

**Facebook.** Both Hoft and Hines agreed to Facebook's Commercial Terms (hereinafter, "Facebook Terms"), which apply to the use of Facebook "for a business or commercial purpose." Declaration of Elisabeth Theodore ("Theodore Decl."), Ex. A at 1 (Facebook Terms, Preamble); *see also* Compl. ¶ 34. Hoft and Hines allege that they use Facebook for business purposes and that their claims in this case arise from and relate to their use of Facebook for business purposes. Hoft alleges that he "operates The Gateway Pundit as a business and draws significant revenue from his ability to post freely on social media," including on Facebook. Compl. ¶ 370. "Among other things," Hoft alleges, "social-media engagement drives traffic to Hoft's website, which directly impacts advertising revenues." *Id.* Likewise, Hines alleges that she obtains "business and

economic opportunities" through the social media activity of her groups Health Freedom Louisi-ana and Reopen Louisiana and alleges damages in the form of "loss of profits and economic val-ue from the freedom of engaging in uncensored speech on social media." *Id.* ¶ 415. She further alleges that, by purportedly "inducing social-media platform(s) to censor or suppress" her and her groups' speech, Defendants "interfered with" her "business relations" and "business expec-tancies." *Id.* ¶ 412. The Facebook Terms define a "business or commercial purpose" to include, among other things, "managing a Page." Theodore Decl., Ex. A at 1 (Facebook Terms, Pream-ble). Health Freedom Louisiana and Reopen Louisiana are "Pages." *See* Theodore Decl., Ex. B at 1 (Health Freedom Louisiana Facebook Page), Ex. C at 1 (Reopen Louisiana Facebook Page).

By agreeing to the Facebook Terms, Hoft and Hines "agree[d] to arbitrate" "any claim, cause of action, or dispute that arises out of or relates to any access or use of" Facebook "for business or commercial purposes ('Commercial Claim') between you and [Facebook]." Theo-dore Decl., Ex. A at 2 (Facebook Terms §§ 5.b, 5.c). They further agreed that any claim not sub-ject to arbitration "must be resolved exclusively in the U.S. District Court for the Northern Dis-trict of California or a state court located in San Mateo County." *Id.* (Facebook Terms § 5.c.i). And they agreed to "waiv[e] their … rights to a trial by jury or to participate in a class or repre-sentative action." *Id.* (Facebook Terms § 5.c.ii). In particular, they agreed to bring claims "only on [their] own behalf" and not to "seek relief that would affect other parties." *Id.* They further agreed that California law would govern. *Id.*

**Twitter.** Hoft also alleges that he has experienced "censorship" on Twitter. Compl. ¶ 368. By operating The Gateway Pundit's Twitter account, Hoft "agree[d] to be bound by" Twitter's Purchaser Terms of Service (hereinafter, "Twitter Terms"). Theodore Decl., Ex. D at 1 (Twitter Terms, Acceptance). Those terms apply to anyone who "sign[s] up for and/or use[s] a

Paid Service," which is defined to include "Twitter Blue." *Id.* (Twitter Terms, Preamble). The Gateway Pundit's Twitter account is a Twitter Blue account. Theodore Decl., Ex. E at 1 (first page of The Gateway Pundit Twitter profile showing blue checkmark). The Twitter Terms contain a "Dispute Resolution Agreement" through which Twitter users, including Hoft, agree to "arbitrate any disputes, claims, or controversies arising out of or relating to these Terms" or to "your participation in" Twitter Blue. Theodore Decl., Ex. D at 3 (Twitter Terms, General Terms § 6.a). Twitter users including Hoft further agree "that any claims may only be brought in our individual capacities and not on behalf of, or as part of, a class action or other representative action" and "expressly waive their right to file a class action or seek relief on a class basis." *Id.* at 4 (Twitter Terms, General Terms § 6.f). They further agree that federal law governs the interpretation and enforcement of the arbitration clause, and that California law governs "[t]o the extent state law applies to any dispute arising out of the terms or the user's use of Twitter Blue. *Id.* (Twitter Terms, General Terms § 6.k).

The Twitter Terms also incorporate by reference the terms of service that apply to all Twitter users (*i.e.*, even those who do not use Twitter Blue). *See id.* at 1 (Twitter Terms, Preamble) ("To the extent that you sign up for and/or use a Paid Service, your use of the Paid Services … are subject to … the 'Twitter Purchaser Terms of Service' … and … "the applicable Twitter Terms of Service."). Through that incorporation, Hoft further agreed that, to the extent any claims relating to his use of Twitter were not subject to arbitration, those claims would be brought "solely in the federal or state courts located in San Francisco County, California, United States." Theodore Decl., Ex. F at 4 (Twitter Terms of Service § 6).

**Other Social Media Platforms.** Although Hoft also alleges that The Gateway Pundit has Instagram and YouTube accounts, the complaint does not allege any "censorship" of any social

media activity on either of those platforms.

## ARGUMENT

**I.     The Court Should Compel All of Plaintiffs' Claims to Individual Arbitration, Dismiss Plaintiffs' Class Claims, and Stay this Litigation Pending Arbitration**

Under the FAA, arbitration provisions "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA reflects a "liberal federal policy favoring arbitration," and courts must "enforce[] [arbitration agreements] as written." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630, 1632 (2018) (quotation marks omitted).

The FAA requires courts to compel arbitration if (1) a valid agreement to arbitrate exists, and (2) the dispute falls within the scope of that agreement. *Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 396 (5th Cir. 2006). And "whenever the relevant state law would make a contract to arbitrate a particular dispute enforceable by a nonsignatory, that nonsignatory is entitled to" compel arbitration under the FAA. *Crawford Pro. Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 257 (5th Cir. 2014); *see Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630-32 (2009). If a lawsuit involves an "issue referable to arbitration" under a written arbitration agreement, any party to the lawsuit may petition the court "for an order directing that such arbitration proceed in the manner provided for in such agreement," and the court "shall … stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. §§ 3-4; *see Arthur Andersen*, 556 U.S. at 630-32 & n.4.

Plaintiffs indisputably entered into binding arbitration agreements covering disputes arising from their use of Facebook and Twitter—the social media accounts at issue here. Under Fifth Circuit precedent and California law, Defendants are entitled to enforce those agreements. Plaintiffs are equitably estopped from refusing to arbitrate because they allege that Defendants and the

social media platforms colluded with each other to engage in the conduct that underlies this lawsuit, and because their claims all depend on the very terms of service that contain the arbitration agreements.

A.    **Plaintiffs Entered into Binding Arbitration Agreements, and Defendants Are Entitled to Enforce Those Agreements**

Both Plaintiffs entered into binding arbitration agreements that must be enforced under the FAA. Indeed, Plaintiffs specifically plead that they accepted the terms of service governing use of each of the social media platforms at issue, and that they entered into binding contractual agreements with those social media platforms through those terms of service. Compl. ¶ 34. Plaintiffs allege that their posts or accounts were censored on Facebook (Hoft and Hines) or Twitter (Hoft). As described above, both the Facebook and Twitter terms require arbitration of claims that "arise[] out of or relate[] to" the terms of service or the use of Facebook or Twitter, as Plaintiffs' claims—which are all premised on the allegation that their speech on Facebook and Twitter was censored through enforcement of those terms—here do. Theodore Decl., Ex. A at 2 (Facebook Terms §§ 5.b, 5.c), Ex. D at 3 (Twitter Terms, General Terms § 6.a).

Defendants may enforce those arbitration agreements against the Plaintiffs, who are signatories, even though Defendants are non-signatories. As the Fifth Circuit has explained, a signatory to an agreement containing an arbitration clause cannot "'have it both ways': it cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory." *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000). Allowing a signatory to avoid arbitration "would be especially inequitable," the Fifth Circuit has noted, "where, as here, a signatory non-defendant is charged with interdependent and concerted misconduct with a non-signatory defendant." *Id.*

Under *Grigson* and subsequent Fifth Circuit decisions, a non-signatory to an arbitration agreement may enforce that agreement against a signatory plaintiff if either of two independent tests is satisfied: "(1) when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against a non-signatory; or (2) when the signatory raises allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more signatories to the contract." *Brown*, 462 F.3d at 398 (quoting *Grigson*, 210 F.3d at 527); *see, e.g.*, *Noble Cap. Grp., L.L.C. v. US Cap. Partners, Inc.*, 2021 WL 3477481, at *3 (5th Cir. Aug. 6, 2021).

The Fifth Circuit has "modified" *Grigson* in the wake of a Supreme Court decision looking to traditional rules of state contract law to assess equitable estoppel in the arbitration context. *Crawford Pro. Drugs*, 748 F.3d at 255. Here, *Grigson*'s federal common law standard still applies directly to the Twitter Terms, because they contain a choice-of-law clause selecting federal law to govern interpretation of the arbitration agreement, *see* Theodore Decl., Ex. D at 4 (Twitter Terms, General Terms § 6.k), and because Louisiana contract law provides that the parties' choice-of-law clause governs, *Ottemann v. Knights of Columbus*, 36 F.4th 600, 605 (5th Cir. 2022). In any event, Louisiana courts have "adopted *Grigson*'s holding." *Acad. of Sacred Heart of New Orleans v. Certain Underwriters at Lloyd's London*, 2023 WL 246832, at *3 (E.D. La. Jan. 18, 2023).

Because the Facebook Terms make California law "controlling," *see* Theodore Decl., Ex. A at 2 (Facebook Terms § 5.c.ii), California equitable estoppel principles determine whether Defendants can enforce Facebook's arbitration agreement. *Crawford Pro. Drugs*, 748 F.3d at 255 (applying state law from agreement's choice-of-law clause). But the result is the same because the California equitable estoppel test mirrors *Grigson*'s. California likewise asks whether the

claims "rely" on or are "founded" or "intertwined" in the agreement containing the arbitration clause, or whether the plaintiff alleges interdependent and concerted misconduct between the signatory and non-signatory. *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128-29 (9th Cir. 2013) (quoting *Goldman v. KPMG LLP*, 173 Cal. App. 4th 209, 219, 221 (2009)). Non-signatories may enforce arbitration agreements where the plaintiff's claims "are based on the same facts and are inherently inseparable from arbitrable claims against signatory defendants,'" or are "intertwined with" the contract containing the arbitration provision. *Franklin v. Cmty. Reg'l Med. Ctr.*, 998 F.3d 867, 870-71 (9th Cir. 2021) (quoting *Metalclad Corp. v. Ventana Env't Organizational P'ship*, 109 Cal. App. 4th 1705, 1713 (2003)).

As we explain below, Plaintiffs have relied on the terms of service and the incorporated content moderation policies throughout their complaint, and their claims are intertwined with those terms: the only injuries alleged in the complaint result from Facebook and Twitter's application of their terms of service and content moderation policies to remove or flag Plaintiffs' posts. And Plaintiffs allege substantially interdependent and concerted misconduct by Defendants and the social media platforms concerning modifications to and application of the terms of services' content moderation policies—conduct that is necessarily intimately connected with the terms of service. Defendants are thus entitled to compel arbitration under either of the two tests outlined in *Grigson* and in California law.[1]

> 1.     *Plaintiffs Rely on the Written Terms Containing the Arbitration Provision*

Plaintiffs rely on the Facebook and Twitter terms of service—which contain the arbitra-

---

[1] Under Fifth Circuit precedent, determining whether a non-signatory may enforce an arbitration clause is a question for the court. *Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 399 (5th Cir. 2022). Defendants preserve for further review the position that such a question is for the arbitrator, not the court, where the arbitration agreement delegates questions of enforceability to the arbitrator. *See, e.g.*, *Swiger v. Rosette*, 989 F.3d 501, 507 (6th Cir. 2021).

tion clauses—in asserting their claims against Defendants. Count Three of the complaint specifically alleges tortious interference with the contractual relations between Plaintiffs and social media companies that were established when Plaintiffs accepted the "terms of service." Compl. ¶ 409. And Count Four alleges that "Defendants and those acting in concert with them"—which Plaintiffs allege include social media platforms—have a "duty … not to interfere" with their ability to "communicate freely on social media." *Id.* ¶ 418. Those allegations, and the alleged existence of such a duty, are necessarily bound up in the terms of service under which Plaintiffs are permitted to use social media platforms.

More generally, the alleged conduct underlying the entire complaint and all four causes of action relates to and depends on the terms of service, which incorporate the social media platforms' content moderation policies. Plaintiffs allege the existence of the terms of service in the very first substantive paragraph of the Complaint, under the heading "General Allegations." *Id.* ¶ 34. Plaintiffs then allege that Defendants, as part of both the EIP and the VP, "pushed social-media platforms" to alter their platform standards and content moderation policies, and then "repeatedly flagged content for censorship" under the "more aggressive censorship practices" they urged the platforms to adopt. *Id.* ¶¶ 47-57, 232-45. The basis for every count in the complaint, including the claims that Defendants violated federal civil rights law, is Plaintiffs' allegation that Defendants identified Plaintiffs' social media posts as violating the social media platforms' content policies and flagged those posts to the social media platforms, which, in turn, enforced the policies through alleged "censorship" of Plaintiffs' social media posts. These platform standards and content moderation policies are all expressly incorporated into, and part of, the Terms of

Service that contain the arbitration agreements Defendants seek to enforce.[2]

The Fifth Circuit has applied equitable estoppel to allow non-signatories to compel arbitration on a "reliance" theory on allegations analogous to (or more attenuated than) those here. For example, in *Crawford Professional Drugs, Inc. v. CVS Caremark Corporation*, the Fifth Circuit applied California's equitable estoppel rule to compel arbitration at the behest of non-signatory pharmacy defendants who were alleged to have misused patient and prescription information. The court explained that plaintiffs' claims were "founded in" the contract containing the arbitration clause because the allegedly misused information "would not have been provided but for the Plaintiffs'" agreement to the contract, and because use of the information was governed by the contract. *Crawford Pro. Drugs*, 748 F.3d at 260-61. Likewise, plaintiffs' claims that they were improperly "denied access to and participation in" a pharmacy network were "founded in" the contract because the contract governed "terms of and eligibility to participate in" the network. *Id.* at 261. That same logic compels equitable estoppel here. Plaintiffs' claims that they were improperly restricted from posting on Facebook and Twitter rely on and are founded in the Facebook and Twitter terms of service because those Terms govern terms of and eligibility to

---

[2] For example, Twitter's "Civic Integrity Misleading Information Policy" prohibits the spread of "false or misleading information" about elections and describes Twitter's right to label or delete posts or to block or "permanently suspend" accounts. *See* Theodore Decl., Ex. G at 3, 6-9 (Twitter Civic Integrity Misleading Information Policy). That policy, like all Twitter content policies, is incorporated into the Twitter Terms that contain the arbitration agreement. *See* Theodore Decl., Ex. D at 1 (Twitter Terms, Preamble) (incorporating by reference "Twitter Rules and Policies, and all policies incorporated therein"). Likewise, Facebook's content moderation policies are included in Facebook's Community Standards, which, for example, describe Facebook's policy of removing "misinformation about vaccines" and misinformation about elections. *See* Theodore Decl., Ex. H at 4-6 (Facebook Community Standards §§ II, III). The Facebook Terms that contain the arbitration agreement incorporate (and require users to abide by) Facebook's Community Standards. *See* Theodore Decl., Ex. A at 1 (Facebook Terms, Preamble) (incorporating Facebook Terms of Service), Ex. I at 8 (Facebook Terms of Service § 5) (incorporating Facebook Community Standards).

use Facebook and Twitter.

Similarly, in *O'Conner v. AT &T Corporation*, plaintiffs' claims that Apple "unduly influenced" AT&T to throttle their wireless data service satisfied the "intertwined claims" test because they necessarily relied on plaintiffs' service agreements with AT&T and required the court to "interpret" those agreements—even though plaintiffs' claims were cast in tort as well as contract. *O'Conner v. AT & T Corp.*, 2013 WL 3107496, at *1, *4 (M.D. La. June 18, 2013). In a different case involving Apple and AT&T, where plaintiffs alleged antitrust violations based on Apple and AT&T's agreement to make AT&T the exclusive wireless provider for the iPhone, the Northern District of California required plaintiffs to arbitrate their claims against Apple because plaintiffs had agreed to arbitrate claims under their service agreement with AT&T, their claims related to that agreement, and they were alleging that "both Defendants jointly subverted rights under the contract." *In re Apple & AT & TM Antitrust Litig.*, 826 F.Supp.2d 1168, 1178 (N.D. Cal. 2011). And applying California law in *Uptown Drug Co., Inc. v. CVS Caremark Corp.*, 962 F. Supp. 2d 1172, 1184 (N.D. Cal. 2013), the Northern District of California compelled arbitration with a non-signatory because the terms of the agreement "expressly addresse[d] the use, dissemination, and ownership of the customer information that Defendants allegedly misappropriated"—just as the terms of service here expressly incorporate the content moderation policies that apply to the posts that Defendants allegedly wrongfully flagged.

Accordingly, because Plaintiffs allege that Defendants violated federal and state law by encouraging the platforms to adopt stricter content moderation policies and by flagging content as violating those policies, Plaintiffs have "rel[ied] on the terms of the written agreement" with the social media platforms "in asserting [their] claims against a non-signatory," and Defendants are entitled to enforce the arbitration provision contained in that written agreement. *Brown*, 462

F.3d at 398 (quoting *Grigson*, 210 F.3d at 527).

2.      *Plaintiffs Allege Substantially Interdependent and Concerted Misconduct*

The Court must independently enforce the arbitration agreement because "the signatory raises allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more signatories to the contract," *i.e.*, Facebook and Twitter. *Brown*, 462 F.3d at 398 (quoting *Grigson*, 210 F.3d at 527). Plaintiffs allege that Defendant non-signatories "collude[d]" with Facebook and Twitter "to monitor and censor disfavored speakers and content." Compl. ¶¶ 2, 127; *see id.* at 26, 58. The gravamen of all four counts of the complaint is that Defendants allegedly worked together with the social-media platforms to engage in misconduct relating to Plaintiffs' social media posts. The complaint alleges interdependent and concerted action by Defendants and social-media platforms, including allegations about changes to the platforms' content moderation policies. *See id.* ¶¶ 47-57, 291-96. The complaint contains a section entitled "Social-Media Platforms Collaborate Closely with the EIP to Censor Speech," and asserts that the platforms "participate directly in the EIP" and that EIP has "privileged access" to the platforms. *Id.* at 26, ¶¶ 127-29. The complaint likewise contains a section entitled "The Virality Project Collaborates and Colludes with Social-Media Platforms," *id.* at 58, alleges that the "VP emphasizes the importance of … social-media platforms in its collaboration on censorship," *id.* ¶ 254, describes "input" from the "platforms" as "crucial" to VP's activities, *id.*, and describes the VP as having "privileged access" to certain platform data, *id.* ¶¶ 293-94.[3]

These allegations of collaboration, collusion, and privileged access easily qualify as "allegations of substantially interdependent and concerted misconduct." Indeed, the Fifth Circuit

---

[3] Defendants do not concede the accuracy of any of these allegations, but recount them because the equitable estoppel test focuses on what a plaintiff "alleges" about the defendant's conduct. *E.g.*, *Grigson*, 210 F.3d at 529; *Franklin*, 998 F.3d at 875.

has held that the "substantially interdependent and concerted misconduct" test is satisfied so long as the claim against the non-signatory defendants "depends, in some part, upon the nature of tortious acts allegedly committed by" the signatories—"acts that would be covered by the arbitration agreement." *Brown*, 462 F.3d at 399. Here, the entire complaint depends on the allegation that the signatory social media platforms wrongfully censored Plaintiffs' social media activity; absent the platforms' decisions to take action against certain of Plaintiffs' posts, Plaintiffs would—by the terms of their own Complaint—have no alleged causes of action or injuries at all.

Courts in this Circuit and in California routinely invoke equitable estoppel to enforce arbitration agreements at the request of non-signatories in cases involving analogous or even less robust allegations of interdependent misconduct. As noted *supra*, equitable estoppel required plaintiffs to arbitrate claims that Apple "unduly influenced" AT&T to throttle their wireless transfer speed, even though Apple was not a signatory to plaintiffs' terms of service with AT&T. *O'Conner*, 2013 WL 3107496, at *4. Claims of undue influence, the court held, "clearly refer to 'concerted misconduct.'" *Id.*; *see, e.g.*, *Koenig v. Ritz-Carlton Hotel Co., LLC*, 2021 WL 5855608, at *4 (E.D. La. June 24, 2021) (requiring arbitration with non-signatory hotels because plaintiff's claims against those hotels were "predicated on her ability" to prove misconduct by signatory hotel); *Chartwell Staffing Servs. Inc. v. Atl. Sols. Grp. Inc.*, 2020 WL 620294, at *7 (C.D. Cal. Jan. 9, 2020) (requiring arbitration where plaintiffs alleged a "concerted and collusive effort" by the defendants and the signatories that "center[ed] around the rights and obligations created by" the agreement containing the arbitration clause); *Salas v. Universal Credit Servs., LLC*, 2019 WL 1242448, at *4 (S.D. Cal. Mar. 18, 2019) (requiring arbitration where plaintiff alleged that non-signatory and signatory defendants passed plaintiff's credit report between themselves, and where the defendants would need to rely on the agreement containing the arbi-

15

tration clause to argue that their treatment of the report was permissible).

### 3.    *Plaintiffs' Attempt to Evade Arbitration Cannot Succeed*

Plaintiffs do not escape the implications of their contractual obligations by electing not to sue Facebook and Twitter—the social media companies with whom Plaintiffs signed the binding agreements and who actually made any decisions to suspend Plaintiffs' accounts or posts. To the contrary, the Fifth Circuit has held, this is all the more reason to hold the Plaintiffs to their agreements and to require them to arbitrate their claims against Defendants. The court has explained that allowing parties to evade arbitration "would be especially inequitable where, as here, a signatory non-defendant [Facebook and Twitter] is charged with interdependent and concerted misconduct with a non-signatory defendant." *Grigson*, 210 F.3d at 528. Plaintiffs' claimed injuries stem most directly from the actions of the social media companies that allegedly took action against Plaintiffs' posts, and with whom Plaintiffs agreed to arbitrate. But Plaintiffs are "seeking to avoid that agreement by bringing the action against a non-signatory charged with acting in concert with that non-defendant signatory." *Id.* That, the Fifth Circuit has held, is unfair and impermissible.

The same is true under California law, where a plaintiff "cannot avoid arbitration simply because she has sued only the [non-signatory defendant] and not [the signatory]." *Franklin*, 998 F.3d at 875. "[I]t is the substance of the plaintiff's claim that counts, not the form of its pleading"; so the question is whether "the substance of [plaintiff's] claims against the [non-signatory defendant] is so intertwined" with claims that are arbitrable under the underlying contract. *Id.* Such is the case here.

### B.    Plaintiffs' Claims Fall Within the Broad Scope of the Arbitration Agreements

Upon finding a valid agreement to arbitrate, courts often next assess whether the agree-

ment covers the claims at issue in the lawsuit because, "[o]rdinarily, whether a claim is subject to arbitration is a question for a court." *Crawford Pro. Drugs*, 748 F.3d at 262. "However, if the parties have clearly and unmistakably agreed to arbitrate arbitrability, certain threshold questions—such as whether a particular claim is subject to arbitration—are for the arbitrator, and not a court, to decide." *Id.* (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)); *see Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019).

Because the Twitter Terms "clearly and unmistakably" assign scope questions to the arbitrator, the court must compel Plaintiff Hoft's claims to arbitration without assessing whether those claims are covered by the arbitration agreement. *Crawford Pro. Drugs*, 748 F.3d at 262. In any event, Plaintiffs' claims fall comfortably within the scope of both the Facebook and Twitter agreements.

### 1.   *The Twitter Agreement Assigns Questions of Scope to the Arbitrator*

The Twitter Terms clearly and unmistakably assign questions of scope to the arbitrator for two independent reasons. First, the plain text assigns questions about whether a dispute is subject to arbitration to the arbitrator: "The arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any Dispute, including, but not limited to, any claim that all or any part of these Twitter Purchaser Terms of Service are void or voidable, *or whether a Dispute is subject to arbitration.*" Theodore Decl., Ex. D at 3 (Twitter Terms, General Terms § 6.c) (emphasis added).

Second, the Twitter Terms state that "all Disputes shall be finally resolved exclusively through binding arbitration administered by the American Arbitration Association ("AAA") … in accordance with the provisions of the AAA's Consumer Arbitration Rules." *Id.* Under Fifth Circuit precedent, "the express adoption of [the AAA] rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Petrofac, Inc. v. DynMcDermott Petrole-*

*um Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012).

Accordingly, because Plaintiff Hoft raises claims relating to Twitter and is bound by the Twitter Terms, the Court must order Plaintiff Hoft to arbitration without considering whether his claims come within the scope of the arbitration agreement. *See Exec. Strategies Corp. v. Sabre Indus. Inc.*, 2020 WL 7213002, at *6 (W.D. La. Dec. 7, 2020).

2.   *Plaintiffs' Claims Fall Within the Arbitration Agreement's Scope*

In any event, both Plaintiffs' claims fall squarely within the scope of the Twitter and Facebook arbitration provisions to which they agreed. In accordance with the "liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983), the Supreme Court has instructed that, "where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (cleaned up). Put differently, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25.

Even absent this strong presumption, it would be clear that Plaintiffs' claims are arbitrable. The Twitter arbitration provision applies to "any disputes, claims, or controversies arising out of or relating to these Terms, the marketing of Paid Services, and/or your participation in the Paid Services." Theodore Decl., Ex. D at 3 (Twitter Terms, General Terms § 6.a). "Paid Service" is defined to include "Twitter Blue." *Id.* at 1 (Twitter Terms, Preamble). Plaintiff Hoft's claims in this lawsuit arise out of and relate to the terms of service and to his participation in Twitter Blue, since he alleges that his Twitter posts have been and continue to be subject to improper censorship in violation of the Twitter Terms.

18

The Facebook arbitration provision applies to any "claim, cause of action, or dispute that arises out of or relates to any access or use of the [Facebook] Products for business or commercial purposes … between you and [Facebook]." Theodore Decl., Ex. A at 2 (Facebook Terms § 5.b). "Business or commercial purposes include using ads, selling products, developing apps, managing a Page, managing a Group for business purposes, or using [Facebook's] measurement services regardless of the entity type." *Id*. at 1 (Facebook Terms, Preamble). Plaintiffs' claims that their Facebook posts were improperly censored arise out of and relate to their access or use of Facebook for business or commercial purposes. As explained above, both Plaintiffs allege that they use Facebook for business or commercial purposes, including to manage "Pages," and they claim that they have suffered "loss of profits" and "loss of business and economic opportunities" as a consequence of the alleged censorship of their Facebook activity. Compl. ¶ 415; *see also id.* ¶¶ 353, 370, 412.

The arbitration provision's use of the phrase "between you and [Facebook]" does not render the claims here non-arbitrable. The dispute here *is* between Plaintiffs and Facebook, notwithstanding that Plaintiffs elected to sue only Defendants rather than Facebook to avoid arbitration. As the Fifth Circuit has noted, "[t]he linchpin for equitable estoppel is equity—fairness." *Grigson*, 210 F.3d at 528. Similarly, in applying California's equitable estoppel principle to compel arbitration at the request of a non-signatory, the Ninth Circuit explained that "[i]n matters of equity, such as the application of equitable estoppel, it is the substance of the plaintiff's claim that counts, not the form of its pleading." *Franklin*, 998 F.3d at 875. The whole point of the equitable estoppel doctrine is to determine when arbitration agreements covering disputes between two parties apply to disputes with a third party—and to prevent plaintiffs from avoiding arbitration clauses by suing only non-signatories for conduct and claims that also run against a

signatory to the agreement. *See Grigson*, 210 F.3d at 528. Accordingly, if the claims at issue would fall within the scope of the arbitration clause if lodged against the signatory, the court must compel arbitration. *See Ryan v. Thunder Restorations, Inc.*, 2011 WL 2680482, at *8 (E.D. La. July 8, 2011) (noting that the scope question turns on whether the challenged acts of the "signatory … would themselves fall within the scope of the arbitration agreement," and compelling arbitration of a dispute with a non-signatory under an equitable estoppel theory even though the contract required arbitration of "disputes … between Customer and [the signatory]").

The Fifth Circuit has thus repeatedly compelled arbitration at the request of a non-signatory under an equitable estoppel theory even where the arbitration agreement referred to claims between the plaintiff and the signatory. Thus, for example, in *Stinger v. Chase Bank, USA, NA*, 265 F. App'x 224, 225-27 (5th Cir. 2008), the Fifth Circuit affirmed a decision compelling arbitration of claims against J.P. Morgan under *Grigson*'s equitable estoppel test, where the plaintiff's arbitration agreement was with Chase Bank and covered claims "by either you or us against the other … relating in any way to" plaintiff's Chase account. Because plaintiff's "claims against [J.P. Morgan] relate to his credit card issuer's obligations to him, those claims are dependent upon the contracts he entered into with Chase regarding the cards." *Id.* at 228.

Likewise, in *Jureczki v. Bank One Tex., N.A.,* 75 F. App'x 272, 275 (5th Cir. 2003), the Fifth Circuit held that a district court "correctly" applied *Grigson* to compel arbitration under an equitable estoppel theory in the context of an arbitration agreement covering claims "by either you or the Bank against the other" relating to the plaintiff's account with the bank. *Jureczki v. Bank One Tex., N.A.*, 252 F. Supp. 2d 368, 372 (S.D. Tex. 2003). The Fifth Circuit explained that all of the allegations related to the bank account, and held that the plaintiffs' claims against non-bank defendants were arbitrable because at the "heart of each of the [plaintiffs'] claims is the al-

legation that all Defendants acted in concert." 75 F. App'x at 275; *see also, e.g.*, *Hardee v. CMH Homes, Inc.*, 2021 WL 2187932, at \*1, \*3 (E.D. La. May 28, 2021) (after finding that equitable estoppel applied, compelling arbitration of a dispute with a non-signatory because the clause covered "any and all claims and disputes" relating to a home, even though the clause stated that "You" and "We" agree to arbitrate disputes); *In re Apple & AT & TM Antitrust Litig.*, 826 F.Supp.2d at 1170 (compelling arbitration at the behest of non-signatory Apple under equitable estoppel theory where the clause covered claims "between the purchaser and [AT&T Mobile]").

### C. The Court Should Strike the Class Claims and Compel Plaintiffs to Individual Arbitration

In addition to agreeing to arbitrate their own claims, Plaintiffs also agreed that they would not bring any disputes as part of a class action. The Facebook Terms state that signatories "waiv[e] their respective rights … to participate in a class or representative action" and "may bring a Commercial Claim only on [their] own behalf and cannot seek relief that would affect other parties." Theodore Decl., Ex. A at 2 (Facebook Terms § 5.c.ii). The Twitter Terms state: "[Y]ou and we further agree that any claims may only be brought in our individual capacities and not on behalf of, or as part of, a class action or other representative action. The parties expressly waive their right to file a class action or seek relief on a class basis." Theodore Decl., Ex. D at 4 (Twitter Terms, General Terms § 6.f) (capitalization altered).

The FAA requires courts to enforce arbitration agreements "in accordance with the terms thereof." 9 U.S.C. § 4. Plaintiffs' agreement not to proceed as part of a class action is valid and binding, and the Court should enforce that agreement by dismissing or striking their purported class claims with prejudice. The Supreme Court and courts in the Fifth Circuit have repeatedly enforced class waivers in arbitration agreements. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 352 (2011); *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 238-39 (2013); *see*

*also, e.g.*, *Banks v. Waitr Holdings, Inc.*, 2019 WL 6883672, at *6 (W.D. La. Dec. 17, 2019) ("under the Agreement to Arbitrate Claims, Banks has waived the right to pursue a collective action, and such waiver is enforceable"); *Jia v. Nerium Int'l, LLC*, 2019 WL 3947712, at *3 (N.D. Tex. Aug. 21, 2019) (compelling individual arbitration in light of class action waiver); *Higginbotham v. Ace Cash Express, Inc.*, 2012 WL 13136455, at *6 (W.D. Tex. Jan. 5, 2012) (same).

In fact, the Supreme Court has held that a court "may not compel arbitration on a class-wide basis" even "when an agreement is 'silent' on the availability of such arbitration." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1412 (2019) (citing *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010)). A fortiori here, where the agreements expressly prohibit class actions, the Court should strike or dismiss the class claims with prejudice and compel individual arbitration.

### D.    The Court Should Stay Proceedings Pending Arbitration

In addition to compelling arbitration of Plaintiffs' individual claims and dismissing their class claims with prejudice, this Court should stay or administratively close all further proceedings in this litigation pending arbitration. The FAA provides that, "[i]f any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending … shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3; *see also Boxley v. Fam. Dollar Stores, Inc.*, 2020 WL 2104945, at *6 (W.D. La. May 1, 2020) (Doughty, J.) (administratively closing case following order compelling arbitration and noting that an administrative closure is "the functional equivalent of a stay").

II.     **If the Court Does Not Compel Arbitration, It Should Transfer this Action to the Northern District of California Under 28 U.S.C. § 1404**

If the Court allows Plaintiffs' claims to proceed in court despite the arbitration agreements, it should transfer the claims to the Northern District of California pursuant to the forum selection clauses in the Twitter and Facebook terms of service. As the Supreme Court has explained, "Section 1404(a) [of Title 28] provides a mechanism for enforcement of forum-selection clauses that point to a particular federal district." *Atlantic Marine Constr. Co. v. U.S. Dist. Court*, 571 U.S. 49 (2013). "When the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause," and "[o]nly under extraordinary circumstances unrelated to the convenience of the parties should a § 1404(a) motion be denied." *Id.* at 62.

Both the Twitter and Facebook terms contain forum selection clauses mandating that, to the extent any claims are not covered by the arbitration agreements, they must be brought in the Northern District of California. Facebook's Terms state that claims "not subject to arbitration … must be resolved exclusively in the U.S. District Court for the Northern District of California." Theodore Decl., Ex. A at 2 (Facebook Terms § 5.c). The Twitter Terms to which Plaintiff Hoft agreed incorporate by reference Twitter's general terms of service, which state that "[a]ll disputes related to these Terms or the Services will be brought solely in the federal or state courts located in San Francisco County, California." Theodore Decl., Ex. F at 4 (Twitter Terms of Service § 6); *see* Theodore Decl., Ex. D at 1 (Twitter Terms, Preamble) (incorporating Twitter Terms of Service). The "Services" are defined to include the Twitter website and the Twitter app. Theodore Decl., Ex. F at 2 (Twitter Terms of Service, Preamble).

Federal law applies to the question of enforceability of a forum selection clause. *Haynsworth v. The Corp.*, 121 F.3d 956, 962 (5th Cir. 1997). An arbitration clause "is a special-

ized forum selection clause," *B & T Rentals Inc. v. True Performance Directional Drilling LLC*, 2021 WL 3660980, at \*4 (W.D. La. Mar. 4, 2021), and the Fifth Circuit has noted that, when it comes to enforceability, "there is little difference between the two," *Haynsworth*, 121 F.3d at 963. The Fifth Circuit has accordingly applied the equitable principles that govern enforcement of arbitration clauses at the request of non-signatories in considering whether to enforce forum selection clauses at the request of non-signatories. *Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517-18 (5th Cir. 2006). District courts within this Circuit have concluded on the basis of this precedent that the federal equitable estoppel principles articulated in *Grigson* apply equally in the context of enforcing a forum selection clause. *See, e.g.*, *Novak v. Almatis Inc.*, 2007 WL 9702686, at \*2-3 (M.D. La. Apr. 10, 2007); *Van Rooyen v. Greystone Home Builders, LLC*, 295 F. Supp. 3d 735, 749-50 (N.D. Tex. 2018); *Vartec Telecom, Inc. v. BCE Inc.*, 2003 WL 22364302, at \*2 (N.D. Tex. Oct. 9, 2003).[4]

Under either of *Grigson*'s equitable estoppel tests, Defendants are entitled to enforce the forum selection clauses. As explained above, *supra* Section I.A.1, Plaintiffs rely on the terms of their agreements with Twitter and Facebook in asserting all of their claims against Defendants. And, likewise, for the reasons explained above, *supra* Section I.A.2, Plaintiffs raise allegations of substantially interdependent and concerted misconduct by Defendants and Facebook and Twitter. Finally, Plaintiffs' claims fall within the scope of the forum selection clauses because they arise out of and relate to Plaintiffs' use of Facebook and Twitter and the respective terms of service. *Supra* Section I.B.

The Fifth Circuit "appl[ies] a 'strong presumption' in favor of enforcing mandatory fo-

---

[4] Because federal law governs this question, *Grigson* applies notwithstanding that the Facebook Terms incorporate California law. (As noted, however, California law is no different than the test in *Grigson*.)

rum selection clauses." *Al Copeland Invs., L.L.C. v. First Specialty Ins. Corp.*, 884 F.3d 540, 543 (5th Cir. 2018). That strong presumption requires enforcement here. There are no "extraordinary circumstances unrelated to the convenience of the parties" that would merit denying this § 1404(a) motion. *Atlantic Marine*, 571 U.S. at 62. (In fact, even the convenience of the parties favors transfer because the evidence and witnesses in this case are much more likely to be found in California than Louisiana.) Defendants note that the forum selection clause requires transfer even if the Court denies Defendants' separate motion to dismiss or transfer venue under Federal Rule of Civil Procedure 12(b)(3) and 28 U.S.C. § 1406. *See Atlantic Marine*, 571 U.S. at 59 (explaining that a forum selection clause must be enforced under § 1404 even if venue is not "'wrong' or 'improper' within the meaning of § 1406(a) or Rule 12(b)(3)").

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court order Plaintiffs to submit their individual claims to arbitration, dismiss the class claims with prejudice, and stay this action pending the outcome of arbitration. If the Court denies that motion and concludes that Plaintiffs' claims may proceed in court, Defendants request that the Court enforce the forum selection clauses and transfer the case to the Northern District of California under 28 U.S.C. § 1404.

August 14, 2023

/s/ Camala E. Capodice
Quentin F. Urquhart, Jr. (Bar #14475)
Camala E. Capodice (Bar #29117)
Gabrielle C. Broders (Bar #39821)
**IRWIN FRITCHIE URQUHART MOORE & DANIELS, LLC**
400 Poydras Street, Suite 2700
New Orleans, Louisiana 70130
Telephone: (504) 310-2100
Facsimile: (504) 310-2101
Email:  qurquhart@irwinllc.com
            ccapodice@irwinllc.com
            gbroders@irwinllc.com

Mary E. Gately (*pro hac vice*)
Samantha L. Chaifetz (*pro hac vice*)
**DLA PIPER LLP (US)**
500 Eighth Street NW
Washington, DC 20004
Telephone: (202) 799-4507
Facsimile: (202) 799-5507
Email:  mary.gately@dlapiper.com
            samantha.chaifetz@us.dlapiper.com

Marie Bussey-Garza (*pro hac vice*)
**DLA PIPER LLP (US)**
1650 Market Street, Suite 5000
Philadelphia, PA 19103
Telephone: (215) 656-3300
Facsimile: (215) 656-3301
Email:  marie.bussey-garza@us.dlapiper.com

*Counsel for Graphika and Camille François*

Respectfully submitted,

/s/ James Brown
James Brown (Bar #14101)
Devin Reid (Bar #32645)
Brady Hadden (Bar #37708)
**LISKOW & LEWIS**
Hancock Whitney Center
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108
Email:  dcreid@liskow.com
            bhadden@liskow.com
            jabrown@liskow.com

John B. Bellinger III (*pro hac vice*)
Elisabeth S. Theodore (*pro hac vice*)
R. Stanton Jones (*pro hac vice*)
Stephen K. Wirth (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave. NW
Washington, DC 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
Email:  john.bellinger@arnoldporter.com
            elisabeth.theodore@arnoldporter.com
            stanton.jones@arnoldporter.com
            stephen.wirth@arnoldporter.com

*Counsel for Alex Stamos, Renée DiResta, the Board of Trustees of the Leland Stanford Junior University, the Leland Stanford Junior University, and the Stanford Internet Observatory*

/s/ Jon K. Guice
Jon K. Guice (Bar #20841)
**HAMMONDS, SILLS, ADKINS, GUICE, NOAH & PERKINS, L.L.P.**
1881 Hudson Circle
Monroe, Louisiana 71201
Telephone: (318) 324-0101
Facsimile: (318) 322-5375
Email:  jguice@hamsil.com

Shelton Dennis Blunt (Bar #21230)
**PHELPS DUNBAR LLP**
II City Plaza | 400 Convention St., Suite 1100
Baton Rouge, Louisiana 70802
Telephone: (225) 346-0285
Facsimile: (225) 381-9197
Email:  dennis.blunt@phelps.com

Karl V. Hopkins (admitted *pro hac vice*)
**BRADLEY ARANT BOULT CUMMINGS LLP**
JPMorgan Chase Tower
600 Travis Street, Suite 5600
Houston, TX 77002
Telephone: (713) 576-0310
Facsimile: (713) 576.0301
Email:  khopkins@bradley.com

Andrew B. Johnson (*pro hac vice*)
**BRADLEY ARANT BOULT CUMMINGS LLP**
1819 Fifth Ave N
Birmingham, Alabama 35203
Telephone: (205) 521-8000
Facsimile: (205) 521-6295
Email:  ajohnson@bradley.com

*Counsel for the Atlantic Council, the Atlantic Council's Digital Forensic Research Lab, and Graham Brookie*

/s/ Alex B. Rothenberg
Alex B. Rothenberg (Bar #34740), T.A.
Ewell E. Eagan (Bar #5239)
Makala L. Graves (Bar #40608)
**GORDON, ARATA, MONTGOMERY, BARNETT, McCOLLAM, DUPLANTIS & EAGAN, LLC**
201 St. Charles Avenue, 40th Floor
New Orleans, Louisiana 70170-4000
Telephone: (504) 582-1111
Facsimile: (504) 582-1121
Email:  arothenberg@gamb.com
        eeagan@gamb.com
        mgraves@gamb.com

Rob McKenna (*pro hac vice*)
Daniel Dunne (*pro hac vice*)
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
401 Union Street- Suite 3300
Seattle, WA 98101
Telephone: (206) 839-4300
Facsimile: (206) 839-4301
Email:  ddunne@orrick.com
        emckenna@orrick.com

Geoffrey Shaw (*pro hac vice*)
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
355 S. Grand Ave., Ste. 2700
Los Angeles, CA 90071
Telephone: (213) 629-2020
Facsimile: (213) 612-2499
Email:  geoffreyshaw@orrick.com

*Counsel for Kate Starbird*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 14th day of August, 2023, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will provide notice of electronic filing to the attorneys for all parties.

/s/ James A. Brown
James A. Brown