# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

JILL HINES, ET AL.,

                *Plaintiffs*,

    *v.*

ALEX STAMOS, ET AL.,

                *Defendants*.

Case No. 3:23-cv-571

Chief Judge Terry A. Doughty

Magistrate Judge Kayla D. McClusky

## MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

    A.   Allegations in the Complaint ................................................................................. 3

        1.   Election Integrity Partnership ............................................................ 3

        2.   Virality Project ................................................................................... 7

        3.   Plaintiffs' Alleged Experiences of "Censorship" ............................... 7

    B.   Parties and Claims ................................................................................................ 8

LEGAL STANDARD .......................................................................................................... 9

ARGUMENT ....................................................................................................................... 9

I.    The Court Lacks Personal Jurisdiction Over All Defendants ............................................. 9

    A.   The Complaint Does Not Allege Minimum Contacts with Louisiana ...................... 10

        1.   Defendants Have No Contacts with Louisiana ........................................ 10

        2.   Personal Jurisdiction Cannot Be Based on Plaintiffs' or Third Parties' Contacts with Louisiana or on Alleged Injuries Suffered in Louisiana .... 12

    B.   Exercising Personal Jurisdiction Would Be Unfair and Unreasonable ..................... 17

II.    Plaintiffs Lack Standing ................................................................................................. 19

    A.   The Complaint Does Not Allege Facts Supporting Standing .................................... 19

    B.   The Complaint Alleges Facts that Affirmatively Foreclose Standing ....................... 22

    C.   Plaintiffs Lack Standing to Sue the Individual Defendants ...................................... 25

III.    Venue Is Not Proper in the Western District of Louisiana .............................................. 26

IV.    The Complaint Fails to State a Claim ............................................................................. 27

    A.   This Suit Is Foreclosed by the First Amendment .................................................... 27

i

B.    The Complaint Fails to State a Section 1985 Claim ................................... 29

      1.    The Complaint Fails to Allege that Defendants Entered into an Agreement Aimed at Intentionally Violating Plaintiffs' Equal-Protection Rights.................................................................................. 30

      2.    The Complaint Fails to Allege Racial Animus ......................... 33

      3.    The Complaint Fails to Allege Any Other Equal Protection Violation .... 35

      4.    The Complaint Fails to Allege a First Amendment Violation................. 37

      5.    The Complaint Fails to Allege that Defendants Caused Plaintiffs' Alleged Injuries.................................................................... 38

C.    The Complaint Fails to State a Section 1983 Claim ................................... 39

      1.    Defendants Are Not State Actors.............................................. 39

      2.    The "Official Capacity" Claim Against Starbird Must Be Dismissed...... 47

      3.    The Complaint Fails to Allege a First or Fourteenth Amendment Violation .................................................................. 48

      4.    The Complaint Fails to Allege that Defendants Caused Plaintiffs' Alleged Injuries.................................................................... 49

D.    The Court Should Dismiss Plaintiffs' State-Law Claims .......................... 50

      1.    The Complaint Fails to State a Tortious-Interference Claim................... 50

      2.    The Complaint Fails to State a "Breach of Duty" Claim........................ 52

E.    The Court Should Dismiss the Individual Defendants ............................... 53

F.    SIO and DFRLab Are Not Juridical Persons and Cannot Be Sued ........................... 54

CONCLUSION....................................................................................................... 55

CERTIFICATE OF SERVICE ............................................................................... 58

# TABLE OF AUTHORITIES

Page(s)

*Alfred v. Corr. Corp. of Am.*,
    2009 WL 789649 (W.D. La. Mar. 24, 2009) ....................................................54, 55

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
    526 U.S. 40 (1999) ................................................................................................39

*Artis v. Dist. of Columbia*,
    138 S. Ct. 594 (2018) ...........................................................................................49

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..............................................................................................20

*Atlantic Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
    571 U.S. 49 (2013) ................................................................................................26

*Barnes Found. v. Township of Lower Merion*,
    242 F.3d 151 (3d Cir. 2001) .................................................................................27

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .......................................................................................9, 50, 52

*Bennett v. Spear*,
    520 U.S. 154 (1997) ......................................................................19, 22, 23, 25

*Bernard v. Gulf Oil Co.*,
    619 F.2d 459 (5th Cir. 1980) ...............................................................................29

*Blum v. Yaretsky*,
    457 U.S. 991 (1982) ...................................................................................39, 42, 43

*Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*,
    869 F.3d 381 (5th Cir. 2017) ...............................................................................31

*Bogues v. La. Energy Consultants, Inc.*,
    71 So.3d 1128 (La. App. 2d Cir. 2011) ...............................................................52

*Bohannan v. Doe*,
    527 F. App'x 283 (5th Cir. 2013) ........................................................................32

*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993).................................................................................... *passim*

*Brentwood Academy v. Tennessee Secondary School Athletic Assn.*,
    531 U.S. 288 (2001)....................................................................................40, 45, 46

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*,
  582 U.S. 255 (2017)................................................................................9, 10, 11, 16

*Bryan v. City of Madison*,
  213 F.3d 267 (5th Cir. 2000) ..........................................................................34

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985)....................................................................................11, 16

*Burstein v. State Bar of California*,
  693 F.2d 511 (5th Cir. 1982) ..........................................................................18

*Calder v. Jones*,
  465 U.S. 783 (1984)..........................................................................................13

*Cantú v. Moody*,
  933 F.3d 414 (5th Cir. 2019) ................................................................33, 34, 35

*Carmona v. Leo Ship Mgmt., Inc.*,
  924 F.3d 190 (5th Cir. 2019) ......................................................................11, 16

*Chestang v. Alcorn State Univ.*,
  820 F. Supp. 2d 772 (S.D. Miss. 2011)............................................................48

*City of Clinton v. Pilgrim's Pride Corp.*,
  632 F.3d 148 (5th Cir. 2010) ............................................................................9

*Collins v. Morgan Stanley Dean Witter*,
  224 F.3d 496 (5th Cir. 2000) ............................................................................3

*Daniel v. Am. Bd. of Emergency Med.*,
  428 F.3d 408 (2d Cir. 2005)............................................................................27

*Danzinger & De Llano, L.L.P. v. Morgan Verkamp, L.L.C.*,
  24 F.4th 491 (5th Cir. 2022) ......................................................................12, 14

*Defense Distributed v. Grewal*,
  971 F.3d 485 (5th Cir. 2020) ..................................................................14, 15, 16

*Doe v. United States*,
  831 F.3d 309 (5th Cir. 2016) ............................................................................41

*Douglass v. Nippon Yusen Kabushiki Kaisha*,
  143 S. Ct. 1021 (2023)......................................................................................10

*Douglass v. Nippon Yusen Kabushiki Kaisha*,
  46 F.4th 226 (5th Cir. 2022) ............................................................................10

*Edmiston v. La. Small. Bus. Dev. Ctr.*,
  2018 WL 6279962 (W.D. La. Nov. 14, 2018) .......................................................54

*Edmiston v. La. Small. Bus. Dev. Ctr.*,
  931 F.3d 403 (5th Cir. 2019) ...............................................................................54

*Evans v. Newton*,
  382 U.S. 296 (1966) .............................................................................................45

*Farber v. City of Paterson*,
  440 F.3d 131 (3d Cir. 2006) ................................................................................37

*Favrot v. Favrot*,
  68 So.3d 1099 (La. App. 4th Cir. 2011) ...............................................................52

*Filarsky v. Delia*,
  566 U.S. 377 (2012) .............................................................................................39

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
  141 S. Ct. 1017 (2021) ...................................................................................10, 11

*Garner v. City of Many*,
  2021 WL 4129769 (W.D. La. Sept. 9, 2021) ...................................................34, 35

*Goodisman v. Lytle*,
  724 F.2d 818 (9th Cir. 1984) ...............................................................................47

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  564 U.S. 915 (2011) .............................................................................................10

*Griffin v. Breckenridge*,
  403 U.S. 88 (1971) ...............................................................................................33

*Grossling v. Ford Mem. Hosp.*,
  614 F. Supp. 1051 (E.D. Tex. 1985) .....................................................................32

*Gulf Oil Co. v. Bernard*,
  452 U.S. 89 (1981) ...............................................................................................29

*Haines v. Fed. Motor Carrier Safety Admin.*,
  814 F.3d 417 (2016) .............................................................................................41

*Haynes Interests, LLC v. Garney Companies, Inc.*
  322 So.3d 292 (La. App. 1st Cir. 2021) ...............................................................52

*Hilliard v. Ferguson*,
  30 F.3d 649 (5th Cir. 1994) ...........................................................................26, 54

*Holdiness v. Stroud,*
    808 F.2d 417 (5th Cir. 1987) ........................................................................31, 32

*Horaist v. Doctor's Hosp. of Opelousas,*
    255 F.3d 261 (5th Cir. 2001) ..............................................................................34

*Hurley v. Irish-American Gay,*
    515 U.S. 557 (1995)..............................................................................................29

*Inst. for Creation Rsch. Graduate Sch. v. Paredes,*
    2009 WL 4333366 (N.D. Tex. Dec. 1, 2009) ........................................................27

*Int'l Soc. for Krishna Consciousness v. Eaves,*
    601 F.2d 809 (5th Cir. 1979) ..............................................................................29

*Ixchel Pharma, LLC v. Biogen, Inc.,*
    470 P.3d 571 (Cal. 2020) ......................................................................................51

*Jackson v. Metro. Edison Co.,*
    419 U.S. 345 (1974)..............................................................................................42

*JeanLouis v. Vidallia,*
    2009 WL 331373 (W.D. La. Jan. 14, 2009) ..........................................................30

*Jenkins Brick Co. v. Bremer,*
    321 F.3d 1366 (11th Cir. 2003) ..........................................................................26

*Johnson v. Dowd,*
    305 F. App'x 221 (5th Cir. 2008) ........................................................................33

*Kentucky v. Graham,*
    473 U.S. 159 (1985)..............................................................................................47

*Lane v. Halliburton,*
    529 F.3d 548 (5th Cir. 2008) ................................................................................9

*Lefkowitz v. Adm'rs of Tulane Educ. Fund,*
    2022 WL 376148 (E.D. La. Feb. 8, 2022) ............................................................54

*Lockett v. New Orleans City,*
    607 F.3d 992 (5th Cir. 2010) ........................................................................29, 38

*Louisiana Div. Sons of Confederate Veterans v. City of Natchitoches,*
    370 F. Supp. 3d 692 (W.D. La. 2019)........................................................43, 44, 45

*Louisiana Div. Sons of Confederate Veterans v. City of Natchitoches,*
    821 F. App'x 317 (5th Cir. 2020) ........................................................................43

*Lugar v. Edmondson Oil Co.*,
    457 U.S. 922 (1982) ............................................................................................40

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ..............................................................................19, 21, 25

*Lynch v. Cannatella*,
    810 F.2d 1363 (5th Cir. 1987) ....................................................................30, 33

*Maher v. Roe*,
    432 U.S. 464 (1977) ............................................................................................43

*Manhattan Cmty. Access Corp. v. Halleck*,
    139 S. Ct. 1921 (2019) ..........................................................................37, 39, 42

*Marie v. Am. Red Cross*,
    771 F.3d 344 (6th Cir. 2014) ............................................................................46

*McAfee v. 5th Cir. Judges*,
    884 F.2d 221 (5th Cir. 1989) ....................................................................30, 31

*Minn. Voters All. v. Mansky*,
    138 S. Ct. 1876 (2018) ......................................................................................38

*Missouri v. Biden*,
    2023 WL 2578260 (W.D. La. Mar. 20, 2023) ........................................38, 43, 47

*Missouri v. Biden*,
    2023 WL 4335270 (W.D. La. July 4, 2023) ..............................................1, 4, 20

*Moody v. Jefferson Par. Sch. Bd.*,
    803 F. Supp. 1158 (E.D. La. 1992) ................................................................34, 35

*Murray v. Earle*,
    405 F.3d 278 (5th Cir. 2005) ............................................................................49

*Nat'l Collegiate Athletic Ass'n v. Tarkanian*,
    488 U.S. 179 (1988) ..............................................................................43, 46, 49

*National Council of La Raza v. Mukasey*,
    283 F. App'x 848 (2d Cir. 2008) ..................................................................24, 25

*Newberry v. E. Texas State Univ.*,
    161 F.3d 276 (5th Cir. 1998) ............................................................................33

*P.R.B.A. Corp. v. HMS Host Toll Roads, Inc.*,
    808 F.3d 221 (3d Cir. 2015) ..............................................................................46

*Panda Brandywine Corp. v. Potomac Elec. Power Co.*,
    253 F.3d 865 (5th Cir. 2001) ..................................................9

*Peck v. United States*,
    470 F. Supp. 1003 (S.D.N.Y. 1979) .......................................32

*Pfannstiel v. City of Marion*,
    918 F.2d 1178 (5th Cir. 1990) .................................................47

*Polacek v. Kemper Cnty.*,
    739 F. Supp. 2d 948 (S.D. Miss. 2010) ....................................47

*Powell v. City of Seattle*,
    2022 WL 16814020 (W.D. Wash. Oct. 20, 2022) ....................47

*Priester v. Lowndes Cnty.*,
    354 F.3d 414 (5th Cir. 2004) .................................................47

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ...............................................................28

*Ruhrgas AG v. Marathon Oil Co.*,
    526 U.S. 574 (1999) .................................................................9

*Rundus v. City of Dallas, Tex.*,
    634 F.3d 309 (5th Cir. 2011) .................................................45

*San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*,
    483 U.S. 522 (1987) ...............................................................46

*Sangha v. Navig8 ShipManagement Priv. Ltd.*,
    882 F.3d 96 (5th Cir. 2018) ...........................................*passim*

*Seiferth v. Helicopteros Atuneros, Inc.*,
    472 F.3d 266 (5th Cir. 2006) ...................................................9

*Shaw v. Villanueva*,
    918 F.3d 414 (5th Cir. 2019) .................................................30

*Skyline Wesleyan Church v. California Dep't of Managed Health Care*,
    968 F.3d 738 (9th Cir. 2020) ...........................................23, 24

*Snyder v. Phelps*,
    562 U.S. 443 (2011) .......................................................27, 28, 29

*Thompson v. Georgia*,
    2008 WL 4909421 (W.D. La. Oct. 15, 2008) .........................27

*Tiner v. Cockrell*,
  756 Fed. App'x 482 (5th Cir. 2019) ................................................................34, 35

*Turaani v. Wray*,
  988 F.3d 313 (6th Cir. 2021) ....................................................................24, 25

*United Bhd. of Carpenters and Joiners of Am., Loc. 610, AFL-CIO v. Scott*,
  463 U.S. 825 (1983)........................................................................30, 31, 33

*Video Int'l Prod., Inc. v. Warner-Amex Cable Comm'ns, Inc.*,
  858 F.2d 1075 (5th Cir. 1988) ....................................................................27

*Walden v. Fiore*,
  571 U.S. 277 (2014)................................................................................*passim*

*Washington v. Jones*,
  585 F. Supp. 3d 871 (W.D. La. 2022)..........................................................48

*Welsh v. Correct Care Recovery Sols.*,
  2022 WL 10676598 (N.D. Tex. Sept. 30, 2022)........................................30, 31

*West v. Atkins*,
  487 U.S. 42 (1988)........................................................................................39

*Wiggins v. Lowndes County*,
  363 F.3d 387 (5th Cir. 2004) ......................................................................28

*Will v. Michigan Dep't of State Police*,
  491 U.S. 58 (1989)....................................................................................47, 48

*Williams v. Bramer*,
  180 F.3d 699 (5th Cir. 1999) ......................................................................48

*Woodke v. Dahm*,
  70 F.3d 983 (8th Cir. 1995) ........................................................................27

*Woods v. Edwards*,
  51 F.3d 577 (5th Cir. 1995) ........................................................................53

*Word of Faith World Outreach Ctr. Church v. Sawyer*,
  90 F.3d 118 (5th Cir. 1996) ....................................................................34, 35

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980)......................................................................................10

## Statutes

28 U.S.C.
§ 1391 .......................................................................................................26
§ 1406(a) ..................................................................................................26

42 U.S.C.
§ 1983 ................................................................................................ *passim*
§ 1985(3) ........................................................................................... *passim*

Louisiana Civil Code
Art. 24 ......................................................................................................54
Art. 3540 ..................................................................................................50

## Rules

Federal Rules of Civil Procedure
Rule 12(b)(1) ..............................................................................................1
Rule 12(b)(2) ..............................................................................................1
Rule 12(b)(3) ..............................................................................................1
Rule 12(b)(6) ..............................................................................................1
Rule 17(b)(3) ............................................................................................54

## Treatises & Miscelaneous Sources

57A Am. Jur. 2d § 68 ......................................................................................52

*Commercial Terms*, Facebook, https://www.facebook.com/ legal/commercial_terms .................50

*Purchaser Terms of Service*, Twitter, https://legal.twitter.com/en/purchaser-terms.html ............50

*Terms of Service*, Twitter, https://twitter.com/en/tos .....................................................50

Defendants Alex Stamos, Renée DiResta, the Board of Trustees of the Leland Stanford Junior University, the Leland Stanford Junior University, the Stanford Internet Observatory (SIO), Kate Starbird, Graphika, Camille François, the Atlantic Council, the Atlantic Council's Digital Forensic Research Lab (DFRLab), and Graham Brookie (together, "Defendants") move to dismiss the Complaint in its entirety under Rules 12(b)(1), (2), (3), and (6) of the Federal Rules of Civil Procedure because the Court lacks personal and subject-matter jurisdiction, venue is improper, and the Complaint fails to state a claim upon which relief may be granted.[1]

Defendants have moved to compel arbitration or, alternatively, to transfer venue under 28 U.S.C. § 1404. The Court should decide that motion before addressing any merits-based ground for dismissal in the Joint Motion to Dismiss, *i.e.*, before deciding whether the complaint states a claim upon which relief may be granted under Rule 12(b)(6).

## INTRODUCTION

Plaintiffs claim to have been censored by social media platforms. But their lawsuit seeks to hold Defendants—a small group of academic institutions and researchers—liable for exercising core First Amendment rights: speaking to the public, social media platforms, and the government about U.S. elections and the COVID-19 vaccines, which Plaintiffs acknowledge are "topics of enormous public interest." Compl. ¶ 5. This Court's decision in Plaintiffs' other lawsuit, *Missouri v. Biden*, does not suggest that their claims against these Defendants may proceed; rather, this lawsuit must be dismissed for numerous reasons not presented or addressed in Plaintiffs' other case, including because it is barred by the First Amendment. But there is no need to

---

[1] The Board of Trustees and Leland Stanford Junior University are the same juridical person and are referred to together as "Stanford University" herein. SIO is a program of Stanford University, and DFRLab is a program of the Atlantic Council. They are not separate juridical persons with the power to sue and be sued. *See infra* Section IV.F.

reach the merits because the Court so plainly lacks personal jurisdiction. There are no allegations that Defendants have any connection to Louisiana whatsoever, much less the sort of purposeful contacts required to support personal jurisdiction. The Complaint does not allege that any Defendant engaged in any conduct in, or directed at, Louisiana. Under binding Supreme Court and Fifth Circuit precedent, allegations that one Plaintiff resides in Louisiana and that Plaintiffs have social media followers in Louisiana cannot support personal jurisdiction as a matter of law. And, for the same reasons, venue is improper.

Plaintiffs also lack standing, which deprives the Court of subject-matter jurisdiction. The Complaint alleges no facts demonstrating that Plaintiffs' alleged injury ("censorship" on Facebook and Twitter) is traceable to Defendants. In fact, the Complaint and its exhibits demonstrate that the opposite is true—that social media platforms always exercised ultimate decisionmaking authority, breaking any causal link to Defendants. The Complaint alleges that, in the overwhelming majority of cases where Defendants identified content that appeared to violate the platforms' policies, the platforms took no action whatsoever.

Beyond these threshold shortcomings, Plaintiffs' suit is barred by the First Amendment. The First Amendment protects Defendants' right to collect data about, and to study, informational trends on the Internet and share their findings with the public, social media platforms, and government officials. It protects Defendants' right to make public policy recommendations to social media platforms and to the government concerning how to address the challenges to our democracy and to public health presented by the online spread of rumors, false narratives, and propaganda. And it protects Defendants' right to say that particular posts on social media platforms are false or misleading—and to advocate that they violate platform policies. Plaintiffs cannot hold Defendants liable for, or enjoin them from exercising, core First Amendment rights.

Finally, the Complaint fails to allege facts to support practically *any* of the elements of its

claims. The § 1985(3) claim fails because there is no nonconclusory factual allegation that Defendants intentionally conspired with the government for the purpose of violating Plaintiffs' equal protection rights; there is no plausible allegation that Defendants acted with racial animus (the only basis for a § 1985(3) claim in this Circuit) or any other discriminatory purpose; and there is no legal basis for Plaintiffs' assertion that they have a First Amendment right to post on Facebook or Twitter without any restrictions by the platforms. The § 1983 claim fails because Defendants are researchers and research institutions, not state actors (on top of the fact that the Complaint does not state a First or Fourteenth Amendment violation). And the state law claims of tortious interference and "breach of duty" fail because they do not allege basic elements like what contract terms Defendants purportedly interfered with or what duty Defendants breached.

The lawsuit has no business in this, or any other, federal court and must be dismissed.

## BACKGROUND

A.     **Allegations in the Complaint**

Although Plaintiffs' properly pleaded factual allegations are accepted as true for purposes of this motion, Defendants do not concede their truth or accuracy.[2] The Complaint contains the following allegations.

1.     *Election Integrity Partnership*

The Election Integrity Partnership (EIP) was an academic research project formed in July 2020 by a coalition of researchers from SIO, the University of Washington's Center for an Informed Public (CIP), Graphika, and the Atlantic Council's DFRLab. "EIP's primary goals were

---

[2] The Complaint attached as exhibits EIP's final report (Compl., Ex. 1) and VP's final report (Compl., Ex. 10). The Court may properly consider these documents—along with all other documents attached to, or incorporated by reference into, the Complaint—on a motion to dismiss. *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).

to: (1) identify mis- and disinformation before it went viral and during viral outbreaks, (2) share clear and accurate counter-messaging, and (3) document the specific misinformation actors, transmission pathways, narrative evolutions, and information infrastructures that enabled these narratives to propagate." Compl., Ex. 1 at 10 (vi). EIP's "objective explicitly excluded addressing comments made about candidates' character or actions." *Id.* at 23 (5). Rather, EIP "focused narrowly on content intended to suppress voting, reduce participation, confuse voters as to election processes, or delegitimize election results without evidence." *Id.*[3]

EIP documented mis- and disinformation across the political spectrum. *See, e.g.*, Compl., Ex. 1 at 204 (186) fig. 5.1. Its final report explained how "partisans on both sides" spread "popular misinformation narratives suggest[ing] that the election had been 'stolen' before it even took place," noting misinformation spread by Democrats that "polling places might be invaded by far-right militias." *Id.* at 68 (50). Likewise, EIP flagged an incident involving footage of unopened mail that led to misinformation spreading from both right- and left-leaning voices:

> Conservative tweets claimed that this mail-dumping incident proved that mail-in voting was not secure because of either incompetence or deliberate sabotage by the USPS and thus should not be allowed. On the liberal side, influencers promoted a different narrative—that President Trump was deliberately sabotaging the USPS to reduce the number of Democratic votes—and stressed the importance of

---

[3] Plaintiffs allege, "[o]n information and belief," that "Defendants deliberately sought to evade what Defendant DiResta calls the 'unclear legal authorities, including very real First Amendment questions' that would arise if the government took these actions directly." Compl. ¶ 4. This Court similarly stated in *Missouri v. Biden* that, "[a]ccording to DiResta, the EIP was designed to 'get around unclear legal authorities, including very real First Amendment questions' that would arise if CISA or other government agencies were to monitor and flag information for censorship on social media." *Missouri v. Biden*, 2023 WL 4335270, at *34 (W.D. La. July 4, 2023). But DiResta did not state that EIP was designed to "get around" unclear legal authorities or the First Amendment; she observed: "*There were* unclear legal authorities, including very real First Amendment questions." Compl. ¶ 46 (quoting Compl., Ex. 2 at 4 (Audio Tr. 2)) (emphasis added). Her full statement merely acknowledged the uncontroversial proposition that *private* institutions and persons (like Defendants) may take actions that the government might not have the capacity or legal authority to take. *See* Compl., Ex. 2.

preserving mail-in voting.

*Id.* at 72-73 (54-55).

Although EIP observed more instances of mis- and disinformation from right-leaning so-cial-social-media accounts, Compl. ¶ 137, its final report also documented "instances of misinformation originating and spreading almost solely via left-leaning accounts, such as a video of an overflow-ing ballot room in Miami-Dade implying that Postmaster General DeJoy was hiding ballots for Biden in the critical county," Compl., Ex. 1 at 204 (186), and a misleading story about voter in-timidation spread by a left-leaning Facebook group, *id.* at 212-13 (194-95). *See also id.* at 208 (190) (describing "incidents of false or misleading information [that ran] through the left").

EIP documented mis- and disinformation using an internal ticketing system called the Jira Service Desk. *Id.* at 26 n.6 (8); Compl. ¶ 79. "Each identified informational event was filed as a unique ticket in the system." Compl., Ex. 1 at 26 (8). For example, one ticket concerned "a fake viral video of ballots being burned," and another concerned "an allegation that a Philadelphia poll watcher was improperly barred from entering a voting precinct." *Id.* at 67 (49). "Tickets were primarily created by members of the four core EIP organizations" (SIO, CIP, Graphika, and DFRLab), in particular by undergraduate and graduate students at Stanford and University of Washington, *id.* at 46 (28), but certain external organizations—including a nonprofit group called the Elections Infrastructure Information Sharing & Analysis Center (EI-ISAC) that worked with state and local election officials—could also submit mis- and dis-information to EIP for review, *see id.* at 29-36 (11-18). No government entity submitted EIP tickets involving purely domestic speech; however, the State Department's Global Engagement Center submitted a small number of tickets involving suspected foreign misinformation. *See id.* at 60 (42). Tickets could be shared externally, including with social media platforms, or with groups like EI-ISAC, by

"tagging" the outside organization in the ticket. *See, e.g.*, *id.* at 37, 46 (19, 28).

EIP "collected data between September 3, 2020 and November 19, 2020," producing a final dataset of 639 tickets. *Id.* at 45 (27). Of these 639 tickets, "363 tickets tagged an external partner organization to either report the content, provide situational awareness, or suggest a possible need for fact-checking or a counter-narrative." *Id.* at 55 (37). When tickets tagged a social media platform, they "contained a list of URLs containing the potentially violative content being spread—for example, the URL for a Facebook post or YouTube video." *Id.* at 57 (39). But it was always up to the platforms to determine whether the URLs violated the platforms' policies or required a response: "[P]latforms took action on 35% of URLs that [EIP] reported to them. 21% of URLs were labeled, 13% were removed, and 1% were soft blocked. No action was taken on 65%." *Id.* at 58 (40). Even when the platforms did take some action, they most often simply affixed labels to posts—like "Get the facts about mail-in ballots," or "Learn how voting by mail is safe and secure"—with links to trusted sources of information. *Id.* at 235 (217).

The Complaint also alleges that social media platforms "made significant changes to election integrity policies" during the 2020 election "to slow the spread of specific narratives and tactics that could potentially mislead or deceive the public." *Id.* at 229 (211). It alleges that EIP "help[ed] [platforms] to strengthen platform standards for combating election-related misinformation," Compl. ¶ 48 (quoting Compl., Ex. 1 at 9 (v)) (emphasis omitted), and it describes these changes as "driven by pressure from the EIP," in particular, by EIP's work to catalogue "the detailed policies of the big platforms and to measure [their effectiveness] against" mis- and disinformation scenarios. *Id.* ¶ 54. The Complaint alleges that "EIP then pressured the platforms to aggressively enforce the new policies that the EIP had pushed them to adopt" by telling platforms when those policies were being "violated." *Id.* ¶ 55. The Complaint does *not* allege that EIP could unilaterally change platforms' policies, remove or label posts, or suspend users.

### 2. Virality Project

In 2021, researchers from the four members of EIP began work on the Virality Project (VP) to analyze mis- and disinformation related to COVID-19 vaccines, with the aim of informing the public and public health officials about these narratives. Compl. ¶¶ 182-83. VP's researchers—again, primarily students—focused on four types of narratives related to COVID-19 vaccines: "(1) safety, (2) efficacy and necessity, (3) development and distribution, and (4) conspiracy theory." Compl., Ex. 10 at 9 (2). VP worked to identify these narratives, understand what communities they appeared in, and track how they spread; VP also "assessed social media platforms' published policies to understand how (if at all) platforms" might take action to limit "the spread of misleading vaccine-related content." *Id.* Like EIP, VP was expressly nonpartisan. *Id.* at 24 (17). VP documented vaccine-related rumors, misinformation, and disinformation from across the political spectrum, including numerous instances of misleading content spread by a current Democratic presidential primary candidate. *Id.* at 82-83 (75-76). *See, e.g.*, *id.* at 23, 54 fig. 3.1 (16, 47). VP's principal output was briefings and public blog posts about vaccine narratives. *Id.* at 25 (18).

VP operated between February and August 2021. Like EIP, VP used a similar multi-tiered Jira ticketing system to track incidents of vaccine-related rumors, misinformation, or disinformation. *Id.* at 34-35 (27-28). Of 911 tickets in VP's final dataset, only "174 [19%] were referred to platforms for potential action." *Id.* at 37 (30).

### 3. Plaintiffs' Alleged Experiences of "Censorship"

Plaintiff Jill Hines is a resident of Ruston, Louisiana. Compl. ¶ 7. She is co-director of Health Freedom Louisiana, "a consumer and human rights advocacy organization," and also "launched a grassroots effort called Reopen Louisiana." *Id.* Hines maintains Facebook accounts for both groups. *Id.* Hines and her organizations protest and advocate against COVID-19 vac-

cines and "other prevention measures." *Id.* ¶¶ 7, 339, 343-44. The Complaint alleges that "[i]n 2022, her personal Facebook account was restricted for 90 days," and "on April 26, 2023, one of her Facebook posts … was censored on Facebook." *Id.* ¶ 360. The Complaint does not allege that EIP or VP tracked, analyzed, or created or shared Jira tickets—or otherwise took any action at all—involving any Facebook activity by Hines or her groups. Instead, Hines bases her claim that Defendants "targeted" her solely on allegations that VP targeted groups *like* hers. *Id.* ¶¶ 339-52.

Plaintiff Jim Hoft is a resident of St. Louis, Missouri. *Id.* ¶ 9. He "is the founder, owner, and operator" of a news website, *The Gateway Pundit*, and runs its Twitter, Facebook, Instagram, and YouTube accounts. *Id.* ¶¶ 9, 367. The Complaint alleges that *The Gateway Pundit*'s Twitter and Facebook accounts have been subject to "censorship," "including on topics specifically targeted by the EIP and the VP." *Id.* ¶ 368.

### B.      Parties and Claims

In May 2023, Plaintiffs filed this lawsuit against (1) Stanford University; SIO; SIO's director, Alex Stamos; and SIO's research director, Renée DiResta; (2) CIP's director, Kate Starbird; (3) Graphika and its former chief innovation officer, Camille François; and (4) the Atlantic Council; its DFRLab; and DFRLab's senior director, Graham Brookie. Plaintiffs did not name any social media platform as a defendant.

The Complaint states four causes of action. Count One alleges that Defendants conspired with government officials to violate Plaintiffs' civil rights in violation of 42 U.S.C. § 1985(3). Compl. ¶¶ 388-400. Count Two alleges that Defendants acted under color of state law to violate Plaintiffs' civil rights in violation of 42 U.S.C. § 1983. *Id.* ¶¶ 401-07. Count Three alleges that Defendants tortiously interfered with Plaintiffs' contractual and business relationships with social media platforms. *Id.* ¶¶ 408-16. Count Four alleges that Defendants breached a "duty" "not to interfere unlawfully with [Plaintiffs'] freedom, rights, and ability to speak, write, listen, read,

and communicate freely on social media with others." *Id.* ¶¶ 417-22.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must allege facts sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Mere "labels and conclusions" and "a formulaic recitation of the elements of a cause of action" do not meet this burden and are not entitled to the presumption of truth. *Id.* Instead, the complaint "must allege facts that support the elements of the cause of action in order to make out a valid claim." *City of Clinton v. Pilgrim's Pride Corp.*, 632 F.3d 148, 152-53 (5th Cir. 2010). This standard is also used to evaluate facial challenges to subject matter jurisdiction and personal jurisdiction. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008); *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 868-69 (5th Cir. 2001).

## ARGUMENT

## I.     The Court Lacks Personal Jurisdiction Over All Defendants

Personal jurisdiction "is an essential element of the jurisdiction of a district court, without which the court is powerless to proceed to an adjudication." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (cleaned up). "Due process requires that the defendant have 'minimum contacts' with the forum state (*i.e.*, that the defendant has purposely availed himself of the privilege of conducting activities within the forum state) and that exercising jurisdiction is consistent with 'traditional notions of fair play and substantial justice.'" *Sangha v. Navig8 ShipManagement Priv. Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018) (citation omitted). Plaintiffs bear the burden of alleging nonconclusory facts establishing personal jurisdiction over *each defendant* as to *each claim*. *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 264-65 (2017); *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274 (5th Cir. 2006). If a plaintiff establishes that a defendant has sufficient purposeful forum contacts, "the burden of proof shifts to the defendant

to show that the assertion of jurisdiction is unfair and unreasonable." *Sangha*, 882 F.3d at 102.

The due process limitation on personal jurisdiction "secures defendants' individual liberty by protecting them against" both "the concrete burden of 'litigating in a distant or inconvenient forum,'" *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 236 (5th Cir. 2022) (en banc), *cert. denied*, 143 S. Ct. 1021 (2023) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)), and "the abstract burden of 'submitting to the coercive power of a [forum] that may have little legitimate interest in the claims in question,'" *id.* (quoting *Bristol-Myers Squibb*, 582 U.S. at 263). It also supports "interstate federalism," *Bristol-Myers Squibb*, 582 U.S. at 263 (citation omitted), and prevents "forum shopping," *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1031 (2021).

Here, the allegations in the Complaint do not establish that any Defendant has sufficient minimum contacts with Louisiana to support the exercise of personal jurisdiction in this case. The Complaint does not allege that any Defendant engaged in any conduct in, or directed at, Louisiana. And the allegations that one Plaintiff resides in Louisiana and that Plaintiffs have social media followers in Louisiana cannot support personal jurisdiction as a matter of law. Further, even if any Defendant had sufficient minimum contacts with Louisiana (and none does), exercising personal jurisdiction here would be unfair and unreasonable. The Court therefore lacks personal jurisdiction over each Defendant, and the Complaint must be dismissed.[4]

## A.    The Complaint Does Not Allege Minimum Contacts with Louisiana

### 1.    *Defendants Have No Contacts with Louisiana*

A defendant's contacts with the forum can give rise to either specific or general jurisdic-

---

[4] Although subject-matter jurisdiction usually precedes personal jurisdiction, the Court has discretion to address personal jurisdiction first in a case like this, where personal jurisdiction is facially deficient. *See Sangha*, 882 F.3d at 99-100.

tion. *Ford*, 141 S. Ct. at 1024. Plaintiffs assert no basis for general jurisdiction, as none of the Defendants is "essentially at home" in Louisiana. *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). None of the individual defendants are alleged to be Louisiana residents, and none of the organizational defendants are alleged to be incorporated, or to have their principal place of business, in Louisiana. *See id.* Instead, Plaintiffs must rely solely on specific jurisdiction, which requires that their claims "'arise out of or relate to the defendant's contacts' with the forum." *Id.* at 1025 (quoting *Bristol-Myers Squibb*, 582 U.S. at 262).

To establish specific jurisdiction, the plaintiff must plausibly allege (and later prove) that the defendant "purposefully availed himself of the benefits and protections of the forum state such that he should reasonably anticipate being haled into court there." *Carmona v. Leo Ship Mgmt., Inc.*, 924 F.3d 190, 193 (5th Cir. 2019) (cleaned up). That requirement ensures that defendants will not be subjected to personal jurisdiction "solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Id.* at 193-94 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). Key here, the *plaintiff* cannot supply "the only link between the defendant and the forum." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Id.* at 290. "[T]he 'defendant *himself*'" must make "contact with the forum," *Carmona*, 924 F.3d at 194 (quoting *Walden*, 571 U.S. at 284); that contact must be "deliberate," *id.*; and it must relate to "[an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation," *Ford*, 141 S. Ct. at 1025 (citation omitted).

The Complaint does not allege facts establishing that any Defendant has sufficient minimum contacts with Louisiana. The Complaint does not plead any facts showing that any Defendant directed *any* conduct at Louisiana. It does not allege that any Defendant ever "traveled to,

conducted activities within, contacted anyone in, or sent anything or anyone to [Louisiana]." *Walden*, 571 U.S. at 289. It does not allege that any Defendant ever "physical[ly] ent[ered]" Louisiana, whether "in person or through an agent, goods, mail, or some other means." *Id.* at 285. Nor does the Complaint allege that any Defendant directly communicated with anyone in the State. *See, e.g.*, *Danzinger & De Llano, L.L.P. v. Morgan Verkamp, L.L.C.*, 24 F.4th 491, 498-99 (5th Cir. 2022). Instead, the Complaint concerns conduct that occurred in California, New York, Washington, and the District of Columbia—*i.e.*, alleged actions taken by EIP's and VP's member organizations to track and flag mis- and disinformation, communications with social media platforms and government officials, and actions by social media platforms to flag or take down posts or suspend accounts.

2.    *Personal Jurisdiction Cannot Be Based on Plaintiffs' or Third Parties' Contacts with Louisiana or on Alleged Injuries Suffered in Louisiana*

Plaintiffs cannot cure Defendants' lack of contacts with Louisiana by pointing to *Plaintiffs' own* contacts with the State or to purported injuries that they allegedly suffered in Louisiana based on Defendants' out-of-State conduct, such as out-of-State communications with social media platforms or government officials. An unbroken line of Supreme Court and Fifth Circuit precedent holds that Plaintiffs' own contacts with the forum are jurisdictionally irrelevant, and that communications transmitted and received entirely outside the forum cannot establish minimum contacts, even if plaintiffs are affected by those communications in the forum.

a.    *Settled Precedent Forecloses Jurisdiction Here*

The Supreme Court's decision in *Walden v. Fiore* forecloses any argument that personal jurisdiction can be based on Plaintiffs' or third parties' contacts with Louisiana. There, a Georgia law enforcement officer seized cash from two Nevada residents passing through Georgia and refused to return it to them for a prolonged period, including after they returned to Nevada. 571

12

U.S. at 279-80. The officer "knew his allegedly tortious conduct in Georgia would delay the return of funds to plaintiffs with connections to Nevada." *Id.* at 279. Nonetheless, the Court held that the officer lacked minimal contacts with Nevada because "no part of [his] course of conduct occurred in Nevada." *Id.* at 288. He "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." *Id.* at 289. The Court also rejected the argument that, under *Calder v. Jones*, 465 U.S. 783 (1984), personal jurisdiction could be based on the fact that plaintiffs "suffered the 'injury' caused by [the officer's] allegedly tortious conduct … while they were residing in the forum." *Walden*, 571 U.S. at 289-90. Stated succinctly, "mere injury to a forum resident is not a sufficient connection to the forum." *Id.* at 290. "Regardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State." *Id.* The Court thus concluded that "when viewed through the proper lens—whether the *defendant's* actions connect him to the *forum*—[the officer] formed no jurisdictionally relevant contacts with Nevada." *Id.* at 289.

Applying *Walden* and *Calder*, the Fifth Circuit has held that personal jurisdiction cannot be based on communications sent by an out-of-state defendant to an out-of-state third party— even where those communications directly concern the plaintiff and the plaintiff's work in the forum or directly interfere with a contract plaintiff entered into in the forum, and thereby directly affect the plaintiff in the forum. In *Sangha*, the plaintiff, Sangha, sued his former employer in Texas, asserting specific personal jurisdiction based on (1) "email communications" concerning his work in Houston that were sent "from two [defendant] representatives located outside the country to [his] then-supervisor in Alabama"; (2) "an employment contract between Cpt. Sangha and [his employer] allegedly confected in Houston"; (3) "that the [defendant's] email communications were targeted at"—and sought to interfere with—"a contract formed in Texas"; and (4) "that the [defendant's] emails concerned work that was to be performed in Texas." 882 F.3d at

13

103. The Fifth Circuit rejected these bases as "legally insufficient to support a finding of specific jurisdiction" under *Walden* and *Calder*, notwithstanding that the defendants' emails were about Sangha and his work in Texas and "affect[ed] [him] while he was at the Port of Houston." *Id.* Responding to Sangha's arguments that, under *Calder*, the "effects" of his former employer's conduct were felt in Texas, the Fifth Circuit explained that "[t]he proper question is not whether [the plaintiff] experienced an injury or effect in a particular location, but whether [the defendant's] conduct connects it to the forum in a meaningful way." *Id.* at 103-04. Because Sangha's "presence in the Gulf of Mexico/Port of Houston [was] largely a consequence of *his* relationship with the forum, and not of any actions [the defendant] took to establish contacts with the forum," Sangha "failed to establish a *prima facie* case of personal jurisdiction." *Id.* at 104.

Even in cases where an out-of-state defendant directly communicated *with the plaintiff* in the forum—which Plaintiffs do not allege here—the Fifth Circuit has made clear that such communications, standing alone, do not establish sufficient minimum contacts for personal jurisdiction. In *Danziger*, the plaintiff (a Texas law firm) sued the defendants (an Ohio law firm and two of its members) in Texas, alleging intentional torts—including interference with prospective contractual relations—related to the defendants' failure to split attorney's fees arising out of the representation of a non-Texas client. 24 F.4th at 494 & n.2. Although the plaintiff was harmed in Texas and the defendants emailed the plaintiff in Texas, the Fifth Circuit held that a single email was insufficient because it was not "meaningful" under *Walden* and *Singha* where all other alleged wrongful conduct occurred outside Texas. *Id.* at 498-99.

*Defense Distributed v. Grewal*, 971 F.3d 485 (5th Cir. 2020), is the other side of the coin. There, then-New Jersey Attorney General Gurbir Grewal sent a cease-and-desist letter to a Texas company, Defense Distributed, threatening legal action unless the company stopped publishing information that would enable recipients to 3D print firearms (so-called "ghost guns"). *Id.* at

14

488-89. The Fifth Circuit found personal jurisdiction over Attorney General Grewal in Texas based on Grewal's cease-and-desist letter. *Id.* at 491. The court stressed that, although the letter was "the totality of Grewal's contacts with Texas," *id.* (cleaned up), "Grewal's contacts with Texas … [were] more than a mere fortuity," because "Grewal intentionally mailed the cease-and-desist letter into Texas, a contact *Walden* specifically mentioned as [jurisdictionally] relevant," *id.* at 495 (quotation marks omitted), and because the attorney general had "selective[ly] … targeted" Defense Distributed while ignoring "many similarly-situated persons" in other states, *id.* at 493. Critically for present purposes, the Fifth Circuit held that "[n]one of [the other] actions" taken by the attorney general—which included sending "letters to third-party internet service providers based in California urging them to terminate their contracts with Defense Distributed"—"represent[ed] direct contacts with Texas." *Id.* at 489.

### b. *Plaintiffs' Alleged Contacts Are Not Jurisdictionally Relevant*

Plaintiffs cannot overcome these settled principles. Starting with Jill Hines, the Complaint alleges that she resides in Louisiana and runs two health freedom or medical freedom groups, and that she operates Facebook groups with "followers" in Louisiana. Compl. ¶¶ 7, 360-62. The Complaint alleges that VP "tracks and flags 'medical freedom' groups" generally and "directly interferes with" these groups' efforts to protest COVID-19 prevention measures "by pushing [social media] platforms to censor them." *Id.* ¶ 351. Based on VP's reporting about *other* "health freedom" groups, the Complaint alleges that "[o]n information and belief, Defendants' conduct successfully targeted and continues to target Ms. Hines, Health Freedom Louisiana, and her social-media groups for censorship, and directly interferes with Ms. Hines' and her audiences' freedom of speech and freedom of association in Louisiana." *Id.* ¶ 352. But the Complaint includes no nonconclusory allegations connecting any Defendant to Hines personally or to her groups; it alleges only that Defendants targeted groups *like* hers. *See* Compl. ¶¶ 339-52.

At most, the Complaint alleges conduct—"track[ing] and flag[ging] 'medical freedom' groups" generally and "pushing platforms to censor them," *id.* ¶ 351—that occurred *outside* of Louisiana and allegedly had some effect on Hines here. But these are precisely the sorts of allegations that the Supreme Court and the Fifth Circuit have held *cannot* establish personal jurisdiction. Even if Defendants had "flagged" posts by Hines or her Facebook groups to Facebook (which the Complaint does not allege), the Complaint contains no factual allegations that Defendants made any contact with *Louisiana*, much less the kind of deliberate and meaningful contacts sufficient to support jurisdiction. *See Walden*, 571 U.S. at 290-91. Defendants' alleged communications with third parties—social media companies and the government—occurred entirely outside Louisiana and therefore cannot establish minimum contacts with the State. *Sangha*, 882 F.3d at 104; *Def. Distributed*, 971 F.3d at 491-92. And the fact that any restrictions Facebook imposed on Hines' Facebook activity impacted her in Louisiana is solely "a consequence of [*her*] relationship with the forum," *Sangha*, 882 F.3d at 104—"unilateral activity of another party" that cannot support specific jurisdiction, *Carmona*, 924 F.3d at 193-94 (quoting *Burger King*, 471 U.S. at 474).

Importantly, the Complaint does not allege that Defendants targeted Hines to censor her speech in Louisiana specifically or selectively targeted her while ignoring similarly situated persons in other states. *See Def. Distributed*, 971 F.3d at 493. In fact, Plaintiffs allege the opposite: that Defendants engaged in a nationwide campaign to track misinformation "across all 50 states." Compl. ¶ 350; *see also Id.* ¶ 278 ("national efforts"); Compl., Ex. 10 at 93-94 (86-87) (VP documented groups "in almost every state" and narratives spread "across all 50 states"). Indeed, that is the premise of Plaintiffs' putative nationwide class of "social-media users" comprising "hundreds or thousands of speakers" and "millions of followers." Compl. ¶ 377-78.

As for Hines's unidentified social media followers who reside in Louisiana, any "effects"

felt by them are "jurisdictionally [ir]relevant" where Defendants lack "meaningful" contacts with the State. *Walden*, 571 U.S. at 290; *see Bristol-Myers Squibb*, 582 U.S. at 264-65. The Complaint contains no such allegations. Plaintiffs have not alleged that Defendants intended to target Plaintiffs' audiences in Louisiana specifically, but instead to address the spread of misinformation nationwide. *E.g.*, Compl. ¶¶ 149, 278, 350. If allegations of nationwide effects on third parties could establish personal jurisdiction in Louisiana, then every social media user with a national audience could assert *universal* specific jurisdiction based solely on the locations of their followers.

Even if mere effects on a plaintiff in the forum could give rise to personal jurisdiction, the Court still would lack personal jurisdiction over Jim Hoft's claims. The Complaint does not allege that Hoft has any connection with Louisiana. He does not live here; he does not work here; he has felt no effects of any Defendant's alleged conduct here. The Complaint alleges only that the restrictions imposed by social media platforms "directly affects … his audiences in the Western District of Louisiana." *Id.* ¶ 10. But the Complaint does not allege that Defendants targeted Hoft's Louisiana followers. If anything, the Complaint indicates that Louisiana (a non-swing state) was *not* a focus because EIP "prioritize[d] … swing states over non-swing states." *Id.* ¶ 149. In any event, effects on third parties cannot support personal jurisdiction where, as here, the Complaint does not plead that *Defendants* deliberately created contacts with the State that are meaningfully connected to Plaintiffs' claims. *Walden*, 571 U.S. at 291.

In short, binding precedent—including *Walden*, *Sangha*, *Danziger*, and *Defense Distributed*—compels dismissal of this lawsuit.

## B.    Exercising Personal Jurisdiction Would Be Unfair and Unreasonable

Even if Defendants had minimum contacts with Louisiana (they do not), the exercise of personal jurisdiction still must be consistent with "traditional notions of fair play and substantial

justice." *Sangha*, 882 F.3d at 101 (citation omitted). Exercising jurisdiction here would be unfair and unreasonable considering "(1) the burden on [Defendants] of having to defend [themselves] in [Louisiana], (2) the interests of [Louisiana] in the case, (3) [Plaintiffs'] interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in the most efficient resolution of controversies, and (5) the shared interests of the states in furthering fundamental social policies." *Id.* at 102. These factors, individually and together, favor dismissal.

*First*, the burden on Defendants of having to defend themselves in Louisiana is great. Defendants are located in places far from Louisiana, including California, Washington, New York, and the District of Columbia; and their witnesses and nearly all of the relevant evidence in the case are located in those states. *Second*, Louisiana has minimal interest in this case. Only one Plaintiff (Hines) resides in Louisiana. And Plaintiffs' claims concern conduct that occurred entirely outside the State and that allegedly had nationwide effects. *See Burstein v. State Bar of California*, 693 F.2d 511, 522 (5th Cir. 1982) ("The cause of action here is essentially unrelated to [defendants'] contacts with Louisiana …."). Indeed, Plaintiffs seek to certify a nationwide class of plaintiffs, the vast majority of whom will be residents of other states. *Third*, Plaintiffs have minimal interest in keeping their lawsuit in Louisiana. Again, only one Plaintiff is a Louisiana resident, and Plaintiffs purport to represent a nationwide class. Only one of the ten attorneys who signed the Complaint is barred in the state—seven are based in Washington, D.C., and two in St. Louis, Missouri. *Fourth*, the interstate judicial system will be best served if this case is adjudicated in a different forum. None of the alleged conduct occurred in Louisiana; none of the evidence is in Louisiana; and "any witnesses likely to be called, other than [Hines] herself, are located outside of Louisiana." *Id.* Judicial efficiency favors dismissal so that Plaintiffs can refile their lawsuit in a district with a connection to the case. *Finally*, the shared interest of the states in furthering fundamental social policies supports dismissal. Plaintiffs ask this Court—which sits in

a District and State that have essentially no connection to their claims—to issue orders and judgments with nationwide effects. That does a great disservice to the federalism and anti-forum-shopping principles that underlie the due process limitations on personal jurisdiction.

## II.    Plaintiffs Lack Standing

To bring suit in federal court, a plaintiff must have "standing" to sue, which "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Without standing, a case cannot proceed. *See id.*

The Complaint fails to adequately allege traceability, one of the three elements required for standing. *Id.* at 560-61. The Complaint alleges no facts demonstrating "a causal connection between the injury and the conduct complained of"—that is, facts showing Plaintiffs' alleged injuries to be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (cleaned up). Rather, the Complaint alleges (at most) that third-party social-media companies, like Facebook and Twitter, adopted policies against misinformation on their platforms and then enforced those policies against Plaintiffs. *See* Compl. ¶¶ 47, 54-55, 185, 232. These are quintessential "independent action[s]" by "third part[ies]." *Lujan*, 504 U.S. at 560. And Plaintiffs cannot avoid that conclusion by alleging that Defendants "pushed"—or advocated for—the platforms to take those actions. Compl. ¶¶ 47, 185, 232. Indirect conduct, like advocacy, cannot support standing if it does not have a "determinative or coercive effect" on the third parties who allegedly harmed the plaintiffs. *Bennett v. Spear*, 520 U.S. 154, 169-71 (1997).

### A.    The Complaint Does Not Allege Facts Supporting Standing

Starting again with Jill Hines, the Complaint contains no factual allegations that any Defendant took any action against her or her groups. Instead, it alleges that, in general, VP "tracks and flags 'medical freedom' groups" across the country and "push[es] [social media] platforms

19

to censor them." Compl. ¶ 351. Based on that alleged general practice and without citing further evidence, the Complaint asserts, "[o]n information and belief, Defendants' conduct successfully targeted and continues to target Ms. Hines, Health Freedom Louisiana, and her social-media groups for censorship." *Id.* ¶ 352. Hines also alleges that her Facebook account was "restricted" twice in 2022, and that one of her Facebook posts "was censored" in April 2023. *Id.* ¶¶ 357, 360.

Plaintiffs allege that VP stopped work in August 2021, *see* Compl. ¶ 256; Compl., Ex. 10 at 34 (27), refuting any notion that any "restriction" on Hines' social media activity in 2022 or 2023 is traceable to any conduct by Defendants. And Hines does not allege that any such "restriction" resulted from or followed the flagging of any of her posts by VP, because she does not allege that VP flagged any of her posts at all. She does not allege that any Defendant even read her Facebook posts, much less that they "track[ed] and flag[ged]" her posts and "push[ed] [Facebook] to censor them." Compl. ¶ 351. There are no nonconclusory factual allegations, for example, that Defendants created Jira tickets regarding any Facebook post by Hines or her groups, or that they mentioned Hines, her groups, or her posts in their reports or communications with social media platforms. Hines and her groups are not mentioned in VP's final report or in any of the other materials Plaintiffs attached to their Complaint.[5] The Complaint's allegations thus "do not permit the court to infer more than the mere possibility," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), that Defendants ever tracked Hines' posts or alerted Facebook to them—especially when the alleged censorship occurred months after VP stopped monitoring social media activity.

---

[5] In *Missouri v. Biden*, this Court cited VP's final report for the proposition that VP "flagged … Jill Hines and Health Freedom Louisiana" as "spreaders of misinformation." 2023 WL 4335270, at *40. But that statement is not supported by VP's final report. VP's final report does not mention Jill Hines or Health Freedom Louisiana, and Hines has never alleged, either in this action or in *Missouri v. Biden*, that VP flagged her, her groups, or any of their posts. All she alleges is that VP flagged "medical freedom groups" generally and that Health Freedom Louisiana is one such group. Compl. ¶ 351.

The Complaint likewise lacks sufficient allegations to establish Jim Hoft's standing. It alleges that EIP "repeatedly flagged" Hoft's website *The Gateway Pundit* and "mentioned" the website in its report "47 times." Compl. ¶¶ 159-60. It alleges that Hoft's Twitter account was suspended for over a year. *Id.* ¶ 367. And it alleges that "The Gateway Pundit's social-media accounts experience censorship on major social-media platforms, including on topics specifically targeted by the EIP and the VP," and that this alleged "censorship" takes the form of "suspensions and deplatforming by Twitter" and unspecified "censorship on Facebook." *Id.* ¶ 368.

These allegations do not suffice for Article III standing. Even if Defendants lobbied Facebook and Twitter to strengthen their policies against misinformation and reported Hoft's (or Hines') posts to the platforms, *see, e.g.*, Compl. ¶¶ 47, 54-55, 185, 232, Plaintiffs' injuries—suspensions or deplatforming on Facebook or Twitter, *see id.* ¶¶ 360, 368—were "the result of independent action[s]" taken by the platforms. *Lujan*, 504 U.S. at 560. The Complaint is clear: "*Platforms* took action against policy violations by suspending users or removing content, downranking or preventing content sharing, and applying informational labels." Compl. ¶ 49 (emphasis added). The Complaint does not allege that Defendants—academics, researchers, and their associated institutions—exercised any direct control over any platform; Plaintiffs do not contend that Defendants could unilaterally change the platforms' policies, take down posts, or suspend users. Rather, the Complaint asserts that Defendants "pushed social-media platforms to adopt more stringent censorship policies" and "pushed the platforms to enforce them." Compl. ¶ 47; *see also id.* ¶¶ 54-55, 155, 185, 232, 234 ("push"); *id.* ¶¶ 2, 48, 54-56 ("pressure"); *id.* ¶¶ 170, 175 ("advocate"); *id.* ¶¶ 2, 168 ("urge"); *id.* ¶ 371 ("instigate"). And *how* did Defendants "push" the platforms? The Complaint alleges only that Defendants *asked them* to adopt policies and *informed them* about posts containing misinformation. *See e.g.*, *id.* ¶¶ 47-57 (EIP's alleged advocacy directed at social media companies); *id.* ¶¶ 125-26 (EIP's alleged methods for "reporting

'misinformation' to platforms"); *id.* ¶¶ 234-45 (VP's alleged communications with Twitter). These allegations make clear that it was the social media platforms themselves—not any Defendant—that were the decisionmakers.

## B. The Complaint Alleges Facts that Affirmatively Foreclose Standing

The Supreme Court has held that, to demonstrate standing in a case like this—where Defendants' actions were *not* "the very last step in the chain of causation"—Plaintiffs must allege nonconclusory facts establishing that Defendants' actions had a "*determinative or coercive effect* upon the action of someone else" who directly caused the alleged injury. *Bennett*, 520 U.S. at 169 (emphasis added). Plaintiffs have not done so. The Complaint does not allege that Defendants' private communications, public advocacy, or reporting had a "determinative or coercive effect" on any decision by any social media platform to take any action against either Plaintiff or their posts. To the contrary, the Complaint and its exhibits *refute* any such conclusion.

The Complaint alleges that "six social-media platforms 'engaged with VP tickets,' 'acknowledge[ed] [*sic*] content flagged for review' by VP, 'and act[ed] on it *in accordance with their policies*.'" Compl. ¶ 247 (emphasis added); *see id.* ¶ 253 (similar). Once EIP analysts identified potential misinformation on a platform, an advanced analyst would "tag[] the platform partners" on a Jira ticket identifying the potential misinformation "so that [the platform] teams were *aware of the content* and could *independently evaluate the post against their policies*." Compl., Ex. 1 at 37 (19) (emphasis added). Likewise, VP "tag[ged] platform or health sector partners" to give the platforms "situational awareness of high-engagement material that appeared to be going viral, *so that these partners could determine* whether something might merit a rapid public or on-platform response (such as a label)." Compl., Ex. 10 at 37 (30) (emphasis added). Plaintiffs therefore concede that the platforms independently assessed flagged posts to determine whether they violated the platforms' policies. As one Twitter employee wrote in an email cited in

the Complaint, VP's reports provided "actionable information regarding *potential* violations on our platform," *id.* ¶ 241 (quoting Compl., Ex. 14), that was "very *helpful* in providing context as well as authoritative information *to make our assessments*," Compl., Ex. 14 (emphasis added).

Plaintiffs allege that social media platforms overwhelmingly *declined* to take action against posts or users that EIP flagged, refuting any notion that Defendants' conduct had a "determinative or coercive" effect. Plaintiffs plead that only "35% of the URLs [EIP] shared with Facebook, Instagram, Twitter, TikTok, and YouTube were either labeled, removed, or soft blocked." Compl. ¶ 155. Specifically, EIP's final report details that "21% of URLs were labeled, 13% were removed, and 1% were soft blocked. *No action was taken on 65%*." Compl., Ex. 1 at 58 (40) (emphasis added). Even when a post plainly violated a platform's policies, the platforms often applied, on a case-by-case basis, "a variety of 'newsworthiness' exceptions, which allowed some high-profile repeat spreaders … to evade bans." *Id.* at 233 (215). Even when the platforms did take some action, they most often simply directed users to further information by affixing labels to posts. *Id.* at 58 (40); 234 (216). The platforms thus exercised independent judgment. They took *no action* in nearly two-thirds of cases, and even when they did act, in most cases, they opted *not* to remove content or suspend accounts. *Id.* at 58 (40), 233 (215), 234 (216).

These allegations in the Complaint are a far cry from the sort of "determinative or coercive effect[s]" that courts have found sufficient to support standing. For example, in *Bennett v. Spear*, the Supreme Court ruled that an "advisory" opinion of the federal Fish and Wildlife Service had a "powerful coercive effect on [the third party]" because of the risk of "substantial civil and criminal penalties, including imprisonment," that could result from disregarding the opinion. 520 U.S. at 169-70. Likewise, in *Skyline Wesleyan Church v. California Department of Managed Health Care*, the Ninth Circuit determined that a church had standing to sue a California agency over letters it sent to insurers, informing them that "effective [immediately]," they "must comply

23

with California law" by removing abortion-coverage restrictions from their plans. 968 F.3d 738, 750 (9th Cir. 2020). In holding that the letters "had a 'determinative or coercive effect' on the seven insurers who received them," the court emphasized that the agency was the "regulatory agency with jurisdiction to approve (or disapprove) the terms of those insurers' offerings throughout California"; that the letters were mandatory; and that "all seven [insurers] complied." *Id.* Defendants, of course, have no regulatory authority over the platforms and have no power to impose civil or criminal sanctions. Nor is it plausible that a small research collective could "coerce" multi-billion-dollar companies into action.

By contrast, courts have dismissed cases for lack of standing where, as here, defendants' conduct had no coercive effect. *National Council of La Raza v. Mukasey*, 283 F. App'x 848 (2d Cir. 2008) (unpublished), parallels this case in several respects. There, the plaintiffs sought to enjoin Department of Homeland Security officials from entering certain civil immigration records into a database, alleging that those records and associated DHS requests led third-party state and local officials to detain individuals for immigration violations. *Id.* at 851-52. But plaintiffs also alleged that "a number of state and local authorities cho[se] not to comply with such DHS requests" and did not "suffer any adverse consequences from this resistance." *Id.* at 852. The Second Circuit affirmed the district court's dismissal for lack of standing. Because state and local authorities could, "for policy reasons," "choose not to comply" with federal requests to detain an alleged immigration violator, the court held that the federal officials' actions did not have "a determinative or coercive effect on those state and local authorities that carry out the allegedly unlawful arrests." *Id.* Here, too, the platforms could—and in 65% of cases did—choose not to take any action when Defendants flagged posts to them for review.

The Sixth Circuit's decision in *Turaani v. Wray*, 988 F.3d 313 (6th Cir. 2021) (Sutton, J.), is also instructive. The plaintiff, Khalid Turaani, sought to buy a gun at a gun show. *Id.* at

315. After the dealer ran a background check, an FBI agent contacted the dealer and stated that "'we have a problem with the company' Turaani 'keeps.'" *Id.* The dealer declined to sell Turaani the gun, explaining that "he was 'no longer comfortable doing so'" because of the FBI visit. *Id.* The Sixth Circuit held that Turaani lacked standing because the FBI's actions did not have a "'determinative or coercive effect'" upon the dealer. *Id.* at 316 (quoting *Bennett*, 520 U.S. at 169). It was not coercive for the FBI to speak with the dealer because "[c]ontact does not equal coercion." *Id.* Likewise, the FBI's statement that "'we have a problem with the company' Turaani 'keeps'" was not coercive because "[p]assing along information, and ambiguous information at that, is a distant cry from forcing action." *Id.* The court concluded that because the dealer "exercised his discretion after speaking with the FBI agent" and the agent "did not compel [the dealer's] chosen course of conduct," Turaani's claims rested on "the kind of attenuated causal chain that fails to meet Article III's requirements." *Id.* at 317.

Plaintiffs likewise have failed to allege an injury that is traceable to Defendants' conduct. Plaintiffs' allegations—that Defendants (like many other Americans) advocated for platforms to enact policies against misinformation and flagged instances of misinformation that violate those policies—cannot establish that Defendants' conduct had a "determinative or coercive effect" where the platforms "exercised [their] discretion," *id.*, and could (and most often did) "choose not to comply" with Defendants' requests "for policy reasons" without "suffer[ing] any adverse consequences," *La Raza*, 283 F. App'x at 852. Simply put, "[c]ontact does not equal coercion," and "[p]assing along information … is a distant cry from forcing action." *Turaani*, 988 F.3d at 316. Plaintiffs' "quarrel is with [the platforms], not [Defendants]." *Id.* Plaintiffs thus lack standing and the Court lacks subject matter jurisdiction. *Lujan*, 504 U.S. at 560-61.

## C.     Plaintiffs Lack Standing to Sue the Individual Defendants

Even if Plaintiffs had adequately alleged that their injuries were fairly traceable to the

conduct of EIP and VP, they would still lack standing to sue Defendants Stamos, DiResta, François, and Brookie. These defendants are not sued in any "official" capacity, and the Complaint does not allege that Stamos, DiResta, François, or Brookie *personally or individually* took any action at all relating to Hoft, Hines, or any of their groups. "[I]t is the general rule that the acts of the agent are the acts of the corporation," not the other way around. *Hilliard v. Ferguson*, 30 F.3d 649, 653 (5th Cir. 1994); *see infra* Section IV.E. Stamos and DiResta may be sued only on the basis of their personal conduct that injured Plaintiffs, not activities by Stanford; François may be sued only on the basis of her personal conduct, not the activities of Graphika; and Brookie may be sued only on the basis of his personal conduct, not activities by the Atlantic Council.

Finally, Plaintiffs also lack standing to sue Defendant Starbird. The Complaint does not allege that Starbird personally took any action, in any capacity, with respect to Hoft or Hines or their groups. And allegations that she acted in her "official capacity" as a professor at the University of Washington (which is conspicuously absent as a defendant) are defective and cannot cure the lack of standing for claims as to her individual actions. *See infra* Section IV.C.2, E.

## III.  Venue Is Not Proper in the Western District of Louisiana

Section 1406(a) of Title 28 requires a court to dismiss or, in the interest of justice, transfer any case filed in the wrong venue. Whether venue is "wrong" for purposes of § 1406(a) is governed by 28 U.S.C. § 1391. If the case does not fall into one of § 1391's three categories, then "venue is improper, and the case must be dismissed or transferred under § 1406(a)." *Atlantic Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 56 (2013).

The Complaint asserts venue solely under § 1391(b)(2), Compl. ¶ 33, which provides that "[a] civil action may be brought in . . . (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." But it fails to allege facts demonstrating that any events or

omissions giving rise to Plaintiffs' claims occurred in the District. Venue—like personal jurisdiction—focuses on the *defendant's* contacts with the district. *See Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371-72 (11th Cir. 2003) ("[Section 1391(b)] protects defendants, and Congress therefore 'meant to require courts to focus on relevant activities of the defendant, not of the plaintiff.'" (quoting *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995))). The Complaint, however, does not allege that any Defendant engaged in any conduct *in*, or directed *at*, the District. *See supra* Section I. "[E]ven if … the effects of [Defendants'] actions were felt in Louisiana, that does not suffice to authorize venue in this district pursuant to § 1391(b)(2)." *Thompson v. Georgia*, 2008 WL 4909421, at *2 (W.D. La. Oct. 15, 2008) (rep. & rec.); *see Inst. for Creation Rsch. Graduate Sch. v. Paredes*, 2009 WL 4333366, at *3 (N.D. Tex. Dec. 1, 2009). And even if Defendants had minimum contacts to support this Court's exercise of personal jurisdiction, those contacts are not "substantial" enough to support venue. *See Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 431-34 (2d Cir. 2005). All of the Defendants' conduct alleged in the Complaint occurred outside the Western District of Louisiana and has no connection to the District.

## IV.   The Complaint Fails to State a Claim

Setting aside the lack of jurisdiction and improper venue, the Court should also dismiss the Complaint on the merits. First and foremost, Plaintiffs' suit is barred by the First Amendment because it seeks to hold Defendants liable for their own speech on matters of public concern. Beyond that, the Complaint fails to state a claim under federal or state law.

### A.   This Suit Is Foreclosed by the First Amendment

The First Amendment bars civil suits that seek to hold defendants liable for speaking or petitioning—or to prevent them from speaking or petitioning—about matters of public concern, on the basis of the content of the speech. *See Snyder v. Phelps*, 562 U.S. 443, 451-53 (2011) (in state tort lawsuit, holding that "the First Amendment prohibits holding [defendant] liable for its

speech"); *Video Int'l Prod., Inc. v. Warner-Amex Cable Comm'ns, Inc.*, 858 F.2d 1075, 1083-84 (5th Cir. 1988) (holding that First Amendment barred § 1983 lawsuit); *Barnes Found. v. Township of Lower Merion*, 242 F.3d 151, 160-61 (3d Cir. 2001) (collecting cases in which First Amendment barred § 1983 and § 1985 claims). It is well settled that speech concerning public affairs "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder*, 562 U.S. at 452 (cleaned up).

Defendants' speech about mis- and disinformation related to elections and COVID-19 vaccines falls squarely within this category of specially protected speech. "Political speech regarding a public election lies at the core of matters of public concern protected by the First Amendment." *Wiggins v. Lowndes County*, 363 F.3d 387, 390 (5th Cir. 2004). And speech about vaccines is part of "an ongoing public debate" regarding safe and effective responses to the COVID-19 pandemic. *Id.* As Plaintiffs acknowledge, these are "topics of enormous public interest." Compl. ¶ 5. Accordingly, Defendants' speech—to the public, to social media platforms, and to the government—concerning mis- and disinformation related to elections and COVID-19 vaccines "is entitled to special protection." *Snyder*, 562 U.S. at 452.

Dismissal is required because Defendants cannot be held liable for the content and viewpoint of their speech. This lawsuit seeks to punish and silence Defendants for flagging Plaintiffs' speech as false and misleading, *see, e.g.*, Compl. ¶¶ 125, 143, 150, 154, 160, 168, 179, 190-92, 211-31, 246-47, 253, 255, 371, and for advocating that social media platforms adopt more "stringent" and "aggressive" policies to restrict misinformation, *see, e.g., id.* ¶¶ 47-57, 232-45, 266-67. Moreover, the Complaint makes clear that Plaintiffs would not have brought this lawsuit if Defendants had flagged their speech as true or advocated for less restrictive platform policies. *See id.* ¶¶ 1, 5. Plaintiffs' claims thus turn "on the content and viewpoint of the message" that Defendants allegedly conveyed to the public, social media platforms, and the government.

*Snyder*, 562 U.S. at 457. Such viewpoint discrimination is "presumptively unconstitutional." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995). And that is true regardless of politics. It would equally violate the First Amendment, for example, to enjoin Fox News or a group of conservative students and professors at George Mason University from engaging in similar activities related to misinformation posted by left-leaning groups.

Plaintiffs cannot overcome that presumption by alleging that they have been harmed by Defendants' speech. The First Amendment forbids the imposition of civil liability even for harmful speech, with only narrow exceptions not applicable here (*e.g.*, true threats and defamation). *See Snyder*, 562 U.S. at 458 (protected speech "cannot be restricted simply because it is upsetting or arouses contempt"); *Hurley v. Irish-American Gay*, 515 U.S. 557, 574 (1995) ("[T]he point of all speech protection … is to shield just those choices of content that in someone's eyes are misguided, or even hurtful."). Indeed, allegations that protected speech caused a plaintiff cognizable injury are a universal feature in cases like *Snyder* barring tort suits under the First Amendment.

Plaintiffs' requested injunctive relief further constitutes an unconstitutional prior restraint. Plaintiffs seek to permanently enjoin Defendants from speaking on matters of public concern based on content and viewpoint. *See* Compl. Prayer for Relief C. A "predetermined judicial prohibition restraining specified expression" of this nature is presumptively unconstitutional. *Bernard v. Gulf Oil Co.*, 619 F.2d 459, 467 (5th Cir. 1980), *aff'd*, 452 U.S. 89 (1981) (quotation marks omitted); *see Int'l Soc. for Krishna Consciousness v. Eaves*, 601 F.2d 809, 833 (5th Cir. 1979). The First Amendment requires dismissal of this entire lawsuit.

### B.      The Complaint Fails to State a Section 1985 Claim

"To state a claim under § 1985(3), a plaintiff must allege facts demonstrating (1) a conspiracy; (2) for the purpose of depriving a person of the equal protection of the laws; and (3) an act in furtherance of the conspiracy; (4) which causes injury to a person or a deprivation of any

right or privilege of a citizen of the United States." *Lockett v. New Orleans City*, 607 F.3d 992, 1002 (5th Cir. 2010) (per curiam). Plaintiffs' § 1985(3) claim (Count One) fails for at least three reasons: The Complaint fails to allege that Defendants entered into a conspiracy aimed at intentionally violating Plaintiffs' rights; Plaintiffs have not alleged any cognizable deprivation of equal protection; and the Complaint fails to allege causation.

> 1.     *The Complaint Fails to Allege that Defendants Entered into an Agreement Aimed at Intentionally Violating Plaintiffs' Equal-Protection Rights*

Plaintiffs allege a § 1985(3) violation on the ground that Defendants conspired to violate their First and Fourteenth Amendment rights, meaning that they must show "proof of state involvement." *United Bhd. of Carpenters and Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 463 U.S. 825, 831-32 (1983). In particular, to succeed on a § 1985 claim, a plaintiff must plead "specific facts demonstrating" that the defendant and the government entered into "an *actual agreement*" to deny the plaintiff equal protection of the laws. *Welsh v. Correct Care Recovery Sols.*, 2022 WL 10676598, at *21 (N.D. Tex. Sept. 30, 2022) (emphasis added); *see Shaw v. Villanueva*, 918 F.3d 414, 419 (5th Cir. 2019); *JeanLouis v. Vidallia*, 2009 WL 331373, at *2 (W.D. La. Jan. 14, 2009). The Supreme Court has made clear, moreover, that "it does not suffice for application of § 1985(3) that a protected right be incidentally affected." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 275 (1993). As such, "[a] conspiracy is not 'for the purpose' of denying equal protection simply because it has an effect upon a protected right. The right must be 'aimed at'; its impairment must be a conscious objective of the enterprise." *Id.* (quoting *Carpenters*, 463 U.S. at 833). Under this standard, "the 'intent to deprive of a right' requirement demands that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it." *Id.* at 276. In this Circuit, plaintiffs must allege an agreement to deprive them of equal protection

with specificity—it is "well settled" that "mere conclusory allegations of conspiracy cannot, absent reference to material facts, state a substantial claim of federal conspiracy." *McAfee v. 5th Cir. Judges*, 884 F.2d 221, 222 (5th Cir. 1989) (quotation marks omitted); *see Lynch v. Cannatella*, 810 F.2d 1363, 1369-70 (5th Cir. 1987) ("Bald allegations that a conspiracy existed are insufficient.").

Plaintiffs have failed to allege that Defendants entered into a conspiracy with the government, much less a conspiracy aimed at denying Plaintiffs equal protection.[6] At most, Plaintiffs allege that Defendants flagged and reported Plaintiffs' content as "misinformation" and "target[ed]" their webpages for monitoring. *See* Compl. ¶¶ 10, 158, 160, 339, 346, 352, 364, 371-72. Plaintiffs do not allege that Defendants entered into "an understanding or agreement" with any alleged third-party government co-conspirators to take these actions against Plaintiffs, *Holdiness v. Stroud*, 808 F.2d 417, 425 (5th Cir. 1987), or that Defendants undertook these actions with the "conscious objective" of denying Plaintiffs equal protection, *Bray*, 506 U.S. at 275. The alleged actions alone do not constitute an agreement, and "conclusory assertions alleging conspiracy" cannot support a § 1985(3) claim. *Welsh*, 2022 WL 10676598, at *21; *see McAfee*, 884 F.2d at 222; *cf. Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 389 (5th Cir. 2017) (dismissing § 1985 claim where "[t]he only alleged connection between Defendants [wa]s that … 'Defendants ha[d] conspired and continue[d] to conspire against Plaintiffs'").

Plaintiffs' conclusory allegations that Defendants worked in "concert" with government officials cannot remedy this pleading deficiency. *E.g.*, Compl. ¶ 393. To plead the requisite state involvement, it is not enough to allege that the government acted in accordance with the conspir-

---

[6] *Carpenters* reserved the question whether § 1985(3) applies to conspiracies unrelated to *racial* animus. 463 U.S. at 835. As explained below, the Fifth Circuit has held that it does not, which is an additional reason to dismiss.

acy; the government must be involved in the conspiracy itself. *Carpenters*, 463 U.S. at 831-32. Here, Plaintiffs attempt to concoct a conspiracy on the basis that the government flagged posts to EIP and VP, which in turn may have reported those posts to social media platforms, *see* Compl. ¶¶ 74, 110, 114, 275-76, and that Defendants met with government officials to discuss EIP's and VP's roles in combatting mis- and disinformation, *see id.* ¶¶ 72, 74, 77, 92-93, 114, 272. "Mere approval of or acquiescence in … private activity is insufficient to prove state involvement." *Grossling v. Ford Mem. Hosp.*, 614 F. Supp. 1051, 1057 (E.D. Tex. 1985); *see Peck v. United States*, 470 F. Supp. 1003, 1012 (S.D.N.Y. 1979) ("Mere knowledge … is insufficient to sustain a claim of conspiracy under § 1985(3)."). Plaintiffs' § 1985(3) claim fails because Plaintiffs have alleged no facts sufficient to infer that Defendants and government officials acted for the "conscious objective" or "very purpose of" violating either Plaintiff's equal protection rights. *Bray*, 506 U.S. at 275-76; *see Holdiness*, 808 F.2d at 425 ("The essence of a conspiracy is an understanding or agreement between the conspirators."); *Bohannan v. Doe*, 527 F. App'x 283, 300 (5th Cir. 2013) ("A conclusory allegation that defendants conspired to violate [the plaintiff's] rights does not suffice [to establish an agreement].").

Plaintiffs' allegations concerning Defendants Stamos's and Starbird's work on a CISA advisory committee, Compl. ¶¶ 104-06, similarly fail to support an inference of conspiracy. The Complaint contains no allegations regarding any actions that Stamos or Starbird took in those capacities, and Plaintiffs do not purport to sue Stamos in any "official" capacity in any event. Thousands of private American citizens serve on federal government advisory bodies; these positions do not transform their other unrelated private activities into a government conspiracy. Similarly, although Plaintiffs allege that Starbird is a state official by virtue of her employment at the University of Washington, *id.* ¶ 277, the Complaint does not contain any non-conclusory allegations regarding Starbird beyond that employment relationship alone, *see id.* ¶¶ 21 (alleging that

"Starbird plays a leading role in the social-media censorship activities described in th[e] Complaint"), 69 (alleging that Starbird's lab received government funding), 102-05 (describing where Starbird is employed), 114 (alleging that Starbird has a "formal role[] at CISA"), 142 (quoting Starbird explaining findings regarding disinformation campaign), 183 (describing VP report "acknowledg[ing] Kate Starbird for feedback and support"), 277 (alleging that Starbird is a government official). The mere allegation that these individual Defendants served as unpaid volunteers on an advisory committee, possessing no official authority, for the limited purpose of providing expertise and advice on information security issues does not constitute an "operative fact[]" connecting either of them to the alleged conspiracy. *Lynch*, 810 F.2d at 1369-70.

In addition, the Complaint contains *no* allegations that Defendants Graphika or François had any contact with any government officials with respect to any of the conduct alleged in the Complaint—let alone that they reached any agreement with respect to the alleged conspiracy. *See* Compl. ¶¶ 1, 22-24, 39, 73, & 235 (no allegations Graphika had any communications with government officials); *id.* ¶ 24 (same for François).[7] Plaintiffs simply have not alleged any facts to connect Graphika or François to an alleged conspiracy. *Lynch*, 810 F.2d at 1369-70.

### 2.     The Complaint Fails to Allege Racial Animus

"In this Circuit … the only conspiracies actionable under section 1985(3) are those motivated by racial animus." *Cantú v. Moody*, 933 F.3d 414, 419 (5th Cir. 2019) (quoting *Newberry v. E. Texas State Univ.*, 161 F.3d 276, 281 n.2 (5th Cir. 1998)) (brackets omitted). The Fifth Circuit "ha[s] held that racial animus is required" in part because "§ 1985(3) was passed pursuant to the Thirteenth Amendment." *Id.* (citing, *inter alia*, *Griffin v. Breckenridge*, 403 U.S. 88, 104-05

---

[7] Indeed, the Complaint's only allegation with respect to François is that she is Graphika's Chief Innovation Officer and helped to lead Graphika's participation in EIP (Compl. ¶ 24)—roles she no longer holds. The Complaint contains no other allegations with respect to François.

(1971)). And in *Carpenters*, the Supreme Court noted that § 1985(3) was enacted to combat racial animus and expressly declined to affirm a lower court's holding that the statute applied to conspiracies motivated by anything other than racial animus. 463 U.S. at 835. Plaintiffs must set forth "an allegation of a race-based conspiracy to present a claim under § 1985(3)." *Johnson v. Dowd*, 305 F. App'x 221, 224 (5th Cir. 2008) (quotation marks omitted); *see Word of Faith World Outreach Ctr. Church v. Sawyer*, 90 F.3d 118, 124 (5th Cir. 1996) (requiring racial animus claim); *Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 271 (5th Cir. 2001) (same).

Plaintiffs do not plausibly allege that any Defendant's actions were motivated by racial animus. Their conclusory allegations that Defendants "deliberately target[ed] … Black people, Spanish-speaking and Chinese-speaking groups and ethnicities," Compl. ¶ 299, lack even arguable support in any pleaded fact. The Complaint recounts that Defendants identified trends and narratives of content that were aimed at members of certain racial groups and took actions motivated by their desire to *prevent* mis- and disinformation from reaching them (just as they sought to prevent mis- and disinformation from reaching White people). *See id.* ¶¶ 310-20; *cf. Tiner v. Cockrell*, 756 Fed. App'x 482, 483 (5th Cir. 2019). Nothing in the Complaint suggests that flagging posts that Defendants believed were likely to harm certain racial groups constituted *animus* toward them. Because Plaintiffs do not "link [their] conspiracy allegations" to racial animus, *Cantú,* 933 F.3d at 419-20 (cleaned up), their "bald assertions of discriminatory intent … cannot withstand 12(b)(6) scrutiny," *Garner v. City of Many*, 2021 WL 4129769, at *4 (W.D. La. Sept. 9, 2021).

Even if Plaintiffs had pleaded racial animus, they lack standing to assert a § 1985(3) claim on behalf of the racial groups that they identify. Plaintiffs asserting a § 1985(3) violation must themselves be members of the class against whom they allege the defendant conspired. *See Bryan v. City of Madison*, 213 F.3d 267, 276 (5th Cir. 2000). Here, Plaintiffs do not allege that

34

they are members of any of the racial minorities against whom they allege Defendants conspired, nor do they allege any basis upon which to bring a claim on behalf of those groups. *Cf. Moody v. Jefferson Par. Sch. Bd.*, 803 F. Supp. 1158, 1163-64 (E.D. La. 1992) (dismissing § 1983 claim where plaintiff did not establish that non-parties lacked "ability to assert their own rights").

>    3.    *The Complaint Fails to Allege Any Other Equal Protection Violation*

Even if Plaintiffs could rely on a discriminatory motive besides racial animus (they cannot), their remaining religious, sex, and viewpoint based discrimination claims would still fail.

>    a.    *The Complaint Does Not Allege Religious or Sex Discrimination*

In addition to race, Plaintiffs allege that Defendants conspired with respect to VP (but not EIP) on the basis of discriminatory animus toward "particular religious beliefs," Compl. ¶ 300; *see id.* ¶¶ 300-09, and women, *id.* ¶ 333; *see id.* ¶¶ 333-38. As an initial matter, the Fifth Circuit has specifically "decline[d] … to extend the reach of section 1985(3) to include conspiracies motivated by religious [animus]." *Sawyer*, 90 F.3d at 124. And Plaintiffs do not have standing to raise a religious-discrimination claim, because they neither claim to be a member of any religious group nor allege any basis upon which to bring a claim on behalf of any religious group. *Cf. Moody*, 803 F. Supp. at 1163-64.

Even if claims based on religion and sex were theoretically cognizable under § 1985(3), they would fail for the same reasons as the racial-discrimination claims. Plaintiffs do not allege any facts suggesting that Defendants acted on the basis of animus toward any particular religion or toward women, only that Defendants identified and tracked specific trends in vaccine hesitancy or misinformation that invoked religious imagery or reasoning or women's health issues. Compl. ¶ 333; *see id.* ¶ 300; *cf. Tiner*, 756 F. App'x at 483; *Cantú*, 933 F.3d at 419-20; *Garner*, 2021 WL 4129769, at *4. None of this constitutes an intentional classification or discrimination on the basis of religion or gender as required to make out an equal protection violation. Plaintiffs

do not, for example, allege that Defendants flagged vaccine-related posts *because* they were written by or about women, or *because* they were written by or about religious adherents. *See Bray*, 506 U.S. at 269-70. Rather, Plaintiffs allege that Defendants flagged mis- and disinformation, *including* posts that involved religion or women's health. The Complaint alleges that, for example, the VP final report noted that some vaccine hesitancy was framed in religious terms. Compl. ¶ 306. Flagging posts that both are and are not framed in religious terms does not constitute unconstitutional discrimination on the basis of religion. Moreover, the Complaint alleges that VP acted out of a desire to study and describe misinformation narratives that targeted religious people and women, not out of animus toward those groups but in order to help public health officials and social media platforms address them. *Id.* ¶¶ 307, 334; *see also* Compl., Ex. 10 at 65-68 (58-61). The Complaint includes no factual allegations suggesting otherwise. Plaintiffs' disagreement with Defendants' motives does not transform attempted assistance into animus.

### b.  *Section 1985(3) Does Not Apply to Viewpoint Discrimination*

Plaintiffs' allegations that Defendants conspired against certain groups on the basis of viewpoint similarly fail. Even putting aside the Fifth Circuit's controlling holding that § 1985(3) does not extend to discrimination motivated by anything other than racial animus, the Supreme Court has specifically held that § 1985(3) does not extend to discrimination on the basis of political viewpoint. In *Bray*, the Court rejected the argument that "women seeking an abortion" qualify as a protected "class" under § 1985(3). 506 U.S. at 269. The Court explained that a cognizable class "unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors." *Id.* "Otherwise, innumerable tort plaintiffs would be able to assert causes of action under § 1985(3) by simply defining the aggrieved class as those seeking to engage in the activity the defendant has interfered with." *Id.*

That reasoning applies with equal force here. *Bray* precludes Plaintiffs from alleging that targeting a group of individuals who Defendants believe spread disinformation about elections or COVID-19 vaccines constitutes invidious, class-based animus. Discrimination on the basis of an immutable characteristic like race is particularly invidious because it is based upon a characteristic that is "determined by the accident of birth and bear[s] no relation to ability to perform or contribute to society." *Farber v. City of Paterson*, 440 F.3d 131, 142 (3d Cir. 2006). Targeting social media content that spreads mis- and disinformation regarding elections and vaccinations raises no similar concerns and "does not remotely qualify for" co-equal treatment with racial animus under § 1985(3). *Bray*, 506 U.S. at 274; *see Farber*, 440 F.3d at 142.

Finally, the Complaint does not even plausibly allege viewpoint discrimination. The materials Plaintiffs attached to the Complaint demonstrate that Defendants were nonpartisan and tracked mis- and disinformation across the political spectrum. *See, e.g.*, Compl., Ex. 1 at 68, 72-73, 204 & fig. 5.1, 208, 212-13 (50, 54-55, 186, 190, 194-95); Compl., Ex. 10 at 23-24, 54 fig. 3.1, 82-83 (16-17, 47, 75-76).

### 4.    The Complaint Fails to Allege a First Amendment Violation

Even if Plaintiffs could theoretically assert a § 1985(3) "equal protection" claim based on the theory that Defendants conspired with the government to violate their First Amendment rights—something Fifth Circuit and Supreme Court precedent preclude—the Complaint does not plausibly allege a First Amendment violation. The Complaint makes clear that, to the extent Plaintiffs' speech was "censored" at all, it was censored by the social media platforms, not Defendants. The Defendants had no ability to remove or label any content on the Internet; only the social media companies could do that. *See supra* Section II. And the law is settled that Plaintiffs do not have a First Amendment right to access private social media platforms: "The Free Speech Clause does not prohibit *private* abridgment of speech." *Manhattan Cmty. Access Corp. v. Hal-*

*leck*, 139 S. Ct. 1921, 1928 (2019).

*First*, Plaintiffs admit that the alleged censorship of their speech via removal, labeling, and de-platforming was done at the hands of social media platforms that Plaintiffs conspicuously opted to leave out of the lawsuit. *See, e.g.*, Compl. ¶ 49 ("*Platforms* took action against policy violations …." (emphasis added)). Although Plaintiffs take issue with Defendants' monitoring and reporting of misinformation to these platforms, *e.g.*, *id.* ¶¶ 55, 185, they nowhere allege—because they could not—that Defendants exercised any control over platforms or platform decisionmaking. *See supra* Section II. To the contrary, Plaintiffs acknowledge that, after receiving reports of potentially violative content, social media platforms independently evaluated the reports in accordance with their policies, and in the overwhelming majority of cases took no action. *See, e.g.*, Compl., Ex. 1 at 58 (40); Compl. ¶¶ 155, 246, 253; *supra* Section II.

*Second*, Plaintiffs do not have a First Amendment right to post on private social media platforms. Plaintiffs allege that they were harmed by their alleged inability to speak on certain social media platforms without restriction. *See* Compl. ¶¶ 353-75. But Plaintiffs do not allege that the social media platforms in their entirety are public forums. Nor could they: The social media platforms are privately owned and controlled, and in using social media platforms, Plaintiffs agreed to engage only in speech that complies with each platform's terms of use. *Compare Missouri v. Biden*, 2023 WL 2578260, at *17 (W.D. La. Mar. 20, 2023) (recognizing that social media platforms are "controlled by neither the States nor the federal government"), *with Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018) (public forums are government controlled).

> ### 5.   The Complaint Fails to Allege that Defendants Caused Plaintiffs' Alleged Injuries

Finally, even if Plaintiffs could allege a conspiracy to deprive them of equal protection of the laws, they fail to allege that Defendants caused their injuries. To state a claim under

§ 1985(3), a plaintiff must allege facts demonstrating they suffered an equal-protection deprivation *as the result of* the defendant's challenged conduct. *See Lockett*, 607 F.3d at 1002 (alleged conspiracy must have "cause[d] injury" to the plaintiff). Plaintiffs have failed to allege nonconclusory facts establishing a causal connection between Defendants' conduct and the alleged restrictions imposed by social media platforms. *See supra* Section II.

### C. The Complaint Fails to State a Section 1983 Claim

Count Two of the Complaint asserts a claim under § 1983, alleging that Defendants "acted and continue to act under color of State law" to deprive Plaintiffs of their rights under the First and Fourteenth Amendments. Compl. ¶ 405. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Plaintiffs do neither. First, they do not show that the alleged constitutional deprivations were committed by persons acting under color of law. With one exception, Defendants are private parties, and the Complaint fails to plead facts showing the requisite nexus between Defendants and state or local government actors.[8] Second, nothing in the Complaint amounts to a constitutional violation under either the First or Fourteenth Amendments. Third, Plaintiffs do not allege causation.

#### 1. *Defendants Are Not State Actors*

"The threshold problem" with Plaintiffs' § 1983 claim "is a fundamental one": with the exception of the official-capacity allegations against Defendant Starbird, Defendants are private

---

[8] If the Court determines that Defendants are state actors and permits the claims against them to proceed, they are entitled to qualified immunity. *See Filarsky v. Delia*, 566 U.S. 377, 384 (2012).

entities and individuals.[9] *Halleck*, 139 S. Ct. at 1928. "[T]he under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrong-ful.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)). "By enforcing that constitutional boundary between the governmental and the private, the state-action doctrine protects a robust sphere of individual liberty." *Halleck*, 139 S. Ct. at 1928. Accordingly, plaintiffs claiming that their constitutional rights have been vio-lated by a private party must first establish that the challenged conduct constitutes state action.

Because the state action requirement is designed to "avoid the imposition of responsibil-ity on a State for conduct it could not control," *Brentwood Academy v. Tennessee Secondary School Athletic Assn.*, 531 U.S. 288, 295 (2001) (cleaned up), the touchstone is fairness; the "goal in every case is to determine whether an action can *fairly* be attributed to the State," *id.* at 936 (Thomas, J., dissenting) (emphasis added) (quotation marks omitted). The Supreme Court employs a two-part approach to resolve the "fair attribution" question. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). "First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible." *Id.* "Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Id.* Plaintiffs' allegations fail at each step.

*First*, Plaintiffs do not identify any state-created right or privilege that *anyone* exercised in making the content-moderation decisions they challenge. *See Lugar*, 457 U.S. at 942. Nor do Plaintiffs identify any "person for whom the State[s] [are] responsible" who "imposed" "a rule of conduct" mandating any content-moderation decisions. *Id.* at 937. In fact, the only "rules of con-

---

[9] As explained below, *infra* Section IV.C.2, the claim against Defendant Starbird in her "official capacity" fails as a matter of law and must also be dismissed.

duct" Plaintiffs mention are the platforms' policies, the terms of which they conspicuously left out of the Complaint. And they draw no connection between those policies and any government.

*Second*, even drawing all inferences in Plaintiffs' favor, the Complaint alleges nothing to establish that Defendants "may fairly be said to be … state actor[s]." *Lugar*, 457 U.S. at 937. Plaintiffs' allegations of state or local government involvement are limited to the vague claims that EIP and VP operate in "close[]" "cooperat[ion]" with unnamed "state … officials." Compl. ¶ 2. As to EIP, Plaintiffs allege that "state-level government officials" "serve as … 'trusted partners,' 'stakeholders,' and 'flaggers' of misinformation for the EIP." *Id.* ¶ 58; *see id.* ¶¶ 62-63 (similar). Specifically, they allege that these officials—"state and local government officials from across the country, such as state Secretary of State's Offices and local election officials"— "participate in the EIP" as "flaggers" and "fact-checkers" through the Elections Infrastructure Information Sharing and Analysis Center (EI-ISAC), "an organization of state and local government officials coordinated by the Center for Internet Security" and funded by CISA, a federal agency. *Id.* ¶ 6; *see id.* ¶¶ 79, 123 (similar). Allegations that state officials share information with a nonprofit organization that then shares information with researchers does not transform the researchers into state actors under any rubric. If it did, practically every academic institution would be a state actor. Beyond that, Plaintiffs offer only the bald legal conclusion that "EIP's participants conspire and collude with … state officials, who are pervasively intertwined with their operations." *Id.* ¶ 66.

As to VP, Plaintiffs' allegations are even barer. They offer the conclusory allegation that "VP collaborates closely with, and is pervasively intertwined with, [] state, and local government officials." *Id.* ¶ 273. But Plaintiffs offer no facts in support, alleging only that VP "includes … state public health officials as key 'stakeholders'" who "were among those who 'provided tips' and 'requests to assess specific incidents and narratives.'" *Id.* ¶¶ 275-76 (quoting Compl., Ex. 10

at 24 (17)). Again, if this were enough to allege state action, then every academic researcher who collaborates with the government would be a state actor. The term "stakeholder"—which just means someone with an interest—does not establish state action.

Plaintiffs' remaining allegations describe conduct by *federal* officials, including at DHS and HHS, but "[f]ederal officials acting under color of federal law" are not *state* actors under § 1983. *Doe v. United States*, 831 F.3d 309, 314 (5th Cir. 2016). Neither are federal agencies. *Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d 417, 429 (2016). Plaintiffs' allegation (Compl. ¶ 75) that students who worked at SIO also interned at CISA, a *federal* agency, is therefore irrelevant to whether Defendants are state actors.[10]

Using state-action buzzwords, the Complaint alludes to four theories under which private conduct "may be fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). Plaintiffs allege that Defendants "acted and continue to act under color of State law" by (1) "significantly encouraging state and local government officials to violate Plaintiffs['] … rights"; (2) "participating in conduct that is pervasively entwined with the activity of state and local government officials"; (3) "engaging in joint participation with state and local government officials"; and (4) "conspiring with state and local government officials." Compl. ¶ 405. But these tests are exacting, especially where protected speech is involved. *See Halleck*, 139 S. Ct. at 1932. Plaintiffs' allegations are insufficient as a matter of law under all four tests.

      *a.*      *State Encouragement*

A private party's conduct may fairly be attributed to the state "only when [the state] has

---

[10] More broadly, if a few internships were enough to convert an academic institution into a state actor, then every university would qualify. Tulane Law School is not a state actor simply because it provides legal interns to the Louisiana Attorney General's Office who may work on matters of interest to both the state and to legal scholars at Tulane.

exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). Plaintiffs allege no coercion. As to encouragement, Plaintiffs allege, in conclusory fashion, that Defendants "significantly encourage[ed] state and local government officials to violate Plaintiffs and Class members' … rights." Compl. ¶ 405. As a threshold matter, that is illogical for state-action purposes: the encouragement must come from the state, not *vice versa*.

But even assuming the encouragement came from the state, the facts Plaintiffs plead are insufficient. As "encouragement," Plaintiffs allege only that state officials flagged information to EIP and VP (as to EIP, Plaintiffs also allege that state officials served as "fact checkers"). *See, e.g.*, Compl. ¶¶ 58, 62-63, 275-76. But identifying information for further academic research is not enough "encouragement" to turn private conduct into state action where the private actor retains the authority to "reject the[] [recommendations] and promulgate its own." *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 194 (1988) (explaining that "[n]either [the public university]'s decision to adopt the NCAA's standards [based on which plaintiff was suspended] nor its minor role in their formulation is sufficient for concluding that the NCAA acted under color of Nevada law when it promulgated standards governing athlete recruitment, eligibility, and academic performance"); *see also Maher v. Roe*, 432 U.S. 464, 476 (1977) ("Constitutional concerns are greatest when the State attempts to impose its will by force of law; the State's power to encourage actions deemed to be in the public interest is necessarily far broader."). The question is: "Did the private actor have a choice to refrain from engaging in the conduct?" *Louisiana Div. Sons of Confederate Veterans v. City of Natchitoches*, 370 F. Supp. 3d 692, 703 (W.D. La. 2019), *aff'd*, 821 F. App'x 317 (5th Cir. 2020). The Complaint confirms that the answer is *yes*.

Plaintiffs allege that any decision to remove or label posts, suspend accounts, and the like was made by the social media platforms—not by any Defendant, much less any state official.

*E.g.*, Compl. ¶¶ 49, 357, 360, 368. Similarly, any decision to provide information to the platforms based on "tips" from state officials was Defendants' independent decision. Plaintiffs do not allege that any of Defendants' or the platforms' decisions were "dictated" by state or local officials. *Missouri*, 2023 WL 2578260, at *33. Defendants' alleged decisions were thus based on "judgments made by private parties according to … standards that are not established by the State[s]." *Blum*, 457 U.S. at 1008; *see id.* at 1012 (holding that private nursing homes were not state actors in deciding to discharge or transfer Medicaid patients to lower levels of care).

Faced with an analogous case, another court in this District reached the same conclusion. In *Louisiana Division Sons of Confederate Veterans*, 370 F. Supp. 3d 692, the Sons of Confederate Veterans (SCV) applied to march in the annual Christmas parade in Natchitoches, Louisiana, as it had done in years prior. *Id.* at 696-97. The festival and the parade were hosted by a private nonprofit organization, the Historic District Business Association (HDBA). *Id.* at 696. HDBA denied SCV's application to participate in the Christmas Parade based on a letter from the mayor of Natchitoches to HDBA expressing concerns about displaying the Confederate Flag at the parade. *Id.* at 697. SCV sued HDBA (among others) under § 1983, alleging violations of the First and Fourth Amendments. The court, Judge Drell presiding, held that HDBA was not a state actor and did not engage in state action in denying SCV's application to march in the parade. *Id.* at 704. Like Plaintiffs here, SCV had invoked the state compulsion theory based on the fact that "HDBA acted with the knowledge of and pursuant to the mayor's letter requesting the Confederate Flag not be displayed during the parade." *Id.* at 702. The court disagreed. Judge Drell explained that the mayor's "letter was nothing more than a request to the HDBA to consider banning the Confederate Flag from the Christmas Parade." *Id.* at 703. HDBA then "considered the request in light of the security concerns the City faced [because of a real possibility of protests and potential violence] and decided it would honor the request." *Id.* at 697, 704.

This case is on all fours. Plaintiffs here allege that, like the mayor in *Sons of Confederate Veterans*, "state-level government officials" flagged content or provided tips to EIP or VP relating to content about which the officials were concerned. Compl. ¶¶ 58, 62-63; *see id.* ¶¶ 275-76 (quoting Compl., Ex. 10 at 24 (17)). And they allege that state government officials were "stakeholders," *id.*, also like the mayor in *Sons of Confederate Veterans*—who had an interest in the success of the Christmas festival and parade, provided ticket booths and music, and cared about the City's reputation. *See* 370 F.Supp.3d at 696-98. As a result, like the state officials allegedly did here, he flagged SCV's application to engage in speech as inconsistent with City policies and preferences and as a potential threat. *See id.* at 697. But that did not matter, the court held, because the ultimate decision over SCV's application was HDBA's. *See id.* at 703-04. Here, Plaintiffs acknowledge that Defendants had a choice about what to do with the "tips" sent to them by state and local officials. And, as in *Sons of Confederate Veterans*, the fact that state and local officials had concerns about Plaintiffs' speech is of no moment because Defendants, "the private actor[s]," had "a choice to refrain from engaging in the conduct" Plaintiffs complain of. *Id.* at 703. There was therefore no state action on a state compulsion theory.

### b.    Entwinement

A private party may be a state actor "when it is 'entwined with governmental policies,' or when government is 'entwined in [its] management or control.'" *Brentwood Acad.*, 531 U.S. at 296 (quoting *Evans v. Newton,* 382 U.S. 296, 299 (1966)). Plaintiffs allege that Defendants "participat[ed] in conduct that is pervasively entwined with the activity of state and local government officials." Compl. ¶ 405; *see id.* ¶¶ 66, 273 (similar). Plaintiffs offer nothing in support of these conclusory statements, alleging only that state officials, local officials, or both are "trusted partners," "stakeholders," or participants in EIP or VP. *Id.* ¶¶ 58, 62-63, 273, 275-76. Aside from being conclusory, these allegations are insufficient as a matter of law. To "justify characterizing

an ostensibly private action as public instead," the Complaint must allege "pervasive" entwine-ment, "to the point of largely overlapping identity." *Brentwood Acad.*, 531 U.S. at 291, 303; *see Rundus v. City of Dallas, Tex.*, 634 F.3d 309, 315 (5th Cir. 2011). The Complaint comes no-where close.

In *Brentwood Academy*, 531 U.S. 288, the seminal case on entwinement, the Supreme Court made clear that entwinement exists only when the entwinement is so pervasive that, "[t]here would [have been] no recognizable Association, legal or tangible, without the public school officials, who d[id] not merely control but overwhelmingly perform[ed] all but the purely ministerial acts by which the Association exist[ed] and function[ed] in practical terms." *Id.* at 300. Plaintiffs allege nothing of the sort. First, they do not allege (because they could not) that state and local officials are involved in EIP's or VP's management or control. And "the mere *perception* of governmental control is insufficient." *P.R.B.A. Corp. v. HMS Host Toll Roads, Inc.*, 808 F.3d 221, 226 (3d Cir. 2015) (citing *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 545 n.27 (1987)). Second, although they do allege that state officials *cooperate* with Defendants, "mere cooperation simply does not rise to the level of merger required for a finding of state action." *Marie v. Am. Red Cross*, 771 F.3d 344, 364 (6th Cir. 2014).

Further, Plaintiffs' allegations that EIP and VP work with state and local officials from multiple states "across the country" (Compl. ¶ 63; *see id.* ¶ 275), cuts against entwinement. *See Brentwood Acad.*, 531 U.S. at 297-98. In *Brentwood Academy*, the Supreme Court distinguished *National Collegiate Athletic Association v. Tarkanian*, 488 U.S. 179 (1988), which involved seemingly similar facts as *Brentwood Academy* but where the Court found no state action. In *Tarkanian*, "an undoubtedly state actor, the University of Nevada, suspended its basketball coach, Tarkanian, in order to comply with rules and recommendations of the [NCAA]." *Brentwood Acad.*, 531 U.S. at 297. The coach alleged that the state university had delegated its own

functions to the NCAA, such that applying the university's rules was a "joint action making the NCAA a state actor." *Id.* The Supreme Court found no state action on the NCAA's part. "Since it was difficult to see the NCAA, not as a collective membership, but as surrogate for the one State," the Supreme Court "held the organization's connection with Nevada too insubstantial to ground a state-action claim." *Id.* at 297-98. That is precisely the situation in this case. What particular state or locality's laws do Plaintiffs allege that EIP or VP are operating under or entwined with? Under *Tarkanian*, an allegation that a private entity is operating simultaneously under color of *every* state's law, as Plaintiffs seem to allege here, cannot support a finding of state action.

### c.   Conspiracy or Joint Participation

Nor do Plaintiffs plausibly allege state action under any joint participation or conspiracy theory. "To sustain a claim that a private citizen is liable under § 1983 on the basis of joint action with the State or state officials, the plaintiff must allege facts showing an agreement or meeting of the minds between the state actor and the private actor to engage in a conspiracy to deprive the plaintiff of a constitutional right." *Polacek v. Kemper Cnty.*, 739 F. Supp. 2d 948, 952 (S.D. Miss. 2010); *see Priester v. Lowndes Cnty.*, 354 F.3d 414, 420 (5th Cir. 2004) (similar). But as Defendants explain in detail above, *supra* Section IV.B.1, Plaintiffs do not allege any such agreement or meeting of the minds. *Cf. Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990) (conspiracy under § 1983 and § 1985 is the same concept). Further, this court has recently recognized that allegations that a state-run entity merely "flagged for [a social media platform]'s review posts that potentially violated the company's content-moderation policy" did not rise to the level of joint action. *See Missouri*, 2023 WL 2578260, a *32-33.

### 2.   The "Official Capacity" Claim Against Starbird Must Be Dismissed

Separately, the § 1983 claim against Defendant Starbird in her "official capacity" as a professor at the University of Washington also fails as a matter of law. In the context of a § 1983

claim, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *see also Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("Official-capacity suits … generally represent only another way of pleading an action against an entity of which an officer is an agent."). Accordingly, Plaintiff's claim against Starbird in her official capacity is in reality a suit against the University of Washington. But "[t]he University of Washington is an arm of the state" and immune from suit under § 1983. *Powell v. City of Seattle*, 2022 WL 16814020, at *2 (W.D. Wash. Oct. 20, 2022); *see Goodisman v. Lytle*, 724 F.2d 818, 820 (9th Cir. 1984). Because § 1983 creates liability only for "persons"—a term that does not encompass the University of Washington—the "official capacity" claim against Starbird must be dismissed. *See Will*, 491 U.S. at 71; *see also Chestang v. Alcorn State Univ.*, 820 F. Supp. 2d 772, 778-79 (S.D. Miss. 2011) (dismissing § 1983 claim against public university professor in his official capacity under *Will*). In any event, as demonstrated below, the Complaint alleges no facts to establish that Starbird personally deprived Plaintiffs of rights under color of law. *Infra* Section IV.E.

> 3. *The Complaint Fails to Allege a First or Fourteenth Amendment Violation*

Insofar as there was *any* abridgement of speech here by Defendants—there was not—it would have been permissible because Defendants are not state actors. But even assuming *arguendo* that Defendants were state actors, the allegations in the complaint do not amount to a First Amendment violation. Plaintiffs admit that, insofar as their speech was "censored," it was censored by the social media platforms, not Defendants; and Plaintiffs do not have a First Amendment right to access private social media platforms. *See supra* Section IV.B.4.

Plaintiffs also fail to state a claim for violation of the Equal Protection Clause of the Fourteenth Amendment. "To successfully plead an equal protection violation, a plaintiff must present factually supported allegations that '1) he was treated differently than persons similarly

situated to him, and 2) that such treatment stemmed from discriminatory intent.'" *Washington v. Jones*, 585 F. Supp. 3d 871, 877 (W.D. La. 2022) (quoting *Williams v. Bramer*, 180 F.3d 699, 705 (5th Cir. 1999)). Discriminatory intent, in turn, "requires a showing that 'the decision maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effect on an identifiable group.'" *Id.* (quoting *Williams*, 180 F.3d at 705). Plaintiffs' allegations do not pass muster under either prong. For the reasons Defendants discuss in detail above, *supra* Section IV.B.2-3, Plaintiffs do not plausibly allege that they were treated differently from others similarly situated to them, nor that, even if they had been, this alleged disparate treatment was motivated by discriminatory intent. As noted, they do not even allege that they are members of the racial or religious groups that they claim were the subject of discrimination. And, to the extent Plaintiffs suggest political conservatives were a targeted group, their own allegations foreclose such a claim. *See supra* Section IV.B.3.b (identifying facts incorporated into Complaint that demonstrate EIP's and VP's identification of mis- and disinformation from sources across the political spectrum).

4.      *The Complaint Fails to Allege that Defendants Caused Plaintiffs' Alleged Injuries*

Section 1983 requires a showing of proximate causation. *Murray v. Earle*, 405 F.3d 278, 290-91 (5th Cir. 2005). "In the typical case raising a state-action issue, a private party has taken the decisive step that caused the harm to the plaintiff, and the question is whether the State was sufficiently involved to treat that decisive conduct as state action." *Tarkanian*, 488 U.S. at 192. Here, Plaintiffs admit that the decisive steps that allegedly caused them harm—the "censorship" of their speech—were taken by social media platforms. *See supra* Section II. In so doing, Plaintiffs admit that Defendants did not cause their alleged injuries. Plaintiffs also nowhere allege— because they could not—that Defendants exercised any control over the platforms; as a result,

they have not shown causation as required under § 1983. *See id.*

**D.    The Court Should Dismiss Plaintiffs' State-Law Claims**

Without a federal cause of action, the Court should decline to exercise supplemental jurisdiction over Plaintiffs' state-law claims of tortious interference (Count Three), Compl. ¶¶ 408-16; and "breach of duty" (Count Four), *id.* ¶¶ 417-22. *See Artis v. Dist. of Columbia*, 138 S. Ct. 594, 598 (2018) (explaining that "district courts may decline to exercise supplemental jurisdiction" where the court "has dismissed all claims over which it has original jurisdiction"). But even if the Court considers those claims, it should dismiss them for failure to state a claim because they are so vague and conclusory that Defendants lack "fair notice of what the … claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (citation omitted).

*1.    The Complaint Fails to State a Tortious-Interference Claim*

The Complaint does not identify the State law under which Plaintiffs' tortious-interference claim arises. To the extent the Complaint alleges the existence of any contract or business relationships at all, Plaintiffs' claim would likely be governed by California law because the social media platforms' terms of service that Plaintiffs invoke include California choice-of-law clauses. Regardless, whether the law of California or Louisiana applies, the result is the same: The Complaint's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice to state a claim. *Twombly*, 550 U.S. at 555.

In Louisiana, contracts and obligations are governed by the law "expressly chosen or clearly relied upon by the parties." La. Civ. Code. art. 3540. Plaintiffs assert they had "valid contractual relations, business relations, business expectancies and similar relationships with social media platform(s)" that "include, but are not necessarily limited to … the social media platform(s) terms of service." Compl. ¶ 409. Count Three of the Complaint does not identify which platforms' terms of service—much less which provisions of those terms of service—Defendants

allegedly impaired, but Plaintiffs do allege (elsewhere in the Complaint) that they experienced censorship on Facebook (Hines and Hoft) and Twitter (Hoft). *See, e.g.*, *id.* ¶¶ 9, 345, 357, 360, 362, 367. These platforms' terms of service—which may be considered on a motion to dismiss because they are incorporated by reference into the Complaint—select California law to govern any claims arising out of them. *See Commercial Terms*, Facebook, https://www.facebook.com/legal/commercial_terms (last visited Aug. 11, 2023); *Purchaser Terms of Service*, Twitter, https://legal.twitter.com/en/purchaser-terms.html (last visited June 21, 2023); *Terms of Service*, Twitter, https://twitter.com/en/tos (last visited Aug. 11, 2023).

California does not recognize a tort of interference with business relations, but it does recognize interference with the performance of a contract and interference with a prospective economic relationship. *Ixchel Pharma, LLC v. Biogen, Inc.*, 470 P.3d 571, 669-70 (Cal. 2020). The elements of each claim are practically identical: (1) a valid contract or economic relationship between plaintiff and a third party; (2) defendant's knowledge of this contract or economic relationship; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual or economic relationship; (4) actual breach or disruption of the contractual or economic relationship; and (5) resulting damage. *See id.*

The Complaint does not allege nonconclusory facts to establish any of these elements. Plaintiffs allege, in a wholly conclusory fashion, that they had "valid contractual relations, business relations, business expectancies and similar relationships with social media platform(s)" arising out of the platforms' "terms of service." Compl. ¶¶ 409-10. But they do not state *what* the provisions of those "terms of service" are, *which* provisions they allege Defendants interfered with, or *how* Defendants' alleged conduct interfered with them. Nor do they allege facts demonstrating that Defendants were *aware* of these Plaintiffs' contractual or business relations with the platforms, much less that Defendants' conduct (flagging Plaintiffs' posts) was *intentionally de-*

*signed* to interfere with Plaintiffs' contractual or business relations (as opposed to some other purpose, such as identifying mis- and disinformation). If anything, Plaintiffs seem to allege that Defendants sought to induce compliance with the agreements at issue. *E.g.*, Compl. ¶ 47 (alleging Defendants "pushed the platforms to *enforce* [their terms]" (emphasis added)). But it is impossible for Defendants to know, from this Complaint, what they are being accused of. The claim amounts to nothing more than "legal conclusion[s] couched as … factual allegation[s]" and must therefore be dismissed. *Twombly*, 550 U.S. at 555. [11]

### 2.    The Complaint Fails to State a "Breach of Duty" Claim

Plaintiffs' last claim—for breach of duty—is even more inscrutable. *First*, there is no independent cause of action called "breach of duty." Breach of duty *is* one of the elements of negligence. 57A Am. Jur. 2d § 68. But Plaintiffs do not allege negligence; they allege that "Defendants intentionally harmed" them.

*Second*, even if Plaintiffs' breach-of-duty claim were somehow legally cognizable, like Count Three, it fails to make the requisite factual allegations. Defendants can only guess at what the elements of the hypothetical "breach of duty" tort are, but presumably the existence of a legal duty of care would be one of them. At least in the negligence context, duty arises out of a legal or special relationship with the plaintiff that gives rises to a legal obligation. *Haynes Interests, LLC v. Garney Companies, Inc.* 322 So.3d 292, 303 (La. App. 1st Cir. 2021). Plaintiffs have not iden-

---

[11] Even if Louisiana law were to apply, the result would be the same. Tortious interference with a contractual relationship in Louisiana applies to "*only* a corporate officer's duty to refrain from intentional and unjustified interference with the contractual relation between his employer and a third person." *Favrot v. Favrot*, 68 So.3d 1099, 1111 (La. App. 4th Cir. 2011) (citation omitted). As for tortious interference with business relations, "the plaintiff must allege [that] the defendant actually prevented the plaintiff from dealing with a third party" and that the defendant did so out of "malice, ill will or spite." *Bogues v. La. Energy Consultants, Inc.*, 71 So.3d 1128, 1135 (La. App. 2d Cir. 2011). Plaintiffs do not allege facts supporting any of these additional elements.

tified any relationship with Defendants that might give rise to a legally enforceable duty. They do not even explain what this duty might have been, other than to refrain from violating what appears to be an undefined laundry list of constitutional rights that do not apply to Defendants as private actors and would certainly not be actionable at tort.

### E.     The Court Should Dismiss the Individual Defendants

Even if the Court permits the case to proceed against the organizational Defendants, it should dismiss the individual Defendants: Alex Stamos, Renee DiResta, Kate Starbird, Graham Brookie, and Camille François. As described above, Plaintiffs have failed to allege that any Defendant's conduct caused their alleged injuries. *See supra* Section II. That is especially so for the individual Defendants, about whom the Complaint alleges little more than their job titles.

Regarding Stamos and DiResta, the Complaint alleges that they were the SIO's director and research manager, respectively, Compl. ¶¶ 16-18, 103; that they made public statements about SIO's and EIP's work, *id.* ¶¶ 40, 46 54-56, 129, 131, 139, 140-41; that they communicated with government officials, *id.* ¶¶ 89-100, 114, 177; that they communicated with (or were copied on emails with) Twitter employees, *id.* ¶¶ 236, 238, 241, 294-95; that they serve on advisory committees for CISA, *id.* ¶¶ 104, 106; and that DiResta testified before Congress, *id.* ¶¶ 179-80. As for Starbird, the Complaint alleges that she is a professor at the University of Washington and CIP's director, *id.* ¶ 21; that she gave a public statement regarding EIP's work, *id.* ¶ 142; that VP's final report "acknowledges [her] for feedback and support," but omits any suggestion that she held an official position or managerial role, *id.* ¶ 183; and that she serves in advisory roles for CISA, *id.* ¶¶ 104-05. As for Brookie, the Complaint barely even mentions him beyond the caption. The only allegation in the entire Complaint is that he is the senior director of the Atlantic Council's DFRLab and that he "led" DFRLab's "contributing team." *Id.* ¶ 28. The same is true of François, who is alleged only to be "the Chief Innovation Officer of Graphika" (*id.* ¶ 24),

a role she no longer holds.

The Complaint's critical deficiency is that it does not allege that Stamos, DiResta, Starbird, Brookie, or François were "personally involved in the [alleged] constitutional viola-tion[s]," *Woods v. Edwards*, 51 F.3d 577, 583 (5th Cir. 1995); there are no nonconclusory factual allegations that any of the individual Defendants ever personally flagged any of Plaintiffs' posts or otherwise engaged in any conduct that caused the social-media platforms to remove Plaintiffs' posts or suspend their accounts.[12] Instead, Plaintiffs seem to base their theory of personal liability on holding the individual Defendants responsible for the actions of their respective employers: Stanford University, the University of Washington, the Atlantic Council, and Graphika. But that gets things precisely backward: "[I]t is the general rule that the acts of the agent are the acts of the corporation," not the other way around. *Hilliard*, 30 F.3d at 653. Absent factual allegations that the individual Defendants engaged in conduct that personally caused Plaintiffs' injuries, they are not proper parties to the lawsuit and should be dismissed.

## F.      SIO and DFRLab Are Not Juridical Persons and Cannot Be Sued

Finally, even if the Court rejects all of the foregoing jurisdictional and merits arguments, SIO and DFRLab should still be dismissed. Under Federal Rule of Civil Procedure 17(b)(3), the "capacity to sue or be sued [is] determined by the law of the state in which the district court is held." Under Louisiana law, only natural persons (*i.e.*, human beings) and juridical persons may be sued. *See* La. Civ. Code art. 24. The code defines a juridical person as "an entity to which the law attributes personality, such as a corporation or partnership." *Id*. To determine whether a pri-vate entity (like SIO or DFRLab) is a juridical person, courts look to whether it has a corporate

---

[12] The Complaint also includes no allegations whatsoever that two of the individual defendants—Kate Starbird and Camille François—personally participated in VP or personally engaged in re-porting on COVID-related activities of any person or group concerning "medical freedom."

charter. *See, e.g., Alfred v. Corr. Corp. of Am.*, 2009 WL 789649, at *2 (W.D. La. Mar. 24, 2009) ("A review of the Louisiana Secretary of State's corporation database suggests that WCC is not a corporation and, as such, not a juridical person."). Courts in Louisiana have repeatedly held that university programs are not juridical persons with the capacity to be sued. *See, e.g.*, *Lefkowitz v. Adm'rs of Tulane Educ. Fund*, 2022 WL 376148, at *13 (E.D. La. Feb. 8, 2022); *Edmiston v. La. Small. Bus. Dev. Ctr.*, 2018 WL 6279962, at *5-7 (W.D. La. Nov. 14, 2018), *aff'd*, 931 F.3d 403 (5th Cir. 2019).

The allegations in the Complaint make clear that SIO and DFRLab are not juridical persons. The Complaint alleges that SIO is "a program of Stanford University's Cyber Policy Center," Compl. ¶ 12 (brackets omitted), and that DFRLab "was founded at the Atlantic Council," *id.* ¶ 25. Further, a review of California (applicable to SIO) and District of Columbia (applicable to DFRLab) public records will reveal that neither is registered as a corporation, partnership, non-profit organization, or any other similar entity. *See Alfred*, 2009 WL 789649, at *2.[13] Nor is there any need for SIO and DFRLab to remain as defendants given the presence of the actual juridical entities of which they are a part—Stanford and Atlantic Council. The Court therefore should dismiss SIO and DFRLab from this lawsuit.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint with prejudice.

---

[13] *See, e.g.*, Cal. Sec'y of State, *Business Search*, https://bizfileonline.sos.ca.gov/search/business; Cal. Dep't of Justice, *Registry Verification Search*, https://rct.doj.ca.gov/Verification/Web/Search.aspx?facility=Y.

August 14, 2023

*/s/ Camala E. Capodice*
Quentin F. Urquhart, Jr. (Bar #14475)
Camala E. Capodice (Bar #29117)
Gabrielle C. Broders (Bar #39821)
**IRWIN FRITCHIE URQUHART MOORE
 & DANIELS, LLC**
400 Poydras Street, Suite 2700
New Orleans, Louisiana 70130
Telephone: (504) 310-2100
Facsimile: (504) 310-2101
Email:  qurquhart@irwinllc.com
         ccapodice@irwinllc.com
         gbroders@irwinllc.com

Mary E. Gately (*pro hac vice*)
Samantha L. Chaifetz (*pro hac vice*)
**DLA PIPER LLP (US)**
500 Eighth Street NW
Washington, DC 20004
Telephone: (202) 799-4507
Facsimile: (202) 799-5507
Email:  mary.gately@dlapiper.com
         samantha.chaifetz@us.dlapiper.com

Marie Bussey-Garza (*pro hac vice*)
**DLA PIPER LLP (US)**
1650 Market Street, Suite 5000
Philadelphia, PA 19103
Telephone: (215) 656-3300
Facsimile: (215) 656-3301
Email:  marie.bussey-garza@us.dlapiper.com

*Counsel for Graphika and Camille François*

Respectfully submitted,

*/s/ James Brown*
James Brown (Bar #14101)
Devin Reid (Bar #32645)
Brady Hadden (Bar #37708)
**LISKOW & LEWIS**
Hancock Whitney Center
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Facsimile: (504) 556-4108
Email:  dcreid@liskow.com
         bhadden@liskow.com
         jabrown@liskow.com

John B. Bellinger III (*pro hac vice*)
Elisabeth S. Theodore (*pro hac vice*)
R. Stanton Jones (*pro hac vice*)
Stephen K. Wirth (*pro hac vice*)
**ARNOLD & PORTER
 KAYE SCHOLER LLP**
601 Massachusetts Ave. NW
Washington, DC 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
Email:  john.bellinger@arnoldporter.com
         elisabeth.theodore@arnoldporter.com
         stanton.jones@arnoldporter.com
         stephen.wirth@arnoldporter.com

*Counsel for Alex Stamos, Renée DiResta, the
Board of Trustees of the Leland Stanford Junior
University, the Leland Stanford Junior University,
and the Stanford Internet Observatory*

/s/ Jon K. Guice
Jon K. Guice (Bar #20841)
**HAMMONDS, SILLS, ADKINS, GUICE, NOAH & PERKINS, L.L.P.**
1881 Hudson Circle
Monroe, Louisiana 71201
Telephone: (318) 324-0101
Facsimile: (318) 322-5375
Email:  jguice@hamsil.com

Shelton Dennis Blunt (Bar #21230)
**PHELPS DUNBAR LLP**
II City Plaza | 400 Convention St., Suite 1100
Baton Rouge, Louisiana 70802
Telephone: (225) 346-0285
Facsimile: (225) 381-9197
Email:  dennis.blunt@phelps.com

Karl V. Hopkins (admitted *pro hac vice*)
**BRADLEY ARANT BOULT CUMMINGS LLP**
JPMorgan Chase Tower
600 Travis Street, Suite 5600
Houston, TX 77002
Telephone: (713) 576-0310
Facsimile: (713) 576.0301
Email:  khopkins@bradley.com

Andrew B, Johnson (*pro hac vice*)
**BRADLEY ARANT BOULT CUMMINGS LLP**
1819 Fifth Ave N
Birmingham, Alabama 35203
Telephone: (205) 521-8000
Facsimile: (205) 521-6295
Email:  ajohnson@bradley.com

*Counsel for the Atlantic Council, the Atlantic Council's Digital Forensic Research Lab, and Graham Brookie*

/s/ Alex B. Rothenberg
Alex B. Rothenberg (Bar #34740), T.A.
Ewell E. Eagan (Bar #5239)
Makala L. Graves (Bar #40608)
**GORDON, ARATA, MONTGOMERY, BARNETT, McCOLLAM, DUPLANTIS & EAGAN, LLC**
201 St. Charles Avenue, 40th Floor
New Orleans, Louisiana 70170-4000
Telephone: (504) 582-1111
Facsimile: (504) 582-1121
Email:  arothenberg@gamb.com
        eeagan@gamb.com
        mgraves@gamb.com

Rob McKenna (*pro hac vice*)
Daniel Dunne (*pro hac vice*)
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
401 Union Street- Suite 3300
Seattle, WA 98101
Telephone: (206) 839-4300
Facsimile: (206) 839-4301
Email:  ddunne@orrick.com
        emckenna@orrick.com

Geoffrey Shaw (*pro hac vice*)
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
355 S. Grand Ave., Ste. 2700
Los Angeles, CA 90071
Telephone: (213) 629-2020
Facsimile: (213) 612-2499
Email:  geoffreyshaw@orrick.com

*Counsel for Kate Starbird*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 14th day of August, 2023, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will provide notice of electronic filing to the attorneys for all parties.

*/s/ James A. Brown*
James A. Brown