**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | |
|---|---|
| JILL HINES and<br><br>JIM HOFT, on behalf of themselves and others similarly situated,<br><br>      Plaintiffs;<br><br>v.<br><br>ALEX STAMOS,<br><br>RENÉE DIRESTA,<br><br>THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY,<br><br>THE LELAND STANFORD JUNIOR UNIVERSITY,<br><br>KATE STARBIRD, in her official and individual capacities,<br><br>GRAPHIKA,<br><br>CAMILLE FRANÇOIS,<br><br>ATLANTIC COUNCIL,<br><br>GRAHAM BROOKIE, and<br><br>THE ASPEN INSTITUTE,<br><br>      Defendants. | No. 3:23-cv-00571-TAD-KDM<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED COMPLAINT**

**NATURE OF THE ACTION**

1

1.   This case challenges probably the largest mass-surveillance and mass-censorship program in American history—the so-called "Election Integrity Partnership" and "Virality Project."  Four entities—Stanford Internet Observatory, University of Washington's Center for an Informed Public, Graphika, and the Atlantic Council's Digital Forensic Lab—collaborate closely with federal, state, and local government officials to monitor and censor disfavored viewpoints on social media.  This government-private censorship consortium tramples on the First Amendment rights, privacy interests, and business expectations of millions of Americans.

2.   The Election Integrity Partnership and Virality Project are two aspects of the same, ongoing mass-surveillance and mass-censorship program, operated by the same people, using the same techniques, and cooperating with social-media platforms and government "stakeholders." Working closely with state and federal government officials, Defendants urge, pressure, and coerce social-media platforms to monitor and censor disfavored speakers and content.

3.   The extent of this mass-surveillance and censorship program is staggering.  On information and belief, its censorship encompasses thousands of speakers and millions of social-media posts, while its surveillance extends to hundreds of millions of social-media posts.

4.   These activities are brazenly unlawful and unconstitutional.  It is "axiomatic" that the government "may not induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973). A private entity thus violates the First Amendment "if the government coerces or induces it to take action the government itself would not be permitted to do, such as censor expression of a lawful viewpoint."  *Biden v. Knight First Amendment Institute at Columbia Univ*., 141 S. Ct. 1220, 1226 (2021) (Thomas, J., concurring).  Yet that is exactly what is occurring here—on information and belief, Defendants launched their colossal mass-surveillance and censorship program, in close

cooperation with government officials, precisely because those officials lack the resources and the legal authority to do so directly.  On information and belief, Defendants deliberately sought to evade what Defendant DiResta calls the "unclear legal authorities, including very real First Amendment questions" that would arise if the government took these actions directly.

5.   Left to their own devices, the social-media platforms engage in review and/or moderation of only a miniscule amount of such disfavored speech on their platforms.  As the Fifth Circuit recently observed, when acting on their own, "the Platforms exercise virtually no editorial control or judgment. The Platforms use algorithms to screen out certain obscene and spam-related content. And then virtually everything else is just posted to the Platform with zero editorial control or judgment. 'Something well north of 99% of th[is] content ... never gets reviewed further. The content on a site is, to that extent, invisible to the [Platform].'"  *NetChioce, L.L.C. v. Paxton*, 49 F.4th 439, 459–60 (5th Cir. 2022), *cert. granted in part sub nom. Netchoice, LLC v. Paxton*, No. 22-555, 2023 WL 6319650 (U.S. Sept. 29, 2023) (quoting *NetChoice, LLC v. Moody*, 546 F. Supp. 3d 1082, 1092 (N.D. Fla. 2021)).  Emails of Kate Starbird, recently released pursuant to a public-records request to the University of Washington, show that the CISA-funded Center for Internet Security comes to the same conclusion, *i.e.*, that the platforms engage in little or no surveillance or moderation of election-related speech when acting on their own.  *See* Ex. 19, at 83 (attached hereto as Exhibit 19 and incorporated by reference).  Thus, when Defendants and their government "partners" engage in mass-surveillance and mass-flagging of disfavored speech, they become, in effect, the *principal enforcers* of the platforms content-moderation policies.

6.   As a result, Defendants and the government officials with whom they conspire have covertly appointed themselves the arbiters of truth on social media for millions of Americans— including on politically sensitive topics of enormous public interest.  This arrangement tramples

upon the most fundamental, cherished, and clearly established principles of the First Amendment: "Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." *United States v. Alvarez*, 567 U.S. 709, 723 (2012) (plurality op.). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion…." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

7.   On information and belief, Defendants' surveillance and censorship operation continues to this day, and it inflicts past, ongoing, and imminent future injuries on millions of Americans.

## PARTIES

8.   Plaintiff Jill Hines is a resident of Ruston, Louisiana, which is located in Lincoln Parish in the Monroe Division of the Western District of Louisiana. She is the Co-Director of Health Freedom Louisiana, a consumer and human rights advocacy organization. In 2020, she launched a grassroots effort called Reopen Louisiana. She maintains social-media accounts for both Health Freedom Louisiana and Reopen Louisiana with approximately 13,000 followers, including many followers in the Western District of Louisiana.

9.   Ms. Hines, her groups, and her audiences have experienced, and continue to experience, extensive censorship of her speech on social media, including speech related to COVID-19 restrictions and election-related speech.  As alleged further below, this censorship is caused by Defendants' activities.  This censorship directly affects Ms. Hines and her audiences in the Western District of Louisiana and elsewhere.

10. Plaintiff Jim Hoft is the founder, owner, and operator of the popular news website The Gateway Pundit. He resides in St. Louis, Missouri. The Gateway Pundit is one of the most popular news sites in the country, with about 2.7 million view per day on average.  Mr. Hoft maintains and

operates The Gateway Pundit's social-media accounts, including a Facebook account with over 650,000 followers, an Instagram account with over 205,000 followers, and a Twitter account with over 526,000 followers. These accounts include many followers in Louisiana, including the Western District of Louisiana.

11. Mr. Hoft, his website, and his audiences have experienced and continue to experience extensive censorship on social-media platforms, including censorship of speech on COVID-19 issues and election-security issues, due to Defendants' actions.  The Election Integrity Partnership's public report mentions Hoft 47 times, identifies him as the "#2 superspreader" of misinformation on Twitter, and repeatedly flags his content as supposed "misinformation." Likewise, the Virality Project also flags Hoft's COVID vaccine-related speech as "misinformation." This censorship, caused by Defendants, directly affects Mr. Hoft and his audiences in the Western District of Louisiana and elsewhere.

12. Hines and Hoft sue on behalf of themselves and on behalf of others similarly situated. Hines and Hoft also assert the First Amendment rights of *speakers* to whom they would otherwise listen, but for Defendants' censorship activities; and their *audiences* who would otherwise hear their speech, but for Defendants' censorship activities.

13. Stanford Internet Observatory ("SIO") is "[a] program of [Stanford University's] Cyber Policy Center, a joint initiative of the Freeman Spogli Institute for International Studies and Stanford Law School." *See* Stanford Internet Observatory, Cyber Policy Center, *at* https://cyber.fsi.stanford.edu/io.

14. The SIO describes itself as "a cross-disciplinary program of research, teaching and policy engagement for the study of abuse in current information technologies, with a focus on social media. Under the program direction of computer security expert Alex Stamos, the Observatory

was created to learn about the abuse of the internet in real time, to develop a novel curriculum on trust and safety that is a first in computer science, and to translate our research discoveries into training and policy innovations for the public good."  *See* About, Stanford Internet Observatory, Cyber Policy Center, *at* https://cyber.fsi.stanford.edu/io/about.  "Trust and safety" is a common industry phrase that refers to and encompasses social-media censorship activities.

15. Defendants represent that the SIO lacks separate legal existence from Stanford University, and that Stanford University is the proper suable entity with responsibility for actions of the SIO and its personnel.  Doc. 70-1, at 55.

16. Defendant The Leland Stanford Junior University ("Stanford University") is a private research university located in Stanford, California.  On information and belief, Stanford University is legally and factually responsible for the activities of its "cross-disciplinary program," the Stanford Internet Observatory, and of its director and staff.

17.  Defendant Board of Trustees of the Leland Stanford Junior University is the governing body of Stanford University.

18. Defendant Alex Stamos is the Director of the Stanford Internet Observatory.

19. Defendant Renée DiResta is the Research Manager of the Stanford Internet Observatory.

20. On information and belief, the social-media censorship activities of the Stanford Internet Observatory alleged in this Complaint were conducted under the direction of Stamos and DiResta. Starbird's emails repeatedly reflect the acknowledgement that Stamos and DiResta play an ongoing, leadership role in directing, coordinating, and controlling the censorship activities alleged herein.  *See* Exhibit 19.  Likewise, the Election Integrity Project's report and Stamos and DiResta's own public statements reflect their personal management, control, and leadership role in Defendants' activities challenged herein.

6

21. The University of Washington's Center for an Informed Public ("CIP") describes itself as an "interdisciplinary effort at the University of Washington … led by the Information School, Human Centered Design & Engineering and the School of Law, with collaboration from numerous other university and community partners." *See* About, Center for an Informed Public, University of Washington, *at* https://www.cip.uw.edu/about/.  The CIP states that its "mission is to resist strategic misinformation, promote an informed society, and strengthen democratic discourse." *Id.* The CIP states that it "brings together diverse voices from across industry, government, nonprofits, [and] other institutions…." *Id.*  According to its website, CIP receives federal funding from the National Science Foundation.

22. The University of Washington ("UW") is a public research university located in Seattle, in the State of Washington. On information and belief, the University of Washington is legally and factually responsible for the activities of the Center for an Informed Public.

23. Defendant Kate Starbird is an Associate Professor in the Department of Human Centered Design & Engineering and the Director of the University of Washington's Center for an Informed Public.  On information and belief, Starbird plays a leading role in the social-media censorship activities described in this Complaint.  Starbird is sued in her official and individual capacities.

24. Starbird, a state official from the University of Washington, played and continues to play a key role in co-directing the Election Integrity Partnership and Virality Project, and her organization—the University of Washington's Center for an Informed Public—was one of the major contributors to the effort.  *See* Ex. 19.  The EIP Report touts the key role played by the University of Washington's Center for an Informed Public in the EIP/VP's efforts: "The Center's interdisciplinary faculty brought deep methodological expertise at systematically analyzing "big" social data at macro-, meso-, and micro- scales to track the spread of misinformation online, and

contextual expertise in online disinformation."  Ex. 1, Doc. 1-2, at 4.  A large team of University of Washington personnel—all state officials—participated in the effort under Starbird's direction: "The CIP contributing team was led by three founding faculty members: Kate Starbird, Emma Spiro, and Jevin West. The team also included one affiliate faculty member, three postdoctoral researchers (all of whom started after the Partnership launched), nine undergraduate and PhD students from the University of Washington, a data engineer, and a communications specialist." *Id.*

25. Defendant Graphika describes itself as a "network analysis firm." Its website states: "Graphika is a SAAS [*i.e.*, "Software As a Service"] and managed services company.  Our cutting-edge technology creates large-scale explorable maps of social media landscapes. Our in-depth analysis reveals meaningful insights to help clients and partners understand complex online networks and take decisive action."  About Graphika, *at* https://graphika.com/our-story.   Its website states that "Graphika leverages AI to reveal and study online communities. We are the best in the world at analyzing how online social networks form, evolve, and are manipulated." *Id.* Graphika is one of the major participants in the Election Integrity Partnership ("EIP") and the Virality Project ("VP"), and it plays a leading role in their social-media censorship activities.

26. The EIP Report details the extensive involvement of Graphika and its Chief Innovation Officer, Camille Francois, in the conspiracy and censorship activities detailed herein: "Graphika's team was led by their Chief Innovation Officer Camille François and Head of Analysis Melanie Smith, and included 13 analysts, data scientists, and open source investigators. This unique combination of skills and expertise enables Graphika to take an innovative approach to detecting and monitoring disinformation" for the EIP/VP.  Ex. 1, Doc. 1-2, at 4.

27. On information and belief, as reported by the Foundation for Freedom Online, "Graphika has historically been funded by government grants from DARPA and from the Defense Department's Minerva Initiative …."  Mike Benz, *DHS Censorship Agency Had Strange First Mission: Banning Speech That Casts Doubt On 'Red Mirage, Blue Shift' Election Events*, FOUNDATION FOR FREEDOM ONLINE (Nov. 9, 2022), *at* https://tinyurl.com/cfpj5a39 (hereinafter "Benz").  On information and belief, as reported by the same group, "[i]n 2021, the year after Graphika helped censor the 2020 election …, Graphika was rewarded with nearly $5 million in government grants from the Pentagon—all to facilitate more censorship work." *Id.*

28. Defendant Camille François is the Chief Innovation Officer of Graphika.  According to the EIP report, she leads Graphika's participation in the EIP: "Graphika's team was led by their Chief Innovation Officer Camille François and Head of Analysis Melanie Smith, and included 13 analysts, data scientists, and open source investigators. This unique combination of skills and expertise enables Graphika to take an innovative approach to detecting and monitoring disinformation."  Exhibit 1 ("EIP Report"), at 22 (4)[1]; *see also* Center for an Informed Public, Digital Forensic Research Lab, Graphika, & Stanford Internet Observatory (2021), *The Long Fuse: Misinformation and the 2020 Election*, Stanford Digital Repository: Election Integrity Partnership. v1.3.0, *available at* https://purl.stanford.edu/tr171zs0069 (online version of same EIP Report).

---

[1] Page numbers for this report are cited as "PDF Page (Numbered Page)."  For example, page 22 (4) is the 22nd page of the PDF file, denoted page 4 in the body of the report.  All Exhibits cited in this Complaint are attached and incorporated by reference as if set forth fully herein.  To avoid duplicative filings, this First Amended Complaint hereby incorporates and attaches all the Exhibits 1-17 attached to the original Complaint, Docs. 1-2 to 1-18, as if attached hereto, and cites them as "Ex. 1" to "Ex. 17."  This Complaint also incorporates and includes this Court's findings of fact and conclusions of law in Doc. 293 in *Louisiana v. Biden*, No. 3:22-cv-01213-TAD-KDM (W.D. La. July 4, 2023), which is attached and incorporated as Exhibit 18 hereto; and a collection of emails of Kate Starbird produced by the University of Washington pursuant to open-records request, which is attached and incorporated as Exhibit 19 hereto.

29. The Atlantic Council's Digital Forensic Research Lab ("DFRLab"), according to the EIP report, "was founded at the Atlantic Council in 2016 to operationalize the study of disinformation by exposing falsehoods and fake news, documenting human rights abuses, and building digital resilience worldwide."  Ex. 1, at 22-23 (4–5).  The DFRLab is a central participant and plays a leading role in the social-media censorship activities described herein.

30. Defendant the Atlantic Council is an American think tank based in Washington, DC, that houses the DFRLab.  On information and belief, the Atlantic Council is legally and factually responsible for the activities of the DFRLab as alleged herein.

31. Defendants represent that the DFRLab lacks separate legal existence from the Atlantic Council, and that the Atlantic Council is the proper suable entity with responsibility for actions of the DFRLab and its personnel.  Doc. 70-1, at 55.

32. On information and belief, the Atlantic Council receives U.S. taxpayer funding from the State Department, USAID, the National Endowment for Democracy, the Defense Department, the U.S. Marines, the U.S. Air Force, and the U.S. Navy, and possibly other federal agencies.

33. Defendant Graham Brookie is the Senior Director of the Atlantic Council's DRFLab, based in Washington, DC.  He plays a leading role in the censorship activities alleged herein: "DFRLab's contributing team was led by Director Graham Brookie and Resident Fellow Emerson Brooking and included 13 DFRLab research assistants and communications staff." Ex. 1 at, 23 (5).

34. The EIP Report details the DFRLab's and Brookie's extensive involvement in the conspiracy and censorship activities alleged herein: "DFRLab's contributing team was led by Director Graham Brookie and Resident Fellow Emerson Brooking and included 13 DFRLab research assistants and communications staff. These professionals brought extensive digital forensic research experience and language skills to the work of the Partnership."  Doc. 1-2, at 5.

35. Starbird's emails produced through public-records request, likewise, reflect Brookie's leadership role in the censorship activities alleged herein, noting that Brookie played "a management or leadership role" in the EIP's activities.  Ex. 19, at 29.

36. On information and belief, the individual Defendants Stamos, DiResta, Starbird, Francois, and Brookie have been and/or are personally involved in directing and controlling the censorship activities that impact Jill Hines and Jim Hoft.

37. Defendant the Aspen Institute is a nonprofit organization headquartered in Washington, DC, and with campuses in Aspen, Colorado, and Wye River, Maryland.  On information and belief, in 2019 the Aspen Institute had net assets of over $310 million.

38. "A 2019 report by The Economist magazine described the Aspen Institute — which sponsors weeklong seminars and an annual, 10-day "Ideas Festival" favored by celebrities, business leaders and politicians — as 'the mountain retreat for the liberal elite'…."  Bruce Golding, *What Is The Mysterious Aspen Institute and Why Did It Hold a Hunter Bident 'Exercise'?*, New York Post (Dec. 19, 2022), *at* https://nypost.com/2022/12/19/what-is-mysterious-aspen-institute-and-why-did-it-hold-hunter-biden-exercise/.  On information and belief, the Aspen Institute brings together senior government officials and key private-sector individuals for government-private collaboration on issues like government-induced censorship.  *See id.*  The Aspen Institute receives funding both from the federal government and social-media platforms like Facebook.  *See id.*

39. According to his CISA/CSAC biography, Defendant Alex Stamos serves as "a member of the Aspen Cybersecurity and Information Disorder Commissions."   In 2022, CISA's Cybersecurity Advisory Committee noted that "CISA is discussing opportunities for collaboration with Aspen" on cybersecurity issues.

11

40. On information and belief, the Aspen Institute has a history of conspiring with federal officials to squelch freedom of expression of private citizens on social media.  For example, the Aspen Institute conducted notorious "tabletop exercises" in conjunction with federal officials to squelch the Hunter Biden laptop story: "A prominent think tank funded by billionaire supporters of President Joe Biden colluded with social media companies and journalists to minimize news coverage of Hunter Biden's emails before the 2020 election, internal Twitter documents show." Chuck Ross, *Think Tank Funded by Pro-Biden Billionaires Colluded With Journalists and Big Tech To Kill Hunter Biden Coverage*, Washington Free Beacon (Dec. 21, 2022), *at* https://freebeacon.com/media/think-tank-funded-by-pro-biden-billionaires-colluded-with-journalists-and-big-tech-to-kill-hunter-biden-coverage/.    Reportedly, the Aspen Institute "convened a working group of social media executives, journalists, and academics to develop a coverage strategy for a hypothetical 'hack and dump' of Hunter Biden's emails, according to documents published … by independent reporter Michael Shellenberger." *Id.*  "A month after the 'tabletop exercise,' the New York Post published emails from Biden's abandoned laptop that detailed his foreign business dealings.  Though there is no evidence that the emails were hacked, many of the attendees of the Aspen event censored or downplayed the story.  Twitter and Facebook, which were represented at the exercise, suppressed the Post article on their platforms. The New York Times, Washington Post, CNN, and Daily Beast, which were represented by journalists or newsroom executives, either criticized the New York Post's report or ignored it." *Id.* "Aspen organizers clearly urged reporters and social media companies to view any explosive stories about Hunter Biden with deep skepticism," *id.*, echoing and reinforcing the warnings of FBI and CISA to platforms on the same issue that this Court has already found to have violated the First Amendment.  *See* Ex. 18.  On information and belief, the Aspen Institute's efforts—

backed by major donations in 2020 from pro-Biden billionaires, *see id.*—were orchestrated and coordinated with federal officials who pursued the same effort in the same time frame. *See also,* Golding, *supra* (reporting that Aspen Digital of the Aspen Institute hosted an "Aspen Digital Hack-and-Dump Working Group" headed by Vivian Schiller of Aspen Digital).

41. Emails of Kate Starbird obtained through open-records request reveal, for the first time, the Aspen Institute's direct role in the EIP/VP and the conduct challenged in this case.  For example, Vivian Schiller, the head of Aspen Digital, participates directly with the EIP/VP issues.  *See* Ex. 19, at 20-21.   She describes Starbird and the EIP/VP as "practitioners in the mis/disinformation space" that are "core academic institutions and not-for-profits" who have "developed the research and practices that inform our work," and states that "[o]ur work is inspired by your amazing scholarship."  *Id.*  Starbird participates in the Aspen Institute's briefings and meetings that are, on information and belief, designed to coordinate the practices of the EIP/VP. *See id.*  On information and belief, based on these emails, the Aspen Institute plays a strategic and/or coordinating role in the EIP/VP's censorship activities challenged herein.

42. On information and belief, in early August 2021, Starbird participated in a strategy session with the Aspen Institute on implementing Defendants' key censorship priorities.  *See* Ex. 19, at 59-62.  Starbird's notes for this in-person meeting with the Aspen Institute include formulating plans to achieve the following core censorship objectives of the EIP/VP, among others: "Platforms … have mechanisms to quickly identify and remove or limit the visibility of harmful content (and those who repeatedly spread it) before it can cause harm"; "have clear policies that can be strictly enforced … for certain content/users"; the prior restraint of "holding areas for potentially harmful content (e.g. from users on probation) that gets manually checked before releasing"; "implement a 'negligence' standard that holds accounts with more visibility … to higher standards in regards

to transparency and enforcement"; "have some ability to collaborate with other platforms" on censorship; and expand direct *government* involvement in social-media censorship, including having government dictate "guidance for platforms around harmful misinformation" and impose "mechanisms for holding platforms accountable for harms, including some mechanism for addressing toxic content on long tail platforms." Ex. 19, at 59-60.

43. Moreover, Starbird's notes for this in-person meeting with the Aspen Institute indicate that she strategizes with the Aspen Institute specifically about EIP/VP's plans to silence Plaintiff Jim Hoft's *entire website*, not just his social-media accounts, by restricting any other users' ability to post content from his website on social media; Starbird's notes state that the strategic goals to be discussed with the Aspen Institute include the plan to "demote sites like … **Gateway Pundit – not just accounts but sites**." Ex. 19, at 60 (emphases added).

44. Likewise, Craig Newmark—the billionaire founder of Craigslist and a major Aspen funder who, according to his Wikipedia profile, has funded "a six-month study on misinformation and disinformation by the Aspen Institute's Commission on Information Disorder"—communicates and coordinates directly with Stamos, DiResta, Starbird, and Vivian Schiller of Aspen Digital regarding the EIP/VP's censorship operations. Ex. 19, at 188-190. An email chain with Newmark shows Starbird's academic collaborator reporting to Newmark about the EIP/VP's plans for censorship during the 2022 midterm elections, stating that "I have a meeting with Kate soon to talk about mid-term monitoring and election response." *Id.* at 188. Starbird followed up with a detailed report to Newmark about the EIP/VP's censorship plans for the 2022 election cycle, stating (among others) that EIP/VP's " 'rapid response' capacity" was "currently planning 2022 election efforts," and that "[a]t UW, we're quietly assessing capacity to provide some lightweight analysis of narratives and gray propaganda networks." *Id.*

14

## JURISDICTION AND VENUE

45. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the federal claims arise under the Constitution and laws of the United States.

46. This Court also has subject-matter jurisdiction under 28 U.S.C. § 1332(d)(2) because the case is a class action, there is minimal diversity of citizenship, and the amount in controversy exceeds $5,000,000.

47. This Court has supplemental jurisdiction over state-law claims under 28 U.S.C. § 1367(a).

48. Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 2201, 2202.

49. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## GENERAL ALLEGATIONS

50. Social-media platforms such as Facebook, Twitter, and YouTube require users and account holders to agree to Terms of Service and/or similar contractual agreements as a condition of creating an account.  Plaintiffs and Class members herein were required to do so here to create the social-media accounts affected by Defendants' conduct.  In this action, however, Plaintiffs do not seek to enforce these terms of service or other contractual agreements against the platforms. Rather, they challenge the pressure and coercion of outside entities working in close conspiracy, cooperation, and entwinement with government officials to push the platforms to take adverse actions against their speech and the speech they listen to.

51. There are also many ways for social-media companies to censor or suppress speech on social-media platforms. These methods include, but are not limited to, terminating speakers' accounts, deplatforming speakers, temporarily suspending accounts, imposing warnings or strikes against accounts to chill future disfavored speech, "shadow banning" speakers, demonetizing

content or speakers, adjusting algorithms to suppress or de-emphasize speakers or messages, deboosting speakers or content, promoting or demoting content, placing warning labels or explanatory notes on content, suppressing content in other users' feeds, promoting negative comments on disfavored content, and requiring additional click-through(s) to access content, and other methods.  Collectively, all these methods of suppressing and/or censoring speech on social media are referred to as "censorship" and/or "suppression" in this Complaint.

## I.   The "Election Integrity Partnership" Surveils and Censors Election-Related Speech.

52. According to its website, "[t]he Election Integrity Partnership (EIP) was formed in July 2020 as a coalition of research entities focused on supporting real-time information exchange between the research community, election officials, *government agencies*, civil society organizations, and *social media platforms*." *The 2020 Election Integrity Partnership*, Election Integrity Partnership, *at* https://www.eipartnership.net/2020 (emphases added).

53. "In March 2021 [the EIP] published [its] final report," which describes "the work carried out by the EIP and its partners during the 2020 U.S. election." *Id.* The EIP report is publicly available and provides a detailed account of the EIP's activities in the 2020 election.  Exhibit 1.

54. The EIP states that "[t]he EIP, in its structure and its operations … united government, academia, civil society, and industry, analyzing across platforms, to address misinformation in real time."  *Id.* at 259 (241).

55. The EIP states that it "was formed between four of the nation's leading institutions focused on understanding misinformation and disinformation in the social media landscape: the Stanford Internet Observatory, the University of Washington's Center for an Informed Public, Graphika, and the Atlantic Council's Digital Forensic Research Lab." *Id.* at 20 (2).

16

56. From its inception, the goals of the EIP included censorship and suppression of disfavored speech on social media.  On August 26, 2020, defendant Stamos stated to a New York Times reporter: "Our goal with that [i.e., setting up relationships with social-media platforms] is that if we're able to find disinformation, that we'll be able to report it quickly and then collaborate with them on *taking it down*."  Benz, *supra* (embedded video interview) (emphasis added).

### A.     The Federal Government Plays a Leading Role in Originating the EIP.

57. The EIP was created "in consultation with CISA [the Cybersecurity and Infrastructure Security Agency at the Department of Homeland Security] and other stakeholders." Ex. 1 at 2. After "consultation with CISA," the EIP "assembled" a "coalition … with like-minded partner institutions." *Id.*

58. According to the EIP, CISA interns originated the idea for the EIP: "The initial idea for the Partnership came from four students that the Stanford Internet Observatory (SIO) funded to complete volunteer internships at the Cybersecurity and Infrastructure Security Agency (CISA) at the Department of Homeland Security." *Id.*

### B.     The EIP Fills a Censorship "Gap" That Government Cannot Lawfully Fill.

59. The EIP was designed to fill a "gap" in the government's ability to police so-called "misinformation" and "disinformation" about elections on social media. According to the EIP Report, "no government agency in the United States has the explicit mandate to monitor and correct election mis- and disinformation."  Ex. 1, at 20 (2).

*60.* The EIP report acknowledges that direct federal monitoring and censorship of Americans' speech would likely exceed legal authority and violate the First Amendment: "This is especially true for election disinformation that originates from within the United States, which would likely

be excluded from law enforcement action under the First Amendment and not appropriate for study by intelligence agencies restricted from operating inside the United States."  *Id.*

61. The EIP report thus states that the EIP was orchestrated to "fill" a "critical gap" left by the lack of "authority" of federal agencies to monitor and remove election-related "misinformation." *Id.* at 9 (v). "[N]one of these federal agencies has a focus on, or *authority* regarding, election misinformation originating from domestic sources within the United States. This limited federal role reveals *a critical gap for non-governmental entities to fill*."  *Id.* (emphasis added).

62. Likewise, Renée DiResta has indicated that the EIP was designed to evade the legal and constitutional issues that would arise if CISA or other government agencies were to engage directly in mass-monitoring and censorship of speech on social media.  Exhibit 2, at 4 (Audio Tr. 2).  She stated that the "gap" which the EIP was designed to fill "had several components.  The federal government wasn't prepared to identify and analyze election mis- and disinfo. … There were unclear legal authorities, *including very real First Amendment questions*."  *Id.* (emphasis added).

**C.      The EIP Pushes Platforms to Adopt More Stringent Censorship Policies.**

63. On information and belief, the EIP pushed social-media platforms to adopt more stringent censorship policies on election-related speech, then pushed the platforms to enforce them.

64. The EIP states that it "bridged the gap between government and civil society [and] helped to *strengthen platform standards* for combating election-related misinformation…."  Ex. 1, at 9 (v) (emphasis added).  On information and belief, "help[ing] to strengthen platform standards" refers to the EIP pressuring social-media platforms to adopt new, more stringent content-moderation policies as to election-related speech, which it then pressured platforms to enforce.

65. The EIP states that "[m]any platforms expanded their election-related policies during the 2020 election cycle."  *Id.* at 12 (viii).  These new policies led to greater censorship: "Platforms

18

took action against policy violations by suspending users or removing content, downranking or preventing content sharing, and applying informational labels." *Id.*

66. The EIP further notes that "during the 2020 election, all of the major platforms made significant changes to election integrity policies, both as the campaigns kicked off and through the weeks after Election Day—policies that attempted to slow the spread of specific narratives and tactics…." *Id.* at 229 (211).

67. The EIP also states that "[m]ajor social media platforms such as Facebook, Twitter, YouTube, Pinterest, and TikTok introduced changes to their community standards in the months leading up to the election and in the aftermath." *Id.* at 230 (212).

68. In particular, in "September 2020," "[a] number of platforms announced the first updates to election-specific policies: making large additions; adding more clarity and specificity; or stating clearly that they will label or remove content that delegitimizes the integrity of the election." *Id.*

69. The policy changes targeted speech by *domestic* speakers, not foreign speech: "[M]uch of the misinformation in the 2020 election was pushed by authentic, domestic actors, and platforms shifted their focus to address downstream harms related to the content itself. As a result, most subsequent updates introduced policies related to specific content categories…." *Id.* at 231 (213).

70. On information and belief, these platform policy changes were driven by pressure from the EIP.  For example, Alex Stamos has publicly stated that the EIP successfully pushed social-media platforms to adopt more restrictive policies about election-related speech in 2020: "My suggestion, if people want to get the platforms to do stuff is, first, you've got to push for written policies that are specific and that give you predictability; right? And so *this is something we started in the summer, in August*….  Carly Miller led a team from all four institutions to look at the detailed policies of the big platforms and to measure them against situations that we expected to happen.

19

*Now we're not going to take credit for all of the changes they made, but … we had to update this thing, like, eight or nine times; right?*  And so like putting these people in a grid to say, you're not handling this, you're not handling this, you're not handling this, creates a lot of pressure inside of the companies and forces them to kind of grapple with these issues, because you want specific policies that you can hold them accountable for."  Ex. 3, at 7 (Audio Tr. 4) (emphases added).

71. Alex Stamos notes that the EIP then pressured the platforms to aggressively enforce the new policies that the EIP had pushed them to adopt: "The second is, when you report stuff to them, report how it's violating those written policies; right?  So there's two steps here. Get good policies, and then say, this is how it's violated it." *Id.*

72. Stamos also states that this pressure succeeds because the platforms face the threat of "huge regulatory impact" from the federal government: "So, you know, on effectively pushing the platforms to do stuff.  So, yes, there's a basic problem that they will always be more responsive in the places that are both economically highly important and that have huge potential regulatory impact, most notably right now that would be the United States and Europe." *Id.* at 6 (Audio Tr. 3).  On information and belief, this threat of "huge regulatory impact" is expressed through threatening communications from senior federal officials, as found in *Louisiana v. Biden*, which reinforce and give coercive power to the EIP/VP's demands to social-media platforms.  *See* Ex. 18.

73. Likewise, on March 3, 2021, at a conference on the release of the EIP report, Emerson Brooking of the Atlantic Council's DRFLab stated: "I think the EIP really helped push the envelope with things like just the notion that … this delegitimization of electoral processes that we were seeing in the summer and early fall that this should be against content moderation policies on these platforms, and begin to take proactive steps there…." Ex. 4, at 6 (Audio Tr. 2).

20

**D.      Federal and State Officials Are "Stakeholders" and Flaggers for the EIP.**

74. On information and belief, both federal and state-level government officials serve as so-called "trusted partners," "stakeholders," and flaggers of "misinformation" for the EIP.

75. The EIP describes "Government" and Social-Media "Platforms" as two of its "Four Major Stakeholders" that provide input to and receive feedback from the EIP.  Ex. 1, at 26 (8) & fig.1.2.

76. The EIP organizes its misinformation reports under groups called "tickets," and it notes that "[t]ickets were submitted by … trusted external stakeholders…" *Id.* at 26 (8).

77. "Trusted external stakeholders" include "government": "External stakeholders included government, civil society, social media companies, and news media entities." *Id.* at 30 (12). Thus, "government" submitted to the EIP "tickets," *i.e.*, reports of so-called "misinformation" to be censored from the public discourse on social media. *Id.* at 26, 30 (8, 12).

78. The EIP report makes clear that the "government" partners who submit tips to the EIP include CISA; the State Department's Global Engagement Center ("GEC"); and the Elections Infrastructure Information Sharing & Analysis Center ("EI-ISAC"), which is an organization of state and local government officials coordinated by the Center for Internet Security ("CIS") pursuant to funding from CISA.   *See EI-ISAC*, Center for Internet Security, *at* https://www.cisecurity.org/ei-isac.  The "Government" "stakeholders" listed under the EIP's "Four Major Stakeholder Groups" are CISA, GEC, and the EI-ISAC.  Ex. 1, at 30 (12).

79. On information and belief, through the EI-ISAC, state and local government officials from across the country, such as state Secretary of State's Offices and local election officials, participate in the EIP as flaggers, reporters, and fact-checkers for claims of "misinformation" to be censored. The EIP works closely with these state and local government officials to relay reports of "misinformation" to the platforms for censorship, feed the platforms supposed "debunking"

21

information from such government officials, and report back to the government officials on the results of its demands for social-media censorship.

80. The EIP notes that these "Government" stakeholders can report misinformation to the EIP: "Government and civil society partners could create tickets or send notes to EIP analysts, and they used these procedures to flag incidents or emerging narratives to be assessed by EIP analysts." *Id.*

81. CISA and the EI-ISAC are directly involved in assisting state and local officials to report "misinformation" for censorship with the EIP: "By serving as a one-stop reporting interface, the EI-ISAC allowed [state and local] election officials to focus on detecting and countering election misinformation while CIS and its partners reported content to the proper social media platforms. Additionally, the Countering Foreign Influence Task Force ("CFITF"), a subcomponent of CISA, *aided in the reporting process*…." *Id.* at 31 (13) (emphasis added).

### E.    The EIP Conspires and Is Pervasively Intertwined With Federal and State Agencies and Officials.

82. On information and belief, the EIP's participants conspire and collude with federal and state officials, who are pervasively intertwined with their operations.

83. On information and belief, at least three of the EIP's four major constituent organizations are funded by the government.

84. Further, the EIP itself is partially funded by the federal government: "Researchers who contributed to the EIP … receive partial support from the U.S. National Science Foundation (grants 1749815 and 1616720)." *Id.* at 17 (xiii).

85. On information and belief, the Stanford Internet Observatory "receiv[ed] a $3 million government grant from the Biden Administration in 2021 after censoring the Biden Administration's political opposition in 2020." Benz, *supra.* Likewise, on information and belief, "the Biden Administration provided Kate Starbird's UW disinfo lab with a $3 million government

grant (jointly with Stanford) just months after Starbird's lab helped censor the Biden Administration's political adversary during the 2020 election." *Id.*

86. As noted above, CISA was directly involved in originating the EIP: "The initial idea for the Partnership came from four students that the Stanford Internet Observatory (SIO) funded to complete volunteer internships at the Cybersecurity and Infrastructure Security Agency (CISA) at the Department of Homeland Security." Ex. 1, at 20 (2).  "The students approached SIO leadership in the early summer, and, in consultation with CISA and other stakeholders, a coalition was assembled with like-minded partner institutions." *Id.*

87. "The Election Integrity Partnership (EIP) was officially formed on July 26, 2020…." *Id.*

*88.* As a key point in its "Operational Timeline," the EIP lists a July 9, 2020, "Meeting with CISA to present EIP concept." *Id.* at 21 (3). In other words, after CISA officials gave the idea of the "gap" to the SIO-funded CISA interns, the Stanford Internet Observatory then "present[ed]" the "EIP concept" to CISA two weeks before the EIP was formed.  *Id.*

89. In sworn deposition testimony, Brian Scully, head of CISA's so-called "Mis, Dis, and Malinformation Team," admits that CISA has established relationships with researchers at "Stanford" and the "University of Washington," as well as "Graphika."  Exhibit 5 (Transcript of Deposition of Brian Scully) ("Scully Depo."), *at* 46:23, 48:1-4.

90. When EIP was starting up, Scully admits that CISA's "involvement" in the EIP's beginning included at least the following: (1) "a couple of our [CISA] interns came up with the idea and … [CISA] had some communications with" the EIP.  Scully Dep. 49:8-10.  (2) CISA "received some briefings on the work that they were doing."   Scully Dep. 49:13-14.   (3) CISA "had some communications early on in the process, when they were making decisions, when Stanford was trying to figure out what the gap was."  Scully Dep. 49:18-21.  (4) CISA "connected them [EIP]

with the Center For Internet Security," which is a CISA-funded nonprofit that channels reports of disinformation from state and local government officials to social-media platforms. Scully Dep. 50:5-6.  (5) CISA connected them [EIP] with some of the election official groups," *i.e.*, "the National Association of Secretaries of State [NASS] and the National Association of State Election Directors [NASED]," both of which are groups of state and local government officials who then reported misinformation to platforms through the EIP.  Scully Dep. 50:6-10.  (6) CISA "facilitated some meetings between those three." Scully Dep. 50:10-11.

91. The CISA interns who originated the EIP "worked for the Stanford Internet Observatory, as well … which was part of the [Election Integrity] Partnership." Scully Dep. 51:7-8, 22-24.

92. Scully and other CISA officials identified the "gap" as a problem to CISA interns who were funded by and simultaneously working for the Stanford Internet Observatory.  According to Scully, this "gap" included the fact that state and local election officials lack the resources to monitor and report on so-called disinformation that affects their jurisdictions.  Scully Dep. 57:6-17.  As noted above, left to their own devices, the social-media platforms would engage in very limited, if any, surveillance and moderation of election-related and similar speech on their platforms.  The EIP was thus designed in part to perform the mass-surveillance and "misinformation" reporting activities that state and local government officials could not perform on their own, and that the platforms do not perform on their own.

93. Scully and other full-time CISA officials were involved in originating the EIP, as they "had some initial conversation with the interns" about this "gap," and then they also "had a conversation with the Stanford Internet Observatory folks about the gap." Scully Depo. 52:3-6. Then, CISA "received a briefing from them [EIP], or two, on kind of what they were putting together." Scully Depo. 52:7-9. Scully and other CISA officials then "facilitated some meetings between Stanford

folks, the Center For Internet Security, and election officials, where they had discussions about how they would work together." Scully Depo. 52:10-13. Further, Scully admits that "we had some conversations, kind of throughout, … particularly when they were putting out public reporting about what they were seeing." Scully Depo. 52:14-17.

94. Scully admits that CISA has "an established relationship" with the EIP and the Stanford Internet Observatory personnel who lead it. Scully Depo. 55:24-25.

95. The Center for Internet Security (CIS) oversees the "Multi-State Information Sharing and Analysis Center," or "MS-ISAC," and the "Election Infrastructure Information Sharing and Analysis Center," or "EI-ISAC." Scully Depo. 60:9-20. Both are organizations of state and/or local government officials, organized for information sharing.  Scully Depo. 60:3-11, 60:25-61:6. Through the EI-ISAC, state and local government officials participate directly in the EIP, communicating with the EIP and platforms on the EIP's Jira software, flagging supposed "misinformation" to the EIP to be reported to platforms, acting as "fact-checkers" for the platforms through the EIP, and receiving reports of the censorship results of their flagging efforts.

96. The Center for Internet Security is a major reporter of misinformation to the EIP: "16% of tickets were filed by the Center for Internet Security (CIS), an election official community partner, in the form of tips."  Ex. 1, at 46 (28); *see also* Center for Internet Security, *EI-ISAC* (last visited Feb. 24, 2023), https://www.cisecurity.org/ei-isac.

97. CISA funds the Center for Internet Security's EI-ISAC, which facilitates the participation of state and local government election officials in the EIP.  Scully Depo. 61:9-10, 62:1 ("CISA provides funding for the EI-ISAC").

98. CISA directs state and local election officials to the Center for Internet Security as an alternative route for reporting misinformation to social-media platforms. Scully Depo. 62:16-24.

99. CISA connected the Center for Internet Security with the EIP because "the EIP was working on the same mission," so "we wanted to make sure that they were all connected." Scully Depo. 62:24-63:1. Thus, CISA set up the collaborations between the EIP and CIS's EI-ISAC. *Id*.

100.     The Center for Internet Security works closely with CISA in reporting misinformation to social-media platforms: CIS officials "were receiving reporting directly from election officials. In the early part of 2020, they would forward what they were receiving election officials to us at CISA, and then we would push that to the social media platform…." Scully Depo. 63:23-64:10.

101.     On information and belief, CIS routinely reported misinformation by sending the notice simultaneously to both CISA and to the EIP, using the EIP's misinformation-reporting email "tips@2020partnership.atlassian.net."

102.     CISA served a mediating role between CIS, the EIP, and the platforms, to coordinate their efforts in reporting "misinformation" to the platforms: "There was a point where one of the platforms was concerned about too much kind of duplicate reporting coming in, and so we did have some conversations with EIP and CIS on how to kind of better manage that activity to make sure we weren't overwhelming the platforms." Scully Depo. 64:21-65:1.

103.     In response to this, Scully coordinated with CIS and EIP to establish a joint reporting process involving agreed roles for all three—CISA, CIS, and EIP. *Id*.; Scully Depo. 209:14-212:12. Scully admits that there was "an agreement for EIP and CIS and CISA to coordinate and let each other know what they were reporting to platforms like Twitter." Scully Depo. 212:7-12

104.     When CISA reported misinformation to platforms, CISA would "generally copy the Center for Internet Security," which was coordinating with EIP.  Scully Depo. 67:20-68:6.

105.     Alex Stamos and Renée DiResta briefed Scully about the EIP report in "late spring, early summer 2021."  Scully Depo. 70:1-10. Scully also reviewed portions of the report. *See id.*; Ex. 1.

106.     Alex Stamos consulted with CISA in part because "he knew he would need [CISA] helping him connect with [state and local] election officials."  Scully Depo. 100:17-18.

107.     Scully believes that there were at least five calls between CISA and Alex Stamos in 2020. Scully Depo. 101:4.

108.     Scully put Stamos in touch with NASED and NASS, and "facilitated some meetings between … them [EIP] and election officials." Scully Depo. 101:15-102:10. Scully "facilitated meetings … some meetings between EIP and CIS" because "they didn't have relationship" and "didn't know each other. So [CISA] just facilitated getting them together to talk and figure out how they were going to work together." Scully Depo. 102:14-20. The purpose of these meetings was "to set up a direct line of communication between CIS and EIP."  Scully Depo. 103:7-10.

109.     Scully also put EIP in contact and facilitated meetings between EIP and representatives of NASED and NASS, the organizations of state and local election officials. Scully Depo. 103:11-104:19. These occurred in July or August 2020.  Scully Depo. 104:24-25.

110.     According to Scully, the CIS "forward[ed] messages that election officials sent to them" reporting supposed misinformation "to EIP."  Scully Depo. 106:10-16.

111.     Scully agrees that "EI-ISAC is part of CIS and we do fund the EI-ISAC." Scully Depo. 110:20-23.

112.     Scully also agrees that CISA collaborated with the EIP. Scully Depo. 111:15-18.

113.     In addition, CISA probably had "between two and four" conversations with the EIP about its public reports on disinformation on social media. Scully Depo. 113:20-24. "[I]f we had

27

a question about jurisdiction[s] being targeted or a new [disinformation] tactic or things like that, we would just ask them … questions about that sort of thing." Scully Depo. 114:17-21.

114.     CISA coordinated with the Center for Internet Security on reporting misinformation to platforms: "we would let them know when we reported something to a platform … to avoid duplication…." Scully Depo. 120:23-121:9.

115.     CIS and the EIP "had a relationship" and "shared information." Scully Depo. 121:20-21.

116.     With respect to the EIP, Alex Stamos and Renée DiResta "shared … lessons learned," and "what some of their big takeaways were" with CISA. Scully Depo. 141:6-8.

117.     Scully admits that "CISA and DHS" were "partners of the EIP."  Scully Depo. 369:1-11.

118.     There is overlap in personnel between CISA and the EIP.  The EIP report acknowledges the contributions of Alex Stamos, Renée DiResta, Kate Starbird, Matt Masterson, Pierce Lowary, and Alex Zaheer.  Ex. 1, at 16 (xii).  All these have or had formal roles in CISA.

119.     The SIO's EIP team was "led by … Research Manager Renée DiResta … and Director Alex Stamos." *Id.* at 22 (4). The University of Washington's "contributing team" was "led by … Kate Starbird." *Id.*

120.     Alex Stamos and Kate Starbird are members of CISA's Cybersecurity Advisory Committee.  *See Cybersecurity Advisory Committee (CSAC) Members*, Cybersecurity & Infrastructure Security Agency (visited Apr. 27, 2023), *at* https://www.cisa.gov/cybersecurity-advisory-committee-csac-members.  Starbird chairs CISA's Subcommittee on "Protecting Critical Infrastructure from Misinformation and Disinformation."  *See* CISA Cybersecurity Advisory Committee,        Subcommittee        Factsheet        1        (April        13,        2022),

https://www.cisa.gov/sites/default/files/publications/CSAC%20Subcommittee%20Factsheet_Apr il%2013%202022.pdf.  Renée DiResta gives lectures on behalf of CISA.  *See* CISA *Cybersecurity Summit 2021: Responding to Mis, Dis, and Malinformation*, YouTube (Oct. 27, 2021), https://www.youtube.com/watch?v=yNe4MJ351wU.

121.     Kate Starbird is also on the Protecting Critical Infrastructure from Misinformation and Disinformation Subcommittee for CISA. Scully Depo. 72:19-73:4.

122.     Renée DiResta serves as a "Subject Matter Expert (SME)" for the CISA's Cybersecurity Advisory Committee's MDM Subcommittee. Scully Depo. 361:15-362:6.

**F.     The EIP's Censorship Staff Overlaps With CISA's Misinformation Flaggers.**

123.     At least six members of CISA "took shifts" in reporting supposed misinformation to social-media platforms, including Brian Scully, Chad Josiah, Rob Schaul, Alex Zaheer, John Stafford, and Pierce Lowary.  Scully Depo. 166:9-168:11, 183:14-16.

124.     At the time, Pierce Lowary and Alex Zaheer were simultaneously serving as interns for CISA and working for the SIO and the EIP. Scully Depo. 168:22-171:16, 183:20-22. Thus, Zaheer and Lowary were simultaneously engaged in reporting "misinformation" to social-media platforms on behalf of both CISA and the EIP. *Id.*

125.     Zaheer and Lowary were also two of the four Stanford interns who originated the idea of the EIP. Scully Depo. 171:14-16, 184:22-24, 185:12-14.

126.     Zaheer "was one of the people that were working the ticketing system" for EIP. Scully Depo. 181:21-23. Likewise, Lowary "did both SIO and CISA push forwarding" at the same time during the fall of 2020. Scully Depo. 183:14-16.  Lowary and Zaheer even flagged misinformation to platforms on behalf of CISA using EIP ticket numbers.

127.     Alex Zaheer, when switchboarding for CISA, forwarded a detailed report of supposed "misinformation" from the Election Integrity Partnership (EIP) to CISA's reporting system.  Scully Depo. 199:6-200:17.

128.     According to Scully, forwarding such reports of misinformation from the EIP to social-media platforms "was our standard practice." Scully Depo. 200:25.

129.     CISA's tracking spreadsheet for misinformation reporting to platforms contains thirteen entries of "switchboarded" reports of misinformation that CISA received directly from "EIP" and forwarded to social-media platforms for review under their policies.  Ex. 6, at 4-5, Column C ("From"), Lines 86-96, 115, 123 (all listing "EIP").  CISA also used EIP tracking numbers for those reports.  *See id.* Column D. One of these notes that content was reported to Twitter because "EIP … saw article on The Gateway Pundit." *Id.* at 4 (Column F, Line 93).

130.     In sum, the coordination between CISA and the EIP includes at least the following: (1) the EIP was formed to address a "gap" in the government's surveillance and censorship activities that CISA identified to its SIO-affiliated interns; (2) CISA interns originated the idea for the EIP; (3) CISA had a series of meetings with Alex Stamos and/or Renée DiResta about forming the EIP before it began, including one meeting listed on the EIP's "Operational Timeline" as "Meeting with CISA to present EIP concept"; (4) CISA connected the EIP with the Center for Internet Security, which runs a CISA-funded clearinghouse for state and local government officials to communicate about misinformation; (5) CISA connected the EIP directly with NASS and NASED, organizations of state and local government officials, so they could report misinformation to the EIP; (6) CISA had ongoing communications with the EIP about its public reports on misinformation as the EIP operated in 2020; (7) CISA collaborated closely with the CIS on flagging misinformation to platforms, while the CIS was collaborating with the EIP, setting up a

"triangle" of collaboration; (8) CISA repeatedly flagged misinformation to social-media platforms using EIP tracking numbers; (9) CISA interns, who were working for CISA and the Stanford Internet Observatory at the same time, were flagging "misinformation" to platforms simultaneously on behalf of CISA and on behalf of the EIP; (10) CISA mediated and coordinated between the EIP, CIS, and the platforms on reporting misinformation to address the platforms' concerns about duplicative reports; (11) the EIP debriefed CISA after the 2020 election cycle about its activities and public report; and (12) there is extensive overlap of personnel between CISA and the EIP, including interns working simultaneously for both groups, and key EIP leaders such as Stamos, DiResta, and Starbird having formal roles at CISA.  On the basis of this and other evidence, this Court found that "CISA and the EIP were completely intertwined."  Ex. 18, at 113.

### G. Federal and State Officials Flag Speech for Censorship Through the EIP.

131.     Federal and state officials flag speech for censorship to the EIP, which reports the so-called "misinformation" to social-media platforms for censorship.

132.     One of the EIP's goals was to "flag policy violations to platforms." Ex. 1, at 24 (6).

133.     The EIP describes "Government" as one of "four major stakeholders," who both provided input into the "intake queue" for "tickets" (*i.e.*, reporting misinformation) and received feedback on "mitigation" (*i.e.*, censorship).  Ex. 1, at 26 (8).

134.     The EIP tracks misinformation using "tickets," which track "informational event[s]" that could encompass many posts: "The EIP tracked its analysis topics and engaged with outside stakeholder organizations using an internal ticketing workflow management system. Each identified informational event was filed as a unique ticket in the system."  Ex. 1, at 26 (8).

135.     "Tickets were submitted by both trusted external stakeholders (detailed in Section 1.4 on page 11) and internal EIP analysts." *Id.* "Section 1.4" on pages 11-12 of the report identifies

government as a trusted external stakeholder: "Trusted external stakeholders" include "*government*, civil society, social media companies, and news media entities." *Id.* at 29-30 (11-12) (emphasis added). Page 12 specifically identifies CISA, the EI-ISAC, and the GEC as the EIP's "Government" stakeholders. *Id.* at 30 (12) fig.1.3.

136.     A "ticket" could encompass many posts: "A single ticket could map to one piece of content, an idea or narrative, or hundreds of URLs pulled in a data dump." *Id.* at 27 (9).

137.     According to the EIP Report, "Government and civil society partners could create tickets or send notes to EIP analysts, and they used these procedures to flag incidents or emerging narratives to be assessed by EIP analysts." *Id.* at 30 (12).

138.     "[G]roups that reported tickets include the State Department's Global Engagement Center…." *Id.* at 60 (42).  In the sworn Declaration of Leah Bray submitted in *Louisiana v. Biden*, GEC admitted that it flagged at least 21 "tickets" to the EIP, including domestic content that was flagged merely because it had the possibility of being cited by foreign actors.

139.     The EIP involves dynamic coordination with state and local officials in pushing platforms to censor speech: "Content reported by election officials to the EI-ISAC was also routed to the EIP ticketing system. … [I]f an internally generated EIP ticket targeted a particular region, analysts sent a short write-up to the EI-ISAC to share with the relevant election official. This allowed the state or local official to verify or refute the claim, and enabled analysts to properly assess whether or not the content violated a platform's civic integrity policies." *Id.* at 31 (13).

140.     For example, the EIP included extensive collaboration with a "government partner" in its example ticket about the so-called "Sharpiegate" incident in Arizona.  *Id.* at 48 (30). Its internal ticket-management software ("Jira") simultaneously allows the "government partner" to

communicate directly with the "platform partner" to supposedly debunk the online claim directly to the social-media platform.  *Id.* at 48 (30) fig.2.2.

### H.  Platforms Are Coerced into Cooperating with the EIP to Censor Speech.

141.     The EIP creates channels for reporting "misinformation" to platforms: "The EIP established relationships with social media platforms to facilitate flagging of incidents for evaluation when content or behavior appeared to violate platform policies." *Id.* at 35 (17).

142.     The EIP receives real-time reports on censorship actions from the platforms, which communicate directly with EIP managers about censorship through the EIP's system: "Analysts conducted their initial assessment on all tickets, and, if content in a ticket appeared to be a violation of a platform's published content policies, an analyst or manager added the platform representative to the ticket.  If questions arose, a manager communicated with the platform representative in the ticket comments.  Analysts put the ticket back in the queue and updated the ticket to note if the content in question received a moderation action." *Id.*

143.     Many social-media platforms participate directly in the EIP: "The EIP onboarded the following social media companies: Facebook and Instagram, Google and YouTube, Twitter, TikTok, Reddit, Nextdoor, Discord, and Pinterest." *Id.*

144.     The EIP has privileged access to at least some platforms' internal data about speech on their platforms.  EIP analysts collect data from Twitter "contemporaneously," and they also have access to "CrowdTangle and Facebook search functionality." *Id.* at 199-200 (181-82).

145.     According to Alex Stamos, the EIP has privileged access to some platforms' data: the EIP "worked with the major platforms, Facebook, Twitter, YouTube, TikTok, Reddit, NextDoor and the like. … [S]ome of those cases we had agreements for access of data.  In other cases, we had to have individual analysts go work with them." Ex. 7, at 5 (Audio Tr. 3).

146.     The EIP "collected data from Twitter in real time from August 15 through December 12, 2020," and did so "[u]sing the Twitter Streaming API" to "track[] a variety of election-related terms. … The collection resulted in *859 million total tweets*."  Ex. 1, at 200-01 (182-183) (emphasis added). Thus, the EIP had privileged access to Twitter's data and used it to engage in mass surveillance of 859 million social-media posts on that platform alone.

147.     On information and belief, pressure and coercion from federal officials induced the platforms' cooperation with the EIP.  On November 10, 2020, at a conference hosted by the Atlantic Council, Alex Stamos stated: "So, you know, on effectively pushing the platforms to do stuff … they will always be more responsive in the places that are both economically highly important and that have *huge potential regulatory impact*, most notably right now that would be the United States and Europe." Ex. 3, at 6 (Audio Tr. 3) (emphasis added).  This Court's (in *Louisiana v. Biden*) and the Fifth Circuit's (in *Missouri v. Biden*) extensive findings of pressure and coercion by federal officials—including federal officials who are heavily intertwined with the EIP/VP—strongly support the inference that platforms participate in the EIP/VP due to federal coercion and pressure.  *See, e.g.,* Ex. 18, *Louisiana v. Biden*, Doc. 293.

148.     As this Court found in *Louisiana v. Biden*, "Government officials began publicly threatening social-media companies with adverse legislation as early as 2018.  In the wake of COVID-19 and the 2020 election, the threats intensified and became more direct.  Around this same time, [federal officials] began having extensive contact with social-media companies via emails, phone calls, and in-person meetings. This contact, paired with the public threats and tense relations between the Biden administration and social-media companies, seemingly resulted in an efficient report-and-censor relationship between [federal officials] and social-media companies." Ex. 18, *Louisiana v. Biden*, Doc. 293, at 131.

34

149.     During the very same time frame, CISA launched the EIP/VP and remained pervasively entwined in its operations.  *See id.* at 113 ("CISA and the EIP were completely intertwined.").

150.     CISA was also closely cooperating with the FBI at the time, which was then brokering secret meetings with congressional staffers to pressure platforms to comply with federal requests for censorship.

151.     Federal pressure on platforms increased when the White House—which also has ties to the EIP—engaged in a massive pressure campaign on platforms in 2021 to force them to comply with censorship requests against COVID and vaccine-related speech.

152.     The White House's threats and pressure coerced platforms into cooperating with the censorship demands of the CDC, the Office of Surgeon General, and similar federal health agencies.  As noted below, the Virality Project's public report admits to close collaboration between the EIP/VP and the CDC and the Office of Surgeon General.  This Court, likewise, found collaboration between the EIP/VP and the White House. Ex. 18, at 19 ("Flaherty further indicated that the White House was coordinating with the Stanford Internet Observatory (which was operating the Virality Project)….").

153.     Thus, the EIP/VP was directly collaborating with those same agencies to target and flag disfavored viewpoints regarding COVID and vaccines.

154.     Accordingly, the EIP/VP directly benefited from, and leveraged, the threats and pressure from federal agencies like the White House, the Surgeon General's Office, the CDC, CISA, and the FBI in procuring the cooperation of platforms.

155.     Just as platforms were coerced into cooperating with federal officials' requests for censorship, they were coerced into cooperating with the federal-state-academic censorship consortium of the EIP/VP.

## I.     The EIP's Viewpoint Discrimination Against Core Political Speech.

156.     On information and belief, in its censorship activities, the EIP/VP engages content- and viewpoint-based discrimination against core political speech.

157.     The EIP Report states that it "used an innovative internal research structure that leveraged the capabilities of the partner organizations through a tiered analysis model based on 'tickets' collected internally and from our external stakeholders. Of the tickets we processed, 72% were related to delegitimization of the election," *i.e.*, core political speech.  Ex. 1, at 10 (vi).

158.     On information and belief, though 72% of the *tickets* related to so-called "delegitimization of the election," "over 99% of the *posts* throttled by narrative during the 2020 election" related to that topic. Benz, *supra* (emphasis added). Thus, on information and belief, the vast majority of speech targeted by the EIP in 2020 was content-based and viewpoint-based— speech on elections and election integrity from viewpoints that cast doubt on election outcomes.

159.     The EIP's surveillance of Americans' speech is extensive: "Team members from each of these tiers were divided into on-call shifts. Each shift was four hours long and led by one on-call manager. It was staffed by a mix of Tier 1 and Tier 2 analysts in a 3:1 ratio, ranging from five to 20 people. Analysts were expected to complete between two to five shifts per week. The scheduled shifts ran from 8:00 am to 8:00 pm PT for most of the nine weeks of the partnership, ramping up only in the last week before the election from *12-hour to 16- to 20-hour days with all 120 analysts on deck*." Ex. 1, at 28 (10) (emphasis added).

160.     The EIP's censorship of the so-called "Sharpiegate" narrative in Arizona provides an example of the scope of the surveillance and censorship.   The "Sharpiegate" narrative alone encompassed 822,477 tweets, according to the EIP.  *Id.* at 203 (185).

161.     The EIP states that it overwhelmingly targeted politically conservative or right-leaning speech.  For example, Table 5.2 of the EIP Report lists the EIP's top 21 "Repeat Spreaders" on Twitter and notes their political orientation as "Left" or "Right."  Every speaker on the list is identified as "Right."  Ex. 1, at 206 (188), fig. 5.2.

162.     The EIP report admits that the speech it targets for censorship is domestic, grassroots speech by American citizens.  The EIP "coded tickets based on whether they … had an element of foreign interference.  Interestingly … less than 1% related to foreign interference."  Ex. 1, at 53 (35).  Thus, virtually all the speech targeted by the EIP comes from American speakers.

163.     Alex Stamos admits that virtually all the speech targeted by the EIP is by domestic: "almost all of this is domestic … It is all domestic."  Ex. 3, at 5 (Audio Tr. 2).

164.     Renée DiResta agrees that "the vast majority of voting related misinformation in the 2020 election was domestic."  Ex. 2, at 6 (Audio Tr. 4).

165.     According to Stamos, "[w]e find very little evidence that there's any foreign involvement at all. In fact, the vast majority of election disinformation in 2020 came from Americans …."  Ex. 7, at 6 (Audio Tr. 4).

166.     On November 17, 2021, Kate Starbird stated: "So we see this – the disinformation campaign was top down … but this campaign was also bottom up with everyday people sharing their own experiences, their own misperceptions of being disenfranchised or finding what they thought to be evidence of voter fraud."  Ex. 8, at 5 (Audio Tr. 3).

167.     The EIP indicates that the "misinformation" it targeted during the 2020 election cycle was content-based, core political speech of American citizens: "Our analysis demonstrates that the production and spread of misinformation and disinformation about Election 2020 … was participatory. In other words, these dynamics were not simply top-down from elites to their audiences, but were bottom-up as well, with members of the 'crowd' contributing in diverse ways…. Repeatedly, our data reveal politically motivated people sincerely introducing content they mistakenly believed demonstrated real issues with election integrity…" *Id.* at 181 (163). "Well-meaning, though often politically motivated, individuals repeatedly introduced this content into the broader information sphere, often via social media…" *Id.* at 182 (164).

168.     Thus, the EIP's targeting of speech was both explicitly content-based (targeting speech about elections and election integrity) and viewpoint-based (targeting, almost exclusively, speech from politically conservative viewpoints; and targeting speech expressing viewpoints that raised concerns about election integrity and/or the legitimacy of election outcomes).

169.     This included censorship of highly visible political figures: "The primary repeat spreaders of false and misleading narratives were verified, blue-check accounts belonging to partisan media outlets, social media influencers, and political figures, including President Trump and his family." *Id.* at 12 (viii).

170.     Left-wing groups like "MITRE, Common Cause, the DNC, the Defending Digital Democracy Project, and the NAACP" submitted tickets reporting speech to the EIP.  Ex. 1, at 60 (42). The EIP does not report that any right-wing political groups submitted tickets to the EIP.

171.     The EIP admits that it focuses on speech from the "political right": "Influential accounts on the political right … were responsible for the most widely spread incidents of false or misleading information in our dataset. Right-leaning accounts also more frequently augmented

their misinformation posts with narrative-related hashtags … which persisted across multiple incidents and were shared millions of times in our dataset." *Id.* at 204-05 (186-87).

172.     According to the EIP, "[t]he 21 most prominent repeat spreaders on Twitter … include political figures and organizations, partisan media outlets, and social media all-stars. … [A]ll 21 of the repeat spreaders were associated with conservative or right-wing political views and support of President Trump." *Id.* at 205 (187).

173.     On information and belief, in its censorship activities, the EIP attempts to influence election outcomes; it "prioritize[es] … swing states over non-swing states." Ex. 1, at 46 (28).

174.     The EIP uses subjective categories such as "exaggerate[d] issue," "misleading stats," and "out of context," to determine whether something is "misinformation" warranting censorship.  Ex. 1, at 52 (34), fig. 2.5.

175.     The EIP Report indicates that it attempts to prevent so-called "misinformation" from crossing the "Virality Threshold" and resulting in "IRL Action" ("In Real Life Action") such as "Protests," "Legal Action & Lawsuits," and "Mainstream Coverage." Ex. 1, at 169 (151).  Thus, the EIP seeks to suppress speech and narratives in advance to prevent political advocacy, legal action, and media coverage supporting outcomes that the EIP and its government partners disfavor.

**J.     The EIP Achieves Massive Levels of Censorship of Core Political Speech.**

176.     The EIP successfully induces platforms to censor core political speech.

177.     The EIP's "dataset included 639 distinct, in-scope tickets."  Ex. 1, at 46 (28).  A "ticket" could be broad, "map[ping]" an entire "idea or narrative." *Id.* at 27 (9). For example, the "Sharpiegate" ticket was submitted on November 4, 2020, to "try and consolidate all the content" regarding the Sharpiegate story from "across Twitter, FB, TikTok, and Youtube." *Id.* at 47 (29) fig.2.1.

178.     The EIP flagged speech for censorship in most tickets: "Of our 639 tickets, 363 tickets tagged an external partner organization to either report the content, provide situational awareness, or suggest a possible need for fact-checking or a counter-narrative." *Id.* at 55 (37).

179.     The EIP reports that it had a high level of success in pushing the platforms to censor speech: "35% of the URLs we shared with Facebook, Instagram, Twitter, TikTok, and YouTube were either labeled, removed, or soft blocked." *Id.* at 45 (27). "We find, overall, that platforms took action on 35% of URLs that we reported to them." *Id.* at 58 (40).

180.     The EIP's tickets encompassed almost 5,000 URLs: "Through our live ticketing process, analysts identified social media posts and other web-based content related to each ticket, capturing original URLs (as well as screenshots and URLs to archived content). In total, the EIP processed 639 unique tickets and recorded 4,784 unique original URLs." *Id.* at 200 (182).

181.     These tickets and URLs included millions of social-media posts, including almost 22 million posts on Twitter alone over a four-month period in 2020: "In total, our incident-related tweet data included 5,888,771 tweets and retweets from ticket status IDs directly, 1,094,115 tweets and retweets collected first from ticket URLs, and 14,914,478 from keyword searches, for a total of *21,897,364* tweets." *Id.* at 201 (183) (emphasis added).

**K.     The EIP Targets Jim Hoft and His Platform, *The Gateway Pundit*.**

182.     On information and belief, the EIP targets Plaintiff Jim Hoft's website *The Gateway Pundit* and its associated social-media accounts for censorship on numerous occasions.

183.     The EIP report mentions *The Gateway Pundit*, the website operated by Plaintiff Jim

Hoft, 47 times. *See id.* at 51, 74, 76, 101, 103, 110, 112, 145, 150-51, 153, 155-56, 172, 183, 194-

95, 206-09, 211-12, 214-16, 226-27.[2]

184.     The EIP report indicates that it repeatedly flagged *The Gateway Pundit*, Plaintiff

Jim Hoft's website, as a purveyor of social-media misinformation: "The top misinformation-

spreading websites in our dataset were … thegatewaypundit[.]com, a far-right news website.  65%

of these tickets involved an exaggeration of the impact of an issue within the election process."

*Id.* at 51 (33) (alteration in original).  Thus, the EIP does not claim that most of *The Gateway

Pundit*'s content was false, only that it involved the "exaggeration of the impact of an issue." *Id.*

185.     The EIP lists *The Gateway Pundit* as the second-ranked "Repeat Spreader[] of

Election Misinformation" on Twitter, ranking it above Donald Trump, Eric Trump, Breitbart

News, and Sean Hannity.  *Id.* at 206 (188) tbl.5.2.  In the 2020 election cycle, the EIP flagged *The

Gateway Pundit*'s speech in 25 incidents with over 200,000 retweets. *Id.*

186.     In addition, the EIP lists *The Gateway Pundit*'s website as the domain cited in the

most "incidents"—its website content was tweeted by others in 29,207 original tweets and 840,740

retweets. *Id.* at 207 (189) tbl.5.3. *The Gateway Pundit* ranks above Fox News, the New York Post,

the New York Times, and the Washington Post on this list. *Id.*

187.     The EIP dedicates an entire subsection of its report to *The Gateway Pundit*. *Id.* at

214-16 (196-98). The EIP reports that "The Gateway Pundit was among the most active spreaders

of election-related misinformation in our analyses. … It appeared as a top repeat spreader through

its website, its Twitter account, its YouTube channel, and its Instagram account." *Id.* at 214 (196).

---

[2] Report pages 33, 56, 58, 83, 85, 92, 94, 127, 132-33, 135, 137-38, 154, 165, 176-77, 188-91, 193-94, 196-98, 208-09.

188.     The EIP report notes that "Twitter suspended [*The Gateway Pundit*'s] account on February 6, 2021," suggesting that its deplatforming on Twitter was due to the EIP's efforts. *Id.*

189.     According to the EIP, "[o]n Twitter, The Gateway Pundit's account was highly retweeted across 26 different incidents (#2 among repeat spreaders). Evidence from our data suggest that its prominence was due both to production of its own material and to amplification (via original and quote tweets) of other partisan content." *Id.* at 215 (197).

190.     According to the EIP, "[o]f all the domains linked to in our Twitter data, The Gateway Pundit's website was connected to the largest number of incidents (46) while also garnering the most related original tweets (29,207) and retweets (840,750). Their YouTube channel appeared in five incidents, and their 13 incident-related videos had more than 4 million views on YouTube." *Id.* at 215-16 (197-98).

191.     According to the EIP, "[t]he Gateway Pundit['s] … Instagram account was tied for #2 among repeat spreaders, appearing in 10 incidents for 20 posts that received more than 132,000 engagements." *Id.* at 216 (198).

192.     The EIP urges platforms to remove "repeat spreaders" like *The Gateway Pundit* more aggressively. *Id.* at 233 (215).

**L.     The EIP's Censorship Activities Are Ongoing.**

193.     On information and belief, the EIP's censorship activities are continuing, and the EIP remains active through the most recent and future election cycles.

194.     The EIP continues to advocate for increased censorship of social-media and online speech, including prior restraints.  The EIP's recommendations to platforms include: "Impose clear consequences for accounts that repeatedly violate platform policies. These accounts could be placed on explicit probationary status, facing a mixture of monitoring and sanctions." *Id.* at 14 (x).

195.     The EIP report states that: "The next election will have its own unique set of misinformation narratives, yet many of the tactics, dynamics, and basic structures of these narratives will likely remain the same." *Id.* at 243-44 (225-26).

196.     The EIP calls for more aggressive, more expansive censorship of social-media speech, including on other broad topics such as "public health." *Id.* at 251 (233).

197.     The EIP proclaims that the "EIP's novel structure, enabling rapid-response analysis and a multistakeholder reporting infrastructure, could prove effective to many information spaces blighted by pervasive misinformation," in addition to election-related speech. *Id.* at 259 (241).

198.     The EIP calls for more aggressive penalties to enforce censorship on social media: "Establish clear consequences for accounts that repeatedly violate platform policies." *Id.* at 256 (238). "Prioritize quicker action on verified or influential accounts if they have already violated platform policies in the past." *Id.* at 257 (239).

199.     The EIP advocates for a system of pre-publication approval for disfavored speakers, *i.e.*, explicit prior restraints: "Consider implementing holding areas for content from high-visibility repeat spreaders, where content can be evaluated against policy before posting." *Id.*

200.     The EIP states that "[t]he lessons from EIP should be both learned and applied. The fight against misinformation is only beginning. The collective effort must continue." *Id.* at 259-60 (241-42).

201.     According to Brian Scully, the EIP continues to operate during the 2022 election cycle. Scully Depo. 53:4-5. According to Scully, at the beginning of the 2022 election cycle, the EIP "gave us [CISA] a briefing, early on, about what they were thinking about," which occurred in "May/June of 2022." Scully Depo. 53:14-19. Scully and Geoff Hale of CISA received the briefing from Renée DiResta and another EIP official. Scully Depo. 53:22-54:7. In that briefing,

the EIP officials "walked through what their plans were for 2022, [and] some of the lessons learned from 2020." Scully Depo. 54:11-13.  Their plans for 2022 were that "they were going to do something similar to what they did in 2020 …." Scully Depo. 54:16-18. They planned to continue to "work with state and local election officials." Scully Depo. 54:22-25.

202.     On July 31, 2022, the Election Integrity Partnership's blog posted "The Election Integrity Partnership in 2022: Our Work Ahead." *See* https://www.eipartnership.net/blog/about-eip-2022. This blog post states: "*The EIP is continuing its nonpartisan and collaborative work in the 2022 election cycle*." *Id.* (emphasis added).  The EIP then posted at least 14 more blog posts, reporting observations from its mass surveillance of election-related speech on social media, throughout the 2022 election cycle, between July 31, 2022 and November 14, 2022.

203.     On July 27, 2022, Renée DiResta gave testimony to the Committee on House Administration, Subcommittee on Elections of the U.S. House of Representatives at a hearing entitled "A Growing Threat: Foreign and Domestic Sources of Disinformation."  In that testimony, DiResta describes the EIP's activities as ongoing during the 2022 election cycle, and notes that this ongoing activity includes coordinating with government officials and flagging misinformation to platforms for censorship. She states: "EIP works as a multistakeholder partnership between academic researchers, election officials, social media companies, and civil society organizations. … EIP works with … election officials to identify instances of election-related rumors shared online. It then analyzes those instances, produces public reports, and routes relevant findings to social media companies…. Social media companies … independently determine whether flagged content violates their policies, and how to action it if so."  Exhibit 9, at 2-4 (1-3).

204.     DiResta's testimony also indicates that the EIP intends to continue its censorship operations in future election cycles as well, such as 2024 and beyond: "Doing nothing is not an

44

option. While the Election Integrity Partnership was intended to meet an immediate need, the conditions that necessitated its creation have not abated, and in fact may have worsened. Academia, tech platforms, civil society, and state and local election officials … must be committed to collaborative models for understanding and responding to rumors and false and misleading claims in the modern information environment." *Id.* at 6 (5).

205.    Kate Starbird's emails produced through open-records request likewise reflect the ongoing and continuing nature of the EIP/VP's censorship activities. *See* Ex. 19.

**II.     The Election Integrity Partnership Continues and Expands in the "Virality Project."**

206.    Having launched the EIP in 2020, Defendants in 2021 expanded their social-media censorship activities to address speech related to COVID-19, COVID vaccines, and COVID restrictions and mandates, using the new moniker "the Virality Project" or "VP."  Regardless of labels, Defendants' censorship activities constitute a unified and continuous course of conduct, as they continue to use the same techniques and collaborate with the same persons and entities to achieve the same censorship goals, and to expand these activities.

207.    Soon after the 2020 election cycle, beginning in early 2021, the same four entities that launched the Election Integrity Partnership expanded the program to address COVID-19 "misinformation" on social media, which they called the "Virality Project" or the "VP" for short. Exhibit 10 ("VP Report"); *see also* Stanford Internet Observatory, et al., The Virality Project, *Memes, Magnets, and Microchips: Narrative Dynamics Around COVID-19 Vaccines* (v.1.0.1 2022), https://purl.stanford.edu/mx395xj8490.

*208.*    The Virality Project's report, dated April 26, 2022, lists Renée DiResta as an Executive Editor and contributor, and acknowledges Kate Starbird for feedback and support.  Ex.

45

10, at 4 (i).[3]  Current and/or former CISA interns Jack Cable, Isabella Garcia-Camargo, Pierce Lowary, and Alex Zaheer are listed as "researchers and analysts" who conducted social-media "monitoring" for the VP.  *Id.*

209.    In addition to the original four entities from the EIP, three new entities joined the Virality Project: the New York University (NYU) Tandon School of Engineering, the NYU Center for Social Media and Politics, and the National Conference on Citizenship's (NCoC)'s Algorithmic Transparency Institute. *Id.* at 17 (10).

210.    According to its report, "[t]he VP team developed technology to identify emerging narratives, to understand what communities they appeared within, and to gauge their scope, speed, and spread. In addition, the analysts assessed social media platforms' published policies to understand how (if at all) platforms might limit or action the spread of misleading vaccine-related content."  *Id.* at 9 (2).  On information and belief, the Virality Project reported "misinformation" and pushed "platforms [to] limit or action the spread of misleading vaccine-related content."  *Id.*

**A.  The Virality Project Targets Speech on the Basis of Content and Viewpoint.**

211.    The VP targets speech on the basis of content (*i.e.*, COVID-19-vaccine-related speech) and viewpoint (*i.e.*, speech that expresses doubt or concern about the safety and efficacy of COVID-19 vaccines).  It targets right-leaning political and religious speech associated with distrust and opposition to government mandates, including prominent right-wing speakers.

212.    Like the EIP, the VP admits that the speech it targets is heavily speech by "domestic actors," *i.e.*, American citizens."  *Id.* at 9 (2).

213.    "Over the course of its seven months of work," the VP targeted "narratives that questioned the safety, distribution, and effectiveness of the vaccines."  *Id.* at 11 (4).

---

[3] Citations of this exhibit are formatted "Ex. 10, at [page of exhibit] ([page of report])."

214.     The VP was overtly biased against "anti-vaccine" viewpoints from the beginning: "The Project's original framing document articulated the threat: **A surge of anti-vaccine disinformation will pose significant challenges to the rollout and public adoption of COVID-19 vaccines in the United States**." *Id.* at 16 (9) (bold in original).

215.     The VP identifies political and religious opinions as "themes" and "tropes" of anti-vaccine misinformation, such as: "*Distrust of industry*: Vaccines are produced by profit-motivated pharmaceutical companies that have repeatedly concealed harm in pursuit of profit"; "*Religiosity*: Vaccines contain materials that are objectionable on religious grounds"; and "*Conspiracy*: … Governments have covered up information proving vaccines are dangerous, [and] Doctors and politicians who advocate for vaccines have been bought off by 'Big Pharma.'" *Id.* at 20-21 (13-14).

216.     The VP focuses, not just on misinformation about vaccines, but political speech and political organizing against "vaccine passports and vaccine mandates": "During the VP's period of analysis, narratives about government overreach and medical freedom focused on two areas of controversy: vaccine passports and vaccine mandates." *Id.* at 59 (52).

217.     The VP treats as "misinformation" political speech and political opinions on these topics, including predictions about future government action, stating: "This amplification hinged upon misleading framing that suggested the implementation of any form of vaccine passport would be compulsory.  In reality, the plans for many programs were entirely optional.  Other framing from domestic right-leaning political actors created a portrait of governments as prying or snooping into citizens' private matters." *Id.* at 60 (53).

218.     The VP views politically conservative speech opposing government-imposed mandates as supposed misinformation: "Activists pushed the idea that through a passport system,

governments and 'Big Tech' were limiting the public's freedoms—situating the conversation within a larger set of narratives surrounding pandemic public health regulations like mask mandates, lockdowns, and social distancing." *Id.*

219.     The VP attributes political successes such as state-level bans on vaccine passports to such supposed misinformation. *Id.* at 61 (54).

220.     The VP also attributes opposition to vaccine mandates by employers to such supposed misinformation: "The backlash to COVID-19 vaccine requirements for employment and other activities parallels the conversation about vaccine passports. It, too, relies on and attempts to exacerbate distrust in public health officials and government institutions." *Id.*

221.     The VP attributes opposition to mask mandates and lockdowns to the viewpoint of the "right-wing political spectrum": "In the months before vaccines or treatments emerged, governments worldwide turned to preventative measures such as masking requirements and lockdowns.  In the US, these measures were quickly framed as affronts to liberty by facets of the US right-wing political spectrum, turning individual responses to the virus into a function of political identity." *Id.* at 15 (8).

222.     The VP targets specific high-profile right-wing speakers, including One America News Network, Fox News, Breitbart News, and others.  *Id.* at 60 (53).  For example, then-Fox News host Tucker Carlson is cited 42 times in the Virality Project report. *See id.* at 57, 73, 87, 91-92, 98, 115, 119-20, 122-23, 193, 201, 208, 215-16, 218.[4]

223.     In fact, the VP report cites the entire Fox News channel as a source of vaccine misinformation: "Fox News has played a particularly pivotal role in spreading vaccine misinformation and anti-vaccine beliefs during the COVID-19 pandemic…. [B]etween June 28

---

[4] Report pages 50, 66, 80, 84-85, 91, 108, 112-13, 115-16, 186, 194, 201, 208-09, 211.

and July 11, 2021, Fox News ran 129 segments about the COVID-19 vaccine on its cable broadcast; more than half of those segments included unverified claims that undermined vaccination efforts." *Id.* at 91 (84).

224.     According to the VP, "Fox News television host Tucker Carlson has been one of the most prominent and sensationalist spreaders of false or misleading information about vaccines throughout the COVID-19 pandemic." *Id.*  According to the VP, "In May 2021, Tucker Carlson misrepresented VAERS data on his talk show, decontextualizing it while claiming that 3,362 Americans had died following COVID-19 vaccinations between December 2020 and April 2021, equating to roughly 30 people every day." *Id.* at 57 (50).

225.     The VP also treats Alex Berenson as a major malefactor in spreading COVID-19 vaccine "misinformation." *See id.* at 54, 57 (47, 50). Alex Berenson is mentioned 49 times in the Virality Project report. *Id.* at 54, 57, 71, 73, 96-97, 122-23, 188-90, 195, 207-08.[5] The VP treats Alex Berenson as one of the "most significant influencer[s]" opposing vaccines. *Id.* at 96 (89).

226.     The VP disfavors Berenson because he criticizes the government to large audiences: "Berenson's popular posts on Twitter notably claimed to be 'digging up' or 'uncovering' information that was hidden from the public about vaccine safety or effectiveness. In one incident in July 2021, Berenson amplified a conspiracy theory from a statement filed with a lawsuit from America's Frontline Doctors stating that the government was covering up more than 45,000 vaccine-related deaths. Berenson's 17-tweet thread, which received over 16,000 interactions on July 21, 2021, claimed that the CDC had 'quietly more than DOUBLED' the number of deaths reported in VAERS, suggesting the CDC had misled the public." *Id.* at 96-97 (89-90).

---

[5] Report pages 47, 50, 64, 66, 89-90, 115-16, 181-83, 188, 200-01.

227.     Berenson had wide audiences when he was censored: "Twitter permanently deplatformed Berenson in August 2021 for repeated violations of Twitter's COVID-19 falsehoods policy. At the time he lost his account, he had more than 200,000 followers." *Id.* at 97 (90).

228.     The VP also cites Candace Owens and The Daily Wire as purveyors of vaccine misinformation. *See, e.g., id.* at 86, 92 (79, 85).

229.     The VP cites Robert F. Kennedy, Jr., a well-known anti-vaccine activist with wide followings, as one of the most influential purveyors of vaccine misinformation. *Id.* at 83 (76).  The VP describes Kennedy as "especially pernicious" because he has a large audience: "RFK Jr.'s activism is especially pernicious because, like other long-standing influencers, he has a large and committed following and has become somewhat of a household name in the US." *Id.*

230.     The VP also cites America's Frontline Doctors and its founder, Dr. Simone Gold, as a source of vaccine misinformation. *Id.* at 87-88 (80-81).  The VP notes that "Simone Gold, a licensed emergency room physician, was the second most prominent PMI across Virality Project's tickets. Gold is the leader of America's Frontline Doctors…. Gold has been influential since the summer of 2020, when the White Coat Summit, an event broadcast online in which members of America's Frontline Doctors spoke on the steps of the Supreme Court. The White Coat Summit promoted hydroxychloroquine both as a preventative measure and as a cure for COVID-19." *Id.*

231.     The VP asserts that Gold's "false and misleading claims about the COVID-19 vaccine" include core political speech like "encouraging her followers to boycott companies for their vaccine protocols" and "organizing a cross-country tour to fight back against 'censorship, chaos, and the undeniable slide towards communism that lurks beneath the tyrannical lockdowns for governmental 'public health' policy'." *Id.* at 88 (81).

50

*232.*      The VP treats Dr. Joseph Mercola as a purveyor of vaccine misinformation. *Id.* at 87 (80). Again, the VP targets Mercola because his speech reaches large audiences.  *Id.*

233.      The VP asserts that "the right-leaning media ecosystem differs from the rest of the media environment in ways that make it especially vulnerable to the spread of mis- and disinformation." *Id.* at 91 (84).

234.      On information and belief, speakers like Alex Berenson, Tucker Carlson, Robert F. Kennedy Jr., Simone Gold, Candace Owens, Joseph Mercola, and others flagged for censorship by the VP have significant social-media followings in the Western District of Louisiana.  Further, Plaintiffs Jill Hines and Jim Hoft follow many of these speakers on social media.

**B.      The VP Targets Truthful Speech for Censorship.**

235.      On information and belief, the VP also targets truthful speech for censorship; it successfully induces social-media platforms to censor and suppress COVID-related speech that was not false or, in many cases, not even violative of platform policies.

236.      The VP admits that "it was not always clear what *was* misinformation; in the case of the novel coronavirus, it was often simply not yet clear what was true or where scientific consensus lay," *id.* at 14 (7), and that "[g]round truth about COVID-19 was rapidly evolving, and even institutional experts were not always aligned on the facts," *id.* at 15 (8). Yet this did not stop the VP from targeting supposed "misinformation" that both was admittedly true at the time, and that later turned out to be true.

237.      The VP targets misinformation "tactics" that involve speech that the VP does not contend is false or even falsifiable. It states that speakers "use tactics that have persisted over time, many of which have been used in service of spreading mis- and disinformation in contexts beyond

the vaccine conversation; for example, the Election Integrity Partnership observed several of these tactics during the lead-up to the 2020 US election." *Id.* at 19 (12).

238.     These "tactics" include such things as "**Hard-to-Verify Content:** Using content that is difficult to fact-check or verify, such as personal anecdotes"; "**Alleged Authoritative Sources:** Using or pointing to information from an alleged public health official, doctor, or other authoritative source"; "**Organized Outrage:** Creating events or in-person gatherings, or using or co-opting hashtags"; and "**Sensationalized/Misleading Headlines:** Using exaggerated, attention-grabbing, or emotionally charged headlines or click-bait." *Id.* (bold in original). Notably, none of these "tactics" involves false speech, and all are protected by the First Amendment.

239.     Another "tactic" decried by the VP is "**Group super-spreader:** An individual account sharing posts into multiple online groups." *Id.* at 20 (13) (bold in original).

240.     The VP boasts that its "analysts had to develop a nuanced and nimble understanding of what content constituted policy violations"—evidently because, on information and belief, it was often flagging content that did not clearly violate platform policies. *Id.* at 21-22 (14-15).

241.     Most speech targeted by the VP was not false or incorrect: "The most commonly employed tactics were Hard-to-Verify Content and Alleged Authoritative Source." *Id.* at 41 (34); *see also id.* at 42 (35) fig.2.6 (showing predominance of these two "tactics").

242.     One of the "Viral Incidents" flagged by the VP was: "In July, posts went viral expressing outrage at attempts by the Biden administration to engage in vaccine outreach." *Id.* at 45 (38). This incident did not involve vaccine-related misinformation, but core political speech opposing government action: "the Biden administration used the phrase 'door-to-door' to describe a push for on-the-ground community-led efforts to persuade more Americans to get vaccinated.

52

Prominent Republican politicians miscast this as a forced vaccination campaign by 'Needle Nazis' and a prelude to the government knocking on the door to take away guns." *Id.* at 46 (39).

243.     The VP tracked and flagged "Claims that [supposedly] misrepresent … vaccine mandates," not just misinformation about the vaccines. *Id.* at 50 (43).

244.     According to the VP, truthful "content" that "leveraged decontextualized statistics from the US Department of Health and Human Services' Vaccine Adverse Event Reporting System (VAERS) database" is misinformation. *Id.* at 51 (44).

245.     According to VP, it is also misinformation when true adverse health events from vaccines are "shared absent context": "Rare incidents documenting verified adverse health events, including blood clotting and heart inflammation, were shared absent context…." *Id.*

246.     According to the VP, discussing "breakthrough" cases and "natural immunity" is misinformation: "False and misleading narratives … included stories of people diagnosed with COVID-19 after being vaccinated—'breakthrough' cases…. Later, the idea that natural immunity from infection is superior to immunity from vaccination became a political talking point raised repeatedly by right-leaning political influencers, despite inconclusive scientific evidence." *Id.* Both of these so-called "narratives" are scientifically based, not "false and misleading."

247.     According to VP, misinformation included "discussions of vaccine passports and mandates (including months before any state or federal officials began advocating for them)." *Id.* Thus, the VP treated as misinformation speech raising the concern that government officials might mandate vaccines and/or vaccine passports—which, of course, many did.

248.     The VP also counts as misinformation "claims that the government was headed toward mandating an unsafe vaccine." *Id.* The federal government did, of course, eventually

mandate the vaccines for millions of Americans. Thus, according to VP, it was "misinformation" to *correctly* predict that the federal government would mandate vaccines.

249.     The VP also treated Americans' "long-standing mistrust of pharmaceutical companies' profit motives" as part of anti-vaccine misinformation.  *Id.*

250.     "Conspiracy Theories" that "assign blame to … government" are also misinformation, according to VP. *Id.*

251.     According to VP, "personal anecdotes" about "vaccine injuries and severe side effects—ranging from rashes, to blood clots, to death" are also misinformation. *Id.* at 52 (45).

252.     According to VP, misinformation includes "[p]ersonal anecdotes" and "[d]istortions of official government statistics."  *Id.*

253.     According to VP, "stripp[ing] both individual stories and official statistics of important context" is misinformation.  *Id.*

254.     According to VP, "adverse event stories" were objectionable because they were "employed to push back against vaccine mandates."  *Id.* at 52-53 (45-46).

255.     According to VP, even truthful information about vaccine effects on health that are still being studied constitutes misinformation: "In early 2021, users on Twitter, Facebook, and Reddit reported unverified reproductive side effects, ranging from abnormal menstrual cycles to miscarriages and infertility. … At the time there was no medical consensus on the vaccine's effect on reproductive health, yet anti-vaccine activists presented the theory as fact and evidence of harm. Research is ongoing…."  *Id.* at 66-67 (59-60).

256.     According to VP, even "videos that appeared to be created satirically" are misinformation when they "were taken seriously."  *Id.* at 68 (61).

### C.     The Virality Project Pushes for More Aggressive Censorship Policies.

257.     On information and belief, the VP successfully pushes platforms to adopt more aggressive censorship policies: "While online platforms have made progress in creating and enforcing vaccine related policies, gaps still exist."  *Id.* at 10 (3).  As noted above, such pressure is backed by threats, coercion, and pressure from federal officials in the White House, the Office of Surgeon General, and others who collaborate with the EIP/VP; on information and belief, these federal threats and coercion induce the platforms to participate and cooperate with the EIP/VP.

258.     The VP calls for more aggressive censorship of COVID-19 misinformation, stating: "To these ends, platforms should: Consistently enforce policies, particularly against recurring actors," and "Continue to improve data sharing relationships with researchers."  *Id.* at 11 (4).

259.     Emails between Twitter and the Virality Project revealed through public reports show that the VP successfully pushed Twitter to adopt more aggressive censorship practices and repeatedly flagged content for censorship under Twitter's policies.

260.     On February 5, 2021, former CISA intern Isabella Garcia-Camargo of the SIO emailed five senior Twitter officials, announcing that the groups involved in the EIP were conducting a similar project to address COVID vaccine-related "disinformation."  Exhibit 11.  She referred to a conversation "at the end of last year" when "we introduced the work that the Stanford team was starting up on Vaccine disinformation response."  *Id.*  She noted that "we've begun our new partnership across three academic organizations (Stanford IO, UW CiP, NYU CSMaP) and in collaboration with Graphika and the DFRLab."  *Id.*  She reported that "[o]ur analysts are chugging along, conducting monitoring across 7 key internet factions that we have identified in this space."  *Id.*  She was writing to "collaborate with the Twitter team on this work."  *Id.*  She noted that "[t]he same Jira system from the EIP is up and running, and we have improved the notification system to incorporate your feedback from the last chat."  *Id.*  She asked to establish "a

55

line of communication with your team, by which we can raise disinformation narratives we are noting either on Twitter or across other platforms." *Id.*

261.     On February 22, 2021, Chase Small of the VP emailed Twitter officials, including Twitter executive Yoel Roth, copying Renée DiResta and Isabella Garcia-Camargo.  Exhibit 17. He stated, "Hello Twitter team, We are excited to have you as an external partner for the Virality Project." *Id.*  He provided "all onboarding and usage instructions for our VP Jira Surface." *Id.* He noted, "Yoel, your Jira credentials are the same as from the EIP.  Please be aware of the new VP Online Portal and email tips@viralityproject.atlassian.net for submitting tips." *Id.*

262.     On February 23, 2021, Garcia-Camargo emailed a large group of Twitter officials to provide "the latest weekly briefing from the Virality Project."  Exhibit 12.  According to her email, the briefing addressed topics like "conversations about vaccine passports, vaccine hesitancy expressed by NBA players, narratives around the efficacy of the vaccine in COVID-19 survivors, conspiracy theories about mRNA vaccines, and accusations of tech censorship." *Id.*  Garcia-Camargo noted, "**We also have begun our ongoing monitoring of Spanish and Mandarin narratives, highlighted in our 'Non English Content' sections!**" *Id.* (bold in original).  She indicated that the VP was or would be "report[ing]" misinformation to Twitter "directly over the Jira platform," stating: "please let us know if there are any specific things which you might like pulled out, highlighted, or *reported to you directly over the Jira platform*." *Id.* (emphasis added).

263.     On March 3, 2021, former CISA intern Jack Cable of the VP sent an email to senior Twitter officials, copying Renée DiResta and Isabella Garcia-Camargo of the VP, advising Twitter that "*we are beginning to ramp up our notification process to platforms*," and providing "a list of *actionable themes of vaccine misinformation* we have recently observed."  Exhibit 13 (emphases added).  Cable noted to Twitter that "[i]n each, we've included samples of the most prominent

cases of the misinformation," and that "this email is intended to give you a cross-platform summary of misinformation that we are escalating to individual platforms. For complete information, you have been tagged in the tickets relevant to your own platform." *Id.*

264.     In this email, Cable indicated that the VP would send "weekly briefing[s]" on misinformation that would be "targeted to the COVID-related policies we've identified on each platform." *Id.*  In other words, the VP would focus on flagging misinformation to each platform that the VP believed the platform would be most likely to censor.

265.     Cable also indicated that the most of the VP's flagging of specific misinformation for censorship would occur through "tag[ging] in the tickets relevant to your own platform." *Id.* On information and belief, this "tagging" in "tickets" occurs through shared access to the Jira software, through which VP analysts, platform employees, and government officials can communicate in real time.  As Cable stated to Twitter in the email, "we will begin tagging you more frequently in the tickets behind the headings in [each] weekly briefing." *Id.*

266.     On March 18, 2021, a Twitter official emailed Jack Cable, copying Renée DiResta and Isabella Garcia-Camargo.  In the email, Twitter noted that it was censoring speech flagged by the VP that otherwise would not have been censored: "the weekly reports and real-time escalations provide us with situational awareness regarding emerging trends … and *with actionable information regarding potential violations on our platform*."  Exhibit 14 (emphasis added). Twitter stated that "in addition to the default escalations you're already providing us, two categories stand out to us as particularly relevant: Known repeat offenders on the platform," and "Notable content that is not on the Twitter platform." *Id.*

267.     Regarding the weekly reports, Twitter stated that "[o]f the themes and patterns observed by our teams, the following are most interesting for us to continue to track and address:

… Misuse of official reporting tools and statistical data… [and] Campaigns against vaccine passports, inciting fear about mandatory immunizations….” *Id.* Twitter thus indicated that, after the VP's reporting, it was censoring truthful speech and political speech about COVID issues.

268.    In another email to Twitter, on information and belief, the VP flagged supposed "misinformation" concerning such topics as "the myocarditis situation, Senator Paul Rand's [*sic*] claims about natural immunity, and serious side effects (including a re-emerging concern about Guillain-Barre Syndrome)," and "how anti-vaccine groups are continuing to bring their movement into the legal space, through petitions, bans, and lawsuits in multiple states—most notably, Texas." Other communications from the VP, on information and belief, flagged speech by Alex Berenson that "suggest[s] that the coronavirus may have leaked from a lab," speech presenting Dr. Fauci's emails in a way that "has been used to exacerbate distrust in Dr. Fauci and in US public health institutions," and "a new analogy … between **vaccine passports and Jim Crow laws** in the American South." (Bold in original). The VP also flagged speech about "**the risk of myocarditis for vaccinated teens**" and "the **necessity of vaccines for people who have previously had COVID-19,**" as well as "worrisome jokes." (Bold in original). *See* Matt Taibbi, *Twitter Files #19: The Great Covid-19 Lie Machine: Stanford, the Virality Project, and the Censorship of "True Stories"*, *at* https://twitter.com/mtaibbi/status/1636729166631432195 (email excerpts embedded in Tweet 2 and Tweet 3 of the chain).

269.    On information and belief, the VP flagged to Twitter "True content which might promote vaccine hesitancy," including "Viral posts of individuals expressing vaccine hesitancy, or stories of true vaccine side effects," and "often true posts which could fuel hesitancy, such as individual countries banning certain vaccines." *Id.* (Tweet 5 of the chain).

270.     In one email from the VP to Twitter, the VP flagged to Twitter "our recent analysis on the 'Vaccine Passport' narrative," stating that "Concerns over vaccination records have been a focus of online vaccine conversation and have driven a larger anti-vaccination narrative about the loss of rights and freedoms."  Exhibit 15.  The VP stated, "We expect the vaccine passport debate to continue as a key talking point especially bridging the anti vax community with the right-wing media sphere."  *Id.*

    **D.**    **The Virality Project Monitors and Censors Speech on a Massive Scale.**

271.     On information and belief, the VP flagged supposed "misinformation" to platforms on a massive scale, with a high degree of success in inducing the platforms to censor it.

272.     The VP admits that six social-media platforms "engaged with VP tickets," "acknowledge[ed] content flagged for review" by the VP, "and act[ed] on it in accordance with their policies"—in other words, censored it.  Ex. 10, at 25 (18).

273.     The VP suggests that it flagged COVID-related posts with extensive engagement, reporting that "[b]efore the major social media platforms began to take down [one] video—which was in violation of their COVID-19 misinformation policies—[it] amassed tens of millions of views and was shared into a wide variety of communities."  *Id.* at 16 (9).

274.     The VP reports that it engages in "rapid response" on misinformation: "The Project's broad array of institutions enabled information sharing and *rapid response* when false and misleading information percolated across social platforms."  *Id.* (emphasis added).

275.     The VP extensively monitored social-media speech to find content and viewpoints that it disfavored: "To surface in-scope content, VP's team of analysts were divided into topical detection teams, referred to as pods…. These pods … enabled analysts to develop and ensure

sustained familiarity with how the COVID-19 vaccine conversation was evolving within particular communities on public platforms." *Id.* at 22 (15).

276.     This monitoring involved VP analysts reading and searching Americans' social-media accounts in real time: "Analysts in each pod assessed emerging narratives that were within scope …, surfacing content both via qualitative observation of the pages and accounts, and by using lists of common terms associated with vaccine hesitancy and long-standing anti-vaccine rhetoric." *Id.*

277.     This covert, mass surveillance of Americans' online speech was extensive, sophisticated, and adaptive: "At the beginning of the project, analysts used broad search terms ('vaccine,' 'jab') to surface relevant content and incidents (specific events or stories), but gradually began to incorporate a combination of machine learning and hand coding to identify additional recurring narratives relevant to the four in-scope categories. This included terms related to medical freedom under 'Vaccine Distribution,' or severe adverse effects and death under 'Vaccine Safety,' among others. As narratives and new keywords emerged throughout the analysis period, analysts continually refined their searches." *Id.* at 23 (16).

278.     The VP states that social-media platforms censored content at the VP's instigation: "**Platforms** were the final stakeholders in the VP effort. Six social media platforms engaged with VP tickets—Facebook (including Instagram), Twitter, Google (including YouTube), TikTok, Medium, and Pinterest—*acknowledging content flagged for review and acting on it in accordance with their policies*. On occasion, platforms also provided information on the reach of *narratives previously flagged by VP*, which provided a feedback loop leveraged to inform the Project's understanding of policies and ongoing research." *Id.* at 25 (18) (bold in original) (italics added).

60

279.     The VP emphasizes the importance of both government officials and social-media platforms in its collaboration on censorship: "As the effort progressed, input from these partners," including government officials and platforms, "was crucial in defining the VP's output formats and in surfacing where the impacts of vaccine mis- and disinformation were being felt offline." *Id.*  This includes the VP's "strong ties with several federal government agencies, ***most notably the Office of the Surgeon General (OSG) and the CDC***," which "facilitate[d] bidirectional situational awareness around emerging narratives."  *Id.* at 24 (17) (emphasis added).

280.     Like the EIP, the VP used "tickets" to track social-media narratives, and each "ticket" could encompass many posts: "As part of the Virality Project, analysts created tickets documenting URLs of in-scope content. In total, 911 tickets were created, tracking both specific pieces of misinformation and broader narratives. At the end of the monitoring period, analysts had created 845 tickets tracking specific vaccine misinformation incidents (events or pieces of content) and 66 tickets tracking broad narratives."  *Id.* at 34 (27).

281.     The VP states that "[f]rom February to August 2021, VP analysts systematically monitored activity across social media platforms to document emerging narratives and trends in public discourse while also tracking the popularity and spread of older content."  *Id.*

282.     "The [VP] used the Jira Service Desk software to log mis- and disinformation incidents that were determined to be in scope for specific areas of the public COVID-19-related conversation. For each single incident of anti-vaccine mis- or disinformation surfaced during monitoring, an analyst filed a ticket that provided a brief description of the incident, including engagement numbers at the time of creation and links to relevant social media posts."  *Id*. at 35 (28).  On information and belief, the Jira software allowed VP analysts, government officials, and platform employees to communicate directly about tickets and reports in real time.

283.     The VP states that it targeted online speech for censorship to prevent it from going viral: "Tickets also enabled analysts to quickly tag platform or health sector partners to ensure their situational awareness of high-engagement material that appeared to be going viral, so that *these partners could determine whether something might merit a rapid public or on-platform response*…." *Id.* at 37 (30) (emphasis added).

284.     The VP states that it reported content in 174 "tickets" to platforms for censorship: "Of the 911 incidents monitored, 174 were referred to platforms for potential action." *Id.*

285.     The VP's monitoring tracked content with about 6.7 million engagements on social media per week, or over 200 million engagements over the seven months: "Average weekly engagement with content tracked across all Virality Project tickets was 6.7 million." *Id.* at 39 (32).

286.     "Four distinct weeks during the monitoring period had incidents observed by Virality Project analysts that generated more than 10 million engagements." *Id.* at 43 (36).

287.     According to the VP, "[o]f the engagement captured by tickets, more than a third came from content primarily spread by accounts that demonstrated recurring success making content go viral; we refer to them here as 'recurring actors.'" *Id.* at 41 (34).

288.     On information and belief, the VP induced "platform action," *i.e.*, censorship, against such "recurring actors": "Recurring actors drove a majority of engagement in the first half of the study period, but fell off in importance after that, most likely due to platform action against certain users beginning in the late spring of 2021." *Id.* at 43 (36).

289.     The VP states that such censorship was effective, especially in "deplatforming" key actors: "The decline of content from recurring actors midway through the monitoring period potentially reflects a policy impact, as deplatforming these actors led to an apparent reduction in false or misleading content." *Id.* at 47 (40).

290.     The VP provides a timeline of policy changes becoming more restrictive of vaccine-related misinformation that shows repeated tightening of policies by Facebook, Twitter, and YouTube during 2021.  *Id.* at 133 (126) & fig. 5.1.

291.     The VP calls for more aggressive censorship to target speech that is not false or incorrect and that constitutes core political speech: "While progress has been made since platforms first developed vaccine-related policies in 2019, clear gaps in platform policy exist with respect to moderating vaccine-related content, including posts that employ personalized stories, medical freedom claims, and misleading headlines and statistics." *Id.* at 143 (136).

292.     The VP also calls for more aggressive action to "suppress content" and "deplatform accounts": "In addition, policies about the actions platforms can take to suppress content, promote trusted voices, and deplatform accounts vary widely from platform to platform and are still not enforced consistently, both within and across platforms."  *Id.*

**E.     The Virality Project Serves as a Conduit for Government Officials to Flag Social-Media Content for Censorship.**

293.     On information and belief, government officials provided "tips" to the VP about misinformation on social media, and the VP flagged such content to platforms for censorship.

294.     The VP identifies "federal health agencies" and "state and local public health officials" as "stakeholders" who "provided tips, feedback and requests to assess specific incidents and narratives."  Ex. 10, at 24 (17).

295.     The VP indicates that it would like to increase the efficiency of having "government partners" share "tips" of misinformation with entities like the VP, stating that "[r]esearch institutions" should "[s]treamline a tip line process to make it easy for civil society and government partners to share observations." *Id.* at 10 (3).

296.     According to the VP, "[a]n area that required ingenuity was creating a framework for facilitating the *intake* of tips from … government partners…. [T]heir tips are often highly valuable…." *Id.* at 148 (141) (emphasis in original).

297.     The VP recommends a more "streamlined" process for "government partners" to provide "tips" of misinformation: "The Virality Project often had to leverage informal exchanges, such as Zoom meetings or calls with our partners, to receive the tips verbally or encourage additional reporting. In future projects, external reporting channels should be strengthened via an easier means of reporting and increased access to the reporting channels, especially for partners on the ground (such as health practitioners or government health officials)." *Id.*

### F.     The VP Conspires and Is Intertwined With Government Officials.

298.     In addition, the VP collaborates closely with, and is pervasively intertwined with, federal, state, and local government officials.  The same conclusion applies to the VP as the EIP: "CISA and the EIP were completely intertwined."  Ex. 18, at 113.  In fact, the VP adds new levels of federal collaboration, as it includes collaborations with the White House, the Office of Surgeon General, and the CDC, which engaged in a massive pressure campaign to induce platforms to censor *just the sort of content that the VP was flagging at the same time.*

299.     The VP states that it is a "multistakeholder collaboration" that includes "government entities" among its stakeholders: "The Virality Project adopted a multistakeholder collaboration with civil society organizations, social media platforms, and government entities to respond to mis- and disinformation around the novel vaccines." *Id.* at 17 (10).

300.     The VP includes federal agencies and state public health officials as key "stakeholders": "The Virality Project established a nonpartisan, multi-stakeholder model consisting of health sector leaders, federal health agencies, state and local public health officials,

social media platforms, and civil society organizations. These stakeholders provided tips, feedback, and requests to assess specific incidents and narratives, and each entity type brought specific expertise to bear on understanding COVID-19 vaccine hesitancy." *Id.* at 24 (17).

301.     The government "stakeholders" such as "federal health agencies" and "state and local public health officials" were among those who "provided tips" and "requests to assess specific incidents and narratives," *i.e.*, flagging content for social-media censorship. *Id.*

302.     One of the key constituent organizations of the Virality Project—the University of Washington and its CIP—is a public state university whose personnel are state employees.  Kate Starbird and the other CIP personnel involved in the Election Integrity Partnership and the Virality Project are themselves state government officials who are subject to the U.S. Constitution, as are those acting in concert with them.

303.     The VP report states that: "**Federal government agencies** served as coordinators for national efforts. The Virality Project built strong ties with several federal government agencies, most notably the Office of the Surgeon General (OSG) and the CDC, to facilitate bidirectional situational awareness around emerging narratives." Ex. 10, at 24 (17).

304.     The VP boasts that the "Office of the Surgeon General incorporated VP's research and perspectives into its own vaccine misinformation strategy," and specifically cites the Surgeon General's Health Advisory on this point.  Ex. 10, at 11 (4) & 13 (6) n.5 (citing Off. U.S. Surgeon Gen., *Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment* (July 15, 2021), https://hhs.gov.sites.default. files.surgeon.general-misinformation-advisory.pdf).

305.     The VP agrees that government pressure pushes social-media platforms to adopt more aggressive censorship policies: "Platforms had started adapting their policies to address

vaccine misinformation in early 2019, spurred by public outcry, negative press coverage, and *government inquiries*…" *Id.* at 21 (14) (emphasis added).  On information and belief, Defendants leveraged that very pressure and coercion from government officials to induce platforms to cooperate in their mass-flagging censorship regime.

306.     The VP engaged in continuous, ongoing communication with government officials, platforms, and other stakeholders: "The Virality Project delivered 31 weekly briefings focused on increasing situational awareness and enabling the stakeholders working on countering vaccine mis- and disinformation to develop the most effective possible response." *Id.* at 25 (18).

307.     The VP states that it "provided strategic insights to government entities such as the OSG, CDC, and the Department of Health and Human Services." *Id.*

308.     Further, the "Stanford Internet Observatory and the Virality Project also hosted Surgeon General Vivek Murthy for a seminar on vaccine mis- and disinformation, including the rollout of the Surgeon General's advisory on health misinformation." *Id.* at 27 (20).

309.     The VP argues that "a whole-of-society effort is needed" to stop the spread of so-called misinformation: "[A] whole-of-society effort is needed in which stakeholders build robust and persistent partnerships to ensure that significant high-harm claims can be addressed as they arise." *Id.* at 147 (140).  This "whole-of-society" effort includes an active role for the government in censoring disfavored speech: "The Virality Project sought to do just that by bringing together four types of stakeholders: (1) research institutions, (2) public health partners, (3) government partners, and (4) platforms. Our recommendations recognize the collective responsibility that all stakeholders have in mitigating the spread of mis- and disinformation…" *Id.*

310.     According to the VP, "The Virality Project offers an early template for structuring interaction between research institutions and nonacademic stakeholders (including government entities, health practitioners, and private companies)." *Id.*

311.     The VP cites its close collaboration with Surgeon General Murthy in particular. *See id.* at 149 (142), 150 (143).

312.     According to VP, collaboration with government officials should increase: "[M]ore can be done moving forward. There are several areas where government officials can focus to improve their ongoing response to mis- and disinformation…." *Id.* at 149-50 (142-43).

313.     These include "real-time response" to misinformation on the model provided by CIS and the EI-ISAC for election speech. *Id.* at 150 (143).

314.     The VP recommends that the federal government "[i]mplement a Misinformation and Disinformation Center of Excellence (CoE) housed within the federal government," housed within CISA, which was instrumental in launching the EIP. *Id.* at 150 (143).

315.     On information and belief, like the EIP, the VP's censorship activities are ongoing and continue past the period described in the VP report.  As noted, the VP report strongly implies that the VP believes the problem of COVID misinformation is ongoing and continues to call for increased censorship activities in this area on the VP model.

**G.     The Virality Project Forces Cooperation with Social-Media Platforms.**

316.     Social media platforms served as VP "stakeholders" alongside federal and state officials: "**Platforms** were the final stakeholders in the VP effort. Six social media platforms engaged with VP tickets—Facebook (including Instagram), Twitter, Google (including YouTube), TikTok, Medium, and Pinterest—acknowledging content flagged for review and acting on it in accordance with their policies." *Id.* at 25 (18) (bold in original).

317.     On information and belief, as alleged further below, platforms were coerced to participate in the EIP/VP's activities through coercion and pressure from federal officials with whom the EIP/VP was completely intertwined.

318.     Social-media platforms participate in the Virality Project through privileged lines of communication.  As noted above, an email from Isabella Garcia-Camargo to Twitter in February 2021 notifies senior Twitter officials that "[t]he same Jira system from EIP is up and running, and we have improved the notification system to incorporate your feedback from our last chat."  Ex. 11.  She states that the VP's "analysts are chugging along, conducting monitoring across 7 key internet factions that we have identified in this space," and that "[o]ur goal would be to have a line of communication with your team, by which we can raise vaccine-related disinformation narratives we are noting either on Twitter or across other platforms." *Id.*

319.     Like the EIP, the VP appears to have privileged access to at least some platforms' internal data about speech: "The engagement data or video view data for links associated with each ticket was collected differently depending on the social media platform in question: Facebook and Instagram: CrowdTangle API; Twitter: Twitter API; YouTube: YouTube API…"  Ex. 10, at 38 (31).  On information and belief, Twitter and YouTube gave the VP greater access to their internal data about speech on their platforms than Facebook did.  *See id.*

**H.     Defendants Target Speech on the Basis of Discriminatory Animus.**

320.     On information and belief, in conducting their censorship activities, Defendants acted and continue to act on the basis of invidious, discriminatory animus based on race, religion, sex, minority status, ethnicity, language group, national origin, and/or disfavored viewpoints.

321.     Defendants make special efforts to ensure that members of particular racial, religious, sex-based, ethnic, and language groups are prevented from hearing speech that might be

of particular interest to them, and that speakers from such groups and/or who reach out to such groups are prevented from speaking to them.

322.     Defendants openly proclaim that they deliberately target certain protected classes—including but not necessarily limited to Black people, Spanish-speaking and Chinese-speaking groups and ethnicities, religious groups and those professing disfavored religious beliefs, and women—to prevent them from having access to free, uncensored discourse on social media. This invidious targeting is directed both at speakers who reach out to these protected classes, and audiences composed of members of these protected classes.

### 1.     Targeting Disfavored Religions and Religious Beliefs.

323.     On information and belief, Defendants target speech reflecting particular religious beliefs, and appealing to certain particular religious groups, for censorship.  This includes speech reflecting religiously motivated views and beliefs, such as the view that COVID vaccines are the "mark of the Beast" from Revelation 13:16-17, and that religious believers cannot take the vaccines because they were developed using aborted fetal tissue, among others.

324.     According to the VP, "anti-vaccine themes, tropes, and narratives" that comprise misinformation include "*Religiosity*: Vaccines contain materials that are objectionable on religious grounds." Ex. 10, at 20 (13).  On information and belief, this reference to "materials that are objectionable on religious grounds" includes the religious belief that believers should not take the vaccines because they were developed using aborted fetal tissue or other similar materials.

325.     The VP monitors anti-vaccine speech via "pods," and one such "pod" is named "Lifestyle and Spirituality," which "focused on spiritual and religious communities, as analysts observed frequent content overlap between these clusters of accounts."  *Id.* at 23 (16).

326.     The VP identifies "Mark of the Beast" as a leading "Conspiracy Theory" of anti-vaccine misinformation.  *Id.* at 65 (58).  This refers to speech comparing the COVID vaccines or vaccine passports to the "mark of the Beast" in Revelation 13:16-17.

327.     The VP treats religious objections to COVID vaccines as such "conspiracy theories": "VP analysts saw that the movement against the COVID-19 vaccine has reincorporated religious narratives. One of the most consistent pandemic conspiracy theories relates to the 'Mark of the Beast' in reference to Revelation 13:16–17, which describes a 'beast' that forces people to receive a mark from the Antichrist and says that people will be unable to 'buy or sell unless they had the mark.' Some evangelical Christians believe the COVID-19 vaccine is the prophesied Mark of the Beast. This wide-ranging theory has been used to undermine any widely advised COVID-19 mitigation measure, including masks, vaccines, and vaccine passports."  *Id.* at 65-66 (58-59), & nn. 79-80 (citing several examples of religious speech opposing COVID vaccines).

328.     The VP decries such expression of religious beliefs opposing COVID vaccines by "[p]olitical leaders and celebrities" who "have shared content suggesting that the Mark of the Beast is connected to COVID-19 vaccines and vaccine passports," including rapper Kanye West and U.S. Representative Marjorie Taylor Greene.  *Id.* at 66 (59).  The VP report provides Rep. Greene's Twitter post, which reads: "They are actually talking about people's ability to buy and sell linked to the vaccine passport.  They might as well call it Biden's Mark of the Beast."  *Id.* fig. 3.9.

329.     The VP report decries such religious speech because it reaches a significant audience of believers and others: "On March 29, 2021, Rep. Greene livestreamed a video in which she framed vaccine passports as Biden's "Mark of the Beast" …. Rep. Greene's comments received widespread engagement, with over 500,000 interactions across Facebook, Twitter, Instagram, and Reddit, elevating this narrative in the public eye …."  *Id.* at 93 (86).

70

330.     On information and belief, the VP flags such speech expressing religious beliefs and pushes platforms to censor such religious speech.  Its report states: "Despite drawing on conspiracy theory framings depicting vaccines as being controlled by a powerful figure, the Mark of the Beast narrative falls within a challenging area for platform enforcement: platforms struggle to balance freedom of expression against the leveraging of religious claims as tools to promote vaccine hesitancy and spread vaccine mis-and disinformation." *Id.* at 66 (59).

331.     Likewise, the VP overtly targets Spanish-language "Religious influencers," noting that the "cast of recurring characters" in Spanish-speaking communities included "Religious influencers; these actors achieved some reach in Spanish-language channels…." *Id.* at 98 (91).

332.     Like the VP report, the EIP report also proclaims that Defendants target religious audiences, speakers, and messages for particular monitoring and censorship. For example, the EIP report states that "Culturally significant messages were sometimes added to the misinformation, complicating the fact-checking process. For Spanish-language users, this content usually took the form of religious commentary denouncing socialism and the left, which appeals to Latino audience members who come from religious, often Catholic, backgrounds and/or who fled a socialist regime in their birth country."  Ex. 1, at 128 (110).

### 2.     Race-Based Animus Against Black Speakers and Audiences.

333.     On information and belief, Defendants also target for censorship speech addressed to racial minorities, especially Black people, on the basis of invidious animus.

334.     The VP report claims that "anti-vaccine activists have … weaponized marginalized groups' preexisting distrust of government to foster vaccine hesitancy specifically among those populations. Although many of the well-known anti-vaccine activists are white, they have often turned to racialized communities, especially Black communities, as the targets of their campaigns,

capitalizing on deep-seated concerns about vaccine development and distribution as well as legacies of medical racism in the US." Ex. 10, at 64 (57).

335.     The VP report states: "Some of the most significant promoters of these narratives have been Children's Health Defense (CHD) and its chairman RFK Jr., who has helped promote the narrative that vaccines are dangerous for Black people through his use of various social media platforms, particularly Twitter." *Id.*

336.     The VP targets such narratives because they are addressed to Black audiences: "The narrative also gained mainstream traction after CHD announced the premier of its documentary *Medical Racism: The New Apartheid*…. [T]he film was legitimized via promotion by the Nation of Islam (NOI), a Black nationalist religious and political organization founded in 1930. Tony Muhammad, an NOI minister … makes a parallel between COVID-19 vaccine trials and the 1932–1972 Tuskegee Syphilis Study, an abusive and unethical study that denied lifesaving treatment to hundreds of study subjects, all of whom were Black men." *Id.*

337.     According to the VP, "[t]he documentary's announcement and trailer … garnered 43,000 views on Instagram and 2,300 engagements on Facebook…. The film then gained more traction on Telegram channels; the trailer was promoted in six Telegram channels that shared the content with 60,000 members, generating 5,000 views collectively." *Id.* at 65 (58).

338.     The VP targets speech comparing COVID vaccines to the Tuskegee syphilis study because it addresses Black audiences: "Throughout the rollout, VP analysts repeatedly reviewed content that referenced the Tuskegee study. In the month of July 2021 alone, VP analysts observed over 200 posts featuring narratives involving Tuskegee. The legacy of the study was consistently used as evidence to undermine support for vaccines: users claimed that past unethical practices

would be repeated in the COVID-19 vaccine rollout, or that the history of Tuskegee reflected establishment public health institutions' inherent untrustworthiness." *Id.*

339.    According to VP, this speech is effective because it "exploit[s] the existing distrust that marginalized communities often hold for medical and scientific professionals." *Id.*

340.    The VP flags several social-media posts referring to the Tuskegee experiment and the COVID vaccines as supposed disinformation addressed to Black audiences. *Id.* at 77 (70) n.76.

341.    The VP also flags speech about Black baseball legend Hank Aaron's death after taking a COVID vaccine because that speech is particularly relevant to Black audiences: "In January [2021], traditional media coverage of the death of retired baseball player Hank Aaron inadvertently fueled the spread of vaccine misinformation and vaccine hesitancy. Aaron died 18 days after receiving the first dose of the Moderna vaccine. His vaccination had been highly publicized, as he hoped it would inspire other Black Americans to do the same…. [A]nti-vaccine influencers, meanwhile, including Children's Health Defense and RFK Jr., took to social media to claim that Aaron's death was linked to the vaccine. RFK Jr.'s Facebook and Twitter posts garnered 12,000 and 20,000 interactions respectively…." *Id.* at 56-57 (49-50).

342.    The VP specifically decries a Twitter post by Robert F. Kennedy Jr. that stated: "Hank Aaron's tragic death is part of a wave of suspicious deaths among elderly closely following administration of COVID vaccines. The baseball legend received the Moderna vaccine on Jan. 5, in an attempt to inspire other Black Americans to step up to the plate and get the vaccine. https://t.co/VbuHt22bJz,' Twitter, January 22, 2021." *Id.* at 72 (65) n.23.

343.    Like the VP report, the EIP report also indicates that Defendants targeted speech, speakers, and audiences on the basis of race, ethnicity, and national origin. For example, the report states that one of its "five working groups" was specifically focused on monitoring and censoring

speech relating to Black speakers and audiences, and Spanish- and Chinese-language speaker and audiences. Ex. 1, at 29 (11). The name of this working group was "'Targeted Group' Monitoring": "*'Targeted Group' Monitoring* focused on identifying misinformation that seemed to specifically target an ethnic or diaspora community in the United States. This included content targeting the Black community, which was the subject of extensive disinformation campaigns in 2016, as well as Chinese- and Spanish-language content." *Id.* (italics in original).

### 3.   Targeting Spanish-Speaking and Chinese-Speaking Ethnicities.

344.   The EIP report notes that "researchers within the Partnership signed up to monitor particular topic groups, such as influencer accounts or Spanish-language content." *Id.* at 46 (28).

345.   The EIP report includes an entire Section (Section 3.5, "Narrative Crossover and Fabrication in Non-English Media") describing its monitoring and censorship targeted at Spanish-speaking and Chinese-speaking communities. *Id.* at 119-128 (101-110). This Section includes two major subheadings: "Chinese-Language Misinformation" and "Spanish-Language Misinformation." *Id.* at 120 (102), 124 (106).

346.   The EIP's "Chinese-Language Misinformation" section states that it targets Chinese-language speech and speakers extensively: "[T]he EIP identified two actors that were prominent in spreading mis- and disinformation in the Chinese-language media sphere, with more complex motives and sophisticated distribution apparatuses: Falun Gong … , which owns and operates the Epoch Times, and Guo Wengui (also known as Miles Guo) and his associated media enterprises, including Himalaya Global and the GTV/GNews media group. … Falun Gong [is] an exiled, virulently anti-CCP Chinese religious movement [whose] entire media complex has more than 12 million followers." *Id.* at 120 (102). The EIP report singles out the Epoch Times as a purveyor of "misinformation" subject to particular monitoring. *See, e.g., id.* at 124 (106).

347.     The EIP also reports monitoring and censorship of Spanish-language speakers and audiences: "Non-verified, grassroots users were an important source of the Spanish language misinformation compilations surfaced by the EIP … The Spanish-language mis- and disinformation sphere also boasted several large-scale influencers who paralleled English-language repeat spreaders in disseminating the top narratives to large audiences." *Id.* at 124 (106).

348.     The EIP report calls for even more extensive monitoring and censorship of speech in Spanish-speaking and Chinese-speaking communities. *See, e.g., id.* at 128 (110).

349.     Likewise, the VP report also notes that it has "Pods" that "[f]ocus on English-language content targeting US Chinese and Spanish language communities." Ex. 10, at 23 (16).

350.     It also notes that its "[l]anguage specialists observed content in Spanish and Chinese—the two most spoken languages in the US after English." *Id.* at 35 (28); *see also id.* at 46 (39) (describing alleged misinformation that "was promoted effectively in multiple languages, including Chinese, Spanish, and English"); *id.* at 87 (80) (noting that Dr. Joseph Mercola "has multiple English and Spanish accounts on WhatsApp, Telegram, BitChute, and Facebook and close to 4 million followers and subscribers across his social media accounts").

351.     The Virality Project report includes an entire Section 4.2 devoted to its targeting censorship activities at "Spanish and Chinese Influencers." *Id.* at 97 (90).

352.     Section 4.2 of the VP report states that "Virality Project researchers prioritized having visibility into content in Spanish and Chinese in the US. … During the course of the Virality Project, three analysts (all with native language proficiency) monitored Spanish-and Chinese-language content circulating in US communities." *Id.* at 97 (90).

353.     The VP report states that "[i]n both Spanish and Chinese, influencers spread mis- and disinformation about the safety and efficacy of vaccines, as well as vaccine conspiracy

theories. Pseudomedical influencers were particularly popular in both Spanish- and Chinese-language online communities." *Id.* at 98 (91).

354.     The VP report includes a specific subsection (Subsection 4.2.1) describing ethnic Latino and Spanish-language speakers and writers that the VP targeted. *Id.* at 98-100 (91-93).

355.     The VP report also includes a specific subsection (Subsection 4.2.2) describing ethnic Chinese and Chinese-language speakers and writers that the VP targeted on the basis of their Chinese-speaking identities and audiences. *Id.* at 100-103 (93-96).

### 4.     Targeting Female Viewpoints and Audiences on the Basis of Sex.

356.     Defendants also target speakers, viewpoints, and audiences on the basis of sex.  The VP report flags speech about COVID vaccines and their impact on issues such as menstruation, pregnancy, and female fertility, which are of unique and particular interest to women, and the report makes clear that Defendants monitor and target female audiences and viewpoints.

357.     For example, the VP report describes targeting of speech addressed to female audiences by largely female speakers: "In early 2021, users on Twitter, Facebook, and Reddit reported unverified reproductive side effects, ranging from abnormal menstrual cycles to miscarriages and infertility. Anti-vaccine activists, health and wellness influencers, and pseudomedical influencers alleged that these events were connected to the COVID-19 vaccines and leveraged them to increase vaccine hesitancy and rejection: using misleading VAERS data to advise pregnant women against the vaccine, exploiting a doctor's miscarriage as 'proof' of the vaccine's danger, and spreading stories of people losing their jobs due to fertility health-related vaccine refusal." *Id.* at 66 (59).

358.     The VP report admits that the speech was not false: "At the time there was no medical consensus on the vaccine's effect on reproductive health, yet anti-vaccine activists presented the theory as fact and evidence of harm.  Research is ongoing…." *Id.* at 66-67 (59-60).

359.     The VP targets female speakers and audiences on the basis of sex on other topics as well: "In April 2021, … VP analysts identified a new form of reproductive health claim that leveraged a long-standing anti-vaccine trope, 'vaccine shedding,' but with a new angle. … These claims coalesced into a new narrative combining older, separate narratives about vaccine shedding and reproductive health. … The narrative was also circulated on April 20, 2021, by Naomi Wolf, who tweeted that unvaccinated women were experiencing menstruation changes after being around vaccinated women." *Id.* at 67 (60).

360.     The VP reports states that these claims about menstruation and female reproductive health "appeared within a broad range of Page and group types." *Id.*

361.     The VP report argues that sex-specific claims about the effects of COVID vaccines may be true but "decontextualized" and thus constitute misinformation: "[I]t can prove difficult for platforms to add context to a decontextualized or misleading interpretation of a fact or figure. In one example of this dynamic, a June 2021 study of pregnant women and COVID-19 vaccines was used to promote the claim that vaccines cause miscarriages.… Posts circulated without the necessary context for users to interpret the findings correctly." *Id.* at 139-140 (132-133).  The VP recommends censorship in the form of "friction" to address such issues: "In June 2020, Twitter began testing a policy that adds more friction to reshares of outside links…." *Id.* at 140 (133).

## I.  The Virality Project Specifically Targets "Health Freedom" Groups and Speech.

362.     On information and belief, health freedom groups, like Plaintiff Jill Hines's group Health Freedom Louisiana, are particular targets of the VP's monitoring and censorship activities.

363.     According to the VP report's taxonomy, Plaintiff Jill Hines, the founder of Health Freedom Louisiana, constitutes a "medical freedom influencer[]" who engages in the "tactic" of "**Organized Outrage**" because she "create[s] events or in-person gatherings" to oppose mask and vaccine mandates in Louisiana. *See id.* at 9, 19 (2, 12) (bold in original).

364.     The VP report repeatedly emphasizes "health freedom" or "medical freedom influencers" like Plaintiff Hines.  It identifies "Liberty" as a "trope" of disinformation: "*Liberty*: Individuals have the right to 'health freedom'; no government or employer should be able to tell people what to put in their bodies."  *Id.* at 20 (13) (italics in original).

365.     The VP report includes an entire section on such groups: "Section 3.2.2 – Government Overreach and Medical Freedom Narratives."  *Id.* at 59 (52).

366.     According to the VP, "[o]ne of the primary long-standing themes of anti-vaccine distribution narratives is that mass vaccine distribution constitutes a government overreach. The movement sees vaccine mandates, including, historically, school vaccine requirements, as an assault on 'health freedom' or 'medical freedom.'"  *Id.*

367.     According to the VP, "[i]n 2020, following the emergence of COVID-19, these same health freedom groups expanded their vaccine protests to social distancing, masks, and other prevention measures."  *Id.*  Plaintiff Jill Hines and her groups engage in such activities.

368.     The VP describes the role of Facebook groups—also employed by Jill Hines—in organizing health freedom groups to oppose vaccine mandates: "[G]roups emerged on platforms such as Facebook during the pandemic, with names specifically related to COVID-19 or mRNA vaccines, to assist in discoverability; some grew their numbers into the tens of thousands."  *Id.*

369.     The Virality Project also specifically flags Plaintiff Jim Hoft's *The Gateway Pundit* as a purveyor of misinformation and COVID "conspiracy theories," stating: "Headlines sometimes

hawked conspiracy theories: one Gateway Pundit headline, 'The Great Reset: Big Tech and Big Pharma Join Forces to Build Digital COVID Vaccination Passport,' was a nod to groups such as QAnon…. The article alleged collusion between Big Tech and Big Pharma that would threaten 'individual rights.'" *Id.* at 60-61 (53-54) & 75 (68) n.49 (citing Joe Hoft, *The Great Reset: Big Tech and Big Pharma Join Forces to Build Digital COVID Vaccination Passport*, Gateway Pundit (January 17, 2021), https://thegatewaypundit.com/great-reset-big-tech-big-pharma-joining-forces-build-digital-covid-vaccination-passport).

370.     "Health freedom" or "medical freedom" groups are discussed dozens of times in the VP report.  The word "freedom" occurs 100 times, almost always in direct connection with a discussion of "health freedom" or "medical freedom" groups, influencers, or content.  *See id.* at 6, 9, 20, 23, 59-62, 66, 70, 74, 77, 82, 84-86, 93-96, 105, 117-18, 121-22, 130-31, 137-38, 141, 143, 187, 197-98, 201, 204, 210, 220-22.[6]

371.     The VP defines "Medical freedom influencers" as actors who "are averse to government interference in individuals' personal lives. While they explicitly advocate for 'health freedom' or 'vaccine choice,' these actors often propagate vaccine doubt by contextualizing the choice with misleading claims of vaccines' adverse medical consequences."  *Id.* at 82 (75).

372.     The VP states that "[t]he newest iteration of medical freedom, adapted for COVID-19, challenges the legitimacy of government or corporate vaccine mandates and public health interventions specific to COVID-19, including vaccine passport systems and masking requirements."  *Id.* at 93 (86).

---

[6] Report pages iii, 2, 13, 16, 52-55, 59, 63, 67, 70, 75, 77-79, 86-89, 98, 110-11, 114-115, 123-24, 130-31, 134, 136, 180, 190-91, 194, 197, 203, 213-15.

373.     The VP states that "medical freedom" groups spread misinformation "across all 50 states": "Medical freedom influencers (MFIs) active in the anti-COVID-19-vaccine movement were fairly distinct from other categories of influencer in that rather than hinging on a handful of key (and often celebrity-status) individuals, they spread their narratives via a franchise model across all 50 states." *Id.* On information and belief, that includes Health Freedom Louisiana.

374.     The VP indicates that it tracks and flags "medical freedom" groups "at a messaging and organizing level," *i.e.*, the level where Jill Hines experiences censorship: "As medical freedom activists have fought requirements imposed by states, cities, or private employers, they have learned from each others' successes and failures—at a messaging and an organizing level—and have brought those lessons to their local communities." *Id.* at 94 (87). On information and belief, the VP directly interferes with such efforts by pushing platforms to censor them.

375.     On information and belief, Defendants' conduct successfully targeted and continues to target Ms. Hines, Health Freedom Louisiana, and her social-media groups for censorship, and directly interferes with Ms. Hines' and her audiences' freedom of speech and freedom of association in Louisiana, including in the Western District of Louisiana.

376.     Indeed, Defendants' conduct involves extensive, direct, and purposeful campaign to interfere with speech by Louisiana speakers and to Louisiana audiences, including both Jill Hines and Jim Hoft's extensive audiences in Louisiana.

377.     Defendants deliberately monitor and track speech on social media by Louisiana residents like Jill Hines and many others. The EIP Report states that it assigned an analyst to each "specific state or interest group … which they developed expertise in and followed throughout the project." EIP Report, at 9. These analysts particularly track the speech's State of origin: "Analysis used open source intelligence and other social media analysis methods to … determine[e] the

suspected origins of a piece of information, tracking its spread over time." *Id.* These analysts then *contact state officials* in the relevant State regarding such reports: "if an internally generated EIP ticket targeted a particular region, analysts sent a short write-up to the EI-ISAC to share with the relevant election official. This allowed the state or local official to verify or refute the claim." *Id.* at 9.

378.    On information and belief, Defendants took and take all these steps with respect to Louisiana in particular—including assigning analyst[s] specifically to Louisiana, determining whether speech originated in Louisiana, tracking the speech's spread from Louisiana, and communicating with state officials in Louisiana about supposed disinformation.

379.    In fact, the inference that Defendants do these things with respect to Louisiana is compelling, because the facts alleged above indicate that Defendants repeatedly target Jill Hines in particular for censorship, to interfere with her ability to reach Louisiana audiences. As noted above, Jill Hines' speech—much of which involves Louisiana issues and organizing to petition the Louisiana legislature—has unique relevance to Louisiana audiences.

380.    This Court found, based on facts similar to those alleged in this Complaint, that Defendants specifically targeted Hines for censorship in Louisiana: "[Jill] Hines of the Health Freedom Louisiana was flagged by the Virality Project to be a 'medical freedom influencer' who engages in the 'tactic' of 'organized outrage' because she created events or in-person gatherings to oppose mask and vaccine mandates *in Louisiana*." Ex. 18, *Louisiana v. Biden*, Doc. 293, at 85. "The Virality Project flagged the following persons and/or organizations as spreaders of misinformation: Jill Hines and Health Freedom Louisiana…." *Id.*

381.    As noted above, much of this speech, including Hines's speech about organizing to lobby the Louisiana legislature, was and is of specific interest and relevance to Louisiana residents.

Defendants intentionally sought and seek to silence that speech, including the speech of Plaintiffs Hines and Hoft, by preventing it from reaching other Louisiana residents.

382.     In doing so, on information and belief, Defendants communicate both with Louisiana government officials and with social-media platforms about Plaintiffs' and others' speech occurring in Louisiana for the purpose of silencing that speech in Louisiana and preventing Louisianans from having access to it.  Indeed, the evidence filed in *Louisiana v. Biden* includes communications between CISA officials, with whom Defendants are "completely intertwined," and Louisiana state officials regarding reports of supposed "disinformation" circulating on social media in Louisiana.  *See Louisiana v. Biden*, Doc. 266-5, at 192-200.

383.     Defendants and their federal allies compelled and compel those third parties to censor that speech in Louisiana, thus intentionally preventing it from reaching Louisiana residents. *See* Ex. 18, *Louisiana v. Biden*, Doc. 293, at 116-17 (finding that "the social-media companies cooperated" in federal censorship activities, such as those involving the EIP/VP, "due to coercion" from federal officials).

384.     Defendants inflicted and inflict injuries that affected tens or hundreds of thousands of Louisiana residents, and the brunt of those injuries, especially as to Hines' speech, was and is felt in Louisiana.

385.     Through this course of conduct, Defendants targeted Jill Hines's speech in particular, and repeatedly induced platforms to silence her and shut down her attempts organize Louisiana residents for political purposes.

386.     Similarly, Defendants deliberately monitor, track, and target Jim Hoft's speech to ensure that it would not reach his substantial audiences in Louisiana and elsewhere.  As this Court previously found, Defendants and their federal-official conspirators "appear to be currently

involved in an ongoing project that encourages and engages in censorship activities specifically targeting Hoft's website."  Ex. 18, *Louisiana v. Biden*, Doc. 293, at 127.  Given the extensive targeting of Hoft's speech alleged herein, it is evident that Plaintiffs routinely attempt to, and succeed in preventing Hoft from reaching his audiences in Louisiana and elsewhere.

387.     In doing so, Defendants censored and restricted what tens or hundreds of thousands of Louisianans could view on social media.  Absent censorship, Hines' audiences would number in the tens of thousands, and Hoft's followers number over one million.

388.     Defendants did all these things deliberately, intending to restrict free expression between and among Louisiana residents, and they restricted both the circulation of Plaintiffs' own speech, thus injuring Plaintiffs and their Louisiana audiences, and the circulation of the speech of other speakers, including Louisiana speakers, to whom Plaintiffs would otherwise listen.

389.     In so directing their campaign of censorship toward Louisiana, on information and belief, all Defendants acted in concert.

## III.    Defendants' Conduct Inflicts Injuries on Plaintiffs.

390.     Plaintiffs and Class members have suffered extensive injuries and losses as the direct and proximate result of Defendants' conduct. Defendants' conduct is the cause-in-fact, legal cause, and but-for cause of these injuries. These injuries include both past injuries and ongoing and imminent future injuries. They include economic and non-economic losses.

391.     Plaintiff Jill Hines is the Co-Director of Health Freedom Louisiana, a consumer and human rights advocacy organization.  Hines has approximately 13,000 followers each for Health Freedom Louisiana and Reopen Louisiana, including many followers in the Western District of Louisiana.  All have experienced social media censorship caused by Defendants' conduct.

392.     Hines' organization engages in public advocacy on behalf of Louisiana citizens on issues of health freedom and fundamental human rights.  She has testified before the Louisiana legislature approximately 20 times on such issues.

393.     Hines and her groups engage in speech on COVID-19 vaccine and mask mandate-related issues.  They have experienced extensive social-media censorship.  On information and belief, much of this censorship was caused by Defendants' actions.

394.     Hines' and her groups' speech that has been censored involves many topics flagged in the VP report.  Her posts pointing to lack of safety of masking were and are targeted, as well as posts that refer to adverse events of vaccinations, including VAERS data.  Hines was completely restricted from Facebook for 30 days starting in January 2022 for sharing the image of a display board used in a legislative hearing that had Pfizer's preclinical trial data on it.  As another example, in late May 2022, Hines's social-media speech was restricted was for re-posting an Epoch Times article that discussed a pre-print study detailing increased emergency calls for teens with myocarditis following covid vaccination.

395.     Hines experiences significant interference, not just with freedom of speech, but also with freedom of association and freedom to petition the government for redress of grievances, including social-media speech to organize her supporters to seek legislative changes.

396.     Hines experiences censorship of her speech addressed to women, including posts of articles raising concerns about pregnant women being vaccinated, and posts about the impact of COVID vaccines on female reproductive health.  This censorship includes truthful speech that presents VAERS data on COVID vaccines and pregnant women accurately.  Hines also experiences censorship of speech addressing religious believers in particular about the COVID vaccines, and speech particularly addressed to racial minorities such as Black people.

397.     Hines' personal Facebook page, and the Facebook pages of both Health Freedom Louisiana and Reopen Louisiana, are under constant threat of being completely deplatformed, in large part due to Defendants' activities.  In 2022, her personal Facebook account was restricted for 90 days.  The censorship she faces continues through the filing of this Complaint.  For example, on April 26, 2023, one of her Facebook posts regarding the health consequences of mask mandates, including the potential impact on female reproductive health, was censored on Facebook.

398.     Through her group Reopen Louisiana, Hines has also experienced social-media censorship of election-related speech of the sort discussed in the EIP report.

399.     Censorship thwarts Hines' ability to organize like-minded supporters, including those located in the Western District of Louisiana, to petition the government.  Two of her Facebook groups were completely deplatformed, effectively disbanding groups of 500 and more than two thousand people organized to engage in direct advocacy to the state legislature.  These groups were organized to address COVID vaccines and mandates.  Removing these groups thwarted Hines's ability to associate with others to influence her state legislature.  Many of those affected by this social-media censorship are located in the Western District of Louisiana.

400.     Hines engages in self-censorship to avoid more severe penalties, and the reach of her voice is greatly hampered.

401.     On information and belief, Hines and her groups, including Health Freedom Louisiana, were and are specifically targeted for monitoring and censorship by Defendants and those working in concert with them.

402.     Hines is also an avid reader and listener of the speech of others on social media, including the speech of those targeted by the Election Integrity Partnership and the Virality Project.  As an audience member of social-media speech, she also suffers extensive censorship caused by

Defendants' activities.  Hines follows and reads the content on social media of numerous speakers and writers who are discussed extensively in the VP and EIP reports and are targeted by Defendants' censorship activities, including but not limited to The Gateway Pundit and many other speakers specifically mentioned in the EIP/VP's reports.

403.     Hines asserts her own First Amendment rights to speak and listen to other speakers on social media, and she asserts the First Amendment rights of her audiences and potential audiences to have access to her speech across social-media platforms.  She asserts her First Amendment right to *interact* with other speakers on social media without restriction, *i.e.*, to "speak and listen, and then … speak and listen once more."  *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017).

404.     Plaintiff Jim Hoft is the founder, owner, and operator of the popular news website The Gateway Pundit, gatewaypundit.com. As of March 2023, The Gateway Pundit is visited about 2.7 million times per day by readers.

405.     Hoft maintains and operates The Gateway Pundit's social-media accounts.  The Gateway Pundit's Twitter account had over 400,000 followers before it was suspended for over a year; since reinstatement, it has about 526,000 followers. Its Facebook account has over 650,000 followers. Its Instagram account has over 205,000 followers. Its YouTube account has over 98,000 followers.  Many of Hoft's social-media followers reside in Louisiana, including in the Western District of Louisiana.

406.     The Gateway Pundit's social-media accounts experience censorship on major social-media platforms, including on topics specifically targeted by the EIP and the VP.  This censorship includes suspensions and deplatforming by Twitter, and censorship on Facebook. Hoft's social-media speech includes speech addressed to audiences targeted on the basis of

86

discriminatory animus by Defendants—such as speech expressing religious beliefs to religious audiences about COVID vaccines, speech about the impact of COVID vaccines on women's reproductive health, and election-related speech from the Chinese-originated publication The Epoch Times, which Defendants target for particular monitoring.

407.     As a result of significant social-media censorship, Hoft engages in self-censorship on social media to avoid more severe penalties.  Furthermore, on information and belief, The Gateway Pundit's readers also self-censor by avoiding re-posting The Gateway Pundit's content to avoid being targeted, suspended, or censored.  Some of Hoft's readers have advised that they avoid sharing The Gateway Pundit's content on Facebook or other social media because it leads to them being suspended for 20-30 days or longer and/or suffering other censorship.

408.     But for Defendants' conduct, Hines and Hoft would not have to self-censor, or self-censor to such a degree, in their speech on social media.

409.     Social-media censorship has inflicted and continues to inflict significant economic injuries and losses on Hoft, who operates The Gateway Pundit as a business and draws significant revenue from his ability to post freely on social media.  Among other things, social-media engagement drives traffic to Hoft's website, which directly impacts advertising revenues.  Social-media censorship throttles engagement and imposes economic injuries on Hoft as a result.

410.     On information and belief, Defendants have instigated and continue to instigate social-media censorship of Hoft's and The Gateway Pundit's speech.  The EIP report mentions Hoft 47 times, identifies him as the "#2 superspreader" of misinformation on Twitter alone, and repeatedly flags his content as supposed "misinformation."  Likewise, the Virality Project also flags Hoft's COVID vaccine-related speech as "misinformation."

411.     Moreover, the EIP's blog posts from the 2022 election cycle indicate that the EIP continued to monitor and target Hoft's speech throughout the 2022 cycle.  *See, e.g.,* Election Integrity Partnership, *Beyond Twitter: The Election 2022 Social Media Ecosystem* (Nov. 5, 2022), *at* https://www.eipartnership.net/blog/2022-election-voter-fraud-influencers-social-media (referring to The Gateway Pundit six times and describing the EIP's monitoring of The Gateway Pundit's content during 2022, including posts through October 31, 2022); *Misinformed Monitors: How Conspiracy Theories Surrounding "Ballot Mules" Led to Accusations of Voter Intimidation* (Nov. 7, 2022), *at* https://www.eipartnership.net/blog/conspiracy-theories-ballot-mules-voter-intimidation (mentioning The Gateway Pundit three times and discussing its social-media posts); *Election Vulnerability Disclosure Becomes Fodder for Dueling Conspiratorial Narratives on Telegram* (Oct. 28, 2022), *at* https://www.eipartnership.net/blog/election-vulnerability-disclosure-conspiratorial-narratives-telegram (mentioning The Gateway Pundit three times).

412.     Hoft is also an avid reader and listener of others' speech on social media, including speech of many speakers targeted for monitoring and censorship in the Election Integrity Partnership report and the Virality Project report. Being able to follow and listen to the speech of others on social media is central to his livelihood.  Censoring the speech of others on social media inflicts severe economic and non-economic injuries on Hoft as well.

413.     Hoft asserts his own First Amendment rights to speak and listen to other speakers on social media, and he asserts the First Amendment rights of his audiences and potential audiences to have access to his speech across social-media platforms.  He asserts his First Amendment right to *interact* with other speakers on social media without restriction, *i.e.*, to "speak and listen, and then … speak and listen once more."  *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017).

414.     On information and belief, the social-media censorship that Hines and Hoft have experienced and continue to experience, both as speaker and audience members, is caused by and traceable to the actions of Defendants and those acting in concert with them.

415.     Hines, Hoft, and Class members suffer ongoing injury in the form of ongoing censorship on social media. They also face imminent future injury from future, additional acts of censorship perpetrated because of Defendants' ongoing unlawful activities.

416.     Hines and Hoft assert an interest in having their speech treated on an equal footing by the social-media platforms, freed from the pressure, coercion, interference, and entanglement of Defendants' in the platforms' content-moderation decisions.

417.     In engaging in the conduct alleged herein in close cooperation with federal officials in agencies like CISA, the CDC, the Surgeon General's Office, and the White House, Defendants leveraged and benefited from the pressure and coercion that federal officials placed and place on social-media platforms to censor disfavored speakers and viewpoints.  As this Court held in *Louisiana v. Biden*, "the social-media companies cooperated due to coercion." Ex. 18, *Louisiana v. Biden*, Doc. 293, at 117.  So also here, the social-media companies cooperate in the EIP/VP, in large part, because of federal coercion and pressure, *i.e.*, "due to coercion."  *Id.*

418.     Such federal coercion by federal officials and agencies is detailed in both Ex. 19, *Louisiana v. Biden*, Doc. 293, and the Fifth Circuit's opinion in *Missouri v. Biden*, 2023 WL 6425697 (5th Cir. Oct. 3, 2023).

419.     In engaging in the conduct alleged herein in close cooperation with federal officials, Defendants are and became deeply entangled in the content-moderation and policy-setting decisions of social-media platforms, along with the federal officials with whom they are intertwined.

420.     In engaging in the conduct alleged herein in close cooperation with federal officials, Defendants were and are pervasively intertwined both with federal agencies and with the social-media platforms themselves.  As this Court held in *Missouri v. Biden*, "CISA and the EIP were completely intertwined."  Ex. 18, at 113.

421.     In engaging in mass-surveillance and mass-flagging operations, Defendants are the "but for" cause of the acts of censorship that they pressure platforms to take.  As Brian Scully testified in his deposition, Defendants' flagging activities *cause* the platforms to censor speech that otherwise would not be censored: "[I]f it hadn't been brought to their attention then they obviously wouldn't have moderated it."

## CLASS ALLEGATIONS

422.     Pursuant to Rule 23(a) and Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, Plaintiffs Hines and Hoft bring this action on behalf of a class of plaintiffs comprising themselves and other persons similarly situated to them.

423.     Plaintiffs propose to define the class ("the Class") as follows: The class of social-media users who have engaged or will engage in, or who follow, subscribe to, are friends with, or are otherwise connected on social media to the account(s) of user(s) who have engaged or will engage in, any speech on any social-media platform(s) that has been or will be censored or suppressed by any platform after Defendants and/or those acting in concert with them have flagged or will flag the speech to the platform(s) for suppression, and/or after Defendants have induced or will induce the platform(s) to censor or suppress the speech.

424.     The Class is sufficiently numerous that joinder of all members is impracticable. On information and belief, Defendants' conduct involves flagging for censorship the speech of hundreds or thousands of speakers, with collectively millions of followers.

90

425.     The Class's claims share questions of law or fact in common, including the question whether the actions of Election Integrity Partnership and Virality Project constitute state action due to the joint participation and/or pervasive involvement of government officials in their activities, and if so, whether those actions violate the civil rights of Plaintiffs and similarly situated class members, among many others.

426.     Hines's and Hoft's claims are typical of those of Class members. The claims of the individual Plaintiffs and the Class members all arise from the same course of conduct by Defendants, *i.e.*, their activities conducted through the so-called "Election Integrity Partnership," the "Virality Project," and similar government/private censorship consortiums. The individual Plaintiffs are not subject to any affirmative defenses that are inapplicable to the rest of the class and likely to become a major focus of the case.

427.     The individual Plaintiffs are willing and able to take an active role in the case, control the course of litigation, and protect the interests of absentees in both classes. No conflicts of interest exist or are likely to develop between the individual Plaintiffs and class members.

428.     The proposed class counsel are the individual Plaintiffs' counsel. The individual Plaintiffs' counsel have extensive experience litigating First Amendment and other civil-rights cases, including class actions. The individual Plaintiffs' counsel have the zeal and competence required to provide adequate representation for both classes.

429.     The proposed Class is defined in terms that are objective and precise.

430.     Defendants have acted on grounds that apply generally to the Class. Consequently, injunctive relief and corresponding declaratory relief is appropriate for the Class as a whole.

431.     Questions of law and fact common to the class members predominate over questions affecting individual members.

432.    A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## PUNITIVE DAMAGE ALLEGATIONS

433.    Defendants intentionally harmed Plaintiffs and Class members without just cause or any adequate justification, and they acted with a deliberate, egregious, and flagrant disregard for the rights of Plaintiffs and Class members. Defendants' conduct was malicious, oppressive, and done in reckless disregard of Plaintiffs' and Class members' rights.

## CLAIMS FOR RELIEF

### COUNT ONE – Civil Rights Conspiracy Under 42 U.S.C. § 1985(3)
### Against All Defendants

434.    The foregoing Paragraphs are incorporated by reference as if set forth fully herein.

435.    Section 1985(3) of Title 42, United States Code, provides:

> If two or more persons in any State or Territory conspire … for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws … in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

436.    Plaintiffs and the Class members enjoy rights to freedom of speech, freedom of expression, freedom of association, freedom to petition the government, and freedom to read and listen to the speech of others on social media and other online discourse that is protected under the First Amendment of the U.S. Constitution, the analogous provisions of state Constitutions, and other provisions of law.

437.    These rights of freedom of speech, freedom of expression, freedom of association, freedom to petition the government, and freedom to read and listen to the speech of others are fundamental rights for the purposes of equal protection analysis because they are deeply rooted in the Nation's history and tradition and they are such that neither justice nor ordered liberty could exist without them.  These rights are also fundamental privileges and immunities under the law.

438.    Plaintiffs and Class members also enjoy rights to equal treatment under the law and to be free from invidious discrimination against protected classes, such as race, religion, national origin, sex, minority and ethnic status, under the Fourteenth Amendment of the U.S. Constitution and other provisions of law.

439.    Defendants and those acting in concert with them, including state, local, and federal government officials, conspired with each other and with others for the purpose of depriving, either directly or indirectly, to deprive Plaintiffs and the Class members of these rights to freedom of speech, freedom of expression, freedom of association, freedom to petition the government, and freedom to read and listen to the speech of others, all on a discriminatory and invidious basis, and thus to deprive them of the equal protection of the laws, and of equal privileges and immunities under the laws.

440.    Defendants and those acting in concert with them, including state, local, and federal government officials, also conspired with each other and with others for the purpose of preventing or hindering the constituted authorities of the States and Territories where Plaintiffs and Class members reside or are located from giving or securing to all persons within such State or Territory the equal protection of the laws, in that they concealed their civil-rights violations from duly constituted State and Territory authorities who would otherwise protect and vindicate such fundamental rights.

441.     Defendants and those acting in concert with them, including state, local, and federal government officials, took many overt acts in furtherance of this conspiracy, as described in detail in this Complaint.

442.     In doing so, Defendants and those acting in concert with them, including state and local government officials, acted under color of law.

443.     Defendants acted on the basis of racial and otherwise class-based invidiously discriminatory animus.  This includes invidious, discriminatory animus on the basis of race, as well as animus on the basis of religion, religious beliefs, sex, minority status, ethnicity, language group, national origin, and disfavored viewpoints.

444.     As a direct result of Defendants' actions, Plaintiffs and Class members were both injured in their property and were deprived of rights and privileges of the United States, including but not limited to the rights to freedom of speech, freedom of expression, freedom of association, freedom to petition the government, and freedom to read and listen to the speech of others on social media, freedom from invidious race- and class-based discrimination, as guaranteed by the First Amendment of the U.S. Constitution, the Fourteenth Amendment of the U.S. Constitution, and analogous provisions of the Constitutions of the States in which Plaintiffs and Class members reside and are located.

445.     Defendants' actions were the cause-in-fact, legal cause, but-for cause, and proximate cause of Plaintiffs' and Class members' injuries.

446.     Defendants intentionally harmed Plaintiffs and Class members without just cause and acted with a deliberate, egregious, and flagrant disregard for the rights of Plaintiffs and Class members. Defendants' conduct was malicious, oppressive, and done in reckless disregard of Plaintiffs' and Class members' clearly established rights.

**COUNT TWO – Deprivation of Rights Under Color of State Law - 42 U.S.C. § 1983
Against All Defendants**

447.     The foregoing Paragraphs are incorporated by reference as if set forth fully herein.

448.     Section 1983 of Title 42 of the United States Code provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…."  42 U.S.C. § 1983.

449.     "The elements under § 1983 are that the conduct (1) deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States and (2) was committed by a person acting under color of state law."  *Guillot on behalf of T.A.G. v. Russell*, 59 F.4th 743, 751 (5th Cir. 2023).

450.     Defendants' conduct deprived and continues to deprive Plaintiffs and Class members of their rights, privileges, and immunities secured by the Constitution and laws of the United States, including their rights to freedom of speech, freedom of expression, freedom of association, freedom to petition the government, freedom to read and listen to the speech of others on social media, and freedom from invidious race- and class-based discrimination, protected by the First and Fourteenth Amendments of the U.S. Constitution and other applicable federal laws; and their rights to equal protection under the laws and equal privileges and immunities under the laws, secured by the Fourteenth Amendment of the U.S. Constitution and other applicable federal laws, including their right to be free from invidious discrimination on the basis of race, religion, religious beliefs, sex, minority status, ethnicity, language group, national origin, and/or disfavored viewpoints.

95

451.     Defendants acted and continue to act under color of State law in depriving Plaintiffs and Class members of their federally protected rights, including by engaging in joint participation with state and local government officials in the activities alleged herein; conspiring with state and local government officials to deprive Plaintiffs and Class members of federally protected rights; significantly encouraging and coercing social-media platforms to censor Plaintiffs' and Class members' speech in violation of their federally protected rights; receiving significant encouragement from state and local government officials to violate Plaintiffs and Class members' federally protected rights; having state officials become entangled in their decisionmaking; having state officials directly involved in carrying out their decisions; and participating in conduct that is pervasively entwined with the activity of state and local government officials in the activities; among others.

452.     Defendants' actions in depriving Plaintiffs and Class members of their federally protected rights inflicted and continue to inflict damages on them, including loss of fundamental freedoms, economic injuries, and non-economic injuries. Defendants' actions are the cause-in-fact, legal cause, but-for cause, and proximate cause of Plaintiffs' and Class members' injuries.

453.     Defendants intentionally harmed and continue to harm Plaintiffs and Class members without just cause and acted with a deliberate, egregious, and flagrant disregard for the rights of Plaintiffs and Class members. Defendants' conduct is malicious, oppressive, and done in reckless disregard of Plaintiffs' and Class members' clearly established rights.

## COUNT THREE – Violation of the First Amendment
### Against All Defendants

454.     The foregoing Paragraphs are incorporated by reference as if set forth fully herein.

455.     In engaging in the conduct alleged herein, Defendants are engaged in government action, both state and federal action, by conspiring with federal and state actors to violate Plaintiffs'

constitutional rights, receiving significant encouragement from such state and federal actors, allowing such state and federal actors to become entangled in their private decisionmaking and to be directly involved in carrying out their decisions, and becoming pervasively intwined with state and federal government actors, among other ways.

456.    In engaging in the conduct alleged herein, Defendants and their federal and state government official co-conspirators and allies have coerced, significantly encouraged, become entangled in the decisionmaking of, become directly involved in carrying the decisions of, and become pervasively intertwined with the social-media platforms in their adoption of content-moderation policies and enforcement of those policies, including against Plaintiffs, their speech, their audiences, and the speech of speakers to whom they listen.

457.    Defendants are thus acting deliberately and intentionally to violate Plaintiffs' rights to freedom of expression and freedom to listen and those of their audiences and speakers to whom they listen, and Defendants are successfully interfering with Plaintiffs' exercise of those rights.

458.    Defendants' conduct constitutes a historic, ongoing, and continuing course of conduct of unconstitutionally inducing platforms to violate Plaintiffs' First Amendment rights, which inflicts past, ongoing, continuous, and imminent future irreparable injury on Plaintiffs, their audiences, the speakers they follow, and class members.

**COUNT FOUR – Tortious Interference with Contractual and Business Relationships Against All Defendants**

459.    The foregoing Paragraphs are incorporated by reference as if set forth fully herein.

460.    Plaintiffs and Class members had and have valid contractual relations, business relations, business expectancies, and similar relationships with social-media platform(s) under which they validly expect to be able to speak, write, read, and listen freely on social media without unlawful or improper interference.

461.     Plaintiffs and Class members had and have valid contractual relations, business relations, business expectancies, and similar relationships with third parties that rely on and require Plaintiffs' and Class members' ability to speak, write, read, listen, and communicate freely with such third parties without unlawful or improper interference.

462.     Defendants and those acting in concert with them knew that Plaintiffs and Class members had and have such contractual relationships, business relationships, business expectancies, and similar relationships with social-media platforms and other third parties and based on their ability to speak, write, read, listen, and communicate freely with others on social media platforms.

463.     Defendants intentionally interfered with such contractual relations, business relations, business expectancies, and similar relationships, by unlawfully and without justification inducing social-media platform(s) to censor or suppress Plaintiffs' and Class members' own speech and content on social media, as well as social-media speech and content that Plaintiffs and Class members had and have valid expectations and legitimate interests in reading and hearing.

464.     Defendants' conduct of interference was and is malicious, intentional, and wanton. Among other things, it involves unjustifiable and unlawful deprivation of fundamental constitutional rights as alleged further in this Complaint; it involves deliberate and intentional content- and viewpoint-based discrimination; it involves invidious discrimination against Plaintiffs, Class members, and their audiences on the basis of race, religion, religious beliefs, sex, minority status, ethnicity, language group, national origin, and disfavored viewpoints; and it was and is done for the deliberate purpose of attempting to evade the restrictions imposed on government officials by the First Amendment and the absence of legal authority to engage in widespread monitoring and censorship activities relating to social-media speech by Americans.

465.     Defendants' conduct was committed without any lawful justification, and Defendants lacked any legal right to engage in the interference alleged herein.

466.     Defendants' conduct of interference with the valid and legitimate contractual relations, business relations, business expectancies, and similar relationships, as alleged herein, has resulted in significant nominal, economic, and non-economic damages to Plaintiffs and Class members. These damages include the deprivation of civil rights, the loss of fundamental freedoms, the loss of profits and economic value from the freedom of engaging in uncensored speech on social media and online platforms, the loss of business and economic opportunities from social-media censorship, and other damages and injuries.

467.     Defendants intentionally harmed Plaintiffs and Class members without just cause and acted with a deliberate, egregious, and flagrant disregard for the rights of Plaintiffs and Class members. Defendants' conduct was malicious, oppressive, and done in reckless disregard of Plaintiffs' and Class members' rights.

**COUNT FIVE – Breach of Duty**
**Against All Defendants**

468.     The foregoing Paragraphs are incorporated by reference as if set forth fully herein.

469.     Defendants and those acting in concert with them, including state, local and federal officials, had and have a clear duty to Plaintiffs and Class members not to interfere unlawfully with their freedom, rights, and ability to speak, write, listen, read, and communicate freely on social media with others, including their fundamental rights to freedom of speech, freedom of expression, freedom of association, and freedom to read and listen to the speech of others, and their fundamental rights to be free from censorship and suppression of social-media speech on the basis of invidious discrimination based on race, religion, religious beliefs, sex, minority status, ethnicity, language group, national origin, and disfavored viewpoints.

470.    Defendants and those acting in concert with them breached and continue to breach this duty by unlawfully and without justification interfering with those rights and interests of Plaintiffs and Class members, and procuring and inducing the censorship and suppression of speech on social media on the basis of viewpoint and discriminatory animus.

471.    Defendants' conduct is the cause-in-fact, legal cause, but-for cause, and proximate cause of Plaintiffs' and Class members' loss of the rights and freedoms and other injuries and damages alleged herein.

472.    As a result of Defendants' conduct, Plaintiffs and Class members have suffered and continue to suffer injuries and losses including loss of fundamental rights and freedoms, economic injuries, loss of economic opportunities, and non-economic injuries, among others.

473.    Defendants intentionally harmed and continue to harm Plaintiffs and Class members without just cause and acted with a deliberate, egregious, and flagrant disregard for the rights of Plaintiffs and Class members. Defendants' conduct is malicious, oppressive, and done in reckless disregard of Plaintiffs' and Class members' clearly established rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of those similarly situated, respectfully pray that this Court grant them the following relief:

A.    Certify the case for class-wide adjudication under Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure;

B.    Declare, pursuant to 28 U.S.C. §§ 2201, 2202, that Defendants' conduct violates the First and Fourteenth Amendments of the United States, 42 U.S.C. § 1985(3), 42 U.S.C. § 1983, common-law doctrines of tortious interference and breach of duty, and other applicable laws;

C.    Preliminarily and permanently enjoin Defendants, their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, from continuing to engage in the ongoing unlawful conduct alleged in this Complaint;

D.    Preliminarily and permanently enjoin Defendants, their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, from taking any steps to procure the censorship of any speech or content on social media by Plaintiffs, Class members, or any speaker they listen to or follow on social media;

E.    Award Plaintiffs and Class members nominal damages for each and every speaker, item, act of social-media content, post, tweet, engagement, comment, liking, reposting, and/or any other act of expression on online or social media that was or would have been made or viewed by any Plaintiff and/or Class member but was or is suppressed or censored in any way in violation of Plaintiffs' and Class members' rights as a result of Defendants' unlawful conduct;

F.    Award compensatory damages appropriate to compensate Plaintiffs' and Class members' monetary losses incurred as a result of Defendants' unlawful conduct;

G.    Award compensatory damages appropriate to compensate Plaintiffs' and Class members' non-economic injuries sustained as a result of Defendants' unlawful conduct;

H.    Award punitive damages appropriate to punish and deter similar unlawful conduct by Defendants and others that are commensurate to the egregious, intentional, widespread, and systematic civil-rights violations and tortious conduct perpetrated by Defendants;

I.    Award Plaintiffs and Class members reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988 and other applicable fee-shifting provisions; and

J.    Grant such other and further relief as the Court deems just and proper.

Dated: October 17, 2023                              Respectfully submitted,

| AMERICA FIRST LEGAL | JAMES OTIS LAW GROUP, LLC |
|---|---|
| */s/* Gene P. Hamilton<br>Gene P. Hamilton, GA Bar No. 516201*<br>Reed D. Rubinstein, DC Bar No. 400153*<br>Nicholas R. Barry, TN Bar No. 031963*<br>Michael Ding, DC Bar No. 1027252*<br>Juli Z. Haller, DC Bar No. 466921*<br>James K. Rogers, AZ Bar No. 027287*<br>Andrew J. Block, VA Bar No. 91537*<br>611 Pennsylvania Ave SE #231<br>Washington, DC 20003<br>(202) 964-3721<br>gene.hamilton@aflegal.org<br>reed.rubinstein@aflegal.org<br>nicholas.bary@aflegal.org<br>michael.ding@aflegal.org<br>juli.haller@aflegal.org<br>james.rogers@aflegal.org<br>andrew.block@aflegal.org | */s/ D. John Sauer*<br>D. John Sauer, Mo. Bar No. 58721*<br>Justin D. Smith, Mo. Bar No. 63253*<br>13321 North Outer Forty Road, Suite 300<br>St. Louis, Missouri 63017<br>(314) 562-0031<br>John.Sauer@james-otis.com<br><br>* admitted *pro hac vice*<br><br>LANGLEY & PARKS, LLC<br><br>By: */s/ Julianna P. Parks*<br>Julianna P. Parks, Bar Roll No. 30658<br>4444 Viking Drive, Suite100<br>Bossier City, Louisiana 71111<br>(318) 383-6422 Telephone<br>(318) 383-6405 Telefax<br>jparks@langleyparks.com |

**CERTIFICATE OF SERVICE**

I hereby certify that on October 17, 2023, a true and correct copy of the foregoing was

filed electronically with the Court's CM/ECF system to be served electronically on counsel of

record for all Defendants who have entered in the case.

*/s/ D. John Sauer*