**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION**

JILL HINES, et al.,

        *Plaintiffs*,

  v.

ALEX STAMOS, et al.,

        *Defendants*.

Case No. 3:23-cv-00571-TAD-KDM

**PLAINTIFFS' RESPONSE TO DEFENDANTS' JOINT MOTION TO DISMISS**

### TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION .............................................................................................................. 1

LEGAL STANDARDS ....................................................................................................... 2

ARGUMENT ..................................................................................................................... 3

    I.   Personal Jurisdiction Exists Over All Defendants. ................................................ 3

       A.   Defendants have sufficient "minimum contacts" with Louisiana ............................ 4

       B.   The Assertion of Personal Jurisdiction in Louisiana Is Fair and Reasonable........ 14

    II.  Plaintiffs Have Standing. ................................................................................... 16

       A.   Plaintiffs Have an Article III Interest in Participating in Social-Media Speech Freed From Defendants' Interference. ................................................................. 17

       B.   Defendants Fail to Address Plaintiffs' Self-Censorship Injuries, Which Independently Satisfy Article III. ...................................................................... 18

       C.   Defendants Specifically Target Both Jill Hines and Jim Hoft. ............................. 19

       D.   Defendants' "Independent Action" Argument Fails............................................. 21

       E.   Defendants Have a "Coercive" and "Determinative" Effect on Censorship......... 24

       F.   The Individual Defendants Directed and Controlled Defendants' Actions. ........... 27

    III.  Venue Is Proper in the Western District of Louisiana. ................................................ 28

    IV.  The Complaint States Valid Claims For Relief. ......................................................... 29

       A.   Defendants' First Amendment Defense Is Meritless........................................... 29

       B.   The Complaint States a Valid Claim Under 42 U.S.C. § 1985(3). .......................... 34

       C.   The Complaint Alleges a Valid Claim Under 42 U.S.C. § 1983. ........................... 45

       D.   The Complaint States Valid State-Law Claims. ................................................... 60

       E.   The Individual Defendants Should Not Be Dismissed. ......................................... 64

CONCLUSION ................................................................................................................ 64

CERTIFICATE OF SERVICE ......................................................................................... 66

## TABLE OF AUTHORITIES

**Cases**

Adickes v. S. H. Kress & Co.,
  398 U.S. 144 (1970) ................................................................. 33, 53
Ainsworth v. Moffett Eng'g, Ltd.,
  716 F.3d 174 (5th Cir. 2013)......................................................... 13
Arabie v. CITGO Petroleum Corp.,
  89 So. 3d 307 (La. 2012)............................................................ 61
Armstrong v. Ashley,
  2023 WL 2005263 (5th Cir. 2023).................................................. 50
Asahi Metal Indus. Co. v. Superior Court,
  480 U.S. 102 (1987) .................................................................. 13
Ashcroft v. Iqbal,
  556 U.S. 662 (2009) ............................................................... 3, 20
Bantam Books, Inc. v. Sullivan,
  372 U.S. 58 (1963) .................................................................... 42
Bd. of Trustees of Univ. of Alabama v. Garrett,
  531 U.S. 356 (2001) .................................................................. 60
Bennett v. Spear,
  520 U.S. 154 (1997) .............................................................. 24, 25
Biakanja v. Irving,
  320 P.2d 16 (Cal. 1958) .............................................................. 63
Boyce v. Andrew,
  510 F.3d 1333 (11th Cir. 2007)...................................................... 33
Bray v. Alexandria Women's Health Clinic,
  506 U.S. 263 (1993) ........................................................ 38, 41, 44
Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n,
  531 U.S. 288 (2001) .............................................................. 54, 55
Brown v. Flowers Industries, Inc.
  688 F.2d 328 (5th Cir. 1982)........................................................ 13
Bryan v. City of Madison,
  213 F.3d 267 (5th Cir. 2000)........................................................ 41
Buchanan v. City of New York,
  556 F. Supp. 3d 346 (S.D.N.Y. 2021)............................................... 33
Burger King Corp. v. Rudzewicz,
  471 U.S. 462 (1985) .................................................................. 11
Calder v. Jones,
  465 U.S. 783 (1984) ................................................................ 5, 8
Cantu v. Moody,
  933 F.3d 414 (5th Cir. 2019)........................................................ 43
Carmona v. Leo Ship Mgmt., Inc.,
  924 F.3d 190 (5th Cir. 2019)......................................................... 3

*Cedillo v. Standard Oil Co. of Tex.*,
  261 F.2d 443 (5th Cir. 1958) ............................................................................... 2
*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ......................................................................................... 19
*Collins v. Womancare*,
  878 F.2d 1145 (9th Cir. 1989) ........................................................................... 53
*Corey Airport Servs., Inc. v. City of Atlanta*,
  No. 1:04-CV-3243-CAP, 2005 WL 8158628 (N.D. Ga. July 15, 2005) ................................ 31
*Council for Periodical Distribs. Ass'n v. Evans*,
  642 F.Supp. 552 (M.D. Ala. 1986) ....................................................................... 18
*Crompton Corp. v. Clariant Corp.*,
  221 F. Supp. 2d 683 (M.D. La. 2002) ............................................................... 13, 14
*Crowe v. Lucas*,
  595 F.2d 985 (5th Cir. 1979) .......................................................................... 49, 50
*Danziger & De Llano, L.L.P. v. Morgan Verkamp, L.L.C.*,
  24 F.4th 491 (5th Cir. 2022) ............................................................................ 3, 11
*Defense Distributed v. Grewal*,
  971 F.3d 485 (5th Cir. 2020) ..................................................... 3, 4, 5, 6, 7, 11, 14
*DeJoria v. Maghreb Petroleum Expl., S.A.*,
  804 F.3d 373 (5th Cir. 2015) ............................................................................... 14
*Dennis v. Sparks*,
  449 U.S. 24 (1980) ........................................................................................... 53
*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019) ...................................................................................... 26
*Dietz v. Dietz*,
  2009 WL 2707402 (W.D. La. Aug. 27, 2009) ............................................................ 9
*Dombroski v. Pfister*,
  380 U.S. 479 (1965) .......................................................................................... 42
*Dykes v. Hosemann*,
  743 F.2d 1488 (11th Cir. 1984) ........................................................................... 49
*Electronic Frontier Found. v. Global Equity Mgmt. (SA) Pty Ltd.*,
  290 F. Supp. 3d 923 (N.D. Cal. 2017) ..................................................................... 9
*Elrod v. Burns*,
  427 U.S. 347 (1976) .......................................................................................... 26
*Ex parte Young*,
  209 U.S. 123 (1908) .......................................................................................... 56
*Frazier v. Bd. of Trustees of Nw. Miss. Reg'l Med. Ctr.*,
  765 F.2d 1278 (5th Cir. 1985) ............................................................................ 53
*Frederick Douglass Foundation, Inc. v. District of Columbia*,
  No. 21-7108, 2023 WL 5209556 (D.C. Cir. Aug. 15, 2023) .......................................... 41
*Gallagher v. Neil Young Freedom Concert*,
  49 F.3d 1442 (10th Cir. 1995) ............................................................................ 53
*Hawbecker v. Hall*,
  88 F.Supp.3d 723 (W.D. Tex. 2015) ...................................................................... 29
*Hoai v. Vo*,
  935 F.2d 308 (D.C. Cir. 1991) ............................................................................. 53

iv

*Hobbs v. Hawkins,*
  968 F.2d 471 (5th Cir. 1992)......................................................................................... 49

*Holdiness v. Stroud,*
  808 F.2d 417 (5th Cir. 1987)......................................................................................... 38

*Hughes v. Superior Court of California,*
  339 U.S. 460 (1950)....................................................................................................... 34

*Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement,*
  326 U.S. 310 (1945) ........................................................................................................ 4

*Ixchel Pharma, LLC v. Biogen, Inc.,*
  470 P.3d 571 (Cal. 2020) ............................................................................................. 61

*Jackson v. Pantazes,*
  810 F.2d 426 (4th Cir. 1987).......................................................................................... 53

*Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.,*
  968 F.2d 286 (2d Cir. 1992).......................................................................... 31, 32, 34, 43

*Keeton v. Hustler Magazine, Inc.,*
  465 U.S. 770 (1984)......................................................................................................... 8

*Kentucky v. Graham,*
  473 U.S. 159 (1985) ...................................................................................................... 56

*King v. Dogan,*
  31 F.3d 344 (5th Cir. 1994)............................................................................................. 2

*Kowalski v. Tesmer,*
  543 U.S. 125 (2004) .............................................................................................. 42, 43

*Laird v. Tatum,*
  408 U.S. 1 (1972) .......................................................................................................... 19

*Lee v. Driscoll,*
  871 F.3d 581 (8th Cir. 2017).......................................................................................... 33

*Lichtman v. Siemens Indus. Inc.,*
  224 Cal. Rptr. 3d 725 (Cal. App. 2017) ....................................................................... 63

*Louisiana Division of Sons of Confederate Veterans v. City of Natchitoches,*
  370 F. Supp. 3d 692 (W.D. La. 2019) ........................................................................... 52

*Lugar v. Edmonson Oil Company,*
  457 U.S. 922 (1982) .............................................................................................. 45, 46

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ...................................................................................................... 21

*Luv N' Care, Ltd. v. Insta-Mix, Inc.,*
  438 F.3d 465 (5th Cir. 2006)......................................................................................... 13

*McCarthy ex rel. Travis v. Hawkins,*
  381 F.3d 407 (5th Cir. 2004).......................................................................................... 56

*Mississippi Interstate Express, Inc. v. Transpo, Inc.,*
  681 F.2d 1003 (5th Cir. 1982)....................................................................................... 13

*Missouri v. Biden,*
  2023 WL 4335270 (W.D. La. July 4, 2023) ..................... 17, 21, 23, 24, 27, 38, 44, 52, 54, 57

*Missouri v. Biden,*
  No. 23-30445, 2023 WL 6425697 (5th Cir. Oct. 3, 2023). 16, 17, 18, 19, 22, 23, 26, 46, 50, 51, 55, 58, 59

v

*Missouri v. Biden,*
No. 3:22-cv-01213, 2023 WL 2578260 (W.D. La. Mar. 20, 2023) ........................... 2, 3, 15, 17

*N.J. Bankers Ass'n v. Att'y Gen.,*
49 F.4th 849 (3d Cir. 2022).................................................................................. 42

*NCAA v. Tarkanian,*
488 U.S. 179 (1988) ............................................................................................ 52

*NetChoice, L.L.C. v. Paxton,*
49 F.4th 439 (5th Cir. 2022)..................................................................... 25, 30, 31, 59

*NetChoice, LLC v. Moody,*
546 F. Supp. 3d 1082 (N.D. Fla. 2021) ................................................................. 25, 59

*Nevada Dep't of Hum. Res. v. Hibbs,*
538 U.S. 721 (2003) ............................................................................................ 60

*O'Handley v. Weber,*
62 F.4th 1145 (9th Cir. 2023)............................................................................... 18

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.,*
791 P.2d 587 (Cal. 1990) ..................................................................................... 62

*Panda Brandywine Corp. v. Potomac Elec. Power Co.,*
253 F.3d 865 (5th Cir. 2001).................................................................................. 3

*Penkoski v. Bowser,*
548 F. Supp. 3d 12 (D.D.C. 2021) ........................................................................ 33

*Pfannstiel v. City of Marion,*
918 F.2d 1178 (5th Cir. 1990)............................................................................... 50

*Rawson v. Recovery Innovations, Inc.,*
975 F.3d 742 (9th Cir. 2020)................................................................................. 53

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015) ............................................................................................ 41

*Regan v. Taxation With Representation of Washington,*
461 U.S. 540 (1983) ........................................................................................ 44, 59

*Regents of Univ. of California v. Superior Ct.,*
413 P.3d 656 (Cal. 2018) ..................................................................................... 63

*Rumsfeld v. Found. for Acad. & Institutional Rts., Inc.,*
547 U.S. 47 (2006) .............................................................................................. 16

*Rush v. Savchuk,*
444 U.S. 320 (1980) ............................................................................................ 10

*Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.,*
9 F.3d 415 (5th Cir. 1993).................................................................................... 13

*Sangha v. Navig8 ShipManagement Priv. Ltd.,*
882 F.3d 96 (5th Cir. 2018).................................................................... 9, 10, 14, 15, 16

*Shaw v. Villanueva,*
918 F.3d 414 (5th Cir. 2019)................................................................................. 49

*Southern U.S. Trade Ass'n v. Unidentified Parties,*
2011 WL 2457859 (E.D. La. June 16, 2011) ......................................................... 29

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
600 U.S. 181 (2023) (Thomas, J., concurring)....................................................... 41

*SwissDigital USA Co. v. Wenger S.A.,*
No. 6:21-CV-00453, 2022 WL 1477625 (W.D. Tex. May 10, 2022)........................... 2

*Trask v. Peake,*
    1992 WL 59389 (E.D. La. Mar. 17, 1992) ........................................................ 9

*United States v. Taren-Palma,*
    997 F.2d 525 (9th Cir. 1993) ........................................................................ 39

*United States v. Veneri,*
    635 F. Supp. 1259 (M.D.N.C. 1986) .............................................................. 39

*United States v. Wilson,*
    154 F.3d 658 (7th Cir. 1998) ........................................................................ 31

*Walden v. Fiore,*
    571 U.S. 277 (2014) ..................................................................... 10, 11, 13

*Warth v. Seldin,*
    422 U.S. 490 (1975) ...................................................................................... 43

*Washington v. Davis,*
    426 U.S. 229 (1976) ...................................................................................... 60

*West v. Atkins,*
    487 U.S. 42 (1988) ........................................................................................ 45

*Wickersham v. City of Columbia,*
    481 F.3d 591 (8th Cir. 2007) ........................................................................ 34

*Wien Air Alaska, Inc., v. Brandt,*
    195 F.3d 208 (5th Cir. 1999) ...................................................................... 5, 7

*Woods v. Edwards,*
    51 F.3d 577 (5th Cir. 1995) .......................................................................... 64

*World-Wide Volkswagen Corp. v. Woodson,*
    444 U.S. 286 (1980) ...................................................................................... 13

*X-Men Sec., Inc. v. Pataki,*
    196 F.3d 56 (2d Cir. 1999) ............................................................................ 32

*Zimmerman v. City of Austin, Tex.,*
    881 F.3d 378 (5th Cir. 2018) ........................................................................ 19

## Constitutional Provisions

La. Const. art. I, § 7 ......................................................................................... 15

## Statutes

28 U.S.C. § 1391 ................................................................................................ 28
42 U.S.C. § 1985 .......................................................................................... 43, 44
La. Civ. Code Ann. art. 3542 ........................................................................... 61
La. Rev. Stat. § 13:3201 ..................................................................................... 3

## Other Authorities

14D Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §
    3806.1 (3d ed. 2004) .................................................................................. 29

## INTRODUCTION

Defendants' Joint Motion to Dismiss, Doc. 70, 70-1, is meritless.  It ignores the Complaint's extensive, detailed factual allegations.  These allegations raise compelling inferences supporting Defendants' liability for the claims asserted.

Regarding personal jurisdiction, the Complaint alleges that Defendants conducted a deliberate campaign to interfere with the freedom of speech of Louisiana speakers to Louisiana audiences, which establishes minimum contacts with the forum.

Plaintiffs have Article III standing because Defendants are the direct and but-for cause of past, ongoing, and imminent future acts of censorship against them and their audiences.

Defendants' First Amendment defense is meritless because the First Amendment does not protect a right to censor others, to conspire with government officials to violate others' civil rights, or to coerce platforms to censor speech; and state actors like Defendants lack First Amendment rights in the conduct that constitutes state action in any event.

Plaintiffs raise a valid claim under 42 U.S.C. § 1985(3) because Defendants conspire with government officials and engage in racial animus against Black, Chinese, and Hispanic speakers and audiences.  Defendants contend that their explicitly *racially* targeted censorship is benign, but that does not make it constitutional.

Plaintiffs also raise a valid claim under 42 U.S.C § 1983.  Defendants are engaged in state action because they conspire with government officials, they receive significant encouragement from them, they allow those officials to become entangled in their decisionmaking processes and to become involved in carrying out those decisions, and government officials are pervasively entwined with them.  Plaintiffs also allege First Amendment violations because Defendants and

1

their government allies coerce, significantly encourage, become entangled with, and are directly involved in carrying out the content-moderation decisions of the social-media platforms.

All Defendants' other arguments are meritless.  The Motion to Dismiss should be denied.

## **LEGAL STANDARDS**

As an initial matter, Plaintiffs have now filed their First Amended Complaint as of right. ("Complaint" or "FAC").  The filing of the First Amended Complaint renders Plaintiffs' pending motions to dismiss moot.  "Plaintiff's amended complaint renders the original complaint of no legal effect because the amended complaint does not refer to, adopt, or incorporate by reference the original complaint. Generally, an amended complaint renders pending motions moot." *SwissDigital USA Co. v. Wenger S.A.*, No. 6:21-CV-00453, 2022 WL 1477625, at *1 (W.D. Tex. May 10, 2022) (citing *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994), and *Cedillo v. Standard Oil Co. of Tex.*, 261 F.2d 443 (5th Cir. 1958)).  Plaintiffs must now re-file their motions to dismiss or file a responsive pleading to the new operative Complaint.  *See id.*

If the Court nevertheless considers Defendants' motion to dismiss, the legal standards that apply are well-settled.  Regarding Defendants' challenge to Article III standing, "[a] defect in the court's Article III or constitutional standing implicates the court's subject-matter jurisdiction and, therefore, is properly raised by a party via Rule 12(b)(1)."  *Missouri v. Biden*, No. 3:22-cv-01213, 2023 WL 2578260, at *7 (W.D. La. Mar. 20, 2023).  "When deciding a motion to dismiss for want of standing, the trial court must 'accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'"  *Id.* at *8 (citation omitted).

Regarding Defendants' challenge to personal jurisdiction, "[p]ersonal jurisdiction exists where the forum state's long-arm statute extends to the nonresident defendant and the exercise of jurisdiction comports with due process."  *Defense Distributed v. Grewal*, 971 F.3d 485, 490 (5th

Cir. 2020) (quoting *Carmona v. Leo Ship Mgmt., Inc.*, 924 F.3d 190, 193 (5th Cir. 2019)).  Here, Louisiana's long-arm statutes authorizes the exercise of personal jurisdiction to the extent permitted by the Due Process Clause.  *See* La. Rev. Stat. § 13:3201(B).  "Because [Louisiana's] long-arm statute is coextensive with the Due Process Clause of the Fourteenth Amendment, the two inquiries merge."  *Defense Distributed*, 971 F.3d at 490.

When personal jurisdiction is challenged "[a]t the motion to dismiss stage, the plaintiffs bear the burden of presenting sufficient evidence to support a *prima facie* case of jurisdiction."  *Id.* (emphasis added).  The court "accept[s] the plaintiff's uncontroverted, nonconclusional factual allegations as true and resolve[s] all controverted allegations in the plaintiff's favor."  *Id.* (quoting *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 868 (5th Cir. 2001)); *Danziger & De Llano, L.L.P. v. Morgan Verkamp, L.L.C.*, 24 F.4th 491, 495 (5th Cir. 2022).

Regarding Defendants' challenges under Rule 12(b)(6), "[t]o withstand a motion to dismiss, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Missouri*, 2023 WL 2578260, at *8 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim is facially plausible when it contains sufficient factual content for the court 'to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id.*  "Plausibility simply calls for enough factual allegations to raise a reasonable expectation that discovery will reveal evidence to support the elements of the claim."  *Id.*

## ARGUMENT

### I.    Personal Jurisdiction Exists Over All Defendants.

"The constitutional requirement for specific jurisdiction is that the defendant has 'minimum contacts' with the forum state such that imposing a judgment would not 'offend traditional notions of fair play and substantial justice.'"  *Defense Distributed*, 971 F.3d at 490

3

(quoting *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945)).  The Fifth Circuit "has framed the inquiry as a three-step analysis: "(1) whether the defendant has minimum contacts with the forum state, *i.e.*, whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable."  *Id.*

## A.   Defendants have sufficient "minimum contacts" with Louisiana.

Here, the Complaint alleges that Defendants have extensive contacts with Louisiana giving rise to Plaintiffs' claims.  The Complaint alleges extensive, deliberate, intentional conduct directed to Louisiana and its residents.  *See* First Amended Complaint, ("FAC"), ¶¶ 362-89.

### 1.   Defendants' conduct is intentionally directed at Louisiana.

The Complaint alleges that Defendants deliberately monitored and tracked speech on social media by Louisiana residents like Jill Hines and many others, *id.* ¶ 378; that much of this speech, including Hines's speech about organizing to lobby the Louisiana legislature, was of specific interest and relevance to Louisiana residents, *id.* ¶ 379; Defendants intentionally sought to silence that speech, including the speech of Plaintiffs Hines and Hoft, by preventing it from reaching other Louisiana residents, *id.* ¶ 381; Defendants communicated with both government officials in Louisiana and social-media platforms about Plaintiffs' and others' speech occurring in Louisiana for the purpose of silencing that speech in Louisiana and preventing Louisianans from having access to it, *id.* ¶ 382; Defendants compelled those third parties to censor that speech in Louisiana, thus intentionally preventing it from reaching Louisiana residents, *id.* ¶ 383; Defendants inflicted injuries that affected hundreds of thousands of Louisiana residents, *id.* ¶ 384; and the brunt of those

injuries, especially as to Hines' speech, was felt in Louisiana, *id.* ¶ 384.  The Complaint alleges that Defendants even dedicated specific analyst(s) to track speech in Louisiana and ensure control over which narratives would reach Louisiana residents.  *Id.* ¶ 378.

Through this course of conduct, Defendants targeted Jill Hines's speech in particular, and repeatedly induced platforms to silence her and shut down her attempts organize Louisiana residents for political purposes.  *Id.* ¶ 385.  Similarly, Defendants deliberately monitored, tracked, and targeted Jim Hoft's speech to ensure that it would not reach his substantial audiences in Louisiana and elsewhere.  *Id.* ¶ 386.  In doing so, they influenced and restricted what hundreds of thousands of Louisianans could view on social media.  *Id.* ¶ 387.  They did all these things deliberately, intending to restrict free expression between and among Louisiana residents, *id.* ¶ 388; and they restricted both the circulation of Plaintiffs' own speech, thus injuring Plaintiffs and their Louisiana audiences, and the circulation of the speech of other speakers, including Louisiana speakers, to whom Plaintiffs would otherwise listen, *id.* ¶ 388.  These actions, taken together, establish beyond doubt that Defendants are "purposely availing [themselves] of 'the privilege of causing a consequence' in [Louisiana].'"  *Defense Distributed*, 971 F.3d at 494 (quoting *Wien Air Alaska, Inc., v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999)).

## 2.    Speech-related cases strongly support personal jurisdiction here.

Cases involving the circulation of speech—such as *Defense Distributed* and *Calder v. Jones*, 465 U.S. 783 (1984)—strongly support a finding of personal jurisdiction here.  In these cases, where a defendant outside the forum deliberately engages in a course of conduct that is intentionally designed to cause or restrict the publication of speech to persons within the forum, that conduct constitutes sufficient "minimum contacts" in the forum.

First, in *Defense Distributed*, a Texas-based online publisher of firearm-related materials sued the Attorney General of New Jersey, alleging that that the Attorney General had engaged in a course of conduct entirely outside Texas that was designed to silence his speech to other Texas residents.  971 F.3d at 489.  These actions included "(1) sending a cease-and-desist letter threatening legal action if Defense Distributed published its files; (2) sending letters to third-party internet service providers based in California urging them to terminate their contracts with Defense Distributed; (3) initiating a civil lawsuit against Defense Distributed in New Jersey; and (4) threatening Defense Distributed with criminal sanctions at a live press conference."  *Id.*  The intended effect of this out-of-state campaign was to "cause[] Defense Distributed to cease publication of its materials," including inside Texas.  *Id.*

The Fifth Circuit held that the New Jersey Attorney General was subject to personal jurisdiction in Texas court.  *Id.* at 497.  The Fifth Circuit acknowledged that the Attorney General's conduct had occurred entirely outside the State of Texas, and that the sole action targeted directly into Texas—sending a cease-and-desist letter by a government official—was insufficient to create minimum contacts standing alone.  *Id.* at 491-92.  Nevertheless, the Fifth Circuit emphasized that the Attorney General's course of conduct was deliberately crafted to injure the speaker and its audiences located in the State of Texas.  *Id.* at 492.  The Court pointed out that the Attorney General "does not cabin his request by commanding the plaintiffs to stop publishing materials to New Jersey residents; he instead demands that the plaintiffs cease publication of their materials generally," *id.*—including to Texas residents.  The Attorney General's "conduct … confirms his intent to crush Defense Distributed's operations and not simply limit the dissemination of digital files in New Jersey."  *Id.* at 493.  Thus, the defendant—though operating from afar, outside the forum—deliberately attempted to block the dissemination of a Texas-based speaker's content to

his Texas-based audiences: "Grewal seeks to bar Defense Distributed from publishing its materials anywhere, not just in New Jersey. Grewal … has projected himself across state lines and asserted a pseudo-national executive authority…." *Id.* at 493. "These activities had foreseeable effects in the forum and were directed at the forum." *Id.*

Thus, it was not merely "fortuitous that the victim's zip code was in Texas," *id.* at 494 (quoting *Wien Air Alaska*, 195 F.3d at 213). Instead, the plaintiffs "allege[d] that Grewal's letter had a chilling effect on the exercise of their First Amendment rights (among other constitutional and Texas law violations). That chilling effect, in turn, caused them to cease publication and reduced Texans' access to the materials the plaintiffs seek to publish…. In this sense, Grewal created contacts with Texas and not just the plaintiffs." *Id.* at 495. So also here, where Defendants planned and intended that harm should occur in Louisiana and affect Louisiana residents on Louisiana-specific topics of speech, it is not unfair to subject Defendants to suit in Louisiana. "The foreseeable effects of a tort are to be assessed as part of the analysis of the defendant's relevant contacts with the forum." *Id.* at 495-96 (quoting *Wien Air Alaska*, 195 F.3d at 211). Like the Attorney General in *Defense Distributed*, Defendants "projected [themselves] across state lines and asserted a pseudo-national … authority" over speech by and to Louisianans. *Id.* at 493.

In upholding personal jurisdiction in *Defense Distributed*, the Fifth Circuit likened the case to *Calder v. Jones*, which addressed personal jurisdiction in the related context of libel. *See id.* at 495. As the Fifth Circuit noted, "[c]ensorship, like libel, is damaging not just to the speaker, but to surrounding audiences. And like libel, censorship's harm occurs not just where it originates, but where it arrives." *Id.* at 495 n.9. In *Calder*, the Supreme Court upheld personal jurisdiction in California against a Florida-based publisher that had limited contacts with California but circulated a magazine in California to 600,000 California residents containing allegedly libelous speech

against the plaintiff.  465 U.S. at 790.  The Supreme Court upheld personal jurisdiction on the

ground that the defendant had purposely targeted the California plaintiff with the libelous speech

and ensured its wide publication in the forum state: "[P]etitioners are primary participants in an

alleged wrongdoing intentionally directed at a California resident, and jurisdiction over them is

proper on that basis." *Id.*  The fact that the defendants were deliberately targeting the California

plaintiff with publication of speech to a California audience was critical:

> [P]etitioners are not charged with mere untargeted negligence. Rather, their
> intentional, and allegedly tortious, actions were expressly aimed at California.
> Petitioner South wrote and petitioner Calder edited an article that they knew would
> have a potentially devastating impact upon respondent. And they knew that the
> brunt of that injury would be felt by respondent in the State in which she lives and
> works and in which the *National Enquirer* has its largest circulation.  Under the
> circumstances, petitioners must "reasonably anticipate being haled into court there"
> to answer for the truth of the statements made in their article.

*Id.* at 789-90.  So also here, Defendants' "intentional actions were aimed at [Louisiana]," *id.*; their

censorship "would have a devastating impact upon" Plaintiffs, including Jill Hines, *id.*; Defendants

"knew that the brunt of that [censorship] injury would be felt by [Plaintiff] in the State in which

she lives and works," *id.*; and the censorship blocked the "large[] circulation" of both Hines' and

Hoft's speech that would otherwise have been achieved in Louisiana, *id.*  As in *Calder*, "[a]n

individual injured in California need not go to Florida to seek redress from persons who, though

remaining in Florida, knowingly cause the injury in California." *Id.* at 790.  Here, Louisiana "is

the focal point of both the [censorship] and of the harm suffered.  Jurisdiction over [Defendants]

is therefore proper in [Louisiana] based on the 'effects' of their [out-of-state] conduct in

[Louisiana]." *Id.* at 789.

Other cases are in accord.  *See, e.g., Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781

(1984) ("Where, as in this case, respondent … has continuously and deliberately exploited the

New Hampshire market, it must reasonably anticipate being haled into court there in a libel action

based on the contents of its magazine."); *Trask v. Peake*, 1992 WL 59389, at *1 (E.D. La. Mar. 17, 1992) ("An action based upon an intentional tort of defamation which had consequences within the state can suffice as a basis for personal jurisdiction in a suit arising from those consequences, if the resulting consequences could have reasonably been expected to follow from the defendant's conduct…."); *Dietz v. Dietz*, 2009 WL 2707402, at *4 (W.D. La. Aug. 27, 2009) ("When a nonresident defendant commits an act outside the state that causes tortious injury within the state, that tortious conduct amounts to sufficient minimum contacts with the state by the defendant to constitutionally permit courts within that state to exercise personal specific jurisdiction."); *Electronic Frontier Found. v. Global Equity Mgmt. (SA) Pty Ltd*., 290 F. Supp. 3d 923, 939 (N.D. Cal. 2017).

### 3.    Defendants' cases are factually off-point and distinguishable.

The cases on which Defendants rely are inapposite.  Plaintiffs rely most heavily on *Sangha*, *see* Doc. 71, at 9, 13-14, but that case bears no resemblance to the facts here.  In *Sangha v. Navig8 ShipManagement Priv. Ltd.*, a Texas-based ship captain who had previously been involved in a ship collision sued his former employer for reaching out to his current employer to object to the captain's involvement in a maneuver between ships that might result in another collision.  882 F.3d 96, 98-99 (5th Cir. 2018).  The email between the employers occurred outside Texas, but it related to a ship maneuver that would occur in the Gulf of Mexico near Texas.  *See id.  Sangha* had nothing to do with the circulation of speech in the forum.  *Id.*  The Fifth Circuit held that personal jurisdiction was lacking because there was nothing Texas-directed about the defendant's conduct; the defendant's objection to the captain's involvement in the ship maneuver had nothing to do with its alleged proximity to Texas.  *See id.* at 103.  The email communications from "outside the country" to "Alabama" were thus "legally insufficient to support a finding of specific

9

jurisdiction," because it was "merely fortuitous" that they impacted the plaintiff in Texas.  *Id.* at

103.  "Sangha's presence in the Gulf of Mexico/Port of Houston is largely a consequence of *his*

relationship with the forum, and not of any actions Navig8 took to establish contacts with the

forum."  *Id.* at 104.  Here, the opposite is true.  It is not "random, fortuitous, or attenuated" that

Defendants injured Plaintiffs (and hundreds of thousands of others) in Louisiana; Defendants

conducted a deliberate campaign to monitor speech in Louisiana, to target speech in Louisiana,

and to ensure that Louisiana-based speech on Louisiana-specific topics by Louisiana residents

would not reach other Louisiana residents.  FAC, ¶¶ 376-89.  This is the antithesis of a "random"

or "fortuitous" connection to Louisiana.

Defendants also rely heavily on *Walden v. Fiore*, 571 U.S. 277 (2014), but that case affords

them no support.  In *Walden*, a Georgia-based law enforcement officer seized cash from Nevada

residents as they passed through Georgia, and allegedly submitted false information to prosecutors

in Georgia to justify retaining the cash in Georgia.  *Id.* at 279-81.  The only impact of defendant's

conduct on Nevada was that, after their cash was seized, plaintiffs traveled to Nevada and thus felt

their injury (loss of money) in Nevada.  *Id.*  There was, therefore, nothing Nevada-directed or

Nevada-specific about the defendant's conduct; plaintiffs would have felt that same injury

(deprivation of money) if they had traveled to any other State in the Union.  *Id.*

*Walden* held that, "[b]ecause the defendant had no other contacts with Nevada, and because

a plaintiff's contacts with the forum State cannot be 'decisive in determining whether the

defendant's due process rights are violated,'" "that the court in Nevada may not exercise personal

jurisdiction under these circumstances."  *Id.* at 279 (quoting *Rush v. Savchuk*, 444 U.S. 320, 332

(1980)).  Instead "the relationship must arise out of contacts that the 'defendant *himself*' creates

with the forum State."  *Id.* at 284 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475

(1985)).  Again, *Walden* bears no resemblance to this case.  Here, Defendants did not injure Plaintiffs in some other State, who then happened to carry those injuries with them to Louisiana. Instead, Defendants monitored, tracked, and targeted speech in Louisiana and engaged in a Louisiana-directed campaign to silence that speech in Louisiana and prevent it from reaching Louisiana audiences.  The Complaint alleges an extensive campaign that was intentionally directed at Louisiana that includes Defendants' extensive "contacts with the forum State [that are] intertwined with [their] transactions or interactions with the plaintiff[s] or other parties" in Louisiana. *Id.* at 286.

Defendants also cite *Danziger & De Llano*, Doc. 70-1, but that case is plainly distinguishable.  *Danziger* addressed a fee dispute between a Texas-based law firm and its non-Texas co-counsel concerning a fee-splitting deal involving a non-Texas client in litigation outside Texas.  24 F.4th at 494-95.  The defendant's only relevant direct connection to Texas was its response to an unsolicited email from the Texas counsel: "The only act or omission of Morgan Verkamp that is even plausibly *connected* to Texas is Morgan Verkamp's allegedly fraudulent reply to Danziger's unsolicited email about [the client]." *Id.* at 497.  The Fifth Circuit held that "a defendant who merely answers one unsolicited email" does not "*meaningfully* connect" the defendant to the forum State. *Id.* at 498.  *Danziger* is not analogous to this case.  In *Danziger*, the defendant's "contacts with Texas were significantly less numerous and less purposeful" than in other cases like *Wien Air*. *Id.*  Here, by contrast, Defendants' actions with respect to Louisiana were both extremely "numerous" and extremely "purposeful."  FAC, ¶¶ 376-89.

Finally, it is unquestionable that "the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts."  *Defense Distributed*, 971 F.3d at 490.  Defendants'

activity in conducting a campaign of censorship that is deliberately directed at censoring speech in Louisiana relates directly to Plaintiffs' claims.

### 4.    Defendants' other arguments regarding minimum contacts lack merit.

Defendants' other arguments lack merit.  First, Defendants contend personal jurisdiction is lacking because "Plaintiffs have not alleged that Defendants intended to target Plaintiffs' audiences in Louisiana specifically."  Doc. 70-1, at 17.  This is simply incorrect—the Complaint *does* specifically allege that "Defendants intended to target Plaintiffs' audiences in Louisiana specifically."  FAC, ¶¶ 376-89.  Defendants' argument effectively concedes that personal jurisdiction is proper when "Defendants intended to target Plaintiffs' audiences in Louisiana specifically."  Doc. 70-1, at 17.  Likewise, Defendants argue that "the Complaint does not allege that Defendants targeted Hines to censor her speech in Louisiana specifically or selectively targeted her."  *Id.* at 16.  Again, the Complaint alleges exactly that.  FAC, ¶¶ 362-75.

Second, Defendants repeatedly argue that the Complaint does not allege that they directly communicated with anyone in Louisiana.  Doc. 70-1, at 12 ("Nor does the Complaint allege that any Defendant directly communicated with anyone in the State."); *see also id.* at 14, 16.  Defendants contend that this omission forecloses a finding of personal jurisdiction.  *Id.* at 16.  This is incorrect; the Complaint alleges that Defendants assigned an analyst or analysts to monitor and track speech arising from Louisiana, and that Defendants apparently communicated with government officials in Louisiana about censoring Louisiana speech.  FAC, ¶ 377.

In any event, neither physical presence within the forum nor communications with persons located in the forum are necessary prerequisites for personal jurisdiction.  The Supreme Court recently reaffirmed that "physical presence in the forum is not a prerequisite to jurisdiction," and recognized contact "through an agent, goods, mail, or some other means."  *Walden*, 571 U.S. at

285.  A longstanding line of cases holds that a defendant can establish sufficient contacts with the forum through actions with foreseeable and expected consequences in the forum, even if the defendant never has any direct contact with the forum.  For example, "[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State."  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98 (1980); *see also, e.g., Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 419-20 (5th Cir. 1993) ("'mere foreseeability or awareness [is] a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce'") (quoting *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 111 (1987)); *Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 470 (5th Cir. 2006); *Ainsworth v. Moffett Eng'g, Ltd*., 716 F.3d 174, 177-79 (5th Cir. 2013).

Indeed, "[t]he Fifth Circuit has stated that 'when a defendant purposefully avails himself of the benefits and protection of the forum's laws—by engaging in activity ... outside the state that bears reasonably foreseeable consequences in the state—maintenance of the lawsuit does not offend traditional notions of fair play and substantial justice.'" *Crompton Corp. v. Clariant Corp*., 221 F. Supp. 2d 683, 695 (M.D. La. 2002) (quoting *Brown v. Flowers Industries, Inc*. 688 F.2d 328, 333 (5th Cir. 1982); and *Mississippi Interstate Express, Inc. v. Transpo, Inc*., 681 F.2d 1003, 1007 (5th Cir. 1982)).  Here, Defendants had much more than an "expectation" that their actions would impact Louisiana; they *designed* and *intended* them to do so.  FAC, ¶¶ 376-89.  The fact that they often (but not always) acted through intermediaries to influence Louisiana—*e.g.*, the social-media companies coerced by federal pressure into cooperating with Defendants' scheme—does not change the fact that they purposely directed their conduct toward Louisiana.

Finally, Defendants argue that "the Court still would lack personal jurisdiction over Jim Hoft's claims," because "[t]he Complaint does not allege that Hoft has any connection with Louisiana." Doc. 70-1, at 17. This is incorrect. The Complaint alleges that Defendants specifically targeted Hoft's speech, like Hines' speech, and interfered with his ability to reach his extensive audiences in Louisiana. FAC, ¶ 386.

### B.   The Assertion of Personal Jurisdiction in Louisiana Is Fair and Reasonable.

Given Defendants' extensive, purposeful conduct directed into Louisiana, the exercise of personal jurisdiction in Louisiana is "fair and reasonable." *Defense Distributed*, 971 F.3d at 490. "If a nonresident has minimum contacts with the forum, rarely will the exercise of jurisdiction over the nonresident not comport with traditional notions of fair play and substantial justice." *Id.* at 496 (quoting *DeJoria v. Maghreb Petroleum Expl., S.A.*, 804 F.3d 373, 388 (5th Cir. 2015)). As noted above, "[t]he Fifth Circuit has stated that '[w]hen a defendant purposefully avails himself of the benefits and protection of the forum's laws—by engaging in activity ... outside the state that bears reasonably foreseeable consequences in the state—maintenance of the lawsuit does not offend traditional notions of fair play and substantial justice.'" *Crompton*, 221 F. Supp. 2d at 695.

"In determining whether the exercise of jurisdiction is fair and reasonable, the court must balance: (1) the burden on the nonresident defendant of having to defend itself in the forum, (2) the interests of the forum state in the case, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in the most efficient resolution of controversies, and (5) the shared interests of the states in furthering fundamental social policies." *Sangha*, 882 F.3d at 102. Here, every one of these factors favors the exercise of jurisdiction in Louisiana. First, (1) "the burden on the nonresident defendant of having to defend itself in the forum," *id.*, is minimal. Defendants are highly sophisticated, well-resourced entities with elite

counsel from major law firms that routinely engage in national practice across the country. Litigating in Louisiana federal court—which involves only occasional travel to the forum—will be no more burdensome for them than litigating in any other federal district court.

Second, "(2) the interests of the forum state in the case," *id.*, are enormous.  Here, Plaintiffs seek to vindicate not only their own injuries, but injuries to the free-speech rights of thousands of Louisianans.  Louisiana has a fundamental policy favoring the freedom of speech within its borders, expressed in Article I, § 7 of its Constitution.  *Missouri*, 2023 WL 2578260, at *14 ("[B]oth Louisiana and Missouri have adopted fundamental policies favoring the freedom of speech.") (citing LA. CONST. art. I, § 7).

Third, "(3) the plaintiff's interest in obtaining convenient and effective relief," *Sangha*, 882 F.3d at 102, is strong.  Unlike Defendants, Plaintiffs are individuals with far more limited resources, especially Plaintiff Jill Hines.  The burden of litigating in a distant forum is thus comparably greater for Plaintiffs like Hines than for Defendants.

Fourth, "(4) the interstate judicial system's interest in the most efficient resolution of controversies," *id.*, strongly favors the Louisiana forum.  This Court is already the forum for *Louisiana and Missouri, et al. v. Biden, et al.*, No. 3:22-cv-001213-TAD-KDM (W.D. La.), which involves related challenges to federal officials' involvement in the Election Integrity Partnership/Virality Project.  Indeed, this Court has already made extensive preliminary factfindings about the EIP/VP in that case, which Plaintiffs rely upon and incorporate in their Complaint here.  FAC, ¶¶ 72, 147, 148, 380, 382, 383, 386, 417, 418, 420.  Having related disputes litigated in the same forum promotes both consistency and efficiency.

Fifth, "(5) the shared interests of the states in furthering fundamental social policies," *Sangha*, 882 F.3d at 102, also favor the Louisiana forum.  As noted above, Louisiana has a

profound interest in advancing its fundamental policy favoring the freedom of speech.  The other forums proposed by Defendants—such as California, New York, etc.—share the same fundamental policy.  It detracts nothing from "the shared interests of the states in furthering" those "fundamental social policies," *id.*, to litigate these claims in Louisiana.

Defendants argue that jurisdiction in Louisiana is unfair because their actions "had nationwide effects" and "Plaintiffs seek to certify a nationwide class of plaintiffs."  Doc. 70-1, at 18.  They cite no authority for this argument, and for good reason—it would entail that personal jurisdiction is appropriate *nowhere* because Defendants' conduct impacted Americans *everywhere*. *See id.*  Fortunately, the opposite is true—the fact that Defendants directed their conduct to Louisiana (as well as many other States) suffices for personal jurisdiction in Louisiana.  Further, Defendants argue that it is unfair that "Plaintiffs ask this Court … to issue orders and judgments with nationwide effects," *id.* at 18-19.  But Plaintiffs give no reason why this Court is less qualified and capable to adjudicate this case than its preferred courts in "California, Washington, New York, and the District of Columbia."  *Id.* at 18.

## II.    Plaintiffs Have Standing.

Next, Plaintiffs argue that Defendants lack standing.  Doc. 70-1, at 19-25.  These arguments lack merit.  "To establish Article III standing, the Plaintiffs bear the burden to show '[1] an injury in fact [2] that is fairly traceable to the challenged action of the defendant and [3] likely to be redressed by [their] requested relief.'"  *Missouri v. Biden*, No. 23-30445, 2023 WL 6425697, at *7 (5th Cir. Oct. 3, 2023).  "The presence of any *one* plaintiff with standing … satisfies Article III's case-or-controversy requirement."  *Id.* (citing *Rumsfeld v. Found. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006)).

In *Missouri v. Biden*, a suit against the federal officials who are "completely intertwined" with the EIP, this Court has already found that these two Plaintiffs—Jill Hines and Jim Hoft— have standing to sue to challenge the activities of the EIP/VP. *Missouri v. Biden*, 2023 WL 4335270, at *59-66 (W.D. La. July 4, 2023). The Court's reasoning in that case anticipates and refutes most of the standing arguments raised by Defendants here. *See id.*; *see also Missouri*, 2023 WL 2578260, at *17-24. The Court should come to the same conclusion here.

### A.     Plaintiffs Have an Article III Interest in Participating in Social-Media Speech Freed From Defendants' Interference.

As an initial matter, Defendants' argument misconceives the full nature and scope of Plaintiffs' injuries. Plaintiffs allege an interest, not only in having their speech uncensored on social-media, but also in being treated on an even footing under the platforms' content-moderation policies—freed from Defendants' (and their federal allies') undue influence. The Complaint alleges that "Hines and Hoft assert an interest in having their speech treated on an equal footing by the social-media platforms, freed from the pressure, coercion, interference, involvement, and entanglement of Defendants' in the platforms' content-moderation decisions." FAC, ¶ 416.

The Fifth Circuit recently reaffirmed that this exact interest and injury satisfy Article III. In *Missouri v. Biden*, the Fifth Circuit emphasized that "Plaintiffs are challenging … the government's *interference with* those social-media companies' independent application of their policies." *Missouri*, 2023 WL 6425697, at *8. The Fifth Circuit "noted multiple times … an important distinction between censorship as a result of social-media platforms' *independent* application of their content-moderation policies, on the one hand, and censorship as a result of social-media platforms' *government-coerced* application of those policies, on the other." *Id.* at *10. In *Missouri*, "[t]he Individual Plaintiffs have not sought to invalidate social-media companies' censorship policies. Rather, they asked the district court to restrain the officials from

unlawfully interfering with the social-media companies' independent application of their content-moderation policies." *Id.* "As the Ninth Circuit has also recognized, there is a direct relationship between this requested relief and the injury alleged such that redressability is satisfied." *Id.* (citing *O'Handley v. Weber*, 62 F.4th 1145, 1161–62 (9th Cir. 2023)).

So also here, Plaintiffs have a strong interest in participating under the social-media platforms' policies *on an even footing*, freed from Defendants' "meddling" in them. *Id.* at *8. This interest encompasses freedom from Defendants' coercion, significant encouragement, entanglement, and/or entwinement in the platforms' independent decisionmaking. *See, e.g., id.* at *18. Even if some of Plaintiffs' content might still be moderated by platforms acting independently, Plaintiffs' interest in receiving a fair shake under the platforms' policies, free from the artificial pressure and flagging of Defendants, is an "independent" injury that satisfies Article III, and it is plainly traceable to Defendants' conduct—in fact, Defendants' meddling *is* an injury. *See id.* at *8, 10; *see also, e.g., Council for Periodical Distribs. Ass'n v. Evans*, 642 F.Supp. 552, 560 (M.D. Ala. 1986) (holding that "the decision whether to" publish private speech should "be made free of [government] coercion and without prior restraint").

**B.    Defendants Fail to Address Plaintiffs' Self-Censorship Injuries, Which Independently Satisfy Article III.**

Plaintiffs' self-censorship injuries also independently satisfy Article III. The Complaint alleges that both Hines and Hoft engage in extensive self-censorship on social media to avoid the more severe penalties that they would inevitably incur under Defendants' mass-surveillance and mass-flagging regime. "Hines engages in self-censorship to avoid more severe penalties, and the reach of her voice is greatly hampered." FAC, ¶ 400. Likewise, "[a]s a result" of Defendants' censorship activities, "Hoft engages in self-censorship on social media to avoid more severe penalties." FAC, ¶ 407. In addition, *The Gateway Pundit*'s readers also self-censor by avoiding

18

re-posting *The Gateway Pundit*'s content to avoid being targeted, suspended, or censored.  Some

of Hoft's readers have advised that they avoid sharing *The Gateway Pundit*'s content on Facebook

or other social media because it leads to them being suspended for 20-30 days or longer and/or

suffering other censorship." *Id.*  "But for Defendants' conduct, Hines and Hoft would not have to

self-censor, or self-censor to such a degree, in their speech on social media." *Id.* ¶ 408.

Again, the Fifth Circuit recently upheld these injuries as satisfying Article III.  In *Missouri

v. Biden*, "[a]ll five Individual Plaintiffs," including Hines and Hoft, "stated in sworn declarations

that their prior censorship has caused them to self-censor and carefully word social-media posts

moving forward in hopes of avoiding suspensions, bans, and censorship in the future."  2023 WL

6425697, at *8.  The Fifth Circuit held that such self-censorship injuries satisfy Article III:

> As the Supreme Court has recognized, this chilling of the Individual Plaintiffs'
> exercise of their First Amendment rights is, itself, a constitutionally sufficient
> injury.  True, to confer standing, allegations of chilled speech or self-censorship
> must arise from a fear of future harm that is not imaginary or wholly speculative.
> But the fears motivating the Individual Plaintiffs' self-censorship, here, are far from
> hypothetical.  Rather, they are grounded in the very real censorship injuries they
> have previously suffered to their speech on social media, which are evidence of the
> likelihood of a future injury.  Supported by this evidence, the Individual Plaintiffs'
> self-censorship is a cognizable, ongoing harm resulting from their past censorship
> injuries, and therefore constitutes injury-in-fact upon which those Plaintiffs may
> pursue injunctive relief.

*Id.* (cleaned up) (citing *Laird v. Tatum*, 408 U.S. 1, 11 (1972); *Zimmerman v. City of Austin, Tex.*,

881 F.3d 378, 390 (5th Cir. 2018); and *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013)).

### C.  Defendants Specifically Target Both Jill Hines and Jim Hoft.

As to Jill Hines, Defendants contend that "the Complaint contains no factual allegations

that any Defendant took any action against her or her groups."  Doc. 70-1, at 19.  This is incorrect.

The Complaint alleges that "Defendants' conduct successfully targeted and continues to target Ms.

Hines, Health Freedom Louisiana, and her social-media groups for censorship, and directly

interferes with Ms. Hines' and her audiences' freedom of speech and freedom of association in Louisiana, including in the Western District of Louisiana."   FAC, ¶ 375.   It alleges that "Defendants' conduct involved extensive, direct, and purposeful campaign to interfere with speech by Louisiana speakers and to Louisiana audiences, including both Jill Hines and Jim Hoft's extensive audiences in Louisiana." FAC, ¶ 376.    "Defendants deliberately monitor and track speech on social media by Louisiana residents like Jill Hines and many others." FAC, ¶ 377.

Defendants contend that these are "conclusory allegations," and that "[t]he Complaint's allegations thus 'do not permit the court to infer more than the mere possibility.'"  Doc. 70-1, at 20 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  Not so.  The Complaint contains extensive, detailed factual allegations raising the compelling inference that Defendants have and continue to target Jill Hines and her groups specifically for censorship in Louisiana.  FAC, ¶ 375.  These include Defendants' detailed, public admissions that they tracked and targeted "health freedom" groups—like Hines' "Health Freedom Louisiana"—across the country, FAC, ¶ 374; their admissions that they target the same tactics of such "health freedom" groups that Jill Hines specifically uses, FAC, ¶ 374; it alleges that censoring "health freedom" groups was such a dominant focus and priority for Defendants that the Virality Project report mentions them almost 100 times, FAC ¶ 370; and it alleges that Defendants targeted such groups "across all 50 states," which necessarily includes Louisiana, FAC ¶ 373.  It also alleges that Hines experienced and experiences extensive censorship on the very topics and viewpoints targeted by Defendants for suppression.  FAC ¶ 394.  These facts raise a compelling inference that Defendants have and continue to target Jill Hines.  As Defendants acknowledge, Doc. 70-1, at 20 n.5, this Court has already drawn this inference: "Plaintiff Hines of the Health Freedom Louisiana was flagged by the Virality Project to be a 'medical freedom influencer' who engages in the 'tactic' of 'organized

outrage' because she created events or in-person gatherings to oppose mask and vaccine mandates in Louisiana." *Missouri*, 2023 WL 4335270, at *40.  "The Virality Project flagged the following persons and/or organizations as spreaders of misinformation: Jill Hines and Health Freedom Louisiana…." *Id.*

Defendants contend that "Plaintiffs allege that the VP stopped work in August 2021."  Doc. 70-1, at 20 (citing Doc. 1, ¶ 256).  But Paragraph 256 of the original Complaint does *not* allege that "the VP stopped work in August 2021," *id.*; on the contrary, it merely alleges that the *VP Report* discusses Defendants' activity "from February to August 2021."  Doc. 1, ¶ 256.  Both the original and the First Amended Complaint plainly allege that Defendants, using whatever moniker, continue to target Hines' speech for censorship into the present day: "Defendants' conduct successfully targeted and *continues to target* Ms. Hines, Health Freedom Louisiana, and her social-media groups for censorship, and directly *interferes* with Ms. Hines' and her audiences' freedom of speech and freedom of association in Louisiana, including in the Western District of Louisiana."  FAC ¶ 375 (emphases added).

### D. Defendants' "Independent Action" Argument Fails.

Likewise, the Complaint makes extensive allegations that Defendants specifically targeted, and continue to target, Jim Hoft's speech.  FAC ¶¶ 182-92, 386.  Defendants do not dispute this.  *See* Doc. 70-1, at 21.  Instead, they argue that "[t]he Complaint … lacks sufficient allegations to establish Jim Hoft's standing" because "Plaintiffs' injuries … were 'the result of independent actions' taken by the platforms."  Doc. 70-1, at 21 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  Defendants argue that "it was the social media platforms themselves—not any Defendant—that were the decisionmakers."  *Id.* at 22.  In *Missouri*, this Court found the same argument to be "wholly unpersuasive."  2023 WL 4335270, at *61.  The same logic applies here.

21

This argument fails for several reasons.  *First*, as noted above, even if platforms were independent decisionmakers here (*but see infra*), Plaintiffs have an interest in participating on the platforms and being subject to their rules on an even footing, free from Defendants' meddling and interference.  *See supra* Part II.A.  As the Fifth Circuit noted, "Plaintiffs are challenging … [Defendants'] *interference with* those social-media companies' independent application of their policies." *Missouri*, 2023 WL 6425697, at *8.  Plaintiffs seek to restore "social-media platforms' *independent* application of their content-moderation policies." *Id.* at *10.  "Plaintiffs have not sought to invalidate social-media companies' censorship policies.  Rather, they asked the district court to restrain [Defendants] from unlawfully interfering with the social-media companies' independent application of their content-moderation policies." *Id.*

Second, Defendants object that "[t]he Complaint does not allege that Defendants … exercised any direct control over any platform."  Doc. 70-1, at 21.  On the contrary, the Complaint alleges that, through their close association with federal officials who were themselves coercing the platforms, Defendants *coerce* the platforms to cooperate in their censorship regime.  FAC ¶ 2. The Complaint alleges that Defendants, who are so closely cooperating with federal officials as to be "completely intertwined," benefit directly from the coercive pressure placed on platforms by federal officials to cooperate in such mass-censorship initiatives: "In engaging in the conduct alleged herein in close cooperation with federal officials in agencies like CISA, the CDC, the Surgeon General's Office, and the White House, Defendants leveraged and benefited from the pressure and coercion that federal officials placed and place on social-media platforms to censor disfavored speakers and viewpoints."  FAC ¶ 417.  "As this Court held in *Louisiana v. Biden*, 'the social-media companies cooperated due to coercion.'"  *Id.* (quoting *Missouri*, 2023 WL 4335270,

at *55).  "So also here, the social-media companies cooperate in the EIP/VP, in large part, because of federal coercion and pressure, *i.e.*, 'due to coercion.'"  *Id.*

Third, the Complaint also alleges that Defendants became deeply entangled with the private decisionmaking of the social-media platforms, and were "completely intertwined" both with federal officials and the platforms themselves.  FAC ¶ 419.  "In engaging in the conduct alleged herein in close cooperation with federal officials, Defendants are and became deeply entangled in the content-moderation and policy-setting decisions of social-media platforms, along with the federal officials with whom they are intertwined."  *Id.*  Even absent a showing of coercion, Plaintiffs allege that Defendants are so entangled in the platforms' decisionmaking that they are responsible for those decisions.  *Id.*  As the Fifth Circuit recently held, such "entanglement in a [private] party's independent decision-making," or "direct involvement in carrying out the decision itself," can constitute state action, rendering the entangled party legally responsible for the decision.  *Missouri*, 2023 WL 6425697, at *14.

Furthermore, the Complaint alleges that Defendants became "completely intertwined," both with federal officials and with the platforms themselves.  FAC ¶ 420.  As this Court found in *Missouri*, based on fourteen pages of factual findings, "CISA and the EIP were completely intertwined."  *Missouri*, 2023 WL 4335270, at *53; *see also id.* at *32-35, 37-40, 52-53.  Such pervasive entwinement also entails that Defendants are legally responsible for content-moderation decisions of the platforms.  *See, e.g., Missouri*, 2023 WL 6425697, at *14 n.11.

Finally, the Complaint alleges that, left to their own devices, platforms would not monitor, surveil, and moderate content to any significant degree.  FAC, ¶ 421.  Defendants, therefore, are the but-for causes of the challenged moderation decisions—they are effectively the only significant enforcers of the platforms' moderation policies.  *See id.*  As the Court held in *Missouri*, "Plaintiffs'

theory of but-for causation is easy to follow and demonstrates a high likelihood of success as to establishing Article III traceability."  2023 WL 4335270, at *62.

Thus, Defendants overlook key allegations in the Complaint when they argue that Defendants merely "advocate" and "urge" platforms to act.  Doc. 70-1, at 21.  The Complaint alleges that such urging, advocating, and pressuring occurs as a form of federal pressure amounting to coercion, that it involves Defendants becoming deeply entangled in the platforms' decisionmaking, that it involves Defendants becoming "completely intertwined" with federal officials and the platforms themselves, and that Defendants are the but-for causes of censorship.

### E.    Defendants Have a "Coercive" and "Determinative" Effect on Censorship.

Next, citing *Bennett v. Spear*, 520 U.S. 154 (1997), Defendants argue that traceability is absent because they did not have a "determinative or coercive effect" on the platforms' decisions.  Doc. 70-1, at 22 (quoting *Bennett*, 520 U.S. at 169).  This is wrong for three reasons.

First, *Bennett* and similar cases are inapposite where Defendants became deeply "entangled" in the private parties' decision-making processes, to the point that Defendants' analysts, government officials, and platforms are engaged in three-way chats on the Jira software to make specific content-moderation decisions in real time.  FAC ¶ 95; Doc. 1-2, at 30.  Such entanglement means that the platforms' decisions were not "the result of the *independent* action of some third party not before the court."  *Bennett*, 520 U.S. at 169.  Instead, due to coercion, entanglement, and significant encouragement of the platforms, Defendants are effectively responsible for the challenged decisions.  *Bennett*, therefore, is simply inapplicable.

Second, even if that were not so, the Complaint alleges both a "determinative" and a "coercive" effect on the platforms' decisions.  Here, Plaintiffs allege a "determinative" effect, because they allege that, but for Defendants' mass-flagging operations, the censored content would

24

not have been censored.  FAC ¶ 421.  As the Complaint alleges, the whole point of flagging potentially violative content to platforms is to induce them to censor content that they otherwise are not censoring.  FAC ¶ 5.  Acting on their own, the platforms leave almost all content unmoderated, even if it technically violates their terms of service: "[T]he Platforms exercise virtually no editorial control or judgment…. [V]irtually everything else is just posted to the Platform with zero editorial control or judgment. '*Something well north of 99% of th[is] content ... never gets reviewed further*.  The content on a site is, to that extent, invisible to the [Platform].'" *NetChoice, L.L.C. v. Paxton,* 49 F.4th 439, 459–60 (5th Cir. 2022), *cert. granted in part*, No. 22-555, 2023 WL 6319650 (U.S. Sept. 29, 2023) (quoting *NetChoice, LLC v. Moody*, 546 F. Supp. 3d 1082, 1092 (N.D. Fla. 2021)) (emphasis added).  Thus, the "flaggers" like the EIP/VP are the principal—and in many cases *only*—enforcers of the platforms' policies.  As CISA official Brian Scully admitted in his deposition, "if it hadn't been brought to their attention then they obviously wouldn't have moderated it."  FAC ¶ 421.

Third, the Complaint also alleges that Defendants have a "coercive" effect on the platforms. *Bennett*, 520 U.S. at 169.  As noted above, the Complaint alleges that federal coercive pressure induces platforms to participate in the EIP/VP.  It alleges that "pressure and coercion from federal officials induced the platforms' cooperation with the EIP."  FAC ¶ 147.  It alleges that "[t]his Court's (in *Louisiana v. Biden*) and the Fifth Circuit's (in *Missouri v. Biden*) extensive findings of pressure and coercion by federal officials—including federal officials who are heavily intertwined with the EIP/VP—strongly support the inference that platforms participate in the EIP/VP due to federal coercion and pressure."  *Id.*

Defendants argue that "social media platforms overwhelmingly *declined* to take action against posts or users that EIP flagged," since platforms took action against "only" 35 percent of

URLs flagged by Defendants.  Doc. 70-1, at 23.  By contrast, the EIP report touts 35 percent as a *high* success rate: "In total, we believe the … major platforms we worked with all had a *high response rate* to our tickets."  Doc. 1-2, at 37 (emphasis added).  Further, when it comes to core political speech, Defendants boast success rates much higher than 35 percent: "Platforms were most likely to take action on tickets that involved premature claims of victory; they took action on these tickets about 45% of the time. They also frequently actioned URLs related to election delegitimization and procedural interference [both about 40 percent of the time, per Fig. 2.11]."  *Id.* at 40.  "Platforms were most likely to action URLs that shared misleading statistics."  *Id.* at 41.  "More than 50% of URLs that contained premature claims or victory, or claims about the election being stolen, were actioned by platforms. About half of URLs that contained unfounded claims about ballots being rejected were removed—the claim with the highest rate of removal after incitement to violence."  *Id.* at 41.  They also had higher success rates on particular platforms: "TikTok had the highest action rate: actioning (in their case, their only action was removing) 64% of URLs that the EIP reported to their team."  *Id.* at 40.

In any event, to establish injury, Article III does not require Plaintiffs to demonstrate that Defendants succeeded in inducing platforms to remove *every single post or URL* that they flagged. In fact, the Fifth Circuit rejected the same argument in *Missouri v. Biden*: "To be sure, there were instances where the social-media platforms *declined* to remove content that the officials had identified for censorship.  But predictability does not require certainty, only likelihood."  2023 WL 6425697, at *10; *see also Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019).  Plaintiffs suffer grave censorship injuries even if Defendants succeed in censoring their content only a fractions of the times they try to do so; even "minimal" acts of censorship constitute irreparable injury under the First Amendment. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  Moreover, Plaintiffs

have an independent interest in having the platforms make these decisions free and clear of Defendants' meddlesome interference, which itself is an Article III injury.  *See supra*.

Defendants claim that they "have no regulatory authority over the platforms and have no power to impose civil or criminal sanctions," and thus it is not "plausible that a small research collective could 'coerce' multi-billion-dollar companies into action."   Doc. 70-1, at 24. Defendants' description of themselves as a "small research collective" is rather fanciful, given that this humble "collective" includes Stanford University ($36.3 billion endowment), the Atlantic Council (annual budget $68 million), and the University of Washington (annual operating budget of $8.25 billion in 2020).  In any event, Defendants ignore dozens of Paragraphs of allegations in the Complaint alleging Defendants' close cooperation and pervasive entwinement with federal officials at national-security agencies like CISA, health agencies like the CDC and the Office of Surgeon General, and even cooperation with the White House.  *See, e.g.*, FAC ¶¶ 82-140, 298, 417.  As the Complaint alleges, Defendants benefit directly from the coercive pressure exercised by these federal officials, about which this Court has made extensive factual findings.  *See Missouri*, 2023 WL 4335270.

## F.   The Individual Defendants Directed and Controlled Defendants' Actions.

Defendants argue that Plaintiffs lack standing to sue Alex Stamos, Renee DiResta, Camille Francois, and Graham Brookie because the Complaint supposedly "does not allege that [they] *personally or individually* took any action at all relating to Hoft, Hines, or any of their groups." Doc. 70-1, at 26.  On the contrary, the Complaint alleges that Stamos and DiResta personally directed and controlled the censorship activities alleged in the Complaint, including as to Jill Hines and Jim Hoft.  FAC ¶ 36.  The EIP and VP Reports attribute a personal and leadership role in all these activities to Stamos and DiResta.  FAC ¶¶ 20.  The Complaint alleges that Camille Francois

27

leads Graphika's participation in EIP and directs a team of thirteen analysts in conducting the EIP/VP. FAC ¶ 28.  And the Complaint alleges that Graham Brookie directs the Atlantic Council's DFR Lab team of similar size and plays a leadership role in the censorship alleged in the Complaint.  FAC ¶ 33.  The Complaint further alleges that all these individual Defendants— Stamos, DiResta, Francois, and Brookie are personally involved in directing and controlling the censorship activities that impact Jill Hines and Jim Hoft.  FAC ¶ 36.

Likewise, Defendants argue that Plaintiffs lack standing to sue Kate Starbird because the Complaint supposedly "does not allege that Starbird personally took any action, in any capacity, with respect to Hoft or Hines or their groups."  Doc. 70-1, at 26.  On the contrary, the Complaint alleges that "Starbird plays a leading role in the social-media censorship activities described in this Complaint," FAC ¶ 23, and that Starbird is "personally involved in directing and controlling the censorship activities that impact Jill Hines and Jim Hoft."  FAC ¶ 36.  Starbird leads a team of at least 18 personnel from the University of Washington in the EIP/VP's conduct.  FAC ¶ 24.

## III.     Venue Is Proper in the Western District of Louisiana.

Defendants argue that venue is improper in the Western District of Louisiana.  Doc. 70-1, at 26-27.  This argument rehashes their argument the Complaint does not allege "that any Defendant engaged in any conduct *in*, or directed *at*, the District."  *Id.* at 27. This contention is plainly erroneous for the reasons discussed above.  *See supra* Part I.  Here, where Defendants purposely directed a course of conduct toward Louisiana to ensure the silencing of disfavored viewpoints in the Western District of Louisiana, venue is proper in the Western District of Louisiana, which is "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."  28 U.S.C. § 1391(b)(2).

For example, in *Southern U.S. Trade Ass'n v. Unidentified Parties*, 2011 WL 2457859 (E.D. La. June 16, 2011), a Louisiana trade association sued a defendant for defamatory statements posted online from a Florida location.  The court held venue proper in the Eastern District of Louisiana. *Id.* at *13.  The court reasoned that "Defendant argues that the 'events' that gave rise to Plaintiffs' claims consist of postings on the Internet made in Florida and that as a result, venue is proper only in Florida. Defendant's contention is not persuasive." *Id.*  "In tort cases, courts consider both 'the place where the allegedly tortious actions occurred' and 'the place where the harms were felt' in determining 'whether a substantial part of the events or omissions giving rise to the plaintiff's claim occurred … in the district.'" *Id.* (quoting 14D CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3806.1 (3d ed. 2004)).  The court noted that "the brunt of the alleged injury in this case was sustained in this district. Moreover, it was Defendant's alleged prior interactions with Plaintiffs in New Orleans that inspired Defendant to write and publish the statements." *Id.*; *see also, e.g., Hawbecker v. Hall*, 88 F.Supp.3d 723, 731 (W.D. Tex. 2015) ("In a defamation case, the Court may consider the venue of where the defamation occurred and the venue of where the harm was felt to determine the location of 'a substantial part of the events' under 1391(b)(2).").

## IV.   The Complaint States Valid Claims For Relief.

Defendants' challenges to the substantive claims in the Complaint are meritless.

### A.   Defendants' First Amendment Defense Is Meritless.

First, Defendants claim that they have a First Amendment right to conspire with government officials to violate other Americans' First Amendment rights, to coerce private parties to violate other Americans' First Amendment rights, and to tortiously interfere with other Americans' legitimate business expectancy. Doc. 70-1, at 27-29.  This argument has no merit.

### 1.    There is no First Amendment right to censor others.

The Complaint plausibly alleges that Defendants are conducting what is probably the largest mass-surveillance and mass-censorship program in American history, and that Defendants—conspiring with state and federal government officials—have successfully coerced, pressured, and induced platforms to censor the free speech of millions of Americans.  FAC ¶ 1. Defendants, in other words, assert that the First Amendment protects their right to silence and stifle the free speech of other Americans on a colossal scale.  In *NetChoice, LLC v. Paxton*, the Fifth Circuit rejected Defendants' argument here—*i.e.*, that they have a First Amendment right to censor their users on the basis of viewpoint.  49 F.4th at 455.  "We reject the Platforms' efforts to reframe their censorship as speech.  It is undisputed that the Platforms want to eliminate speech—not promote or protect it.  And no amount of doctrinal gymnastics can turn the First Amendment's protections for free *speech* into protections for free *censoring*."  *Id.*  In fact, "there's no First Amendment right for censors to select their targets," *id.* at 464 n.16, and "censorship of [social-media] users" is not "protected speech."  *Id.* at 466. The Fifth Circuit thus held that "the Platforms' censorship is not protected speech under the First Amendment."  *Id.* at 469.

The same logic applies here.  As with the social-media platforms in *NetChoice*, Defendants here attempt to "reframe their censorship as speech," but "no amount of doctrinal gymnastics can turn the First Amendment's protections for free *speech* into protections for free *censoring*."  *Id.* at 455.  In fact, Defendants' argument here is even weaker than the platforms' argument in *NetChoice*.  Defendants have conspired and worked closely with state and federal *government* officials to trample speech; Defendants and their federal allies have coerced the platforms' participation in such speech; and Defendants, unlike the platforms, have no agreement with users

30

that would even arguably give them a contractual right to censor speech.  As in *NetChoice*, Defendants' "censorship is not protected speech under the First Amendment." *Id.* at 469.

### 2.  There is no First Amendment right to conspire with government to violate other peoples' civil rights.

As the Complaint alleges, Defendants are engaged in a massive conspiracy with federal and state officials to violate the First Amendment rights of other Americans.  FAC ¶ 1.  Regardless of whether Plaintiffs would have their own First Amendment rights to lobby the platforms to remove speech as private actors, once they engage in a conspiracy with *government* officials to censor Americans on the basis of viewpoint, the First Amendment no longer applies to their conduct.  *See, e.g., Corey Airport Servs., Inc. v. City of Atlanta*, No. 1:04-CV-3243-CAP, 2005 WL 8158628, at *12 (N.D. Ga. July 15, 2005) ("Fouch did not have a First Amendment right to conspire with the Atlanta City Defendants to violate the laws and regulations governing the DBE certification process…"); *see also United States v. Wilson*, 154 F.3d 658, 666 (7th Cir. 1998) (rejecting the notion that "there is a First Amendment right to conspire to break a valid law").

### 3.  There is no First Amendment Right to coerce platforms.

Furthermore, the Complaint alleges that platforms were coerced to cooperate in Defendants' censorship schemes by federal pressure, threats, and coercion.  FAC ¶ 2.  There is no First Amendment right to coerce platforms to cooperate in Defendants' censorship scheme.

The Second Circuit faced a similar scenario in *Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.*, 968 F.2d 286, 288 (2d Cir. 1992).  In *Jews for Jesus*, the defendant allegedly used a threat of economic boycott to pressure a venue not to host the plaintiff's event, ostensibly because the defendant disfavored plaintiff's race and religion.  *See id.*  When the plaintiff sued, the defendant claimed that it had a First Amendment right to lobby the venue not to host the plaintiff's event.  *See id.*  The Second Circuit determined that there was sufficient evidence

31

for a trier of fact to determine that defendants had "appl[ied] concerted economic pressure and explicit threats thereof to the [venue] to coerce, compel, or incite the [venue] to cancel JFJ's contract and deny access to plaintiffs." *Id.* at 294.  Given this finding of coercion, pressure, and threats, the Second Circuit held that "[i]t has long been established that the First Amendment provides no defense to persons who have used otherwise protected speech or expressive conduct to force or aid others to act in violation of a valid conduct-regulating statute." *Id.* at 296 (citing numerous cases).  Describing this as a "rather unremarkable constitutional principle," the Second Circuit noted that the plaintiffs alleged that defendants pressured the venue into violating "unquestionably constitutional" anti-discrimination statutes. *Id.*  It thus concluded that "third parties who use speech or other expressive conduct to coerce a 'primary' actor to violate an anti-discrimination statute" are not protected by the First Amendment. *Id.*

Where "defendants engaged in concerted economic pressure, principally through a threatened boycott, with the objective of coercing the [venue] to deny plaintiffs accommodations for reasons prohibited by the anti-discrimination statutes," their conduct was "designed to secure an unlawful objective" and "is not protected by the First Amendment." *Id.* at 297.  That is because "parties are not exempt from conforming their actions to laws of general application not directed at speech but at conduct." *Id.* at 298; *see also, e.g., X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 71 (2d Cir. 1999) (holding that "speech by persons who are not decisionmakers and who merely engage in advocacy *without threats, intimidation, or coercion* is protected by the First Amendment") (emphasis added).

So also here—the Complaint alleges that Defendants conspired with federal officials and, together with federal officials, unlawfully coerced and pressured platforms to engage in unlawful conduct, *i.e.*, censoring Plaintiffs' and other Americans' speech in violation of the First

Amendment and in violation of state common-law doctrines.  FAC ¶ 2.  Defendants have no First

Amendment right to coerce the platforms to engage in such conduct.

### 4. Defendants are state actors who lack First Amendment rights in the conduct that constitutes state action.

Further, Defendants are state actors who are conspiring with, entangled with, and

pervasively entwined with state and federal government officials.   State actors lack First

Amendment rights in the conduct that constitutes state action.

The Complaint alleges that Defendants are state actors on numerous grounds—including

by conspiring with state actors, allowing state actors to become entangled in their decisionmaking,

and becoming pervasively entwined with state actors, among others.  FAC ¶¶ 82-122.  Defendants

challenge these allegations of state action, but their arguments are meritless for the reasons

discussed below.   Given Plaintiffs' allegations of state action, Defendants' First Amendment

defense is meritless.   State actors do not have First Amendment rights in the conduct that

constitutes state action.   *See, e.g., Buchanan v. City of New York*, 556 F. Supp. 3d 346, 357

(S.D.N.Y. 2021) (noting that government employees "lack First Amendment protection as a matter

of law"); *Lee v. Driscoll*, 871 F.3d 581, 586 n.2 (8th Cir. 2017) ("[A]n elected official has no First

Amendment petition or free-speech right to participate in non-public government meetings in her

official capacity"); *Boyce v. Andrew*, 510 F.3d 1333, 1343 (11th Cir. 2007) ("If the government

employee, however, was speaking as an employee, then there can be no First Amendment

issue…."); *see also Penkoski v. Bowser*, 548 F. Supp. 3d 12, 21 (D.D.C. 2021) ("The First

Amendment's Free Speech Clause … does not apply to the government's own speech.").

Defendants cannot assert a First Amendment defense to protect themselves from liability

created by the fact that they have become "willful participant[s] in joint activity with the State or

its agents."  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970).  For example, in *Wickersham*

33

*v. City of Columbia*, 481 F.3d 591, 599 (8th Cir. 2007), the Eighth Circuit held that a private entity ("Salute") was engaged in state action when it cooperated with government officials to restrict speech at a public event: "Since Salute and the city were knowingly and pervasively entangled in the enforcement of the challenged speech restrictions, we conclude that Salute was a state actor when it interfered with appellees' expressive activities," and "Salute's curtailment of appellees' freedom of expression constituted state action and was actionable under § 1983." *Id.* The private entity contended that it had its own First Amendment right to exclude speakers from the hosted event, but the Eighth Circuit held that Salute's involvement as a state actor undermined that claim: "we cannot say that the presence of leafleters and sign carriers interfered with any First Amendment rights Salute might have in the circumstances *where its involvement is that of a state actor*." *Id.* at 601 (emphasis added). So also here, where Defendants' "involvement is that of a state actor," *id.*, it should not be shielded from liability by the First Amendment.

### 5. There is no First Amendment right to tortiously interfere with business expectations.

Finally, there is no First Amendment right to engage in tortious interference with business expectations, even though such interference commonly occurs through speech or conduct intertwined with speech. As the Second Circuit held in *Jews for Jesus*, "the First Amendment is no bar to liability under the general common law prohibition of tortious interference with contract, which, like the statutes, is directed against conduct, not speech." *Jews for Jesus*, 968 F.2d at 296 (citing *Hughes v. Superior Court of California*, 339 U.S. 460, 466–68 (1950)).

### B. The Complaint States a Valid Claim Under 42 U.S.C. § 1985(3).

Defendants argue that the Complaint fails to allege a valid civil-rights conspiracy claim under § 1985(3) for four reasons: (1) the Complaint supposedly does not allege a conspiracy with government officials to violate Plaintiffs' equal-protection rights; (2) the Complaint supposedly

does not allege racial animus; (3) the Complaint supposedly does not allege any other class-based animus; and (4) the Complaint supposedly does not allege that Defendants caused their injuries. Doc. 70-1, at 29-39.  These arguments are meritless.

### 1.    The Complaint alleges a conspiracy to violate Plaintiffs' rights.

The Complaint alleges extensive facts raising the compelling inference of a conspiracy between Defendants and federal and state government officials to deprive Plaintiffs of their First and Fourteenth Amendment rights.  From the beginning, the Complaint alleges that Defendants "collaborate closely with federal, state, and local government officials to monitor and censor disfavored viewpoints on social media."  FAC ¶ 1.   "Working closely with state and federal government officials, Defendants urge, pressure, and coerce social-media platforms to monitor and censor disfavored speakers and content."  *Id.* ¶ 2.  "Defendants launched their colossal mass-surveillance and censorship program, in close cooperation with government officials, precisely because those officials lack the resources and the legal authority to do so directly."  *Id.* ¶ 4. "Defendants and the government officials with whom they conspire have covertly appointed themselves the arbiters of truth on social media for millions of Americans."  *Id.* ¶ 6.

The Complaint provides a long series of detailed factual allegations to support these conspiracy allegations.  It alleges that Defendants work with "government agencies" and "united government … and industry."  *Id.* ¶ 54.  It alleges that federal officials played a leading role in launching the EIP/VP.  *Id.* ¶¶ 57-58 (Section I.A).  It alleges that the EIP/VP resulted from federal officials' attempt to fill a censorship "gap" that the government could not fill directly.  *Id.* ¶ 59 (Section I.B).  It alleges that the EIP "bridged the gap between government and civil society," *i.e.*, platforms, "to strengthen platform standards," *id.* ¶ 64, and that the EIP convinced platforms to change content-moderation policies due to pressure and coercion from the government, *id.* ¶ 63.

It alleges that federal and state officials both serve as key stakeholders and flaggers for the EIP/VP. *Id.* ¶ 74 (Section I.D).  It alleges that these collaborators include federal officials at CISA, the State Department's Global Engagement Center, and the state and local officials who coordinate through the CISA-funded EI-ISAC.  *Id.* ¶ 78.

The Complaint alleges that "state and local government officials from across the country, such as state Secretary of State's Offices and local election officials, participate in the EIP as flaggers, reporters, and fact-checkers for claims of 'misinformation' to be censored.  The EIP works closely with these state and local government officials to relay reports of 'misinformation' to the platforms for censorship, feed the platforms supposed 'debunking' information from such government officials, and report back to the government officials on the results of its demands for social-media censorship." *Id.* ¶ 79.  It alleges that "the EIP's participants conspire and collude with federal and state officials, who are pervasively intertwined with their operations." *Id.* ¶ 82 (Section I.E).  It alleges that state and federal officials extensively collaborate with the EIP in censoring speech. *Id.*  It alleges that the EIP and CISA shared staff who simultaneously engage in flagging for CISA and the EIP. *Id.* ¶ 124 (Section I.F).  The Complaint alleges at least 12 specific forms of collaboration between CISA and the EIP.  *Id.* ¶ 130.  The Complaint  alleges that "[f]ederal and state officials flag speech for censorship to the EIP, which reports the so-called 'misinformation' to social-media platforms for censorship." *Id.* ¶ 131 (Section I.G).

The Complaint makes very similar allegations as to the Virality Project, the EIP's COVID-related moniker. *Id.* ¶¶ 206-389 (Section II).  It alleges that "[t]he VP emphasizes the importance of both government officials and social-media platforms in its collaboration on censorship: 'As the effort progressed, input from these partners,' including government officials and platforms, 'was crucial in defining the VP's output formats and in surfacing where the impacts of vaccine

mis- and disinformation were being felt offline.'" *Id.* ¶ 279.   "This includes the VP's 'strong ties with several federal government agencies, most notably the Office of the Surgeon General (OSG) and the CDC,' which 'facilitate[d] bidirectional situational awareness around emerging narratives.'"   *Id.* ¶ 279.   It alleges that Defendants' "Jira software allowed VP analysts, government officials, and platform employees to communicate directly about tickets and reports in real time." *Id.* ¶ 282.  It alleges that the VP serves as a conduit for government officials to push platforms to censor disfavored speech.  *Id.* ¶¶ 293-97 (Section II.E).  It alleges that "government officials provided 'tips' to the VP about misinformation on social media, and the VP flagged such content to platforms for censorship." *Id.* ¶ 293.  "The VP identifies 'federal health agencies' and 'state and local public health officials' as 'stakeholders' who 'provided tips, feedback and requests to assess specific incidents and narratives.'" *Id.* ¶ 294.  It alleges that "the VP collaborates closely with, and is pervasively intertwined with, federal, state, and local government officials.  *Id.* ¶ 298 (Section II.F).  "The VP states that it is a 'multistakeholder collaboration' that includes 'government entities' among its stakeholders."   *Id.* ¶ 299.   "One of the key constituent organizations of the Virality Project—the University of Washington and its CIP—is a public state university whose personnel are state employees.  Kate Starbird and the other CIP personnel involved in the Election Integrity Partnership and the Virality Project are themselves state government officials."  *Id.* ¶ 302.

The Complaint alleges that "The VP report states that: '**Federal government agencies** served as coordinators for national efforts.  The Virality Project built strong ties with several federal government agencies, most notably the Office of the Surgeon General (OSG) and the CDC, to facilitate bidirectional situational awareness around emerging narratives.'"   *Id.* ¶ 303.  "The VP engaged in continuous, ongoing communication with government officials."  *Id.* ¶ 306.  "The VP

states that it 'provided strategic insights to government entities such as the OSG, CDC, and the Department of Health and Human Services.'" *Id.* ¶ 307. "The VP cites its close collaboration with Surgeon General Murthy in particular." *Id.* ¶ 311. On top of all this, the Complaint incorporates this Court's factual findings regarding the EIP/VP from *Louisiana v. Biden*, which include fourteen pages of similar findings, leading to the conclusion that "CISA and the EIP were completely intertwined." *Missouri*, 2023 WL 4335270, at *32-35, 37-40, 52-53.

Here, the well-pleaded facts overwhelmingly support the inference of conspiracy between Defendants and government officials to carry out the censorship activities challenged in the Complaint. Thus, contrary to Defendants' argument, the Complaint plainly alleges "an *actual agreement*" to deprive Plaintiffs of their federally protected rights, such that the deprivation is "a conscious objective of the enterprise." Doc. 70-1, at 30. Defendants' argument that the Complaint includes only "mere conclusory allegations" and "[b]ald allegations," *id.* at 31, is demonstrably erroneous. The Complaint plainly alleges "an understanding or agreement" between Defendants and "third-party government co-conspirators to take these actions against Plaintiffs." *Id.* (quoting *Holdiness v. Stroud*, 808 F.2d 417, 425 (5th Cir. 1987)). It is equally plain that the Complaint alleges that violating Plaintiffs' rights was a "conscious objective" of the conspiracy. Doc. 70-1, at 31 (quoting *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 275 (1993)).

Finally, Defendants argue that "the Complaint contains *no* allegations that Defendants Graphika or Francois had any contact with any government officials with respect to any of the conduct alleges in the Complaint." Doc. 70-1, at 33. But the Complaint alleges that Graphika and Camille Francois served as co-leaders of the censorship enterprise along with Stanford, Stamos, DiResta, Starbird, Brookie, and others. FAC ¶ 36. For a conspiracy to exist, it is not necessary that every member of the conspiracy have direct contact with every other conspirator. *See, e.g.,*

*United States v. Taren-Palma*, 997 F.2d 525, 530 (9th Cir. 1993) ("Every member of the conspiracy need not know every other member nor be aware of all acts committed in furtherance of the conspiracy."); *United States v. Veneri*, 635 F. Supp. 1259, 1261 (M.D.N.C. 1986), aff'd, 813 F.2d 1229 (4th Cir. 1987) ("Certainly not every member of the conspiracy knew one another or worked together on every transaction.").   Here, the Complaint alleges agreement and joint participation between Graphika and Francois and the other EIP/VP Defendants, and it alleges that the other EIP/VP Defendants effected the same agreement with government officials.

### 2.      The Complaint alleges racial animus.

Next, Defendants argue that the Complaint fails to allege racial animus.  Doc. 70-1, at 33-35.  This argument is meritless.  The Complaint alleges extensive racial animus, including animus against Black, Chinese, and Hispanic speakers and audiences.   FAC ¶¶ 333-55 (Sections H.2 and H.3).   Among other things, the Complaint alleges that Defendants particularly target Black speakers and audiences for censorship "on the basis of invidious animus," *id.* ¶ 333; *see also id.* (Section H.2).  The Complaint quotes from the Virality Project Report's discussions of the need to silence anti-vaccine activists and narratives that circulate in "racialized communities, especially Black communities." *Id.* ¶ 334.  It alleges that Defendants "target[] such narratives because they are addressed to Black audiences," giving specific examples of Defendants' targeting of speech circulating in Black communities about medical racism and the infamous Tuskegee syphilis experiments.  *Id.* ¶¶ 336.  It alleges that Defendants seek to suppress such speech "because it addresses Black audiences." *Id.* ¶ 338.  It notes that Defendants provide other examples, such as speech about the death of Black baseball legend Hank Aaron shortly after taking his COVID vaccine, which they target because it is "particularly relevant to Black audiences." *Id.* ¶ 341. Quoting the EIP Report, the Complaint alleges that the Election Integrity Partnership even had a

working group called "*Targeted Group Monitoring*" that was "specifically focused on monitoring and censoring speech relating to Black speakers and audiences, and Spanish- and Chinese-language speaker and audiences." *Id.* ¶ 343 (emphasis added).

The Complaint also alleges similar animus against Chinese and Hispanic speakers and audiences. *Id.* ¶¶ 344-55 (Section H.3). It alleges that the EIP Report has an entire section "describing its monitoring and censorship targeted at Spanish-speaking and Chinese-speaking communities." *Id.* ¶ 345. It alleges that Defendants "targets Chinese-language speech and speakers extensively," and that they also engage in "monitoring and censorship of Spanish-language speakers and audiences." *Id.* ¶ 346. It alleges that "[t]he Virality Project report includes an entire Section 4.2 devoted to its targeting censorship activities at 'Spanish and Chinese Influencers,'" *id.* ¶ 351, which "includes a specific subsection (Subsection 4.2.1) describing ethnic Latino and Spanish-language speakers and writers that the VP targeted," *id.* ¶ 354, and "includes a specific subsection (Subsection 4.2.2) describing ethnic Chinese and Chinese-language speakers and writers that the VP targeted on the basis of their Chinese-speaking identities and audiences," *id.* ¶ 355. These allegations raise a compelling inference that Defendants and their co-conspirators extensively targeted speakers and audiences on the basis of race—including Black, Hispanic, and Chinese speakers and audiences.

Defendants argue that their racially targeted censorship does not constitute "animus" because it was supposedly *benign*, *i.e.*, "motivated by their desire to *prevent* mis- and disinformation from reaching" those protected classes. *Id.* But even supposedly benign racial animus constitutes racial animus and is unconstitutional. The Supreme Court has explicitly rejected the notion that "the 'animus' requirement can be met only by maliciously motivated, as opposed to assertedly benign (though objectively invidious), discrimination…." *Bray,* 506 U.S.

at 269–70.  A plaintiff demonstrates animus by showing that the defendant's conduct is "motivated by a purpose (malevolent *or* benign) directed specifically at [the protected group] as a class," *i.e.*, "a purpose that focuses on [the minority group] *by reason of* [their membership in that group]." *Id.* at 270.  Thus, as "an illustration of assertedly benign discrimination," the Supreme Court posited a defendant who acted for "the purpose of 'saving' women *because they are women* from the combative, aggressive profession such as the practice of law."  *Id.*  Here, that is exactly what Defendants contend—that they acted from the supposedly benign purpose of protecting Black, Chinese, and Hispanic people from disinformation because members of those minority communities could not be trusted to draw their own conclusions about what to believe.  FAC ¶ 333.  That is quintessential racial animus under *Bray* and other cases.  *See also, e.g., Frederick Douglass Foundation, Inc. v. District of Columbia*, No. 21-7108, 2023 WL 5209556, at *12 (D.C. Cir. Aug. 15, 2023) ("Viewpoint discrimination violates the First Amendment, regardless of the government's benign motive or lack of animus toward the ideas contained in the regulated speech…. Innocent motives do not eliminate the danger of censorship.") (cleaned up) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015)).  "History has repeatedly shown that purportedly benign discrimination may be pernicious." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 257 (2023) (Thomas, J., concurring).

Defendants also argue that Plaintiffs lack third-party standing to assert the rights of the minority communities to whom Plaintiffs speak and whom Defendants specifically target for censorship.  Doc. 70-1, at 34-35.  This argument is meritless.  The sole case Defendants cite in support, *Bryan v. City of Madison*, 213 F.3d 267 (5th Cir. 2000), does not discuss third-party standing at all and thus provides no support for Defendants' argument.  *See id.*

Here, Plaintiffs repeatedly allege that they engaged in speech specifically directed toward the targeted minority audiences.  *See, e.g.,* FAC ¶ 394 (alleging that Hines re-posts speech by the Chinese newspaper Epoch Times addressed to Chinese audiences); *id.* ¶ 396 (alleging that Hines "experiences censorship of … speech particularly addressed to racial minorities such as Black people"); *id.* ¶ 406 (alleging that "Hoft's social-media speech includes speech addressed to audiences targeted on the basis of discriminatory animus by Defendants—such as … election-related speech from the Chinese-originated publication The Epoch Times, which Defendants target for particular monitoring").

Plaintiffs unquestionably have the right to assert the interests of their audiences and social-media interlocutors in this context.  The Supreme Court has held that third-party standing requirements are "quite forgiving" in the context of freedom of speech.  *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004).  The usual "close relationship" and "hindrance" are not required; instead, Article III injury is all that is required.  *See id.*; *Dombroski v. Pfister*, 380 U.S. 479, 486-87 (1965); *N.J. Bankers Ass'n v. Att'y Gen.*, 49 F.4th 849, 860 (3d Cir. 2022).  The Court applied this very reasoning to uphold third-party standing in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963).  Allowing third-party standing to vindicate free-speech rights is particularly appropriate because "[i]t is characteristic of the freedoms of expression in general that they are vulnerable to gravely damaging yet barely visible encroachments," and thus "the freedoms of expression" must be shielded by "the most rigorous procedural safeguards" and "ringed about with adequate bulwarks."  *Id.* at 66.

Moreover, even if this case did not involve the "freedoms of expression," *id.*, third-party standing is routinely upheld "when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights."  *Kowalski*, 543 U.S. at 130 (quoting

*Warth v. Seldin*, 422 U.S. 490, 510 (1975)).  Here, the "challenged restriction," *id.*, is Defendants' censorship of the Plaintiffs' speech, which violates the rights of those who would read the Plaintiffs' speech—including their right not to be targeted for censorship on the basis of discriminatory animus.  Plaintiffs have third-party standing to assert those rights on this basis too.

### 3.    The Complaint alleges other forms of invidious animus.

Plaintiffs acknowledge that the Fifth Circuit has held that "the only conspiracies actionable under section 1985(3) are those motivated by racial animus." *Cantu v. Moody*, 933 F.3d 414, 419 (5th Cir. 2019).  But the Supreme Court has not addressed this issue, *see id.*; other Circuits disagree, *see, e.g., Jews for Jesus*, 968 F.2d at 291 ("Several courts, including this one, have defined 'class-based animus' [in § 1985(3)] to include discrimination based on religion.") (citing cases from the Second, Fourth, and Tenth Circuits); and the Fifth Circuit's precedent contradicts the statute's plain meaning, which refers not only to racial animus but more generally to the "equal protection of the laws" and "equal privileges and immunities under the laws," 42 U.S.C. § 1985(3).  Accordingly, to preserve the issue for future *en banc* and Supreme Court review, Plaintiffs have alleged other class-based forms of animus that violate equal protection, including animus on the basis of religion, sex, and viewpoint.  *See* FAC ¶ 323 (Section H.1 – allegations re animus toward religious speakers and audiences); FAC ¶ 356 (Section H.4 – allegations re animus toward female speakers and audiences).

Defendants argue that these allegations are insufficient, but their arguments merely rehash the meritless arguments they make about race discrimination. Doc. 70-1, at 35-36.  Contrary to Defendants' arguments, targeting speech for censorship that is specifically targeted to audiences of women, or audiences of particular religious believers, reflects animus on the basis of sex and

religion.  *See Bray*, 506 U.S. at 269–70.  Once again, Defendants claim that their motives were benign, Doc. 70-1, at 36, but that argument fails under *Bray* as well.  *See* 506 U.S. at 270.

Regarding the Complaint's allegations of viewpoint discrimination, Defendants argue that "§ 1985(3) does not extend to discrimination on the basis of political viewpoint."  Doc. 70-1, at 36.  But § 1985(3) extends to conspiracies to deprive persons "of the equal protection of the laws," and free-speech rights fall within the small class of rights deemed to be "fundamental rights" that automatically trigger heightened scrutiny for equal-protection purposes.  *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 547 (1983) (holding that, under the Equal Protection Clause, government policies "are subjected to a higher level of scrutiny if they interfere with the exercise of a fundamental right, *such as freedom of speech*, or employ a suspect classification, such as race") (emphasis added).  Here, where Defendants' conduct extensively interferes with Plaintiffs exercise of "a fundamental right, such as freedom of speech," *id.*, on the basis of viewpoint, they deprive Plaintiffs of "the equal protection of the laws."  42 U.S.C. § 1985(3).  As for Defendants' claim that "the Complaint does not even plausibly allege viewpoint discrimination," Doc. 70-1, at 37, the Complaint contains entire sections documenting Defendants' egregious viewpoint discrimination.  FAC ¶¶ 156-75, 211-34 (Sections I.I, II.A).  This Court— after viewing many of the same materials—came to the same conclusion.  *Missouri*, 2023 WL 4335270, at *41, 44, 48-49, 53.  In fact, this Court specifically found that "[t]he VP, EIP, and Stanford Internet Observatory … demonstrat[ed] likely 'viewpoint discrimination.'"  *Id.* at *53.

### 4.    The Complaint alleges extensive First Amendment violations.

Next, Defendants briefly argue that "the Complaint does not plausibly allege a First Amendment violation."  Doc. 70-1, at 37-38.  This argument is meritless for the reasons discussed in detail below regarding Plaintiffs' § 1983 claim.  *See infra*, Part IV.C.

5.      **The Complaint alleges that Defendants cause Plaintiffs' injuries.**

Finally, Defendants argue that the Complaint fails to allege that Defendants cause Plaintiffs' injuries.  Doc. 70-1, at 38-39.  This argument merely cross-references Defendants' arguments on traceability in their standing argument.  *See id.* at 39.  These arguments are meritless for the reasons discussed above.  *See supra* Part II.

C.      **The Complaint Alleges a Valid Claim Under 42 U.S.C. § 1983.**

Next, Defendants contend that the Complaint fails to state a claim under 42 U.S.C. § 1983.  According to Defendants, the Complaint (1) fails to allege state action, (2) fails to allege a valid claim against Kate Starbird in her official capacity, (3) fails to allege a First or Fourteenth Amendment violation, and (4) fails to allege causation.  Doc. 70-1, at 39-50.  These arguments are meritless.  As Defendants concede, Doc. 70-1, at 39, "[t]o state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).  The Complaint satisfies both requirements.

1.      **The Complaint alleges state action.**

Citing *Lugar v. Edmonson Oil Company*, Defendants argue that "the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible."  Doc. 70-1, at 40 (quoting 457 U.S. 922, 937 (1982)).  But that rule was announced in a totally different context—a line of cases addressing whether state action occurs when a private party employs a state-created procedure and the state's authority to seize or restrict another person's property, *i.e.*, cases addressing "garnishment and prejudgment attachment procedures."  *Id.* at 932.  In such cases, a threshold requirement for private party's use of the garnishment or prejudgment attachment

procedure to constitute state action is that the procedure be state-created in the first place.  *Id.* at 937.  This requirement does not apply in cases that do not involve a private party invoking a formal procedure to deprive another person of his or her rights.  Thus, the Fifth Circuit's decision in *Missouri v. Biden* contains an extensive, detailed discussion of state action, yet the Fifth Circuit did not discuss or apply this requirement to find state action in the interactions between government officials and social-media platforms.  *See Missouri*, 2023 WL 6425697, at *12-26.

But even if that requirement applied, it is easily satisfied here.  The Complaint alleges that federal and state officials—including CISA and state officials working through the EI-ISAC—worked with Defendants to set up an elaborate, formal procedure for flagging and censoring speech on the basis of viewpoints, complete with organizational flowcharts and real-time reporting interactions between state officials, Defendants, and platforms.  FAC ¶¶ 131-40.  This formalized procedure is akin to the attachment and prejudgment seizure procedures at issue in *Lugar* and similar cases, and thus it satisfies the requirement that Defendants were involved in "the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible."  *Lugar*, 457 U.S. at 937.

Next, Defendants argue that the Complaint does not allege action under color of state law under any theory.  The "state action" and "under color of state law" doctrines overlap here: "[I]n a § 1983 action brought against a state official, the statutory requirement of action 'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical."  *Lugar*, 457 U.S. at 929.  Here, the Complaint validly alleges state action under multiple theories.

***Conspiracy with State Officials.***  First, the Complaint alleges an extensive agreement and meeting of minds between Defendants and both federal and state officials to violate Plaintiffs' First Amendment rights (and those of millions of other Americans).  *See supra*.

46

Setting aside the references to federal officials, and focusing only on *state* officials' involvement under § 1983, the Complaint alleges extensive conspiracy, agreement, and participation of state officials in the EIP/VP censorship enterprise.  The Complaint alleges that Defendants work with "government agencies" and "united government … and industry," where (as throughout the Complaint) the "government officials" include both federal and *state* officials. *Id.* ¶ 54.   It alleges that state officials serve as key stakeholders and flaggers for the EIP/VP. *Id.* ¶ 74 (Section I.D).  It alleges that the EIP/VP's collaborators include the state and local officials who coordinate through the CISA-funded EI-ISAC.  *Id.* ¶ 78.  The Complaint alleges that "state and local government officials from across the country, such as state Secretary of State's Offices and local election officials, participate in the EIP as flaggers, reporters, and fact-checkers for claims of 'misinformation' to be censored.  The EIP works closely with these state and local government officials to relay reports of 'misinformation' to the platforms for censorship, feed the platforms supposed 'debunking' information from such government officials, and report back to the government officials on the results of its demands for social-media censorship."  *Id.* ¶ 79.

The Complaint alleges that "the EIP's participants conspire and collude with federal and state officials, who are pervasively intertwined with their operations."  *Id.* ¶ 82 (Section I.E).  It alleges that state and federal officials extensively collaborate with the EIP in censoring speech. *Id.* ¶ 102 (Section I.E).  The Complaint alleges that "[f]ederal and state officials flag speech for censorship to the EIP, which reports the so-called 'misinformation' to social-media platforms for censorship."  *Id.* ¶ 131 (Section I.G).  It alleges that "[t]he VP emphasizes the importance of both government officials and social-media platforms in its collaboration on censorship: 'As the effort progressed, input from these partners,' including government officials and platforms, 'was crucial in defining the VP's output formats and in surfacing where the impacts of vaccine mis- and

47

disinformation were being felt offline.'" *Id.* ¶ 279.  It alleges that Defendants' "Jira software allowed VP analysts, government officials, and platform employees to communicate directly about tickets and reports in real time." *Id.* ¶ 282.  It alleges that "government officials provided 'tips' to the VP about misinformation on social media, and the VP flagged such content to platforms for censorship." *Id.* ¶ 293.  Again, these "government officials" include *state* officials: "The VP identifies 'federal health agencies' and 'state and local public health officials' as 'stakeholders' who 'provided tips, feedback and requests to assess specific incidents and narratives.'" *Id.* ¶ 294. It alleges that "the VP collaborates closely with, and is pervasively intertwined with, federal, state, and local government officials." *Id.* ¶ 298 (Section II.F).

The Complaint alleges that "[t]he VP engaged in continuous, ongoing communication with government officials." *Id.* ¶ 306.  "The VP states that it is a 'multistakeholder collaboration' that includes 'government entities' among its stakeholders." *Id.* ¶ 299.  "One of the key constituent organizations of the Virality Project—the University of Washington and its CIP—is a public state university whose personnel are state employees.  Kate Starbird and the other CIP personnel involved in the Election Integrity Partnership and the Virality Project are themselves state government officials." *Id.* ¶ 302.  In fact, the Complaint alleges that Kate Starbird, a *state* official at the University of Washington, plays a key leadership role in directing all of the EIP/VP's censorship activities.  *Id.* ¶ 24.  The Complaint alleges that the other Defendants collaborate and work closely with Starbird in censoring Americans' speech.  *Id*. ¶ 36.  Further, the University of Washington's Center for an Informed Public is one of the four principal research organizations composing the EIP/VP, and Starbird leads a "contributing team" consisting of at least *eighteen* University of Washington state officials and employees who direct and implement the EIP/VP's activities.  FAC ¶ 24; Doc. 1-2, at 4.  An enterprise that is co-directed by a state official exercising

control over its daily operations, with 18 state officials directly participating in its activities, involves state action.

These facts support an inference of state action on many grounds.  First, they support an inference of conspiracy with state officials to violate First Amendment rights.  To establish a "§ 1983 conspiracy claim," the plaintiff must allege "(1) the existence of a conspiracy involving state action," and "(2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy."  *Shaw v. Villanueva*, 918 F.3d 414, 419 (5th Cir. 2019).  Both these requirements are easily met here.  The facts discussed above raise a powerful inference of the existence of a conspiracy with state officials, and the conspiracy actually deprived Plaintiffs of their First Amendment rights, as discussed below.

To satisfy the "color of law" requirement of § 1983, "the defendant need not be an officer of the state to satisfy this requirement; private persons may be held liable under § 1983 if they willfully participate in joint action with state agents.  *Alleging a conspiracy between private and public actors satisfies this requirement*."  *Hobbs v. Hawkins*, 968 F.2d 471, 480 (5th Cir. 1992) (emphasis added).  State action thus exists when a state official "reache[s] an understanding" with private parties to violate a victim's rights.  *Dykes v. Hosemann*, 743 F.2d 1488, 1498 (11th Cir. 1984).  As the Fifth Circuit has held, this requirement usually is "met by circumstantial evidence" because "conspirators rarely formulate their plans in ways susceptible of proof by direct evidence."  *Crowe v. Lucas*, 595 F.2d 985, 993 (5th Cir. 1979).[1]  Plaintiffs need not prove, however, that

---

[1] In *Crowe*, the plaintiff sued state officials under 42 U.S.C. § 1983, alleging that they had arranged for his arrest in furtherance of a conspiracy to deprive him of "his rights to freedom of speech and assembly" after he questioned the integrity of an election.  *Id.* at 988–92.  Although there was no direct evidence of an agreement among the defendants, "[t]he evidence showed that the defendants had participated in private meetings at which Crowe was discussed."  *Id.* at 993.  "From this evidence and the testimony regarding the defendants' course of conduct toward Crowe," the Fifth

Defendants "reached an understanding" to censor each particular item of speech—only that Defendants reached an understanding with state officials to censor in general.  When a plaintiff establishes "the existence of a conspiracy involving state action," the government becomes responsible for *all* constitutional violations committed "in furtherance of the conspiracy by a party to the conspiracy."  *Armstrong v. Ashley*, 2023 WL 2005263, at *12 (5th Cir. 2023).  That is because conspiracy can "be charged as the legal mechanism through which to impose liability on each and all of the Defendants *without regard* to the person doing the particular act" that deprives the plaintiff of his constitutional rights.  *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990) (emphasis added) (cited in *Armstrong*, 2023 WL 2005263, at *12).

Further, the fact that Defendants are conspiring with state officials in *multiple* states does not undermine the finding of state action; it exacerbates it.  Because Kate Starbird, a state official of the State of Washington, co-directs the EIP/VP's enterprise in her official capacity as a UW official, Defendants are acting under color of Washington law at all times.  Further, when Defendants conspire with state officials in other states—such as when the Arizona Secretary of State cooperates with them to silence speech about the "Sharpiegate" incident in Arizona—they are acting under color of Arizona law, or the law of each relevant conspiring State.

***Significant Encouragement by State Officials.***  Further, the Complaint alleges facts demonstrating that Defendants received "significant encouragement" from state officials.  As the Fifth Circuit has recently held, "significant encouragement" can occur in many ways, including "(1) entanglement in a [private] party's independent decision-making or (2) direct involvement in carrying out the decision itself."  *Missouri*, 2023 WL 6425697, at *14.  Here, the allegations in the

Circuit concluded, "the jury could reasonably have inferred that a conspiracy existed."  *Id.*  The evidence supporting the inference of conspiracy is far, far stronger here.  *See supra.*

Complaint discussed above raise the inference that Defendants and state officials deliberately set up an elaborate system for misinformation reporting, flagging, and fact-checking that left state officials "entangle[d]" in the EIP/VP's decision-making.  *See supra*.  Indeed, state officials were key decisionmakers for the EIP/VP's system, because they were the principal source for specific misinformation reports on the ground, they reported those issues for flagging to the EIP, and then they were directly involved in fact-checking or debunking for the EIP/VP's analysts and platforms in real time.  *See, e.g.,* Doc. 1-2, at 30.  For example, the EIP Report includes a snapshot of a real-time Jira chat between "members of the EIP, government partners, and platform partners" in debunking the #Sharpiegate hashtag, which resulted in the censorship of hundreds of thousands of social-media posts expressing perfectly valid concerns about the use of Sharpies in marking ballots in Arizona.  *Id.*  The chat thread makes perfectly clear that an Arizona state official (identified as "Government partner") working with the EIP is directly involved in fact-checking or "debunking" the voters' claims to convince the platforms (successfully) to censor them.  *Id.*  The "EIP member" notes that "the content we have gathered on this ticket … is affecting all of Youtube, FB, Twitter, TikTok…"  *Id.*  This example shows state officials deeply entangled in the EIP/VP's decisionmaking processes, down to the level of censoring specific posts and narratives.

For similar reasons, these allegations show that state officials had "direct involvement in carrying out the decision[s]" of the EIP/VP.  *Missouri*, 2023 WL 6425697, at *14. Again, the Jira thread on throttling the "Sharpiegate" narrative in Arizona provides a prime example.  It shows that, once the EIP/VP decided to flag that narrative as misinformation to platforms, they brought the state official on board to ensure that the platforms would censor the narrative, by fact-checking or debunking the narrative to the platforms to convince them that it violated their terms of service. *See* Doc. 1-2, at 30.  And this is only one example—state officials' participation in this manner,

51

the Complaint alleges, was systematic.  FAC ¶ 79.  Thus, in addition to being directly involved in the EIP/VP's decisions on what to censor, state officials also played a key role in *implementing* the EIP/VP's censorship decisions, by acting as advocates to the platforms to convince them to censor the disfavored content and viewpoints.  *See id.*  This constitutes both "entanglement" in the EIP/VP's decisionmaking and direct involvement in carrying out the EIP/VP's decisions.  Indeed, considering very similar facts, this Court made similar findings of significant encouragement that the Fifth Circuit affirmed in *Missouri v. Biden.  See Missouri*, 2023 WL 4335270, at *52-53.

In arguing that the Complaint does not allege significant encouragement, Defendants do not cite the Fifth Circuit's governing standards from *Missouri v. Biden*.  Instead, they rely on two off-point cases: *NCAA v. Tarkanian*, 488 U.S. 179 (1988), and *Louisiana Division of Sons of Confederate Veterans v. City of Natchitoches*, 370 F. Supp. 3d 692 (W.D. La. 2019).  Doc. 70-1, at 43-44.  As for the latter case, *Louisiana Division*, this Court has already considered the case and rejected similar reliance upon it.  *See Missouri*, 2023 WL 4335270, at *43.  As the Court noted, in that case, the sole action by a state official was that "[t]he Mayor sent a letter asking the private business to prohibit the display of the Confederate battle flag."  *Id.*  That case bears no resemblance to the extensive, repeated entanglement and direct involvement of state officials in the EIP/VP.  Likewise, *Tarkanian* is not analogous to this case.  In *Tarkanian*, the University of Nevada-Las Vegas (a state university) had voluntarily adopted NCAA standards, by which the plaintiff's employment was suspended.  488 U.S. at 194.  The Supreme Court held that UNLV's voluntary adoption of the NCAA's proposed standards did not render the NCAA a state actor, because UNLV "retained plenary power to reexamine those standards and, if necessary, to reject them and promulgate its own."  *Id.  Tarkanian* would have looked very different if, once UNLV adopted the NCAA's rules, NCAA officials remained directly involved in applying and enforcing them.  Yet

that is what the state officials did here—they not only cooperated with the EIP/VP in establishing a censorship-flagging system, but they were also directly involved in the ongoing, day-to-day decisionmaking and implementation of that system.

In contrast to the off-point cases cited by Defendants, a host of cases supports the Fifth Circuit's "entanglement" and "direct involvement" standards, all directly confirming the finding of state action here. *See, e.g., Dennis v. Sparks*, 449 U.S. 24, 27 (1980) (state action when a private party is "a willful participant in joint action with the State or its agents"); *Adickes*, 398 U.S. at 152 ("[I]t is enough that he is a willful participant in joint activity with the State or its agents"); *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 753 (9th Cir. 2020) (state action when "the state significantly involves itself in the private parties' actions and decisionmaking at issue," or "the state has … deeply insinuated itself into" a private decisionmaking "process"); *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1454 (10th Cir. 1995) ("'a substantial degree of cooperative action' between state and private officials" or "'overt and significant state participation'" in private conduct); *Hoai v. Vo*, 935 F.2d 308, 313 (D.C. Cir. 1991) ("overt and significant state participation in the challenged action"); *Collins v. Womancare*, 878 F.2d 1145, 1154 (9th Cir. 1989) (a "substantial degree of cooperative action" between government and private actors); *Jackson v. Pantazes*, 810 F.2d 426, 429 (4th Cir. 1987) (the private party "has acted together with or has obtained significant aid from state officials"); *Frazier v. Bd. of Trustees of Nw. Miss. Reg'l Med. Ctr.*, 765 F.2d 1278, 1288 (5th Cir. 1985) (state "plays some meaningful role in the mechanism leading to the disputed act"). All these formulations are closely akin to the Fifth Circuit's "entanglement" and "direct involvement" standards. And Defendants are engaged in state action under all of them.

Again, the case for "entanglement" and "direct involvement" is even more clear when one considers that one of EIP/VP's key leaders, Kate Starbird, is *herself a state official* acting in her official capacity as a public university professor and administrator; and the EIP/VP's key academic research organizations include the public University of Washington, which is "undoubtedly" a state actor.  FAC ¶ 24; *see also, e.g., Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 297 (2001) (a public university is "an undoubtedly state actor").  Starbird leads a team of 18 state officials from the University of Washington in co-directing and implementing the EIP/VP.  FAC ¶ 24.  It is hard to imagine a higher level of "entanglement" and "direct involvement" in private decision-making when a state official co-directs the EIP/VP's entire enterprise and leads a team of 18 state officials in the daily decision-making and operations of the enterprise.  *See id.*

***Joint Action and Pervasive Entwinement.***  In addition to conspiracy and significant encouragement, state officials were also pervasively entwined in the EIP/VP.  In fact, the EIP/VP is a government-launched program in which government officials—including state officials—are just as integral to the program's operations as the academic researchers themselves.  This is especially true of state official Kate Starbird, who is one of the EIP/VP's key leaders, and it also applies to the state and local officials who serve as key flaggers, reporters, fact-checkers, and debunkers for the EIP/VP.  State officials, in other words, are absolutely central and integral to the EIP/VP's operations.  This Court recently found that "CISA and the EIP were completely intertwined."  *Missouri*, 2023 WL 4335270, at *53.  The same conclusion applies to state officials as well, who had extremely high levels of involvement and integration in the EIP/VP's operations.

In *Missouri v. Biden*, the Fifth Circuit reaffirmed that "joint action" in the form of "pervasive entwinement" of state officials into the private organization constitutes state action.

2023 WL 6425697, at *14 n.11.  Just such "pervasive entwinement" is alleged here, where the EIP/VP is a joint government/private operation *co-directed by a state official* with other state officials integrally involved in every major aspect of its censorship operations.  Thus, the EIP/VP has a "symbiotic relationship" with state officials and it is an "ostensibly private organization [that] ought to be charged with a public character."  *Id.*

As Defendants admit, "[a] private party may be a state actor 'when it is entwined with governmental policies,' or when government is 'entwined in its management and control.'"  Doc. 70-1, at 45 (quoting *Brentwood Academy*, 531 U.S. at 296).  Here, the EIP/VP satisfies both tests. It is deeply "entwined in governmental policies" favoring the censorship of disfavored election-related speech, and state officials—most notably, Kate Starbird, and also the trusted state-official flaggers of the EI-ISAC—are "entwined in its management and control."  *Id.*  Defendants argue that *Brentwood Academy* supports their position, but in fact that case strongly supports a finding of pervasive entwinement and state action here.  In *Brentwood Academy*, the Supreme Court emphasized that "the entwinement of public … officials with the Association from the bottom up" was combined with "entwinement from top down," as public officials served both as rank-and-file members and directors of the state athletic association.  531 U.S. at 300.  The analogy to this case is striking, where the state officials who flag, report, fact-check, and debunk disfavored speech provide for "entwinement … from the bottom up," while Kate Starbird and the University of Washington serving as co-leaders provide "entwinement from top down."  *Id.*  To be sure, the EIP/VP is not identical to a state athletic association, but state action's "criteria lack rigid simplicity," and it is a "necessarily fact-bound inquiry."  *Id.* at 295, 298.  Any "nominally private character of the [EIP/VP] is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings."  *Id.* at 298.

## 2.    Starbird is properly sued in her official and individual capacities.

Defendants also argue that the official-capacity claim against Kate Starbird must be dismissed.  Doc. 70-1, at 47-48.  Not so.  The Complaint asserts multiple claims against Starbird, including a freestanding claim arising under the First Amendment; and it seeks injunctive relief to prevent future violations.  It is black-letter law that state officers in their official capacities may be sued to prevent violations of federal law.  *See, e.g., McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 413–14 (5th Cir. 2004) ("[T]he courts of appeals have been unanimous in rejecting arguments that state officers cannot be sued for prospective relief in their official capacities for violations of" federal law).  And because Plaintiffs seek "prospective relief" in the form of injunctive relief, Defendants' invocation of the University of Washington's putative Eleventh Amendment immunity does not apply.  A suit against a state official in her official capacity seeking prospective injunctive relief is not barred by the Eleventh Amendment.  *See id.* at 414 ("Defendants have been sued in their official capacities and are therefore representing their respective state agencies … for all purposes *except the Eleventh Amendment*.") (emphasis added); *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985) ("[O]fficial-capacity actions for prospective relief are not treated as actions against the State.") (citing *Ex parte Young*, 209 U.S. 123 (1908)).

## 3.    The Complaint Alleges First And Fourteenth Amendment Violations.

Defendants argue that the Complaint fails to allege any violations of the First and Fourteenth Amendment.  Doc. 70-1, at 48-49.  These arguments lack merit.

### a.    The Complaint alleges egregious First Amendment violations.

First, the Complaint alleges that the EIP/VP's activities—including those of the state and federal officials involved—transform the *platforms'* content-moderation decisions into state

action.  This is a distinct question from whether *Defendants'* actions constitute state action, which is discussed above, but it relies on the same legal principles.

   *Coercion.*  First, as noted above, the Complaint alleges that the platforms are coerced by pressure and threats from government officials to participate in the EIP/VP.  FAC ¶ 2.  This allegation draws direct support from this Court's analysis in *Missouri v. Biden*:

> Government officials began publicly threatening social-media companies with adverse legislation as early as 2018.  In the wake of COVID-19 and the 2020 election, the threats intensified and became more direct.  Around this same time, [federal officials] began having extensive contact with social-media companies via emails, phone calls, and in-person meetings. This contact, paired with the public threats and tense relations between the Biden administration and social-media companies, seemingly resulted in an efficient report-and-censor relationship between [federal officials] and social-media companies.

2023 WL 4335270, at *62.  During the very same time frame, CISA—one of the defendants discussed in the block quote above—launched the EIP/VP and remained pervasively entwined in its operations.  *See id.* at *53 ("CISA and the EIP were completely intertwined.").  CISA was also closely cooperating with the FBI at the time, which was then brokering secret meetings with congressional staffers to pressure platforms to comply with federal requests for censorship.  FAC ¶ 150.  Federal pressure on platforms increased when the White House—which also has ties to the EIP—engaged in a massive pressure campaign on platforms in 2021 to force them to comply with censorship requests against COVID and vaccine-related speech.  FAC ¶ 151.  The White House's threats and pressure coerced platforms into cooperating with the censorship demands of the CDC, the Office of Surgeon General, and similar federal health agencies.  FAC ¶ 152.  The EIP/VP was directly collaborating with those same agencies to target and flag disfavored viewpoints regarding COVID and vaccines.  FAC ¶ 153.  Accordingly, the EIP/VP directly benefited from, and leveraged, the threats and pressure from federal agencies like the White House, the Surgeon

General's Office, the CDC, CISA, and the FBI in procuring the cooperation of platforms.  FAC ¶ 154.

 ***Significant Encouragement.***  Second, through the EIP/VP, Defendants and their state and federal official co-conspirators significantly encouraged the platforms to engage in the acts of censorship challenged in the Complaint.  As noted above, significant encouragement can involve both "(1) entanglement in a [private] party's independent decision-making or (2) direct involvement in carrying out the decision itself." *Missouri*, 2023 WL 6425697, at *14.  Here, through the EIP/VP, federal and state officials are deeply "entangle[d]" in the platforms' "independent decision-making," *id.*—they have a seat at the table when individual content-moderation decisions are made, and they are actively involved in identifying, flagging, fact-checking, and debunking content for the platforms' content-moderation processes.  *See supra*. Moreover, the Complaint alleges that Defendants—working closely with government officials— successfully pressured platforms to adopt more restrictive content-moderation *policies*, and then pushed the platforms to *enforce* those new government-induced policies against disfavored viewpoints.  FAC ¶¶ 63-73.  As the Fifth Circuit recently held, this constitutes quintessential "significant encouragement."  Through the EIP/VP,

> [government] officials exercised meaningful control—via changes to the platforms' independent processes—over the platforms' moderation decisions.  By pushing changes to the platforms' policies through their expansive relationship with and informal oversight over the platforms, the officials imparted a lasting influence on the platforms' moderation decisions without the need for any further input.  In doing so, the officials ensured that any moderation decisions were not made in accordance with independent judgments guided by independent standards.  *Instead, they were encouraged by the officials' imposed standards*.

*Missouri*, 2023 WL 6425697, at *24 (emphasis added). The exact same reasoning applies here.

 For similar reasons, through the EIP/VP, Defendants and their government co-conspirators were also "directly involve[d] in carrying out the decision itself" in the platforms' content-

moderation decisions.  *Id.* at *14.  To "carry[] out" the decision to adopt new, more restrictive policies, *id.*, the platforms had to enforce those policies, and the EIP/VP was directly involved in that process by identifying specific posts for enforcement under the new policies and pushing platforms to enforce them.  FAC ¶ 71.  In fact, the platforms acting on their own moderate only a miniscule fraction of content that violates their policies: " *'Something well north of 99% of th[is] content ... never gets reviewed further.*  The content on a site is, to that extent, invisible to the [Platform].'"  *NetChoice*, 49 F.4th at 459–60 (quoting *Moody*, 546 F. Supp. 3d at 1092).  Thus, the EIP/VP, by flagging arguably violative content on a massive scale, is actually the *chief enforcer* of the new moderation policies—not the platforms themselves.  In addition, government officials of the EIP/VP are also directly involved in carrying out individual content-moderation decisions, as they act as both flaggers, fact-checkers, and debunkers for such individual decisions.

### b.    The Complaint alleges Fourteenth Amendment violations.

The platforms' content-moderation decisions, made under the EIP/VP's pervasive influence, constitute state action for the reasons discussed above.  Given the finding of state action, the Complaint alleges extensive Fourteenth Amendment violations, including violations of the Equal Protection Clause.  As noted above, the Complaint extensively alleges that Defendants engaged in *intentional* discrimination on the basis of race, sex, and religion, without any adequate justification.  FAC ¶¶ 320-61.  This intentional discrimination resulted in extensive violations of the free-speech rights of those disfavored minorities, both as speakers and as audiences, including Plaintiffs' speech addressing those audiences.  *See id.*  Those free-speech rights are themselves "fundamental rights" for the purposes of equal-protection analysis, as discussed above.  *Regan*, 461 U.S. at 547.  Accordingly, Defendants' purposeful and intentional targeting of speakers and audiences for censorship on the basis of race, sex, and religion constitutes a textbook violation of

the Fourteenth Amendment.  *See, e.g., Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 750 (2003) (holding that "a pattern of intentional discrimination" by a State is "prohibited by the Fourteenth Amendment"); *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 375 (2001) (noting that "purposeful and intentional action" is "required to make out a violation of the Equal Protection Clause"); *Washington v. Davis*, 426 U.S. 229, 241 (1976) (holding that a violation of equal protection turns on the existence of the "necessary discriminatory racial purpose"). Similarly, Defendants' targeting of speakers (including Hines and Hoft) for censorship on the basis of disfavored viewpoint imposes a severe burden on their fundamental right to free speech, which likewise violates the Equal Protection Clause.

### 4.    The Complaint alleges that Defendants caused Plaintiffs' injuries.

Once again, Defendants argue that the Complaint fails to allege that Defendants caused Plaintiffs' injuries.  Doc. 70-1, at 49-50.  This argument is meritless for the reasons discussed above.  *See supra* Part II.

### D.    The Complaint States Valid State-Law Claims.

Defendants argue that Plaintiffs' Complaint with detailed factual allegations and citations does not provide them sufficient notice of the claims against them.  Doc. 70-1, at 50-53. Defendants are incorrect.  Plaintiffs have sufficiently stated valid tort claims for tortious interference with contract relations and breach of duty.

### 1.    The Complaint states a valid tortious-interference claim.

Plaintiffs do not dispute that California law most likely governs Plaintiffs' state law claims. Defendants argue that "Plaintiffs' claim would likely be governed by California law because the social media platforms' terms of service that Plaintiffs invoke include California choice-of-law clauses."  Doc. 70-1, at 50.  That is the wrong reason.  As detailed in Plaintiffs' Opposition to the

Motion to Compel Arbitration, Defendants cannot enforce the provisions of the terms of service to which they are not a party.  Instead, California law applies based on *Louisiana* choice-of-law principles that tend to favor California based on the location of more Defendants than any other state, the place of conduct due to interactions with California-based social media companies, and the policies of deterring wrongful conduct and of repairing the consequences of injurious acts.  *See* La. Civ. Code Ann. art. 3542; *Arabie v. CITGO Petroleum Corp.*, 89 So. 3d 307, 316 (La. 2012).

Defendants rely on the California Supreme Court decision governing tortious interference with contractual relations.  Doc. 70-1, at 51 (citing *Ixchel Pharma, LLC v. Biogen, Inc.*, 470 P.3d 571, 575 (Cal. 2020)).  Contrary to Defendants' protestations, Plaintiffs have pled nonconclusory allegations for each element of this tort.  First, Plaintiffs have alleged the existence of a valid relationship between the plaintiff and a third party.  Plaintiffs have alleged that they were required to agree to terms of service with social media platforms like Facebook, Twitter, and YouTube in order to create the social media accounts affected by Defendants' conduct.  FAC, at ¶ 50.  As recognized by Defendants, Plaintiffs make allegations related to Defendants' conduct with Facebook and Twitter.  Doc. 70-1, at 51 (citing Doc. 1, at ¶¶ 9, 345, 357, 360, 362, 367).

Second, Plaintiffs have alleged that Defendants had knowledge of that contract.  Plaintiffs allege that Defendants pressured social media platforms to adopt more stringent censorship policies in their terms of service for election-related and vaccine-related speech.  Defendants took this action because they were aware of the terms of service with current social media users, which included Plaintiffs, and deemed those terms insufficient to suppress speech with which Defendants and the federal government disagreed.

Third, Plaintiffs have alleged that Defendants' intentional acts were designed to induce a breach or disruption of the contractual relationship.  Defendants pressured social media platforms

to adopt more stringent censorship policies so that disfavored speech, like that of Plaintiffs, could be censored.  Plaintiffs quote Defendants repeatedly bragging about pressuring social media platforms to change their election-related and vaccine-related policies in order to censor more speech.  Though Defendants claim these numerous quotations do not provide them with sufficient information, Doc. 70-1, at 51, Plaintiffs have alleged the who, what, where, when, why, and how of Defendants' intentional acts.

Fourth, Plaintiffs have alleged that Defendants' actions caused actual breach or disruption of the contractual or economic relationship.  Doc. 1, at ¶¶ 158-168, 339-375.  Under the law, this element only requires "proof of interference," such as if "plaintiff's performance is made more costly or more burdensome."  *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 791 P.2d 587, 592 (Cal. 1990) (citing cases).  Plaintiffs allege that Defendants' actions caused disruption of Plaintiffs' contractual relationships with the social media platforms by restricting their accounts and censoring their posts, making their activity on the platforms more burdensome by limiting or eliminating the content about which they could post.

Fifth and finally, Plaintiffs have alleged resulting damage from Defendants' actions.  An entire section in the Complaint is entitled, "Defendants' Conduct Inflicts Injuries on Plaintiffs." Doc. 1, at 72, ¶¶ 353-375.  This section provides detailed allegations about specific injuries suffered by Plaintiffs, including account restrictions, individual social media post censorship, self-censorship, and impact on advertising revenue.  *See id.*

### 2.     The Complaint states a valid breach of duty claim.

Plaintiffs also have stated a negligence claim alleging that Defendants breached a duty to them that caused damages.  Defendants do not contest the elements of breach of duty, causation, or damages.  Defendants only attack the legal duty element.  "The existence of duty is not an

immutable fact of nature but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." *Regents of Univ. of California v. Superior Ct.*, 413 P.3d 656, 669 (Cal. 2018) (internal quotations omitted) (emphasis original). The California Supreme Court has identified policy factors to evaluate, including: "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." *Id.* at 670; *see also Biakanja v. Irving*, 320 P.2d 16, 19 (Cal. 1958). In *Biakanja*, the California Supreme Court affirmed a plaintiff's recovery after a notary public failed to properly record a will that would have provided the plaintiff all of the decedent's estate instead of the 1/8 share the plaintiff received. *Id.* Recently, the California Court of Appeals reversed summary judgment to a business responsible for maintaining a battery backup system when there were no batteries in a traffic signal's backup unit during a power outage and plaintiff's vehicle was struck by another vehicle in a dark intersection. *Lichtman v. Siemens Indus. Inc.*, 224 Cal. Rptr. 3d 725, 726, 732 (Cal. App. 2017).

Here, the public policy factors strongly favor imposing a duty of care on Defendants. The harm to Plaintiffs by Defendants' efforts to censor posts was clearly foreseeable. Plaintiffs have suffered injury by censorship of their social media posts and restriction of their social media accounts. The injury suffered by Plaintiffs is a direct result of Defendants' actions. Censoring speech in violation of the First Amendment attaches moral blame to Defendants' conduct. Preventing future free speech violations is important. The burden to Defendants is minimal by

requiring them to respect the First Amendment, and the same is true with respect to consequences to the community.  Insurance is not needed to protect against the risk of violating the First Amendment, but any such policy should not differ from general liability insurance in any event.

**E.     The Individual Defendants Should Not Be Dismissed.**

Finally, Defendants argue that the individual Defendants should be dismissed because "it does not allege that Stamos, DiResta, Brookie, or Francois were 'personally involved in the alleged constitutional violations.'"  Doc. 70-1, at 54 (quoting *Woods v. Edwards*, 51 F.3d 577, 583 (5th Cir. 1995)).  This argument is meritless.  As discussed in detail above, the Complaint makes extensive allegations about the personal involvement of these individual Defendants in personally leading, managing, directing, and participating in the censorship activities challenged in the Complaint.  *See* FAC ¶¶ 20, 23, 28, 33, 36.  Defendants' claim that Complaint "alleges little more than their job titles" is incorrect.  It alleges extensive personal involvement, including that each such Defendant personally lead a large team of analysts to carry out the censorship scheme in the Complaint.  *Id.*

<u>**CONCLUSION**</u>

Plaintiffs' Joint Motion to Dismiss, Doc. 70, should be denied.

Dated: October 17, 2023                    Respectfully submitted,

| AMERICA FIRST LEGAL | JAMES OTIS LAW GROUP, LLC |
|---|---|
| /s/ Gene P. Hamilton<br>Gene P. Hamilton, GA Bar No. 516201*<br>Reed D. Rubinstein, DC Bar No. 400153*<br>Nicholas R. Barry, TN Bar No. 031963*<br>Michael Ding, DC Bar No. 1027252*<br>Juli Z. Haller, DC Bar No. 466921*<br>James K. Rogers, AZ Bar No. 027287*<br>Andrew J. Block, VA Bar No. 91537*<br>611 Pennsylvania Ave SE #231<br>Washington, DC 20003<br>(202) 964-3721<br>gene.hamilton@aflegal.org<br>reed.rubinstein@aflegal.org<br>nicholas.bary@aflegal.org<br>juli.haller@aflegal.org<br>james.rogers@aflegal.org<br>andrew.block@aflegal.org | /s/ D. John Sauer<br>D. John Sauer, Mo. Bar No. 58721*<br>Justin D. Smith, Mo. Bar No. 63253*<br>13321 North Outer Forty Road, Suite 300<br>St. Louis, Missouri 63017<br>(314) 562-0031<br>John.Sauer@james-otis.com<br><br>* admitted *pro hac vice*<br><br><br>LANGLEY & PARKS, LLC<br><br>By:  /s/ *Julianna P. Parks*<br>Julianna P. Parks, Bar Roll No. 30658<br>4444 Viking Drive, Suite100<br>Bossier City, Louisiana 71111<br>(318) 383-6422 Telephone<br>(318) 383-6405 Telefax<br>jparks@langleyparks.com |

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on October 17, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*