**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | |
|---|---|
| JILL HINES, *et al.* | |
| *Plaintiffs,* | Case No. 3:23-cv-00571 |
| | Chief Judge Terry A. Doughty |
| *v.* | Magistrate Judge Kayla D. McClusky |
| ALEX STAMES, *et al.* | |
| *Defendants.* | |

**RESPONSE TO DEFENDANTS' JOINT MOTION TO COMPEL INDIVIDUAL ARBITRATION, DISMISS PLAINTIFFS' CLASS CLAIMS, AND STAY ALL PROCEEDINGS, OR ALTERNATIVELY TO TRANSFER VENUE UNDER 28 U.S.C. § 1404**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................................ iii

INTRODUCTION ........................................................................................................................... 1

BACKGROUND ............................................................................................................................ 4

   I.    Defendants work with government officials to censor speech. ................................. 4

   II.   Defendants censor Hines and Hoft. ......................................................................... 6

   III.   Hines's and Hoft's claims. ....................................................................................... 8

   IV.   Defendants' current motion. .................................................................................... 9

ARGUMENT .................................................................................................................................. 9

   I.    Plaintiffs' amended complaint moots Defendants' motion. ................................... 10

   II.   The Court should defer ruling on Plaintiffs' premature motion to compel arbitration. 11

   III.   Defendants' motion to compel arbitration is meritless. ......................................... 11

     A.   Defendants cannot enforce Facebook's or Twitter's arbitration agreement with Plaintiffs. ..................................................................................................................... 12

       1.   Defendants' unclean hands prohibit them from asking for equitable relief. ..... 12

       2.   As state actors, Defendants cannot take advantage of equitable estoppel. ........ 17

       3.   Equitable estoppel does not apply. .................................................................... 19

         a.   Equitable estoppel is unavailable where, as here, a plaintiff does not sue a signatory to the contract ...................................................................................... 20

         b.   Equitable estoppel does not apply. ................................................................ 23

           1)   Plaintiffs' claims do not rely on the contracts containing the arbitration agreements. ..................................................................................................... 24

           2)   Defendants cannot invoke equitable estoppel by pointing to allegations of collusion. ...................................................................................................... 31

     B.   Even if Defendants are right, numerous claims are outside the scope of Facebook's and Twitter's arbitration agreements. ........................................................ 34

       1.   Defendants' censorship of posts on other social media platforms are not subject to arbitration under Facebook's or Twitter's terms of service. ............................. 35

       2.   Facebook's arbitration agreement applies only to the censoring of Plaintiffs' business and commercial speech on the platform, not to Plaintiffs' other claims..... 36

       3.   Plaintiffs' request for public injunctive relief is not subject to arbitration. ...... 39

   IV.   Count I and Count II do not involve arbitrable claims. ......................................... 41

   V.   The Court should deny Defendants' request to strike Plaintiffs' class claims........... 45

i

**VI.    Defendants request for a stay and § 1404 transfer is derivative of their meritless equitable estoppel claims, and the Court should deny them for the same reasons.**........... **45**

**A.    Defendants' request for a stay fails.** ........................................................................ **45**

**B.    Defendants' request to transfer fails.** .................................................................... **47**

**VII.    Alternatively, the Court should order discovery related to Defendants' equitable estoppel claim.** ..................................................................................................................... **49**

**CONCLUSION** ..................................................................................................................... **51**

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Adams v. Ga. Gulf Corp.*,
    237 F.3d 538 (5th Cir. 2001) ............................................................... 46
*Adams v. Raintree Vacation Exch., LLC*,
    702 F.3d 436 (7th Cir. 2012) ........................................................... 48, 49
*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013) ...................................................................... 15, 17
*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
    571 U.S. 49 (2013) ........................................................................ 47
*Backpage.com, LLC v. Dart*,
    807 F.3d 229 (7th Cir. 2015) ........................................................... 33, 34
*Banc One Acceptance Corp. v. Hill*,
    367 F.3d 426 (5th Cir. 2004) .............................................................. 37
*Bank of Saipan v. CNG Financial Corp.*,
    380 F.3d 836 (5th Cir. 2004) .............................................................. 13
*Barnes v. Vroom Auto, LLC*,
    2023 WL 3025076 (S.D. Tex. Apr. 20, 2023) ...................................... 9, 10, 36
*Blair v. Rent-A-Center, Inc.*,
    928 F.3d 819 (9th Cir. 2019) .............................................................. 39
*Boelens v. Redman Homes, Inc.*,
    759 F.2d 504 (5th Cir. 1985) .............................................................. 10
*Borough of Duryea v. Guarnieri*,
    564 U.S. 379 (2011) ...................................................................... 16, 17
*Boxley v. Fam. Dollar Stores, Inc.*,
    2020 WL 2104945 (W.D. La. May 1, 2020) ............................................. 46
*Brown v. Pacific Life Insurance Co.*,
    462 F.3d 384 (5th Cir. 2006) ....................................................... 23, 32, 34
*Burnett v. Grattan*,
    468 U.S. 42 (1984) ........................................................................ 43
*Chartwell Staffing Services Inc. v. Atl. Sols. Grp.*,
    2020 WL 620294 (C.D. Cal. Jan. 9, 2020) .............................................. 32
*CompuCredit Corp. v. Greenwood*,
    565 U.S. 95 (2012) ........................................................................ 42
*Conrad v. Phone Directories Co., Inc.*,
    585 F.3d 1376 (10th Cir. 2009) ........................................................... 11
*Crawford Professional Drugs, Inc. v. CVS Caremark Corp.*,
    748 F.3d 249 (5th Cir. 2014) ....................................................... 26, 27, 37
*DMS Servs., LLC v. Super. Ct.*,
    205 Cal. App. 4th 1346 (2012) ........................................................... 31
*Dos Santos v. Bell Helicopter Textron, Inc. Dist.*,
    651 F. Supp. 2d 550 (N.D. Tex. 2009) .................................................. 47
*Dupuy-Busching Gen. Agency, Inc. v. Ambassador Ins. Co.*,
    524 F.2d 1275 (5th Cir. 1975) ........................................................... 11

*EEOC v. Waffle House, Inc.*,
   534 U.S. 279 (2002) ................................................................................. 12, 44

*FDIC v. Abraham*,
   137 F.3d 264 (5th Cir. 1998) ......................................................................... 21

*Felisilda v. FCA US LLC*,
   53 Cal. App. 5th 486 (2020) .......................................................................... 22

*First Options of Chi., Inc. v. Kaplan*,
   514 U.S. 938 (1995) ........................................................................................ 45

*Franklin v. Community Regional Medical Center*,
   998 F.3d 867 (9th Cir. 2021) ......................................................................... 21

*Franlink Inc. v. BACE Servs., Inc.*,
   50 F.4th 432 (5th Cir. 2022) ..................................................................... 48, 49

*Gassaway v. Beacon Fabrication, LLC*,
   2021 WL 1523008 (N.D. Tex. Feb. 24, 2021) ................................................ 9

*Gillaspy v. Dallas Indep. Sch. Dist.*,
   278 F. App'x 307 (5th Cir. 2008) (per curiam) ............................................ 48

*Gilmer v. Interstate/Johnson Lane Corp.*,
   500 U.S. 20 (1991) .......................................................................................... 42

*Goldman v. KPMG, LLP*,
   173 Cal. App. 4th 209 (2009) ...................................... 21, 22, 23, 24, 26, 30, 32

*Grant v. House of Blues New Orleans Restaurant Corp.*,
   2011 WL 1596207 (E.D. La. Apr. 27, 2011) .................................................. 9

*Griffin v. Breckenridge*,
   403 U.S. 88 (1971) .................................................................................... 43, 44

*Grigson v. Creative Artists Agency, LLC*,
   210 F.3d 524 (5th Cir. 2000) .................................. 12, 22, 23, 24, 25, 26, 49

*Grove City Coll. v. Bell*,
   465 U.S. 555 (1984) ........................................................................................ 16

*Guillot ex rel. T.A.G. v. Russell*,
   59 F.4th 743 (5th Cir. 2023) ......................................................................... 44

*Hawkins v. KPMG LLP*,
   423 F. Supp. 2d 1038 (N.D. Cal. 2006) ........................................................ 17

*Hellenic Inv. Fund, Inc. v. Det Norske Veritas*,
   464 F.3d 514 (5th Cir. 2006) ......................................................................... 47

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
   139 S. Ct. 524 (2019) ...................................................................................... 37

*Hernandez v. Meridian Mgmt. Servs., LLC*,
   87 Cal. App. 5th 1214 (2023) ................................................. 3, 20, 21, 22, 23

*Hill v. GE Power Sys., Inc.*,
   282 F.3d 343 (5th Cir. 2002) ............................................................... 30, 31, 46

*Hodges v. Comcast Cable Commc'ns, LLC*,
   21 F.4th 535 (9th Cir. 2021) ........................................................... 39, 40, 41

*Hohe v. Casey*,
   956 F.2d 399 (3d Cir. 1992) .......................................................................... 43

*In re Apple and AT and TM Antitrust Litigation*,
   826 F. Supp. 2d 1168 (N.D. Cal. 2011) ......................................................... 27

*In re Henson*,
  869 F.3d 1052 (9th Cir. 2017) ................................................................. 26

*In re Humana Inc. Managed Care Litig.*,
  285 F.3d 974 (11th Cir. 2002) ........................................................ 32, 34

*Jackson v. Royal Caribbean Cruises, Ltd.*,
  389 F. Supp. 3d 431 (N.D. Tex. 2019) ..................................................11

*Jennings v. Patterson*,
  488 F.2d 436 (5th Cir. 1974) ................................................................. 42

*JLM Indus., Inc. v. Stolt-Nielsen SA*,
  387 F.3d 163 (2d Cir. 2004) ................................................................. 49

*Jones v. Cain*,
  600 F.3d 527 (5th Cir. 2010) ................................................................. 48

*Koenig v. Ritz-Carlton Co., LLC*,
  2021 WL 5855608 (E.D. La. June 24, 2021) .................................... 32

*Kramer v. Toyota Motor Corp.*,
  705 F.3d 1122 (9th Cir. 2013) ............................................... 23, 26, 31, 32

*Lawhorn v. Atl. Refining Co.*,
  299 F.2d 353 (5th Cir. 1962) ..................................................................11

*Lim v. Offshore Specialty Fabricators, Inc.*,
  404 F.3d 898 (5th Cir. 2005) ................................................................. 42

*Magi XXI, Inc. v. Stato della Citta del Vaticano*,
  714 F.3d 714 (2d Cir. 2013) ................................................................. 48

*McDonald v. City of W. Branch*,
  466 U.S. 284 (1984) ....................................................................... 42, 43

*McGill v. Citibank, N.A.*,
  2 Cal. 5th 945 (2017) ............................................................... 39, 40, 41

*Missouri v. Biden*,
  2023 WL 4335270 (W.D. La. July 4, 2023) ............................ 1, 36, 51

*Missouri v. Biden*,
  2023 WL 6425697 (5th Cir. Oct. 3, 2023) ............... 13, 14, 24, 33, 41

*Mitchum v. Foster*,
  407 U.S. 225 (1972) ....................................................................... 42, 44

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
  473 U.S. 614 (1985) ............................................................................. 43

*Montemayor v. Ford Motor Co.*,
  92 Cal. App. 5th 958 (2023) ................................................................. 31

*Motorola Credit Corp. v. Uzan*,
  274 F. Supp. 2d 481 (S.D.N.Y. 2003) ............................................ 12, 15

*MS Dealer Serv. Corp. v. Franklin*,
  177 F.3d 942 (11th Cir. 1999) ........................................ 23, 24, 30, 32, 34

*Mun. Energy Agency of Miss. v. Big Rivers Elec. Corp.*,
  804 F.2d 338 (5th Cir. 1986) ..................................................................11

*Murphy v. DirecTV, Inc.*,
  724 F.3d 1218 (9th Cir. 2013) ............................................. 3, 12, 26, 32

*Ngo v. BMW of North America, LLC*,
  23 F.4th 942 (9th Cir. 2022) ................................................................. 22

*Noble Capital Group, LLC v. US Capital Partners, Inc.*,
   2021 WL 3477481 (5th Cir. Aug. 6, 2021) ............................................................ 33
*O'Conner v. AT&T Corp.*,
   2013 WL 3107496 (M.D. La. June 18, 2013) ................................................. 27, 32
*Pac. Fertility Cases*,
   85 Cal. App. 5th 887 (2022) ................................................................................. 31
*Patsy v. Bd. of Regents of Fla.*,
   457 U.S. 496 (1982) ................................................................................. 42, 43, 44
*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981) .................................................................................................. 16
*Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*,
   139 F.3d 1061 (5th Cir. 1998) .............................................................................. 12
*Perry Education Association v. Perry Educators Association*,
   460 U.S. 37 (1983) ................................................................................................ 16
*Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*,
   687 F.3d 671 (5th Cir. 2012) ................................................................................ 37
*Planned Parenthood of Greater Ohio v. Hodges*,
   917 F.3d 908 (6th Cir. 2019) (en banc) ............................................................... 17
*Precision Instrument Mfg. Co. v. Automotive Maint. Machinery*,
   324 U.S. 806 (1945) ........................................................................................ 13, 15
*Red Lion Broad. Co. v. FCC*,
   395 U.S. 367 (1969) .............................................................................................. 40
*Rideau v. Lafayette Health Ventures, Inc.*,
   381 F. Supp. 3d 709 (W.D. La. 2019) .................................................................. 36
*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
   547 U.S. 47 (2006) ................................................................................................ 18
*Safer v. Nelson Fin. Grp., Inc.*,
   422 F.3d 289 (5th Cir. 2005) ................................................................................ 12
*Salas v. Universal Credit Servs., LLC*,
   2019 WL 1242448 (S.D. Cal. Mar. 18, 2019) ...................................................... 32
*Shearson/American Express Inc. v. McMahon*,
   482 U.S. 220 (1987) .............................................................................................. 42
*Sokol Holdings, Inc. v. BMB Munai, Inc.*,
   542 F.3d 354 (2d Cir. 2008) ....................................................... 3, 15, 27, 28, 29
*Solar & Envtl. Techs. Corp. v. Zelinger*,
   726 F. Supp. 2d 135 (D. Conn. 2009) .................................................................. 15
*Sun Coast Res., Inc. v. Conrad*,
   956 F.3d 335 (5th Cir. 2020) ................................................................................. 1
*Sure-Tan, Inc. v. NLRB*,
   467 U.S. 883 (1984) ........................................................................................ 16, 17
*Tex. Educ. Agency v. U.S. Dep't of Educ.*,
   992 F.3d 350 (5th Cir. 2021) ................................................................................ 18
*Tinder v. Pinkerton Sec.*,
   305 F.3d 728 (7th Cir. 2002) ................................................................................ 10
*Tripp v. Renaissance Advantage Charter Sch.*,
   2003 WL 22519433 (E.D. Pa. Oct. 8, 2003) ........................................................ 44

*United Brotherhood of Carpenters and Joiners of America, Local 610 v. Scott*,
   463 U.S. 825 (1983) .................................................................................... 43, 45
*Uptown Drug Co., Inc. v. CVS Caremark Corp.*,
   962 F. Supp. 2d 1172 (N.D. Cal. 2013) ............................................................ 27
*Waste Mgmt., Inc. v. Residuos Industriales Multiquim, S.A. de C.V.*,
   372 F.3d 339 (5th Cir. 2004) ............................................................................ 46
*Webster v. Doe*,
   486 U.S. 592 (1988) ......................................................................................... 18
*Weems v. Hodnett*,
   2011 WL 2731263 (W.D. La. July 13, 2011) ................................................... 48
*Westmoreland v. Sadoux*,
   299 F.3d 462 (5th Cir. 2002) ........................................................... 12, 15, 18, 45
*Will-Drill Res., Inc. v. Samson Res. Co.*,
   352 F.3d 211 (5th Cir. 2003) ............................................................................ 37

**Statutes**

28 U.S.C. § 1404 ....................................................................................................... 47
5 U.S.C. § 572 ........................................................................................................... 18
9 U.S.C. § 3 ................................................................................................................ 46

**Other Authorities**

Cong. Globe, 42d Cong., 1st Sess., 476 (1871) ...................................................... 42
Cong. Globe, 42d Cong., 1st Sess., App. 188 (1871) .............................................. 43
Cong. Globe, 42d Cong., 1st Sess., App. 69 (1871) ................................................ 43
*Managing*, Am. Heritage Dictionary (5th ed. 2022) ............................................... 38

**Rules**

LR56.1 ....................................................................................................................... 10

## INTRODUCTION

A "tactic powerful economic interests sometimes use against the less resourced is to increase litigation costs in an attempt to bully the opposing party into submission by war of attrition." *Sun Coast Res., Inc. v. Conrad*, 956 F.3d 335, 341 (5th Cir. 2020). Just so here. Defendants are a group of well-resourced individuals and entities who work hand-in-glove with federal, state, and local officials to effectuate "arguably … the most massive attack against free speech in United States' history." *Missouri v. Biden*, 2023 WL 4335270, at *1 (W.D. La. July 4, 2023), *affirmed in part, rev'd in part*, 80 F.4th 641 (5th Cir. 2023), *withdrawn and superseded on panel reh'g*, 2023 WL 6425697 (5th Cir. Oct. 3, 2023), *stay extended* 2023 WL 6763585 (Oct. 13, 2023). They have now filed a motion to compel arbitration, stay proceedings, and transfer venue premised on a contract they did not sign. This is the first shot in a war of attrition whose aim is to prevent these Defendants from ever having to answer for their role in a massive, government-sponsored censorship regime. The Court should ensure it is the last shot.

To start, Defendants fail to bring their motion to compel arbitration in regular order. Motions to compel arbitration under the Federal Arbitration Act are compulsory counterclaims that can be brought only after the Court has determined that Plaintiffs have stated a claim and after Defendants have answered. The Court should defer ruling on Defendants' request until then—and, furthermore, allow discovery on the issue of arbitration in the interim.

Regardless, Defendants' motion is meritless. Defendants are strangers to the arbitration agreement between Plaintiffs and Facebook and Twitter. They ask this Court to exercise its equitable powers to treat them as signatories to the agreement. But for Defendants to receive equity, they must have acted equitably. They have not. Rather, Defendants double down on their inequitable conduct. They seek to take advantage of arbitration agreements between their victims, Plaintiffs (who they have censored) and Facebook and Twitter (who they have coerced and

controlled as cats' paws to censor Plaintiffs).  That is enough to deny their motion.  But adding to their unclean hands is the fact that Defendants are part of a government scheme to avoid normal constitutional limits on the ability of government to censor private speech by laundering the censorship through EIP and VP—nominally private entities.  Their request would further that scheme—and so place the court's imprimatur on actions taken by government actors, and those in cahoots with them like Defendants, to work around important constitutional safeguards.

On the merits, Defendants' invocation of equitable estoppel rests on a panoply of legal and factual errors, legerdemain, and *ipse dixit* that justify denying their entire motion.  To start, Plaintiffs do not sue Facebook and Twitter—and that means Defendants, who are not signatories to Plaintiffs' agreement with those companies, cannot invoke the doctrine of equitable estoppel.

In any event, the requirements for equitable estoppel are absent because Plaintiffs' claims do not rely on their agreements with Facebook and Twitter and there are no allegations of intertwined misconduct relating to those contracts.  What Plaintiffs seek here is what the plaintiffs in *Missouri v. Biden* sought—an end to governmental *interference* in those contracts.  That is, Plaintiffs do not seek to enforce any duty or obligation arising from their contracts with Facebook and Twitter; they seek to hold Defendants liable for coercing the social media companies to censor their speech.  That in no way relies on the terms of Plaintiffs' agreements with Facebook and Twitter.  Thus, the most important consideration for application of equitable estoppel is absent.

That is sufficient to deny Defendants' request.  Regardless, Plaintiffs' claims do not arise from intertwined misconduct between Defendants and Facebook and Twitter that relates to their contract with the social media companies—which vitiates Defendants' reliance on such conduct to establish equitable estoppel.  So, however considered, there is no unfairness to Defendants here. Plaintiffs are not seeking to impose liabilities on Defendants based on duties or obligations found

in their contracts with Facebook or Twitter.  They are suing Defendants based on their unlawful control over Facebook and Twitter.

Unsurprisingly, there is a plethora of on-point caselaw supporting Plaintiffs—caselaw Defendants ignore. To name a few:  A California court has held that where—like here—a plaintiff sues only non-signatories, equitable estoppel does not apply.  *See Hernandez v. Meridian Mgmt. Servs., LLC*, 87 Cal. App. 5th 1214, 1219–20 (2023).  In *Murphy v. DirecTV, Inc.*, 724 F.3d 1218 (9th Cir. 2013), the Ninth Circuit concluded that a non-signatory's fraudulent inducement of consumers was unrelated to a contract containing an arbitration clause even though "on some abstract level" the claims "require the existence of" that contract.  *Id.* at 1230.  So too here. Defendants' wrongful conduct may rely on the existence of the terms of service as a means of effectuating censorship, but the conduct Plaintiffs challenge is the encouragement and coercion of social media companies to censor speech.  And the Second Circuit has said that a non-signatory cannot take advantage of an arbitration clause where the non-signatory tortiously induced a breach of that contract.  *See Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 361 (2d Cir. 2008). So too here.  Defendants' relationship to the contracts between Plaintiffs, Facebook, and Twitter arose only through their wrongful and unconstitutional control over Facebook and Twitter.  As a result, it is not unfair to ask that they defend their actions in court as opposed to an arbitral forum. Simply put, their wrongful interference in the relationship between Plaintiffs and Facebook and Twitter means Plaintiffs "in no way consented to extend" their arbitration agreements to them.  *Id.* at 362.

But even if Defendants are right, numerous aspects of Plaintiffs' case fall outside the arbitration agreements Defendants provide.  For one, there are Plaintiffs' claims involving censorship on social media companies other than Facebook and Twitter.  For another, there are

Plaintiffs' claims unrelated to the censorship of their accounts—such as their constitutional right to receive information.  For a third, there are Plaintiffs' claims for public injunctive relief which are, by the terms of the arbitration agreements and operation of law, not subject to mandatory arbitration.  Finally, Congress has excluded Plaintiffs' constitutional claims from mandatory arbitration; it is, rather, Congress's intent that a court hear them.  All of those claims belong in this Court, and not before an arbitrator.  Defendants' attempt to hand-wave or ignore those issues does not obviate the very real effect they have on their request.

## BACKGROUND

### I.    Defendants work with government officials to censor speech.

Defendants "collaborate closely with federal, state, and local government officials to monitor and censor disfavored viewpoints on social media," including Plaintiffs' viewpoints.  First Amended Complaint ("FAC"), ¶ 1.  Their purpose: to evade legal constraints those officials would otherwise face.  Their method: operate nominally private entities in conjunction with governmental officials.  In doing so, Defendants allow governmental officials to avoid "'the unclear legal authorities, including very real First Amendment questions' that would arise if the government took these actions directly."  FAC ¶ 4 (quotations omitted) (quoting Defendant DiResta).  Thus, Defendants created the Election Integrity Project (EIP) and the Virality Project (VP)—two monikers for the same enterprise—to communicate the censorship dictates of government officials to social media platforms.  *See* FAC ¶ 2.

As planned and expected, EIP/VP—along with Defendants—are intertwined with governmental officials and agencies.  Government officials play key roles in EIP and VP.  Both entities consistently communicate and collaborate with government officials.  *See*, *e.g.*, FAC ¶¶ 95, 112, 303-04, 306.  Government funding for the EIP is extensive and existential.  *See* FAC ¶¶ 83-85.  The Cybersecurity and Infrastructure Agency (CISA) within the Department of Homeland

4

Security "was directly involving in originating the EIP," FAC ¶ 86, shared personnel with EIP, *see* FAC ¶¶ 118-27, and connected EIP with state and local officials, as well as other federal and CISA-affiliated entities, for the purpose of monitoring and suppressing so-called misinformation, *see* FAC ¶¶ 90, 96, 100, 102-15.  *See also* FAC ¶ 130 (providing the links between CISA and EIP).

Also as planned and expected, government officials are integral in ensuring that social media platforms obey the censorship dictates of EIP and VP.  For example, "pressure and coercion from federal officials induced the platforms' cooperation with the EIP."  FAC ¶ 147.  So, too, for VP.  *See* FAC ¶ 257.  "In fact, the VP adds new levels of federal collaboration, as it includes collaborations with the White House, the Office of Surgeon General, and the CDC, which engaged in a massive pressure campaign to induce platforms to censor *just the sort of content that the VP was flagging at the same time.*"  FAC ¶ 298.  Defendants, in fact, admit as much; they have highlighted the role the threat of regulatory pressure plays in ensuring social media companies follow their recommendations.  *See* FAC ¶ 72 (providing quotes from Stamos about the importance of regulatory pressure in ensuring compliance); FAC ¶ 305 ("The VP agrees that government pressure pushes social-media platforms to adopt more aggressive censorship policies.").  In short, EIP and VP extensively collaborated with governmental agencies, up to and including the White House, who threatened and pressured social media platforms to censor disfavored speech.  *See* FAC ¶¶ 147–55 (providing details, many of which come from extensive fact-finding in the *Missouri* litigation).

That all coalesced in the censorship regime Plaintiffs challenge.  Defendants, through EIP and VP, craft content moderation policies and "pressure[] the platforms to aggressively enforce" them.  FAC ¶¶ 70-71; *see also* FAC ¶¶ 257-70.  But really, governmental views of what is proper for social media users to say drive enforcement.  EIP, for example, allows government officials to

flag misinformation, and engages in "dynamic coordination with state and local officials in pushing platforms to censor speech."  FAC ¶ 139; *see* FAC ¶¶ 131-40 (describing the ticket system). Likewise, "government officials provide[ ] 'tips' to the VP about misinformation on social media, and the VP flag[ ] such content to platforms for censorship."  FAC ¶ 293; *see also* FAC ¶¶ 293-96. Once EIP or VP flags a topic via a ticket (which, again, is often done in conjunction with governmental officials)—which could "encompass many posts," FAC ¶ 136—they send the ticket to the relevant social media company, *see* FAC ¶¶ 142, 284.  Social media companies would then act on the information, often by censoring it.  *See*, *e.g.*, FAC ¶¶ 179, 289.

Social media companies thus functioned as the cats' paws for state-sponsored, state-directed censorship.

## II.    Defendants censor Hines and Hoft.

Plaintiffs are victims of that censorship.  *See* FAC ¶¶ 182-92, 362-89.  Both run social media accounts on numerous platforms, including Twitter and Facebook.  *See*, *e.g.*, FAC ¶¶ 8-11.  What they say on the platforms is core First Amendment speech.  Hines, for example, posts information on her own profile and on the pages of her advocacy groups about the "lack of safety of masking" and "adverse events of vaccinations."  FAC ¶ 394.  Hines also engages in "election-related speech" "[t]hrough her group Reopen Louisiana."  FAC ¶ 398.  And she uses her social media accounts to advance other core First Amendment rights like the right to association and petition; for example, she uses her platforms "to organize her supporters to seek legislative changes."  FAC ¶ 395. Similarly, she uses social media to reach particular groups, such as women, religious groups, and racial minorities via her posts.  FAC ¶ 396.

In all those efforts, Hines and her organizations have been the target of censorship.  *See* FAC ¶¶ 393–99.  The topics on which she posts are issues where EIP's and VP's censorship efforts are most active.  Her health-related posts, for example, "involve[ ] many topics flagged in the VP

report."  FAC ¶394.  She "has also experienced social-media censorship of election-related speech of the sort discussed in the EIP report."  FAC ¶398.  Thus, her "personal Facebook page, and the Facebook pages of" her groups, "are under constant threat of being completely deplatformed;" her personal account was restricted in 2022; and the censorship continues to the current day.  FAC ¶397.

Hoft is in a similar position.  He runs "the popular news website The Gateway Pundit," which has millions of readers and accounts with tens of thousands and hundreds of thousands of followers across multiple social media platforms.  FAC ¶¶404-05.  "The Gateway Pundit's social-media accounts experience censorship on major social-media platforms, including on topics specifically targeted by the EIP and the VP."  FAC ¶406.  That "includes speech addressed to audiences targeted on the basis of discriminatory animus by Defendants."  *Id.*  For example, "[t]he EIP report mentions Hoft 47 times, identifies him as the '#2 superspreader' of misinformation on Twitter alone, and repeatedly flags his content as supposed 'misinformation.'  Likewise, the Virality Project also flags Hoft's COVID vaccine-related speech as 'misinformation.' "  FAC ¶410.  "Moreover, the EIP's blog posts from the 2022 election cycle indicate that the EIP continued to monitor and target Hoft's speech throughout the 2022 cycle."  FAC ¶411.

Moreover, Hoft and Hines self-censor because of Defendants' actions.  *See* FAC ¶¶400, 407.  So do their readers.  *See* FAC ¶407 ("The Gateway Pundit's readers also self-censor by avoiding re-posting The Gateway Pundit's content to avoid being targeted, suspended, or censored.").  Moreover, Hines and Hoft are "avid reader[s] and listener[s] of the speech of others on social media, including the speech of those targeted by" EIP and VP.  FAC ¶¶402, 412; *see also* FAC ¶234..  So "[a]s … audience member[s] of social-media speech," the two have suffered harm.

FAC ¶402.  Indeed, for Hoft, "[b]eing able to follow and listen to the speech of others on social media is central to his livelihood."  FAC ¶412.

### III.    Hines's and Hoft's claims.

To end Defendants' role in working with government officials to censor speech, Hoft and Hines have brought this suit.  They bring five claims against Defendants, and they seek declaratory and injunctive relief as well as damages.  FAC, at 99-100.

*First*, Hines and Hoft bring a civil rights conspiracy claim under 42 U.S.C. § 1985(3).  This claim rests on Defendants' conspiracy to violate the First Amendment rights of Plaintiffs and the class, as well as Defendants' invidious race, religion, national origin, sex, minority, and ethnic status discrimination.  *See* FAC ¶¶434–446.

*Second*, Hines and Hoft bring a claim under 42 U.S.C. § 1983, predicated on the same violations of the First and Fourteenth Amendments.  *See* FAC ¶¶447–53.

*Third*, Hoft and Hines bring a claim under the First Amendment, alleging a deliberate and intentional violation of their rights to freedom of expression and freedom to listen.  *See* FAC ¶¶454–58.

*Fourth*, Hoft and Hines raise a tortious interference with contractual and business relationships claim.  They allege that Defendants' actions interfere with Plaintiffs' relationships with social media companies by interposing governmental censorship between the two.  Defendants are also interfering with contractual relationship Plaintiffs have with third parties "that rely on and require Plaintiffs' … ability to speak, write, read, listen, and communicate freely with such third parties without unlawful or improper interference."  FAC ¶¶459-67.

*Fifth*, Defendants breached a duty owed to Plaintiffs "not to interfere unlawfully with their freedom, rights, and ability to speak, write, listen, read, and communicate freely on social media with others, including their fundamental rights to freedom of speech, freedom of expression,

freedom of association, and freedom to read and listen to the speech of others, and their fundamental rights to be free from censorship and suppression of social-media speech on the basis of invidious discrimination based on race, religion, religious beliefs, sex, minority status, ethnicity, language group, national origin, and disfavored viewpoints."  FAC ¶ 469.

## IV.     Defendants' current motion.

For Hines and Hoft to create their social media accounts, they had to sign up for each company's terms of service.   FAC ¶ 50.   Defendants are not parties to those terms, or any agreements between Hines and Hoft and social media platforms.   Nevertheless, Defendants claim they may enforce arbitration agreements and forum selection clauses contained in agreements between Hines and Hoft and Facebook and Twitter.   They have thus moved to compel arbitration according to those terms, stay proceedings, or—alternatively—transfer venue to the Northern District of California.   *See generally* Joint Mot. Compel Individual Arbitration, Doc. 69 [hereinafter Mot.]; Mem. Supp. of Defs.' Joint Mot. Compel Individual Arbitration, Doc. 69-1 [hereinafter Mem.].

## <u>ARGUMENT</u>

While "[t]he Fifth Circuit has not articulated the appropriate procedure [to evaluate a defendant's motion to compel arbitration], . . . district courts within it have used the Rule 56 standard."  *Barnes v. Vroom Auto, LLC*, 2023 WL 3025076, at *2 (S.D. Tex. Apr. 20, 2023); *see also Grant v. House of Blues New Orleans Restaurant Corp.*, 2011 WL 1596207, at *3 (E.D. La. Apr. 27, 2011).   "Under this well-settled standard, summary judgment is appropriate when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Gassaway v. Beacon Fabrication, LLC*, 2021 WL 1523008, at *4 (N.D. Tex. Feb. 24, 2021).

"In the context of a motion to compel arbitration, the Rule 56 standard requires the movant to present evidence sufficient to demonstrate an enforceable agreement to arbitrate." *Barnes*, 2023 WL 3025076, at *2. "Once this burden has been met by the movant, the burden shifts to the non-movant to raise a genuine dispute of material fact for trial." *Id.* " 'In deciding whether the party opposing compelled arbitration has identified a genuine issue of material fact for trial, the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.' " *Id.* (alterations omitted) (quoting *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002)).

Typically, a party moving for summary judgment must provide "a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried." LR56.1. Defendants have not provided that statement. Rather, they rely on Plaintiffs' Complaint, its attached exhibits, and nine of their own exhibits constituting Facebook's and Twitter's (now X's) terms of service, Health Freedom Louisiana's Facebook page, Reopen Louisiana's Facebook page, and the Gateway Pundit's Twitter account. *See* Decl. of Elisabeth S. Theodore, ECF 69-2 (describing Defs.' Exs. A–I). For this motion, then, Defendants are treating the allegations of the Complaint as true. *See* Mem. 14 n.3 ("Defendants do not concede the accuracy of any of these allegations, but recount them because the equitable estoppel test focuses on what a plaintiff alleges about the defendant's conduct.") (quotations omitted).

## I.    Plaintiffs' amended complaint moots Defendants' motion.

To start, Defendants' motion is moot. As noted above, the factual allegations in the original complaint are key to the motion. That complaint no longer exists. The "amended complaint . . . supersedes the original and renders it of no legal effect." *Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 508 (5th Cir. 1985). As a result, key factual predicates of Defendants' motion are absent, and the motion should be denied as moot.

## II.     The Court should defer ruling on Plaintiffs' premature motion to compel arbitration.

The Court need not address the merits of Defendants' request to compel arbitration at this time.  Defendants seek an order compelling individual arbitration under Section 4 of the FAA. Mot. 1.  Put another way, they do *not* seek dismissal of Plaintiffs' case; they "seek[ ] only the relief provided for in the FAA, rather than any other judicially-provided remedy."  *Conrad v. Phone Directories Co., Inc.*, 585 F.3d 1376, 1387 (10th Cir. 2009).

They cannot do that in this procedural posture.  "[T]he Section 4 right of [a defendant is] a compulsory counterclaim . . . ."  *Dupuy-Busching Gen. Agency, Inc. v. Ambassador Ins. Co.*, 524 F.2d 1275, 1277 (5th Cir. 1975).  Because Defendants have filed Rule 12(b) motions to dismiss, *see* Defs.' Joint Mot. Dismiss, ECF 70, "[t]he time for filing an answer and counterclaim in the present suit ha[s] not arrived."  *Mun. Energy Agency of Miss. v. Big Rivers Elec. Corp.*, 804 F.2d 338, 345 (5th Cir. 1986).  Indeed, until the Court determines that Plaintiffs have stated a claim (which they do), Defendants cannot raise this counterclaim.  "Taking the Rules at face value, a plaintiff must have a claim *before* a defendant is required to assert a compulsory counterclaim." *Lawhorn v. Atl. Refining Co.*, 299 F.2d 353, 357 (5th Cir. 1962) (emphasis added).  Thus, the Court should defer ruling on Defendants' motion until Defendants have answered and properly raised their counterclaim.

## III.     Defendants' motion to compel arbitration is meritless.

"Courts in the Fifth Circuit employ a two-step inquiry when determining a motion to compel arbitration under the FAA."  *Jackson v. Royal Caribbean Cruises, Ltd.*, 389 F. Supp. 3d 431, 443 (N.D. Tex. 2019).  "The first step is to determine whether the parties agreed to arbitrate the dispute at issue."  *Id.*  "In order to make this determination, [the Court] must decide: '(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in

question falls within the scope of that arbitration agreement.'" *Safer v. Nelson Fin. Grp., Inc.*, 422 F.3d 289, 293 (5th Cir. 2005).

**A.    Defendants cannot enforce Facebook's or Twitter's arbitration agreement with Plaintiffs.**

"Arbitration is a matter of contract between the parties." *Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1064 (5th Cir. 1998).  It is therefore "the language of the contract that defines the scope of disputes subject to arbitration." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002).  "[N]othing in the [FAA] authorizes a court to compel arbitration of any issues, or by any parties, that are not already covered in the agreement." *Id.*  Thus, arbitration cannot, "in general, be required for a matter involving an arbitration agreement non-signatory." *Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 528 (5th Cir. 2000).

Yet that is what Defendants are—and they do not say otherwise.  They nevertheless argue they can enforce the arbitration agreement under the doctrine of equitable estoppel.  *See* Mem. 7–16.  Indeed, that is their only argument.  But courts are rightly "wary of choices imposed after the dispute has arisen and the bargain has long been struck" and thus "allow a nonsignatory to invoke an arbitration agreement only in rare circumstances." *Westmoreland v. Sadoux*, 299 F.3d 462, 465 (5th Cir. 2002); *see also Murphy*, 724 F.3d at 1229 ("Because generally only signatories to an arbitration agreement are obligated to submit to binding arbitration, equitable estoppel of third parties in this context is narrowly confined.").  This is not one of those rare circumstances.

**1.    Defendants' unclean hands prohibit them from asking for equitable relief.**

"The linchpin for equitable estoppel is equity—fairness." *Grigson*, 210 F.3d at 528.  Because "the estoppel doctrine invoked by defendants is rooted in equity, [it] is therefore subject to the equitable maxim that 'he who comes into equity must come with clean hands.'" *Motorola Credit Corp. v. Uzan*, 274 F. Supp. 2d 481, 505 (S.D.N.Y. 2003), *affirmed in part, vacated in part*,

388 F.3d 39 (2d Cir. 2004) (first quotations omitted) (quoting *Precision Instrument Mfg. Co. v. Automotive Maint. Machinery*, 324 U.S. 806, 814 (1945)).[1]  "This maxim is far more than a mere banality.  It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief."  *Precision Instrument*, 324 U.S. at 814.

The doctrine applies here for multiple reasons, all of which relate to the fact that Defendants are integral to a governmental effort to significantly encourage and coerce social media companies into censoring Plaintiffs in violation of the Constitution.  *See* FAC ¶ 451; *see also, e.g.*, FAC ¶¶ 70–72, 147, 257–70, 305 (giving examples of the pressure campaign against social media companies); FAC ¶¶ 74–81, 131–40, 300–01 (describing how government officials were part of the fact-checking system at EIP and VP).

To start, Defendants' actions are inequitable to Plaintiffs.  When Hoft and Hines created their social media accounts, so far as they knew, they were entering into a private agreement with private companies.  *See* FAC ¶ 50.  That is, they agreed that the social media companies would exercise their own judgment in enforcing the terms of service against them.  *Cf. Missouri*, 2023 WL 6425697, at *8 (describing, in a case involving the government officials, that "the Individual Plaintiffs are challenging is the government's *interference* with those social-media companies' independent application of their policies").  Yet Defendants' actions have hijacked that judgment. It would be inequitable to permit Defendants to take advantage of one part of a contract they are not signatories to (the arbitration agreement) while undermining another aspect of the agreement

---

[1] That a motion to compel arbitration, "like all equity-oriented actions, carries with it the *affirmative defense* of 'unclean hands,'" *Bank of Saipan v. CNG Financial Corp.*, 380 F.3d 836, 840 (5th Cir. 2004) (emphasis added), underscores that Defendants' motion is a premature counterclaim.  *See supra* Argument § II.

(that the social media companies would exercise their own judgment in moderating Plaintiffs' content).

It is especially unfair since the social media companies, no less than Plaintiffs, are victims in Defendants' scheme.  For example, "pressure from federal officials" to cooperate with EIP is integral to Defendants' ability to control their content moderation decisions.  FAC ¶ 147.  Likewise, "VP agrees that government pressure pushes social media-platforms to adopt more aggressive censorship policies."  FAC ¶ 307.  So here, as in *Missouri*, the social media companies do not act independently on information Defendants provided; rather, social media companies, like Facebook and Twitter, are victims of a pressure campaign orchestrated by government officials and Defendants to censor speech.  *See Missouri*, 2023 WL 6425697, at *27 ("Ultimately, we find the district court did not err in determining that several officials—namely the White House, the Surgeon General, the CDC, the FBI, and CISA—likely coerced or significantly encouraged social-media platforms to moderate content, rendering those decisions state actions.").[2]

Thus the great inequity (and irony) of Defendants' motion:  They seek to take advantage of an arbitration agreement between their two victims.  That is patently inequitable.  Defendants cannot force arbitration of Plaintiffs' claims because Defendants brow-beat social media companies into cooperating with their censorious regime.  Indeed, Defendants' victimization of *all* parties to the arbitration agreements at issue presents a stronger reason to reject application of equitable estoppel than cases where the non-signatory improperly deprives *some* signatories of their contractual benefits.  *See Solar & Envtl. Techs. Corp. v. Zelinger*, 726 F. Supp. 2d 135 (D.

---

[2] The Fifth Circuit, to be sure, said the district court's initial injunction in *Missouri* "may implicate private, third-party actors that are not parties in this case," referencing EIP and VP.  2023 WL 6425697, at *31.  Here, however, the Defendants who created EIP and VP are parties to the case and the allegations amply back up the fact they work hand-in-glove with government actors to censor speech and so are state actors.

Conn. 2009).  Indeed, *Zelinger* says that tortious interference with a contract—*i.e.*, Count IV, *see*
FAC ¶¶ 459–67—is an example where a movant's unclean hands prevent application of equitable
estoppel to compel arbitration.  *See id.* at 150 (discussing *Sokol*, 542 F.3d 354).

Just so here.  And the fact that Defendants' censorship actions constitute state action, *see*,
*e.g.*, FAC ¶ 451, or, in the case of Starbird, a state employee, FAC ¶ 23, heightens the inequitable
nature of Defendants' request.

First, granting Defendants' request would affirm their unlawful conduct.  Defendants, in
conjunction with government officials, set up EIP and VP "to evade … unclear legal authorities,
including very real First Amendment questions that would arise if the government took [the
alleged] actions directly."  FAC ¶ 4 (quotations omitted).  That is, the very purpose of Defendants'
actions is *to avoid judicial oversight of governmental censorship* by routing it through a nominally
private entity.  To grant Defendants' motion would vindicate that strategy.  *See Westmoreland*, 299
F.3d at 465 (noting that arbitration is antithetical to the usual norm of resolving disputes openly, in
court).  Defendants have therefore acted *with* (not "without") "fraud and deceit as to the
controversy in issue" and so cannot seek the aid of equity.  *Precision Instrument*, 324 U.S. at 815;
*see Motorola Credit Corp.*, 274 F. Supp. 2d at 505 ("[D]efendants … effectively carried their fraud
right into the courtroom.  A court faced with such conduct is constrained to deny the equitable
relief of estoppel that defendants here seek to invoke in aid of arbitration.").

Second, to grant Defendants' motion would sanction a circumvention of constitutional
limits on how governmental entities can use their contracting power to limit First Amendment
rights.  Governmental contracts can impose conditions that "affect the recipient's exercise of its
First Amendment rights," so long as the recipient can avoid the condition by refusing the funding.
*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).  "The

legitimacy of" those conditions "thus rests on whether the [recipient] voluntarily and knowingly

accepts" them.  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *see Grove City*

*Coll. v. Bell*, 465 U.S. 555, 575 (1984) ("Congress is free to attach reasonable and unambiguous

conditions to federal financial assistance that educational institutions are not obligated to accept."),

*superseded in different part by statute*.  Conversely, "[t]here can … be no knowing acceptance if

a [counterparty] is unaware of the conditions."  *Id.*

      To reiterate, Defendants' censorship decisions constitute state action—and that state action

was aimed at controlling how Facebook and Twitter created and enforced their content moderation

decisions.  Governmental control over what Plaintiffs can say on their social media accounts

plainly affects First Amendment rights; as does limiting Plaintiffs from filing suit in federal court,

*see infra* Argument § III.A.2.  Yet Plaintiffs have never had a chance to object to state control over

their speech on social media or to having to arbitrate their claims against Defendants.  To apply

equitable estoppel would thus allow Defendants to avoid constitutional limits on governmental

contracting—and is, therefore, inequitable.

      It is doubtful that a state actor could ever condition access to a social media platform like

Facebook or Twitter on allowing government officials to monitor a user's speech, *see Perry*

*Education Association v. Perry Educators Association*, 460 U.S. 37, 46 (1983) (requiring content-

based restrictions in forums "the state has opened for use by the public" to pass strict scrutiny), or

on a user giving up his right to sue in federal court, *see Borough of Duryea v. Guarnieri*, 564 U.S.

379, 387 (2011) ("The right of access to courts for redress of wrongs is an aspect of the First

Amendment right to petition the government.") (quoting *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883,

896–97 (1984)).  "The government may not deny an individual a benefit … on a basis that infringes

his constitutional rights."  *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 911 (6th

Cir. 2019) (en banc).  Yet that is what happened here.  Defendants—operating on behalf of government officials—control Facebook's and Twitter's terms of service and so have conditioned (covertly) Plaintiffs' use of social media on governmental censorship.  And through this motion, they seek to condition Plaintiffs' right to speak on social media platforms on the giving up of their right to seek relief in a judicial forum.  Equity does not sanction such an end-run around clear constitutional limits.

In short, Defendants have used, and continue to use, state authority to pressure social media companies to censor Plaintiffs and millions of others.  They now seek to take advantage of an arbitration agreement between their two victims to evade judicial review (thus advancing one of the main purposes behind their decision to set up EIP and VP) and without giving Plaintiffs a chance to object to limiting their First Amendment right to speak on social media and to file suit in federal court (thus evading constitutional limits on the government's ability to impose contractual conditions).  "What defendants ask this court to do … would make a mockery of this court's equitable powers."  *Hawkins v. KPMG LLP*, 423 F. Supp. 2d 1038, 1053 (N.D. Cal. 2006).  The Court should reject the invitation.

### 2.    As state actors, Defendants cannot invoke equitable estoppel.

Relatedly, the fact that Defendants are engaged in state action, and so are state actors with regards to the conduct on which the Complaint rests, prohibits them from invoking equitable estoppel at all.  That stems, first and foremost, from constitutional principles.  "The right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government."  *Borough of Duryea*, 564 U.S. at 387 (quoting *Sure-Tan, Inc.*, 467 U.S. at 896–97).  The Constitution requires that before a party gives up that right by agreeing to arbitrate disputes with the government, it must have a chance to reject that condition *ex ante*.  *See Agency for Int'l Dev.*, 570 U.S. at 214.  That requires, at a minimum, that the agreement to arbitrate be unambiguous

at the time the party entered the agreement.  *See, e.g., Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361–62 (5th Cir. 2021) (holding that *post hoc* regulations cannot provide the requisite clarity for spending clause conditions).

Government actors can therefore never invoke equitable estoppel.  In such cases, the limit on a plaintiff's choice of forum is imposed "after the dispute has arisen and the bargain has long since been struck."  *Westmoreland*, 299 F.3d at 465.  Structural concerns support that conclusion. For example, allowing state actors to invoke equitable estoppel risks circumventing laws limiting or specifically addressing the ability of governmental actors to arbitrate.  *See, e.g.*, 5 U.S.C. § 572(a) (requiring "the parties agree to" arbitration before federal agency can "use a dispute resolution proceeding for the resolution of an issue in controversy").  And where, as in Counts I and II here, a plaintiff raises constitutional claims, rote application of equitable estoppel in the federal courts risks limiting or precluding "judicial review of constitutional claims" absent a clear expression that Congress intended the FAA to so apply.  *Webster v. Doe*, 486 U.S. 592, 603 (1988). Avoiding "the 'serious constitutional question' that would arise if" a plaintiff could not access a "judicial forum for a colorable constitutional claim" militates against application of equitable estoppel on behalf of state actors, or those engaged in state action that results in a deprivation of constitutional rights.  *Id.*  Indeed, it is unlikely that governmental actors could even require mandatory arbitration for constitutional claims *ex ante*.  To condition a contract on a party giving up his First Amendment right to file suit often—if not always—means the government is improperly conditioning a benefit "on a basis that infringes his constitutionally protected freedom of speech . . . ."  *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 59 (2006) (quotations omitted).

It follows, that a governmental actor cannot invoke equitable estoppel to force arbitration *ex post*. The government cannot accomplish after the fact what it could not do before the agreement existed. At minimum, the Facebook or Twitter terms of service would have had to unambiguously indicate that their terms may extend to state actors. They do not. The Facebook commercial terms of service are expressly limited to disputes "between you [the signatory] and Meta Platforms, Inc." Defs. Ex. A, at 2 (§ 5(c)(i)). And later on, the contract says that its terms "do not confer any third party beneficiary rights." *Id.* at 3 (§ 7(e)). Even the general terms of service address disputes between users and Facebook; not users and third parties. *See* Defs. Ex. I, at 7. Likewise for the Twitter terms of service. The terms reference a signatory's ability "to bring claims against Twitter" as opposed to other parties. Defs. Ex. A, at 1. The arbitration agreement is described as "important with respect to the agreement between you and Twitter," not a third-party and much less a state actor. *Id.* at 3 (§ 6(a)). Furthermore, the waiver of a jury trial in the arbitration agreement is limited to "you and Twitter" and the limitations period says claimants "have one year to bring a claim against Twitter." *Id.* (§ 6(c)). Indeed, the fact that "Twitter will pay [the] initial filing fee" for arbitration, *id.* (§ 6(d)), further suggests that the agreement does not contemplate the inclusion of third parties. Very few governmental entities can onboard a financial liability like that without some form of legislative authorization.

Thus, the arbitration agreements at issue do not unambiguously, or even ambiguously, say that claimants will have to arbitrate their claims against state actors like Defendants. As a result, Defendants cannot take advantage of those terms.

### 3. Equitable estoppel does not apply.

Regardless, Defendants cannot succeed on the merits. Defendants claim that "federal common law," as embodied in *Grigson*, applies to the arbitration agreement in Twitter's terms of service both because the terms' choice-of-law clause points to federal law "and because Louisiana

contract law provides that the parties' choice-of-law clause governs." Mem. 9. Defendants also say California law applies to Facebook's arbitration agreement under the terms' choice of law provision. *Id.* For now, Plaintiffs need not discuss this; indeed, Plaintiffs agree that the result under both laws are the same, *see id.* at 9 ("[T]he result is the same because the California equitable estoppel test mirrors *Grigson*'s."); *see also id.* at 24 n.4 ("As noted, however, California law is no different than the test in *Grigson*."). Either way, Defendants' motion is meritless.[3]

### a. Equitable estoppel is unavailable where, as here, a plaintiff does not sue a signatory to the contract.

To start, and contra Defendants, *see* Mem. 16, Plaintiffs' decision not to sue Facebook and Twitter means that Defendants cannot enforce the arbitration agreements between those companies and Hines and Hoft.

The Facebook arbitration agreement is clear on this point. That agreement is governed by California law—and recent, on-point California caselaw says that where a signatory sues just non-signatories, there is no unfairness in letting the suit proceed. *Hernandez v. Meridian Management Services, LLC*, 87 Cal. App. 5th 1214 (2023), involves a plaintiff who was employed by one company (Intelex) with whom she had an arbitration agreement, but who worked for six other companies. *Id.* at 1217. She sued the other companies, but not Intelex, for wrongful termination on the theory they and Intelex are joint employers. *See id.* at 1218. The other companies sought arbitration, in part by arguing that equitable estoppel permits them to enforce plaintiff's arbitration agreement with Intelex. *See id.* at 1219.

The California Court of Appeals agreed with the lower court that equitable estoppel did not apply, adopting much of its reasoning. *Id.* It noted that " 'the other party to the contract [Intelex]

---

[3] Like Defendants, *see* Mem. 10 n.1, Plaintiffs preserve their ability to argue about any threshold issues, including who may enforce the arbitration agreements.

is *not* also a party to the case, and never was[.]'" *Id.* (quoting the trial court).  That made the case atypical, and made whether equitable estoppel applied an "'issue of first impression.'" *Id.*  The court started with the proposition that "'the linchpin of the estoppel doctrine is fairness." *Id.*  It then held that "[t]he Other Firms complain that it is unfair for Hernandez to tailor her complaint in such a way as to avoid arbitration.  But it isn't, really." *Id.* (internal quotations and alterations omitted) (quoting the trial court).  The plaintiff was not "trying to have it both ways—to appear in court, she has completely given up her claims against Intelex.  Parties make tactical 'bargains' like this all the time." *Id.*

Just so here.  Plaintiffs have not sued Facebook and Twitter.  Rather, as noted above, Plaintiffs view them, as well as other social media companies, as victims.  Simply put, Plaintiffs have "given up" their claims against the two companies insofar as any such claims may parallel the ones Plaintiffs bring against Defendants.  *Id.*  Thus, Defendants cannot take advantage of the arbitration agreements between Plaintiffs, Facebook, and Twitter.

Defendants ignore *Hernandez*, instead pointing to *Franklin v. Community Regional Medical Center*, 998 F.3d 867 (9th Cir. 2021).  *See* Mem. 16.  But *Franklin* is a Ninth Circuit decision that pre-dates *Hernandez*.  *Hernandez* is the latest word from California state courts about how estoppel applies in a case like this; it, not the Ninth Circuit's *Erie*-guess, controls.  *See FDIC v. Abraham*, 137 F.3d 264, 268 (5th Cir. 1998) (finding a state intermediate appellate court's decision is typically binding on matters of state law).  That is especially so since the one California case *Franklin* cites for the proposition that "[i]t does not matter that Franklin's allegations are leveled only at" (in a "*cf.*" cite) is *Goldman v. KPMG, LLP*, 173 Cal. App. 4th 209 (2009).  *Franklin*, 998 F.3d at 875.  *Goldman* involves a plaintiff suing a signatory and non-signatory to an arbitration

agreement and is a case where the court declined to apply equitable estoppel on behalf of the non-signatory.  173 Cal. App. 4th at 214, 216.  It cuts against Defendants' position here.

That *Franklin* is an outlier is further evidenced by *Ngo v. BMW of North America, LLC*, 23 F.4th 942 (9th Cir. 2022).  In that case, a plaintiff sued a car manufacturer over defects in her car, and the manufacturer argued that equitable estoppel let it take advantage of an arbitration agreement between the plaintiff and the dealership.  *Id.* at 945.  The Ninth Circuit, applying California law, disagreed.  *See id.* at 950.  In doing so, it distinguished a California Court of Appeal case—*Felisilda v. FCA US LLC*, 53 Cal. App. 5th 486 (2020).  Per the court, "[i]t makes a critical difference that the Felisildas, unlike Ngo, sued the dealership [*i.e.*, the signatory] in addition to the manufacturer."  *Id.* at 950.  That conclusion stands in significant tension with *Franklin*—and underscores that the case is an outlier or, in light of *Hernandez*, a misstatement of California law.

Fifth Circuit precedent does not compel a different result as to the Twitter terms of service—though it appears there is no circuit precedent directly addressing this issue.  That is because, as Defendants say, "the California equitable estoppel test mirrors *Grigson*'s."  Mem. 9.  So it makes sense that *Grigson* is consistent with *Hernandez*.  While *Grigson* did not involve a signatory as a defendant, a prior case did—and the plaintiff voluntarily dismissed it after the signatory defendant moved to compel arbitration.  *Grigson*, 210 F.3d at 526.  The second suit, filed almost immediately after the dismissal, *see id.*, was so similar in legal theory and fact as the first one that "[i]n reality, the two actions [were] the same," *id.* at 530.  That is, the identical nature of the two actions in *Grigson* meant that there was, at some point, a signatory defendant in the case—a situation that was not present in *Hernandez*, where a signatory defendant was "*not* also a party to the case, and never was[.]"  87 Cal. App. 5th at 1219.  Finally, *Grigson* confirms that "[t]he linchpin for equitable estoppel is equity—fairness."  210 F.3d at 528.  And *Hernandez*—consistent

with that observation—rests its analysis on fairness.  *See* 87 Cal. App. 5th at 1219 (starting the analysis by noting "the linchpin of the estoppel doctrine is fairness") (quotations omitted).

<strong>b.      Equitable estoppel does not apply.</strong>

Regardless, Defendants' argument fails on its own premises.  To start, Defendants misstate the governing standard.  They say that equitable estoppel applies (1) if a signatory relies on the terms of a contract containing an arbitration agreement, or (2) if there are "allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more signatories to the contract."  Mem. 9 (quotations omitted); *see also id.* at 9–10 (discussing California law).

That is incomplete.  The second factor, properly understood, involves two considerations.  It can be a plus factor that renders a plaintiff's attempt to avoid arbitration "especially inequitable." *Grigson*, 210 F.3d at 528.  Alternatively, it can be the basis for applying equitable estoppel if the "allegations of interdependent misconduct must be founded in or intimately connected with the obligations of the underlying agreement."  *Goldman*, 173 Cal. App. 4th at 219; *see also Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1132–33 (9th Cir. 2013) ("California state contract law does not allow a nonsignatory to enforce an arbitration agreement based upon a mere allegation of collusion or interdependent misconduct between a signatory and nonsignatory."); *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 948 (11th Cir. 1999) (similar).  For example, in *Brown v. Pacific Life Insurance Co.*, the Fifth Circuit concluded that equitable estoppel applied because the claims against the non-signatories depend "in some part" on "acts that would be covered by the arbitration agreement . . . ."  462 F.3d 384, 398-99 (5th Cir. 2006).  And when applying the proper legal standard here, it is clear that Defendants have not shown that equitable estoppel should apply.

1)      **Plaintiffs' claims do not rely on the contracts containing the arbitration agreements.**

Defendants fail to establish that Plaintiffs' claims against Defendants "'rely on the terms of the written agreement'" Plaintiffs have with Facebook and Twitter.  *Grigson*, 210 F.3d at 527 (emphasis omitted) (quoting *MS Dealer* 177 F.3d at 947).  That is because Plaintiffs do not "seek to hold the non-signatory [Defendants] liable pursuant to duties imposed by the agreement," *id.* at 528; *see also Goldman*, 173 Cal. App. 4th at 220 (quoting the same), or rely on "contractual obligations" those contracts impose, *MS Dealer*, 177 F.3d at 948, in making their claims.  Rather, this case is like *Missouri v. Biden*.  Plaintiffs "are not seeking to enjoin" or enforce any social media company's "content moderation policies," but are "challenging [Defendants'] *interference with* those social-media companies' independent application of their policies." 2023 WL 6425697, at *8; *see* FAC ¶¶ 64, 70 (noting EIP pressured social media companies to adopt and enforce certain policies); FAC ¶¶ 257–70 (discussing VP).  As Plaintiffs allege in the FAC, they "do not seek to enforce these terms of service or other contractual agreements against the platforms.  Rather, they challenge the pressure and coercion of outside entities working in close conspiracy, cooperation, and entwinement with government officials to push the platforms to take adverse actions against their speech and the speech they listen to."  FAC ¶ 50.

Such interference is independent of, and external to, the terms of service and moderation policies of Facebook and Twitter.  Consider, for example, Plaintiffs' constitutional claims in Count II.  They rest on Defendants' actions "significantly encouraging and coercing social-media platforms to censor Plaintiffs' and Class members' speech ... ."  FAC ¶ 451.  Count II therefore does not depend on what Facebook's or Twitter's content moderation policy is or what their terms of service say but whether the content moderation decisions "can also be traced to [Defendants]-coerced enforcement of those policies."  *Missouri*, 2023 WL 6425697, at *9 (emphasis omitted).

And because the same conduct also forms the basis of Count I, *see* FAC ¶ 439, Count I does not rely on Plaintiffs' agreements with Facebook and Twitter.  Count V also does not arise from the Facebook or Twitter terms of service.  Like Counts I and II, it turns on Defendants' actions "procuring and inducing the censorship and suppression of speech on social media," FAC ¶ 470, as opposed to the existence of any particular provision of Facebook's or Twitter's terms of service. So too with Count IV.  *See* FAC ¶ 463 (alleging that Defendants tortiously interfered with Plaintiffs' business relations by "inducing social-media platform(s) to censor or suppress Plaintiffs' and Class members' own speech and content on social media").

Plaintiffs are, therefore, not suing on their contracts with Twitter or Facebook.  To be sure, Defendants invoke those terms and policies to censor Plaintiffs.  But that does not make Plaintiffs' claims "dependent upon" them.  *Grigson*, 210 F.3d at 529.  Had Defendants chosen a different means of censoring Plaintiffs (for example, leaving the choice of rationale up to Facebook or Twitter or telling Facebook or Twitter to censor Plaintiffs without relying on any content policies and to just deplatform Plaintiffs), Plaintiffs' case would be little changed.  The same cooperation between Defendants and governmental agents, and the same encouragement and coercion of social media companies, would remain because, at core, that is what Defendants did.  Working with and on behalf of government entities, Defendants essentially told Facebook and Twitter to censor Plaintiffs "or else."  *See*, *e.g.*, FAC ¶ 72 (providing quotes from Stamos about the importance of regulatory pressure in ensuring compliance); FAC ¶ 147 (quoting Defendant Stamos:  "So, you know, on effectively pushing the platforms to do stuff … they will always be more responsive in the places that are both economically highly important and that have huge potential regulatory impact, most notably right now that would be the United States and Europe.") (emphasis omitted); FAC ¶ 305 ("The VP agrees that government pressure pushes social-media platforms to adopt more

aggressive censorship policies."). Far from referencing or presuming the existence of the terms of service, the merits of Plaintiffs' claims are agnostic towards their contents. Their claims are "independent of the existence of" the terms of service Defendants provide, and therefore do not rely on them. *Kramer*, 705 F.3d at 1131.

This case is thus like *Murphy*. There, the Ninth Circuit—applying California law—rejected Best Buy's attempt to take advantage of DirecTV's arbitration agreement with customers who leased television equipment from Best Buy. *See* 724 F.3d at 1223. Best Buy, according to the *Murphy* plaintiffs, misrepresented that the customer was buying the equipment as opposed to leasing it. *See id.* at 1230. That misrepresentation, however, had "nothing to do" with the agreements the plaintiffs made with DirecTV to be customers. *Id.* That was so "[e]ven if Best Buy is correct that Plaintiffs' claims on some abstract level require the existence of" those agreements. *Id.* "In California, equitable estoppel is inapplicable where a plaintiff's 'allegations reveal no claim of any violation of any duty, obligation, term or condition imposed by the [customer] agreements.'" *Id.* (quoting *Goldman*, 173 Cal. App. 4th at 230): *see also In re Henson*, 869 F.3d 1052, 1060 (9th Cir. 2017) (same).[4] Plaintiffs' claims are nothing like that.

In contrast to this case are those precedents applying equitable estoppel. Because there is no need for the Court to determine "the meaning of the" terms of service or content moderation policies of Facebook or Twitter, this case is not like *Grigson*. *Id.* at 530. That also distinguishes *Crawford Professional Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249 (5th Cir. 2014). *See* Mem. 12–13 (discussing the case). There—unlike here—the plaintiffs' claims turned on the

---

[4] As all agree, California law and Fifth Circuit precedent intersect. *See* Mem. 9; *see also id.* at 24 n.4. *Murphy*'s analysis therefore applies to the Twitter arbitration agreement. Regardless, under Fifth Circuit precedent, courts consider whether a plaintiff "seek[s] to hold a non-signatory liable pursuant to duties imposed by the agreement." *Grigson*, 210 F.3d at 528. That is, the claim at issue must involve a violation of a duty, obligation, term, or condition of a contract.

meaning and application of the contract containing the arbitration agreement.  *See Crawford*, 748 F.3d at 261.  As Defendants put it, the claims in *Crawford* were "governed" by the contract.  Mem. 12.  *Uptown Drug Co., Inc. v. CVS Caremark Corp.*, 962 F. Supp. 2d 1172 (N.D. Cal. 2013)— another case Defendants cite, *see* Mem. 13—is the same as *Crawford*.  *See Uptown Drug Co.*, 962 F. Supp. 2d at 1184–85.  Indeed, *Uptown Drug* illustrates Plaintiffs' point.  There was intertwinement there because "absent the" contract containing the arbitration claims, the plaintiff "would have no claims against Defendants … ."  *Id.* at 1185–86.  Here, Plaintiffs would have a claim in the absence of the terms of service.  *O'Conner v. AT&T Corp.*, 2013 WL 3107496, at *4 (M.D. La. June 18, 2013), also falls into this category of cases.  *See* Mem. 13 (citing *O'Conner*).  There—unlike here—resolving the plaintiffs' claims "would necessarily require the Court to interpret the contracts" containing the arbitration agreement.  *Id.* at *4; *see also* Mem. 13 (noting the importance of contract interpretation to *O'Conner*).

Defendants also cite *In re Apple and AT and TM Antitrust Litigation*, 826 F. Supp. 2d 1168 (N.D. Cal. 2011).  Mem. 13.  But in discussing whether the claims there were intertwined, the court noted that "Plaintiffs themselves have contended throughout this litigation that their … claims … arise from" the contracts containing arbitration agreements.  *In re Apple*, 826 F. Supp. at 1178.  Plaintiffs do not so contend here.  But *In re Apple* is not irrelevant.  The case discusses the Second Circuit case, *Sokol*, 542 F.3d 354.  *See In re Apple*, 826 F. Supp. 2d at 1178–79.  Despite citing *In re Apple*, Defendants do not discuss *Sokol*.  But that case, like this one, involved a claim of tortious interference with contract.  *Sokol*, 542 F.3d at 358–59.  And the defendants there, like the Defendants here, argued for application of equitable estoppel.  *See id.*

The Second Circuit disagreed.  It noted that "in addition to 'intertwined' factual issues, there must be a relationship among the parties of a nature that justifies a conclusion that the party

which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement." *Id.* at 359.  After canvassing its precedents, the court noted that "[i]n each case, the promise to arbitrate by x, the entity opposing arbitration, was reasonably seen on the basis of the relationships among the parties as extending not only to y, its contractual counterparty, but also to y[1], an entity that was, or would predictably become, with x's knowledge and consent, affiliated or associated with y in such a manner as to make it unfair to allow x to avoid its commitment to arbitrate on the ground that y was not the very entity with which x had a contract." *Id.* at 361.  That, the Second Circuit said, tracked with the "basic principle that one does not give up one's right to court adjudication except by consent." *Id.*  It also meant there was no reason to apply equitable estoppel.  The non-signatory's relationship with the signatory in *Sokol* arose from the former "wrongfully inducing [the latter] to breach [his contractual] obligations . . . ." *Id.* at 362.  In such a case, there is "no unfairness in allowing x, the victim of the tortious interference, to insist that, while he agreed to arbitrate with his contractual counterparty y, he in no way consented to extend that agreement to an entity which tortiously subverted his rights under the agreement." *Id.*

Just so here.  Defendants' relationship with Facebook and Twitter stems from their wrongful attempts to control those companies' decisions to censor Plaintiffs.  As in *Sokol*, there is no unfairness in allowing Plaintiffs to proceed in court as opposed to before an arbitrator.  Plaintiffs in no way consented to having a third party wrongfully interfere in their relationship with Facebook and Twitter—especially not third parties working with government officials to create a far-reaching censorship program.

After all, Plaintiffs could not have foreseen that Defendants would be related to Facebook and Twitter, and their terms of service, in that way.  Defendants are, in large part, responsible for

that fact.  Defendants created EIP and VP as fronts to allow government officials to evade "the unclear legal authorities, including very real First Amendment questions that would arise if the government took [the alleged] actions directly."   FAC ¶4 (quotations omitted).   Because Defendants' affiliation with Facebook and Twitter stems from an attempt to evade legal authorities that no one contends Plaintiffs knew about at the time they created their accounts, it is not "unfair for [Plaintiffs] to claim that [their] agreements to arbitrate ran only to" Facebook and Twitter. *Sokol*, 542 F.3d at 361.

To that, Defendants have no response.  Factually, Defendants claim that "[t]he basis for every count in the complaint, including the claims that Defendants violated federal civil rights law, is Plaintiffs' allegation that Defendants identified Plaintiffs' social media posts as violating the social media platforms' content policies and flagged those posts to the social media platforms, which, in turn, enforced the policies through alleged 'censorship' of Plaintiffs' social media posts." Mem. 11; *see also* Mem. 13 (arguing Plaintiffs rely on the terms of service "because Plaintiffs allege that Defendants violated federal and state law by encouraging the platforms to adopt stricter content moderation policies and by flagging content as violating those policies").  The implicit point is that Plaintiffs complain about a content-moderation decision made by Facebook and Twitter, not by Defendants.

But as noted above, that is not what the FAC says.  Defendants are more than content flaggers who provide information to social media companies for their independent consideration. Rather, Defendants work "closely with state and federal government officials, … [to] urge, pressure, and coerce social-media platforms to monitor and censor disfavored speakers and content." FAC ¶2. As the Complaint makes clear, platforms' cooperation stems from "pressure from federal officials … ." FAC ¶154; *see also*, *e.g.*, FAC ¶¶147–55.  That is, the social media

companies' content moderation decisions are not their own decisions; they are Defendants'/government officials' decisions.

Defendants' own misstatement undermines their argument in any event.  As they frame the facts, their actions involve identifying and flagging content, which is separate from the next step— Facebook's and Twitter's decision to deplatform content.  *See*, *e.g.*, Mem. 11.  The latter is what purportedly implicates the terms of service containing the arbitration agreements at issue in their motion, and so Defendants' own (incorrect, to be sure) framing of the Complaint necessarily concedes that their conduct is separate from Facebook's and Twitter's acts that rely on the terms of service.  And, thus, it necessarily concedes that Plaintiffs' case does not rely on those terms.

It is a necessary concession because Defendants' argument wrongly conflates reference with reliance.  Plaintiffs do, as Defendants say, refer to the terms of service.  *See* Mem. 11.  But "[t]he difference between 'reference,'" which is what Defendants focus on, "and 'reliance,' as employed by *MS Dealer* and others is significant."  *Goldman*, 173 Cal. App. 4th at 218.  The latter refers to "actual reliance on the terms of the agreement to impose liability on the nonsignatory." *Id.* at 231; *see id.* (relying on *MS Dealer*); *see Hill v. GE Power Sys., Inc.*, 282 F.3d 343, 349 (5th Cir. 2002) (noting that "'touching matters' is not the appropriate test" and that just because claims "are dependent" on a contract's existence does not mean they rely on the contract).

It does Defendants no favors to say that Plaintiffs had to agree to the terms of service "to use social media platforms."  Mem. 11.  This argument comes perilously close to arguing that because the existence of the terms of service are a but-for cause of Plaintiffs' claims, the suit relies on the terms.  The premise of this argument is not right.  Plaintiffs' claims do not turn on what the terms of service, and incorporated content moderation guidelines, require.  They turn on Defendants' control over social media companies.

Regardless, the reliance requirement does not turn on "a simple 'but for' test but whether plaintiffs' claims demonstrate actual reliance on the terms of the" agreements. *Pac. Fertility Cases*, 85 Cal. App. 5th 887, 896 (2022) (second quotations and alterations omitted). Defendants thus "confuse[ ] the concept of 'claims founded in and intertwined with the agreement containing the arbitration clause' with but-for causation." *DMS Servs., LLC v. Super. Ct.*, 205 Cal. App. 4th 1346, 1356–57 (2012); *see also Montemayor v. Ford Motor Co.*, 92 Cal. App. 5th 958, 970 (2023) ("To be sure, the Montemayors would not have sued Ford for the defective condition of the vehicle but for the sale of the vehicle by AutoNation pursuant to the sales contract. … But that does not mean Ford's obligation to provide a non-defective vehicle under its separate express warranty is in any way founded on an obligation imposed by the sales contract or is intertwined with those obligations.").

\* \* \*

Thus, Plaintiffs' claims do not rely on the terms of service between them and Facebook and Twitter. Plaintiffs are not seeking the benefits of those contracts; they are seeking to stop Defendants' actions, taken independently of those terms, to significantly encourage and pressure social media companies to censor Plaintiffs. Plaintiffs' claims are therefore "independent of the existence of" these contracts. *Kramer*, 705 F.3d at 1131; *see also* FAC ¶ 50.

### 2) Defendants cannot invoke equitable estoppel by pointing to allegations of collusion.

Defendants' argument as to interdependent misconduct is half-hearted at best. To start, this factor is insufficient to mandate arbitration by itself. In *Hill*, the Fifth Circuit affirmed a district court's refusal to apply equitable estoppel where the second, but not the first, factor was present. 282 F.3d at 349.

The Court can also reject Defendants' analysis because it relies almost exclusively on allegations of collusion between social media companies and Defendants. *See* Mem. 14. "Mere allegations of collusion are insufficient to trigger equitable estoppel." *Murphy*, 724 F.3d at 1232. "[R]ather, such allegations support an application of estoppel only when they 'establish that the claims against the nonsignatory are intimately founded in and intertwined with the obligations imposed by the contract containing the arbitration clause.' " *In re Humana Inc. Managed Care Litig.*, 285 F.3d 974, 975 (11th Cir. 2002) (alterations omitted) (quoting *MS Dealer*, 177 F.3d at 948), *overruled in different part sub nom. PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401 (2003); *see also Kramer*, 705 F.3d at 1128–29 (same) (quoting *Goldman*, 173 Cal. App. 4th at 219). Yet that is all Defendants provide. The Court can reject their argument out of hand.

Indeed, Defendants acknowledge that caselaw requires a linkage between the allegations of intertwined misconduct and the contract containing the arbitration clause. *See* Mem. 14–15 (summarizing *Chartwell Staffing Services Inc. v. Atl. Sols. Grp.*, 2020 WL 620294 (C.D. Cal. Jan. 9, 2020), and *Salas v. Universal Credit Servs., LLC*, 2019 WL 1242448 (S.D. Cal. Mar. 18, 2019)). In *O'Conner*, *see* Mem. 15, the intertwined conduct involved the non-signatory unduly influencing the signatory "to breach [the] contract" containing the arbitration agreement. *O'Conner*, 2013 WL 3107496, at *4 (quotations omitted). And the *Brown* court, *see* Mem. 14–15, applied equitable estoppel based on this factor because "there was no way to bring actions against [the non-signatories] without considering the actions of" signatories. *Brown*, 462 F.3d at 398. Those "acts … would be covered by the arbitration agreement." *Id.* That is, the intertwined conduct was connected with the contract containing the arbitration clause. *Koenig v. Ritz-Carlton Co., LLC*, 2021 WL 5855608 (E.D. La. June 24, 2021), *see* Mem. 15, is of the same ilk. *See* 2021 WL 5855608, at *4 ("Defendants point out that Plaintiff's claim that Sheraton, Marriott, and Starwood

did not hire her because of her protected complaints of discrimination against Ritz-Carlton is predicated on her ability to prove one of her claims against Ritz-Carlton.").

Defendants ignore their own caselaw on this front.  They cite an unreported Fifth Circuit decision, *Noble Capital Group, LLC v. US Capital Partners, Inc.*, 2021 WL 3477481 (5th Cir. Aug. 6, 2021), to support their incorrect phrasing of the standard for applying equitable estoppel.  *See* Mem. 9.  *Noble Capital*, however, discusses only this factor—and says that equitable estoppel applied because the non-signatory and signatory defendants "acted together as a single unit to defraud Noble and *because such allegations are connected with the obligations of the parties' agreements*," pointing to *Kramer* quoting *Goldman* as support.  *Id.* at *3 (emphasis added).  That is, *Noble Capital* affirms that Defendants misstate the governing legal standard and their interdependent and concerted misconduct argument is insufficient to apply equitable estoppel.

To the extent Defendants mention Facebook's or Twitter's terms of service, they make the same factual error as they did in arguing reliance.  Defendants argue that "the entire complaint depends on the allegation that the signatory social media platforms wrongfully censored Plaintiffs' social media activity; absent the platforms' decisions to take action against certain of Plaintiffs' posts, Plaintiffs would—by the terms of their own Complaint—have no alleged causes of action or injuries at all."  Mem. 15.  Wrong on the last count (and others).  Attempts to censor are no less derogatory of First Amendment rights than actual censorship.  *See Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015) ("[A] threat is actionable and thus can be enjoined even if it turns out to be empty—the victim ignores it, and the threatener folds his tent."); *see also*, *e.g.*, *Missouri*, 2023 WL 6425697, at *19 ("[A] credible threat may violate the First Amendment even if the victim ignores it, and the threatener folds his tent.") (quotations omitted) (tracing the rule

back to *Backpage*).  Thus, at least Counts I and II would survive even if the social media companies had refused to censor Plaintiffs.

Regardless, the social media companies are not independent actors: "in this case [they] yielded" to Defendants.  *Backpage*, 807 F.3d at 231.  Plaintiffs allege that Defendants unlawfully imposed their will, and the will of government officials, on social media companies—and that led to the censoring of Plaintiffs' social media activity.  *See*, *e.g.*, FAC ¶¶2, 70–71, 147–55, 257–70. Whatever collusion existed between social media companies and Defendants, *see* Mem. 14, was coerced, *see* FAC ¶155.  Defendants' pressure campaign is independent of (as opposed to founded in or intertwined with) the terms of service between Plaintiffs and Facebook and Twitter.  To the extent the terms of service enter the equation at all, they do so incidentally.

In short, Plaintiffs' case does not depend "in some part, upon the nature of the tortious acts committed by the signatories" Facebook and Twitter.  *Contra* Mem. 15 (quotations omitted) (quoting *Brown*, 462 F.3d at 399).  So far as the Complaint goes, Facebook and Twitter are not the wrongdoers and Plaintiffs' claims are not "'founded in and intertwined with the obligations imposed by'" their terms of service.  *In re Humana*, 285 F.3d at 975 (quoting *MS Dealer*, 177 F.3d at 948).  Rather, the case depends on Defendants' significant encouragement and coercion of those companies to censor Plaintiffs.

**B.    Even if Defendants are right, numerous claims are outside the scope of Facebook's and Twitter's arbitration agreements.**

Even if Defendants can take advantage of the contract between Plaintiffs and Facebook or Twitter, many of Plaintiffs' claims are not subject to arbitration either by the terms of the arbitration agreements or by operation of law.

**1.** **Defendants' censorship of posts on other social media platforms are not subject to arbitration under Facebook's or Twitter's terms of service.**

Defendants are simply wrong in saying that "the complaint does not allege any 'censorship' of any social media activity on either of those platforms." Mem. 6–7. The complaint details Defendants' censorious activities across numerous platforms. It alleges, for example, that EIP pressured media companies like "Facebook, Twitter, *YouTube*, *Pinterest*, and *TikTok*" to change their community standards. FAC ¶¶ 67, 70 (emphases added) (quotations omitted). Likewise, it notes that EIP worked with not just Facebook and Twitter, but Instagram, Google, TikTok, Reddit, Nextdoor, Discord, and Pinterest to advance its censorious goals. FAC ¶¶ 143, 145. The Complaint provides further details, noting as an example that EIP's " 'Sharpiegate' ticket was submitted … to 'try and consolidate all the content' regarding the Sharpiegate story from 'across Twitter, FB, *TikTok*, and *Youtube*.' " FAC ¶ 177 (emphases added) (quoting the EIP report). And " '35% of the URLs [EIP] shared with Facebook, *Instagram*, Twitter, *TikTok*, and *Youtube* were either labeled, removed, or soft blocked.' " FAC ¶ 179 (emphases added) (quoting the EIP report). The VP is no different. It has worked with "[s]ix social media platforms," including Google, which includes YouTube, TikTok, Medium, and Pinterest. FAC ¶ 278. VP's work with Facebook, furthermore, also included Instagram. *Id.* And VP had privileged access to YouTube's user data. *See* FAC ¶ 319.

Those activities led to censorship of Plaintiffs on platforms other than Facebook and Twitter. For example, the EIP report points to The Gateway Pundit's YouTube and Instagram accounts in claiming the news organization "was among the most active spreaders of election-related misinformation in our analyses." FAC ¶ 187 (quotations omitted). "Their YouTube channel," per EIP, "appeared in five incidents, and their 13 incident-related videos had more than 4 million views on Youtube." FAC ¶ 190 (quotations omitted). And The Gateway Pundit's

"Instagram account was tied for #2 among repeat spreaders, appearing in 10 incidents for 20 posts that received more than 132,000 engagements."  FAC ¶ 191 (quotations omitted).

The clear inference is that Defendants censor media posts, including Plaintiffs' posts, on platforms other than Facebook and Twitter.  *See also Missouri*, 2023 WL 4335270, at *59 (noting that the federal government, with whom Defendants worked, censored speech by Louisiana and Missouri on YouTube).  *Contra* Mem. 6.  Given the applicability of the summary judgment standard, that is the controlling inference.  *See, e.g., Rideau v. Lafayette Health Ventures, Inc.*, 381 F. Supp. 3d 709, 716 (W.D. La. 2019) ("In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor.").

Neither Facebook's nor Twitter's arbitration agreements cover Plaintiffs' claims as to those platforms.  *See* Defs.' Ex. A, at 2 (applying the arbitration mechanism to disputes relating to "access or use of the Meta Products"); Defs.' Ex. D, at 3 (linking Twitter's arbitration clause to the use of Twitter's services).  Thus, there is no agreement "to arbitrate the dispute" concerning Defendants' censorship on platforms other than Facebook and Twitter—and so no reason to grant Defendants' motion as to those claims.  *Barnes*, 2023 WL 3025076, at *1.

> **2.**     **Facebook's arbitration agreement applies only to the censoring of Plaintiffs' business and commercial speech on the platform, not to Plaintiffs' other claims.**

The Facebook arbitration agreement (encompassed in the Meta Commercial terms) does not apply to a number of Plaintiffs' claims.[5]  Hines, for example, uses Facebook for more than

---

[5] Plaintiffs concede that under Fifth Circuit precedent, the question of whether a claim is arbitrable is for the arbitrator under the Twitter terms of service.  *See* Defs. Ex. D, at 3 (§ 6(c)).  Plaintiffs preserve all arguments they have to overturn that precedent.

But to reiterate, the Court should not get this far in the analysis.  Defendants argue that "[b]ecause the Twitter Terms 'clearly and unmistakably' assign scope questions to the arbitrator,

business or commercial purposes.  *Contra* Mem. 19.  She uses Facebook for her personal speech—

and that speech "has been censored" as well as that of "her groups' ... ."  FAC ¶ 394.  Her "personal

Facebook page ... [is] under constant threat of being completely deplatformed," and was, in fact,

censored in 2022.  FAC ¶ 397.  And she had two Facebook groups "completely deplatformed."

FAC ¶ 399.  Defendants provide no evidence that those groups' Facebook profiles were pages, such

that the Meta Commercial terms apply to her creation and management of them.  *See* Defs. Ex. A,

at 1.  Because there is no evidence that Hines's personal Facebook page, or the pages of those two

groups, involves the "access or use of the Meta Products for business or commercial purposes, *id.*

at 2 (§ 5(b)); *see id.* at 1 (describing what constitutes a business or commercial purpose),

Defendants' actions as to those accounts fall outside the scope of Facebook's arbitration agreement.

Likewise for Hines's claims arising from her status "[a]s an audience member" of

numerous social media accounts.  FAC ¶ 402.  Beyond the fact that Hines listens to other's speech

---

the court must compel Plaintiff Hoft's claims to arbitration without assessing whether those claims
are covered by the arbitration agreement," citing *Crawford Drugs* and *Henry Schein, Inc. v. Archer
& White Sales, Inc.*, 139 S. Ct. 524 (2019).

The Defendants, however, skim over the fundamental prerequisite the Supreme Court
identified in *Henry Schein, Inc*.  The predicate question is whether *these* parties have an agreement.
As the Court explained, "Under our cases, courts should not assume that the parties agreed to
arbitrate arbitrability unless there is clear and unmistakable evidence that they did so."  *Id.* at 531
(quotations omitted).

Only "if a valid agreement exists, and if the agreement delegates the arbitrability issue to
an arbitrator, [does] a court may ... decide the arbitrability issue.  *Id.* at 530.  Or as the Fifth Circuit
noted in *Noble Capital*, which Defendants cite, *see* Mem. 9, "where the 'very existence of a
contract' containing the relevant arbitration agreement is called into question, the federal courts
have authority and responsibility to decide the matter." *Id.* (citing *Banc One Acceptance Corp. v.
Hill*, 367 F.3d 426, 429 (5th Cir. 2004) (quoting *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d
211, 218 (5th Cir. 2003)).  Likewise for *Petrofac, Inc. v. DynMcDermott Petroleum Operations
Co.*, 687 F.3d 671 (5th Cir. 2012).  *See* Mem. 17–18 (citing the case).  Scope questions must—
unlike here—turn on the existence of a valid agreement between the parties.  *See Petrofac*, 687
F.3d at 674–75.

As noted above, there is no valid agreement to arbitrate between Plaintiffs and Defendants.
Thus, the scope of the Twitter arbitration agreement—and whether it delegates this threshold issue
to the arbitrator—is academic.

on her personal pages, *see* FAC ¶402, receiving information falls outside the scope of the Meta Commercial Terms' definition of "business or commercial purpose."  Of the listed examples of such purposes, the most applicable is "managing a Page."  Defs. Ex. A, at 1; *see also* Mem. 19 (relying on this example).  But logging in to read or listen to the speech of others, *see* FAC ¶402, is not "managing a Page," Defs. Ex. A, at 1.  "Managing," in context, is a transitive verb suggesting active direction or administration, like posting on a Page, as opposed to using the page as a passive vehicle for consuming speech.  *See Managing*, Am. Heritage Dictionary (5th ed. 2022) ("To have charge of; direct or administer").[6]  This argument also applies to Hoft.  He, like Hines, "is … an avid reader and listener of others' speech on social media."  FAC ¶412.

Thus, the *only* claims that Defendants have shown to be conceivably subject to arbitration under Facebook's arbitration agreement are those that directly censor Hines's and Hoft's speech on pages other than their personal pages.  Indeed, that is implicit in Defendants' motion.  They argue that "Plaintiffs' claims that their Facebook posts were improperly *censored* arise out of and relate to their access or use of Facebook for business or commercial purposes."  Mem. 19 (emphasis added).  By referencing Hines's and Hoft's censored Facebook posts, Defendants implicitly concede that the claims stemming from their status as consumers of speech are not arbitrable.  Moreover, that necessarily extends to Defendants' invidious discrimination.  *See*, *e.g.*, FAC ¶¶320–61.

Thus, the constitutional violations in Count I, II, and III, *see* FAC ¶¶436-37, 450, 457, and Defendants' breach of duty claim in Count V, *see* FAC ¶469, fall outside the scope of Facebook's arbitration agreement.  So too does Count IV to the extent it involves contractual and business

---

[6] *Available at* https://ahdictionary.com/word/search.html?q=managing.

relationships that turn on Plaintiffs' "ability to…read [and] listen … freely … on social media platforms."  FAC ¶ 462.

### 3. Plaintiffs' request for public injunctive relief is not subject to arbitration.

Next, Plaintiffs request for public injunctive relief are not subject to arbitration under either the Facebook or Twitter arbitration agreements.  For one, the Twitter arbitration agreement expressly excludes such relief from arbitration: "Notwithstanding the requirements of this arbitration provision, if the Dispute involves a claim for public injunctive relief, you may choose to sever that claim from the arbitration proceeding and bring it in any court of proper jurisdiction." Defs.' Ex. D, at 3 (§ 6(c)).  For Facebook, it stems from California law, *see Blair v. Rent-A-Center, Inc.*, 928 F.3d 819, 824 (9th Cir. 2019), which governs the Facebook terms of service.  *See* Defs.' Ex. A, at 2 (§ 5(c)(ii)).

Plaintiffs request public injunctive relief as to Counts I, II, and III.  First, the relief Plaintiffs request as to those counts "has the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general public."  *Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535, 541–42 (9th Cir. 2021) (quotations omitted) quoting *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 957 (2017)).  The injunctive relief relating to Counts I and II seeks to prevent Defendants from violating the First and Fourteenth Amendment rights of all individuals who use social media platforms.  This includes not just users, but also those who read material others post but do not themselves have an account.  Defendants' censorship of material impairs their right "to read and listen to the speech of others … ."  FAC ¶ 437; *see also* FAC ¶ 450.  Given the ubiquity of social media, the number of people who will receive relief must be considered the public at large.

Indeed, that Plaintiffs' request is to prevent public injury stems from the nature of the First Amendment.  "It is the purpose of the First Amendment to preserve an uninhibited marketplace of

ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee." *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969). Plaintiffs' requested injunctive relief thus prevents injury to the general public by protecting a source of information for ideas that the entire public can access and so is integral to the marketplace of ideas.

Second, while Plaintiffs bring class allegations, *see* FAC ¶¶ 422–32, the relief they seek ranges more broadly than the defined class. *See Hodges*, 21 F.4th at 542 ("[A] request for public injunctive relief 'does *not* constitute the pursuit of representative claims or relief on behalf of others,' nor does it involve 'prosecuting actions on behalf of the general public.' " (alterations omitted) (quoting *McGill*, 2 Cal. 5th at 959–60)). Enjoining Defendants' censorship will benefit the whole public by ensuring a free flow of information. While it may provide unique benefits to "users" of social media platforms, FAC ¶ 423, both users and non-users will benefit from the free flow of information.

That is because recipients of information on social media platforms are not necessarily users. Defendants prove that. Defendants' Exhibits B and C are screenshots of Health Freedom Louisiana's and Reopen Louisiana's Facebook pages. Defendants do not suggest that a Facebook account is needed to access those pages and the information on them. Indeed, following the links on the exhibits shows an account is unnecessary. Thus, relief protecting Hines necessarily benefits the broader public who can read the information she provides. Likewise for Hoft, who also gets readers from social media. *See* FAC ¶ 409 (noting "social-media engagement drives traffic to Hoft's website."). And, of course, news sources may report on information first posted on social media. Thus here, too, the fact the general public can access social media accounts establishes the public nature of Plaintiffs' relief.

Proving the point is that Plaintiffs can get injunctive relief even absent class certification. That is the lesson of *Missouri*.  There, the Fifth Circuit affirmed that injunctive relief not only could, but had to, extend beyond "content posted by plaintiffs themselves."  *Missouri*, 2023 WL 6425697, at *32 (emphasis omitted).  That was because the defendant officials in *Missouri* "have engaged in a broad pressure campaign designed to coerce social-media companies into suppressing speakers, viewpoints, and content disfavored by the government.  The harms that radiate from such conduct extend far beyond just the Plaintiffs; it impacts every social-media user."  *Id.*  Defendants here have partnered with government officials in the same "broad pressure campaign" to censor disfavored speech.  *Id.*  Thus, Plaintiffs' requested relief must necessarily—indeed, inevitably— extend past their social media content regardless of the outcome of class certification.  *See id.*

Third, it follows from the above that Plaintiffs' requested relief as to Counts I and II "involves diffuse benefits to the 'general public' as a whole."  *Hodges*, 21 F.4th at 542 (quoting *McGill*, 2 Cal. 5th at 93).  This, again, looks towards the general public benefit that accrues by ensuring the free flow of information on social media accounts—which reflects the First Amendment right to receive and consume information as well as the more general benefit of a free-flowing marketplace of ideas.

As a result, Plaintiffs seek, as to Counts I, II and III, "forward-looking injunctions that seek to prevent future violation of law for the benefit of the general public as a whole."  *Hodges*, 21 F.4th at 542.  Indeed, that is basically the *only* relief Plaintiffs seek as to Count III.  They thus seek public injunctive relief, and that relief does not fall within the scope of the Facebook or Twitter arbitration agreements.

## IV.    Count I and Count II do not involve arbitrable claims.

Defendants cannot arbitrate Plaintiffs' claims in Count I and II because those claims are not arbitrable.  Parties can agree to arbitrate federal statutory claims "unless the FAA's mandate

has been 'overridden by a contrary congressional command.' " *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (quoting *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 226 (1987)).  That command is "discoverable in the text" of the federal law, "its legislative history, or an 'inherent conflict' between arbitration and the [law]'s underlying purposes."  *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991) (quoting *McMahon*, 482 U.S. at 227)); *see also Lim v. Offshore Specialty Fabricators, Inc.*, 404 F.3d 898, 907 (5th Cir. 2005).

Count II alleges a violation of 42 U.S.C. § 1983.  "The very purpose of § 1983 was to interpose the *federal courts* between the States and the people."  *McDonald v. City of W. Branch*, 466 U.S. 284, 290 (1984) (emphasis added) (quoting *Mitchum v. Foster*, 407 U.S. 225, 242 (1972)); *Jennings v. Patterson*, 488 F.2d 436, 441 (5th Cir. 1974) ("It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts…").  In enacting § 1983, "Congress assigned to the federal courts a paramount role in protecting constitutional rights."  *Patsy v. Bd. of Regents of Fla.*, 457 U.S. 496, 503 (1982).  Representative Dawes, for example, said "there is no tribunal so fitted" to evaluate claims brought under § 1983 as the federal courts.  *Id.* at 503 (quoting Cong. Globe, 42d Cong., 1st Sess., 476 (1871)); *see id.* at 504–05 (providing statements from the legislative record about how the law was to "throw open the doors of the United States courts," how the United States was protecting citizens by "the assertion of immediate jurisdiction through its courts" through the law, and more) (quotations and emphasis omitted).

Section 1983 claims are therefore uniquely the province of federal courts.  Numerous cases illustrate the point.  For example, *Patsy* concluded that "exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983."  *Id.* at 516.  Requiring exhaustion, the Court intimated, would be inconsistent with the federal courts'

"paramount role in protecting constitutional rights." *Id.* at 503.  The Third Circuit has since concluded that *Patsy* means States cannot mandate arbitration of § 1983 claims.  *See Hohe v. Casey*, 956 F.2d 399, 408–09 (3d Cir. 1992).  In *McDonald*, the Supreme Court held that it is inappropriate to accord "preclusive effect to an arbitration award in a subsequent § 1983 action" because doing so "would undermine that statute's efficacy in protecting federal rights."  466 U.S. at 290.  And in *Burnett v. Grattan*, the Supreme Court—citing *McDonald*—said that applying "an administrative statute of limitations" to § 1983 claims "ignores the dominant characteristic of civil rights actions: they belong in court."  468 U.S. 42, 50 (1984).

Likewise for Plaintiffs' § 1985(3) claims in Count I.  Like § 1983, Congress enacted § 1985 "'to enforce'" constitutional rights.  *Griffin v. Breckenridge*, 403 U.S. 88, 100 (1971) (quoting Cong. Globe, 42d Cong., 1st Sess., App. 69 (1871) (statement of Rep. Shellaberger); *see also id.* (providing another statement from Rep. Shellaberger and one from Rep. Willard).  The law was intended to "combat the prevalent animus against [African-Americans] and their supporters" in the South, *United Brotherhood of Carpenters and Joiners of America, Local 610 v. Scott*, 463 U.S. 825, 836 (1983), and so ensure the "'equal protection of the laws and . . . equal privileges and immunities under the laws,'" *Griffin*, 403 U.S. at 100 (Cong. Globe, 42d Cong., 1st Sess., App. 188 (1871) (statement of Rep. Willard)).  As a result, § 1985 claims, like § 1983 claims, "exist independent of any other legal or administrative relief that may be available as a matter of federal or state law.  They are judicially enforceable in the first instance."  *Burnett*, 468 U.S. at 50.  The "dominant characteristic" of § 1985(3) claims is therefore that it "belong[s] in court."  *Id.*

The history and legislative purposes behind 42 U.S.C. § 1983 and § 1985(3) therefore show that Congress intended "to preclude a waiver of judicial remedies for" those claims.  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985).  Claims brought under

those laws are "uniquely judicial." *Tripp v. Renaissance Advantage Charter Sch.*, 2003 WL 22519433, at *8 (E.D. Pa. Oct. 8, 2003) (discussing § 1983).   It would "dilute [their] effectiveness … to require such claims to be resolved in binding arbitration … ."  *Id.* at *10. "Accordingly, an inherent conflict exists between the purposes of [those laws] and arbitration." *Id.*  And, as a result, the latter—as embodied in the FAA—must give way.

That makes sense.  As discussed, both laws responded to the threat state and local officials and local groups like the KKK posed to the rights of others by providing a federal judicial forum to victims to vindicate their rights.  Both §§ 1983 and 1985 thus represent a congressional distrust of local authorities—including local courts, which had proven ineffective at vindicating "federally secured rights."  *Mitchum*, 407 U.S. at 240 (quotations omitted); *see also Patsy*, 457 U.S. at 509 ("Of primary importance to the exhaustion question was the mistrust that the 1871 Congress held for the factfinding processes of state institutions.").  The Reconstruction Congress's distrust of local authority generally, and local forums for vindicating federal rights specifically, strongly suggests it would have balked at the idea of local, non-judicial (*e.g.*, arbitral) forums hearing claims it enacted legislation specifically to place in federal court.

Nor is there any reason to believe that Congress overwrote that intent when it subsequently passed the FAA.  Congress, in enacting the FAA, sought to "ensure[ ] the enforceability of *private* agreements to arbitrate."  *Waffle House, Inc.*, 534 U.S. at 289 (emphasis added).  The FAA's focus on private agreements contrasts with 42 U.S.C. §§ 1983 and 1985.  Section 1983, for example, focuses on public action; liability only attaches when an act is "committed by a person under color of state law."  *Guillot ex rel. T.A.G. v. Russell*, 59 F.4th 743, 751 (5th Cir. 2023).  And while § 1985(3) reaches private conspiracies, *see Griffin*, 403 U.S. at 102, where, as here, the alleged conspiracy involves First Amendment rights, the plaintiff must "prove[ ] that the state is involved

in the conspiracy or that the aim of the conspiracy is to influence the activity of the state," *United Brotherhood of Carpenters and Joiners of America*, 463 U.S. at 830.  It would be odd indeed if a law meant to enforce *private* agreements also extended to such litigation, which involves public actors engaging in official acts, or at least acts done under the color of law.  The better view is that Congress did not intend the FAA to undermine its intent to allow for a federal forum for constitutional claims brought under 42 U.S.C. §§ 1983 and 1985.

In sum, arbitration is inconsistent with the congressional purpose behind 42 U.S.C. §§ 1983 and 1985(3) of ensuring a judicial forum to vindicate federal constitutional rights.  Because Counts I and II bring constitutional claims under those statutes, they are not subject to mandatory arbitration.

**V.     The Court should deny Defendants' request to strike Plaintiffs' class claims.**

Defendants also ask the Court to strike the class claims and compel individual arbitration.  Mem. 21–22.  This argument depends entirely on whether and to what extent Defendants can enforce the arbitration agreements, and whether the agreements cover the claims in this suit.  *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995) ("[A] party who has not agreed to arbitrate will normally have a right to a court's decision about the merits of its dispute … ."); *Westmoreland*, 299 F.3d at 465 (noting that, generally, only signatories may enforce arbitration agreements).  Since Defendants cannot enforce the agreements—either in whole or in part—their request is inappropriate.

**VI.    Defendants' request for a stay and § 1404 transfer is derivative of their meritless equitable estoppel claims, and the Court should deny them for the same reasons.**

**A.     Defendants' request for a stay fails.**

Defendants cite only one inapposite case for their argument that the Court should stay proceedings pending arbitration.  Mem. 22 (citing *Boxley v. Fam. Dollar Stores, Inc.*, 2020 WL

45

2104945, at *6 (W.D. La. May 1, 2020)).  *Boxley* involved a pro se plaintiff who had signed an arbitration agreement with the employer she was attempting to sue.  *Id.* at *1–2.  The plaintiff also did not file an opposition to the employer's motion to dismiss or stay.  *Id.* at *3.  Because the Court found that the uncontested facts established an agreement to arbitrate that covered the plaintiff's claim, the Court administratively closed the case pending arbitration.  *Id.* at *6.  Those facts—an uncontested agreement to arbitrate between the plaintiff and the defendant—do not remotely resemble these facts.  Here, Defendants do not claim that that they entered into an agreement with Plaintiffs, and Defendants' motion is contested.

"In general, [9 U.S.C.] Section 3 only applies to parties to an agreement containing an arbitration clause."  *Hill*, 282 F.3d at 346; *see also* 9 U.S.C. § 3 ("upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement").  Thus, whether Plaintiffs' claims "are 'referable to arbitration' such that a stay of litigation under § 3 would be mandated" is "identical" to whether Plaintiffs' claims are covered by an arbitration agreement.  *Waste Mgmt., Inc. v. Residuos Industriales Multiquim, S.A. de C.V.*, 372 F.3d 339, 343 (5th Cir. 2004).  As previously discussed, Plaintiffs' claims are not subject to arbitration.  Because Defendants are "not parties to the arbitration agreement, … the issues presented [are] not referable to arbitration."[7]  *Adams v. Ga. Gulf Corp.*, 237 F.3d 538, 541 (5th Cir. 2001).  While Defendants may believe "that being forced to litigate in federal court impairs [their] chances of success in the lawsuit[,] [t]he forum selection concerns of a non-party are not remotely commensurate to the impediment to the federal policy favoring arbitration created by redundant arbitration or potential impairment of the signatories' rights to arbitrate."  *Id.*

_____

[7] Because § 3 does not apply, the Fifth Circuit will not have jurisdiction to hear any interlocutory appeal denying Defendants' request for a stay.  *See Adams*, 237 F.3d at 541-42.

**B.      Defendants' request to transfer fails.**

Under 28 U.S.C. § 1404(a), Defendants seek transfer of Plaintiffs' claims to the Northern District of California pursuant to forum selection clauses in the Twitter and Facebook terms of service. Mem. 23. Again, Defendants' argument rises and falls on their ability to enforce a contract to which they are not a party. So again, Defendants' argument fails.

Defendants conspicuously do not quote any portion of Section 1404(a), which provides, "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division *to which all parties have consented*." 28 U.S.C. § 1404(a) (emphasis added). The *Atlantic Marine* case relied upon by Defendants involved a contract between the plaintiff and the defendant, and "a contractually valid forum-selection clause." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 53, 62 n.5 (2013). Here, Plaintiffs and Defendants never contracted with each other.

Defendants' claim thus hinges on their ability to enforce a contract to which they are not a signatory. Defendants identify only one case that they claim involves "enforcement of arbitration clauses at the request of non-signatories." Mem. 24 (citing *Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517–18 (5th Cir. 2006)). But in *Hellenic*, the defendant party who signed a contract containing a forum selection clause attempted to enforce it against the plaintiff who had not signed it. *Id.* at 517. Contrary to Defendants' characterization, *Hellenic* applied a forum selection clause at the request of a signatory against a benefitting non-signatory, not the other way around. *Cf. Dos Santos v. Bell Helicopter Textron, Inc. Dist.*, 651 F. Supp. 2d 550, 555–56 (N.D. Tex. 2009) ("[T]here appears to be no case from the United States Court of Appeals for the Fifth Circuit addressing the issue" of a non-signatory enforcing a forum selection clause). *Hellenic* thus

does not apply to non-signatory Defendants' attempt to enforce a forum selection clause against Plaintiffs here.

Last year, the Fifth Circuit adopted a "closely related" test for enforcement of forum selection clauses. *Franlink Inc. v. BACE Servs., Inc.*, 50 F.4th 432, 441 (5th Cir. 2022). Although like *Hellenic*, the *Franlink* case involved a signatory attempting to bind a non-signatory to a forum selection clause, *id.* at 435, the *Franlink* court cited approvingly to other circuit court decisions that did involve a non-signatory attempting to enforce a forum selection clause. *Id.* at 439 (citing *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 723 (2d Cir. 2013) ("We hold that a non-signatory to a contract containing a forum selection clause may enforce the forum selection clause against a signatory when the non-signatory is 'closely related' to another signatory."); *Adams v. Raintree Vacation Exch., LLC*, 702 F.3d 436, 439 (7th Cir. 2012) ("A number of cases say that the test for whether a nonparty to a contract containing such a clause can nonetheless enforce it (and whether the nonparty will be bound by the clause if, instead of suing, it is sued) is whether the nonparty is 'closely related' to the suit.")).

Defendants do not discuss the "closely related" test, instead relying on their equitable estoppel arguments. *See* Mem. 24. As noted above, those are meritless. And because Defendants do not discuss *Franlink* or the "closely related" test, they have waived those arguments. *See Gillaspy v. Dallas Indep. Sch. Dist.*, 278 F. App'x 307, 315 (5th Cir. 2008) (per curiam) ("It is the practice of this court and the district courts to refuse to consider arguments raised for the first time in reply briefs."); *Weems v. Hodnett*, 2011 WL 2731263, at *1 (W.D. La. July 13, 2011) ("'Arguments raised for the first time in a Reply brief are waived.'") (alterations omitted) (quoting *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010)).

Regardless, any such claim would be futile.  Judge Posner's opinion for the Seventh Circuit allowed a non-party to enforce a forum selection clause based on the principles of "affiliation" and "mutuality."  *Adams*, 702 F.3d at 439; *see also Franlink Inc.*, 50 F.4th at 442 (citing *Adams*, 702 F.3d at 439-42).  Affiliation does not apply here; Defendants do not have a corporate relationship, such as a parent or subsidiary, with a signatory to the forum selection clause.  *Adams*, 702 F.3d at 439-40.  Nor does mutuality apply; Defendants are not the secret principal of a contract signatory, and they could not sue Plaintiffs in the Northern District of California under the forum selection clause.  *Id.* at 442–43.  None of the other factors set forth by the Fifth Circuit for application against a non-signatory are applicable here, either.  *Franlink*, 50 F.4th at 442.

## VII.   Alternatively, the Court should order discovery related to Defendants' equitable estoppel claim.

Defendants' arguments are premised on application of the doctrine of equitable estoppel.  *See* Mem. 7–16.  "[T]his estoppel inquiry is fact-specific."  *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 178 (2d Cir. 2004), *abrogated in different part by Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010); *see Grigson*, 210 F.3d at 527 ("Each case … turns on its facts.").  As discussed above, proper application of equitable estoppel turns on, among other factors:

(1) Whether Defendants are state actors.

(2) The extent to which Defendants are intertwined with Facebook and Twitter and/or intertwined with government officials.

(3) Whether Twitter and Facebook were coerced into cooperating with Defendants.

(4) Whether Defendants effectively commandeered Twitter and Facebook's private decisionmaking processes.

Answering either of those questions will resolve issues critical to this motion.   If Defendants are not state actors, for example, then equitable estoppel is more likely to be available

to them. *See supra* Argument §III.A.1–2. Many of Defendants' arguments assume—contrary to the Complaint—that they are not state actors controlling social media companies' moderation decisions. And Defendants have put into issue the extent to which they are intertwined with the social media companies, *see* Mem. 14–16; if they are not, a fact-intensive part of their argument is fatally undermined. Discovery will thus aid in the proper resolution of these issues.

Moreover, the relevant material almost certainly exists and is in Defendants' control—as discovery from *Missouri v Biden* illustrates. Emails from that case show that Defendants constantly emailed CISA and CIS, as well as social media companies, to flag speech for censorship. *See* Capps Ex. A. But those documents do not tell the full story of how Defendants censored social media posts. For example, one email from CIS says "EIP has been tracking this spread under ticket EIP-243 and has more examples," which are not described. Capps Ex. A, at 1 (CIS notifying CISA that "EIP has been tracking this spread under ticket EIP-243 and has more examples" which were not described); *see also*, *e.g.*, Capps Ex. C, at 52 (CISA official noting the occurrence of "briefings" and "conversations" by Defendants when the EIP was forming in 2020). And while Defendant Stamos admits that he and the other Defendants pressured social media companies to adopt and enforce certain content moderation policies,[8] the exact nature of that pressure

---

[8] *See*, *e.g.*, Capps Ex. B, at 38 (Defendant Stamos stating, "My suggestion, if people want to get the platforms to do stuff is, first, you've got to push for written policies that are specific and that give you predictability...this is something we started in the summer [2020] is as Kate [Starbird] talked about Carly Miller led a team from all four institutions to look at the detailed policies of the big platforms and to measure them against situations that we expected to happen. Now we're not going to take credit for all of the changes they made, but there—we had to update this thing, like, eight or nine times … so like putting these people in a grid to say, you're not handling this, you're not handling this, you're not handling this, creates a lot of pressure inside of the companies and forces them to kind of grapple with these issues, because you want specific policies that you can hold them accountable for. The second is, when you report stuff to them, report how it's violating those written policies … So there's two steps here. Get good policies, and then say, this is how it's violated it.").

campaign—which includes the extent to which Defendants are intertwined with governmental entities pressuring social media companies—is unknown.

This request for targeted discovery, "made far in advance of the typical discovery process and . . . important to the resolution of" Defendants' motion is thus appropriate. *Missouri v. Biden*, 2023 WL 4335270, at *1 (W.D. La. July 4, 2023).  Indeed, it would also address the procedural defects of Defendants' request.  *See supra* Argument § II.  Allowing discovery would give Defendants time to raise their request for arbitration in regular order: in their answer as a counterclaim.  *See id.*

## **<u>CONCLUSION</u>**

For those reasons, the Court should deny Defendants' Joint Motion to Compel Individual Arbitration, Dismiss Plaintiffs' Class Claims, and Stay All Proceedings, or Alternatively to Transfer Venue Under 28 U.S.C. § 1404.  Alternatively, the Court should defer ruling on Defendants' motion and order expedited discovery on issues relevant to this motion.

Dated: October 17, 2023                              Respectfully submitted,

| AMERICA FIRST LEGAL | JAMES OTIS LAW GROUP, LLC |
|---|---|
| /s/ Gene P. Hamilton<br>Gene P. Hamilton, GA Bar No. 516201*<br>Reed D. Rubinstein, DC Bar No. 400153*<br>Nicholas R. Barry, TN Bar No. 031963*<br>Michael Ding, DC Bar No. 1027252*<br>Juli Z. Haller, DC Bar No. 466921*<br>James K. Rogers, AZ Bar No. 027287*<br>Andrew J. Block, VA Bar No. 91537*<br>611 Pennsylvania Ave SE #231<br>Washington, DC 20003<br>(202) 964-3721<br>gene.hamilton@aflegal.org<br>reed.rubinstein@aflegal.org<br>nicholas.bary@aflegal.org<br>juli.haller@aflegal.org<br>james.rogers@aflegal.org<br>andrew.block@aflegal.org | /s/ D. John Sauer<br>D. John Sauer, Mo. Bar No. 58721*<br>Justin D. Smith, Mo. Bar No. 63253*<br>13321 North Outer Forty Road, Suite 300<br>St. Louis, Missouri 63017<br>(314) 562-0031<br>John.Sauer@james-otis.com<br><br>* admitted *pro hac vice*<br><br><br>LANGLEY & PARKS, LLC<br><br>By: /s/ *Julianna P. Parks*<br>Julianna P. Parks, Bar Roll No. 30658<br>4444 Viking Drive, Suite100<br>Bossier City, Louisiana 71111<br>(318) 383-6422 Telephone<br>(318) 383-6405 Telefax<br>jparks@langleyparks.com |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 17, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*