# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

JILL HINES, ET AL.,

         *Plaintiffs*,

   v.

ALEX STAMOS, ET AL.,

         *Defendants*.

Civil Action No. 3:23-cv-00571

Chief Judge Terry A. Doughty

Magistrate Judge Kayla D. McClusky

## MEMORANDUM IN SUPPORT OF DEFENDANT THE ASPEN INSTITUTE'S MOTION TO COMPEL INDIVIDUAL ARBITRATION AND STAY ALL PROCEEDINGS

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................. 1

II.  BACKGROUND ................................................................................................. 3

    A.   Plaintiffs and Their Social-Media Accounts ......................................... 3

    B.   The Social-Media Companies' Arbitration Provisions ....................... 3

    C.   Plaintiffs' Claims ..................................................................................... 5

    D.   The Other Defendants' Motion to Compel Arbitration ...................... 6

III. ARGUMENT ...................................................................................................... 7

    A.   The Federal Arbitration Act Requires Enforcement of Plaintiffs' Agreements to Arbitrate Disputes Relating to Their Social-Media Accounts ...................................................................................................... 7

    B.   Plaintiffs Agreed to Arbitrate Disputes ................................................ 8

    C.   Plaintiffs Are Equitably Estopped from Denying that Aspen Is Entitled to Invoke Their Arbitration Agreements ............................... 8

        i.    California and federal common law recognizes equitable estoppel ......... 10

        ii.   Plaintiffs are equitably estopped because their claims rely on the social-media platforms' terms of service .................................. 11

        iii.  Plaintiffs are equitably estopped because they allege substantially interdependent and concerted misconduct with the social-media platforms ..................................................................................... 12

        iv.   Aspen does not have unclean hands ........................................... 13

    D.   Plaintiffs' Claims Fall Within the Scope of Their Arbitration Agreements .............................................................................................. 15

    E.   Any Argument that the FAA Has Been Implicitly Repealed or that the Social-Media Companies' Arbitration Clauses Are Unenforceable Should Be Rejected .............................................................................. 17

        i.    Claims under Section 1983 and 1985 are arbitrable ................ 17

        ii.   Plaintiffs' claims for injunctive relief are arbitrable ............... 19

            1.   The McGill rule does not apply here ......................... 19

            2.   The McGill rule is preempted ..................................... 20

    F.   Plaintiffs' Claims Should Be Compelled to Arbitration on an Individual Basis and This Action Stayed ............................................. 22

IV. CONCLUSION ................................................................................................. 23

# TABLE OF AUTHORITIES

**Page**

*Academy of Sacred Heart of New Oleans v. Certain Underwriters at Lloyd's London*,
2023 WL 246832 (E.D. La. Jan. 18, 2023)....................................................................9

*Arthur Anderson LLP v. Carlisle*,
556 U.S. 624 (2009)..........................................................................................................9

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
475 U.S. 643 (1986)........................................................................................................14

*Banks v. Waitr Holdings, Inc.*,
2019 WL 6883672 (W.D. La. Dec. 17, 2019) (Doughty, J.)....................................23

*Barnes v. StubHub, Inc.*,
2019 WL 11505575 (S.D. Fla. Oct. 3, 2019)..............................................................19

*Beach Orangethorp Hotel, LLC v. Evertrust Bank*,
2023 WL 7320584 (Cal. Ct. App. Nov. 7, 2023) (unpublished) ..............................10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................................13

*Blair v. Rent-A-Center, Inc.*,
928 F.3d 819 (9th Cir. 2019) ........................................................................................22

*Bloom v. Jersey City Mun. Utils. Auth.*,
2008 WL 360986 (D.N.J. Feb. 8, 2008) .....................................................................18

*Brown v. Pac. Life Ins. Co.*,
462 F.3d 384 (5th Cir. 2006) ........................................................................................12

*Buckeye Check Cashing, Inc. v. Cardegna*,
546 U.S. 440 (2006)........................................................................................................14

*Capriole v. Uber Techs., Inc.*,
2020 WL 1323076 (D. Mass. Mar. 20, 2020)............................................................19

*Chartwell Staffing Servs. Inc. v. Atl. Sols. Grp. Inc.*,
2020 WL 620294 (C.D. Cal. Jan. 9, 2020) ................................................................12

*Cisneros v. U.D. Registry, Inc.*,
39 Cal. App. 4th 548 (Ct. App. 1995)..........................................................................21

# TABLE OF AUTHORITIES
(continued)

Page

*Citizens Bank v. Alafabco, Inc.*,
   539 U.S. 52 (2003)............................................................................7

*CompuCredit Corp. v. Greenwood*,
   565 U.S. 95 (2012)...........................................................................18

*Crawford Pro. Drugs, Inc. v. CVS Caremark Corp.*,
   748 F.3d 249 (5th Cir. 2014) ...........................................................9

*Epic Sys. Corp. v. Lewis*,
   138 S. Ct. 1612 (2018).....................................................................7

*Felisilda v. FCA US LLC*,
   53 Cal. App. 5th 486 (Ct. App. 2020).............................................11

*Franklin v. Community Regional Med. Ctr.*,
   998 F.3d 867 (9th Cir. 2021) .........................................................11

*Gilmer v. Interstate/Johnson Lane Corp.*,
   500 U.S. 20 (1991).....................................................................18, 23

*Grant v. Houser*,
   469 F. App'x 310 ............................................................................15

*Grigson v. Creative Artists Agency L.L.C.*,
   210 F.3d 524 (5th Cir. 2000) ..........................................9, 10, 11, 12

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
   139 S. Ct. 524 (2019)......................................................................14

*Hernandez v. Meridian Management Services, LLC*,
   87 Cal. App. 5th 1214 (Ct. App. 2023)...........................................10

*Hodges v. Comcast Cable Commc'ns, LLC*,
   21 F.4th 535 (9th Cir. 2021) ..........................................................20

*Huckaba v. Ref-Chem., L.P.*,
   892 F.3d 686 (5th Cir. 2018) ...........................................................8

*Ikossi-Anastasiou v. Bd. of Supervisors of La. St. Univ.*,
   579 F.3d 546 (5th Cir. 2009) ...........................................................8

**TABLE OF AUTHORITIES**
(continued)

**Page**

*In re A2P SMS Antitrust Litig.*,
    972 F. Supp. 2d 465 (S.D.N.Y. 2013).......................................................................14

*In re Uber Techs. Wage & Hour Cases*,
    95 Cal. App. 5th 867 (Sept. 28, 2023) ...................................................................10

*Koenig v. Ritz-Carlton Hotel Co.*,
    2021 WL 5855608 (E.D. La. June 24, 2021).........................................................13

*Lag Shot LLC v. Facebook, Inc.*,
    545 F. Supp. 3d 770 (N.D. Cal. 2021) ...................................................................22

*Lamps Plus, Inc. v. Varela*,
    139 S. Ct. 1407 (2019).............................................................................................16

*Landry's, Inc. v. Ins. Co. of the St. of Penn.*,
    4 F.4th 366 (5th Cir. 2021) .....................................................................................15

*Levine v. N.Y. St. Police*,
    2022 WL 1987845 (N.D.N.Y. June 6, 2022).........................................................18

*Mattson Tech., Inc. v. Applied Materials, Inc.*,
    314 Cal. Rptr. 3d 918 (Ct. App. 2023) (as modified on denial of reh'g Nov.
    20, 2023) ...........................................................................................................10, 11

*Mawing v. PNGI Charles Town Gaming, LLC*,
    2010 WL 11520680 (N.D.W. Va. Aug. 18, 2010) .................................................19

*McGee v. Armstrong*,
    2014 WL 3012879 (N.D. Ohio July 3, 2014) ........................................................18

*McGill v. Citibank, N.A.*,
    393 P.3d 85 (Cal. 2017) ..........................................................................................19

*McMahon v. Meta Platforms, Inc.*,
    2023 WL 4546377 (W.D. Wash. July 14, 2023) ...................................................16

*Metalclad Corp. v. Ventana Env't Org. P'ship*,
    109 Cal. App. 4th 1705 (Ct. App. 2003).................................................................12

*Molecular Analytical Sys. v. Ciphergen Biosystems, Inc.*,
    186 Cal. App. 4th 696 (Ct. App. 2010)...................................................................12

**TABLE OF AUTHORITIES**
(continued)

Page

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983).................................................................................16

*Newman v. Plains All Am. Pipeline, L.P.*,
    23 F.4th 393 (5th Cir. 2022) .................................................................17

*O'Conner v. AT&T Corp.*,
    2013 WL 3107496 (M.D. La. June 18, 2013)........................................12

*Otteman v. Knights of Columbus*,
    36 F.4th 600 (5th Cir. 2022) ...................................................................9

*Oxford Health Plans LLC v. Sutter*,
    569 U.S. 564 (2013)...............................................................................22

*Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*,
    687 F.3d 671 (5th Cir. 2012) .................................................................16

*Roberts v. AT&T Mobility LLC*,
    2018 WL 1317346 (N.D. Cal. Mar. 14, 2018).......................................19

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*,
    490 U.S. 477 (1989)...............................................................................18

*Scott v. AT&T Inc.*,
    2021 WL 2839959 (N.D. Cal. Feb. 16, 2021) ......................................20

*Shearson/Am. Express. Inc. v. McMahon*,
    482 U.S. 220 (1987)...............................................................................17

*Stover v. Experian Holdings, Inc.*,
    978 F.3d 1082 (9th Cir. 2020) ...............................................................20

*Swanson v. H&R Block, Inc.*,
    475 F. Supp. 3d 967 (W.D. Mo. 2020) .............................................21, 22

*Tripp v. Renaissance Advantage Charter Sch.*,
    2003 WL 22519433 (E.D. Pa. Oct. 8, 2003).........................................18

*United States v. Mearis*,
    36 F.4th 649 (5th Cir. 2022) ...................................................................7

*Vacco Indus., Inc. v. Van Den Berg*,
    5 Cal. App. 4th 34 (Ct. App. 1992).......................................................15

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Weber v. PAC XPP Techs., AG*,
  811 F.3d 758 (5th Cir. 2016) ................................................................14

*Wolff v. Westwood Mgmt., LLC*,
  558 F.3d 517 (D.C. Cir. 2009) ..............................................................14

**STATUTES**

Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634................17

California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* .........................19

Clayton Act, 15 U.S.C. §§ 12-27 ...............................................................17

Credit Repair Organizations Act, 15 U.S.C. § 1679 ..................................17

Securities Act of 1933, 15 U.S.C. § 77a ....................................................17

Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq* .........................17

Sherman Act, 15 U.S.C. §§ 1-38 ................................................................17

9 U.S.C. § 2...................................................................................................7

9 U.S.C. § 3.................................................................................................22

9 U.S.C. § 10...............................................................................................21

9 U.S.C. § 11...............................................................................................21

9 U.S.C. § 16(a)............................................................................................7

42 U.S.C. § 1983.........................................................6, 8, 16, 17, 18, 19

42 U.S.C. § 1985...........................................................6, 17, 18

**OTHER AUTHORITIES**

American Arbitration Associations' "Consumer Arbitration Rules." ...........16

## I.     INTRODUCTION

Plaintiffs are social-media users who assert that Facebook and Twitter took down their posts or suspended or closed accounts that they ran for their businesses or other groups because of determinations that Plaintiffs were spreading disinformation. Plaintiffs contend that they have a First Amendment and contractual right to post freely on social media. But they have not sued the social-media companies over the removal of their content—doubtless because they know that they agreed with those companies to resolve disputes such as this one through arbitration on an individual basis.

Instead, Plaintiffs have chosen to target Defendants—nonprofits, academic institutions, and researchers alleged to have been involved in examining the issue of the viral spread of disinformation on social-media and the harms it does to society. Recently, Plaintiffs filed an amended complaint adding The Aspen Institute ("Aspen") as a defendant. Am. Compl. [Doc. #77], ¶ 37. Plaintiffs characterize the activities of Aspen and the other defendants with respect to misinformation as a campaign, "[w]orking closely with state and federal government officials" to "coerce" the platforms to censor Plaintiffs. *Id.* ¶ 2. Plaintiffs allege that Defendants violated Plaintiffs' First Amendment rights and tortiously interfered with their contracts with the social-media companies.

Like the other Defendants, Aspen contends that this case belongs in arbitration. Aspen recognizes that the Court recently denied the other Defendants' motion to compel arbitration and that those Defendants have appealed that ruling. Aspen submits this motion to preserve its rights in the event the court of appeals reaches a conclusion different from this Court regarding the arbitration issues.

Aspen submits that Plaintiffs cannot evade their agreements to arbitrate disputes over content moderation on social media platforms by choosing to sue third parties who reported the content rather than the social-media companies that removed it.

First, the doctrine of equitable estoppel holds that Plaintiffs cannot rely on their contracts with social-media companies without also being subject to the arbitration agreements contained in those very same contracts—yet that is precisely what Plaintiffs seek to do. They invoke the contracts to support their claims against Aspen—indeed, their contractual right to post is a key element of each claim. They therefore may not turn around and argue that the contract is wholly irrelevant when Aspen invokes those same contracts' arbitration clauses. Equitable estoppel bars such selective reliance on contractual provisions.

Second, equitable estoppel applies when a signatory accuses a non-signatory of substantially interdependent and concerted misconduct with another signatory. Plaintiffs had argued, and the Court had agreed, that the other Defendants were not allegedly conspiring with the social-media companies because the thrust of the amended complaint is that the social-media companies were also those Defendants' victims. But, crediting Plaintiffs' factual allegations for purposes of this motion, Plaintiffs admit that the social-media companies did not act on the vast majority of Defendants' alleged reports of flagged content. The companies thus exercised independent judgment in content moderation and, therefore, based on Plaintiffs' own allegations, were willing participants in any allegedly wrongful removal of content.

The Court also concluded that the other Defendants' "unclean hands" barred them from invoking equitable estoppel. Mem. Order [Doc. #88], at 7-8. Binding precedent, however, forecloses this application of the unclean-hands doctrine.

2

In sum, Aspen is entitled to compel arbitration under the doctrine of equitable estoppel. And the other arguments Plaintiffs might raise to avoid arbitration should be rejected.[1]

## II.     BACKGROUND

### A.     Plaintiffs and Their Social-Media Accounts.

Plaintiff Jill Hines is a Louisiana resident who is the co-director of Health Freedom Louisiana and a founder of Reopen Louisiana. Am. Compl. [Doc. #77], ¶ 8. She alleges that she has run "Facebook groups" that were "suspended on Facebook," "deplatformed," or had posts "censored." *Id.* ¶¶ 368, 394, 397, 399.

Plaintiff Jim Hoft is a Missouri resident who runs the "Facebook account," "Instagram account," and "Twitter account" for his business, a website called "The Gateway Pundit." *Id.* ¶ 10. He alleges that he has experienced "suspensions and deplatforming by Twitter, and censorship on Facebook." *Id.* ¶ 406.

Plaintiffs use their accounts for business purposes. Mr. Hoft describes The Gateway Pundit as "a business" that "draws significant revenue from his ability to post freely on social media. *Id.* ¶ 409. Both Ms. Hines and Mr. Hoft allege that they have suffered "loss of profits" and "the loss of business and economic opportunities from social-media censorship." *Id.* ¶ 466.

### B.     The Social-Media Companies' Arbitration Provisions.

Plaintiffs allege that "[s]ocial-media platforms such as Facebook, Twitter, and YouTube require users and account holders to agree to Terms of Service and/or similar contractual agreements as a condition of creating an account." *Id.* ¶ 50. They allege that they "were required to do so here to create the[ir] social-media accounts[.]" *Id.*

---

[1] Aspen has also filed a separate motion to dismiss the claims for lack of jurisdiction and improper venue.

Facebook's Commercial Terms govern the use of Facebook "for a business or commercial purpose," which is defined as including "using ads, selling products, developing apps, managing a Page, managing a Group for business purposes, or using our measurement services regardless of the entity type." Exh. 1, Decl. of Sarah Sanders, Ex. A at 1 (Facebook Commercial Terms). Under Facebook's Commercial Terms, "any claim, cause of action, or dispute that arises out of or relates to any access or use of the Meta Products [such as Facebook] for business or commercial purposes" must be arbitrated on an individual basis, without "a class or representative action." *Id.* at 2 (Facebook Commercial Terms §§ 5.b, 5.c.ii). The Facebook Commercial Terms also include a California choice-of-law clause. *Id.* at 2 (Facebook Commercial Terms § 5.c.ii).

Under Twitter's Purchaser Terms of Service, which applies to The Gateway Pundit's Twitter Blue account, Twitter users agree to "arbitrate any disputes, claims, or controversies arising out of or relating to these Terms . . . and/or [their] participation in the Paid Services." Exh. 1, Sanders Decl., Ex. D at 7 (Twitter Purchaser Terms § 6.a). The Twitter Purchaser Terms specify that federal law governs the interpretation and enforcement of the arbitration clause and that California law shall govern "[t]o the extent" that state law applies. *Id.* at 9 (Twitter Purchaser Terms § 6.k). The Twitter Purchaser Terms incorporate by reference Twitter's general terms of service, which apply to all users of Twitter products. *See id.* at 1 (Twitter Purchaser Terms, Preamble ("To the extent that you sign up for and/or use a Paid Service, your use of the Paid Services . . . are subject to . . . '[Twitter] Purchaser Terms of Service' [and] the applicable [Twitter] Terms of Service.")). Just as under Facebook's Terms, Mr. Hoft "expressly waived [his] right to file a class action or to seek relief on a class basis." *Id.* at 8 (Twitter Purchaser Terms, General Terms § 6.f).

Instagram's Terms of Use also contains a provision stating that "any cause of action, legal claim, or dispute between you and us arising out of or related to these Terms or Instagram ('claim(s)') must be resolved by arbitration on an individual basis. Class actions and class arbitrations are not permitted." Exh. 1, Sanders Decl., Ex. E at 6 (Instagram Terms). The Instagram Terms also provide that the "laws of the State of California" shall apply. *Id.*

### C.     Plaintiffs' Claims.

Plaintiffs allege that some of their social-media posts regarding "COVID-19 issues and election-security issues" were removed by social-media companies. Am. Compl. [Doc. #77], ¶ 11. Rather than suing the social-media companies, Plaintiffs have chosen to sue several academics, universities, and non-profits for allegedly working with "state and federal government officials" to "urge, pressure, and coerce social-media platforms to monitor and censor disfavored speakers and content." *Id.* ¶ 2.

Plaintiffs allege that "[f]our entities—Stanford Internet Observatory, University of Washington's Center for an Informed Public, Graphika, and the Atlantic Council's Digital Forensic Lab—collaborate[d] closely with" government officials to create the "Election Integrity Partnership" and the "Virality Project" *Id.* ¶¶ 1-2. Plaintiffs allege that these projects identified disinformation spreading on social-media platforms and urged social-media companies to adopt policies that resulting in offending posts or accounts being flagged or taken down. *Id.* ¶¶ 55, 63, 207, 258. Plaintiffs allege that Aspen plays an undefined "strategic and/or coordinating role" in these projects' "censorship activities." *Id.* ¶ 41.

Plaintiffs sue on behalf of a putative class of all "social-media users who have engaged or will engage in, or who follow, subscribe to, are friends with, or are otherwise connected on social media" to any users "who have engaged or will engage in, any speech on any social-media platform(s) that has been or will be censored or suppressed by any platform after Defendants" or

anyone "acting in concert with them have flagged or will flag the speech . . . for suppression[.]" *Id.* ¶ 423. Seeking nominal damages for every suppressed social-media interaction, compensatory and punitive damages, attorneys' fees and costs, and injunctive relief (*id.* at 101), Plaintiffs assert (1) a civil rights conspiracy claim under 42 U.S.C. § 1985(3) for conspiracy to violate First Amendment rights; (2) civil rights claims under 42 U.S.C. § 1983 for First and Fourteenth Amendment violations; (3) a claim directly under the First Amendment; (4) a common law claim for tortious interference with contractual and business relationships; and (5) a claim alleging a breach of a purported duty "not to interfere unlawfully with [Plaintiffs'] freedom." Am. Compl, [Doc. #77], ¶¶ 434, 447, 454, 459, 469.

D.    **The Other Defendants' Motion to Compel Arbitration.**

Aspen was not added as a defendant in this action until Plaintiffs filed their amended complaint on October 17, 2023 [Doc. #77]; and Aspen was not served with the amended complaint until November 14, 2023 [Doc. #87].

Previously, on August 14, 2023, the original Defendants had moved to compel arbitration or alternatively to transfer the case to the Northern District of California. [Doc. #s 69-70]. On November 15, 2023, the Court issued an order denying the motion to compel arbitration or transfer. Mem. Order [Doc. #88]. The Court held that because the Defendants were not signatories to Plaintiffs' arbitration agreements with the social-media companies, the Defendants could not compel arbitration. *Id.* at 5. The Court held that Defendants were "not entitled to the use of equitable estoppel" to prevent Plaintiffs from denying that Defendants were signatories (*id.* at 5-

8), and that they could not invoke the forum-selection clauses in the social-media companies' terms to transfer the case (*id.* at 8).[2]

On November 16, 2023, the Defendants that were parties to the motion appealed the denial of arbitration under 9 U.S.C. § 16(a). [Doc. #89]. The next day, the Court issued an Order administratively closing the case and staying proceedings during the interlocutory appeal. [Doc. #92] (citing *Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023).

## III.   ARGUMENT

### A.   The Federal Arbitration Act Requires Enforcement of Plaintiffs' Agreements to Arbitrate Disputes Relating to Their Social-Media Accounts.

The Federal Arbitration Act ("FAA") governs any arbitration agreement that is "written" and contained in a contract "evidencing a transaction involving commerce." 9 U.S.C. § 2. Both criteria are met here: (i) the Facebook, Instagram, and Twitter arbitration clauses are in writing (*see* § II.B., *supra*); and (ii) user agreements for online social media applications involve interstate commerce because "internet" communications on social media platforms "affect[] interstate commerce." *United States v. Mearis*, 36 F.4th 649, 655 (5th Cir. 2022). Indeed, "the statute provides for 'the enforcement of arbitration agreements within the full reach of the Commerce Clause.'" *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) (citation omitted).

The FAA provides that arbitration provisions "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. It requires courts "rigorously to enforce arbitration agreements," including terms requiring arbitration using "individualized rather than class . . . procedures." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (internal quotation omitted).

---

[2] The Court's Order inadvertently referred to Aspen has having joined the motion (Mem. Order [Doc. #88], p. 1 n.1), but at the time the motion was filed, Aspen was not yet a party to the case. *See* [Doc. #69], p. 1.

Adjudicating a motion to compel arbitration "involves two analytical steps: (1) whether there is a valid agreement to arbitrate; and (2) whether the dispute falls within the scope of that agreement." *Huckaba v. Ref-Chem., L.P.*, 892 F.3d 686, 688 (5th Cir. 2018). Here, Plaintiffs accepted the arbitration agreements in the social-media platforms' terms of service, and—for the reasons explained below—Plaintiffs should be equitably estopped from denying that Aspen can enforce those agreements. Plaintiffs' claims fall squarely within the scope of those arbitration agreements.

### B.    Plaintiffs Agreed to Arbitrate Disputes.

Plaintiffs concede that, "to create social-media accounts," they—like all "users and account holders"—"agree[d] to Terms of Service and/or similar contractual agreements" with "Facebook, Twitter," and other social media companies. Am. Compl. [Doc. #77], ¶ 50; *see also id.* ¶ 397 (Plaintiff Hines has Facebook accounts); *id.* ¶ 405 (Plaintiff Hoft has accounts on Facebook, Instagram, and Twitter). These "[f]actual assertions in the complaint are 'judicial admissions conclusively binding' on" Plaintiffs. *Ikossi-Anastasiou v. Bd. of Supervisors of La. St. Univ.*, 579 F.3d 546, 550 (5th Cir. 2009) (citation omitted).

Facebook's, Twitter's, and Instagram's Terms require arbitration of claims "aris[ing] out of or relat[ing] to" those terms and services. Exh. 1, Sanders Decl., Ex. A at 1 (Facebook Commercial Terms §§ 5.b, 5.c), Ex. D at 7 (Twitter Purchaser Terms § 6.a), Ex. E at 6 (Instagram Terms). Plaintiffs therefore cannot deny that they entered into agreements to arbitrate.

### C.    Plaintiffs Are Equitably Estopped from Denying that Aspen Is Entitled to Invoke Their Arbitration Agreements.

Aspen respectfully submits that Plaintiffs are equitably estopped from denying Aspen's right to compel arbitration.

"[W]henever the relevant state law would make a contract to arbitrate a particular dispute enforceable by a nonsignatory, that nonsignatory is entitled to" the same rights as a signatory, including the right to compel arbitration. *Crawford Pro. Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 257 (5th Cir. 2014); *see also Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 630-32 (2009). Here, Facebook's and Instagram's terms contain California choice-of-law clauses and the Twitter terms contain a federal choice-of-law clause. Exh.1, Sanders Decl., Ex. A at 2 (Facebook Commercial Terms § 5.d.iii), Ex. D at 9 (Twitter Purchaser Terms § 6.k), Ex. E at 6 (Instagram Terms). California law and federal law therefore govern the equitable estoppel issue.[3]

Aspen recognizes that this Court concluded that a California Court of Appeal decision rejected equitable estoppel and that the Ninth Circuit's earlier recognition of equitable estoppel was merely an "*Erie* guess." Mem. Order [Doc. #88], at 8. But other California decisions confirm that California recognizes equitable estoppel, and the Court overlooked the fact that claims regarding Twitter implicate federal common law of equitable estoppel. Moreover, the two types of estoppel recognized under California and federal law—(1) when the plaintiff's claims against the nonsignatory rely on the contract requiring arbitration; and (2) when the plaintiff alleges concerted misconduct by the nonsignatory and a signatory—are present here. Finally, the Court's alternative reason for denying equitable estoppel—that the other Defendants had unclean hands— is absent here.

---

[3] Louisiana law recognizes and has enforced contractual choice-of-law clauses. *Otteman v. Knights of Columbus*, 36 F.4th 600, 605 (5th Cir. 2022) (citing La. Civ. Code art. 3540). In any event, Louisiana courts have adopted the holding in *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000), that equitable estoppel exists under federal common law. *See Academy of Sacred Heart of New Oleans v. Certain Underwriters at Lloyd's London*, 2023 WL 246832, at *3 n. 19 (E.D. La. Jan. 18, 2023).

### i.  California and federal common law recognizes equitable estoppel.

The Court cited *Hernandez v. Meridian Management Services, LLC*, 87 Cal. App. 5th 1214 (Ct. App. 2023), for the proposition that "where a signatory to an arbitration agreement sues a non-signatory, there is no unfairness in allowing the suit to proceed." Mem. Order [Doc. #88], at 8. But *Hernandez* did not categorically reject the doctrine of equitable estoppel. Rather, the *Hernandez* Court declined to apply the doctrine in that case because the movants' "opening brief never explains why it would be fair to" excuse them from "the usual requirement that you must be a party to a contract to enforce it." *Hernandez*, 87 Cal. App. 5th at 1220.

Indeed, decisions by California courts after *Hernandez* was decided in January 2023, confirm that "equitable estoppel" remains a basis for extending arbitration agreements to non-signatories. Thus, the First District California Court of Appeal recently observed that "[e]quitable estoppel" entitles a "non-signatory" to "invoke an arbitration clause" under certain circumstances. *Mattson Tech., Inc. v. Applied Materials, Inc.*, 314 Cal. Rptr. 3d 918, 925 (Ct. App. 2023) (as modified on denial of reh'g Nov. 20, 2023); *see also*, *e.g.*, *Beach Orangethorp Hotel, LLC v. Evertrust Bank*, 2023 WL 7320584, at *3 (Cal. Ct. App. Nov. 7, 2023) (unpublished) (recognizing equitable estoppel); *In re Uber Techs. Wage & Hour Cases*, 95 Cal. App. 5th 867, 1315 (Sept. 28, 2023) (same).

Moreover, equitable estoppel also is a valid basis for non-signatories to invoke arbitration agreements under federal common law. *See*, *e.g.*, *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 527-28 (5th Cir. 2000). Twitter's arbitration clause specifies it is governed by federal law, not California law. Exh.1, Sanders Decl., Ex. D at 7 (Twitter Terms § 6.a). The California Court of Appeal's decision in *Hernandez* could not have eliminated equitable estoppel under federal common law.

### ii. Plaintiffs are equitably estopped because their claims rely on the social-media platforms' terms of service.

"When a signatory to a contract asserts claims against a non-signatory that rely upon, or are inextricably bound up with, the contract terms, the non-signatory may invoke an arbitration clause in the same contract." *Mattson*, 314 Cal. Rptr. 3d at 925; *accord Grigson*, 210 F.3d at 527-28 (same under federal common law). That is because "a party is 'not entitled to make use of [a contract containing an arbitration clause] as long as it worked to [his or] her advantage, then attempt to avoid its application in defining the forum in which [his or] her dispute . . . should be resolved.'" *Felisilda v. FCA US LLC*, 53 Cal. App. 5th 486, 496 (Ct. App. 2020) (citation omitted; alternations by court).

Here, Plaintiffs' claims "rely upon" and "are inextricably bound up with" the social-media platforms' terms.

This Court held that Plaintiffs "are not relying" on those terms in the sense that the "Amended Complaint specifically alleges that Plaintiffs do not seek to enforce the terms of service[.]" Mem. Order [Doc. #88], at 6. But in "the application of equitable estoppel [under California law], it is the substance of the plaintiff's claim that counts, not the form of its pleading." *Franklin v. Community Regional Med. Ctr.*, 998 F.3d 867, 875 (9th Cir. 2021). The substance of Plaintiffs' complaint is that they had "contractual relations . . . with social-media platform(s)" entitling them to post "freely," but that Defendants, including Aspen, deprived them of that right. Am. Comp. [Doc. #77], ¶ 460. Whether styled as a tortious interference claim or some other tort or constitutional claim (*id.* ¶¶ 434-73), Plaintiffs at bottom seek to vindicate a purported right to post conferred by the social-media platforms' terms.

Plaintiffs cannot invoke the right to post content specified in one part of the terms while simultaneously denying the existence of the arbitration clause in another part of the terms. *See*,

*e.g.*, *Grigson*, 210 F.3d at 527-31 (applying equitable estoppel to claim that non-signatory engaged in "interference" with film distribution contract containing arbitration clause); *O'Conner v. AT&T Corp.*, 2013 WL 3107496, at *4 (M.D. La. June 18, 2013) (same for claims that Apple "unduly influenced" AT&T to throttle data speeds in breach of service agreements with arbitration clauses); *Molecular Analytical Sys. v. Ciphergen Biosystems, Inc.*, 186 Cal. App. 4th 696, 716 (Ct. App. 2010) (same for claim that non-signatory "interfered with" contract); *Metalclad Corp. v. Ventana Env't Org. P'ship*, 109 Cal. App. 4th 1705, 1717 (Ct. App. 2003) (same for claims that non-signatory "caused" a signatory "to violate" the contract).

### iii.   Plaintiffs are equitably estopped because they allege substantially interdependent and concerted misconduct with the social-media platforms.

Equitable estoppel applies for the additional, independent, reason that Plaintiffs "raise[] allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more signatories to the contract [containing the arbitration clause]." *Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 398 (5th Cir. 2006) (citing *Grigson*, 210 F.3d at 527) (federal common law); *see also Chartwell Staffing Servs. Inc. v. Atl. Sols. Grp. Inc.*, 2020 WL 620294, at *7 (C.D. Cal. Jan. 9, 2020) (citing *Goldman v. KPMG LLP*, 173 Cal. App. 4th 209, 221 (Ct. App. 2009) (recognizing same principle under California law where the allegations "center around the rights and obligations created by" the contract).

We recognize that the Court in its opinion rejected this type of estoppel because it construed Plaintiffs' allegations to suggest that only the "Defendants" and "government officials" had "colluded," not "the social media companies." Mem. Order [Doc. #88], at. 6-7. However, Plaintiffs' amended complaint alleges facts that support only one plausible inference: that the social-media companies were not under the control of the alleged conspiracy between Defendants and government officials and, therefore, exercised their own judgment in making deletion

decisions. Specifically, Plaintiffs allege that only "35% of the URLs [that the Election Integrity Partnership] shared with Facebook, Instagram, Twitter, TikTok, and YouTube were either labeled, removed, or soft blocked." Am. Compl. [Doc. #77], ¶ 179. That means that the companies declined to act on 65% of URLs sent to them—demonstrating that they were exercising independent judgment. Conclusory allegations in a complaint—like Plaintiffs' refrain of "pressure and coercion" here (*id.* ¶¶ 50, 147, 305, 417)—that are undercut by factual allegations in the complaint cannot state a claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568-69 (2007) (conspiracy allegation not plausible when "the complaint itself gives reasons to believe" that a "conspiracy was not suggested by the facts"). And, for the same reason, conclusory allegations contradicted by factual allegations cannot defeat equitable estoppel.

In any event, even crediting Plaintiffs' contention that the companies were coerced, Plaintiffs are asserting that the companies engaged in misconduct by removing posts and accounts in violation of users' purported contractual and constitutional rights. *E.g.*, Am. Comp. [Doc. #77], ¶¶ 51, 456, 460-63. Even if that misconduct was allegedly induced by other wrongs, it still constitutes "substantially interdependent and concerted misconduct" that implicates the rights created by the social-media companies' terms. Indeed, the claims against Aspen are "predicated on [Plaintiffs'] ability to prove" that the social-media companies improperly removed Plaintiffs' posts, which further shows that Plaintiffs have "allege[d] substantially interdependent misconduct." *Koenig v. Ritz-Carlton Hotel Co.*, 2021 WL 5855608, at *4 (E.D. La. June 24, 2021).

### iv.      Aspen does not have unclean hands.

The Court declined to allow the other Defendants to invoke equitable estoppel under the "unclean hands" doctrine because "both of the signatories to the terms . . . are victims of Defendant and government collusion and pressure to violate Plaintiffs' free speech rights," which are "fundamental right[s]." Mem. Order [Doc. #88], at 7-8.

We respectfully submit that the Court erred. This "unclean-hands notion puts the cart before the horse: It would require th[e] [C]ourt to reach the merits of the dispute to determine whether to" enforce the arbitration clause—yet "the enforceability determination should be made without reference to the underlying merits." *Weber v. PAC XPP Techs., AG*, 811 F.3d 758, 775 (5th Cir. 2016). As the Supreme Court has explained, "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims"—and so courts "have no business weighing the merits of the grievance" or "considering whether there is equity in a particular claim." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649-50 (1986). And this "principle applies with equal force to the threshold issue of arbitrability." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019).

In other words, under the FAA, courts may consider "challenges specifically [to] the validity of the agreement to arbitrate." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006). But they cannot consider "challenges [to] the contract as a whole," such as that "the agreement was fraudulently induced" or "that the illegality of one of the contract's provisions renders the whole contract invalid." *Id.* That is because only the "arbitrator" decides those merits issues. *Id.*

This rule bars Plaintiffs from resisting enforcement of their arbitration agreement on the ground that their underlying claims, if proven, would establish that Aspen has unclean hands. *See, e.g.*, *Wolff v. Westwood Mgmt., LLC*, 558 F.3d 517, 521 (D.C. Cir. 2009) ("Appellants' unclean hands argument goes to the merits of their claims rather than their arbitrability," and so "can be dismissed in short order."); *In re A2P SMS Antitrust Litig.*, 972 F. Supp. 2d 465, 481-83 (S.D.N.Y. 2013) (similar).

Moreover, the alleged conduct constituting unclean hands "must relate directly to the transaction" at issue, which here is the formation of the arbitration agreement. *Vacco Indus., Inc. v. Van Den Berg*, 5 Cal. App. 4th 34, 52 (Ct. App. 1992). Yet Plaintiffs have not, and could not have, alleged that Aspen interfered with or otherwise affected the formation of their arbitration agreements with social-media companies.

In sum, Plaintiffs concede that they accepted the social-media companies' terms, which contain arbitration clauses. And they are equitably estopped from denying that Aspen is entitled to invoke those clauses.

### D.    Plaintiffs' Claims Fall Within the Scope of Their Arbitration Agreements.

The social-media companies' arbitration clauses all broadly require arbitration of claims "aris[ing] out of or relat[ing] to" the services. Exh. 1, Sanders Decl., Ex. A at 1 (Facebook § 5.b), Ex. D at 7 (Twitter Terms § 6.a), Ex. E at 6 (Instagram Terms).[4] The Fifth Circuit has described this language as "broad," and intended "to reach all aspects of the relationship." *Landry's, Inc. v. Ins. Co. of the St. of Penn.*, 4 F.4th 366, 371 (5th Cir. 2021) (internal quotation marks omitted). To be arbitrable "a dispute then need only 'touch matters covered' by the agreement[.]" *Grant v.*

---

[4] The Facebook terms require arbitration of claims relating to "any access or use of the [] Products for business or commercial purposes." Exh. 1, Sanders Decl., Ex. A at 2 (Facebook Terms § 5.b). And Plaintiffs' allegations that their Facebook posts were removed does involve their "access or use" of Facebook for "business or commercial purposes." For example, both Plaintiffs seek damages for "loss of profits" and "loss of business and economic opportunities." Am. Compl. [Doc. #77], ¶ 466; *see also id.* ¶ 409. And both Plaintiffs alleged that they used Facebook to manage "Pages" (*id.* ¶¶ 397-99, 405), which is defined in the Facebook terms as a "[b]usiness or commercial purpose[]." Exh. 1, Sanders Decl., Ex. A at 1 ("Business or commercial purposes include . . . managing a Page"). Although Ms. Hines does refer in passing to her "personal Facebook account" being restricted (Am. Compl. [Doc. #77], ¶ 397), claims relating to her use of that account for a "business" purpose within the meaning of the Facebook Terms—which would include promoting her groups—would still be arbitrable.

*Houser*, 469 F. App'x 310, 315 (quoting *Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067-68 (5th Cir. 1998)).

These broad arbitration clauses encompass Plaintiffs' claims here. Indeed, the paradigmatic complaint that must be arbitrated under these clauses is a complaint about the removal of a post or account. *See*, *e.g.*, *McMahon v. Meta Platforms, Inc.*, 2023 WL 4546377, at *3 (W.D. Wash. July 14, 2023) (compelling arbitration over removal of account). The claims here all relate to that same core concern of content moderation, just targeted at the third party who allegedly complained about the offending post instead of the company itself. But the subject matter of the dispute— allegedly improper content moderation to allegedly "censor" speech—remains the same.

Even if there were "any doubts concerning the scope of arbitrable issues"—and there are none—those doubts would have to be "resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). The FAA requires that "ambiguities about the scope of an arbitration agreement must be resolved in favor of arbitration." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1418 (2019). Thus, in light of that principle, Plaintiffs' arbitration agreements must be interpreted to encompass their claims.[5]

---

[5] The Twitter Purchaser Terms, to which Mr. Hoft agreed, clearly and unmistakably delegate questions of arbitrability to the arbitrator: "The arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any Dispute, including . . . *whether a Dispute is subject to arbitration*." Exh. 1, Sanders Decl., Ex. D at 7 (Twitter Purchaser Terms § 6.c) (emphasis added). Moreover, the Twitter Purchaser Terms incorporate by reference the American Arbitration Associations' "Consumer Arbitration Rules." *Id.* Those rules also delegate questions of arbitrability to the arbitrator. Exh. 1, Sanders Decl., Ex. F (AAA Consumer Arbitration Rule R-14(a)) ("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of any arbitration agreement or to the arbitrability of any claim or counterclaim."). The Fifth Circuit has held that "the express adoption of [the AAA] rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012). Any contention by Mr. Hoft that his claims involving Twitter are not arbitrable therefore should be decided by an arbitrator.

E.    **Any Argument that the FAA Has Been Implicitly Repealed or that the Social-Media Companies' Arbitration Clauses Are Unenforceable Should Be Rejected.**

Although Plaintiffs might resist enforcement of their arbitration agreements on other grounds, those arguments should be rejected. For example, Plaintiffs opposed the other Defendants' arbitration motion by arguing that Congress guaranteed a judicial forum for Section 1983 and 1985 claims and that their claims for public injunctive relief are exempt from arbitration. Plaintiffs' Proposed Resp. to Defendants' Motion to Compel Arbitration [Doc. #79], at 38-45. Both arguments are meritless.

i.    **Claims under Section 1983 and 1985 are arbitrable.**

Although the FAA can be "overridden by a contrary congressional command" (*Shearson/Am. Express. Inc. v. McMahon*, 482 U.S. 220, 226 (1987)), Plaintiffs are mistaken to suggest that either statute they invoke—42 U.S.C. §§ 1983 and 1985—overrides the FAA.

The Supreme Court has explained that courts have a "duty to interpret Congress's statutes as a harmonious whole rather than at war with one another." *Epic*, 138 S. Ct. at 1619. As a result, Plaintiffs must satisfy a "heavy burden" of establishing a "clear and manifest" intent by Congress to override the FAA (*id.* at 1616, 1624)—for that reason, the Supreme Court has to date "rejected *every* . . . effort" to "conjure conflicts between the [Federal] Arbitration Act and other federal statutes." *Id.* at 1627 (emphasis added). This unbroken line of cases includes rulings addressing "statutes ranging from the Sherman and Clayton Acts to the Age Discrimination in Employment Act, the Credit Repair Organizations Act, the Securities Act of 1933, the Securities Exchange Act

---

We acknowledge that the Fifth Circuit has held that whether "equitable estoppel" applies to permit a non-signatory to invoke an arbitration agreement "cannot [be] delegate[d]" to "an arbitrator." *Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 398-400 (5th Cir. 2022). Aspen respectfully preserves for appellate review its contention that *Newman* was wrongly decided and that Mr. Hoft must arbitrate whether the doctrine of equitable estoppel entitles Aspen to invoke arbitration under the Twitter Purchaser Terms.

of 1934, and the Racketeer Influenced and Corrupt Organizations Act." *Id.* (citing *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228 (2013); *CompuCredit Corp. v. Greenwood*, 565 U.S. 95 (2012); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991); *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477 (1989); *McMahon*, 482 U.S. 220 (1987).

Like those federal statutes, neither Section 1983 nor Section 1985 overrides the FAA. The Supreme Court's decisions uniformly have required that Congress speak with "clarity"—that is, expressly in the text of the statute—to override the FAA. *CompuCredit*, 565 U.S. at 103. Yet neither Section 1983 nor Section 1985 mentions arbitration at all. Rather, Section 1983 merely authorizes suit "in an action at law, suit in equity, or other proceeding for redress." 42 U.S.C. § 1983. And Section 1985 merely permits "an action for the recovery of damages." 42 U.S.C. § 1985(3). That textual silence regarding arbitration alone should be dispositive: When a federal statute is "silent on whether claims . . . can proceed in an arbitrable forum, the FAA requires [an] arbitration agreement to be enforced according to its terms." *CompuCredit*, 565 U.S. at 104.

Plaintiffs did cite one unpublished district court case from 2003 deeming Section 1983 claims non-arbitrable—*Tripp v. Renaissance Advantage Charter Sch.*, 2003 WL 22519433 (E.D. Pa. Oct. 8, 2003). That decision has been abrogated by the Supreme Court's subsequent rulings in *CompuCredit* and *Epic*, making clear the demanding standard that applies to determine whether Congress has overridden the FAA.

Other more recent decisions hold that Section 1983 and 1985 claims are arbitrable. *See Bloom v. Jersey City Mun. Utils. Auth.*, 2008 WL 360986, at *5 (D.N.J. Feb. 8, 2008) (rejecting *Tripp*); *see also*, *e.g.*, *Levine v. N.Y. St. Police*, 2022 WL 1987845, at *6 (N.D.N.Y. June 6, 2022) (rejecting argument that "Section 1983 and 1985 claims" are "not subject to arbitration"); *McGee v. Armstrong*, 2014 WL 3012879, at *6 (N.D. Ohio July 3, 2014) ("there is no indication that it

was Congress's intent to make federal statutory claims," such as the plaintiff's Section 1983 claim, "non-arbitrable"); *Mawing v. PNGI Charles Town Gaming, LLC*, 2010 WL 11520680, at *2 (N.D.W. Va. Aug. 18, 2010) (finding "that the section 1983 . . . claims were arbitrable").

> ### ii.        Plaintiffs' claims for injunctive relief are arbitrable.

Plaintiffs fare no better by arguing that they have asserted "public injunction claims" that are exempt from individual arbitration under *McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017). California's *McGill* rule is inapplicable and preempted by the FAA.

> ### 1.  The *McGill* rule does not apply here.

In *McGill*, the California Supreme Court held that an arbitration agreement's waiver of the ability to seek injunctions on behalf of the general public—a claim available under particular California consumer-protection laws—violates state public policy. *Id.* at 93-94 (discussing California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, False Advertising Law, *id.* § 17500 *et seq.*, and Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*).

Plaintiffs do not assert claims under any of the laws relied upon in *McGill*—or any other California statute. Instead, Plaintiffs assert federal and common law claims. Enforcement of their arbitration agreements therefore would not implicate the waiver of any California statutory rights. *See, e.g.*, *Capriole v. Uber Techs., Inc.*, 2020 WL 1323076, at *3 (D. Mass. Mar. 20, 2020) (*McGill* inapplicable to claims under Massachusetts law); *Barnes v. StubHub, Inc.*, 2019 WL 11505575, at *4 (S.D. Fla. Oct. 3, 2019) (same for Florida claim); *Roberts v. AT&T Mobility LLC*, 2018 WL 1317346, at *9 (N.D. Cal. Mar. 14, 2018) (same for Alabama claim, and noting absence of "any legal authority applying *McGill* to consumer protection laws other than California's").

Even if Plaintiffs could invoke *McGill*, that rule applies only to requests for public injunctive relief, not requests for private injunctive relief, such as Plaintiffs' requests here. "Relief that has the *primary* purpose or effect of redressing or preventing injury to an *individual plaintiff*—

or *to a group of individuals similarly situated to the plaintiff*—does *not* constitute public injunctive relief." *McGill*, 393 P.3d at 90 (emphasis added). As the Ninth Circuit has explained, "public injunctive relief involves diffuse benefits to the 'general public' as a whole"—a group that "'fails to meet' the class-action requirement of 'ascertainable class.'" *Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535, 542 (9th Cir. 2021) (quoting *McGill*, 393 P.3d at 90, 93). A request for injunctive relief to benefit the plaintiffs or a class of "similarly situated" people or a "particular class of persons" is a request for "private injunctive relief" that remains arbitrable. *Id.* That is what Plaintiffs seek here—injunctions against steps furthering the alleged censorship of Plaintiffs themselves and their proposed classes of "social-media users." Am. Compl. [Doc. #77], ¶ 423 & p. 101.

Moreover, even if Plaintiffs were requesting public injunctive relief, they still could not invoke *McGill* because, as explained in Aspen's separate Motion to Dismiss, Plaintiffs lack Article III standing to seek that relief. For the reasons explained in that motion, Plaintiffs cannot pursue an injunction. When, as here, a plaintiff lacks "Article III standing" to seek "public injunctive relief in federal court," the Ninth Circuit has held that "the *McGill* rule does not excuse [the plaintiff] from binding arbitration of her claims" on an individual basis. *Stover v. Experian Holdings, Inc.*, 978 F.3d 1082, 1088 (9th Cir. 2020); *see also*, *e.g.*, *Scott v. AT&T Inc.*, 2021 WL 2839959, at *3-7 (N.D. Cal. Feb. 16, 2021) (compelling individual arbitration and declining to consider plaintiffs' arguments under *McGill* because the plaintiffs lacked Article III standing to seek a public injunction).

### 2. The *McGill* rule is preempted.

Even if the *McGill* rule did apply, the FAA would preempt it. First, the FAA preempts any state-law rule that interferes with the "traditionally individualized and informal nature of arbitration." *Epic*, 138 S. Ct. at 1623.

In *AT&T Mobility LLC v. Concepcion*, the Supreme Court held that the FAA preempts a California rule deeming arbitration agreements unconscionable unless they permit class proceedings because "the switch from [individual] to class arbitration sacrifices the principal advantage of arbitration—its informality—and makes the process, slower, more costly, and more likely to generate procedural morass than final judgment." 563 U.S. 333, 348 (2011). The Court also emphasized that "class arbitration greatly increases risks to defendants," because it combines the high stakes of class actions with the lack of judicial review of arbitration awards. *Id.* at 350-51 (citing 9 U.S.C. §§ 10-11). Allowing the unconscionability defense would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting the FAA—to "promote arbitration." *Id.* at 346, 352.

California's *McGill* rule suffers from the same defect. As one federal court has agreed, "arbitrating a public injunction request would transform the [individual arbitration] proceeding from an individualized determination of redressing injury to a single claimant into an expansive inquiry aimed at preventing future injury to the general public." *Swanson v. H&R Block, Inc.*, 475 F. Supp. 3d 967, 976 (W.D. Mo. 2020). Moreover, like the class procedures addressed in *Concepcion*, engrafting public-injunction procedures on an arbitration makes the arbitration more procedurally complex than a one-on-one arbitration, given the need to consider the effects and rights of numerous third parties, with effectively class-wide discovery and a wide-ranging trial. *See*, *e.g.*, *Cisneros v. U.D. Registry, Inc.*, 39 Cal. App. 4th 548, 564 (Ct. App. 1995) (adjudicating public-injunction claim requires considering evidence of "similar practices involving other members of the public").

In other words, arbitrating a public injunction is like arbitrating a Rule 23(b)(2) class action—which, *Concepcion* held, a state cannot require. And the stakes of a public injunction are

enormous; defendants can be forced to change practices on a nationwide scale and yet would be effectively unable to appeal an erroneous injunction. *See Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 572-73 (2013) ("[C]onvincing a court of an arbitrator's error—even his grave error—is not enough," because "[t]he potential for those mistakes is the price of agreeing to arbitration."). By insisting upon the availability of public-injunction claims in arbitration, *McGill* therefore frustrates the FAA's purpose of promoting arbitration and ensuring the enforceability of agreements for "traditional[] individualized and informal . . . arbitration." *Epic*, 138 S. Ct. at 1623.[6]

Even if *McGill* did exempt Plaintiffs' claims for public injunctions from arbitration, Plaintiffs' damages claims and claims for private injunctive relief should be severed, and the public injunction determination stayed pending the outcome of arbitration. *See, e.g.*, *Lag Shot LLC v. Facebook, Inc.*, 545 F. Supp. 3d 770, 786 (N.D. Cal. 2021) ("The Court stays the public injunction determination pending the arbitrator's determination of liability on Plaintiff's [individual] UCL claim.").

**F. Plaintiffs' Claims Should Be Compelled to Arbitration on an Individual Basis and This Action Stayed.**

When, as here, the FAA governs an arbitration provision that covers a plaintiff's claims, Section 3 of the FAA directs the district court to compel arbitration and stay the lawsuit. *See* 9 U.S.C. § 3 (providing for a stay of court proceedings pending the resolution of arbitration); *see*

---

[6] The Ninth Circuit has held that the FAA does not preempt *McGill* because a public injunction can be sought in an individual action (and so class procedures are not required). *See Blair v. Rent-A-Center, Inc.*, 928 F.3d 819, 828-30 (9th Cir. 2019). But as the *Swanson* Court explained in rejecting *Blair*'s reasoning, "the relevant inquiry is not whether the procedures at issue are exactly equivalent to class arbitration, but whether the contract defense in question interferes with the FAA's protection of individualized arbitration[.]" 475 F. Supp. 3d at 977.

*also*, *e.g.*, *Gilmer*, 500 U.S. at 25. Accordingly, Plaintiffs' claims should be stayed pending the outcome of arbitration.

The arbitrations in this case should take place on an individual basis in accordance with the arbitration clauses, each of which forbids class proceedings in arbitration. *See* Exh. 1, Sanders Decl., Ex. A at 2 (Facebook Commercial Terms § 5.c.ii), Ex. D at 8 (Twitter Purchaser Terms § 6.f), Ex. E at 6 (Instagram Terms). Under the FAA, those waivers of class proceedings in arbitration are enforceable. *See*, *e.g.*, *Epic*, 138 S. Ct. at 1631; *Concepcion*, 563 U.S. at 352; *Banks v. Waitr Holdings, Inc.,* 2019 WL 6883672, at *6 (W.D. La. Dec. 17, 2019) (Doughty, J.).

## IV.    CONCLUSION

Aspen respectfully requests an Order: (i) compelling Plaintiffs to arbitrate their claims on an individual basis in accordance with their arbitration agreements; and (ii) staying further litigation until the arbitrations are resolved.

Dated: December 18, 2023                    Respectfully submitted,

                                            By: /s/   Elizabeth M. Carmody
                                            Elizabeth Mendell Carmody, #25792
                                            COOK, YANCEY, KING & GALLOWAY, PLC
                                            333 Texas Street, Suite 1700
                                            P.O. Box 22260
                                            Shreveport, LA 71120-2260
                                            Tel: (318) 221-6277
                                            Fax: (318) 227-7850
                                            elizabeth.carmody@cookyancey.com

                                            Andrew J. Pincus (*pro hac vice*)
                                            Archis A. Parasharami (*pro hac vice*)
                                            Kevin Ranlett (*pro hac vice*)
                                            MAYER BROWN LLP
                                            1999 K Street, N.W.
                                            Washington, DC 20006
                                            Tel: (202) 263-3000
                                            Fax: (202) 263-3300
                                            apincus@mayerbrown.com
                                            aparasharami@mayerbrown.com
                                            kranlett@mayerbrown.com

                                            *Attorneys for Defendant The Aspen Institute*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 18th day of December, 2023, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will provide notice of electronic filing to the attorneys for all parties.

/s/  *Elizabeth M. Carmody*
Elizabeth Mendell Carmody