# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# MONROE DIVISION

JILL HINES, *et al.*

*Plaintiffs*,

*v.*

ALEX STAMOS, *et al.*

*Defendants.*

Case No. 3:23-cv-00571
Chief Judge Terry A. Doughty
Magistrate Judge Kayla D. McClusky

## RESPONSE TO ASPEN INSTITUTE'S MOTION TO DISMISS FOR LACK OF JURISDICTION AND IMPROPER VENUE

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION ......................................................................................................... 1

BACKGROUND — ASPEN'S ROLE IN THE EIP/VP CENSORSHIP REGIME ............... 1

ARGUMENT ................................................................................................................ 3

   I.    The Court Should Order Jurisdictional Discovery. ....................................... 4

   II.    The Complaint Pleads Sufficient Facts to Establish Personal Jurisdiction Over Aspen. 5

     A.   There are sufficient minimum contacts. ................................................... 5

     B.   The exercise of personal jurisdiction would be fair and reasonable. .................. 15

   III.   The Complaint Alleges Facts Establishing Hines' and Hoft's Standing. ............... 16

     A.   Hines and Hoft have shown their injuries are traceable to Aspen's actions. ........ 16

     B.   Aspen has a coercive and determinative effect on censorship. ............................. 20

     C.   *Murthy v. Missouri* does not undermine Hines's and Hoft's standing. .................. 22

   IV.   Venue Is Appropriate in the Western District of Louisiana. .................................. 24

CONCLUSION ............................................................................................................ 25

CERTIFICATE OF SERVICE ...................................................................................... 27

## TABLE OF AUTHORITIES

**Cases**   **Page(s)**

*Allstate Life Insurance Co. v. Linter Group Ltd.*,
    782 F. Supp. 215 (S.D.N.Y. 1992) .......................................................................11

*Ambraco, Inc. v. Bossclip B.V.*,
    570 F.3d 233 (5th Cir. 2009) ...............................................................................3

*Armstrong v. Ashley*,
    60 F.4th 262 (5th Cir. 2023) ...............................................................................11

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...........................................................................................20

*Bennett v. Spear*,
    520 U.S. 154 (1997) ...........................................................................................20

*Bullion v. Gillespie*,
    895 F.2d 213 (5th Cir. 1990) ...............................................................................7

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) ...........................................................................................11

*Calder v. Jones*,
    465 U.S. 783 (1984) .............................................................................................9

*Cent. Freight Lines Inc. v. APA Transport Corp.*,
    322 F.3d 376 (5th Cir. 2003) .............................................................................14

*Clemens v. McNamee*,
    615 F.3d 374 (5th Cir. 2010) ...............................................................................5

*Danziger & De Llano, LLP v. Morgan Verkamp, LLC*,
    24 F.4th 491 (5th Cir. 2022) ...............................................................................9

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor*,
    45 F.4th 846 (5th Cir. 2022) .............................................................................16

*Def. Distributed v. Grewal*,
    971 F.3d 485 (5th Cir. 2020) ...............................................3, 5, 7-10, 14-15

*Dietz v. Dietz*,
    2009 WL 2707402 (W.D. La. Aug. 27, 2009)....................................................9

*Dobbin Plantersville Water Supply Corp. v. Lake*,
   108 F.4th 320 (5th Cir. 2024) ................................................................20

*Edmond v. U.S. Postal Serv. Gen. Counsel*,
   949 F.2d 415 (D.C. Cir. 1991) ..............................................................4

*Electronic Frontier Found. v. Global Equity Mgmt. (SA) Pty Ltd.*,
   290 F. Supp. 3d 923 (N.D. Cal. 2017) ..................................................9

*Fielding v. Hubert Burda Media, Inc.*,
   415 F.3d 419 (5th Cir. 2005) ................................................................4

*FTC v. Educare Centre Servs., Inc.*,
   414 F. Supp. 3d 960 (W.D. Tex. 2019) .........................................10, 13

*Gen. Land Office v. Biden*,
   71 F.4th 264 (5th Cir. 2023) .............................................................3, 20

*Guidry v. United States Tobacco Co.*,
   188 F.3d 619 (5th Cir. 1999) ..............................................................12

*Hawbecker v. Hall*,
   88 F. Supp. 3d 723 (S.D. Tex. 2015) ..................................................25

*Hines v. Stamos*,
   2024 WL 3580618 (5th Cir. July 30, 2024) ........................................24

*Huizenga v. Indep. Sch. Dist. No. 11*,
   44 F.4th 806 (8th Cir. 2022) ................................................................20

*Inclusive Communities Project, Inc. v. Department of Treasury*,
   946 F.3d 649 (5th Cir. 2019) ..............................................................21

*InPwr Inc. v. Olson Restoration LLC*,
   2022 WL 2286182 (W.D. La. June 23, 2022) ......................................13

*JMF Med., LLC v. Team Health, LLC*,
   490 F. Supp. 3d 947 (M.D. La. 2020) .................................................15

*Johnson v. TheHuffingtonPost.com, Inc.*,
   21 F.4th 314 (5th Cir. 2021) ...............................................................13

*Keeton v. Hustler Magazine, Inc.*,
   465 U.S. 770 (1984) .........................................................................9, 14

*Kelly v. Syria Shell Petroleum Dev. B.V.*,
 213 F.3d 841 (5th Cir. 2000) ...........................................................................4

*Kennedy v. Biden*,
 2024 WL 3879510 (W.D. La. Aug. 20, 2024)....................................... 16, 22-23

*Lolavar v. de Santibanes*,
 430 F.3d 221 (4th Cir. 2005) .........................................................................11

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992)...................................................................................3, 20

*Melea Ltd. v. Jawer SA*,
 511 F.3d 1060 (10th Cir. 2007) .....................................................................11

*Mississippi Interstate Express, Inc. v. Transpo, Inc.*,
 681 F.2d 1003 (5th Cir. 1982) .............................................................. 11-12, 14

*Missouri v. Biden*,
 83 F.4th 350 (5th Cir. 2023)...........................................................................16

*Missouri v. Biden*,
 680 F. Supp. 3d 630 (W.D. La. 2023) .......................................................16, 23

*Murthy v. Missouri*,
 144 S. Ct. 1972 (2024).............................................................16, 18, 22, 24

*National Council of La Raza v. Mukasey*,
 283 F. App'x 848 (2d Cir. 2008) .....................................................................21

*Parsons v. U.S. Dep't of Justice*,
 801 F.3d 701 (6th Cir. 2015) ...........................................................................20

*Patterson v. Dietze, Inc.*,
 764 F.2d 1145 (5th Cir. 1985) ..........................................................................4

*Rush v. Savchuk*,
 444 U.S. 320 (1980)........................................................................................11

*S. U.S. Trade Ass'n v. Unidentified Parties*,
 2011 WL 2457859 (E.D. La. June 16, 2011) ..................................................25

*Sangha v. NAVIG8 Shipmanagement Private Ltd.*,
 882 F.3d 96 (5th Cir. 2018) ............................................................................10

*Stallworth v. Bryant*,
936 F.3d 224 (5th Cir. 2019) ...................................................................................20

*Stellar Restoration Servs., LLC v. James Christopher Courtney*,
533 F. Supp. 3d 394 (E.D. Tex. 2021) .......................................................................5

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2015) ...................................................................................20

*Thomas v. Kadish*,
748 F.2d 276 (5th Cir. 1984) ...................................................................................12

*Trask v. Peake*,
1992 WL 59389 (E.D. La. Mar. 17, 1992) ................................................................9

*Turaani v. Wray*,
988 F.3d 313 (6th Cir. 2021) ...................................................................................21

*Walden v. Fiore*,
571 U.S. 277 (2014) ............................................................................................9-10

*Wien Air Alaska, Inc., v. Brandt*,
195 F.3d 208 (5th Cir. 1999) ...............................................................................7, 10

*Williamson v. Tucker*,
645 F.2d 404 (5th Cir. 1981) .....................................................................................4

**Statutes**

LA. REV. STAT. § 13:3201 .................................................................................................5

**Other Authorities**

*$1.6 Million Awarded to Support Scaling Evidence-based Pathways for Opportunity Youth*,
ASPEN INST. F. FOR CMTY. SOLS.: BLOG (June 3, 2021), https://perma.cc/FH65-NUT9 .....5

Ben Berliner, *The Aspen Challenge: New Orleans Solution Showcase Culminates in Unprecedented Tie for First Place*, ASPEN INST. (Apr. 12, 2023), https://perma.cc/YXV3-CVQB ...............................................................................................................................5

Kelvin Spears, *The Aspen Institute Names CLTCC as a Top 150 U.S. Community Colleges*,
CENLANOW.COM (Nov. 1, 2023), https://perma.cc/X64U-TME6 .....................................5

*Louisiana*, ASPEN INST. (July 2014), https://perma.cc/D6QS-4CHH .............................5

## INTRODUCTION

Plaintiffs have alleged that Aspen Institute ("Aspen") is an integral part of the conspiracy to censor speech in Louisiana.  This conspiracy involved dedicating specific analysts to track speech in Louisiana and communicating with government officials in Louisiana about Plaintiffs' and others' Louisiana speech for the purpose of silencing that speech in Louisiana and preventing Louisianans from having access to it.  These actions and others alleged in the First Amended Complaint ("FAC") satisfy the pleading standards for personal jurisdiction, standing, and venue. Therefore, Aspen's motion to dismiss should be denied.

## BACKGROUND — ASPEN'S ROLE IN THE EIP/VP CENSORSHIP REGIME

To avoid "the 'unclear legal authorities, including very real First Amendment questions' that would arise if the government took these actions directly," Defendants and their governmental allies created the Election Integrity Project ("EIP") and the Virality Project ("VP") (collectively the "EIP/VP").  FAC ¶¶ 2, 4 (quotations omitted) (quoting Defendant DiResta).  Defendants, including Aspen, intertwined themselves with government officials and agencies through the EIP/VP.  Government officials play key roles in EIP and VP.  Both entities consistently communicate and collaborate with government officials.  *See, e.g.*, FAC ¶¶ 95, 112, 303–04, 306. Government funding for the EIP is extensive and existential.  *See* FAC ¶¶ 83–85.  The Cybersecurity and Infrastructure Security Agency ("CISA") within the Department of Homeland Security "was directly involved in originating the EIP," FAC ¶ 86, shared personnel with EIP, *see* FAC ¶¶ 118–27, and connected EIP with state and local officials, as well as other federal and CISA-affiliated entities, for the purpose of monitoring and suppressing so-called misinformation, *see* FAC ¶¶ 90, 96, 100, 102–15.  *See also* FAC ¶ 130 (providing the links between CISA and EIP). "[P]ressure and coercion" from government officials then "induced platforms' cooperation with the" EIP/VP.  FAC ¶ 147; *see* FAC ¶ 298 (discussing VP); *see also* FAC ¶¶ 72, 147–55, 305.  Thus,

Defendants forced social media platforms to adopt and "aggressively enforce" content moderation policies that Defendants created and publicized through the EIP/VP.  *See* FAC ¶¶ 70–71, 257–70.

While national in ambition, Defendants operated the EIP/VP on a state-by-state basis to monitor, track, and flag speech for censorship, *see* FAC ¶¶ 375–78, using a "systematic" process for each piece of information, FAC Ex. 1, at 246 (Doc. 1-2).  EIP, for example, assigned an analyst "to a specific state" to develop "expertise in and follow[ ] throughout the project."  *Id.* at 9; *see* FAC ¶ 377.  The analyst would then use in-state resources to build a case for censorship, for example, cross-referencing "election officials, fact-checking organizations, local media, or mainstream outlets."  FAC Ex. 1, at 9.  Analysts would also determine the "origins of a piece of information" and track its spread.  *Id.*  And "if an internally generated EIP ticket targeted a particular region, analysts sent a short write-up to the [Elections Infrastructure Information Sharing & Analysis Center ("EI-ISAC")] to share with the relevant election official.  This allowed a state or local official to verify or refute the claim."  *Id.* at 13.

Aspen is as integral to that censorship regime as any other Defendant, with a just as long, if not longer, "history of conspiring with federal officials to squelch freedom of expression … on social media."  FAC ¶ 40.  That includes on topics of election disinformation, much like the other Defendants.  *See id.*  And also like the other Defendants, Aspen brings together governmental officials and private sector actors to collaborate "on issues like government-induced censorship."  FAC ¶ 38.  It serves as a bridge between the federal government and social-media platforms; as evidence, it receives funding from both.  *Id.*  As emails from Starbird reveal, Aspen has a "direct role in the EIP/VP and the conduct challenged in this case."  FAC ¶ 41.

Confirming Aspen's direct role, three of the major players of the EIP/VP's censorship regime—Starbird, Stamos, and DiResta, FAC ¶¶ 20, 23–24, 118–21, 130—worked closely with

Aspen.   Starbird and other "academic institutions and not-for-profits" engaged in censorship efforts had meetings with Aspen, which shows Aspen's "strategic and/or coordinating role in the EIP/VP's censorship activities . . . ." FAC ¶ 41.  In August 2021, Starbird "participated in a strategy session with the Aspen Institute on implementing Defendants' key censorship priorities."  FAC ¶ 42.  Her "notes for this in-person meeting with the Aspen Institute include formulating plans to achieve . . . core censorship objectives of the EIP/VP," including censoring Hoft.  FAC ¶¶ 42–43. Starbird also communicated with Craig Newmark, "a major Aspen" donor who "funded a ... study on misinformation and disinformation by the Aspen Institute's Commission on Information Disorder."  FAC ¶ 44.   Starbird provided him with "a detailed report . . . about the EIP/VP's censorship plans for the 2022 election cycle," and worked with academic collaborators who likewise communicated to Newmark plans "about mid-term monitoring and election response." *Id.* (quotations omitted).  In addition, Stamos is a member of an Aspen commission looking at cybersecurity and information disorder.  FAC ¶ 39.  And, like Starbird, he communicated with Newmark.  FAC ¶ 44 (quotations omitted).

## ARGUMENT

In assessing Aspen's motion, all factual assertions are taken as true, and the complaint is viewed in the light most favorable to Plaintiffs, with all reasonable inferences drawn in Plaintiffs' favor.  *See, e.g.*, *Def. Distributed v. Grewal*, 971 F.3d 485, 490 (5th Cir. 2020) (personal jurisdiction); *Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 237–38 (5th Cir. 2009) (venue). Moreover, in evaluating standing "[a]t the pleading stage, 'general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] 'presume that general allegations embrace those specific facts that are necessary to support the claim.'" *Gen. Land Office v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023) (alteration omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

## I.  The Court Should Order Jurisdictional Discovery.

For the reasons set out in Plaintiffs' response to the other Defendants' supplemental memorandum, the Court should defer ruling on Aspen's motion and instead order jurisdictional discovery.  *See* Resp. Supp. Mem. 1–4, 24–25.  Doing so is entirely consistent with the Fifth Circuit's limited remand in this case.  *See id.*  As Aspen's cases recognize, "an *opportunity* for discovery is required."  *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 855 (5th Cir. 2000) (citing *Patterson v. Dietze, Inc.*, 764 F.2d 1145, 1147 n.4 (5th Cir. 1985)) (emphasis in original).  Plaintiffs have not yet had such an opportunity.  Contrary to Aspen's claims (at 14 n.9), Plaintiffs have alleged facts showing jurisdiction, which Aspen and the other Defendants dispute.  Plaintiffs also have sufficiently alleged a conspiracy, which entitles them to discovery.  *See Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 425 (D.C. Cir. 1991) ("[I]t is an abuse of discretion to deny jurisdictional discovery where the plaintiff has specifically alleged: (1) the existence of a conspiracy, (2) the nonresident's participation, and (3) an injury-causing act of the conspiracy within the forum's boundaries.").  Hines and Hoft thus "should have an opportunity to develop and argue the facts in a manner that is adequate in the context of the disputed issues and evidence."  *Williamson v. Tucker*, 645 F.2d 404, 414 (5th Cir. 1981); *see also Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 429 (5th Cir. 2005).

For example, Aspen argues that "[i]n sum, Plaintiffs have failed to allege that Aspen had formed sufficient minimum contacts with Louisiana to support personal jurisdiction in Louisiana."  Aspen MTD 14.  It further argues that any request by Plaintiffs for jurisdictional discovery should be denied.  Aspen MTD 14 n.9.  Aspen fails to recognize that the organization itself has often

stepped foot into Louisiana, where it is active both generally[1] and specifically regarding this case, as set forth below.

## II.    The Complaint Pleads Sufficient Facts to Establish Personal Jurisdiction Over Aspen.

All agree that Louisiana's long-arm statute authorizes personal jurisdiction to the extent consistent with constitutional due process.  Aspen MTD 6; *see also* LA. REV. STAT. § 13:3201. Contrary to Aspen's arguments (at 8–16), specific jurisdiction exists.   Specific jurisdiction considers: (1) "whether [Aspen] purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether [Hines's and Hoft's] cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable."  *Def. Distributed*, 971 F.3d 490–91 (quotations omitted) (gathering sources).  Aspen contests only minimum contacts and the fairness of exercising personal jurisdiction.  Aspen MTD 1–2, 8–14.

### A.    There are sufficient minimum contacts.

Aspen mischaracterizes (at 9–12) the FAC by claiming that Hines and Hoft rely only on harms to their speech or to the rights of their Louisiana audiences to establish personal jurisdiction.

---

[1] The Aspen Institute has been active in Louisiana for years, including as recently as 2023, allowing for the court to find general jurisdiction, or at a minimum, a basis for further discovery.  "The Due Process Clause of the Fourteenth Amendment permits a court to exercise personal jurisdiction over a non-resident defendant when the defendant has 'purposefully availed himself of the benefits and protections of the forum state by establishing minimum contacts with the forum state' and 'the exercise of jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice.'"  *Stellar Restoration Servs., LLC v. James Christopher Courtney*, 533 F. Supp. 3d 394, 412 (E.D. Tex. 2021) (citing *Clemens v. McNamee*, 615 F.3d 374, 378 (5th Cir. 2010)). *E.g.*, Ben Berliner, *The Aspen Challenge: New Orleans Solution Showcase Culminates in Unprecedented Tie for First Place*, ASPEN INST. (Apr. 12, 2023), https://perma.cc/YXV3-CVQB; Kelvin Spears, *The Aspen Institute Names CLTCC as a Top 150 U.S. Community Colleges*, CENLANOW.COM (Nov. 1, 2023), https://perma.cc/X64U-TME6; *$1.6 Million Awarded to Support Scaling Evidence-based Pathways for Opportunity Youth*, ASPEN INST. F. FOR CMTY. SOLS.: BLOG (June 3, 2021), https://perma.cc/FH65-NUT9 (grantees including New Orleans, LA); *Louisiana*, ASPEN INST. (July 2014), https://perma.cc/D6QS-4CHH.

The FAC alleges that Defendants deliberately monitored and tracked speech on social media by Louisiana residents like Jill Hines and many others, FAC ¶ 378; this speech, including Hines's speech about organizing to lobby the Louisiana legislature, was of specific interest and relevance to Louisiana residents, FAC ¶ 379; Defendants intentionally sought to silence that speech, including Plaintiffs' speech, by preventing it from reaching Louisiana residents, FAC ¶ 381; Defendants communicated with government officials in Louisiana and social-media platforms about Plaintiffs' and others' Louisiana speech for the purpose of silencing that speech in Louisiana and preventing Louisianans from having access to it, FAC ¶ 382; and Defendants compelled those third parties to censor that speech in Louisiana, thus preventing it from reaching Louisiana residents, FAC ¶ 383.

Defendants even dedicated specific analysts to track speech in Louisiana and ensure control over which narratives would reach Louisiana residents, FAC ¶¶ 377–78, as part of a "systematic process" that involved those analysts developing "expertise in and follow[ing]" Louisiana "throughout the project," FAC Ex. 1, at 9.  Analysts would then use in-state resources to build a case for censorship, for example, cross-referencing "election officials, fact-checking organizations, local media, or mainstream outlets." *Id*.  Analysts would also determine the "origins of a piece of information" and track its spread.  *Id.*  And "if an internally generated EIP ticket targeted a particular region, analysts sent a short write-up to the EI-ISAC to share with the relevant election official.  This allowed a state or local official to verify or refute the claim."  *Id.* at 13.  In sum, Defendants inflicted injuries that affected hundreds of thousands of Louisiana residents, FAC

¶ 384, and the brunt of those injuries, especially as to Hines' speech, was felt in Louisiana, FAC ¶ 384.  This is simply the tip of the minimum-contacts iceberg.[2]

Through that deliberate, systematic process, Defendants targeted Hines's speech, and repeatedly induced platforms to silence her and shut down her attempts to organize Louisiana residents for political purposes.  FAC ¶ 385.  Similarly, Defendants deliberately monitored, tracked, and targeted Hoft's speech to ensure that it would not reach his substantial Louisiana audience.  FAC ¶ 386.  In doing so, Defendants influenced and restricted what hundreds of thousands of Louisianans could view on social media.  FAC ¶ 387.  They did all these things deliberately, intending to restrict free expression between and among Louisiana residents.  FAC ¶ 388.  In addition, they restricted both the circulation of Plaintiffs' own speech, thus injuring Plaintiffs and their Louisiana audiences, and the circulation of the speech of other speakers, including Louisiana speakers, to whom Plaintiffs would otherwise listen.  *Id.*  These actions, taken together, establish beyond doubt that Defendants are "purposely availing [themselves] of 'the privilege of causing a consequence' in [Louisiana]."  *Def. Distributed*, 971 F.3d at 494 (quoting *Wien Air Alaska, Inc., v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999)).

Plaintiffs' personal jurisdiction allegations are far stronger than those in cases that found personal jurisdiction existed.  Hines and Hoft discussed those cases in addressing the non-Aspen Defendants' motion to dismiss, and they incorporate that discussion here.  *See* Doc. 80, at 5–9.  *Defense Distributed* is particularly relevant.  In that case, the New Jersey Attorney General engaged in a course of conduct entirely outside Texas that was designed to silence the plaintiff's

---

[2] To the extent Aspen suggests (at 9) that it, or its agents, must have been present in Louisiana, it is simply wrong.  "It is well settled that specific jurisdiction may arise without the nonresident defendant's ever stepping foot upon the forum state's soil ... ."  *Bullion v. Gillespie*, 895 F.2d 213, 216 (5th Cir. 1990).

speech to other Texas residents.  971 F.3d at 489.  The Attorney General's actions included "(1) sending a cease-and-desist letter threatening legal action if Defense Distributed published its files; (2) sending letters to third-party internet service providers based in California urging them to terminate their contracts with Defense Distributed; (3) initiating a civil lawsuit against Defense Distributed in New Jersey; and (4) threatening Defense Distributed with criminal sanctions at a live press conference."  *Id.*  His intended effect was to "cause[] Defense Distributed to cease publication of its materials," including inside Texas.  *Id.*

Personal jurisdiction existed.  The Attorney General had caused harm with his cease-and-desist letter and was focused on stopping the plaintiff from disseminating its information "generally."  *Id.* at 492.  The Attorney General's "conduct … confirms his intent to crush Defense Distributed's operations and not simply limit the dissemination of digital files in New Jersey."  *Id.* at 493.  Thus, the defendant—though operating from outside Texas—deliberately attempted to block the dissemination of a Texas-based speaker's content to his Texas-based audiences: "Grewal seeks to bar Defense Distributed from publishing its materials anywhere, not just in New Jersey. Grewal … has projected himself across state lines and asserted a pseudo-national executive authority … ."  *Id.*  "These activities had foreseeable effects in the forum and were directed at the forum."  *Id.*  Far from mere fortuity, the defendant's actions "had a chilling effect on the exercise of their First Amendment rights (among other constitutional and Texas law violations).  That chilling effect, in turn, caused them to cease publication and reduced Texans' access to the materials the plaintiffs seek to publish. …  In this sense, Grewal created contacts with Texas and not just the plaintiffs."  *Id.* at 495.

*Defense Distributed* follows from libel cases, like *Calder v. Jones*, 465 U.S. 783 (1984). *See Def. Distributed*, 971 F.3d at 494–96.  "Censorship, like libel, is damaging not just to the

speaker, but to surrounding audiences. And like libel, censorship's harm occurs not just where it originates, but where it arrives." *Id.* at 495 n.9. In libel cases, the intentional tort is "directed at a [forum] resident, and jurisdiction … is proper on that basis." *Calder*, 465 U.S. at 790. And so "the plaintiff is the focus of the activities of the defendants out of which the suit arises." *Id.* at 788. Unlike "untargeted negligence," the libel is "expressly aimed" at a forum state because it targets the resident victim, *id.* at 789, and residents who read it, *see id.* at 789–90 (pointing to the large circulation of the libel to California residents).[3]

Thus, effects can give rise to sufficient minimum contacts—as Aspen's own cases acknowledge—where, as here, they connect the defendant to the forum. *See Danziger & De Llano, LLP v. Morgan Verkamp, LLC*, 24 F.4th 491, 496–97 (5th Cir. 2022) (discussing *Walden v. Fiore*, 571 U.S. 277 (2014) (discussing *Calder*)). Actions that "give rise to intentional tort causes of action" are such contacts. *Def. Distributed*, 971 F.3d at 493–94 (quotations omitted). And that is what Hines and Hoft plead Aspen did here. *Compare id.* at 494 ("Section 1983's intentional 'tort' of unconstitutional censorship and intentional interference with a contractual relationship are just two possibilities" of claims where the tort itself creates personal jurisdiction.), *with* FAC ¶¶ 434–73. That is, the EIP/VP generally—and Aspen, as a direct participant in its censorship operations—affected Louisiana residents' speech as well as the speech that Louisiana residents could receive, and so affected Louisiana.

---

[3] *See also, e.g.*, *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984) ("Where, as in this case, respondent … has continuously and deliberately exploited the New Hampshire market, it must reasonably anticipate being haled into court there in a libel action based on the contents of its magazine."); *Electronic Frontier Found. v. Global Equity Mgmt. (SA) Pty Ltd.*, 290 F. Supp. 3d 923, 939 (N.D. Cal. 2017); *Dietz v. Dietz*, 2009 WL 2707402, at *4 (W.D. La. Aug. 27, 2009); *Trask v. Peake*, 1992 WL 59389, at *1 (E.D. La. Mar. 17, 1992).

Aspen does not dispute the legal principle or that the contacts discussed above give rise to personal jurisdiction.  Rather, Aspen points (at 10–11) to *Walden* and cases from this circuit, *Danzinger* and *Sangha v. NAVIG8 Shipmanagement Private Ltd.*, 882 F.3d 96 (5th Cir. 2018), for the proposition that personal jurisdiction does not exist where the plaintiff is "the only link between the defendant and the forum."  *Walden*, 571 U.S. at 285.  But blanket denials do not obviate the allegations establishing that Aspen had a "direct role in the EIP/VP and the conduct challenged in this case."  FAC ¶ 41.  Aspen participated in strategy sessions that resulted in "plans to achieve … core censorship objectives of the EIP/VP," including the silencing of Hoft.  FAC ¶¶ 42, 43.  Aspen is intimately connected to EIP/VP leaders Starbird, Stamos, and DiResta, *see* FAC ¶¶ 39, 41–44, and they reported to a major Aspen funder regarding EIP/VP's censorship program, *see* FAC ¶ 44.  Aspen's Commission on Information Disorder worked with Stamos, Starbird, and DiResta "regarding EIP/VP's censorship operations."  FAC ¶ 44.  And its role in the EIP/VP is consistent with its history of working with government officials and private parties to censor speech, including on topics the EIP/VP police.  FAC ¶¶ 38, 40.

Those "allegations are not conclusory."  *FTC v. Educare Centre Servs., Inc.*, 414 F. Supp. 3d 960, 976 (W.D. Tex. 2019).  By leveraging the EIP/VP, and its intertwinement with governmental officials to censor speech, Aspen "projected [itself] across state lines and asserted a pseudo-national executive authority" and engaged in conduct that "gives rise to intentional tort causes of action" in Louisiana.  *Def. Distributed*, 971 F.3d at 493–94 (quotations omitted). " '[T]his alone constitutes purposeful availment.' "  *Id.* at 494 (quoting *Wien Air Alaska*, 195 F.3d at 213).  And on top of that, Aspen was involved in creating a "systematic" process that targeted Louisiana, involved communication with Louisiana officials, *see* FAC ¶¶ 375–78; FAC Ex. 1, at

10

9, 246, and intentionally caused harm in Louisiana by censoring speakers and by limiting speech that reached Louisiana audiences, *see* FAC ¶ 376.

To avoid the factual allegations linking Aspen to the EIP/VP, Aspen claims (at 12–14) improper group pleading. But Plaintiffs provide "factual material suggesting" Aspen sought to suppress speech in Louisiana, including Plaintiffs' speech, through its active role with the other Defendants in planning to censor disinformation, including by helping set up the EIP/VP. *Armstrong v. Ashley*, 60 F.4th 262, 274 (5th Cir. 2023). "The requirements of *International Shoe* … [are] met as to each defendant … ." *Rush v. Savchuk*, 444 U.S. 320, 332 (1980). Thus, Aspen shifts to arguing group pleading and intimating that conspiracy allegations do not establish personal jurisdiction over every co-conspirator. *See* Aspen MTD 13–14. But since "the parties' relationships with each other may be significant in evaluating their ties to the forum," *Rush*, 444 U.S. at 332, it follows that "[t]he existence of a conspiracy and acts of a co-conspirator within the forum may, in some cases, subject another co-conspirator to the forum's jurisdiction," *Melea Ltd. v. Jawer SA*, 511 F.3d 1060, 1069 (10th Cir. 2007) (citing *Lolavar v. de Santibanes*, 430 F.3d 221, 229 (4th Cir. 2005)). *See Allstate Life Insurance Co. v. Linter Group Ltd.*, 782 F. Supp. 215, 221 (S.D.N.Y. 1992) ("Many courts in this Circuit have asserted personal jurisdiction … pursuant to a conspiracy theory."); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 n.22 (1985) (noting "commercial activities … carried on in behalf of an out-of-state party … may be ascribed to the party") (quotations omitted). *Mississippi Interstate Express, Inc. v. Transpo, Inc.*, 681 F.2d 1003 (5th Cir. 1982), is illustrative. There, personal jurisdiction existed in Mississippi against two California defendants who conspired with another California defendant over a breached contract and a related tort. *See* 681 F.2d at 1004–05. The Fifth Circuit rejected arguments similar to Aspen's. The *Mississippi Interstate Express* defendants emphasized that:

> 1) the initial contract discussions were in California; 2) the defendants are all residents of California, and did not act inside Mississippi … ; 3) all shipments originated and terminated in states other than Mississippi; 4) the defendants have no office or place of business in Mississippi, nor have they ever sent representatives there; 5) they solicited no business in Mississippi and had no local advertising or bank accounts there; and 6) with regard to the tort alleged, all acts of the alleged conspirators occurred outside of Mississippi.

*Id.* at 1005.

As to the conspirators, the Fifth Circuit held that "the due process requirements of sufficient contact with Mississippi and foreseeable involvement with its law are met by the intentional acts of the non-resident defendants that caused a breach of a Mississippi-centered contract and resultant damage in Mississippi." *Id.* at 1012.  So also here.  By actively involving itself with the EIP/VP, Aspen actively involved itself in the EIP/VP's targeting of speech, including Hines's and Hoft's speech, and so disrupted Louisiana-centric speech and caused harm in Louisiana.

Aspen counters by calling (at 13–14) a descriptive passage in *Guidry v. United States Tobacco Co.*, 188 F.3d 619 (5th Cir. 1999), a holding.  In full, the cited passage says, "The district court did not determine whether the plaintiffs had made a prima facie case of specific personal jurisdiction over each tobacco trade association defendant based on a tort committed in the state, individually and not as part of a conspiracy, by each particular defendant." *Id.* at 625.  The court did not instruct district courts to ignore well-pleaded (as opposed to conclusory, *see Thomas v. Kadish*, 748 F.2d 276, 282 (5th Cir. 1984)) conspiracy allegations in assessing personal jurisdiction.  Rather, the court declined to address the issue.  *See id.* at 631.  But *Guidry* does say that detailed factual allegations of a conspiracy are "not required and [are] on the whole undesirable." *Id.* at 632 (quotations omitted).   The implication is that a properly pleaded conspiracy makes out a *prima facie* case of personal jurisdiction, or at least justifies permitting "the pleader … to resort to the discovery process and not be subjected to a dismissal of his complaint." *Id.* (quotations omitted).

The FAC properly pleads conspiracy.  Count One, for example, alleges a conspiracy.
Aspen does not argue the claim is conclusory—and cannot do so on reply, *see, e.g.*, *InPwr Inc. v.
Olson Restoration LLC*, 2022 WL 2286182, at *6 (W.D. La. June 23, 2022), or in general.  "[A]t
the motion to dismiss stage, courts often find that directly alleging a defendant committed a
wrongful act at issue is not conclusory for jurisdictional purposes."  *Educare Centre Servs.*, 414
F. Supp. 3d at 976.  The censorship scheme, and Aspen's role in it, are clearly alleged.  Thus, there
is a *prima facie* claim of personal jurisdiction that justifies further discovery.  *See id.* ("Plaintiffs
allege Souheil's individual leadership role in illegal activity that is specifically detailed across the
Complaint, not merely restating the ultimate legal conclusion of minimum contacts.").

Aspen shifts to arguing that because EIP/VP operated nationwide, its activities were "not
targeted uniquely at Louisiana."  Aspen MTD 11.  But Aspen acknowledges, without qualification,
that EIP/VP analysts engaged in "communications with government officials" in Louisiana, *id.* at
10 (citing FAC ¶¶ 280, 282); *see also* FAC ¶ 378, which is a factual basis for targeting.  Indeed,
admitting that the EIP/VP did not prioritize Louisiana over swing states, *see* Aspen MTD 11–12,
does not suggest non-targeting; prioritization suggests there was *some* focus on Louisiana and,
thus, some purposeful availment.  Nor does Aspen address the other allegations connecting the
EIP/VP's activities to Louisiana, their targeting of Hines and Hoft, and their "extensive, direct,
and purposeful campaign to interfere with speech by Louisiana speakers and to Louisiana
audiences, including both Jill Hines['s] and Jim Hoft's extensive audiences in Louisiana."  FAC
¶¶ 375–76; *see* FAC ¶¶ 375–89.  Purposeful availment does not mean exclusive availment.  Thus,
cases involving universally accessible websites, *see* Aspen MTD 13 (discussing *Johnson v.
TheHuffingtonPost.com, Inc.*, 21 F.4th 314 (5th Cir. 2021)), are irrelevant here.  Instead, this case
is like *Defense Distributed*, where the defendant "projected himself across state lines and asserted

a pseudo-national executive authority," 971 F.3d at 493, or *Mississippi Interstate Express*, where a contracting California defendant (not the co-conspirators discussed above) "engaged in extensive commercial activities throughout the United States," and so had "contacts with any single jurisdiction [that were] comparatively fleeting and slight," 681 F.2d at 1010.  Indeed, *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984), held that personal jurisdiction existed over the defendant in New Hampshire despite the fact that the defendant produced "a national publication aimed at a nationwide audience." *Id.* at 781.  "There is no unfairness in calling it to answer for the contents of that publication wherever a substantial number of copies are regularly sold and distributed." *Id.*  So too here.  There is no unfairness in requiring Aspen—or the other Defendants—to defend their nationwide censorship regime in a State where they actively implemented that regime.

Aspen does not dispute that the EIP/VP targeted Hoft, *see id.* at 12 n.6, and thus his audience, *see* FAC ¶ 386.  Aspen attempts to avoid the issue by saying Hoft "is not from Louisiana." *Id.* at 12 n.6.  But it is Aspen's intentional interference with Hoft's "relationships with" Louisiana residents—which are important to his business, *see* FAC ¶ 409—that creates the relevant contacts.  *See Cent. Freight Lines Inc. v. APA Transport Corp.*, 322 F.3d 376, 383–84 (5th Cir. 2003) ("[W]e find that CFL has pled facts that are sufficient to show that APA committed intentional torts that were purposefully directed at APA's contractual business relationship with another Texas entity.").  Moreover, a plaintiff need not "have 'minimum contacts' with the forum State" for due process.  *Keeton*, 465 U.S. at 779.

Aspen also improperly reads the FAC's allegations of the censorship of Hines.  That the EIP/VP, for example, targets the "type of content" that Hines posts, *see id.* at 11 (citing FAC ¶¶ 362, 364), suggests that Hines's speech is caught in the censorship web Aspen helped weave—

14

which is the inference that must be drawn at this point.  *See JMF Med., LLC v. Team Health, LLC*, 490 F. Supp. 3d 947, 953 (M.D. La. 2020) ("For the purposes of a motion to dismiss, the Court must accept the ... factual allegations as true and draw all reasonable inferences in favor of the plaintiff.").  And indeed, Hines alleges numerous instances of social-media censorship.  *See* FAC ¶¶ 375, 393–98.

**B.    The exercise of personal jurisdiction would be fair and reasonable.**

With minimum contacts in place, there is only Aspen's challenge to the fairness of maintaining this suit in Louisiana.  This is a high hill to climb.  "If a nonresident has minimum contacts with the forum, rarely will the exercise of jurisdiction over the nonresident not comport with traditional notions of fair play and substantial justice."  *Def. Distributed*, 971 F.3d at 496 (quotations omitted).  The relevant factors, *see* Aspen MTD 14, do not support Aspen.

In arguing burden, Aspen relies only on its geographic distance from Louisiana.  But Aspen is a highly sophisticated, well-resourced entity with elite counsel from major law firms that routinely engage in national practice across the country.  Occasional travel to Louisiana cannot be said to be more burdensome for them than travel anywhere else.  By contrast, there are significant Louisiana-based interests, not the least of which is the harm to Hines.  Aspen engaged in an "extensive, direct, and purposeful campaign to interfere with speech by Louisiana speakers and to Louisiana audiences," including—as to Hines—speech that implicated the political processes of the State.  FAC ¶¶ 376, 379.  Louisiana also has a fundamental policy favoring the freedom of speech within its borders, expressed in Article I, § 7 of its Constitution.  Those considerations are also relevant to the third factor, which is further bolstered by the relatively fewer resources that Plaintiffs, especially Hines, have compared to Aspen.  It would also be efficient to litigate this case in this forum, since this Court is already presiding over the related case, *Louisiana and Missouri, et al. v. Biden, et al.*, No. 3:22-cv-001213-TAD-KDM (W.D. La.).  In addition, Plaintiffs allege

15

violations of federal rights.  At core, all Aspen does is claim (at 15) that it has no connection with Louisiana.  The FAC says otherwise.

## III.    The Complaint Alleges Facts Establishing Hines' and Hoft's Standing.

### A.    Hines and Hoft have shown their injuries are traceable to Aspen's actions.

Aspen also claims (at 16–21) that Hines and Hoft have not established that their injuries are traceable to Aspen.  Because Aspen's attempt (at 16, 18) to distance itself from EIP/VP fails for the reasons already discussed, that leaves Aspen's argument that the EIP/VP "did not remove plaintiffs' content," and so the injuries here arose from the actions of third parties.  Aspen MTD 16.  As with personal jurisdiction, this argument is premised on a crabbed analysis of the FAC.  Aspen's claim (at 16–17) that governmental officials are independent third parties misses that "the EIP/VP was directly collaborating" with governmental officials.  FAC ¶ 153; *see also, e.g.*, FAC ¶¶ 1–2, 82–140, 417–19.  Indeed, the paragraphs that Aspen cites contain numerous allegations that the EIP/VP are "pervasively entwined" with governmental agencies, FAC ¶¶ 147, 149, and of "close collaboration," FAC ¶ 152.  Indeed, this Court has twice recognized that the EIP/VP are "completely intertwined" with the federal government.  *See Missouri v. Biden*, 680 F. Supp. 3d 630, 703–05 (W.D. La. 2023); *see also Kennedy v. Biden*, 2024 WL 3879510, at *6, *7 (W.D. La. Aug. 20, 2024).  And that factual determination has never been overruled.  *See Missouri v. Biden*, 83 F.4th 350, 396 (5th Cir. 2023) (rejecting extension of injunctive relief to EIP/VP entities on grounds unrelated to this Court's factual findings).[4]

---

[4] The Supreme Court reversed this Court's preliminary injunction ruling in *Missouri* only because of the absence of "standing to seek a preliminary injunction." *Murthy v. Missouri*, 144 S. Ct. 1972, 1981 (2024); *see id.* at 1985 n.3.  Thus, the Fifth Circuit's merits analysis affirming this Court's substantive reasoning is binding.  *See Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 856 n.2 (5th Cir. 2022).

Likewise for Aspen's claims (at 16–18) that social-media companies are independently responsible parties.  The FAC alleges that, through their close association with federal officials, Defendants, including Aspen, *coerce* the platforms to cooperate in their censorship regime.  FAC ¶ 2.  Aspen and the other Defendants, who are so closely cooperating with federal officials as to be "completely intertwined," benefit directly from the coercive pressure placed on platforms by federal officials to cooperate in such mass-censorship initiatives:  "In engaging in the conduct alleged herein in close cooperation with federal officials in agencies like CISA, the CDC, the Surgeon General's Office, and the White House, Defendants leveraged and benefited from the pressure and coercion that federal officials placed and place on social-media platforms to censor disfavored speakers and viewpoints."  FAC ¶ 417.  That includes Aspen, who, "in close cooperation with federal officials[,] … became deeply entangled in the content-moderation and policy-setting decisions of social-media platforms, along with the federal officials with whom they are intertwined."  FAC ¶ 419.  Indeed, one of the things that Aspen does is bring "together senior government officials and key private-sector individuals for government-private collaboration on issues like government-induced censorship."  FAC ¶ 38.  For example, Aspen held tabletop exercises and developed strategies to censor the Hunter Biden laptop story.  FAC ¶ 40.  Those "efforts … were orchestrated and coordinated with federal officials who pursued the same effort in the same time frame."  *Id.*  And because Aspen, the other Defendants, and federal officials are "completely intertwined" in social-media companies' moderation decisions, FAC ¶ 420, Aspen is responsible for those decisions.  Indeed, the Defendants are, "in effect, the *principal enforcers* of the platforms['] content-moderation policies."  FAC ¶ 5.

Aspen also disregards the other interests that Hines and Hoft seek to vindicate here.  "Hines and Hoft assert an interest in having their speech treated on an equal footing by the social-media

platforms, freed from the pressure, coercion, interference, involvement, and entanglement of Defendants' in the platforms' content-moderation decisions." FAC ¶ 416; Doc. 80, at 17–18. Aspen harms that interest by "bring[ing] together senior government officials and key private-sector individuals for government-private collaboration on issues like government-induced censorship," FAC ¶ 39, including to run exercises and develop strategy for suppressing speech on social media platforms like Facebook and Twitter, *see* FAC ¶ 40 (discussing Aspen's role in suppressing the Hunter Biden laptop story). Aspen also ignores the self-censorship harms that Hines and Hoft have experienced. *See id.* at 18–19 (summarizing the theory). And Aspen ignores that Hines's and Hoft's harms stem from the content policies social-media platforms adopted under the EIP/VP's coercive efforts as well as EIP/VP's flagging operations. *See, e.g.*, FAC ¶¶ 67–71, 257–70. Aspen had a role in that, too. Starbird's in-person meeting with Aspen, for example, references the creation of "policies that can be strictly enforced and creation of a negligence standard for high-visibility accounts." FAC ¶ 42. Lastly, Hines and Hoft allege injuries as audience members, as well as "a concrete, specific connection to" a censored speaker. *Murthy*, 144 S. Ct. at 1996. Hines points to Hoft, and both point to those "targeted by Defendants' censorship activities." FAC ¶¶ 402, 412. For purposes of pleading standing, this is enough to infer the necessary connection.

At core, Aspen does here what it did in arguing personal jurisdiction: ignore the allegations. For example, Aspen cites (at 17) paragraph 397—but paragraph 397 also alleges that Hines's Facebook pages "are under constant threat of being completely deplatformed, in large part due to Defendants' activities." Aspen also claims (at 17) that the FAC alleges VP ended operations in August 2021. But the FAC quotes the *VP Report* discussing Defendants' activity "from February to August 2021." FAC ¶ 281. It does not say VP is defunct or that Defendants are no longer

flagging speech.  Aspen also claims (at 17) that no one—itself included—"ever read a single one of [Hines's] posts or mentioned them to anyone," though it concedes the VP "flagged content like that of Hines."  *See also* FAC ¶¶ 362–64.  Targeting an entire category of speech is targeting all speech in that category.  Thus, a campaign to target speech like Hines, *see* FAC ¶¶ 370, 373–75, raises the inference that the campaign targeted Hines's speech.  Coupled with the fact that Hines was, indeed, censored, *see, e.g.*, FAC ¶ 394, the inference is compelling.  Regardless, the FAC alleges Aspen targeted Hines.  *See* FAC ¶¶ 375–77.  And Aspen's claim that Hoft was not targeted is unexplained and later undermined by Aspen's admission that he was targeted and that Starbird discussed demoting his site in a meeting with Aspen.  Aspen MTD 17.

In addition, the fact that its actions resulted in censorship of 35 percent of posts represents an astonishing success rate.  *But see* Aspen MTD 18.  "Left to their own devices, the social-media platforms engage in review and/or moderation of only a miniscule amount"—*i.e.*, near zero percent—"of … speech on their platforms."  FAC ¶ 5.  By contrast, when the EIP reported information, "platforms took action on 35% of" the flagged URLs, which represents millions of posts, FAC ¶¶ 179–81, but with significant variation between platforms, *see* FAC Ex. 1, at 40.  The success rate jumps when it comes to core political speech.  "More than 50% of URLs that contained premature claims or victory, or claims about the election being stolen, were actioned by platforms."  *Id.* at 41.  In sum, there is a significant jump in censorship that correlates with Defendants' involvement in flagging speech through the EIP/VP.  *See* FAC ¶ 181.  The correlation reinforces that Defendants are "in effect, the *principal* enforcers of platforms['] content-moderation policies."  FAC ¶ 5.  Moreover, the FAC alleges that Defendants' actions—including Aspen's—are ongoing.  *See* FAC ¶¶ 193–205.

"In the nebulous land of 'fairly traceable,' where causation means more than speculative but less than but-for, the allegation that a defendant's conduct was a motivating factor in the third party's injurious actions satisfies the requisite standard." *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 714 (6th Cir. 2015).  Defendants'—including Aspen's—success in censoring speech "raises a factual merits defense, not a response cognizable on a motion to dismiss where allegations … must be taken as true." *Gen. Land Office*, 71 F.4th at 273.  And even a "minor" effect on the social media companies' decisions does "not negate standing." *Texas v. United States*, 809 F.3d 134, 160 (5th Cir. 2015).

Aspen incorrectly attempts to import the standard for pleading entitlement "to relief" under Rule 8(a)(2) into the standard for pleading jurisdiction under Rule 8(a)(1).  *See* Aspen MTD 19 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).  "[T]he test for standing is not whether [Plaintiffs] met [the *Twombly/Iqbal*] pleading requirements, but rather whether they have demonstrated their injuries to be fairly traceable to the Agencies' actions."  *Parsons*, 801 F.3d at 715; *see also Huizenga v. Indep. Sch. Dist. No. 11*, 44 F.4th 806, 811 (8th Cir. 2022) (per curiam). " '[G]eneral factual allegations' suffice," *Dobbin Plantersville Water Supply Corp. v. Lake*, 108 F.4th 320, 327 n.4 (5th Cir. 2024) (quoting *Lujan*, 504 U.S. at 561), for they "embrace those specific facts that are necessary to support the claim," *Lujan*, 504 U.S. at 561 (quotations omitted). Thus, a reasonable inference that Hines and Hoft have standing is all that is necessary, *see, e.g.*, *Stallworth v. Bryant*, 936 F.3d 224, 230 (5th Cir. 2019), and what Hines and Hoft have provided is much more than that—for here they have provided allegations that Aspen was directly involved in censoring their, and others', speech on social-media platforms.

### B.    Aspen has a coercive and determinative effect on censorship.

Aspen next points to *Bennett v. Spear*, 520 U.S. 154 (1997), to argue (at 19–21) that traceability is lacking because Aspen did not have a coercive or determinative effect on censorship

decisions of social-media platforms.  Hines and Hoft have addressed *Bennett* before, *see* Doc. 80, at 24–27, and incorporate that analysis.  But far from supporting Aspen, *Inclusive Communities Project, Inc. v. Department of Treasury*, 946 F.3d 649 (5th Cir. 2019), underscores the futility of Aspen's position.  *Contra* Aspen MTD 19–20.  In discussing *Bennett*, the Fifth Circuit noted that the case involved "a motion to dismiss" where "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Inclusive Cmtys. Project*, 946 F.3d at 658 n.16 (quotations omitted).  Thus, in *Bennett*, "the Court was obligated to accept [the] allegation" that one agency "would abide by the restrictions imposed by" another. *Id.* (quotations omitted).  "[T]hat was enough at the pleadings stage to make" the challenged action "determinative" and so result in standing. *Id.* (quotations omitted).  Just so here.  The allegation that Aspen had a "direct role in the EIP/VP and the conduct challenged in the case," FAC ¶ 41, that is urging, pressuring, and coercing censorship, *see, e.g.*, FAC ¶ 2, likewise suffices, for it establishes their determinative role in the censorship at issue.

*Turaani v. Wray*, 988 F.3d 313 (6th Cir. 2021) (cited at Aspen MTD 20–21) did involve a Rule 12(b)(1) motion.  But the plaintiff there "never assert[ed] that [the defendant] commanded the gun dealer not to go through with the sale." *Id.* at 317.  As discussed above, Hines and Hoft have provided extensive allegations that Defendants played an active role in coercing and significantly encouraging social media companies to censor speech in cooperation with governmental allies, and that Aspen played an active role in that effort.  Here, there were threats of "adverse consequences from," *National Council of La Raza v. Mukasey*, 283 F. App'x 848, 852 (2d Cir. 2008) (cited at Aspen MTD 21), social media companies' refusal to accede to the demands

of Defendants and their governmental allies.  *See* FAC ¶¶ 2, 141–155, 316–19.  This is sufficient to allege standing.

### C.   *Murthy v. Missouri* **does not undermine Hines's and Hoft's standing.**

In discussing standing, Aspen's reply brief will likely focus on *Murthy*, but for the same reasons why it does not aid the other Defendants, it does not aid Aspen.  *See generally* Resp. Supp. Mem.  At core, *Murthy* is a narrow decision that is not dispositive here.  Key to the decision, for example, was that it arose in the context of a motion for a preliminary injunction, thus heightening the showing plaintiffs had to make, and involved an evidentiary record, thus barring plaintiffs' reliance "on mere allegations."  *Murthy*, 144 S. Ct. at 1986 (quotations omitted).  *Murthy* therefore did not address, and thus did not alter, the pleading standard for standing discussed above.  *See* Resp. Supp. Mem. 14–18.  As discussed above, the FAC alleges traceability under the pleading standard of Rule 8(a)(1), and thus there is standing.

Under any pleading standard, Plaintiffs have alleged standing.  Defendants are all involved in directing and coordinating the censorship activities of the EIP/VP.  *See, e.g.*, FAC ¶¶ 1–2, 20, 24, 26, 34, 41.  Aspen specifically "plays a strategic and/or coordinating role in the EIP/VP's censorship activities . . . ."  FAC ¶ 41.  Defendants are engaged in "the same, ongoing mass-surveillance and mass-censorship program" that was run under the aegis of EIP and VP.  FAC ¶ 2.  So while in *Murthy* "[d]ifferent groups of defendants communicated with different platforms, about different topics, at different times," 144 S. Ct. at 1988, here, there is unity in communication from Defendants to the coerced social-media platforms.  It was done via the EIP or VP, which created "channels for reporting 'misinformation' to platforms."  FAC ¶ 141; *see also* FAC ¶¶ 142–55, 266–70, 316–19.  So here, it is enough to plead even under *Murthy* that the EIP/VP—since that is the organ through which Defendants engage in censorship—will pressure "a particular platform to censor a particular topic . . . ."  *Kennedy*, 2024 WL 3879510, at *3 (discussing *Murthy*).

As alleged in the FAC, Defendants, through the EIP/VP, "directly collaborat[ed]" with government officials, FAC ¶ 153; *see also, e.g.*, FAC ¶¶ 1–2, 82–140, 417–19, and so became "pervasively entwined" with them, FAC ¶¶ 147, 149.  *See also Kennedy*, 2024 WL 3879510, at *6, *7; *Missouri*, 680 F. Supp. at 703–05.  That permitted Defendants to censor speech by issuing diktats via the EIP/VP.  *See* FAC ¶¶ 147–55, 317–19.  Defendants—to include Aspen—became, and continue to be, *see* FAC ¶¶ 193–205, "the *principal* enforcers of platforms['] content-moderation policies."  FAC ¶ 5.  Those platforms include Facebook and Instagram, Google and YouTube, Twitter, TikTok, Reddit, Nextdoor, Discord, Medium, and Pinterest, *see, e.g.*, FAC ¶¶ 143, 145, 255, 278, 290, 316, 319, which means Aspen's censorship cooperative applies to the social media platforms on which Hines and Hoft post: Facebook, Twitter, Instagram, and YouTube, FAC ¶¶ 394, 397, 399, 405–07.  In this, Defendants were successful.  As noted above, the posts that the EIP/VP flagged were much more likely to be censored than other social media posts.  *See supra* Argument § III.A.  That is more than enough to show Aspen "pressured particular platform[s] to censor a particular topic before the platforms suppressed" the speech.  *Kennedy*, 2024 WL 3879510, at *3.  And that is all *before* considering the allegations that specifically identify the evidence that Defendants targeted Hoft and Hines.  *See* Resp. Supp. Mem. 18–22.

At core, what Plaintiffs allege here tracks with what this Court found, factually, in *Missouri*.  *See* 680 F. Supp. 3d at 680–82, 685–88; *see also id.* at 704–05.  *Murthy* left those findings untouched.  That an order may be void for want of subject-matter jurisdiction, says nothing about facts found in the course of issuing that order that are incorporated into a separate complaint, which is the case here.  *See* Resp. Supp. Mem. at 9.

*Murthy* is also narrow in that it involves only prospective, preliminary relief.  But Hines and Hoft also seek monetary relief.  *See* FAC, at 101.  For that form of relief, "the traceability of

their past injuries [is] the whole ball game." *Murthy*, 144 S. Ct. at 1987.  As discussed above, the allegations in the FAC more than raise the inference that Defendants' actions resulted in at least some censorship of Hines and Hoft.  Indeed, *Murthy* admitted that "Hines has eked out a showing of traceability for" past censorship.  *Id.* at 1992.  And the Court pointed to the EIP as working with Twitter to censor Hoft.  *See id.* at 1990.  To be sure, the Court also said that the evidence there did "support the conclusion that Hoft's past injuries are likely traceable to the FBI or CISA."  *Id.*  But they do support that conclusion as to the EIP and its participants—Defendants here.  In any event, there is no such evidentiary record here, and so the Court's observation based on the record before it does not control the outcome of this case.  Indeed, if anything, it underscores the need for jurisdictional discovery here.

Finally, *Murthy* does not affect the viability of Hines's and Hoft's other theories of standing. *See* Resp. Supp. Mem. at 22–24.  By establishing traceability for their direct censorship harms, Plaintiffs have established standing for their self-censorship injury.  *See Murthy*, 144 S. Ct. at 1995 (linking the two).  As noted above, *see supra* Argument § III.A, Plaintiffs have standing as audience members under *Murthy*.  And Hines and Hoft are harmed by Defendants pushing certain content policies on social-media platforms, *see, e.g.*, FAC ¶¶ 67–73, 257–70, as well as "having their speech treated on an equal footing by the social-media platforms, freed from the pressure, coercion, interference, involvement, and entanglement of Defendants in the platforms' content-moderation decisions," FAC ¶ 416.  *Murthy* has nothing to say about those standing theories.

## IV.    Venue Is Appropriate in the Western District of Louisiana.

Because the Fifth Circuit's limited remand directed the Court to address only personal jurisdiction and subject-matter jurisdiction, *see Hines v. Stamos*, 2024 WL 3580618, at *10 (5th Cir. July 30, 2024), Aspen's venue arguments are not ripe for decision.  They are also meritless. Aspen merges this argument with its argument that "Plaintiffs fail to allege that Aspen engaged in

any conduct in this District," and so there is no personal jurisdiction. Aspen MTD 22. Thus, Aspen's venue argument fails for the same reason its attack on personal jurisdiction fails: Hines and Hoft have amply demonstrated Aspen's connection with Louisiana and this district. For venue, as with personal jurisdiction, Aspen attempts to argue that the only linkage to the district are the effects Plaintiffs felt while ignoring that "[i]n tort cases, courts consider both the place where the allegedly tortious actions occurred and the place where the harms were felt." *S. U.S. Trade Ass'n v. Unidentified Parties*, 2011 WL 2457859, at *13 (E.D. La. June 16, 2011). Here, as with personal jurisdiction, the effects of Aspen's censorious activities—and the activities of all Defendants, for that matter—connect them to the district just as they connect them to the forum for purposes of personal jurisdiction. *See Hawbecker v. Hall*, 88 F. Supp. 3d 723, 731 (S.D. Tex. 2015).

## CONCLUSION

For those reasons, the Court should deny the Aspen Institute's motion to dismiss.

25

Dated:  September 4, 2024                          Respectfully submitted,

| | |
|---|---|
| AMERICA FIRST LEGAL<br><br>*/s/ Gene P. Hamilton*<br>Gene P. Hamilton, GA Bar No. 516201*<br>Reed D. Rubinstein, DC Bar No. 400153*<br>Nicholas R. Barry, TN Bar No. 031963*<br>Michael Ding, DC Bar No. 1027252*<br>Juli Z. Haller, DC Bar No. 466921*<br>James K. Rogers, AZ Bar No. 027287*<br>Andrew J. Block, VA Bar No. 91537*<br>611 Pennsylvania Ave SE #231<br>Washington, DC 20003<br>(202) 964-3721<br>gene.hamilton@aflegal.org<br>reed.rubinstein@aflegal.org<br>nicholas.bary@aflegal.org<br>juli.haller@aflegal.org<br>james.rogers@aflegal.org<br>andrew.block@aflegal.org | JAMES OTIS LAW GROUP, LLC<br><br>*/s/ D. John Sauer*<br>D. John Sauer, Mo. Bar No. 58721*<br>Justin D. Smith, Mo. Bar No. 63253*<br>13321 North Outer Forty Road, Suite 300<br>St. Louis, Missouri 63017<br>(314) 562-0031<br>John.Sauer@james-otis.com<br><br>* admitted *pro hac vice*<br><br><br>LANGLEY & PARKS, LLC<br><br>By:  */s/ Julianna P. Parks*<br>Julianna P. Parks, Bar Roll No. 30658<br>4444 Viking Drive, Suite100<br>Bossier City, Louisiana 71111<br>(318) 383-6422 Telephone<br>(318) 383-6405 Telefax<br>jparks@langleyparks.com |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on September 4, 2024, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

<i><u>/s/ D. John Sauer</u></i>